**CLAIMS FOR RELIEF**

**CLAIM 1:      PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BECAUSE COUNSEL**

---

Superintendent, 171 F.3d 877, 889-90 (3d Cir. 1999) (en banc) (claims evaluated under the "unreasonable application" clause are reviewed to determine "whether the state court's application of Supreme Court precedent was objectively unreasonable").  See Hull v. Kyler, 190 F.3d 88 (3d Cir. 1999) (finding state court decision on Strickland claim to be an unreasonable application of Strickland and granting habeas relief under AEDPA).

**WAS INEFFECTIVE AT THE GUILT AND PENALTY PHASES FOR FAILING TO SECURE AN ADEQUATE MENTAL HEALTH EVALUATION AND FOR FAILING TO DISCOVER AND PRESENT THE EVIDENCE OF MR. BREAKIRON'S IMPAIRMENTS TO THE JURY IN SUPPORT OF HIS INTOXICATION/DIMINISHED CAPACITY DEFENSE IN THE GUILT PHASE AND IN THE PENALTY PHASE.**[17]

The Pennsylvania Supreme Court found that trial counsel was ineffective for failing to have Mr. Breakiron properly evaluated by a mental health expert in accordance with state law. Indeed, as we will see below, Mr. Breakiron was sequentially represented by four different lawyers, each of whom apparently expected the work to be done by someone else. As a result, the rudimentary steps necessary to represent a capital defendant were not undertaken.

Had these steps been taken, the jury would have learned that Mark Breakiron has long suffered from serious mental problems which include Alcohol Dependence, Drug Dependence, Intermittent Explosive Disorder, and the effects of a traumatic childhood. His alcohol dependence and abuse dates back to his childhood and includes a history of blackouts. These impairments were highly relevant: 1) in the guilt phase to support the intoxication/diminished capacity defense that was offered at trial and; 2) in the penalty phase to prove mitigating circumstances and to rebut the aggravating circumstance of torture.

The jury, however, never heard about Mark's impairments and the way in which they affect him because counsel: (1) failed to have Mr. Breakiron properly evaluated by a mental health expert and (2) failed to adequately investigate Mr. Breakiron's history of alcohol dependence, family dysfunction, and mental illness. As a result of counsel's erroneous understanding of the law, and

---

[17]This Claim was presented to the Pennsylvania Supreme Court in Breakiron-2. The Pennsylvania Supreme Court ruled on the merits of the Claim. As explained infra, the Pennsylvania Supreme Court applied the wrong standard of prejudice under Strickland v. Washington and Williams v. Taylor so that the decision was "contrary to law."

a flawed investigation, trial counsel presented a fraction of the available evidence to support the intoxication/diminished capacity defense in the guilt phase and to prove the overwhelming mitigating circumstances which actually exist.[18]  Counsel was constitutionally ineffective in both the guilt and penalty phase.

     A.     **Trial Counsel's Investigation and Preparation For Mr. Breakiron's Capital Trial and Sentencing Was Constitutionally Deficient.**

Counsel's investigation and preparation for capital sentencing was woefully deficient. Four separate attorneys sequentially represented Petitioner in the eight months prior to trial.  During that period, one left for private practice.  Two of the four attorneys withdrew from the case in order to join the Fayette County District Attorney's Office.  The last attorney discovered that he would be trying the case by himself just weeks before trial after believing that the other attorney would be taking the primary role on the case.  Trial counsel's request for a continuance for more time to prepare was denied and he was left holding the bag on an ill-prepared case.  Each of Mr. Breakiron's attorneys expected the case preparation to occur later – and to be done by someone else.  As a result, no one ensured that Mark received an appropriate mental health evaluation, obtained Mark's extensive records, or investigated his background.  The attorney that remained--- trial counsel -- was left holding the bag for his predecessors' failure to prepare for trial.  By his own admission, with the trial to occur in just weeks, he had Mark only once before.  Not surprisingly, the Pennsylvania Supreme Court concluded that trial counsel "mishandle[d]" the mental health aspects of the case and found that trial counsel performed deficiently.  Breakiron-1, 729 A.2d at 1099 (1999).  Indeed, the fundamental prerequisites of competent capital representation were not met.

---

[18]The jury found no mitigating circumstances existed.  Accordingly, they were required to sentence him to death if they found an aggravating circumstance.

### 1.    The Legal Standards Applicable to Representation in a Capital Case.

The duty to investigate is fundamental to counsel's role as an advocate.  Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process."  Strickland v. Washington, 466 U.S. 668, 688 (1984).  This can be done only if counsel investigates, id. at 691 -- "counsel must investigate all apparently substantial defenses available to the defendant."[19]

The United States Supreme Court reiterated the necessity of investigation in the context of a capital case in Williams v. Taylor, 529 U.S. at 396.   Trial counsel has an "obligation to conduct a thorough investigation of the defendant's background" in capital cases.  Williams, 529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary at 4-55. (2d ed. 1980).   As Chief Judge Smith recently explained:

> The lawyer has a substantial and important role to perform in raising mitigating factors ... to the court at sentencing.  This cannot effectively be done on the basis of broad general emotional appeals or on the strength of the statements made to the lawyer by the defendant.  Information concerning the defendant's background, education, employment record, mental and emotional stability, family relationships, and the like, will be relevant, as will mitigating circumstances surrounding the commission of the offense itself.  Investigation is essential in the fulfillment of these functions.  Such information ... will be relevant at trial and at sentencing.

---

[19] United States v. Williams, 615 F.2d 585, 594 (3d Cir. 1980) (quoting Beasely v. United States, 491 F.2d 687, 696 (6th Cir. 1974)); see also United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) ("[A]t a minimum, counsel has the duty to interview potential witnesses and to make an independent investigation of the facts and circumstances of the case." (quoting Nealy v. Cabana, 764 F.2d 1173, 1177 (5th Cir. 1985)); United States v. Gray, 878 F.2d 702, 711-12 (3d Cir. 1989) (counsel "must investigate a case in order to provide minimally competent professional representation" (quoting Crisp v. Duckworth, 743 F.2d 580, 583 (7th Cir. 1984))); United States v. Baynes, 622 F.2d 66, 69 (3d Cir. 1980) ("Defense counsel is under an ethical obligation 'to conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to guilt and to a degree of guilt or penalty.'" (quoting A.B.A. Project on Standards for Criminal Justice, Standards Relating to the Prosecution Function and the Defense Function, § 4.1 (tent. draft 1970))).

Pursell v. Horn, at *97 n. 58, quoting 1 ABA Standards for Criminal Justice 4-4.1, commentary at 4-55, cited with approval in Williams.

The American Bar Association also published Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases. (1989). The Guidelines also emphasize the importance of investigation and require that the investigation "begin immediately upon counsel's entry into the case and should be pursued expeditiously." Guideline § 11.4.1. Counsel should immediately "collect information relevant to the sentencing phase of trial including, but not limited to: medical history, (mental and physical illness or injury of alcohol and drug use)...." Guideline 11.4.1.2. Moreover, counsel should secure the assistance of experts where it is necessary or appropriate for:

A.    preparation of the defense;

B.    adequate understanding of the prosecution's case;

C.    rebuttal of any portion of the prosecution's case at the guilt/innocence phase or the sentencing phase of the trial;

D.    presentation of mitigation. Experts assisting in investigation and other preparation of the defense should be independent and their work product should be confidential to the extent allowed by law. Counsel and support staff should use all available avenues including signed releases... to obtain all necessary information.

Guideline 11.4.1.7.

Trial counsel in this case failed to investigate and prepare.

**2.    The Lack of Preparation and Investigation.**

**a.    Mr. Kristobek and Mr. Lepore Fail to Investigate or Prepare for Trial**

Petitioner's mental problems were obvious to defense counsel from the start. Prior to his

34

arrest, Mr. Breakiron contacted the Fayette County Public Defender to discuss his involvement in

the homicide.  Mr. Breakiron was interviewed by Chief Public Defender Alphonse Lepore, Jr, who

was familiar with Mark's problems,[20] and assistant public defender Ronald Kristobek.  When

Petitioner was formally charged, the public defender's office was appointed to represent him and Mr.

Lepore assigned Mr. Kristobek to represent Mr. Breakiron.  Counsel knew that even prior to

Petitioner's arrest on the murder charges, he had been arrested shortly after the killing for public

drunkenness and, because of his threats to commit suicide, was sent to the Fayette County Mental

Health Center for an evaluation.[21]

---

[20]Mr. Lepore had represented Mark on earlier charges.

[21]The intake form for that evaluation revealed the following evidence of Mark's
psychiatric and alcohol problems:

The client's judgment appeared to be questionable.

The client was referred by Fayette County Prison Officials and has a prior record
for psychiatric treatment.

Patient expressed suicidal ideations to arresting officers and he had a double
edged razor blade in his shoe that prompted prison officials to ask for an
evaluation.

He has a number of personal problems including family feuds, financial difficulties and
inability to maintain a job or friends.

The patient has had problems with drugs in 1983 and continues at this time to have
problems with alcohol.  Specifically, he admits to having blackouts and tolerance with
alcohol but no indication of withdrawal symptoms.  A lot of his arrests stem from alcohol
and intoxication, including a demonstration of poor judgment, impulsivity and
explosiveness.

The patient was seen by a psychiatrist when he was 13 years old.

The patient says specifically that he has difficulty controlling his temper and reports that
when he gets into jail "I go crazy during the first couple of days"

Although it was his judgment that a mental health defense was one of the only possible defenses to pursue, NT at 7/17/97 AM at 65, Mr. Kristobek failed to obtain any background records or materials. When asked about his preparation for the case, Mr. Kristobek justified his lack of preparation and investigation by indicating that he considered his involvement in the case "rather limited":

> Q:    Okay.   But did you take in any further, you never investigated the background?
>
> A:    I am sorry, once again, I had the case for about three months, I consider my role rather limited.  I am sure there were other issues as to intoxication, but I think that is an issue for trial.  As to whether I would have addressed that at the preliminary stages, I don't believe that I followed up any further other than getting the general information.

NT PCRA 7/17/97 AM at 31.   Compare Guideline for Appointment and Performance of Counsel in Capital Cases § 11.4.1 (investigation into should begin immediately upon counsel's entry into case).

Mr. Kristobek knew that Mr. Breakiron had mental problems and knew that the defendant's mental condition was likely to be a critical issue at trial.  Instead of investigating his background or obtaining a defense mental health expert, defense counsel acquiesced in the appointment of a court expert who informed Mr. Breakiron that anything he said would be used against him and only evaluated Mr. Breakiron for his competency to stand trial and whether or not he was insane.   See Order of Capuzzi, J., 5/4/87.  Defense counsel did not ask the court-appointed expert to evaluate Mr.

_____

Reports attempted suicide when he was 8 or 9-years old.

Fayette County Mental Health Center  Readmission Intake, 3/27/87.   None of Mr. Breakiron's counsel ever obtained this report.

Breakiron for either diminished capacity or mitigation.

   **b.     Jack Heneks and Richard Bower Fail to Investigate or Prepare
            for Trial**

Before being provided with Dr. Adamski's report on competency and sanity, Mr. Kristobek

resigned the public defender's office, and withdrew from the case. Jack Heneks and Richard Bower

entered their appearance in the case on August 17, 1987. From the start, Mr. Heneks, who took the

lead counsel role, admitted that he thought he might be joining the Fayette County District

Attorney's Office throughout his representation of Mr. Breakiron:

> Q:     And initially, when – I believe that when you initially entered your
>        appearance, you did not anticipate at that point that you would be leaving the
>        Public Defender's Office, or did you?
>
> A:     Not specifically, but there was that possibility, because Mr. Lepore had run,
>        there was a vacancy, he had lost the primary election, and there was a
>        vacancy as a result of Mr. Wagner, at that time, being appointed. So, there
>        was a possibility of there being a vacancy in the District Attorney's Office.
>        Mr. Lepore was a candidate for that vacancy.

