IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | Nos. 154, 1/8, 2/8, 3/8, |
| | : | 4/8, 5/8, 6/8, 7/8 of |
| vs. | : | 1986 and 110, 1/8, 2/8, |
| | : | 3/8, 4/8, 5/8, 6/8, |
| ELLIS ROY PRICE and ROBERT | : | 7/8 of 1986 |
| KEITH PRICE, | : | |
| | : | |
| Defendants. | : | |

## CRIMINAL JURY TRIAL PROCEEDINGS

The first day of a criminal jury trial was held before the

Honorable WILLIAM J. FRANKS, Judge, on Wednesday, October 8, 1986,

at 3:55 P.M. in Courtroom No. 2 of the Fayette County Courthouse,

Uniontown, Pennsylvania.

APPEARANCES:

    RALPH C. WARMAN, ESQUIRE, First Assistant District Attorney,
      on behalf of the Commonwealth.

    CARL P. IZZO, JR., ESQUIRE, on behalf of the Defendant,
      Ellis Roy Price.

    JOHN S. CUPP, JR., ESQUIRE, on behalf of the Defendant,
      Robert Keith Price.

Tammy Rhodes
Official Court Reporter

COMMONWEALTH'S
EXHIBIT
E

PENGAD 800-631-6989

PROCEEDINGS

COURT COMMENCING AT 3:55 P.M.
WEDNESDAY, OCTOBER 8, 1986

THE COURT:  Mr. Warman.

MR. WARMAN:  If it please the Court, Your

Honor, the Commonwealth now calls the cases

of Commonwealth of Pennsylvania versus Robert

Keith Price, No. 110 of 1986, Commonwealth versus

Ellis Roy Price, No. 154 of 1986.

THE COURT:  These cases have fractional

numbers also; is that correct?

MR. WARMAN:  Yes, Your Honor.

THE COURT:  Very well.  Is the defense

prepared, Mr. Izzo?

MR. IZZO:  Your Honor, I represent Ellis Price,

and I am prepared to proceed.

THE COURT:  Mr. Cupp, you represent

Robert Price. Are you prepared to proceed?

MR. CUPP:  That's correct, Your Honor. We

are ready to proceed.

THE COURT:  Very well. We will pick a panel

of thirty.

(A panel of thirty prospective jurors was selected)

THE COURT:  Those members of the jury panel

who have not been called for this case may now

leave for the day, but we want you to report to

Courtroom No. 1 for roll call tomorrow morning

at 9:15.  I understand that your services will be

needed for a case that will be called after roll

call tomorrow morning.  So, you may now leave.

Those thirty of you who have been called for

this case, we are not going to strike you or

challenge you tonight because of the lateness

of the hour, but we want all thirty of you to

report to this room at 9:15 tomorrow morning.

Come directly here at 9:15 tomorrow morning, and

then we will begin by asking you some questions.

I'm sure some of you have been through this

already, and you will be challenged, and then

after we have the twelve of you and two alternates,

then we will begin the consolidated trials that will

take place in this room.  I don't know whether

you know anything about this case, but if

you know anything about this, please do not

discuss this case with anyone, and do not permit

anyone to approach you to talk to you about the

case which you may be serving as a juror.  So,

to repeat, all thirty of you will report to this

room at 9:15 tomorrow morning.  Good night.

COURT ADJOURNED AT 4:03 P.M.

- - - -

-4-

## CERTIFICATE

I hereby certify that the foregoing is a true and correct record of the proceedings in the within styled matter and that the copies are a correct transcript of the same.

_____
Tammy Rhodes
Official Court Reporter

The foregoing record of the proceedings in the within styled matter is hereby approved and directed to be filed.

_____
William J. Franks, Judge

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | Nos. 154, 1/8, 2/8, 3/8, |
| | : | 4/8, 5/8, 6/8, 7/8 of |
| vs. | : | 1986 and 110, 1/8, 2/8, |
| | : | 3/8, 4/8, 5/8, 6/8, |
| ELLIS ROY PRICE and ROBERT | : | 7/8 of 1986 |
| KEITH PRICE, | : | |
| | : | |
| Defendants. | : | |

### CRIMINAL JURY TRIAL PROCEEDINGS

The second day of a criminal jury trial was held before the

Honorable WILLIAM J. FRANKS, Judge, on Thursday, October 9, 1986,

at 9:23 A.M. in Courtroom No. 2 of the Fayette County Courthouse,

Uniontown, Pennsylvania.


APPEARANCES:

    RALPH C. WARMAN, ESQUIRE, First Assistant District Attorney,
      on behalf of the Commonwealth.

    CARL P. IZZO, JR., ESQUIRE, on behalf of the Defendant,
      Ellis Roy Price.

    JOHN S. CUPP, JR., ESQUIRE, on behalf of the Defendant,
      Robert Keith Price.

