Q    You said they were standing together.  About how far apart were they, a foot, two feet?

A    It wasn't -- they were next to each other.  Right next to each other , like a huddle.

Q    Fine.  You said that whenever you looked out the door of the bar that it was twenty feet at most from there?

A    About that at the most it was.

Q    Whenever you -- do you remember testifying before District Justice Eugene Simon?

A    Yes.

Q    Whenever you testified there, you said it was twenty-five feet.

A    Like I said, I just know twenty, twenty-five.  Like I said, I think it wasn't more than twenty.

Q    Well, are you more sure of the distance now than you were then?

A    Because I had just gotten out of the hospital then.

Q    That was closer in time?

A    Um-hum.

Q    Your memory got better as time passed.  Did you see anyone carrying a gun inside of the bar?

A    No, I didn't.

Q    You did see both of the defendants inside of the bar though you are sure?

A    Yes, I did.

Q     You said you saw flashes and felt like you got hit with a
sledge hammer; is that right?

A     Yeah.

Q     When you saw the flashes, did you see who was holding the
gun?

A     No, I didn't.  Like I said, they were still standing both
together at the time one reached in the car, and like I said --

Q     Are you sure he reached in the car?

A     Yes, on the seat because I thought it was a club.  I
thought maybe they were going to pull out a club or something.

Q  .  Did you see who was holding the gun?

A     No.  Like I said, he came right up on top and fired, like I
said.

Q     Setting the gun on top of the car?

A     He more or less like -- I don't know if he sat it on top, but
he came over, you know, the top.  Like I said, he reached on -- well,
it would be like this (indicating).  He came over and like
that (indicating) and right there.  There was no --

                    THE COURT:   There was no what?

                    THE WITNESS:   No hesitation or anything.  It was
            just right like (indicating).

BY MR. CUPP:

Q     It happened in a very short period of time?

A     Yes.

Q     You can't tell which hand he used?

A    No.

Q    You said that Mr. Pletcher came out the door past you as you were falling backwards?  Had the shooting already occurred as he came out the door?

A    Out which door?

Q    The first door?

A    Yeah.  Well, he was out in the hallway when it happened, you know, out in the alcove.

Q    He was in the alcove?

A    Yeah.

Q    You mean this area right in here (indicating)?

A    Yeah, he was walking towards me as the shooting happened.

Q    And you were standing right here (indicating)?

A    No, I was in the doorway.

Q    Right there (indicating)?

A    Right from the doorway.

Q    And these people were standing over here (indicating)?

A    Um-hum.

Q    Let me put a little "x" on here.  Is this where you were (indicating)?

A    Yes.

Q    Where would Mr. Pletcher have been whenever the shooting occurred, right here (indicating)?

A    About half way down the hallway in the alcove.  About right in there, around in there.

Q    Okay. Are there windows or any type of glass in there, or is it brick block?

A    It is mostly block.  There is two windows up high.  You know, they are real high.

Q    Would there be an unobstructed view of the vehicle?

A    No, there would be no view of the vehicle.

Q    No view of the vehicle from where Mr. Pletcher was standing at the time you were shot.

                    MR. CUPP:  No further questions.

                    THE COURT:  Mr. Warman?

                    REDIRECT EXAMINATION

BY MR. WARMAN:

Q    When you say Mr. Pletcher was there when the shooting took place, are you indicating when the shooting started or when it stopped?

A    When the shooting started.

Q    Do you know where he was when the shooting finally stopped?

A    He had went out chasing them.  He had went -- like I said, when I backed out the door, he went out and was chasing them more or less.

Q    So, as far as you know he was outside when the shooting ended?

A    Yeah.

                    MR. WARMAN:  I have no further questions.

                    THE COURT:  Mr. Izzo, anything further?

-48-

MR. IZZO:  That's all of this witness, Your

Honor.

THE COURT:  Mr. Cupp?

### RECROSS EXAMINATION

BY MR. CUPP:

Q    You say when the shooting started.  When the first two shots

were fired, the two that were fired at you, was Mr. Pletcher

still inside of that alcove?

MR. IZZO:  I'll object, Your Honor.

This question assumes facts, and not evidence,

two shots.

THE COURT:  I think he did state there

were two shots fired, or he heard two shots.

We overrule the objection.  You may answer

that question.

THE WITNESS:  What was it again?

BY MR. CUPP:

Q    Whenever the shots were fired at you --

A    Um-hum.

Q    Was Mr. Pletcher in the alcove when both of those shots

were fired?

A    Yes.

Q    Were they instantaneously?

A    Yes.

Q    His view would have been obstructed at all times during those

two shots?

A    At that time, yes.

MR. CUPP: I have no further questions.

THE COURT: Mr. Ricker, just to clarify something, the two persons who were standing by the car, were they the defendants who are in court?

THE WITNESS: Yes, they were.

THE COURT: How do you know that?

THE WITNESS: There was a dust to dawn light right -- almost opposite the car, right on the building.

THE COURT: In the elongated part of that building on the diagram?

THE WITNESS: Yeah.

THE COURT: There is a dust to dawn light?

THE WITNESS: Right above it.

THE COURT: So, are you saying that the area around this parked car was lighted?

THE WITNESS: Lit reasonably. Like I said, as much if -- there is not real like day or night -- day, but like I said, it is lit enough that you can see.

THE COURT: So, you are saying that the two individuals standing near that car were the two defendants in court today?