NT 7/18/97 PM at 9. Mr. Heneks did little for Mr. Breakiron. While Dr. Adamski's report did not

address either mitigation or voluntary intoxication, the report contained numerous red flags that

should have alerted competent counsel as to the existence of mental health issues that could and

should have been explored for both an intoxication defense and mitigation including:

> "Mr. Breakiron suffers from long-standing alcohol problems as manifested by his
> symptoms of tolerance to alcohol as well as blackout episodes."
>
> "he []appear[ed] mildly dysphoric"
>
> "From his history he also appears to have had long-standing problems of episodic
> dyscontrol which is manifested by blowing-up out of proportion to a provoking
> incident, having poor impulse control and alienating friends and family. This ...
> reflects a disorder of personality or an inability to deal with stress."

"Patient was seen by a psychiatrist when he was 13 years old."

"attempted suicide when he was 8 or 9 years old."

Adamski report of 8/27/87.

At this point, defense counsel knew (if he either read Dr. Adamski's report or conferred with prior counsel) that his client had: (a) a history of alcohol problems; (b) a history of "blackout episodes;" (c) long-standing problems of "episodic dyscontrol;" (d) a history of suicide attempts. Counsel also knew that Dr. Adamski opined that Mr. Breakiron was competent and not insane but that the evaluation had not covered mitigation or a diminished capacity defense.

Competent counsel would have a) had Mr. Breakiron evaluated for mitigation and diminished capacity; b) obtained the records about Mr. Breakiron's past mental health problems; c) thoroughly investigated Mr. Breakiron's background. Counsel did none of these things. Ignorant of Petitioner's right to a defense mental health expert, counsel never obtained one. Apparently ignorant of the difference between the legal standards for competency and diminished capacity or mitigation, counsel never explored whether he might develop evidence from a mental health expert in support of diminished capacity or mitigation. Instead, he ruled out using a mental health expert because Dr. Adamski concluded that Mr. Breakiron was not insane and that he was competent at the time of trial. NT PCRA PM 7/18/97 at 7.

Nor did counsel conduct the appropriate background interviews or make any effort to obtain records or develop mitigation, despite his knowledge of Mark's problems and that it was a death penalty case. NT PCRA 7/18/97 PM at 9 (interviewing only his mother and some other relative).

> Q:    Were you aware of Mark's prior problems with drug and alcohol or his
>        mental problems?

A:    We had talked about that, that is Mr. Breakiron and I talked about that. I was
      aware in general term about some of those issues, yes.

Q:    Were you aware that he had been an inpatient at Mayview in 1984?

A:    I am not sure that I was aware – I don't have any present recollection of being
      aware of that. I may have been aware of that at that time.

Q:    And, the same would apply to Centerville Clinic and the Gateway Rehab,
      when he was there, and he would have been treated in those facilities?

A:    I think my answer would be the same to that.

Q:    Did you personally, during your representation of Mr. Breakiron, ever request
      any records, or subpoena any records from these facilities?

A:    Not that I am aware of.

NT PCRA 7/18/97 at 10-11.

Q:    [W]hat other investigation did you do in preparation of this case for trial?

A:    I researched the newspaper issues... We also, as I said talked to some of the
      witnesses, and that is basically what my involvement was at that time.

NT PCRA 7/18/97 at 9.  Compare to Williams, 529 U.S. at 396 (defense counsel has "obligation

to conduct a thorough investigation of defendant's background."); Death Penalty Guidelines § 11.4.1

(Investigation should "begin immediately upon counsel's entry into the case and be pursued

expeditiously").

### c.    No Defense Strategy.

Mr. Heneks, indicated that as of his departure for the Fayette County District Attorney's

Office, two months before the trial (which began the first week of April), they had not even

formulated a defense strategy:

Q:    During the time that you represented him in those months, did you ever
      discuss any defense, what defense would be used at trial with Mark

39

Breakiron?

A:    I believe that we had some general discussion, but we had not even advanced past the pretrial stage at that point. So, when I left in January, we had still not had a decision on the pretrial. I believe that that came a couple of weeks after January of '88. So, we did not have an occasion to go into a full blown strategy, as far as a defense. As I said, the trial was still going to be some months away. There was some general discussions, but as far as formulating a precise defense at that point, no, we didn't do that.

NT 7/18/97 PM at 11. With a capital murder trial two months away, the defense had not yet

identified a strategy.

Nor had the defense considered using a mental health expert:

Q:    Given Mark Breakiron's past history of alcohol use...., did you petition or consider petitioning the court for an expert that would review the case for the effects of alcohol on this particular defendant?

                                        ***

A:    Did I consider using a – not an expert per se, no, I don't think we reached that stage.

NT 7/18/97 PM at 15.

### d.    Trial counsel, Mr. Bower, inherits an Unprepared Case

Mr. Heneks entered his motion to withdraw on January 13, 1988, leaving Mr. Bower as sole

counsel for Mr. Breakiron. Court documents filed at the time of trial make it clear that until Mr.

Heneks departed, Mr. Bowers had little involvement with the case. As of February 29th, 1988, one

month before trial, Mr. Bower had met with Mr. Breakiron only three times, twice on the week

before, and admitted that "Mr. Heneks ... had handled most of the case until his resignation." NT

Continuance Proceedings 2/29/88 at 4.[22] Jury selection began on April 4, 1988. As of five weeks

_____

[22]At the PCRA proceedings, Mr. Bower initially testified that he met with Mr. Breakiron on "numerous" occasions prior to Mr. Heneks departure for the district attorney's office. After

before trial, Mr. Bower had met with Mark once and indicated that Mr. Heneks had handled most of the case.

> Your Honor, as I said in Motions Court in Monday [February 29, 1988], I had talked to Mr. Breakiron at the present time now four times, since I talked with him yesterday. Mr. Heneks and Mr. Kristobek had communicated with him on all of the other occasions.

NT Continuance Proceedings 3/2/88 at 6-7. As noted above, Mr. Heneks had indicated in his testimony that at the time of his departure at the end of January to the Fayette County District Attorney's Office, they had not formulated a defense strategy. NT 7/18/97 PM at 11.

Not surprisingly, counsel sought a continuance, at least until May in order to prepare the case. NT 2/29/88 (Continuance Proceedings) at 2. The continuance was denied.[23] Mr. Bower was left holding the bag on a woefully ill-prepared case. No mental health evidence had been prepared. No records had been sought or obtained. Only Mr. Breakiron's mother had been interviewed. Trial counsel did not even know that his client had a history of blackouts.

Trial counsel did little to remedy the failures of his predecessors. Counsel apparently believed that since Dr. Adamski found Mr. Breakiron competent and not insane there were no mental health issues in the case and no need to have Mr. Breakiron evaluated. NT PCRA 7/17/97 at 26 (counsel testifying that second evaluation was unnecessary since Dr. Adamski found that Mr. Breakiron was competent and sane).

Nevertheless, at his client's request, he requested another evaluation. Again, counsel did

---

being confronted by the statements that he had made in the continuance proceedings, he admitted that by "numerous" he meant "three." NT 7/17/97 P.M. at 18.

    [23]The continuance was denied apparently because of backlogs in the Court's docket. See NT 3/2/88 Continuance Proceedings at 8-9.

not request a defense expert, a confidential evaluation, or ask that his client be evaluated for diminished capacity or mitigation. Dr. Reich was appointed for the evaluation. Petitioner was again informed that this report was not confidential, either, and chose, therefore, not to speak with the examiner. Breakiron-2, 729 A.2d at 1098. In its entirety, Dr. Reich's report stated: "Mark David Breakiron was evaluated and the chart reviewed on March 3, 1988. At this time Mr. Breakiron was found to be competent to stand trial and assist counsel with his defense. He is able to consult with a lawyer and has a rational understanding of the charges against him." Report of Dr. Reich, 3/3/88.

Counsel was fundamentally confused about the defendant's right to an appropriate mental health examination:

> Q:    Did you tell Mark that he had the right to have a private psychiatrist evaluate him if he disagreed with the result of the court-appointed psychiatrist from the county?
>
> A:    If he could afford to hire one, he could have gotten one.
>
> Q:    If he could afford to hire one?
>
> A:    Is that what you are talking about? If he didn't like the one that was there, he could have gone and gotten a private psychiatrist? Or, if I could have petitioned the court or something like that?

NT PCRA 7/17/97 PM at 35; see also NT PCRA 7/18/97 AM at 24 (Trial counsel admitting: "I don't think we really ever discussed having psychological testing done.... None of that was ever discussed.") As the Pennsylvania Supreme Court correctly concluded, counsel "mishandled" the mental health aspects of the case.

Nor did counsel attempt to take advantage of what little time remained to investigate any mental health issues:

> Q:    During your representation, did you subpoena or secure any school records?

A:    I don't believe so.

Q:    Besides psychiatric – the petition for psychiatric evaluation, did you ever petition for a psychological examination for the purpose of psychological tests being done on Mark Breakiron?

A:    No.

Q:    Did you review any psychological testing that may have been done prior to the crime?

A:    No.

Q:    Did you ascertain Mark Breakiron's IQ level?

A:    Do you mean, did I have him tested for it, or did I—

Q:    No, no, no.  Did you review any records that may have indicated his IQ level prior to March, 1987?

A:    No.

NT PCRA 7/17/97 PM at 23. See also id. at 29-30 (counsel admits not seeking or reviewing any other medical records of Mr. Breakiron or asking Mr. Breakiron about them); id. at 32-33 (counsel admitted he doesn't "have any idea" if Dr. Adamski reviewed any records of Mr. Breakiron).

    **e.**    **The Trial and the Penalty Phase.**

At trial, the only evidence to support the diminished capacity defense offered was the testimony of Mr. Breakiron that he had been drinking and could not remember exactly what happened.  NT at 1253-56.  Obviously relevant evidence that he had also consumed other drugs on the night of the offense was excluded without objection from defense counsel. NT at 1239.  No mental health testimony was offered to support Mr. Breakiron's account.  No description of what a blackout consists of was offered.  None of the available records to corroborate Mr. Breakiron's history of blackouts were offered.  Indeed, trial counsel admitted at the PCRA hearing that he did

43

not even know that Mr. Breakiron suffered a history of blackouts.   NT PCRA 7/17/97 PM at 22.

Similarly, at penalty phase, counsel offered no mental health expert, provided no evidence about Mr. Breakiron's intoxication the night in question.  Nor did he call any mental health expert to discuss his well-documented mental illness, his history of blackouts, explained that alcoholism was a disease or explored his traumatic upbringing.   Instead, he presented the testimony of his mother, his minister and Mr. Breakiron himself.  Unprepared by his attorney, Mr. Breakiron stated simply, "I like to drink."

### 3.    Counsel Performed Deficiently

As explained above, none of Mr. Breakiron's four attorneys satisfied their "obligation to conduct a thorough investigation of the defendant's background."  Williams v. Taylor, 529 U.S. at 396.

#### a.    It was Unreasonable to Rely upon Dr. Adamski's Report in lieu of a defense mental health evaluation.

Counsel's reliance on Dr. Adamski's report was unreasonable because it was not confidential and it was not directed at the issues relevant to Mr. Breakiron's trial and sentencing: diminished capacity and mitigating circumstances.