INDEX

COMMONWEALTH'S WITNESSES:

Raymond Ricker
  Examined By Mr. Warman - 18
  Examined By Mr. Izzo - 33
  Examined By Mr. Cupp - 42
  Examined By Mr. Warman - 47
  Examined By Mr. Cupp - 48

Richard Pletcher
  Examined By Mr. Warman - 50
  Examined By Mr. Izzo - 61
  Examined By Mr. Cupp - 62
  Examined By Mr. Warman - 67
  Examined By Mr. Cupp - 68

Dr. David C. Blass
  Examined By Mr. Warman - 69
  Examined By Mr. Izzo - 76
  Examined By Mr. Cupp - 77

Deborah Ann Zinn
  Examined By Mr. Warman - 80
  Examined By Mr. Izzo - 83
  Examined By Mr. Cupp - 85
  Examined By Mr. Warman - 88

DEFENDANT'S WITNESSES:   (Robert Keith Price)

Kelly Sue Price
  Examined By Mr. Cupp - 106
  Examined By Mr. Warman - 113
  Examined By Mr. Izzo - 114

Robert Keith Price
  Examined By Mr. Cupp - 123
  Examined By Mr. Warman - 129

DEFENDANT'S WITNESSES:   (Ellis Roy Price)

Ellis Roy Price (Testimony outside the presence of the jury panel)
  Examined By Mr. Izzo - 144

## PROCEEDINGS

COURT COMMENCING AT 9:23 A.M.
THURSDAY, OCTOBER 9, 1986

    THE COURT:  Good morning.  You may administer

   the oath to the panel for voir dire questioning.

 (The oath was administered to the panel of prospective jurors)

    THE COURT:  May I see counsel at sidebar?

  SIDEBAR CONFERENCE HELD OFF THE RECORD

    THE COURT:  Let the record reflect that

the defendants are present as well as their counsel.

My remarks are directed primarily to you thirty

people who have been selected as prospective

jurors  in the consolidated cases that will take

place in this courtroom.  These are the cases

of Commonwealth of Pennsylvania against Robert

Keith Price and Commonwealth of Pennsylvania

against Ellis Roy Price.  The charges in this

case, I'm led to believe, stem from a similar

incident or the same incident on January 1, 1986.

Therefore, these cases have been consolidated or

joined by order of court and will be tried jointly.

A little later I will tell you what I'm informed

the cases are all about, but I'm sure at this

point most of you are aware of what takes place.

We are concerned with challenging, that is
striking, some of you from being on the jury in
this case.  Even if all thirty of you were perfect
jurors, we could not use all thirty of you.  All
we need are twelve and two alternates.  We are
going to select two alternates, and the two
alternates will be selected among you last four
people that are on this panel.  In law, we have
what we call challenges.  I think you will recall
in my opening remarks to the jury panel Monday
morning that I stated that if you are challenged, and
there are various reasons for people to be challenged
from being on a case, do not take it personally.
There is nothing personal intended if  you are
challenged.  There are all kinds of theories
and all kinds of reasons for people to be challenged.
What we are trying to do, the Court and the lawyers,
is we are trying to get the very best jury that
can be had for this kind of a case.  That is what it
boils down to.  There are two kinds of challenges
in the law.  The first kind is known as a challenge
for cause.  If there is a good legal reason why
you should not sit on this case, then you will
be challenged for cause, and you will not sit
as a juror.  For example, if you know something

about the case which would prohibit you from being
objective and unbias in judging the case solely
on what you hear in the courtroom, that will be
reason to challenge you for cause. We will
primarily be concerned with what are known as
peremptory challenges. These are the kinds of
challenges for which the attorneys are given
a certain number, depending on the kind of case,
and nobody knows why you are being challenged
except the attorneys and those whom they represent.
The Court does not even know why you are challenged
peremptorily. There are all kinds of reasons,
depending perhaps on how you answer the questions.
You may be challenged for those reasons. It may
be they are looking for an even balance of
men and women on the jury. Perhaps they are
looking for people from a certain area
of the county. Perhaps not from a certain area
of the county. There are all kinds of reasons.
Again, if you are challenged, it is nothing
personal. All of you have been given a badge
and all of you have been given names. So, when
we ask you some questions very shortly, we want
you first if you are going to answer the
question to give us your name and badge number.

If you forget, I will remind you to give us your
name and badge number.  That is the way we know
who answered the question.  We have a check.  We
use your name and badge number, and when the
testimony is transcribed, then we will know who
made the answers.  It is also necessary that you
talk loudly and plainly  because the court
reporter has to take everything down that is
said in this courtroom.  You will note that she
is taking everything down now that I'm saying.
So, when you talk, please talk loudly and plainly.
If you don't understand a question that is asked of
you or can't hear it, I will be glad to rephrase
it or repeat it.  We don't want you to answer a
question that you don't know or don't understand.
We have placed you under oath which means that any
answers you give to the questions we will ask you
are given under oath, and we know you are going
to be truthful, but that is an extra precaution
to make sure you tell us the truth, we have put
you under oath.  Again, the questions that
I'll be asking you will be of a general nature
and to assist the lawyers in their challenges.  A
little later you will see the book with the
list of jurors that will be passed among the

lawyers, and you will note that they will be
crossing off names. Those will be the persons
that they will challenge. As I stated to you,
we really have two cases that have been consolidated
for trial because they arise out of the same set of
circumstances. I have been given some information
by the District Attorney, allegations or facts
however you want to call them, but I do want to
caution you that whatever I tell you now regarding
any facts or allegations would not be binding
on you if you are selected as jurors because you
will decide what the facts are, not what I tell
you. My only reason in presenting this
information before you now is to see whether any of
you know anything about the case, and that may be a
reason if you do know something about it to
challenge you for cause or perhaps peremptorily.
So, what -- to repeat, whatever I say now regarding
the facts is not binding on you, because you as
jurors will be the deciders or the determiners
of the facts. Now, each of these defendants is
charged with several crimes, and I'm just very
briefly going to tell you what these offenses mean
just to sort of guide you so you will know
why we are asking questions and maybe to guide
you during the hearing of the testimony, but in