THE WITNESS:  Yes, I am.

THE COURT:  The only thing you are not able to say which one --

THE WITNESS:  Did the shooting.

THE COURT:  -- did the shooting?

THE WITNESS:  Um-hum, because like I say, they were huddled together, and it happened so fast when they reached down, and just came right up on top.

THE COURT:  Was this establishment known as the Sugar Loaf Hotel?

THE WITNESS:  Sugar Loaf and Parkway.

THE COURT:  All right.  You may step down.

(Witness excused)

MR. WARMAN:  The Commonwealth called Mr. Pletcher.

MR. IZZO:  Your Honor, before we bring Mr. Pletcher in, could I have an offer of proof on this witness?

SIDEBAR CONFERENCE HELD OFF THE RECORD

THE COURT:  Mr. Pletcher, you may come forward and be sworn in.

(Witness sworn)

RICHARD PLETCHER, having first been duly sworn, was examined and testified as follows:

## DIRECT EXAMINATION

BY MR. WARMAN:

Q    For the record, sir, will you give us your full name?

A    Richard Pletcher.

Q    And where do you live?

A    West Leisenring.

Q    And how old are you?

A    Thirty-four.

Q    Are you married or single?

A    What's that?

Q    Are you married or single?

A    Divorced.

Q    And are you acquainted with the individual who just testified here today, Raymond Ricker?

A    Yeah.

Q    Okay.  How long have you known him?

A    Eight or nine months.

Q    Where do you know him from?

A    The bar.  He was working at the bar.

Q    Okay.  So, you know him as a result of something that occurred at the bar?

A    Yeah.

Q    What was that?

A    A shooting.

Q    Can you tell me were you present at the bar -- what bar was it

to begin with?

A    Tigo's Lounge.

Q    And where is Tigo's Lounge located?

A    On fifty-one.

Q    Pennsylvania Route 51?

A    Yeah.

Q    And can you tell me if you were present at Tigo's Lounge on the late hours of December 31st or early morning hours of January 1st of 1986?

A    Yes, I was there.

Q    And how did you happen to be there at that time?

A    They was having a New Year's Eve party, and we had reservations.

Q    Okay. So, you had reservations for a New Year's Eve party?

A    Um-hum.

Q    I'm going to ask you to speak up a little bit because it is a little difficult for me to hear you here, and the members of the jury have to hear what you say. Okay? Do you know approximately what time you got to Tigo's lounge that day?

A    I would say around eleven o'clock.

Q    And did you see Raymond Ricker there that morning or that night?

A    Yes, he was standing at the door taking the invitations that you had when you come in.

Q    So that you saw him then when you first entered the building?

-53-

A     Yes.

Q     And can you tell me if you saw -- did you see anyone with
a gun at that time?

A     No, I didn't.

                    MR. IZZO:  I'll object to that, Your Honor.

                    It is a leading question.  He can ask the

                    witness what he did see.

                    THE COURT:  Sustained, and the jury will

                    disregard the answer.

BY MR. WARMAN:

Q     Is there anything that brought your attention to the outside
of Tigo's Lounge at any time that morning?

A     Yes.

Q     Can you tell me what it was?

A     I was sitting at the corner of the bar, and this woman,
Goldie, hollered  Tiny went outside with a couple of guys.  You
better go see what was going on.  So, I walked out.

Q     So, somebody said Tiny went outside with a couple guys, and
you decided to go out?

A     Yes.

Q     And can you tell me approximately what time it was?

A     No, I couldn't.

Q     What did you do when that happened, when you heard them
say Tiny went out?

A     What did I do?

Q     Yeah.

-54-

A    Well, I went outside and Tiny was standing in the doorway,

then I heard some shots.  So, I looked around the door, and then I

seen flashes.

Q    Where were the flashes coming from?

A    A guy over there (indicating) shooting with the gun.

Q    Okay.  Now, you were pointing somewhere.  Where were you

pointing to when you said the guy over there with the gun?

A    The one on the corner with the dark jacket.

Q    That would be the defendant at the far end of the counsel

table from me?

A    Um-hum.

Q    And where was he standing when you saw him with a gun?

A    Behind the car.  There was a car sitting there, and he was

standing behind the car.

Q    Now, when you say behind the car, would you show us on this

diagram here where that was that you saw him?  Was it -- let me

back up a second.  Was he moving at the time you saw him?

                    MR. IZZO:  I'll object, Your Honor.  He is

            leading the witness.

                    THE COURT:  Sustained.

BY MR. WARMAN:

Q    How about telling us what you saw then?

                    THE COURT:  You may step down there.

BY MR. WARMAN:

Q    I want you to come down here and show us on the diagram.

A    The large item on that chart is the lounge and --

Q    Is this the car (indicating)?

     THE COURT:  Is that correct, that is the

    car?  Do you want to step to the side so the jury

    can see.

     THE WITNESS:  (Indicating).

BY MR. WARMAN:

Q    So, you are pointing then behind the car?

A    Um-hum.

Q    And how far away from the door of the establishment would

he have been at that point there, do you have any idea?

A    Fifteen to twenty feet.

Q    And was there anyone with him at that time?

A    Yes.

Q    Who was with him?

A    The guy in the blue shirt (indicating).

Q    Okay.    You are indicating the man who is seated the

third from the far end of counsel table then?

A    Yeah.

Q    In the blue shirt?

A    Yes.

Q    Let the record indicate he is pointing to Ellis Price.