##### 1.    The Evaluation was Not Confidential

Dr. Adamski performed the evaluation as the court's expert and produced a report evaluating Mr. Breakiron's competency and sanity.  Dr. Adamski was not appointed to be a defense expert.[24] At the evaluation, Dr. Adamski first warned Petitioner  that anything he said could be used against

---

[24]Petitioner would have absolutely entitled to the appointment of a defense expert if he had requested one.  Ake v. Oklahoma, 470 U.S. 68 (1985); Szuchon v. Horn, 273 F.3d 299, 318 (2001) ("Under Ake, evaluation by a 'neutral' court psychiatrist does not satisfy due process.")

44

him at trial. <u>Breakiron-2</u>, 729 A.2d at 1098.  Because he did not want to waive his Fifth Amendment privileges, Mr. Breakiron never told Dr. Adamski about his alcohol and drug use on the night of the offense,  NT PCRA 9/29/97 at 76, although  Mr. Breakiron's state of mind on the night of the incident was obviously the critical issue at trial.  Thus, the evaluation was done without <u>any</u> confidentiality and was performed as much for the court and the prosecution as for the defense.

Counsel was ineffective for failing to obtain the defense expert to which he was entitled.

Due process requires that an indigent defendant, especially in a capital case, be provided with the "basic tools of an adequate defense," <u>Britt v. North Carolina</u>, 404 U.S. 266, 277 (1971), including "access to the psychiatric examination and assistance necessary to prepare an effective defense," <u>Ake v. Oklahoma</u>, 470 U.S. 68, 70 (1985).  Such "basic tools" for "an effective defense" were not utilized by counsel in this case.

In <u>Ake</u>, the Supreme Court recognized that there are profound, constitutionally significant differences between an "independent" mental health evaluation performed for the court and the prosecution as well as the defense, and the assistance of a <u>defense</u> expert.  Because "[p]sychiatry is not ... an exact science, and psychiatrists disagree widely and frequently" in their answers to the questions posed by any case, the finder of fact "must resolve differences in opinion within the psychiatric profession <u>on the basis of the evidence offered by each party</u>."  <u>Ake</u>, 470 U.S. at 81.

In other words, "[c]onsistent with the adversarial nature of the fact-finding process and the quasi-scientific nature of psychiatric opinion, the <u>Ake</u> court explicitly rejected the notion ... that there is such a thing as '<u>neutral</u>' psychiatric testimony."  <u>Smith v. McCormick</u>, 914 F.2d 1153, 1157 (9th Cir. 1990).  Thus, "under <u>Ake</u>, evaluation by a 'neutral' court psychiatrist does not satisfy due

45

process." Szuchon v. Horn, 273 F.3d 299, 318 (2001).[25]  Instead, an expert must be appointed to assist the defense – "[t]he right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate." Id. at 1157.[26]

As the Third Circuit has explained, counsel cannot effectively prepare and utilize expert mental health assistance unless the defendant is "as free to communicate with a psychiatric expert as with the attorney he is assisting." United States v. Alvarez, 519 F.2d 1036, 1046 (3d Cir. 1975); accord Smith, 914 F.2d at 1159-60 (quoting Alvarez).  When, as here, there is no confidentiality because the expert is reporting to the prosecution and the court, the lack of confidentiality has "the inevitable effect of depriving defendants of the effective assistance of counsel." Alvarez, 519 F.2d at 1046; Smith, 914 F.2d at 1160; see also Christy v. Horn, 28 F.Supp.2d 307, 321 (W.D. Pa. 1998) ("A defendant is denied the essential benefits of an expert when the services of the doctor must be shared with the prosecution.").  These confidentiality protections were absent in Dr. Adamski's evaluation. The results are apparent where Mr. Breakiron refused to discuss the facts of the case with Dr. Adamski.

Given the circumstances, Mr. Breakiron's lack of trust was wholly appropriate – he was

---

[25] Accord Starr v. Lockhart, 23 F.3d 1280, 1290 (8th Cir. 1994) (under Ake due process is not satisfied by an "examin[ation] by neutral psychiatrists"); Bright v. State, 265 Ga. 265, 455 S.E.2d 37, 46 (1995) ("Ake counsels that the appointment of neutral psychiatrists whom either the state or the defense may question does not satisfy the requirements of due process."); Rey v. State, 897 S.W.2d 333, 342-43 (Tex. Cr. App. 1995) (en banc) (under Ake, "'neutral' experts are insufficient to satisfy due process in our adversarial system"); see also Marshall v. United States, 423 F.2d 1315, 1319 (10th Cir. 1970) (expert who shares "a duty to the accused and a duty to the public interest" is burdened by "an inescapable conflict of interest").

[26] Accord Liles v. Saffle, 945 F.2d 333, 340 (10th Cir. 1991); Cowley v. Strickland, 929 F.2d 640, 644 (11th Cir. 1991); Christy v. Horn, 28 F.Supp.2d 307, 321 (W.D. Pa. 1998).

talking to an agent of the court and the state, not a member of the defense team. Dr. Adamski's role as servant of the court and the prosecution prevented the defense from obtaining the appropriate evaluation. Counsel was ineffective for failing to obtain the confidential evaluation of Mr. Breakiron to which he was constitutionally entitled.

### 2. The Evaluation was not Directed to the Issues Relevant at Trial and Sentencing: Diminished Capacity and Mitigation

Even if the defense were not constitutionally entitled to a confidential psychiatrist, Dr. Adamski's evaluation was inadequate because it was not directed at the issues at trial: petitioner's diminished capacity, intoxication, and mitigation. Dr. Adamski's evaluation was limited to the questions of whether Petitioner understood the proceedings; if he could cooperate with counsel; and if he was insane at the time of the offense. Thus, any possible of Dr. Adamski's evaluation was further gutted by its narrow scope.

The effects of this narrow focus are apparent on the face of the report. For example, Dr. Adamski notes that Petitioner suffers from "long-standing alcohol problems as manifested by his symptoms of tolerance to alcohol as well as blackout episodes." Such information and evidence would be highly relevant to the intoxication/diminished capacity defense offered at trial and to the (e)(2), (e)(3), and (e)(8) mitigating circumstances.[27] Nevertheless, it was not explored by Dr. Adamski or counsel. Similarly, the report notes that Mr. Breakiron suffers from "long-standing problems of episodic dyscontrol," and impulsivity problems -- factors that would be relevant to

---

[27]The Pennsylvania Death Penalty Statute, 42 Pa. C.S. § 9711 (e) reads as follows: Mitigating circumstances shall include the following: (2) The defendant was under the influence of extreme mental or emotional disturbance... (3) The capacity of the defendant to... conform his conduct to the requirements of law was substantially impaired... (8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense." The jury in this case found no mitigating circumstances.

whether he had the specific intent to kill necessary for first degree murder and the (e)(2) ("mental or emotional disturbance"), (e)(3) ("capacity to conform") , and (e)(8) (catch-all) mitigating circumstances. Dr. Adamski did not explore these factors, however, because he was appointed only to determine Mr. Breakiron's competency, and whether or not he was legally insane.

Ake makes it clear that a general competency examination is not constitutionally adequate. Ake, 470 U.S. at 1090-91 (Ake had been examined for competency at the time of trial but not for diminished capacity or mitigating circumstances). "As Ake explains, due process requires access to an expert who will conduct, not just any, but an appropriate examination. We find that [Petitioner]'s examination was inappropriate because it did not delve into the mitigating questions essential to [Petitioner]... The issue of mitigation, or diminished capacity is different from that of guilt." Starr v. Lockhart, 23 F.3d 1280, 1289 (8th Cir. 1994).[28]

### 3. Dr. Adamski's Report Contained Numerous Red Flags that Called for further Investigation.

As explained above, the Dr. Adamski evaluation was not addressed to mitigation or diminished capacity. Nevertheless, it included numerous red flags that call for further investigation, childhood suicide attempts, problems of alcohol abuse, blackouts, epidsodic dyscontrol, and prior psychiatric treatment. Adamski report of 8/27/87. As related above, none of Mr. Breakiron's counsel investigated any of these areas.        It was ineffective not to perform any investigation of

---

[28]A competency evaluation is a far cry from an actual evaluation for mental health mitigating evidence. See Blanco, 943 F.2d at 1503 (there is "a great difference between failing to present evidence sufficient" to show incompetency to stand trial and "failing to pursue mental health mitigating evidence" -- "[o]ne can be competent to stand trial and yet suffer from mental health problems that the jury .... should have had an opportunity to consider."); Kenley v. Armontrout, 937 F.2d 1298, 1307 (8th Cir. 1991) ("The fact that [a psychiatric] report rules out a mental disease or defect and incompetency does not mean it rules out lesser but potentially mitigating conditions and disorders.")

the matters contained in the report or obtain a mental health expert to develop these matters for the diminished capacity defense offered at trial and mitigation at sentencing.

>    **b.    Counsel was Ineffective for Failing to Obtain Records and Investigate Mr. Breakiron's Background.**

As described above, counsel ineffectively failed to obtain prior records about Mr. Breakiron that document his history of mental and emotional problems and alcohol and substance addiction. Because counsel failed to investigate and develop this information, he also failed to provide it to a mental health expert. Nor did counsel interview any relatives of Mr. Breakiron's other than his mother. Counsel's failure to obtain and provide to an expert this important background information constituted ineffective assistance of counsel.[29]

>    **c.    Counsel had no valid tactical or strategic reason for failing to investigate and present expert mental health evidence to support Mr. Breakiron's Diminished Capacity Defense and Mitigation in Sentencing.**

It is not clear that trial counsel even claimed to have had any strategy or tactic at all for failing to procure an appropriate mental health evaluation. It seems more like it simply never occurred to

_____

[29]E.g., Glenn v. Tate, 71 F.3d 1204, 1210 n.5 (6th Cir. 1995) ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant"); Wallace v. Stewart, 184 F.3d 1112, 1118 (9th Cir. 1999) ("It's true that the [defense mental health] experts who examined [the defendant] didn't ask [counsel] to investigate his background further. However, ... this does not relieve the attorneys of their duty to seek out such evidence and bring it to the attention of the experts." (footnote omitted)); Smith v. Stewart, 189 F.3d 1004, 1011 (9th Cir. 1999) (in case where counsel had defendant seen by six psychiatrists, the court noted "the duty of defense counsel 'to seek out [evidence of the defendant's background] and bring it to the attention of the experts'" and found counsel ineffective (bracketed material in original)); ABA GUIDELINES, 11.8.6, The Defense Case at the Sentencing Phase (counsel should always investigate and consider presenting the client's "[f]amily and social history (including physical, sexual or emotional abuse, neighborhood surroundings" as well as "[e]xpert testimony concerning [such a background] and the resulting impact on the client").

him.  NT PCRA 7/17/97 PM at 35 (trial counsel suggesting that Mr. Breakiron could only have

gotten a defense mental health expert if he could afford it.).  NT PCRA 7/18/97 AM at 24 (Trial

counsel admitting:   "I don't think we really ever discussed having psychological testing done....

None of that was ever discussed.")  As the Pennsylvania Supreme Court observed, there was no

"reasonable basis" for trial counsel's failure.  Breakiron-2 729 A.2d at 1099.

Trial counsel did <u>claim</u> to have a strategy for failing to obtain any records about Mr.

Breakiron.   He testified that he decided not to get any records because he did not want to bring out

evidence of Mark's prior violent acts.  NT PCRA 7/17/97 PM at 20; NT PCRA 7/18/97 AM at 29.