my charge to you at the conclusion of the trial,
I will give you in detail the elements necessary
for each one of these crimes. The first offense
for which each of these defendants is charged,
and each defendant is charged with two counts of
each one of these, the first one is criminal attempt
to commit criminal homicide. Now, what that means
is that it is an attempt to commit the crime of
homicide, and as I said, each one of these
defendants is each charged with two of these
crimes. Another crime that is before us,
and again each defendant is each charged with
two of these, is aggravated assault. Now, that
means that one intentionally and feloniously and
recklessly, knowingly causes some kind of serious
bodily injury to someone which manifests an
extreme indifference to the value of human life,
or that someone did cause or attempted to cause
bodily injury to somebody with what we call a
deadly weapon. That is what we mean very generally
with the offense of aggravated assault, and each
of these defendants is also charged with two counts
of the crime of recklessly endangering another
person. That means that a person unlawfully and
recklessly engages in certain conduct which places

another person in danger of death or serious bodily
injury. Each one of these defendants is also
charged with criminal conspiracy. Each one is
charged with two counts each of criminal conspiracy,
and criminal conspiracy means very generally that
somebody enters into an unlawful agreement to
commit a crime, a plan, an unlawful plan to commit
the crime. So, these very briefly and generally
are what these persons are on trial for at this
time. According to the information that I have
received from the District Attorney's Office,
the District Attorney alleges that all of these
offenses happened in Fayette County, I believe in
North Union Township, at a -- in a parking lot at
a place of business known at Tigo's Lounge on
January 1, 1986, and the allegations are that
the two defendants, as far as the criminal attempt
to commit criminal homicide, that they fired a
handgun, a loaded handgun, one or both of them,
as one is an accomplice and one fired, at a person
known a$_s$ Raymond Ricker, and that the bullets
struck this Raymond Ricker in the arm and abdomen
causing him serious bodily injury. Also, there is
another count, as I stated, of criminal attempt
to commit criminal homicide, and the Commonwealth

alleges that at the same place and the same time,
that a handgun was used and discharged through a
window of a vehicle in which a Richard Pletcher
was located, and that gave rise to the second
criminal attempt to commit criminal homicide.
The Commonwealth also alleges that from this set
of circumstances, that the crime of aggravated
assault was attempted or caused both to this
Raymond Ricker and Richard Pletcher, that giving
rise to the aggravated assault. Also, that these
two defendants engaged in reckless conduct placing
this Richard Pletcher and Raymond Ricker in danger
of serious bodily injury, and in fact they allege
that Raymond Ricker was struck in the abdomen and
was in fact serious bodily injured. So, these
according to the Commonwealth gives rise to the
recklessly endangering another person charges.
Finally, the Commonwealth alleges that as a result
of this same incident on January 1st of this year
that the two defendants conspired between themselves
to commit the assault upon these persons which
resulted in the injuries or the incidents that
I have told you about. So, very briefly and very
generally that is what the Commonwealth has
given me, very cryptic notes, which again I tell

you that you are not bound by what I have
just told you if you are selected as a juror,
but I now want to know whether any of you know
anything about this case from any source whatsoever.

(Voir Dire)

THE COURT:  Do counsel have any
additional questions?  Mr. Warman?

MR. WARMAN:  The Commonwealth has none,
Your Honor.

THE COURT:  Mr. Izzo?

MR. IZZO:  None, Your Honor.

THE COURT:  Mr. Cupp?

MR. CUPP:  None, Your Honor.

THE COURT:  Very well.  You may now
commence your challenges.

(The panel of twelve principal jurors was selected)

(The two alternate jurors were selected)

THE COURT:  Is this jury as presently
composed and the two alternates satisfactory
with the Commonwealth?

MR. WARMAN:  It is, Your Honor.

THE COURT:  Satisfactory with defense  counsel,
Mr. Izzo?

MR. IZZO:  It is, Your Honor.

THE COURT:  Mr. Cupp?

MR. CUPP:  Yes, Your Honor.

THE COURT:  You may administer the oath.

(The oath was administered to the twelve principal jurors
and to the two alternate jurors)

THE COURT:  Are you prepared to open to the
jury, Mr. Warman?

MR. WARMAN:  Yes, Your Honor.

(Mr. Warman made his opening statement to the jury panel)

THE COURT:  Mr. Izzo, do you desire to open
at this time?

MR. IZZO:  Yes, Your Honor.

(Mr. Izzo made his opening statement to the jury panel)

MR. CUPP:  Ladies and gentlemen, good morning.
My name is John Cupp, and I represent Bob Price.
Do you want to stand up?

DEFENDANT ROBERT KEITH PRICE:  (Indicating).