And where was he?  Where was Ellis Price at that time?

A    He was walking down the side of the car.

Q    So, he was also in the back of the car when you first saw him?

A    Yes.

Q    How far were they apart, these two individuals?

A    From here (indicating) to the officer (indicating).

Q    So, maybe standing six feet apart?

A    Maybe.

THE COURT:  Keep your voice up, please.

THE WITNESS:  Maybe six feet apart.

BY MR. WARMAN:

Q    What was Robert Price -- excuse me, what was the individual you said had the dark jacket on that you pointed out here in the courtroom, what was he doing with the gun when you saw him?

A    Pointing towards the bar and shooting it.

Q    Now, when you say towards the bar, toward what area of the bar?

A    To the doorway.

Q    How many shots did you see or hear?

A    Probably around three or four.

Q    And what did you do at that time?

A    Well, then the one started -- he started into the car and got in the driver's door and the other one went around the passenger door.  So, I come around the passenger, and he closed it and shot through the window to me.

Q    Which one went around to get in the driver's door?

A    The one in the light blue shirt.

Q    That would be -- okay, which one then went to the passenger?

A    The one in the dark coat.

Q    At the far end of the counsel table?

A    Yeah.

Q    Did you -- could you tell whether or not they were talking to each other at that time?

A    No.

Q    You could not tell?

A    Huh-uh.

Q    Maybe you can resume the stand.  Can you tell me whether it was lighted in this area back here (indicating)?

A    Yeah, there is a dust to dawn light there.

Q    And is it anywhere near where it happened?

A    It sets up on the corner, yeah.

Q    And did you have a good view of what took place there that morning?

A    Yes, I did.

Q    Had you seen either of these individuals earlier that evening in the bar?

A    Yes, they were sitting -- I was sitting here, and they were sitting straight across from me at the bar.

Q    Is this a circular bar or something?

A    Yeah, it comes like this and goes (indicating).

Q    What is it circular or square or --

A    More like triangular I would say.

Q    Okay.  And you say they were sitting opposite you?

A    Yes.

Q    So, you had a straight view of them then at the bar?

A    Yes.

Q    And over what period of time had you had an opportunity to view them at the bar?

A    What do you mean by that?

Q    How long did you see them there at the bar?

A    Oh, fifteen, twenty minutes.

Q    And do you know why they left the bar?

A    I didn't then, but I do now.

Q    Okay.  So, you didn't know what happened then that day?

A    No.

Q    Now, when you say you were shot at at the car, was this while the window was open or down?

A    The window was up.  He shot right through the window.

Q    What happened to the window?

A    It shattered, and I took off running.

Q    Okay.  And how many times were you shot at then at the car itself through the window?

A    Once, that I know of, because he shot and the glass busted, and I took off.

Q    Do you know which one of the occupants of the car it was that fired the shot through the window?

A    No, I couldn't see in the car.

THE COURT:  Was anybody else in this car to your knowledge other than the two defendants?

THE WITNESS:  I didn't see anybody else get in it.

THE COURT:  Is this a two seated car or one seat?

THE WITNESS:  Two seats.

THE COURT:  Front and back, is that what you mean?

THE WITNESS:  Yeah.

THE COURT:  And what area did the shots come from, the front seat area or the back seat area?

THE WITNESS:  The front seat passenger window.

BY MR. WARMAN:

Q    What type of car was it?

A    A white Chevy II Nova.

Q    A white Chevy II Nova, and can you tell me whether it was four door or two door?

A    Two door.

Q    What did you do then after -- what did they do?  Where did the car go after that?

A    They took off.

Q    What did you mean by that?

A    Well, they just drove away.

Q    And where did you see them going when they drove away?

A    Out onto fifty-one.

Q    Now, the way the car is depicted on the diagram, that would be going out it looks like it would be going straight out to Route 51 south. Is that the way they went?

A    Yes.

Q    And after they left, what did you do?

A    Well, that is when I went back in the bar and found out Tiny was shot, and I called an ambulance.

Q    And when you found out he was shot, where was he?

A    Leaning back into the doorway, against the other wall.

Q    Did you see any blood at that time?

A    No.

Q    Now, the fellow that you refer to as Tiny, who is that?

A    Ray.

Q    Raymond Ricker?

A    Yeah.

Q    Could you tell what kind of gun it was that was used for this shooting?

A    No, I thought it was a blank gun because I didn't hear it hitting nowhere or nothing. I just seen flashes.

                    MR. WARMAN:  Cross-examine.

                    THE COURT:  We will hold off the cross-
               examination until after our noon recess. Members
               of the jury, during this noon recess, you are not

-61-

to discuss the case among yourselves or permit
anyone to approach you to talk to you about the
case.   Should that happen, do not talk to them
and call it to our attention.   Also, if there are
any news accounts about this case, please avoid
any news accounts.   We will recess until one-thirty
this afternoon.

COURT RECESSED AT 11:56 A.M.

COURT RECONVENED AT 1:30 P.M.

THE COURT:  Mr. Pletcher, you may resume the
witness stand.  I would like to remind you that
you are still under oath.

THE WITNESS:  Okay.

THE COURT:  I believe you had completed
your direct examination, Mr. Warman?

MR. WARMAN:  That's correct, Your Honor.

THE COURT:   You may cross-examine, Mr. Izzo.

MR. IZZO:  Thank you, Your Honor.