He indicated that based on this "strategy," there was no need to obtain anything:

Q:    Did you ever request any record, mental health record, or medical records
      from Mayview, Centerville, or the Fayette County Health Department while
      – during your representation of Mr. Breakiron?

A:    No.

Q:    [D]o you recall if you ever, during your representation of him, asked him to
      sign authorizations to release medical records?

A:    I don't recall.  Well, let me think a second, here.  We covered a lot of that in
      our conversations.  I would say that I never had him sign any authorizations
      based on our conversations and our strategy.

Q:    Did he make you aware during your conversations with him that he had been
      a patient and treated in the facilities that I named, Mayview, Centerville, and
      Fayette County Mental Health?

A:    Well, I think that Fayette County Mental Health, you know, I discussed with
      him Dr. Adamsky's report, obviously, if you look at the motion, and
      additionally, I believe Mayview.  Based on his, and my discussions, and the
      tactic that was to be taken, there was no reason to obtain anything.

NT PCRA 7/17/97 PM at 20.

As noted above, the Pennsylvania Supreme Court already found that "trial counsel was not

able to articulate a reasonable basis" for "mishandling" the mental health aspects of the case. The Court rejected counsel's ostensible "reasonable basis" for his failure to investigate and failure to procure an appropriate mental health evaluation: his fear of introducing past violent episodes that involved Mr. Breakiron's drinking.   As the Pennsylvania Supreme Court found, this was not "reasonable."   This conclusion was correct.

### 1.    There can be no "strategic" decision without investigation.

First, it is clear that a "strategy" undertaken without investigation is no strategy at all.  While counsel can limit investigation based on reasonable professional judgments, that is not what occurred in this case.  It is clear from the continuance proceedings of 2/29/88 that that trial counsel inherited an unprepared case with only four weeks to go before trial began.  Prior counsel testified that they had not developed a trial strategy at the time of his departure in late January. NT 7/18/97 PM at 11. Counsel never obtained a proper mental health evaluation because of his ignorance of the relevant law, and never obtained relevant records of Mr. Breakiron's prior treatment.  He therefore did not and could not know what information was available to present.  Accordingly, counsel could not have made a reasonable tactical or strategic decision to avoid presenting such testimony, as a matter of law.

The United States Supreme Court addressed this situation in Williams v. Taylor, 529 U.S. 362, 396 (2000), ruling that counsel's decision not to investigate was not justified by prior violent acts committed by the habeas petitioner because counsel failed to investigate:

> Of course, not all of the additional evidence was favorable to Williams... But as the Federal District Court correctly observed, the failure to introduce the...[positive] evidence... was not justified by a tactical decision to focus on Williams' voluntary confession.  Whether or not those omissions were sufficiently prejudicial to have affected the outcome of sentencing, they clearly demonstrate that trial counsel did not

51

fulfill their obligation to conduct a thorough investigation of the defendant's background.

Id. at 396. As the Court of Appeals for the Third Circuit has explained, "counsel can hardly be said to have made a strategic choice ... when s/he has not yet obtained the facts on which such a decision could be made .... Under [such] circumstances, counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence," and counsel is ineffective. United States v. Gray, 878 F.2d 702, 711-12 (3d Cir. 1989). The case law that supports this logical proposition is legion.[30]

---

[30] Accord United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997) ("an attorney must investigate a case, when he has cause to do so, in order to provide minimally competent professional representation"; counsel's failure to present evidence cannot "be characterized as 'strategy'" unless counsel has thoroughly investigated and therefore knows what he is foregoing); United States v. Baynes, 622 F.2d 66, 69 (3d Cir. 1980) ("failure to investigate a critical source of potentially exculpatory evidence" cannot be characterized as "strategy"); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) ("In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence ... counsel must [investigate] the available options. Thus ... case law rejects the notion that a strategic decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."); Bryant v. Scott, 28 F.3d 1411, 1419 (5th Cir. 1994) ("Although factors tending to diminish [a witness'] credibility might support a strategic decision not to call [the witness] at trial, those considerations do not suggest that [counsel's] failure to investigate [the witness'] testimony was a strategic decision. Without speaking to [the witness, counsel] was ill equipped to assess his ... persuasiveness as a witness"); Hill v. Lockhart, 28 F.3d 832, 837 (8th Cir. 1994) ("Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories."); id. at 840, 843-47 (where counsel testified in post-conviction hearing that he did not present mitigating evidence contained in defendant's records because of his fear that it might have "opened the door" to rebuttal with the defendant's criminal history, ineffective assistance was established because counsel did not fully and meaningfully investigate the records before making the decision); Martinez-Macias v. Collins, 810 F. Supp. 782, 818 (W.D. Tex. 1991) (counsel's "decision to forego investigation and use of [certain evidence], having been made without knowledge of what [that evidence would include], was not a strategic or tactical decision; nor was it a reasonable one"), aff'd, 979 F.2d 1067 (5th Cir. 1992); Cave v. Singletary, 971 F.2d 1513, 1518 (11th Cir. 1992) ("we wish to emphasize ... that the mere incantation of the word 'strategy' does not insulate attorney behavior from review"); Griffin v. Warden, 970 F.2d 1355, 1358-59 (4th Cir. 1992) (counsel could not have devised a reasonable tactic about a witness because he never

Here counsel, who was stuck with the case only weeks before trial, admitted that: 1) he didn't know that Mr. Breakiron had suffered a documented history of blackouts;[31] 2) he had obtained no mental health records on Mr. Breakiron at all;[32] 3) he apparently believed that Mr. Breakiron was only permitted a defense psychiatrist if he could personally afford it.[33]  A decision based on such appalling ignorance of the relevant law and facts is not the product of strategy.

---

spoke to the witness); Horton v. Zant, 941 F.2d 1449, 1461-62 (11th Cir. 1991) ("invoking the word strategy to explain errors [is] insufficient" when counsel's decisions are based upon inadequate investigation; "case law rejects the notion that a 'strategic' decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them"); Blanco v. Singletary, 943 F.2d 1477, 1502-03 (11th Cir. 1991) (rejecting the assertion that there was a "strategic decision" to not present mitigating evidence because "[t]he ultimate decision ... not to call witnesses" was not the result of thorough investigation and preparation of the evidence; counsel's "strategic decision ... based upon counsel's fears that Blanco's criminal background ... would be brought in" was not reasonable because counsel had not fully investigated the client's mitigating evidence and thus could not make a reasonable strategic decision as a matter of law); Kenley v. Armontrout, 937 F.2d 1298, 1304, 1306, 1308 (8th Cir. 1991) ("Failing to interview witness or discover mitigating evidence relates to trial preparation and not trial strategy." "Counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made." (citing United States v. Gray, supra; Chambers v. Armontrout, 907 F.2d 825, 828 (8th Cir. 1990))); Harris v. Dugger, 874 F.2d 756, 762-64 (11th Cir. 1989) (counsel could not make a reasonable tactical decision that mitigating evidence would have opened the door to harmful rebuttal, even if it might have, because he had not fully investigated the actual mitigation); Eutzy v. Dugger, 746 F. Supp. 1492, 1499 (N.D. Fla. 1989) ("A tactical, or strategic, decision implies an informed, knowledgeable, reasoned choice.  Such a reasoned judgment cannot be made and options exercised unless and until an investigation into the defendant's background and character has been made."), aff'd, 912 F.2d 1468 (11th Cir. 1990); Magill v. Dugger, 824 F.2d 879, 889 (11th Cir. 1987) (counsel must make "informed" decisions about the presentation of mitigating evidence; when counsel breaches the duty to reasonably investigate, counsel's decisions are not informed and even purported "strategic" or "tactical" decisions must be held constitutionally deficient).

[31]NT PCRA 7/17/97 PM at 22.

[32]NT PCRA 7/17/97 PM at 20, 23.

[33]NT PCRA 7/17/97 PM at 35; NT PCRA 7/18/97 AM at 24.

Counsel's "strategy" in this case was merely a post hoc invention in an attempt to excuse his own failures.  Because counsel's failure was a failure of investigation and made in complete ignorance of the testimony that a defense mental health expert might provide, Mr. Breakiron's records, and indeed the relevant law, it cannot be characterized as a "strategy" or "tactic."

### 2. Counsel's "strategy" was unreasonable.

Even if counsel's failures are improperly deemed a "strategy," his stated "strategic" reasons would have to be characterized as patently unreasonable, for several reasons.

First, there simply is no conceivable tactical or strategic advantage to be gained from remaining ignorant of what a properly conducted mental health evaluation might reveal about diminished capacity.   Indeed, even trial counsel himself represented shortly before trial that it was "imperative to have [another] psychiatric evaluation."  NT Continuance Proceeding 2/29/88 at 5. This belies his "strategy" of ignorance.  Similarly, there is no conceivable tactical or strategical advantage of remaining ignorant about the contents of the records and interviews of family members, especially given the likelihood that they would contain information important to the diminished capacity strategy adopted at trial, and given the minimal time and effort that would have been required to obtain and review them.

Secondly, counsel's alleged fear   -- the introduction of previous bad acts by the Commonwealth -- was wholly unwarranted.  Pennsylvania law undermines any assertion that counsel had a valid reason to fear prosecutorial introduction of specific crimes or acts of misconduct had he introduced mental health testimony about Mr. Breakiron's mental impairments.   Pennsylvania's "character impeachment" standards are clear.  "Character evidence" -- as opposed to background evidence -- is limited to "general reputation" in the community for a particular trait. Commonwealth

v. Luther, 463 A.2d 1073, 1077 (Pa. Super. 1983) (collecting Pennsylvania cases which so hold).

"The cross-examination of such witnesses by the Commonwealth must be limited to the same traits."

Id. at 1077 (collecting Pennsylvania cases dating back to 1936 which so hold). "Such evidence . .

. must be established by testimony of witnesses as to community opinion of the individual in

question, not through specific acts or mere rumor." Id. at 1077-78 (citations and internal quotation

marks omitted).

> The Luther court also explained:
>
> [T]he fear of trial counsel that the cross-examination [of] character witnesses would reveal appellant had been suspended from high school, had lost his job and used alcohol and marijuana was unfounded since, while the Commonwealth may discredit evidence of good character, it may do so by evidence of general reputation and not by particular acts of misconduct, ... and the cross-examination of character witnesses by the Commonwealth is limited to knowledge of the reputation of the defendant as to the traits vouched for on direct examination.

Luther, 463 A.2d at 1079-80 (emphasis added); see also id. at 1080 (finding defense counsel

ineffective for not presenting the evidence). See also Commonwealth v. Jenkins, 198 A.2d 497, 498

(Pa. 1964) (where the defendant's grandmother testified "concerning his previous good reputation

in the community" it was erroneous for the prosecutor to question her about the defendant's specific

acts of misconduct -- "It is clear to us that this line of questioning was primarily for the purpose of

calling to the attention of the jury particular acts of prior misconduct on the part of the defendant and

was, therefore, improper.")     Had counsel conducted the necessary research to familiarize himself

with the law, he would have known that mental health evidence to support a voluntary intoxication

defense and the mitigating effect of such evidence could not have opened doors to introducing bad

acts.[34]

Finally, had counsel prepared, he would have learned that significant evidence could have been presented without discussing any violent incidents.   Dr. Martone testified during post-conviction proceedings as to her expert opinion that Mark suffered a blackout during the crime and that his capacity to confirm his behavior to the law was substantially impaired.  See infra.  This involved no discussion of past violent behavior on Mr. Breakiron's part.   Nor did the Commonwealth bring out any evidence of violence on cross-examination of Dr. Martone.  Because counsel did not prepare, his "strategy" was based on ignorance of the available options.