MR. CUPP:  You have heard a lot talked about
this morning concerning your duties as jurors,
and I'm sure whenever you were first taken into
Courtroom No. 1, Judge Adams explained to you
what a juror's function is.  You are playing one
of the most important roles in society that is
guaranteed by both our Federal and State
constitution.  Each one of you, should you be
accused of a crime in the future, would have
the same rights --

MR. WARMAN:  I'm going to object to that,
Your Honor, attempting to place the jury in the
place of the defendants.

THE COURT:  That is correct.  You may continue.

MR. CUPP:  The right to trial by jury is one
of the rights which has existed for many years.
It is a right that is now being taken advantage
of by these two gentlemen.  It is your duty to
determine innocence or guilt of these gentlemen
based on the evidence which is presented before
you today.  As has been said before, the
evidence which counts is the evidence which is given
from that witness stand (indicating).  The speeches
that I make at the beginning and the end or that
are made by anyone else here have no evidentiary
quality.  There is no fact that I say or
that is said by anyone other than the witnesses
from that stand which you are to consider.  I
want you to pay close attention to what those
witnesses say and to the instructions that the Judge
gives you, because the instructions that the
Judge gives you will be the  guidelines by which
you judge that evidence.  We are not going to put
on a long defense either.  We plan on having two
witnesses testify for Bob Price, one of whom

-18-

will be Bob himself. There aren't a whole lot of conflicts as to what went on on January 1, 1986. Everybody is going to admit that Bob Price was at the bar. The question is going to be who did the shooting, and that is the point that you will have to determine from the evidence that is presented before you this morning. I thank you.

THE COURT: We will give the jury its morning recess before we commence the testimony. Members of the jury, during this recess, as I will be telling you throughout the trial, you are not to discuss the case among yourselves or with anyone else. You may announce a recess.

COURT RECESSED AT 10:45 A.M.

COURT RECONVENED AT 11:00 A.M.

THE COURT: You may call your first witness.

MR. WARMAN: The Commonwealth calls Raymond Ricker.

(Witness sworn)

RAYMOND RICKER, having first been duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

BY MR. WARMAN:

Q    For the record, sir, will you give us your full name?

A    Raymond Ricker.

Q   And where do you live?

A   Uniontown.

Q   And how old are you?

A   Thirty-three.

Q   And are you married or single?

A   Divorced.

Q   And are you familiar with Tigo's Lounge?

A   Yes, I am.

Q   And how are you familiar with Tigo's Lounge?

A   I help the owner out once in a while, bar tend a little bit or watch the door.

Q   So, you work there occasionally?

A   Um-hum.

Q   Where is Tigo's Lounge located?

A   Fifty-one, out past Hills.

Q   Now, when you say fifty-one, are you talking about Pennsylvania Route 51?

A   Yes, Route 51 north.

Q   That goes from Uniontown to Pittsburgh?

A   Yeah.

Q   And whereabout on fifty-one would it be?

A   I think it is about two miles out of town, two or three miles out of town.

Q   North of Uniontown?

A   Yeah.

Q   And it is in the wide medial strip out there?

A     Right before you get to Nuzum's.

Q     Before Jerry Nuzum Chevrolet?

A     Yes.

Q     And can you tell us what kind of a place this is?

A     A country bar nightclub with dances and that.

Q     And can you tell me if you were working there or helping
out this friend of yours on January 1st of this year, 1986?

A     Yes, I was.

Q     Beg your pardon?

A     Yes, I was.

Q     And can you tell me when you got there that day?

A     About eight-thirty, nine o'clock.

Q     That would be in the evening?

A     Evening, yes.

Q     And was this some special occasion?

A     New Year's Eve dance.  They was having a small party.

Q     And you were there until what time?

A     Well, until two.

Q     Now, can you tell me if you saw either of the defendants?

            MR. IZZO:  I'll object to that,

        Your Honor.  It is a leading question.

            THE COURT:  I don't believe it is.

            MR. WARMAN:  I'll ask another question.

            THE COURT:  I don't believe it is leading.

        We will overrule the objection.  You may ask it.

BY MR. WARMAN:

Q    Can you tell us whether you saw either of the defendants
that morning?

A    Yes, I did.

Q    And can you tell me where, what time?

A    Okay.  I was at the door at Tigo's, you know, checking
in people because there was a cover charge.  So, about one o'clock
the two defendants came in with a girl, and they asked if
they could come in  and, you know, dance a little bit  and that.
Like I say, I knew the girl so I let them in, and that is when
they first came in.

Q    Okay.  And that was about?

A    One o'clock.

Q    One o'clock in the morning?

A    Yeah.

Q    What were you doing then, you were acting as a --

A    Door man.

Q    A door man?

A    Um-hum.

Q    Do you act sometimes as a bouncer out there?

A    Yeah, a bouncer.

Q    You are a pretty good size fellow?

A    Yeah.

Q    Did you see these individuals after they entered Tigo's?

A    Yes, I did, because I watched them, because we had seating

arrangements around the bar that were reserved and that, and they

started sitting in everybody else's seats and that. So, I was

watching to make sure there was no trouble started or caused

and that. So, I watched them off and on the night.

Q    Okay. So, you did see them off and on that night. Were they

dressed the same as they are now when they came in?

A    No.

Q    How did they appear at that time?