## CROSS-EXAMINATION

BY MR. IZZO:

Q    Mr. Pletcher, I just have one question for you.  I just
want to know whether this man, Robert Price, is the man you saw
in the parking lot of Tigo's Lounge firing shots at the
doorway?

A    Yes, he is.

-62-

MR. IZZO:  That's all I have, Your Honor.

THE COURT:  Mr. Cupp?

### CROSS-EXAMINATION

BY MR. CUPP:

Q    Mr. Pletcher, have you ever been convicted of any crimes?

A    No.

Q    You are not the same Richard Pletcher who is charged in 1972 with indecent assault and corruption of minors?

MR. WARMAN:  I'm going to object to that, Your Honor.  I think he is trying to impinge the character of this witness by a crime which isn't even crimen falsi.

THE COURT:  Well, I don't know, what is the offense?  Did you say that you were never convicted of any crime?

THE WITNESS:  See, there was me and another guy.  I got out of it.  I didn't do nothing.

THE COURT:  Let's have a sidebar.

THE WITNESS:  I was underage.

SIDEBAR CONFERENCE HELD OFF THE RECORD

THE COURT:  Members of the jury, you heard some testimony regarding whether this witness was involved in some other crime.  That was an entirely improper question to ask of this witness.  You are to disregard the question and

answer.  It will have no bearing whatsoever in your decision and in your deliberation in this case.  You may continue, Mr. Cupp.

BY MR. CUPP:

Q    Mr. Pletcher, on the evening of January 1, 1986, had you been drinking?

A    Yes.

Q    Do you have any idea how much alcohol you had consumed by one o'clock in the morning?

A    No.

Q    When did you start drinking?

A    Oh, probably around eleven-thirty.

Q    Eleven-thirty on the evening of December 31st?

A    Yes.

Q    And at the time the shooting occurred, do you recall about what time it was?

A    No, I don't.  I had just got done eating.  That is whenever everything happened.

Q    What were you drinking that evening, do you remember that?

A    Windsor and gingerale.

Q    Windsor is a type of whiskey?

A    Yes.

Q    Do you have any idea how many of those you had drunk?

A    No.

Q    More than six?

A    No, I won't say more than six.

Q    How large were the glasses?

A    Only about this high (indicating).

Q    How long had you known Mr. Ricker, who is this Tiny, the
bouncer?

A    About eight or nine months.

Q    Did you know him any period of time prior to January 1st?

A    Just when I was going over there.  That is how I met him,
over there.

Q    You said a woman told you that Tiny went out in the parking
lot.  Do you recall which woman told you that?

A    No, I don't.

Q    You said you heard shots and then saw the flashes?

A    Yeah, because I was walking through the hallway, because
there is a hallway there.  When I walked through the hallway,
I heard about two shots, and then I walked out around the corner
of the door, and that is when I seen flashes.  They were still
shooting.

Q    You saw the flashes, but you didn't hear the shots outside,
you heard the shots inside?

A    Two shots I heard walking through the hallway.  I didn't
see no flashes on them.  Then when I went outside and stepped
around the door, I seen the flashes.

Q    You saw flashes?

A    Yes.

Q    Okay.  You said that you saw these two gentlemen both in the bar?

A    Yes.

Q    When you were in there.  Did you see either of them or both of them when they came through the door, when they entered the bar the first time?

A    No.

Q    You were inside of the bar already when that occurred?

A    Yes.

Q    And you didn't pay any particular attention to their entrance?

A    No.

Q    Did you pay any particular attention to their leaving?

A    No.

Q    Did you see them when they walked out?

A    No.

Q    I'm going to call your attention to the drawing on the blackboard.  Now, you said you could distinguish between the two defendants out in the parking lot, you could see which was which, okay?

A    Um-hum.

Q    Where was Mr. Robert Price, the fellow with the coat, was he standing here (indicating) when you saw him?

A    Yes.

Q    As if he were going around to get in this side
of the car (indicating)?

A    No, he was standing there shooting.  The other one was --

Q    He was standing here (indicating)?

A    The other one was going around the car.

Q    The other one was standing here, too (indicating)?

A    No, he was going around the car.

Q    He was over here (indicating)?

A    Coming down the side of the car.

Q    Or over here (indicating)?

A    No, he was already --

Q    Over here (indicating)?

A    Yeah.

Q    Okay.  No one was standing over here (indicating)?

A    Not that I seen.

Q    Okay.  And you were coming through this door (indicating);
is that right?

A    I was already out the door then, yes.

Q    You were out the door, and you saw these two people standing
here (indicating)?

A    Yes.

Q    Okay.  Did you hear either of these people saying anything?

A    No, I didn't.

Q    No conversation at all?

A    No.

-67-

Q    Did you see anybody else out in the parking lot?

A    No.

Q    You said you saw flashes and then you ran towards the car?

A    Um-hum.

Q    Weren't you afraid they were going to shoot you?

A    I thought it was a blank gun, because I didn't hear it hitting nothing.

Q    How many shots did you hear?

A    Two when I was coming through the hallway and three or four outside.

Q    Is that before the shot went through the car window?

A    Yes.

Q    So, you heard three or four shots before the --

A    Yes.

                    MR. CUPP:  No further questions.

                    THE COURT:  Any redirect, Mr. Warman?

                    REDIRECT EXAMINATION

BY MR. WARMAN:

Q    So, all together you saw -- you heard five or six shots?

A    Yes.

                    MR. WARMAN:  I have no further questions.