### 4.      Conclusion

For a few strange months in 1988, representing Mr. Breakiron for a couple months prior to his trial appeared to be the fastest track to the Fayette County District Attorney's Office.  Because of the revolving door quality of his representation, none of his four attorneys undertook the basic steps that are necessary to effectively represent a capital defendant at trial.  As the Pennsylvania Supreme Court found, no one ensured that Mr. Breakiron was properly evaluated.  No one thoroughly investigated Mr. Breakiron's background.  No one obtained Mr. Breakiron's mental health records.  When Richard Bowers finally realized he was going to be trying the case by himself, he had only a few weeks to prepare.  His request for a continuance was denied.   He never had Mr. Breakiron properly evaluated for the issues that were relevant at trial: Mr. Breakiron's diminished capacity and mitigating circumstances.  Not surprisingly, the diminished capacity defense offered at trial consisted solely of Mr. Breakiron testifying that he had been drinking and that he didn't

---

[34]Nor did counsel seek any pretrial ruling, on the scope of what would be admissible and what would have opened the door to what. Counsel could not do it because he had not adequately investigated or developed the evidence.

remember much of what happened.  Trial counsel was unaware that Mr. Breakiron had a history of

blackouts.  Counsel did not obtain the records that would have corroborated his history of such

blackouts.  Nor was any of Mr. Breakiron's mental health history developed at the penalty phase.

The Pennsylvania Supreme Court concluded that the mental health evaluation of Mr.

Breakiron was bungled.  Breakiron-2 at 1099.[35]  Moreover, the Court found that counsel was not

able to articulate a reasonable basis for failing to have Mr. Breakiron properly evaluated.  Id.  As

outlined above, the Court's conclusion that counsel performed deficiently is inescapable.  The Court

erred, however, in concluding that Mr. Breakiron was not prejudiced by that deficient performance.

In fact, Mr. Breakiron was prejudiced at both the guilt and penalty phases.

**B.     Petitioner Was Prejudiced at the Guilt Phase By Counsel's Deficient Performance.**

In the PCRA proceedings, trial counsel (Mr. Bower) indicated that his strategy was that of

---

[35]The Pennsylvania Supreme Court addressed the claim as follows:

Breakiron asserts that counsel failed to employ the MHPA properly in that
the court-appointed psychiatrist, Dr. Adamski, improperly conducted the
examination and essentially gave him "Miranda" warnings during the August
1987 interview that were not in accordance with the MHPA. He then argues that,
pursuant to the MHPA, he had some expectation of confidentiality, that he had a
right to have trial counsel present, and that he had a right to a defense expert
psychiatrist following his objection to Dr. Adamski's conduct.  These errors,
Breakiron asserts, prejudiced him because the effect was to deprive him of the
opportunity to have a private psychiatrist testify as to his mental health and
psychiatric history during both the guilt and sentencing phase of the trial.

In reviewing the record in this matter, it appears that trial counsel did
mishandle the competency evaluation in a number of respects.  No counsel was
present and following objection to Dr. Adamski's "Miranda" warnings, trial
counsel did not request a private defense expert to be present at a second court
ordered examination.  Further, in reviewing the PCRA testimony of this matter,
trial counsel was not able to articulate a reasonable basis for failing to comply
with the MHPA. Thus, our determination in this matter hinges upon whether these
errors were prejudicial to the defendant at either the guilt or the sentencing phase
of the trial.

57

diminished capacity based on Mr. Breakiron's consumption of alcohol at the time of the offense. NT PCRA 7/18/97 AM at 14. Nevertheless, counsel failed to have Mr. Breakiron properly evaluated, failed to obtain a defense expert, failed to obtain relevant records, and failed to present any of the evidence available to support the intoxication defense that he offered at trial other that his client's unsupported testimony that he had been drinking. Mr. Breakiron was prejudiced by counsel's deficient performance. The unpresented evidence would have created a reasonable probability that the jury would have found that the Commonwealth could not prove that he had the specific intent to kill beyond a reasonable doubt. The Pennsylvania Supreme Court rejected this claim because they applied a standard of showing prejudice that was almost insurmountable – and was "contrary to... clearly established Federal law."

## 1.    The Law of Voluntary Intoxication

Evidence of voluntary intoxication is admissible in homicide cases "whenever it is relevant to reduce murder from a higher degree to a lower degree of murder." 18 Pa. C.S. § 308. It may reduce the crime of murder from first degree murder if it "clouds the intellect so as to deprive it of the power of deliberation or premeditation." Commonwealth v. Wilson, 307 A.2d 351, 352 (Pa. Super. 1973). Whitney v. Horn, 2002 WL 181342, *9 (3d Cir. 2002). C.f. United States v. Gold, 661 F. Supp. 1127 (D.D.C. 1987) (permitting expert testimony on defendant's diminished capacity).[36] Where it is raised, the Commonwealth must disprove it beyond a reasonable doubt. Pennsylvania Standard Criminal Jury Instruction 8.308(B). See Claim 8 infra (trial court in this case erroneously instructed jury that Commonwealth had no burden to disprove this defense).

---

[36]See also United States v. Frisbee, 623 F. Supp. 1217 (N.D. Cal. 1985) (same); People v. Cronin, 458 N.E.2d 351, 352 (N.Y. 1983) (reversing conviction because trial court improperly precluded expert testimony on voluntary intoxication defense).

Trial counsel's ostensible strategy was to present a diminished capacity defense. Nevertheless, he failed to marshal the readily available evidence in support of it.

>   2.    **The Readily Available Evidence in Support of Mr. Breakiron's Voluntary Intoxication Defense.**

Substantial evidence was readily available to support and corroborate Mr. Breakiron's voluntary intoxication defense. Most importantly, a defense mental-health expert could have testified to the fact that Mr. Breakiron was intoxicated on the evening of the event and suffered from a blackout during the events in question. Such testimony could be corroborated by Mr. Breakiron's history of blackouts. This would have negated the specific intent to kill necessary to prove first-degree murder. Moreover, a defense mental health expert could have explained the significance of Mr. Breakiron's extensive record of alcohol dependence to the jury.

State post-conviction counsel retained the respected forensic psychiatrist Dr. Christine Martone to evaluate Mr. Breakiron.[37] In post-conviction proceedings she offered some of the testimony that the jury could and should have heard:

>   At the time of the incident, and at the time of his trial, it is my opinion that Mr. Breakiron suffered from Alcohol and Multiple Drug Abuse and Dependence. He also suffered at the time of the incident from Alcohol and Drug Intoxication.[38]

---

[37]Current counsel have retained the services of two other psychiatrist who have reviewed the relevant materials of this case and have evaluated Petitioner. Both Dr. Julie Kessel and Dr. Fox reach conclusions consistent with Dr. Martone. See Affidavits of Drs. Julie Kessel and Robert Fox.

[38]Dr. Kessel explained:

>   On the evening of the incident for which Mr. Breakiron is incarcerated, he was intoxicated, and suffered a blackout. In the context of that experience, he also appears to have suffered a trauma to the head, and developed an explosive episode of dyscontrol. As a result of a combination of his voluntary intoxication,

NT PCRA 9/17/97 at 33.  Dr. Martone's testimony demonstrated that a defense mental health expert

could also have explained that in her expert opinion Mark suffered a blackout:

> [I]n my opinion, he suffered a blackout.  He has had blackouts before.  The amount
> that he ingested, and the period of time that he ingested in his life from age thirteen,
> would be very consistent with experiencing blackouts.

NT PCRA 9/17/97 at 35.  Her conclusion that Mark suffered a blackout was directly probative to

whether Mark had the specific intent to kill:

> Q:      Maybe for the purpose of the record and for me and the Court, what does the
>         term blackout mean?

> A:      ...A blackout does not mean one is unconscious.  It means that they really are
>         acting in almost a state of automation.  They do not remember, and they do
>         not appear to have the same control that a non-intoxicated person would
>         have.

NT PCRA 9/17/97 at 37.  Mr. Breakiron was prejudiced by the absence of this testimony at trial to

explain the effect of alcohol on his behavior support and support his intoxication and diminished

capacity defense.

Further material in support of the diminished capacity defense was available in Mr.

Breakiron's records, all of which were readily available to counsel prior to trial and all of which

would have been obtained and reviewed by effective counsel.  The Mayview Hospital records note

that Mark: "Began to use alcohol at the age of thirteen or fourteen" "he gets out of control when he

drinks."  Mayview Hospital report, 2/10/84.  "He admits to blackouts.... arrests stem from alcohol

and intoxication."  Fayette County Mental Health Center Readmission Intake, 3/27/87.  These

---

> his underlying mental illness, Intermittent Explosive Disorder, he was impaired in
> his capacity to form the specific intent to kill such that he had diminished
> capacity.

Affidavit of Dr. Kessel.

records would have substantially buttressed a mental health expert's opinion supporting Mr. Breakiron's intoxication defense and showed to the jury that Mr. Breakiron had a long well-documented history of alcohol- related mental infirmity.

Even Dr. Adamski's report, which did not address specifically address diminished capacity, contained significant support of the diminished capacity defense. For example, Dr. Adamski notes that "Mr. Breakiron suffers from long-standing alcohol problems as manifested by ... <u>blackout episodes</u>.... From his history he also appears to have had <u>long-standing problems of episodic dyscontrol</u>." Dr. Adamski's report of 8/27/87. This material was dropped into counsel's lap and would have substantially buttressed the defense's contention that Mr. Breakiron suffered from a blackout on the night of the event and that, therefore, he did not have the deliberate, willful, premeditated intent to kill required to sustain a conviction of first degree murder.

### 3.    Rebutting the Commonwealth's Medically Incorrect Argument

At trial, the Commonwealth argued that Mr. Breakiron must have had the specific intent to kill because he was able to remember parts of the evening, he was able to drive and acted purposefully. This argument is medically incorrect. Such behavior is wholly consistent with the diminished capacity as a result of intoxication associated with an alcohol blackout. A defense mental health expert could have explained to the jury:

> [The person suffering from a blackout] can then suddenly, you know, begin to remember as the intoxication level begins to wear off, or if some very traumatic event occurs, which kind of breaks through, and you can act then in a very purposeful way afterwards, and be aware of some of the pieces of it.

NT PCRA 9/17/97 at 37.

> Q:    And, in your report on page five, I mean, the paragraph under Discussion and Recommendation, about midway down in that first paragraph, you have a

sentence there that his actions subsequent to the stabbing do not negate a
blackout.

A:    Yes.  They do not negate a blackout, because people act in a purposeful and
or/violent way and/or foolish way.

NT PCRA 9/17/97 at 36-37.   But because counsel bungled Petitioner's mental health evaluation,
the jury never learned these basic facts of alcohol-induced blackouts, and instead were readily
swayed by the prosecutor's inaccurate and unsubstantiated theories that Petitioners' memories of the
events and the purposefulness of his post-homicide actions were necessarily inconsistent with his
intoxication defense.

### 4.    The Readily Available Evidence was Vastly More Powerful than What Counsel Presented at Trial

Counsel could have presented a powerful case that Mr. Breakiron lacked the specific intent
to kill based on the expert opinion of a mental health expert, the physiological effects of his
consumption of vast quantities of alcohol, his ingestion of illegal drugs, his lack of tolerance, and
his history alcohol and substance abuse which included blackouts.  Because he failed to investigate,
he was ignorant of the availablity of this evidence to support the defense.