A    Well, like one had like a -- like I say, it was New Year's,

and had a shirt that was half way cut off sleeves and one like had

not a denim, like a blue jean jacket, a blue jacket, real light

blue.

Q    Were they --

A    Rough.

Q    Were they cleanly shaved and so on?

A    No, one had like -- just like a starting of a beard or just

like he started it, and the other one was more frizzy hair.

Q    Which one had which?

A    What the jacket or what?

Q    Which one had the sort of a beard on his face?

A    The one on the end had like the beard (indicating).

Q    You are pointing at the defendant at the far end of counsel

table from me?

A    Yeah.

Q    And how about the other one?

A    He was scrubbed, but like I said, he didn't have a

beard, but like I said, his hair was a little bit longer and

frizzy.

Q    And you are sure that the two defendants here in the courtroom

are the same individuals that came into Tigo's Lounge at approximately

one o'clock on that morning?

A    No doubt.

Q    Now, is there anything that directed your attention to them

later on after they entered the bar?

A    Like I said, they were sitting in other people's seats and

people was asking them to get up and move, and like I said, they

kept on sitting around and that, and then finally, around two

o'clock, they started arguing with the bartender that they gave

him so much money and that he didn't give them back the right

change. So, I went over and started talking to them to find

out what was going on and that, and like I said, they were a little

bit loud and that. So, I gave them back the $5.00 and asked them

to leave.

                    THE COURT:  What do you mean gave them the $5.00?

                    THE WITNESS:  They claimed they gave him

                    $10.00 and he only gave them back the change for

                    a five.  So, I gave them the extra five and asked them

                    to leave.

BY MR. WARMAN:

Q    That was the argument with the bartender?

A    Yeah.

Q    How long did this argument with the bartender and your talking to them, how long did that go on?

A    About two or three minutes. About five at the most. Like I said, it wasn't that long, just -- because like I said, it was two o'clock, and time to be getting out of there anyway, and I figured to keep the trouble down, it was best because at that point they looked like they were a little bit under the weather.

Q    Had you known either of these defendants before?

A    Never seen them before in my life.

Q    Now, when you talked to them when you gave them back this $5.00, what did you tell them at that time?

A    I asked them to leave. They had to leave, because we don't need any fights in here or anything and --

Q    Did you ask them or tell them to leave?

A    It was a little bit of both, I think. I said, you have to leave. I guess that is telling.

Q    And did they leave then at that point?

A    Pretty close. Like I said, they were talking a little bit, and then I said, you have to go now. So, they started walking off, and they were grumbling a little bit walking out the door. So, when they did that, I said, there was cars parked outside and that. So, then I went out and followed them out about a minute later, two minutes, to make sure they didn't fool around with any of the cars, knock the lights out or anything.

Q    So, you just wanted to make sure there was no damage done in the parking lot?

A    Um-hum.

Q    How long had they been gone out of the building when you walked out?

A    About two or three minutes.

Q    And how far out did you go?

A    Just to the outside entrance, right in the doorway.

Q    Just to the outside entrance, and can you tell us whether you saw the individuals, the two defendants, at that time?

A    Yes, I did.  They were down standing beside their car.

Q    If I ask you if you would make us a rough drawing of the side of Tigo's or the back of Tigo's where this occurred and show the relationship of the car to Tigo's, could you do that?

A    I can try.

          MR. WARMAN:  Your Honor, I would ask if we
     could use the blackboard.

          THE WITNESS:  (Indicating).  There is
     51 North and South.  Okay, here is Tigo's right
     in the middle here.  Okay, there is a little
     cubby hole here that opens up.  Okay, I was standing
     here.  Okay, right here is a little opening,
     and their car was parked right here, and they
     were standing here.

BY MR. WARMAN:

Q    Okay.  Now, of course, this is not drawn to scale, right?

A    Right.

Q    But so you have Route 51 pictured on the north of the drawing here going towards Pittsburgh (indicating); is that correct?

A    Yeah.

Q    And then at the bottom of the drawing would be Route 51 south?

A    Going into Uniontown.

Q    And this is Tigo's Lounge (indicating) that sits in the middle?

A    (Indicating).

Q    And this portion up here of the building (indicating) that you have pictured that looks like a little offshoot of the building, what is that?

A    That is a little alcove that -- here is the main entrance (indicating) to the bar.  Here is the little alcove (indicating). I don't know -- it is a little alcove they attached on to it. I don't know what purpose it is used for, but I didn't build the building.  So, I don't know.

Q    Okay.  Now, could you tell us when these individuals exited the building which way they went?

A    No.

Q    Okay.  When you went out to see if there was anything going on in the parking lot, which way did you go?

A    I came right here (indicating) and stood right here (indicating)
Right in the doorway.  This door (indicating) was open.

Q    You came through, is that a doorway, too, right there
(indicating)?

A    Yeah.

Q    You came through that first doorway, and then stood in the
second doorway?

A    To the outside.  That is the way they had to come, too.

Q    It looks like you have double doors pictured there, that
outside door (indicating); is that correct?

A    Yeah, but only one of them was open.  It would be a double
door, but this one (indicating) always stays closed.  It is
never opened.

Q    Now, how far would you say the defendants' car was from
where you were?

A    About twenty feet at the most.

Q    And you say they were on the opposite side of the car?

A    This was -- the car was pointing this way (indicating).