                    THE COURT:  Mr. Izzo, do you have anything

            further?

                    MR. IZZO:  Nothing further with

            this witness, Your Honor.

THE COURT:  Mr. Cupp, anything further?

RECROSS EXAMINATION

BY MR. CUPP:

Q    You said you heard three or four shots outside, and then there
was a shot through the window, and there were two shots you
heard prior to going outside.  That means, you heard six or seven
shots all together?

A    No, I said I heard two shots when I come through the
hallway, and then outside three or four, and then the shot
through the window.

Q    Right.  So, you add up two, three, and one, and you get six,
and two, four, and one, and you get seven, right?

A    Yes.

Q    Mr. Pletcher, you said that you saw one of the
people shooting whenever you walked outside of the bar, and you
saw the flashes.  Can you tell me how he was holding the gun?

A    He was holding it out, like this (indicating).

Q    Do you recall which hand?

A    No.

Q    You don't recall?

A    Because I was watching the flashes.

Q    He was holding it with one hand?

A    I don't know if he was holding it with one or two, because
he was out like this (indicating), and I just seen the flashes.
I was watching the flashes.

Q     You didn't see which hand?

A     No.

                MR. CUPP:  No further questions.

                THE COURT:  That will be all.

                   (Witness excused)

                MR. WARMAN:  The Commonwealth calls Dr. Blass.

                   (Witness sworn)

DR. DAVID C. BLASS, having first been duly sworn, was examined

and testified as follows:

### DIRECT EXAMINATION

BY MR. WARMAN:

Q     For the record, Doctor, will you give us your full name?

A     David C. Blass.

Q     And you are currently practicing medicine in Uniontown, Pa.?

A     That's correct.

Q     What sort of a medical practice do you have?

A     I am a general surgeon.

Q     And do you also do work at the Uniontown Hospital?

A     That's correct.

Q     And what type of employment do you have with Uniontown
Hospital?   Are you employed by the hospital, too?

A     No.

Q     You practice --

A     I am privately employed.

Q     And you practice your medicine at the Uniontown Hospital?

A    That's correct.

Q    And can you -- could you briefly, Doctor, give us a brief
synopsis of your professional qualifications as a doctor?

A    I attended medical school at the University of West Virginia
from 1967 to 1971. I completed my surgical residency in general
surgery at the University of West Virginia in 1977. I have been
practicing as a staff surgeon at the Uniontown Hospital since 1977.

Q    Okay.

A    I am board certified by the American Board of Surgery.

                    MR. WARMAN:  Your Honor, we would submit Dr.
              Blass as an expert in the field of medicine.

                    THE COURT:  Do you care to cross-examine
              Dr. Blass, Mr. Izzo, regarding his qualifications?

                    MR. IZZO:  No, we accept his qualifications.

                    THE COURT:  Mr. Cupp?

                    MR. CUPP:  No, we will accept them.

                    THE COURT:  Very well. Then we will qualify
              Dr. Blass as an expert in the field of general
              surgery.

BY MR. WARMAN:

Q    You were practicing your profession in January of 1986,
correct, Doctor?

A    That's correct.

Q    And did you have occasion at that time to come in contact
with one Raymond Ricker?

A    Yes, I did.

Q    And can you tell me how you came in contact with Mr. Ricker?

A    Mr. Ricker presented to the emergency room early on the
morning of 1-1-86 with a gunshot wound of the epigastric area.
He presented in the emergency room in shock from blood loss.
Blood loss in the abdomen and also in the left chest.

Q    Okay.  Could you tell us whether you made an external exam-
ination of this person when he came into the hospital?

A    I did, yes.

Q    What did you find at that time, Doctor?

A    He was hypotensive.  His blood pressure was down.  His abdomen
was distended.  He had blood in his chest, in the left chest.
A chest tube was inserted and approximately 300 c.c.'s of fresh
blood was removed from the left chest.  He also had blood in the
abdomen.  This was determined by a procedure called paracentesis
which is placement of an indwelling catheter in the abdomen, and
it is more of a diagnostic study, and fresh blood was found
in the abdomen also.  He was transferred from the emergency room
to the intensive care unit where he was briefly observed and
then taken to the operating room.

Q    And were you involved in the procedures that were used in
the operating room in regard to this patient?

A    That's correct.  I performed the surgery.

Q    Can you tell us why surgery was necessitated?

A    The indications for surgery included the presence of blood
in the abdomen.  The preoperative impression was probable,
rupture of the spleen, also penetration of the left diaphragm,
and as I mentioned he had a left hemothorax.  There was also a
strong suspicion of an injury to the stomach.

Q    And did you in fact perform surgery on Raymond Ricker?

A    Yes, I did.

Q    Can you tell us as a result -- can you tell us how you
performed the surgery, or what you had to do to perfom the
surgery?

A    The abdomen was opened through a very wide incision which
extended, I believe, if I remember correctly, it was a left
subcostal incision that extended up into the epigastric region.
It entailed the use of a large incision because of the immense
size and also because of the suspicion of extensive injury.

Q    Can you tell us after you made the incision, were you able
to observe any of the -- any internal injuries in this patient?

A    Yes, the internal injuries consisted of a through and through
gunshot wound of the fundus of the stomach.  That is the upper
part of his stomach, just adjacent to the esophagus.  He also
had a penetration gunshot wound of the left hemidiaphragm and
the superior capsule of the spleen was avulsed or torn
away, and there was active bleeding from the spleen.