Instead of presenting the readily available evidence of Mr. Breakiron's history of blackouts
and expert testimony to support the intoxication/diminished capacity defense, trial counsel called Mr.
Breakiron, to testify that he drank a great deal of alcohol.  NT at 1230-1256.  Mr. Breakiron also
testified that he couldn't remember sections of the evening and that "it was like a tv screen inside
my head and I saw somebody laying there getting stabbed." NT at 1256.  Without any mental health
testimony to explain the phenomena of alcoholic blackouts and to put this into context, the jury
likely found this testimony merely bizarre.  Mr. Breakiron attempted to testify about his illegal drug

use on the night of the offense to support his voluntary intoxication defense, but the Commonwealth's objection was improperly sustained without argument from defense counsel. NT at 1239.

Had counsel investigated and obtained a proper mental health evaluation, he could have presented a strong case that Mr. Breakiron's alcohol and drug ingestion, combined with his lack of tolerance and history of "episodic dyscontrol" supported his diminished capacity defense at trial. There is at least a reasonable probability that the jury would have concluded that the Commonwealth did not prove that Mr. Breakiron possessed the specific intent to kill beyond a reasonable doubt.

**5.    The Pennsylvania Supreme Court's Opinion is "Contrary to" Clearly Established Law Because it Applied the Wrong Legal Standard.**

The Pennsylvania Supreme Court applied the wrong legal standard in ruling on this claim. One of the ways that a Petitioner may show that he is entitled to the writ is to show that the state court decision is "contrary to... clearly established Federal law." 28 USC § 2254 (d)(1). The Pennsylvania Supreme Court's decision as to this claim was "contrary to... clearly established Federal law, in this case Strickland v. Washington, 466 U.S. 668 (1984). Williams, 529 U.S. at 391 ("[Petitioner] is therefore entitled to relief if the [State] Supreme Court's decision rejecting his ineffective assistance claim was either 'contrary to, or involved an unreasonable application of,' [Strickland]")

In Strickland, the United States Supreme Court held that ineffective assistance of counsel claims were governed by a "reasonable probability" standard. Instead of applying this standard, the Pennsylvania Supreme Court required Mr. Breakiron to show that counsel's errors "would have" changed the outcome. Breakiron-2, 729 A.2d at 1099. The Pennsylvania Supreme Court's

application of the wrong legal standard means that its opinion is "contrary to" to clearly established federal law.

Strickland makes clear that in order to prove prejudice:

The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.

Strickland, 466 U.S. at 694. The question is not whether representation by effective counsel necessarily would have actually changed the jury's ultimate verdict, nor even whether representation by effective counsel would "more likely than not" have changed the verdict. Id. Instead, prejudice is established when there is "a reasonable probability" that the outcome would be different. Id., 466 U.S. at 694. This standard for prejudice "is not a stringent one. It is less demanding than the preponderance standard."[39]

In this case, the Pennsylvania Supreme Court applied a grossly erroneous standard in addressing the prejudice caused by counsel's deficient performance. Rather than apply the "reasonable probability" standard mandated by Strickland, the Court required Mr. Breakiron to prove conclusively that the outcome "would have changed." Given this nearly impossible burden, it is not surprising that the Court found that Mr. Breakiron was not prejudiced:

These errors [in obtaining a mental evaluation], Breakiron asserts, prejudiced him because the effect was to deprive him of the opportunity to have a private psychiatrist testify as to his mental health and psychiatric history during both the guilt and

---

[39] Hull v. Kyler, 190 F.3d at 110 (internal quotation marks and citations omitted) (citing Nix v. Whiteside, 475 U.S. 157, 175 (1986); Baker v. Barbo, 177 F.3d 149, 154 (3d Cir. 1999)); accord United States v. Day, 969 F.2d 39, 45 n.8 (3d Cir. 1992) (Strickland "does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that that is the case").

sentencing phase of the trial.

***

> He surmises that trial counsel's failure to follow the MHPA left the attorney without any psychiatric evidence to assist in Breakiron's defense or to present mitigating evidence at trial. We find that Breakiron has not met his burden of establishing that counsel's errors prejudiced him because he cannot establish that had an examination been done according to the MHPA, the defense strategy, or the outcome of either the guilty verdict or sentence of death, would have changed.  Instead, the PCRA proceedings show that Breakiron was competent at the time of trial, and there was no evidence that trial counsel could have presented an insanity defense.  Therefore, the only defense available to trial counsel was of diminished capacity, which was presented and rejected by the jury at trial.  Thus, the alleged errors, had they been corrected, would not have led to a different result, and we cannot find that Breakiron was prejudiced in the guilt phase of the trial.

Breakiron-2, 729 A.2d at 1099.   The Court rejected  Mr. Breakiron's claim because he could not

establish "his burden" of showing that "the outcome of either the guilty verdict of sentence of death

would have changed."

This is "contrary to... clearly established Federal law."   Indeed, it is so "contrary to... clearly

established Federal law" that it is the paradigmatic example used by the United States Supreme

Court to show  what "contrary to law" means.  In Williams v. Taylor, the United States Supreme

Court made clear that:

> A state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases.  Take, for example, our decision in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   If a state court were to reject a prisoner's claim of ineffective assistance of counsel on the grounds that the prisoner had not established by a preponderance of the evidence that the result of his criminal proceeding would have been different, that decision would be " diametrically different," "opposite in character or nature," and "mutually opposed" to our clearly established precedent because we held in  *Strickland* that the prisoner need only demonstrate a "reasonable probability that ... the result of the proceeding would have been different."  *Id.,* at 694, 104 S.Ct. 2052.

65

Williams, 529 U.S. at 405.[40]

The Pennsylvania Supreme Court engaged in the same incorrect prejudice analysis utilized by Wiliams to exemplify a state court decision that was contrary to clearly established federal law. The Court did not apply the proper standard of prejudice under Strickland but rather adjudicated Petitioner's ineffectiveness claim under its own "would have changed" standard rather than the correct "reasonable probability" standard. Strickland at 694. Petitioner has met the standard for habeas relief required by § 2254(d).

But even if the Court had applied the proper standard, any determination that Breakiron was not prejudiced would be unreasonable under Strickland and Williams. As demonstrated above, if counsel had Mr. Breakiron properly evaluated, he could have provided an expert opinion to corroborate Mr. Breakiron's account that he suffered a blackout and corroborated his intoxication and diminished capacity defense. This would have also rebutted the Commonwealth's contention that Mr. Breakiron could not have suffered a blackout because he was able to drive and remember certain things about the evening. Instead, counsel failed to have Mr. Breakiron properly evaluated and was so unprepared that he did not know that Mr. Breakiron had a documented history of blackouts. There is far more than a "reasonable probablity" that counsel's failures prejudiced Mr. Breakiron. Habeas relief is appropriate on this claim.

**C.    Petitioner was Prejudiced by Counsel's Ineffectiveness at the Penalty Phase.**

As explained above, the revolving door nature of Mr. Breakiron's representation meant that no one ensured that Mr. Breakiron received an adequate mental evaluation, secured records, or

---

[40]Indeed, the error in Mr. Breakiron's case was even more egregious because the Pennsylvania Supreme Court did not use a preponderance of the evidence standard but rather the almost insurmountable "would have changed" standard.

interviewed family members.  As explained above, the transcript of the Continuance Proceeding indicates that weeks before trial, Mr. Bower indicated that Mr. Jeneks had been taking the lead role, and that he had only met with Mr. Breakiron once prior.   None of Mr. Breakiron's previous counsel had obtained a defense mental-health expert, secured records, or interviewed family members besides his mother.

All of the evidence that should have been gathered and presented to the jury in support of his diminished capacity defense was also highly relevant to Mr. Breakiron at the penalty phase in support of the (e)(2) (mental or emotional disturbance), (e)(3) (capacity to conform to the law), and (e)(8) (catch-all) mitigating circumstances.  Mr. Breakiron was prejudiced by counsel's failure to investigate.

At the PCRA hearing, trial counsel testified that he had a strategic reason to remain ignorant of relevant evidence.  Counsel's "strategy" was based on ignorance and lack of preparation.  Counsel could not have a reasonable tactic for not presenting expert mental health testimony when he was ignorant of Mark's mental health background because he failed to obtain available records and never consulted with a defense expert.   Similarly, counsel's "strategic" decision to present only two witnesses was based on the fact that he did not interview or consult with any other family members.  NT PCRA 7/17/97 PM at 21.   As explained above at Claim 1 A (3)(c), an ex post "strategy" based on ignorance of the relevant law, and a failure to investigate is not reasonable as a matter of law.

### 1.    The Readily Available Mitigation

Counsel erroneously believed that Petitioner was only entitled to a defense mental health expert if "he could afford to hire one."  NT PCRA 7/17/97 PM at 34.  Consequently, counsel never sought the appointment of a defense mental health expert.  Had he done so, a trained mental health

expert could have explained that Mark suffered a blackout at the time of the offense:    As Dr.

Martone testified at the state post conviction hearing:

> [I]n my opinion, he suffered a blackout.  He has had blackouts before.  The amount that he ingested, and the period of time that he ingested in his life from age thirteen, would be very consistent with experiencing blackouts.[41]

NT PCRA 9/17/97 at 35.  A defense mental-health expert, like Dr. Martone could have explained

how this reduced Mark's culpability:

> Q:    Maybe for the purpose of the record and for me and the Court, what does the term blackout mean?
>
> A:    Okay.  That is what I had tried to explain before.  A blackout does not mean one is unconscious.  <u>It means that they really are acting in almost a state of automation.</u>  They do not remember, and they do not appear to have the same control that a non-intoxicated person would have.

---

[41]Dr. Kessel explains the significance of his history of blackouts:

Mr. Breakiron's family members drank.  His father was an alcoholic and his older brother introduced him to the use of alcohol.  He had a clear genetic, as well as environmental, tendency to drink.  He began to drink alcohol in his early adolescent years. It reduced his anxiety, sense of humiliation and improved his self esteem and sense of assertiveness.  He first drank with his older brother.  Then he began to drink with others and his habit became quite regular.  At the age of about 14 or 15, he had his first black out.  His friends told him that he assaulted a mailbox and appeared out of control.  He did not recall any of the evening.  The occurrence of a blackout so early into his use life of use of alcohol is a predictor of the seriousness of the disease that he had.  Over the years, his use became extreme and he coupled it with the use of a variety of other drugs including marijuana and pills such as Quaaludes.  This became a daily routine for him.  his use of alcohol included all types of alcohol.  His regular use though typically exceeded a fifth of liquor with or without beer.  He would, however, drink whatever was available.  He reported that liquor was especially associated with causing blackouts.  He had blackouts often.  Mr. Breakiron's use of alcohol is amongst the most extreme that I have encountered.  His behavior under the influence of alcohol reflects substantial disinhibition and appears to aggravate the underlying Intermittent Explosive Disorder.

Affidavit of Dr. Julie Kessel.

NT PCRA 9/17/97 at 37.

A trained mental health expert could have explained Mark's mental health impairments:

At the time of the incident, and at the time of his trial, it is my opinion that Mr. Breakiron suffered from Alcohol and Multiple Drug Abuse and Dependence.[42]  He also suffered at the time of the incident from Alcohol and Drug Intoxication; an Intermittent Explosive Disorder, which was precipitated and aggravated by intoxication, and an Antisocial Personality Disorder.

NT PCRA 9/17/97 at 33.  At the penalty phase, she could have explained the effects of Mark's

Intermittent Explosive Disorder:

Intermittent Explosive Disorder... is a condition where there is a rage, an uncontrolled rage, with violent aggressive outbursts, which are completely out of proportion to the precipitating stress or the provocation.  When the incident is over, the individual is frequently quite contrite.  It really had no goal in mind.  It wasn't necessarily to protect or to badger or to get money.  <u>It is an uncontrollable rage.</u>[43]

---

[42]Dr. Fox explained the mitigating effects of Alcohol Dependence:

Alcohol dependence is an Axis I psychiatric illness as defined by the American Psychiatric Association in the Diagnostic and Statistical Manual.  The use of alcohol by alcoholics (individuals with this disease) is not the voluntary action of individuals who do not suffer from this severe disorder.  It is compulsive behavior driven by the disorder itself.