Q    Okay.

A    Towards the southbound lane.

Q    Okay.  Why don't you just sit back on the stand.
How far were -- would you say the defendants were from you at
that point?

A    Well, they were right on the other side of the car.  So,
it would be about twenty feet.

Q    And are you indicating they were standing together?

A    Yes.

Q    When you went out to the outer door, you say you leaned against that outer door?

A    I stood in the middle of it.

Q    Stood in the outer door.  What were they doing?

A    Talking.  I could hear them say something, but I couldn't -- you know, they were talking, but I couldn't hear what they said.

Q    You heard them talking, but you could not overhear what they were saying.  When you say you heard them talking, who were they talking to?

A    To each other.

Q    And after you came out and positioned yourself in this outer door, what happened?

A    Well, I stood there for about a couple seconds, and then they said something about coming back in, and I said, no, you are not.  You have to leave now, and one of them reached down on the seat of the car and pulled out -- I didn't know what it was. I thought it might have been a club or something, they wanted to fight or something.  So, I just stood there, and the next thing I knew they came up on top of the car, and I seen a flash and heard a bang, and it was too late.

Q    Let's back up a second.  You say you saw something reach -- do you know which one it was that reached in the car?

A    No, I don't.

Q    When you say someone came up over the car, what do you
mean by that?  Tell us what you mean.

A    Well, I guess -- now, I know -- they reached on the seat.
it must have been a gun, and they came -- like I said, they were
standing on the passenger side.  They came up over top like this
(indicating).

Q    So, you are indicating they put their arm up over the
top of the car?

A    Yes.

Q    And which way was this arm pointed that came up over the top
of the car?

A    Towards me.

Q    And what happened when that arm was raised up over top?

A    There was a gunshot.  Like I said, at the time, I figured
it was a gunshot, or two of them actually.  One of them hit me.

Q    So, you heard shots fired?

A    Yeah.

Q    Did you see any flashes?

A    Yes.

Q    And did you feel anything at that time?

A    Yeah.

Q    What was it that you felt?

A    Like a sledge hammer hitting your chest.

Q    And what happened when you felt this?

A    Well, when I went -- I bent down, because like I said, it

didn't feel like -- I didn't feel anything going in.  I went down,

and I backed out of the door, because I was holding like

this (indicating), and when it hit, I went like this (indicating)

and backed away into the alcove out of the door, and then another

guy came out running.

Q    So, you were standing in the doorway with your arms crossed?

A    Like this (indicating).

Q    And were you struck anywhere else on your body besides --

A    It went through the top of my arm into here (indicating).  It

grazed, almost grazed it, and went through right (indicating) --

the wrist.

Q    It went through the top of your arm?

A    Right here (indicating).

Q    And through -- where are you pointing?

A    Chest, upper, above -- a little bit above the stomach, I

guess it would be.

Q    And now after you backed back into the alcove, what did you

do?

A    I just stood there waiting.  Like I said, I was trying to

wait.  It didn't feel like anything went in.  So, I was waiting

for the pain to go away, and another guy ran out, and then when

he came back in, he says, your arm is bleeding, because I didn't

even know about the arm.  I didn't feel the arm.  He said, your

arm is bleeding, then I knew something was wrong or really wrong,

and then I laid down.

Q    Were you bleeding at all other than your arm?

A    My arm was bleeding mostly. A little bit on the chest, but not much.

Q    Did you detect any exit wound at that time?

A    No. Like I said, I didn't know much of anything at that time after that.

Q    Did you get any help?

A    Yes. Well, a couple guys came out of the bar after that, and they laid me down and put ice on it, and then we called the ambulance and the State Police.

Q    And did the ambulance come and get you?

A    Yeah.

Q    Where were you taken?

A    Uniontown Hospital.

Q    And were you treated at Uniontown Hospital?

A    Yes, I was.

Q    What doctor treated you?

A    Dr. Blass.

Q    And how long did you stay in the hospital?

A    Ten days at the first time.

Q    Ten days the first time?

A    Um-hum.

Q    And you are indicating then you had to go back?

A    I was readmitted back on the twenty-third. I stayed until the tenth on the first time, and I was readmitted to about the

-32-

twenty-third or twenty-fourth because I had a blood clot.  They
don't know --

Q    The twenty-third of February?

A .  No, the twenty-third of January to the third of February.

                MR. IZZO:  Your Honor, I would like to object

          to the admissibility of the information about

          this individual's second time in the hospital on

          the grounds of relevancy.

                THE COURT:  At this point, yes, it has

          not been established that was relevant.  We sustain

          the objection, and the jury will disregard the

          testimony regarding the second admission to the

          hospital.

BY MR. WARMAN:

Q    Now, was there anyone else in the parking lot of Tigo's
that you saw?

A    No.

Q    When you were shot?

A    No.

Q    And at the time of the actual shooting, can you tell me
where both of these defendants were?

A    Yes, right on the same side of the car, right at the
door, passenger side door.

Q    That would be where you have the mark made on the chalkboard?

A    Yes.

Q    Did you threaten them with any kind of a weapon or anything?

A    No, I didn't.  Like I said, I had my arms -- I had nothing.

Q    Would you point out to us -- you pointed out one of the defendants.  Would you point out the other person to us that was there?