Q    Were you able to determine the path of the bullet?

MR. IZZO:  I'll object to that, Your Honor.

I don't believe that Dr. Blass has been
qualified as a ballistics expert.

THE COURT:  Well, he said it was a through and
through gunshot wound, and there has been no
objection to that.  So, we feel if he is able to
tell us that, that we will permit him to do that.
Objection overruled.

THE WITNESS:  To some extent I can predict
the path of that missile.  The gunshot wound entered
the epigastric area which is in the center of the
abdomen, high, and it traversed the abdominal wall.
It went through the anterior and posterior or the
front and back of the stomach, and it seemed to
have moved from his right to his left, across to
the left side and through the diaphragm, and in
doing so, it either struck the superior pole of
the spleen which is in juxtaposition or located
against the diaphragm.  It either struck it or it
avulse<sub>d</sub> the spleen from the impact,
the explosive impact of the missile.  The
bullet went through the diaphragm, and it either
penetrated the left lung, or it caused the bleeding
which appeared in the left chest from just the
injury of the diaphragm itself.  The bullet
appeared on the x-ray to be lodged in his back, in

the lower left thorasic region, and I believe

it is probably still there. We didn't open his

chest. There was no indication for a thoracotomy

because we repaired the diaphragm through the

abdomen, but to answer your question, I think the

missile entered the epigastric area and moved

to the left traversing the diaphragm and

injuring his spleen, and it came to rest in his

back in the left posterior lateral chest.

BY MR. WARMAN:

Q    So, the bullet then was no removed from his body?

A    No, huh-uh.

Q    And can you tell us, Doctor, whether the injury that the

defendant -- excuse me, that Mr. Ricker received from this

projectile was life threatening?

A    Certainly, yes, it was life threatening. I want to add one

thing that I forgot to mention. He had a through and through

injury of his left wrist. The bullet penetrated his left wrist,

and I believe that his hand must have been up over his abdomen

when he was shot because the bullet went through his wrist,

went through the anterior and posterior aspect of his wrist,

and then into the abdomen as I stated.

Q    And you are able to say in your medical opinion to a

reasonable degree of medical certainty that this was a

life threatening situation?

A    Certainly, most definitely.

Q    Can you tell me how long he remained in the hospital following your surgery?

A    I believe ten days. That is, I looked at the records today before I came up, and I think it was ten days. I'm not certain about that. So, I'm just -- that is my recollection.

Q    Do you know whether he had to be readmitted at any time relative to this?

A    Yes, he was readmitted.

Q    Could you tell us what that was for?

A    He was readmitted, and, again, I'm not sure of the date, but it was several weeks after his discharge, and he was admitted for a pulmonary embolism, and the pulmonary embolism was due to a blood clot which more than likely was in his left leg that went up to his left lung, and caused an infarction which is the death of a portion of the left lung.

Q    And are you able to say to a reasonable degree of medical certainty whether or not that subsequent readmission was caused by the injury which he received on January 1st of '86?

A    Yes, I can.

Q    And was it?

A    Well, I have to qualify that. This patient I had known him before. This patient had some underlying disease. He was morbidly obese. He has diabetes, and he also had venous stasis disease of his lower extremities, and he therefore was very

susceptible and very prone to deep venous thromboembolic disease,
and we can say with our best degree of certain$_{ty}$ that the
thromboembolic problem that he sustained was due to the prolonged
period of bed rest that he had following his gunshot wound.
He was in the hospital approximately ten days. He was in bed
most of the time, and assuming that he was predisposed to this type
of problem, the prolonged period of bed rest caused it. It is
a complication of bed rest, and it is also a complication of
severe underlying disease.

        MR. WARMAN: Thank you, Doctor. Cross-examine.

        THE COURT: Mr. Izzo?

        MR. IZZO: Thank you, Your Honor.

          CROSS-EXAMINATION

BY MR. IZZO:

Q    Dr. Blass, you were working at the emergency room on
January 1, '86?

A    I was present in the hospital. I wasn't working in the
emergency room. I'm not employed by the hospital. I was asked
to see him for a consultation.

Q    Okay. When he arrived though, you were at the hospital?

A    I saw him when he arrived.

Q    Okay. You weren't at Tigo's Lounge on the first, were you?

A    No. No, no.

Q    You have no way of knowing from your own personal knowledge
who it was that caused the injuries to Mr. Ricker, do you?

A    No, I have no way of knowing.

            MR. IZZO:  That's all, Your Honor.

            THE COURT:  Mr. Cupp?

                    CROSS-EXAMINATION

BY MR. CUPP:

Q    Dr. Blass, you said that there was a bullet which pierced the left wrist and then entered into the abdomen?

A    That's correct.

Q    Was it your opinion that there was only one bullet that did all of that damage rather than two separate bullets?

A    Yes, that is my opinion.

            MR. CUPP:  No further questions.

            THE COURT:  Anything further, Mr. Warman?

            MR. WARMAN:  No, Your Honor.

            THE COURT:  Very well.  That will be all, Doctor.

            MR. WARMAN:  We would ask that the Doctor be excused, Your Honor.

            THE COURT: Any objection from counsel?

            MR. IZZO:  None, Your Honor.

            MR. CUPP:  No.

            THE COURT:  You are excused from further attending this trial, Dr. Blass.  Thank you for coming.

            MR. WARMAN:  Thank you, Doctor.