Affidavit of Dr. Robert Fox.

[43]Dr. Kessel explained Mr. Breakiron's Intermittent Explosive Disorder and its sources:

Mr. Breakiron's father as well as his mother had periods of depression and mood instability.  This likely resulted in his having a genetic vulnerability as well to instability of mood.  In fact, Mr. Breakiron's mental instability continued into his young adult and adult years.  His crying fits and temper tantrums led to frank episodes of gross agitation.  These episodes would be triggered by a variety of stimuli including what seem to be insignificant events.  The episodes would be characterized by a sense of anxiety and agitation.  This experience would escalate to physical discomfort, intense pressure in his head and then an outburst of emotion or aggression, often not directed toward anything or anyone in particular.  The event might last for minutes during which time he would lose track of time and have a sense of unreality.  This would be followed by a sense of tiredness.

69

NT PCRA 9/17/97 at 33.

A defense mental health expert could also have explained the significance of the personality

disorder diagnosis:

> This is a pervasive pattern and lifestyle in an individual. It must –
> according to the criteria, there are signs of it before eighteen, as early
> as fifteen, but you do not make the diagnosis until the person reaches
> eighteen. The criteria includes such things as <u>inability</u> to conform
> one's behavior to the law.

NT PCRA 9/17/97 at 34. Finally, counsel would be able to offer an expert opinion that Mr.

Breakiron's impairments were mitigating circumstances:

> In my opinion, this individual, given his past history and his tendency towards an
> explosive disorder, with the amount of alcohol and drugs that he ingested, his
> frustration tolerance, his judgment, and his impulse control, would all be diminished
> to the extent that there would be, within a reasonable degree of medical certainty,
> mitigating circumstances in terms of his state of mind at the time of the crime.

---

> These episodes which have their origins in childhood, are consistent with a
> diagnosis, Intermittent Explosive Disorder. In addition to his tendency to have
> frank aggressive outbursts prompted by a trigger, Mr. Breakiron also maintains a
> constant level of anxiety and tension. He reports period of racing heart, shortness
> of breath, upset stomach and reports frequent loose bowels for most of his life.
> He is often fidgety and restless and has a sense of lack of calm often. His mental
> status examination was consistent with free floating anxiety, distractibility some
> somatic preoccupation.
>     Intermittent Explosive Disorder can be associated with sub-clinical seizure
> activity. Although seizures were never diagnosed in Mr. Breakiron, an EEG
> which was performed at Centerville in 1975 indicated significant abnormality
> identified as "sharp waves". Individuals with Mr. Breakiron's characteristic
> pattern of explosive outbursts coupled with abnormal seizure activity can be
> medicated with anti-seizure medications. Such treatment is often useful in
> reducing explosive outbursts and may eliminate them altogether.

Affidavit of Dr. Julie Kessel.

70

NT PCRA 9/17/97 at 43.[44]  Thus counsel could have presented expert testimony to support the (e)(2),

(e)(3), and (e)(8) mitigating circumstances.

Had counsel consulted standard medical references, he would have learned the devastating

impact of alcohol on adolescents:

> There are potentially important differences between drug and alcohol use in adolescents and in adults.  Among them are the effect of substance use on the developmental process itself (e.g. identity, motivation, peer relationships), the neurobiological consequences of use and abuse, and the above mentioned consideration of continuity versus discontinuity between adolescent and adult patterns of use.

Jerry W. Weiner, Textbook of Child and Adolescent Psychology (1997) (hereinafter Weiner) at 641.

 Counsel also could have explained to the jury the relationship between Mark's difficult childhood

environment and his alcohol problems:

> The disruptive effects of a parent's substance use are far-reaching and go beyond the poor role modeling that is self-evident.  Disruptive consequences of parental drinking include health, financial and legal difficulties; marital discord and domestic violence; and an inability to promote self-esteem and social competence (S.A. Brown 1989; J.L Johnston et al. 1991; Rivinus 1991).  The relationship between parental drinking and the development of psychopathology in offspring is well documented and further adds to a young person's risk of engaging in substance use....[45]

---

[44]Again, as discussed supra, Drs. Kessel and Fox concur with these conclusions.

[45] Dr. Fox explains the significance of his father's alcohol use:

> Mark Breakiron's father's alcoholism is also clinically significant.   A history of alcoholism in the prior generation is a significant predictor that Mr. Breakiron himself would develop a similar substance abuse disorder.   In an effort to cope with his dysfunctional family background and the effects of the trauma he suffered, Mr. Breakiron began drinking alcohol and using drugs at an early age. This behavior pattern was modeled by his father's alcohol abuse.  Also, such a history of turning to alcohol and drugs as a means of escaping inner turmoil is not unusual in cases of children raised in households like Mark's.  Alcoholism is a progressive disease that usually becomes worse at an early age in individuals with his family history.

71

Id. at 646.  In particular, counsel could have explained that Mark's family situation played a critical role in causing his alcoholism:

> Family structure has long been thought to play a role in disruptive behavior.  A longitudinal study on the impact of changes in family structure that come with divorce and remarriage showed that indeed these changes had profound effects.  Boys, especially when divorce took place during adolescence, were most affected, and remarriage seemed to help prevent adolescent substance use (Needle et al. 1990).

Id. at 646

If counsel had fully investigated and contacted Mr. Breakiron's family and asked about his background, he would have learned that the deveastating effects of his family dysfunction  -- that his violent alcoholic father left them when Mark was eight and that Mark took it very hard.  Affidavit of Bruce Breakiron; Affidavit of Gloria Breakiron; Affidavit of Holly Duda; Affidavit of Melanie Breakiron.  Counsel scratched the surface of this background in his presentation of Mark's mother's testimony at the penalty phase.  NT at 1408-12.  But counsel never explained to the jury the relationship between Mark's background and his alcoholism and psychiatric problems:

> Children of alcoholic parents often have associated psychiatric disturbances, such as attention deficit/hyperactivity disorder; conduct disorder; learning and language disorders; anxiety disorders; affective disorders; eating disorders; personality disorders; ingrained personality traits, including compulsive overachieving, low self-esteem, denial of feelings, and difficulty with interpersonal relationships (Bennet et. al; Russell et. al 1985); and post-traumatic stress disorder (Cermack 1988).   They also are significantly more likely to develop alcoholism (Goodwin 1985, Schuckit 1985b) and to marry a substance abuser.

Weiner at 639-40.[46]

_____

Affidavit of Dr. Robert Fox.

[46]See also Weiner at 645 ("Most efforts to link psychoactive substance abuse and biology focus on the transmission of alcoholism.  Twin studies (Cloninger et al. 1989) and adoption studies (Cadoret et al. 1980, 1986; Cloninger et al. 1981) document a strong genetic component to the predisposition to develop alcoholism.").

Trial counsel also would have learned that Marks' parents fought violently in front of the family. Holly Duda reports that Mark's mother threw the wooden leg of a heavy butcher block table at her father. Affidavit of Holly Duda, ¶ 2. Similarly, Melanie Breakiron could have testified that she remembers her parents violently throwing each other across the rooms in fights. Affidavit of Melanie Breakiron, ¶ 2. The violence is corroborated by Mindy Yunk, Mark's sister. Affidavit of Mindy Yunk, ¶ 2.[47]

Similarly, had counsel obtained the history referred to in Dr. Adamski's report, he would have discovered a wealth of mitigating evidence. Dr. Christine Martone testified at the PCRA

---

[47]Dr. Fox likewise explains the significance of family violence on Mark's development:.

Children such as Mr. Breakiron, who witness violent relationships often suffer serious emotional and behavioral adjustment problems. They are likely to have adjustment difficulties in a number of areas, including behavioral problems, and disorders in cognitive and emotional development. They are likely to feel guilty for failing to stop the violence and failing to protect family members. They feel that they are to blame for the violence. They carry with them feelings of being sad, withdrawn, afraid and anxious. Their problems are often externalized in disruptive or inappropriate behavior. They suffer deficits in social competence and have difficulties in peer relationships.

There is a high correlation between violence in the family and later violent activity by the childhood witness of that violence. Violence witnessed during childhood may be internalized by the victim in childhood and acted-out in adulthood because children learn adult roles and behaviors by observing and interacting with adults. Instead of learning appropriate developmental lessons, within his "home" the male role-model was a violent alcoholic who did not provide appropriate care. In a chaotic and sometimes violent childhood home, what the child learns is that the world is a frightening and unpredictable place. They learn that violence and aggression are normal and acceptable means of problem solving. That Mr. Breakiron suffered and suffers such impairments is clear from the records, accounts of those who know him, and from my own evaluation of him.

Affidavit of Dr. Robert Fox.

73

hearing that the family situation was very traumatic and that his mother had a great deal of difficulty

maintaining control and taking care of the children:

> [H]e remembers a great deal of arguing or quarreling. His father moved to Maryland, and his mother continued the upbringing of her family. I confirmed with him something that I had already read in the records that she had difficulty maintaining control over these many children and managing as a single mother. He indicated that they were poor and they were raised on welfare and that there were times that Sheriff's notices were on the door.

NT PCRA 9/17/97 at 16.   The records reflect this chaotic environment.  See Centerville Report

6/11/76.  Dr. Martone also noted that when Mark was fourteen years old, he was removed from the

house because of a disruptive home environment.  NT PCRA 9/17/97 at 21.   This fact speaks

volumes about the chaos in which the young Mr. Breakiron was raised.[48]

The testimony provided by Dr. Martone at the PCRA hearing that was relevant to Mr.

Breakiron's guilt phase, described above, would have been equally applicable to the penalty phase.

Indeed because Petitioner's history of alcohol and substance abuse, including his history of alcohol

blackouts, it would have been relevant and vital mitigating evidence, even if the jury had rejected

the more demanding standards imposed on an intoxication/diminished capacity defense at the guilt

phase.   The statutory mental health mitigators (e)(2) and (e)(3), as well as the catch-all (e)(8)

(circumstances of offender and crime) would all permit the jury to consider Mark's extensive history

of alcoholic blackouts and substance abuse problems.  Yet the jury never had the opportunity to

consider that evidence because, as a result of counsel's miscues, and failure to properly investigate,

no such evidence was ever presented.  Petitioner was prejudiced by counsel's failures.

---

[48]The records of his placement at New Castle YDC also indicate that he did well when he was removed from his chaotic family environment.  New Castle YDC records, 1976 (noting that Mark does not possess a delinquent value system).

### 2.    What Counsel Presented at Trial Paled in comparison with the Available Mitigation.

Instead, trial counsel presented the meager testimony of Rev. Collins, Mr. Breakiron's mother, and Mr. Breakiron. Reverend Collins testified that Mark had some problems drinking and that had been numerous attempts to help Mark with his drinking and drugs. NT at 1388-89. Mark's mother testified that she divorced her husband, Mark had problems with alcohol, Mark was an alcoholic and that he used drugs. NT at 1410. Her entire testimony is less than four transcript pages.[49] Finally, counsel presented the defendant. Unprepared by counsel, when asked about his alcohol problems, he replies only: "I like to drink a lot." NT at 1412.