A    The third man (indicating).

Q    At Tigo's that day?

A    The third man.

Q    The third man in?

A    From the far left.

Q    Far lefthand table.

MR. WARMAN:   Cross-examine.

### CROSS-EXAMINATION

BY MR. IZZO:

Q    Mr. Ricker, you mentioned that these two individuals who had come into the bar that evening that you indicated to the jury that you remember how they were dressed; is that correct?

A    Slightly.  Like I said, not down to the last detail, but, you know, reasonably.

Q    Okay.  You indicated that one of the individuals was wearing a blue jacket?

A    Like a blue jacket, blue sweater, real light.  Like I said, it was a jean jacket, because like I said, it had been faded.

Q    Okay.  Was the individual who had the beard on that was wearing this jacket?

A    Yes, sir.

Q    And the other individual without a beard, who you had indicated

as being in the bar, was Ellis Price?

A    Yes, sir.

Q    And he had on a shirt with three quarter length sleeves?

A    About three quarter length.

Q    Do you remember what color it was?

A    Offhand, no, I don't.

Q    Okay.  Now, you mentioned something about a cover charge

when you were standing at the door.  Do you recall how much the

cover charge was?

A    Like I said, it was $10.00 per person.

Q    Per person?

A    Um-hum.

Q    Do you recall whether you indicated to these two gentlemen

when they came in that there was a cover charge?

A    Actually, I didn't talk to them two when they first came in

because I talked to the girl.

Q    I see.  You were standing at the door?

A    Yes.

Q    Were you collecting money for cover charges?

A    Yes.

Q    You didn't ask them for ten?

A    Yeah, I asked them.  I told them all they have to do is pay

$5.00 since it was one o'clock.  The girl said she would take

care of it.  Like I said, the girl had been in a couple times

before, and I knew her, and like I said, that is why they were
let in to begin with.

Q    Do you know what that girl's name is?

A    Kelly Price.

Q    Do you know if she is related to these people?

A    As far as I know, no.  I don't know.

Q    You are not sure?

A    No.

Q    Now, you mentioned that when you were inside of the bar that
these two individuals were arguing with the bartender; is
that correct?

A    Um-hum.  Not arguing, but like I said, he was saying, okay
if somebody -- they got back -- they said they gave the bartender
$10.00 instead of a five, and they were telling him about that,
and the bartender said, no, he didn't.  It was nothing real loud.

Q    Oh, so it wasn't really an argument?

A    It was an argument.

Q    Maybe a discussion?

A    A discussion more it was an argument, because like I said,
it started to get loud and that is when I came over.

Q    Did you hear Ellis Price at any time threaten the bartender
during the course of this discussion?

A    No.

Q    Now, when you asked these two fellows to leave the bar,
that was because they were having a discussion or argument?

A    Like I said, I watched them throughout the evening a little

while since they came in, because they were sitting in other

people's seats and that, and that was the first time they were

ever in, and like I said, it was a New Year's party, and like I

said they were causing a little commotion before that, and like I

said it was two o'clock anyway.  So, it was time to leave, so

that is why I asked them.  I said, it is best that they left.

Q    Did you ask any other individuals at that time to leave?

A    No, I didn't.

Q    You mentioned as they walked out that they were grumbling.

Do you recall anything that either of them said?

A    Like I said, I can remember they were mumbling.

Q    Grumbling to themselves?   Did my client, Ellis Price,

ever threaten you as he walked out the door?

A    No.

Q    Did my client, Ellis Price, ever say to his brother that we

ought to do something about this?

A    Not that I know of.  Like I said, I wasn't close.  Like

I said, I stayed where I was at for a minute or two, and then I

thought about while they were grumbling going out the door, I

said, I don't want any cars messed up out there, and that is

the only reason I actually went out to the door.

Q    Okay.  Now, you indicated they were grumbling as they walked

out the door.  You had asked them to leave.  Where were you in

relation to the main -- the first door, the inside door?  Where

were you in relation to that door when you told them to leave?

A    Right -- well, we have a U-shaped bar.  The entrance comes

in, and then you go through a small short hallway, and then you

have the bar right there.  I was on the opposite side of the

bar about from here (indicating) to the first row of pews

(indicating) from the first doorway.

Q    From the first door.  So, about twenty-five feet?

A    I would say around in there.

Q    Did you watch them go out that first door?

A    Yes, sir.

Q    As they went out the first door, did you follow them then?

A    Not right that minute because like I said, I wasn't going

to follow them, and then I thought well, like I said, I better

check to make sure the cars are all right.

Q    Did you see them go through the outside door?

A    No, I didn't.

Q    So, you said it was maybe a minute or two or maybe three

minutes before you actually went out?

A    Yeah, about two minutes at the most.

Q    When you finally decided to walk out and then you walked

out this outside door, you saw both of the individuals on this

side (indicating) of the car?

A    Yes.

Q    And what was the first thing they said, either one of them?

A    The first they said to me about coming back into the bar.

Q    They wanted to come back into the bar, isn't that right?

A    Yeah.

Q    Why did they want to come back into the bar?

A    I don't know.  Like I said, I don't know why.  Like I said, they just wanted to keep on partying or what.

Q    Didn't they indicate they wanted to come back in the bar to pick up the girl they brought?