(Witness excused)

MR. WARMAN:  The Commonwealth calls Deborah
Zinn.

MR. IZZO:  Your Honor, I would like an offer
of proof on this witness.

SIDEBAR CONFERENCE HELD OFF THE RECORD

SIDEBAR CONFERENCE HELD ON THE RECORD

THE COURT:  The purpose of this sidebar is
to receive an offer.

MR. WARMAN:  And, Your Honor, this witness,
Deborah Zinn, is being called basically as an
identification witness.  She was the waitress
at Tigo's Bar on the night this happened.  She
observed the two individuals standing at the
bar.  They were right next to the area in which you
had to come into the bar for whatever she got, and
she in fact danced with one of the defendants
at the bar.  She overheard part of the problem
between the defendants and either the bartender
or Mr. Ricker, and basically an identification
witness.

THE COURT:  Will she state which one she
danced with?

MR. WARMAN:  I don't know.  I think -- I
believe she will.  Sure, um-hum.

THE COURT:  Do you know which one it was she danced with?

MR. WARMAN:  No, I don't.  I wasn't that curious.

THE COURT:  I don't know whether there is any dispute that these men were in there.  Perhaps you could find out from her if she can tell that, and we will put that on the record which one she danced with.

SIDEBAR CONFERENCE HELD OFF THE RECORD

SIDEBAR CONFERENCE HELD ON THE RECORD

MR. WARMAN:  Ellis Price.

THE COURT:  She danced with Ellis Price. All right.  Now, is that your client?

MR. IZZO:  Yes.

THE COURT:  Mr. Izzo?

MR. IZZO:  Your Honor, I would simply state that I object to that portion of the testimony of this witness which comprises cumulative testimony, that is that the two defendants were present at Tigo's Lounge on the evening in question, and I believe that the other portions of the offer set forth by Mr. Warman are irrelevant to the questions in the case and at least immaterial.

THE COURT:  Mr. Cupp?

MR. CUPP:  I didn't object.  He did.

THE COURT:  We see no harm in permitting this witness to testify.  She appears to have been -- appears as though she will be a disinterested witness and is not involved in the fracas and was not a victim.  We think the Commonwealth can properly call her for further identification and for the fact that she danced with Ellis Price.

MR. IZZO:  Okay.

THE COURT:  We overrule your objection.

END OF SIDEBAR CONFERENCE

(Witness sworn)

DEBORAH ANN ZINN, having first been duly sworn, was examined and testified as follows:

### DIRECT EXAMINATION

BY MR. WARMAN:

Q    For the record, would you give us your full name, Deborah?

A    Deborah Ann Zinn.

Q    And where do you live?

A    Uniontown.

Q    And how old are you?

A    Twenty-seven.

Q    And can you tell me if in January of 1986 you were employed at Tigo's Lounge?

A    Yes, sir.

Q    Were you aware that there was a shooting there that day?

A    Yes.

Q    Did -- can you tell us what you -- whether you heard anything
or whether you were in the area where Raymond Ricker was before
the shooting?

A    You mean --

Q    Inside of the tavern?

A    Yeah, there was those two guys there (indicating).  They
were arguing with the bartender over money.

Q    Okay.  Now, you said those two guys there.  Could you point
out the individuals to the jury that you say were there
that morning?

A    That one and that one (indicating).  The one in the blue suit
and the blue shirt.

Q    When you are saying the one in the blue suit, you mean the
person at the far end of the counsel table from me?

A    Excuse me?

Q    You mean the person at the far end of counsel table from me?

A    Yes, sir.

Q    And you said the -- how did you describe the other one?

A    The blue shirt.

Q    The blue shirt.  Let the record show that Ellis Price is
the person with the blue shirt.  You say you saw those individuals
in the bar that morning; is that correct?

A    That night, yes.

Q    That night, yes.  How long had those persons been in the bar?

A    For about an hour.

Q    And how close to them did you get?

A    I was standing right next to them.

Q    What were you doing there that morning?

A    I was waitressing, and it is just like straight, and you just have to come right to the bar, and I was here (indicating), and they were here (indicating).

Q    So, as you would come up to the bar for things, they would be standing right next --

A    Next to me.

Q    -- to where you had to come up?

A    Yes, sir.

Q    Did you have an opportunity to see them that morning?

A    Yes, sir.

Q    To look at them?

A    Um-hum.

                    THE COURT:  You will have to speak up.

                    THE WITNESS:  Yes, sir.

BY MR. WARMAN:

Q    And can you tell me whether you did anything else with either one of them?  Did you talk to either one of them at any time?

A    Yes, I talked to them.  I danced with the one.

Q    Which one did you dance with?

A    The one with the blue shirt.

Q    And how long total period of time would you say that you observed those two fellows?

A    The whole time almost, except for when I had to go back to the tables.

Q    And are you sure that these are the two men that you saw in Tigo's that morning?

A    Yes, sir.

Q    Did you see them leave the bar?

A    Yes, sir.

Q    And why did they leave?

A    Because Tiny asked them to leave, Ray.

Q    You mean Raymond Ricker?

A    Yes, sir.

Q    Now, you didn't go outside?

A    No, sir.

Q    So, you didn't see any shooting?

A    No.

MR. WARMAN: Cross-examine.

CROSS-EXAMINATION

BY MR. IZZO:

Q    Is it Miss Zinn?

A    I'm not married.