Nowhere in this testimony is any explanation that Alcohol Dependence is a major mental illness. Nowhere is there an explanation that Mark's documented history of blackouts corroborates his account of not remembering the crime. Nowhere is any explanation of Mark's Intermittent Explosive Disorder. Nowhere does counsel argue that Mr. Breakiron's impairments constitute mental health mitigating circumstances – that is they satisfy (e)(2) "The defendant was under the influence of an extreme mental or emotional disturbance" or (e)(3) "The capacity of the defendant to appreciate the criminality of the conduct or to conform his conduct to the requirements of the law was substantially diminished." of the capital sentencing statute. Nowhere in defense counsel's presentation is any psychological <u>explanation</u> for the defendant's actions provided. Instead, the jury simply heard that Mark had a history of drinking a lot and that he doesn't remember the offense very well.

---

[49]Nor did counsel bring out the available mitigation from Mark's mother. She could have described the difficult conditions of Mark's childhood, his cruel and distant father, and his father's alcoholism.

### 3.     Established Law Demonstrates that Petitioner was prejudiced by Counsel's Failure to Present the Available Mitigation.

Prejudice is established when there is "a reasonable probability" that the outcome would be different.  Strickland v. Washington., 466 U.S. at 694.  This standard for prejudice "is not a stringent one.  It is less demanding than the preponderance standard." Hull v. Kyler, 190 F.3d at 110.  Because the jury's decision as to a death penalty must be unanimous, a habeas petitioner can show prejudice, "if there is a reasonable probability that the presentation of the specific and disturbing mitigating evidence ... would have convinced one juror to find the mitigating factors to outweigh" the aggravating circumstances.  Jermyn v. Horn, 266 F.3d at 308 (2001).

Petitioner was prejudiced because had counsel presented the mitigating evidence there is a reasonable probability that the jury would have found the (e)(2), (e)(3), and (e)(8) mitigating circumstances and a reasonable probability that the jury would not have found the torture aggravating circumstance.

In the context of counsel's failure to investigate and present mitigating evidence, prejudice is established if the introduction of the mitigating evidence "might well have influenced the jury['s] appraisal of [Petitioner]'s moral culpability."  Williams, 529 U.S. at 398.  As the Supreme Court explained in Penry v. Lynaugh, 492 U.S. 302, 319, (1989) "evidence about the defendant's background and character is relevant because of the belief long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional or mental problems, may be less culpable than defendants who have no such excuse. [Petitioner's] early years... coupled with his serious mental problems, might have caused at least one member of the jury to see sufficient grounds to spare his life."  See also Williams, 529 U.S. at 398 (mitigating evidence

satisfies prejudice requirement because it helps show that "violent behavior was compulsive reaction rather than cold-blooded premeditation.")

"In case after case, federal courts have found prejudice when counsel fails to investigate, develop, or introduce mitigating evidence that is similar to the evidence in [Petitioner]'s case. This case is no different." Pursell at *101   E.g., Williams v. Taylor, 529 U.S. 362, 398 (2000); Jermyn v. Horn, 266 F.3d at 311 (3rd Cir. 2001);  Antwine v. Delo, 54 F.3d 1357, 1366-67; Middleton v. Dugger, 849 F.2d 491, 495; Jacobs v. Horn, 129 F. Supp. 390 (M.D. Pa. 2001).

Counsel can be ineffective, even where defense counsel presents some mitigating evidence to the jury.  In Jermyn v. Horn, the Court explained:

> [T]he Pennsylvania Supreme Court's conclusion that Jermyn had not been prejudiced by counsel's omissions appears to have been based in part on the fact that Jermyn's counsel had put some mitigating evidence before the jury....But the fact that counsel presented some mitigating evidence of a different nature and quality seems largely beside the point, given the significance of the evidence that was omitted and the reasonable likelihood that the totality of the available mitigating evidence (presented at trial and at the PCRA hearing) might have led to a different result

Jermyn, 266 F.3d at 311; Williams v. Taylor, 529 U.S. at 368 (counsel was ineffective and Petitioner prejudiced even though counsel presented testimony at sentencing from defendant's mother, two neighbors, and a psychiatrist).

Not only might have the unpresented evidence established mitigating circumstances (e)(2), (e)(3), and (e)(8), it would have also served to rebut the evidence of the (d) (8) torture aggravating circumstance.  The evidence of Mark's blackout on the night of the incident, his Intermittent Explosive Disorder, his history of Alcohol Dependence, and his history of blackouts would have undermined the "torture" aggravating circumstance, because  it would have demonstrated that the offense was committed by a psychologically impaired and extremely intoxicated man in the grips

77

of an uncontrollable rage rather than a person who deliberately intended to cause pain.

Under Pennsylvania law, to be convicted of the torture aggravating circumstance, the Commonwealth must prove that the defendant intended to cause the victim pain above and beyond the pain involved in the murder. The readily available mitigating evidence that chronicled Mr. Breakiron's history of blackouts, his history of episodic dyscontrol, his intoxication from alcohol and drugs on the night of the offense, would have rebutted the Commonwealth's effort to prove the specific intent to torture. As Chief Judge Smith explained, in a similar case involving the torture aggravating circumstance:

> [I]ntroduction of this mitigating evidence [of Petitioner's mental problems and intoxication] might have demonstrated to the jury that the attack on [the victim] was an outburst not a preplanned or premediated attack.  <u>While there was testimony to this effect at the sentencing hearing, [Petitioner's unpresented] psychological evidence would have given more weight to this argument</u>.... The jury could have easily married [the expert psychological testimony offered in post-conviction] with the other evidence supporting an "outburst" murder and found death inappropriate... [I]t could have found that [Petitioner] did not torture [the victim], mainly because he lacked the requisite intent.

<u>Pursell</u> at *101.

There is a reasonable probability that at least one juror would have found that the mitigating evidence in this case justified a life verdict. A mental health expert could have explained that Mr. Breakiron was functioning like an automaton and was impaired by both alcohol, drugs, and his mental illness on the night of the incident, supporting the (e)(2) and (e)(3) mitigating circumstances and rebutting the intent necessary for torture. A mental health expert could also have placed Mr. Breakiron's actions in context and explained how a young Mark Breakiron was affected by his father's violent alcoholism, his sudden absence, and the chaotic dysfunction that ensued. Similarly, the jury could have learned that by both genetic predisposition, fatherly example, and neglectful

environment, Mr. Breakiron was influenced to turn to alcohol and drugs.  Finally, the jury could have

heard about Mr. Breakiron's mental illness, and the ways in which alcohol, drugs, combined with

his mental impairments  to impair his ability to conform his conduct to the requirements of the law.

"Had it heard this evidence, it would have had a better understanding of how this murder occurred,

a thorough picture of [Petitioner]'s life, and substantial reasons for withholding the death penalty."

Pursell at *101.  Prejudice is established.

### 4.    The Pennsylvania Supreme Court's Opinion was Contrary to and an Unreasonable Application of Federal Law.

As it had when evaluating Mr. Breakiron's claim that he was prejudiced in the guilt-phase

of the trial, the Pennsylvania Supreme Court applied an erroneous prejudice standard in addressing

the prejudice caused by counsel's deficient performance.   Rather than apply the "reasonable

probability" standard mandated by Strickland, the Court required Mr. Breakiron to prove

conclusively that the outcome "would have changed."  Given this nearly impossible burden, it is not

surprising that the Court found that Mr. Breakiron was not prejudiced:

> These errors [in obtaining a mental evaluation], Breakiron asserts, prejudiced him
> because the effect was to deprive him of the opportunity to have a private psychiatrist
> testify as to his mental health and psychiatric history during both the guilt and
> sentencing phase of the trial.
>
> ***
>
> He surmises that trial counsel's failure to follow the MHPA left the attorney without
> any psychiatric evidence to assist in Breakiron's defense or to present mitigating
> evidence at trial. We find that Breakiron has not met his burden of establishing that
> counsel's errors prejudiced him because he cannot establish that had an examination
> been done according to the MHPA, the defense strategy, or the outcome of either the
> guilty verdict or sentence of death, would have changed.

Breakiron-2, 729 A.2d at 1099.  The Court rejected  Mr. Breakiron's claim because he could not

establish "his burden" of showing that "the outcome of ... the ... sentence of death would have changed."   Rather than undertaking the appropriate test – whether there exists a "reasonable probability" that counsel's failures might have led to a different outcome, the Pennsylvania Supreme Court utilized the wrong test – requiring the claimant to prove that the outcome "would have" changed.

As explained above, this is "contrary to... clearly established Federal law."   Indeed, it is so "contrary to... clearly established Federal law" that it is the paradigmatic example used by the United States Supreme Court to show  what "contrary to law" means.  Williams v. Taylor, 529 U.S. 362, 405 (2000) (applying wrong Strickland prejudice standard to claim of ineffectiveness is contrary to law.)

The Pennsylvania Supreme Court's opinion is also an "unreasonable application of federal law" to the extent that it excuses counsel's failure to investigate and obtain a proper mental health evaluation because counsel had a strategy to avoid the admission of prior bad acts.  First of all, the Court had already found that counsel "was not able to articulate a reasonable basis for failing to comply with the MHPA."  Thus, the Court already rejected any possible strategy offered by trial counsel for failing to have Mr. Breakiron properly evaluated.

Nor, when questioned, did counsel articulate any strategy for not having his client evaluated. While counsel offered this justification for remaining ignorant of Mr. Breakiron's past history of being institutionalized, he did not offer even this feeble justification for not having his client properly evaluated.  Instead he apparently believed that Mr. Breakiron could only get a mental health expert if he could afford it.  NT PCRA 7/17/PM at 35.

Moreover, as discussed above, even if counsel had posited this justification for failing to have

80

his obviously mentally troubled client evaluated, the failure to investigate cannot be excused by a subsequent "strategy." Williams v. Taylor, 529 U.S. 362, 398 (2000) ("failure to introduce [mitigating] evidence... was not justified by a tactical decision [where] trial counsel did not fulfill their obligation to conduct a thorough investigation of defendant's background.") As the Court of Appeals for the Third Circuit has explained, "counsel can hardly be said to have made a strategic choice ... when s/he has not yet obtained the facts on which such a decision could be made .... Under [such] circumstances, counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence," and counsel is ineffective. United States v. Gray, 878 F.2d 702, 711-12 (3d Cir. 1989). See supra explaining why counsel's "strategy" unreasonable as a matter of law.

Here counsel did not have Mr. Breakiron properly evaluated or undertake the constitutionally required investigation. Consequently, there could be no strategic reason for remaining ignorant of the powerful mitigating evidence that a mental health expert could offer.

### 5. Conclusion

Mr. Breakiron was intoxicated and suffered a blackout on the night of the offense. His account of the night is consistent with suffering a blackout, and he has a documented history of suffering blackouts. Moreover, he has a long history of mental illness, Alcohol Dependence, Intermittent Explosive Disorder, and the lasting effects of a violently alcoholic father. A defense mental health expert could have effectively explained all of this to the jury in both the guilt and penalty phases of the trial. This evidence would have vastly strengthened defense counsel's diminished capacity intoxication defense in the guilt phase of the trial and acted as powerful mitigation in the penalty phase. The Pennsylvania Supreme Court held that counsel performed

81

deficiently in not securing an appropriate mental health evaluation.  Because of this failure, and counsel's failure to investigate, counsel was ineffective and prejudiced Mr. Breakiron in both the guilt and penalty phases of his capital trial.

---

[50]This claim was raised on direct appeal in <u>Breakiron - 1</u>, and was addressed on its merits by the Pennsylvania Supreme Court.  Therefore, the standard of review mandated by Section 2254(d) is applicable.  <u>See</u> Section VI, <u>supra</u>.