A    No.

                THE COURT:  Did you say that they said this while they were standing beside the car?

                THE WITNESS:  Yes.

                THE COURT:  Do you know which one made this statement?

                THE WITNESS:  No.

                THE COURT:  They wanted to come in?

                THE WITNESS:  Like I said, they were both standing close together and I --

                THE COURT:  Only one?

                THE WITNESS:  Only one, yeah.

                THE COURT:  Only one of them said he wanted to come into the bar?

                THE WITNESS:  Yeah.

BY MR. IZZO:

Q    But you are not sure which one?

A    No.

Q    Did they threaten you verbally at any time when they were

saying they wanted to come back in?

A    No, because I wouldn't be standing in the doorway like that if they did.

Q    Did you indicate to them right away that they couldn't come back in?

A    Yes, sir.  I said, no, you can't.  You have to leave.

Q    Did they say anything to you in a threatening way when you said, no, you can't come back in?

A    All he did was reach down on the seat and pick up something.

Q    But you don't know who?

A    I said at the time I didn't know who picked it up or what it was.

Q    What was the other individual doing while this one person was reaching on the seat?

A    Standing there.

Q    Standing there?  Was the door open in this car whenever they reached in, this person reached in?

A    I don't know.  No, I don't think -- yeah, it was open.

Q    The door was open?

A    Yeah.

Q    Was the light on inside of the car?

A    I can't remember.  I don't think it was.

Q    But you are sure the door was open?

A    Um-hum.

Q    Which way would that door have opened on the car?

A    Okay, it would have swung this way (indicating).  The car was pointed this way (indicating), straight down.

Q    You were standing at the back of the car?

A    No.

Q    I mean, you were standing -- the back of the car was facing you?

A    Towards me.

Q    Now, you mentioned that after you felt this pain, this hit in your chest, that you didn't know what happened right away and so on?

A    I never have been hit by a bullet before.  So, I didn't know what it felt like.

Q    And you backed up into the alcove, and you mentioned that another person came out of the bar?

A    Um-hum.

Q    When did that other person come out?

A    Well, as I backed out, he was standing more or less right beside me, or just a little bit -- he was coming out the door at the time.

Q    That person was coming out the door as you were backing up?

A    Of that first door.

Q    That first door, this door (indicating)?

A    Yeah.

Q    You were backing up?

A    Like I said, I was right in the doorway.  I was standing right --

Q    Like right here (indicating)?

A    Dead in the doorway.

Q    So, the wall would have been right next to you here (indicating)?

A    Like I said, I backed in.

Q    Okay, and you backed in immediately?

A    Well, pretty close to immediately as far as I know, yes, because like I said, I seen the flash and heard the bang, and I thought -- my first thing was to move, and like I said, so I went to move, and by that time, it was too late to do anything anyway.

Q    And while you were moving this guy was passing you?

A    Within a minute.

Q    A minute?

A    He was coming out.  I don't think it was -- it was almost instantaneously.  He was standing right here (indicating) and then he heard the shots, and he seen me.  Hey, I don't even know if he knew I was hit because I backed out, and he took off.

Q    Just like that (snapping fingers)?

A    Because somebody had told in the bar, go watch Tiny.  That is what they call me, Tiny, because they seen me walk out with -- walk after them.

Q    That's fine.  Do you know who it was that came out?

A    Yes.

Q    Who was it?

A    Richard Pletcher.

Q    Richard Pletcher.  He was in the bar that evening?

-42-

A    Yes.

Q    You know him?

A    Yes.

       MR. IZZO:  I have no further questions of this witness, Your Honor.

       THE COURT:  Mr. Cupp?

<u>CROSS-EXAMINATION</u>

BY MR. CUPP:

Q    Mr. Ricker, you said you arrived at about 8:30. That was actually December 31st, wasn't it?

A    Yes.

Q    And you said that the defendant arrived around one o'clock?

A    Yes.

Q    And there were three of them there?

A    Well, there was three people. Yeah, three.

Q    The two defendants and the girl?

A    Yeah.

Q    And you said that the girl was Kelly Sue Price?

A    Um-hum, Kelly Price.

Q    Had you ever seen her before?

A    Yes, I have.

Q    Had you ever seen either of these two gentlemen before that evening?

A    No, I haven't.

Q    You were describing the clothes that the people were wearing.

Does your recollection come from the specific moment that the people entered the bar, or whenever you described one as having had on a blue jacket and one having had a shirt with a three quarter length sleeve? Does that recollection come from seeing them inside of the bar?

A    More or less inside of the bar.

Q    Then whenever they came through the door, would it have been possible for one of them to be wearing --

                    MR. IZZO:  I'll object, Your Honor.  It calls

                    for speculation of the witness.

                    THE COURT:  It sounds like it is coming

                    to be a speculative question, would it be possible.

                    We are going to sustain the objection.

BY MR. CUPP:

Q    You don't have any recollection as to how they were attired when they came through the door?

A    No, I wasn't -- I was talking more to the girl, because like I said, I knew her.

Q    Okay.  You said they were both standing beside the car?

A    Um-hum.

Q    Is that right?

A    Yes.

Q    And in a parking lot.  When they were standing beside the car, were they both on the passenger side or the driver's side?

A    Passenger side.