Q    Okay.  Miss Zinn, you say that Ellis and Robert Price were

-84-

inside of Tigo's Lounge on the first of January?

A    Yes, sir.

Q    And you stated that they were there for about an hour?

A    Yes, sir.

Q    And you stated that you observed them the whole time they were in there except when you had to go get drinks?

A    Yes.

Q    Did you stand there and look at them for an hour?

A    Well, it wasn't hard to miss them.  They were arguing a lot.

Q    Okay.  Do you know what in particular Robert Price said to the bartender, his words?

A    No, sir.

Q    You don't.  Do you know what words in particular Ellis Price said to the bartender?

A    No.

Q    Who was the bartender?

A    Woody.

Q    Woody.  What is his real name?

A    I don't know.

Q    But Woody is not Raymond Ricker?

A    No, sir.

Q    And Woody is not Mr. Pletcher?

A    No, sir.

Q    Do you recall what Robert Price was wearing on the first of January?

-85-

A    No, I don't.

Q    Do you recall what Ellis Price was wearing?

A    (Shaking head negatively).

Q    While you were dancing with him?

A    (Shaking head negatively).

Q    Did you enjoy your dance?

          THE COURT:  You will have to give your answer

      so the reporter can take it down.

          THE WITNESS:  No.

BY MR. IZZO:

Q    Did you enjoy your dancing?

A    No.

Q    Was Ellis threatening anyone?

A    Yes, he bothered a lot of the women around the bar about

dancing.

Q    He bothered them about -- he asked them to dance?

A    Yeah.

Q    Come on let's dance.

          MR. IZZO:  I have no further questions, Your

      Honor.

          THE COURT:  Mr. Cupp?

          CROSS-EXAMINATION

BY MR. CUPP:

Q    Miss Zinn, have you ever seen either of these two people

before January 1, 1986?

A    No, sir.

Q    Okay.  Did you go into the parking lot after the alleged incident occurred?

A    No, sir.

Q    Okay.  Did you see any of the events that occurred in the parking lot?

A    No.

Q    Did you see either of these gentlemen as they came in the bar when they first came in in the evening or when they left?

A    Yes, sir.

Q    Do you recall what they were wearing when they came in the door?

A    No, I didn't really pay any attention.

Q    Did you know if there was anybody there with them?

A    Yes, sir.

Q    Was there a young woman with them when they came in?

A    Yes, sir.

Q    Did you know her?

A    Yes, sir.  I don't know her that well.

Q    Do you know who she is?

A    Yes.

Q    And who was it?

A    Kelly Price.

Q    Do you know a Richard Pletcher?

A    Yes, sir.

Q    Did you see him there that evening?

A    Yes, sir.

Q    About how long was he there before one o'clock?

A    About two hours.

Q    Did you see him drinking?

A    I didn't really pay any attention.

Q    Well, you don't know whether he was drinking at all or not?

A    Yes, he was probably drinking.

Q    Do you know whether he was intoxicated?

A    He didn't look intoxicated to me.

Q    You don't know how much he drank?

A    No, sir.

Q    You said you were working there.  Were you serving him, or was somebody else serving him?

A    Somebody else.

Q    So, Mr. Pletcher wasn't in the same area of the bar you were working in?

A    No, sir.

Q    You saw Mr. Ricker that evening, didn't you, Raymond Ricker?

A    Yes, sir.

Q    He was the bouncer in the bar; is that right?

A    Well, he was there and at the door.

Q    Did he have anything to drink that evening?

A    Yes, sir.

Q    Do you have any idea how much he had to drink?

A    No.

MR. CUPP:  No further questions.

THE COURT:  Do you have anything further,
Mr. Warman?

### REDIRECT EXAMINATION

BY MR. WARMAN:

Q    You didn't really notice any distinguishing clothing on
these individuals, is that what you are saying?

A    No, I didn't really look at their clothes.

Q    Did you notice any other distinguishing markings on them?

A    Yeah, the one has a tattoo on his hand that says killer.

Q    Which one was that?

A    The one in the suit at the end.

THE COURT:  Which one?

THE WITNESS:  That one (indicating).

THE COURT:  The one in the blue jacket today?

THE WITNESS:  Yes, sir.

BY MR. WARMAN:

Q    You noticed that that night at the lounge?

A    Yes, sir.

Q    And where is that tattoo on his hand?

A    About in here (indicating).

Q    I can't --

A    (Indicating.)

THE COURT:  That is the wrist area?

THE WITNESS:  Well, I know it is in there
somewhere.

THE COURT:  All right.  About the wrist?

THE WITNESS:  About in that area (indicating).

MR. WARMAN:  I have no further questions.

THE COURT:  Do you have anything further,

Mr. Izzo?

MR. IZZO:  No, Your Honor.

THE COURT:  Mr. Cupp?

MR. CUPP:  No, Your Honor.

THE COURT:  That will be all.  You may step

down.

(Witness excused)

MR. WARMAN:  At this point, Your Honor, the

Commonwealth will rest.

MR. IZZO:  Your Honor, may we approach the

bench?

THE COURT:  Yes, you may.

SIDEBAR CONFERENCE HELD OFF THE RECORD

THE COURT:  Members of the jury, there

is a matter that I have to take up with the lawyers

outside of your presence, and I assure you it is

not for the purpose of keeping evidence from you.

Therefore, we are going to give you a recess,

send you in the jury room while we take the matter

up with the attorneys, and when we have completed

that matter, we will have you brought back into