the courtroom.  While you are in the jury room,

please do not discuss the case among yourselves

and do not permit anyone to talk to you about the

case.  As I indicated to counsel at sidebar,

we will give you approximately five minutes to

prepare your arguments.

COURT RECESSED AT 2:11 P.M.

COURT RECONVENED AT 2:30 P.M.

THE COURT:  Let the record show that there are

no jurors in the courtroom and no members of this

week's jury panel in the courtroom.  Mr. Izzo,

I believe you had a motion?

MR. IZZO:  Yes, Your Honor.  On behalf of my

client, Ellis Price, at this time we would enter a

demurrer to all of the charges proffered against

my client.  First, with respect to the conspiracy

charge, there has been no evidence of a conspiracy

offered at all.  We have no evidence of statements

made by either of the defendants to each other,

among one another and so on, that have any bearing

on the crimes of recklessly endangering, aggravated

assault, or attempted homicide.  With respect to the

charges of -- the three charges I just mentioned

other than conspiracy, it is clear that the

Commonwealth has presented only evidence which

indicates that Robert Price, my client's co-defendant was the active or acting party in those offenses. The only theory therefore that the District Attorney could use to find culpability on the part of my client, Ellis Price, would be through the accomplice standards as set forth in 18 Pennsylvania Consolidated Statutes Section 306(c). I might note that the general rule is listed under 306(a), liability for conduct of another, general rule, a person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable. Subsection (c) states accomplice, a person is an accomplice of another person in the commission of an offense if -- I'll wait until you find the place, Your Honor.

THE COURT:  All right.

MR. IZZO:  An accomplice -- a person is an accomplice of another person in the commission of an offense if one with the intent of promoting or facilitating the commission of the offense, and I would like to stop right there and state that the District Attorney has presented no evidence whatsoever of Ellis Price's intent to commit any offense or otherwise if with intent of promoting

or facilitating the commission, he -- and I
believe No. 2(i.i.) is the applicable portion,
substantiates or agrees or attempts to aid such
other person in planning or committing it, namely,
that offense.  The District Attorney has presented
no evidence whatsoever of any action on the part of
Ellis Price to either aid in the commission of a
crime, there was no evidence of an agreement to aid
in the commission of the crime, or that he in any
way attempted to aid or agree in the facilitation
of the crimes.  As I stated to the jury, Your Honor,
and I find a case which agrees, that mere presence
at the scene of a crime does not establish
complicity.  In the case of Commonwealth
versus Smith found at 490 Pennsylvania Reporter
374, that is a 1980 case, on page 377, that rule is
set out.  We agree that mere presence at the scene
of the crimes standing alone does not establish
complicity, and therein they set forth further cites.
The Superior Court has agreed.  I believe at the
latest time in 317 Pennsylvania Superior Court 109,
and I don't have the name of that case, Your Honor.
That is Commonwealth versus Stores, 1983.  The
evidence presented by the District Attorney shows
only that my client, Ellis Price, was with his

brother, Robert Price, with him at the time
that Robert Price opened fire on the doorway of
Tigo's Lounge and that at the time he was opening
fire, my client, Ellis Price, was walking away
from him and getting into the automobile. I will
state that the District Attorney had evidence that
the car drove away, but the witness Mr. Pletcher
stated merely that the car, quote, just drove
away. There has been no indication that it was a
getaway car or anything like that. I believe it
is only natural for an individual who was somewhere
where he was told to leave. He left the
building, and then he got in the car, and they left.
For those reasons, Your Honor, I would ask that
you grant our demurrer to all of the charges
proferred by the District Attorney.

THE COURT: What about the shot fired from the
inside of the vehicle when both defendants were in-
side of the vehicle?

MR. IZZO: Well, Your Honor, there is no
indication by Mr. Pletcher as to who fired that shot.
We do not know that. Directly immediately before
that shot was fired, Robert Price walked
away from Tigo's Lounge, ran, got into the
passenger side of the vehicle, and had the gun

in his hand. Now, at the same time that was happening, my client was driving the car away and Robert Price, having immediately had that gun in his hand prior to that point, it would be fair for the jury to infer that he in fact continued his shooting spree and shot through his window of the car, the passenger window, causing the glass to blow out and towards Mr. Pletcher. I do not believe it is a fair inference that once inside of the car Robert Price handed the gun over to his brother, Ellis, who was driving. I don't believe that the jury can fairly infer that that happened, putting the gun in Ellis' hand. We certainly don't have any evidence to that point.

THE COURT: Well, the car wasn't being moved at that time.

MR. IZZO: I believe Mr. Pletcher stated that the car was moving at that time.

THE COURT: As the shot came through the window?

MR. IZZO: Well, Your Honor, that is what I remembered from the evidence. That may not -- the car may not have been moving, but I don't believe that the car moving or not is dispositive on taking an inference like that. That is what you are asking the jury to do.

THE COURT: It could have been either one, could it not have been? The gun could have been placed on the seat of the car.

MR. IZZO: Well, again, it is speculative.

THE COURT: Sure it is speculation as to which one shot it.

MR. IZZO: Certainly, and I don't believe --

THE COURT: Is that what you are saying?

MR. IZZO: It is speculation.

THE COURT: So, you have three people in the room, and one gets shot, you have two left, you can't hold any of them because you can't say which one definitely shot the third?

MR. IZZO: That is certainly correct, Your Honor

THE COURT: Do you have any authority for that?

MR. IZZO: Well, again, mere presence at the scene is what you have. Those individuals were in the room. I believe that Commonwealth versus Smith as I previously cited would cover that situation also.

THE COURT: All right. Mr. Warman?

MR. WARMAN: Your Honor, I think there are other inferences that can be -- fair inferences that can be drawn from the tesitmony that is introduced. Of course, the jury would be permitted

to draw reasonable inferences and not
speculate, but if we take the evidence as it
has been presented, when the two individuals left
the bar, obviously from the testimony that has
been introduced, they did not go out of the bar for
the purpose of leaving the parking lot. Both of
them -- when Mr. Ricker went out, both of them
were on the opposite side, the passenger side,
of the vehicle engaged in conversation with
the passenger door open, and one of them said to him
they wanted to come back in. They were
coming back in, and he indicated to them, no, you
are not, at which time one of them reached down
on the seat of the vehicle and -- or inside of the
vehicle and pulled out this gun and started shooting.
Now, Mr. Ricker then told the Court that he saw
Robert Price back from the car then, or Mr.
Ricker didn't see them, excuse me. Mr. Pletcher
saw them. Mr. Pletcher saw them back closer to
the door of Tigo's, apparently Robert going from
the door of the vehicle over to get a better shot
into the doorway of the bar.

THE COURT: Well, there is no evidence of
that.

MR. WARMAN: Well --

THE COURT: Apparently to get a better shot.

MR. WARMAN: No, there is no evidence to get a better shot, but he was still shooting at that time, and he was shooting at the doorway of the bar area.

THE COURT: Robert?

MR. WARMAN: Robert, and at that point while he was doing that, Ellis is coming around the car he has indicated. I would submit to the Court that that also is an indication that there was something planned as far as shooting taking place, and their making haste to get out of the area. I would submit to the Court that there is sufficient evidence that has been introduced to indicate that both of these individuals are involved in this crime. Now, we have charged Ellis with the crime as an accomplice, and the Court will see that from the informations that are filed. I would submit to the Court that there is sufficient testimony that has been introduced in this case to show that Ellis was an accomplice in this crime.

THE COURT: Well, to be an accomplice you need more than just the presence. I think you will accept that premise, wouldn't you?

MR. WARMAN: That's correct, but I think the

jury is allowed to draw reasonable

inferences from the evidence that has been

introduced.  I mean, neither one of these

individuals were at the driving side of the vehicle

when Mr. Ricker came out of the bar.  It wasn't

as if Ellis was going out to leave the area and

getting in the car to drive away.

THE COURT:  When they immediately left the bar,

we don't know that they weren't going to leave.

There has been no evidence they weren't going

to leave the parking lot as they were leaving

the bar.  You said they weren't going to

leave the bar area or the parking lot.  There is

no evidence as they were leaving the bar there.

MR. WARMAN:  No, not as they were leaving

the bar, but when he came outside, I think it is

apparent and the inference can be drawn, that

at that point they were not intending to leave,

that there was something else afoot because they

were both on the passenger side of the vehicle

at that point.

THE COURT:  What inference is that?  They may

have just gone to the passenger side.  They may

have been discussing where they were going to go

next, or where they were going to eat, or where

they were going to party next.  There has been

nothing said what they talked about.

MR. WARMAN:  Well, Your Honor, they

indicated to Mr. Ricker that they wanted to

come back in.  They were going to come back into

the bar.

THE COURT:  Wasn't that after they did some

talking?

MR. WARMAN:  They were talking between

themselves, yes.

THE COURT:  And one of them, as I recall,

said they were going to come back in.  Well, isn't

it always a reasonable inference that they could

have said, we don't want to go to such and such

a place or go home yet, let's see if we can go back

in and finish our New Year's Eve party there?

MR. WARMAN:  Well, I think with the events

that happened afterwards, Your Honor, I would say, no

that is not the inference to be drawn from that.

The fact that the one individual reaches into the

vehicle and grabs a gun that is apparently

readily available on the passenger side of the

vehicle where they were standing and begins shooting

at the individual in the doorway of the bar, and

then both of them moving away from that doorway

area where they were, one of them to come around
the car to drive the vehicle away and the other
one still shooting at the bar, and then going back
to the passenger side of the vehicle and getting
in, I would say that that is indicative of a
plan that they were going to carry out and escape.

THE COURT: Where is the conspiracy?

MR. WARMAN: The conspiracy, Your Honor, would
be -- of course, the conspiracy does not have to
be, I mean, proven by words. It can be by the
actions of the parties, and I would submit that
the conspiracy is clearly shown here by the
actions of the parties as I have pointed out
to the Court in what they did, in what took place.

THE COURT: All right. Do you have anything
further, Mr. Izzo?

MR. IZZO: Not at this point, Your Honor.

THE COURT: Mr. Cupp?

MR. CUPP: Your Honor, we would like to offer
a demurrer to the charges of conspiracy because
there has been nothing introduced into evidence
that indicates that any plan was committed.
Although our testimony is going to contradict the
testimony of the Commonwealth's witnesses, it is
our opinion that the Commonwealth has offered

absolutely no proof that a conspiracy of any
sort existed even if all of the testimony they
offered into evidence were to be correct. By
way of inference for two people on the same side
of the car, I will tell you what my client is
going to testify to and that --

THE COURT: I have to base the conspiracy
on what I have heard already.

MR. CUPP: Right.

THE COURT: Not on what may come up later on.
We are at the stage where the Commonwealth has
rested its case.

MR. CUPP: I am aware of that, Your Honor.
I think it is reasonable to infer, Your Honor, that
whenever Mr. Warman was talking about what the two
people were doing on one side of the car, one
person may have been there just to unlock the
door for the other one to get in, and that may
have been the reason for the parties --

THE COURT: We don't know that either.

MR. CUPP: That's true, but that is as
reasonable an inference as to assume there was a
conspiracy. I heard nothing that would allow a
reasonable person to infer from the evidence
presented that these two individuals had plotted

in order to do anything.

THE COURT: Are you demurring to both counts of conspiracy against Robert Price?

MR. CUPP: That's correct, Your Honor.

THE COURT: I will take a short recess to check out these cases, and then I will be back as soon as I'm ready. You may announce a recess.

COURT RECESSED AT 2:48 P.M.

COURT RECONVENED AT 3:33 P.M.

THE COURT: After considering the demurrers submitted in the case of Commonwealth against Robert Keith Price as to the charges of conspiracy to which a demurrer was made, that will be the charge at No. 110 3/8 and 110 7/8, the Court will sustain the demurrers as to the conspiracies, and we would expect counsel to submit the motion in writing with a suggested order. In the case of Commonwealth against Ellis Roy Price, we had demurrer as to all charges. The Court will sustain the demurrers at Nos. 154, 154 1/8, 2/8 and 3/8. Those deal with the incident involving Raymond Ricker. As to 154 4/8, 5/8, 6/8, involving an incident involving Richard Pletcher, the Court refuses the demurrer. At 154 7/8, the criminal conspiracy, the Court will sustain the demurrer. We find no

-103-

evidence of the conspiracy. The case will proceed
as to Robert as to all charges except the
criminal conspiracies. As to Ellis, the case
will proceed as to all charges pertaining to the
shooting from the inside of the vehicle with the
exception of the conspiracy, and we would ask
you, Mr. Warman -- Mr. Izzo, to submit a written
demurrer and a suggested order.

      MR. IZZO:  Thank you.

      THE COURT:  You may call the jury back in.

(The jury panel was escorted back into the courtroom)

      THE COURT:  Members of the jury, I thank you
for your patience with us while we had to consider
certain legal matters. The recess was longer
than we had anticipated, and we hope it wasn't
too hot or too crowded in the jury room. I think
fourteen just about makes it snug in there.
During the recess, I have made some rulings,
and there will be certain parts of this case that
will not be for your determination because of the
legal rulings I have made. As to Robert Keith Price,
I have removed from this case and from your
determination the charges -- the two charges of
criminal conspiracy, the unlawful agreement part
of the case that involves Robert Keith Price,

-104-

and Robert Keith Price is the defendant with the
blue jacket.  So, you will no longer have for
your consideration the criminal conspiracy charges.
With regard to Ellis Roy Price, and he is the
defendant not wearing a coat, with the blue shirt,
I have removed from your consideration for legal
reasons the charges that arise from the shooting
of the man at the door, Raymond Ricker.  Those
are the charges of criminal attempt to commit
criminal homicide, the aggravated assault, the
recklessly endangering another person, and the
criminal conspiracy with regard to that incident.
Likewise, I have removed from your consideration
the charge of criminal conspiracy against Ellis
Roy Price with regard to the shooting that occurred
while a person was outside of the automobile and
the shooting through the window of the automobile.
So, those will no longer be for your consideration
in this case.  To summarize and to make certain you
understand what is before you for further
consideration during this trial, with regard to
Robert Keith Price, all charges are before you
concerning him except the two criminal conspiracy
charges, that is the unlawful agreement.  With
regard to Ellis Roy Price, the charges that are

still remaining are the charges of criminal

attempt to commit criminal homicide, the aggravated

assault, and the recklessly endangering another

person which arises from the incident around

the automobile shooting through the -- the

shooting through the window of the automobile.

Now, I do want to caution you that inasmuch as

I have dismissed some charges against these

defendants, that in no way should that affect

your consideration of the remaining charges.

That in no way should affect your decision as

to what it should be at the end of this case

as to these remaining charges against the

defendants.  The charges against these defendants

that have been dismissed have been dismissed for

legal reasons in the eyes of the Court, but in no

way should that affect the remaining charges.

You are to listen to all of the testimony and

should the remaining charges come before you for

determination, you are to consider them as though

the other charges have not been dismissed.  Is

the defense prepared to proceed with its evidence?

Mr. Izzo or Mr. Cupp, which one of you will go

first?

           MR. IZZO:    Your Honor, on behalf of my

client, Ellis Price, we will not call any

witnesses.

THE COURT:  Very well.  You have discussed

this with Mr. Price, your client?

MR. IZZO:  I have, Your Honor.

THE COURT:  And he is satisfied?

MR. IZZO:  Yes, Your Honor, he is in agreement

with that.

THE COURT:  Is that correct, Mr. Price, you

are in agreement with your attorney that you will

present no evidence on your behalf?

ELLIS ROY PRICE:  Yes, Your Honor.

THE COURT:  You have discussed this with your

attorney?

ELLIS ROY PRICE:  Yes, Your Honor.

THE COURT:  Very well.  Mr. Cupp?

MR. CUPP:  Your Honor, we are prepared to

proceed.  We have two witnesses to call.

THE COURT:  Very well.

MR. CUPP:  We will call at this time

Kelly Sue Price.

(Witness sworn)

KELLY SUE PRICE, having first been duly sworn, was examined and

testified as follows:

## DIRECT EXAMINATION

BY MR. CUPP:

Q    Kelly, would you give the stenographer your full name for the record, please?

A    Kelly Sue Price.

Q    And where do you live, Kelly?

A    Uniontown.

Q    And how old are you?

A    I'm twenty.

Q    Are you related to either of the two defendants by blood or marriage?

A    No, sir.

Q    The name, Price, is the name you were given when you were born?

A    Yes.

Q    And to the best of your knowledge, you do not have a relationship to these people?

A    No.

Q    I want to ask you to tell the Court whether or not you have been acquainted with either or both of these people for a period of time?  Have you known them for a long period of time?

A    Yes.

Q    Can you tell me about how long you have known Robert Price?

A    About four and a half years.

Q    And during the four and a half year period of time you have known him, have you become acquainted with any of his habits?

A     Such as --

Q     Have you ever seen Mr. Price whenever firearms were present, Robert Price?

A     No.

Q     Have you ever been present when anyone other than Mr. Price brought firearms into his presence?

A     Yes.

Q     Can you tell us what his reaction was?

        MR. IZZO:  I'll object, Your Honor.  I don't see the relevancy of this.

        MR. CUPP:  Your Honor --

        THE COURT:  Objection sustained.  It is very vague.  When and what reaction are you talking about, Mr. Cupp?

        MR. CUPP:  May I approach the bench, Your Honor?

        THE COURT:  Yes, you may.

SIDEBAR CONFERENCE HELD ON THE RECORD

        MR. CUPP:  Your Honor, Mr. Price is missing a very large portion of his right hand blown away from a firecracker as a fourteen year old juvenile. He has a fear of firearms and that was what we wanted to introduce into the record.  This witness is familiar with Mr. Price and is aware of his fear of firearms.  We want to show that having a firearm in his possession would be out of his character.

THE COURT: Well, the way you are asking it
assuming it is proper is not a proper way to ask it,
and we think your question is vague as to when and
why, what his reaction is. We think you can ask
her direct questions, perhaps does he have any
disability, but you cannot ask her any opinions.
For example, do you think he could hold a firearm,
or do you think he would become scared, because
she is not called as a psychiatrist or psychologist
or anyone else who might give an expert opinion.

MR. CUPP: Right.

THE COURT: So, that is the reason for our
ruling. We will continue in that regard.

END OF SIDEBAR CONFERENCE

BY MR. CUPP:

Q    Kelly, are you aware of any disability which Robert Price
has?

A    He is missing three fingers on his right hand, I believe.

Q    Do you know how he lost those three fingers?

A    A firecracker.

Q    Do you recall -- do you know when he lost them?

A    I'm not exactly sure what age. I believe --

THE COURT: Don't guess. If you don't know,
say you don't know. Do you know what age?

THE WITNESS: No.

-110-

BY MR. CUPP:

Q    As a result of that injury, are you aware of any habit or

behavior that Mr. Price has?

A    He has always had a fear of firearms, firecrackers, any

type of fireworks.

Q    Were you with Mr. Price -- the two gentlemen here present

in the courtroom on January 1, 1986?

A    Yes.

Q    Did you accompany them to Tigo's Lounge?

A    Yes.

Q    Do you recall what time you got there?

A    Not exactly what time, around one, one fifteen.

Q    Did you arrive with them in the same car?

A    Yes.

Q    Did you leave with them?

A    No.

Q    Did you see any shooting take place at Tigo's Lounge?

A    No.

Q    Did you see a firearm in anyone's possession?

                    MR. IZZO:  I'll object, Your Honor.  That

                is a leading question.

                    THE COURT:  Sustained.

BY MR. CUPP:

Q    While you were at Tigo's Lounge, did anything out of the

ordinary occur?  Were you shown anything out of the ordinary?

MR. IZZO:  Objection, Your Honor.  It is
a leading question.

THE COURT:  Sustained.  Is your answer no
to the first question?  You didn't have an
opportunity to answer.

THE WITNESS:  I don't really understand the
question, out of the ordinary as to --

BY MR. CUPP:

Q    Okay.  If you don't understand any of my questions or if you
don't hear my questions, please tell me, and I'll rephrase the
question.  Were you with both Robert and Ellis Price on that
evening?

A    Yes.

Q    While you were in their presence, did Ellis Price show you --

MR. IZZO:  I'll object, Your Honor.  It is
a leading question.

THE COURT:  Well, let's finish it and don't
answer it.  What is the question?

MR. CUPP:  While you were in their presence,
did Ellis price show you anything that you did not
normally see on a person's possession?

THE COURT:  Objection is sustained.

BY MR. CUPP:

Q    Kelly, would you tell us what went on at Tigo's Lounge on
the evening of January 1?

A    We got to the bar, and when we first got there when we came

into the door, I spoke to Tiny, Richard -- or I don't know his

real name, Tiny, the man that was shot that night.  I talked

to him when we came in about a cover charge, and I had given him

some money.  So, he said I could pay him the rest later.  So,

we came in, and we sat down and ordered some drinks, and we danced a

little bit, and we were sitting at the bar for a while, and

Ellis Price opened his coat and showed me a handgun, and I was

a little bit nervous after I saw that, and at that time, things --

the band had left and they were getting ready to close the bar down,

and the owner had said something about last call I believe, and

I told Ellis and Robert that I was going to go to the restroom,

and when I came out we could finish our drinks and leave, and

at that point I went into the restroom, and when I came out of

the restroom, Ellis and Robert, I didn't see them sitting at

the bar, and one of the barmaids, Debbie Zinn, had told me that

they had left and that they took my jacket.  So, I started to walk

around the bar to go outside to see if they were out there,

and when I got to the first doorway, I saw Tiny, the man who was

shot, laying in the doorway, and at that point I hadn't any

idea as to what had happened.  I didn't hear any shots, or I

had no idea that anything had even occurred, and the owner

of the bar, Goldie, took me into the kitchen and another lady.

They held me in the kitchen until the State Police arrived.

Q    Okay.  You did not see anybody do any shooting?

A    No.

-113-

Q    Did you hear any shots?

A    No.

Q    Did you ever go out into the parking lot while Robert and
Ellis were there and in the process of leaving?

A    No.

                    MR. CUPP:  Your witness, Mr. Warman.

                    CROSS-EXAMINATION

BY MR. WARMAN:

Q    You were dating another Price, weren't you, a brother?

A    Yes, I have a son by Kevin Price.

Q    You are not married to him?

A    No.

Q    You say that the gun that you saw that night was in Ellis
Price's possession?

A    Yes.

Q    Where was it that you saw it?

A    On him or at what place?

Q    When?

A    We were sitting at the bar.  I don't know what time it
was  just after we had been there for a while sitting in the bar.

Q    How did you happen to see this gun?

A    He just opened his coat and showed it to me.

Q    Where was it on his person?

A    On an inside pocket of his jacket.

Q    Now, you told the State Police that night that you didn't even

-114-

know the two fellows that you came with; isn't that right?

A    Yes.

Q    That you had met them somewhere, and you just went to Tigo's with them?

A    Yes.

Q    So, you were not truthful with them that night when they talked to you?

A    No.

Q    Do you still date Kevin Price?

A    No.

MR. WARMAN:  I have no further questions.

THE COURT:  Mr. Izzo?

CROSS-EXAMINATION

BY MR. IZZO:

Q    Miss Price, you claim that Ellis Price showed you the gun inside of a jacket pocket; is that right?

A    Yes.

Q    What kind of a jacket was it?

A    I don't really recall.

Q    Do you know what color it was?

A    I believe it was an Army coat.  The color I'm not sure. Green, an Army coat.

Q    Did you mention this weapon to any of the police who asked you about this case prior to this time?

A    No.

Q    When was the first time you told anybody about this weapon?

-115-

The first time you told anybody about this weapon?

A    I'm trying to recall who I had talked to about it first.

Q    Anybody like the police or someone involved in the case?

A    You mean an official person in the case?

Q    You might say that.  I mean other than someone like a member of your family or something?

A    The only other person out of my family that I discussed it with was Mr. Cupp.

Q    Robert's attorney?

A    Yes, sir.

      MR. IZZO:  No further questions, Your Honor.

      THE COURT:  When did you discuss this with Mr. Cupp?

      THE WITNESS:  Monday.

      THE COURT:  This week?

      THE WITNESS:  This Monday.

      THE COURT:  Do you have anything further, Mr. Cupp?

      MR. CUPP:  No, I have no further questions of this witness, Your Honor.

      THE COURT:  You may step down.

      (Witness excused)

      MR. CUPP:  Your Honor, at this time, we would like to call Robert Price to the stand.

      THE COURT:  Will the testimony be lengthy?

MR. CUPP:  I would anticipate, Your Honor,

that it will take at least a half hour to an hour.

THE COURT:  May I see counsel at sidebar?

MR. CUPP:  Sure.

SIDEBAR CONFERENCE HELD OFF THE RECORD

THE COURT:  Members of the jury, because

of the lateness of the hour and counsel for the

next witness had indicated that his direct will

be at least half an hour, by the time we get

through cross-examination by the two attorneys,

it could at least be close to an hour and

perhaps longer.  So, we are going to adjourn

for the day and resume the trial tomorrow morning.

So, we want you to report directly to this room

tomorrow morning at 9:15.  You don't go to

Courtroom 1, you come here, and after we are sure

you are all here and in your proper chairs, we will

resume the trial.  So, all fourteen of you come

here tomorrow.  I understand that the other jurors

for this week who are not sitting on cases have been

sent home for the week.  So, you fourteen lucky

ones will still have to come here tomorrow.

However, I do have to direct you that you are not

to discuss this case among yourselves, not with

members of your families, nor with anyone else.

Should anyone approach you and try to talk to you
about the case, do not talk to them and report
it to us. Also, if there are any news accounts,
whether they be in the newspaper or on the radio,
pertaining to the trial or the defendants, you are
not to listen or read any of the news accounts.
You are to avoid them. We say these things
because we don't want you to prejudge the case
and get any ideas from any source other than from
this courtroom. That is why we say these things.
We do not sequester you, keep you here overnight.
We do allow you to lead your normal lives after
you leave us, but we still don't want you to
be talking about this case with anyone, and
there will be plenty of time for the jurors
to talk about the case among yourselves when
you deliberate upon the verdicts. So, we will
now adjourn and ask all fourteen of you to report
directly to this room tomorrow morning at 9:15.

COURT ADJOURNED AT 4:00 P.M.

— — — —

-118-

### CERTIFICATE

I hereby certify that the foregoing is a true and correct record of the proceedings in the within styled matter and that the copies are a correct transcript of the same.

_Tammy Rhodes_
Tammy Rhodes
Official Court Reporter

The foregoing record of the proceedings in the within styled matter is hereby approved and directed to be filed.

_William J. Franks_
William J. Franks, Judge

-119-

IN THE COURT OF COMMON PLEAS OF FAYETTE COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | Nos. 154, 1/8, 2/8, 3/8, |
| | : | 4/8, 5/8, 6/8, 7/8 of |
| vs. | : | 1986 and 110, 1/8, 2/8, |
| | : | 3/8, 4/8, 5/8, 6/8, |
| ELLIS ROY PRICE and ROBERT | : | 7/8 of 1986 |
| KEITH PRICE, | : | |
| | : | |
| Defendants. | : | |

## CRIMINAL JURY TRIAL PROCEEDINGS

The third and final day of a criminal jury trial was held before

the Honorable WILLIAM J. FRANKS, Judge, on Friday, October 10,

1986, at 9:25 A.M. in Courtroom No. 2 of the Fayette County

Courthouse, Uniontown, Pennsylvania.

APPEARANCES:

    RALPH C. WARMAN, ESQUIRE, First Assistant District Attorney,
      on behalf of the Commonwealth.

    CARL P. IZZO, JR., ESQUIRE, on behalf of the Defendant,
      Ellis Roy Price.

    JOHN S. CUPP, JR., ESQUIRE, on behalf of the Defendant,
      Robert Keith Price.

Tammy Rhodes
Official Court Reporter

### INDEX

COMMONWEALTH'S WITNESSES:

Raymond Ricker
  Examined By Mr. Warman - 18
  Examined By Mr. Izzo - 33
  Examined By Mr. Cupp - 42
  Examined By Mr. Warman - 47
  Examined By Mr. Cupp - 48

Richard Pletcher
  Examined By Mr. Warman - 50
  Examined By Mr. Izzo - 61
  Examined By Mr. Cupp - 62
  Examined By Mr. Warman - 67
  Examined By Mr. Cupp - 68

Dr. David C. Blass
  Examined By Mr. Warman - 69
  Examined By Mr. Izzo - 76
  Examined By Mr. Cupp - 77

Deborah Ann Zinn
  Examined By Mr. Warman - 80
  Examined By Mr. Izzo - 83
  Examined By Mr. Cupp - 85
  Examined By Mr. Warman - 88


DEFENDANT'S WITNESSES:   (Robert Keith Price)

Kelly Sue Price
  Examined By Mr. Cupp - 106
  Examined By Mr. Warman - 113
  Examined By Mr. Izzo - 114

Robert Keith Price
  Examined By Mr. Cupp - 123
  Examined By Mr. Warman - 129


DEFENDANT'S WITNESSES:   (Ellis Roy Price)

Ellis Roy Price (Testimony outside the presence of the jury panel)
  Examined By Mr. Izzo - 144

## PROCEEDINGS

COURT COMMENCING AT 9:25 A.M.
FRIDAY, OCTOBER 10, 1986

THE COURT: Good morning to everybody.
Mr. Cupp, I believe you were going to call the
defendant as your next witness.

MR. CUPP: That's correct, Your Honor. We
would call Robert Keith Price at this time.

THE COURT: Very well.

MR. IZZO: Your Honor, before we call this
witness, may I have an offer of proof?

THE COURT: Certainly.

SIDEBAR CONFERENCE HELD OFF THE RECORD

SIDEBAR CONFERENCE HELD ON THE RECORD

MR. CUPP: Mr. Price is going to testify
to his disability with his right hand,
his ability to use a firearm or anything else,
and his recollection of the events of January 1,
1986.

MR. WARMAN: What else is he going to testify
to? His disability with his right hand and what
else?

MR. CUPP: His recollection of the events
of January 1, 1986.

MR. IZZO: And his recollection of the events?

-122-

MR. CUPP:  Right.

MR. IZZO:  Could you tell us a little more specifically what he is going to testify to?

MR. CUPP:  He is going to say he went to Tigo's Lounge on January 1, 1986, and he went there with Kelly Sue Price and Ellis Price. He is going to tell us he didn't have a gun. He walked out into the parking lot, that he heard the shots fired. He did not see the shots fired. He got in the car, the driver's side, that Ellis got in the car on the passenger side, that whenever he got in the car with Ellis, Ellis had a gun, and he was waiving it around, that Ellis fired the gun through the passenger door window at Richard --

THE COURT:  Pletcher.

MR. CUPP:  -- Pletcher, and that he grabbed the gun from Ellis' hand, stuck it under his leg, drove home, gave Ellis the gun and left.

THE COURT:  Is that it?

MR. CUPP:  That's it.

THE COURT:  All right.

MR. IZZO:  Thank you, Your Honor.

END OF SIDEBAR CONFERENCE

-123-

THE COURT:  The defendant may take the stand.

(Witness sworn)

ROBERT KEITH PRICE, having first been duly sworn, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CUPP:

Q    Mr. Price, would you state your name for the record, please?

A    Robert Keith Price.

Q    And what is your date of birth?

A    June 1st of 1957.

Q    And are you related to Ellis Price?

A    Yes, he is my brother.

Q    Okay.  Mr. Price, where do you live?

A    In Uniontown.

Q    Okay.  How long have you lived in the Uniontown area?

A    A little -- about two years.

Q    And before that, where did you live?

A    I lived in Washington, D.C.

Q    And how long had you lived there?

A    Three years.

Q    And how long -- where did you live before you lived in Washington, D.C.?

A    Detroit, Michigan.

Q    Do you suffer from any disabilities, Mr. Price?

A    Yes, I do.  I am missing three fingers on my right hand.

-124-

Q    Can you tell us how you lost those fingers?

A    A firecracker blew them off.

Q    Do you recall about when that occurred?

A    When I was sixteen.

Q    And what sort of difficulty do you have in using
that hand as a result of the injury?

A    Well, I have difficulty picking things up with it.  You know,
it is difficult to handle things.

Q    Can you describe for us what sort of range of motion you
have with that one finger?

A    This is it (indicating).

Q    You can't bend it at the joint?

A    No.

Q    I would like to call your attention to the events of January 1,
1986.  If you recall, were you present at Tigo's Lounge in North
Union Township on that date?

A    Yes, I was.

Q    Would you tell us when you got there as you recall it?

A    I don't know the exact time, but it was after twelve.

Q    Could you tell us who was with you?

A    Yes, she was.

Q    Can you tell us who was with you?

A    Kelly Price and Ellis Price and myself.

Q    And you arrived at the same time?

A    Yes.

Q    And when you arrived at Tigo's Lounge, would you describe

for us what took place in the tavern after you arrived?

A    Well, we was in there drinking, you know, listening to the band.  My brother danced a couple times.  I was sitting and watching, and about an hour or so went by, and I guess they were calling last call, and Ellis went up to the bar to order a last round of drinks, and he gave the bartender a five dollar bill, bought two beers, and they were only a dollar a beer, and she never gave no change back to him.  So, he asked her where his change was, and she said she gave it back, and I was sitting there, and I didn't see her giving him no change back.  So, at that time, Ellis was wanting -- demanding his money, wanting his change, and then the bartender calls the bouncer over, and he asked what was going on, and Ellis told him, and he handed Ellis back a five dollar bill and said leave.  So, at that time, I just -- I had like a half of a beer left.  So, I drank it up, and I told him, let's go.  So, we walked out to the car, and I opened the passenger side door, and I asked Ellis what about Kelly.  We can't leave her, and then by that time, the man was standing at the doorway, and Ellis asked him if he could come back and get Kelly.  He said, no.  So, I just told him to forget it, and I started walking around and two shots were fired, and I got, you know, got in the car, and Ellis got in the car and somebody pounded on the window, and I was more or less moving away, and Ellis shot out the window, and I left.

Q    Do you recall what you were wearing on that night?

A    I was dressed, you know. I remember having a dark almost
a black sport coat on.

Q    Do you recall what Ellis was wearing?

A    He was wearing a green field jacket, Army jacket, and I
don't know what kind of pants or shirt he had.

Q    Whenever you left the bar, was Kelly with you?

A    No, she wasn't. She was still in the bar.

Q    Did you get an opportunity to clearly see the guy who was
pounding on your window?

A    No, I couldn't see nothing.

Q    I'm going to call your attention to the drawing here.   Is
this an approximate location of where your car was in relation --

A    The car was parked at the end of the building.

Q    Down here (indicating)?

A    Yeah.  It was like right there at the corner maybe five
feet past the building.  The car was parked long ways.

Q    Pointed towards Route 51?

A    Yes, sir.

Q    And was the light at the corner of the building?

A    No, there was a light on the other side of the parking
lot back towards the entrance more or less.

Q    Over here (indicating)?

A    Back against the far parking lot.

                    THE COURT:  Perhaps he can go down to the
                blackboard.  Why don't you go down to the

blackboard and indicate these things?

THE WITNESS: See, I guess all -- right here was the car (indicating). That is where the car was. This was the car right here (indicating).

THE COURT: Do you want to step to the side so the jurors can see the drawing?

THE WITNESS: All here was the parking lot (indicating). The entrance was right here (indicating). There was a light about right there (indicating), and that's all I remember about that night.

BY MR. CUPP:

Q    The car was parked here (indicating)?

A    Yes, sir.

Q    And it was pointed this way (indicating)?

A    Yes, sir.

Q    And you said that you went over to the passenger side and unlocked the door?

A    I unlocked the door, and Ellis opened it.

Q    You walked around the back of the car to get in?

A    Yeah. As I was walking around the back of the car to the driver's side, the shots were fired.

Q    And you didn't see the shots, but you heard them?

A    Yes.

Q    And when you got inside of the car, Ellis got inside of

the car with you?

A    Yes.

Q    And you drove away?

A    Yes.

Q    As you were driving away, someone pounded on the window?

A    Yeah.

Q    And Ellis fired a shot through the window?

A    Yes.

Q    Did you at any time fire the gun?

A    No.  Ever since I lost my fingers, I have been very scared and very frightened of firearms, firecrackers.  I have nightmares. You can ask anybody that knows me.  I wake up in a deep sweat over loud noises before.

Q    Mr. Price, you said that you heard shots.  How many shots did you hear?

A    There was only three shots fired the whole -- from the beginning to the end.  There was only three shots fired period.

Q    How many shots were fired before you got into the car?

A    Twice.

Q    Two?

A    Two, yes.

Q    And how many shots were fired from the car?

A    One.

Q    And those were the only shots you heard all evening?

A    Yes, sir.

Q    How much growth of beard did you have on your face on that evening?

A    I believe I might have shaved the day before.  I'm not -- I can't remember that far back about my beard.  I know I didn't have no beard though.

Q    Do you recall how much beard your brother had?

A    No.

MR. CUPP:  Your witness, Mr. Warman.

## CROSS-EXAMINATION

BY MR. WARMAN:

Q    I have seen you up here on the stand pointing at the blackboard, adjusting your tie, drawing on the blackboard, and that is all with your left hand; isn't that right?

A    Yes, sir.

Q    You are left-handed?

A    Now, I am.  I was originally right-handed.

Q    Well, I mean, when did this accident happen?  This was a good while ago, wasn't it?

A    Yes.

Q    And how long ago did you lose the fingers on your right hand?  Were you a boy or what?

A    Yes, I was sixteen.

Q    Sixteen.  How old are you now?

A    Twenty-nine.

Q    So, that is thirteen years ago?

A    Yes.

Q    And since then you have adjusted, and you have become
left-handed?

A    To a degree.  You know, I get clumsy at certain things.

Q    You can hold things in your left hand?

A    Yes.

Q    And you tie your shoes, do you use your left hand?

A    I don't have shoes that tie.  I have either zip up or snaps.

Q    Button your coat, you use your left hand?

A    I zip it.

Q    You don't have any buttons on any coats?

A    This here, this is not buttoned (indicating), but I can
button a coat.

Q    Do you eat with your left hand?

A    Yes.

Q    So, you are left-handed?

A    No, yes.  I have no choice.

Q    Were you -- when you went to Tigo's -- when you went to
Tigo's that early morning of January 1, 1986, had you been drinking
any before that?

A    Yes.

Q    How much had you had to drink before that?

A    Well, I can't remember how -- exactly how much, but I was --
when I was at Tigo's I was feeling a little tipsy.

Q    And had you been drinking with Ellis earlier?

A    Yes.

Q    So, you and he had been drinking together?

A    Well, not only him.  We went to a New Year's party
before there.

Q    So, you had already been to a New Year's party?

A    We were drinking at a bar, another bar.

Q    And isn't it true that you were sitting in other people's
chairs at Tigo's, other people's stools?

A    Well, when we walked in, you know, there was no -- nobody
said that there was no seating arrangement.  There was no one
ever spoke to me about it, and there was empty seats opened,
and it was kind of crowded, you know.  When there was an empty
seat, I sat in it, but when people came back, we got up.  We
didn't cause no commotion in there.

Q    And you were arguing at times though, were you not?

A    No, I was not.  Never.

Q    You were a perfect gentleman all night?

A    Sure.  I was sitting back watching, watching the band,
watching people dance.

Q    A perfect gentleman then you were?

A    Yes, sir, I was.

Q    And when you were asked to leave, you just said, fine,
and you got up and left?

A    I drank -- well, we asked why, and he said it was getting
late anyway, and we had to leave.

-132-

Q    So, you didn't complain?

A    No, sir, I did not say not a word to him.

Q    That's when you were leaving the area of the bar going for the door, you weren't worrying about Kelly at that point?

A    Well, I was.  I thought she was on her way out with us.  She did say she was going to the restroom, you know.  I didn't know she was going to be taking that long.  I thought she was on the way out with us, and when she didn't come out, I asked Ellis, what about Kelly.

Q    You didn't say anything to Ellis at that point, you waited until you were outside?

A    I was walking out.  You know, when you are walking out the door, you know, you don't say nothing until you get to the car.

Q    And you always do that then, you walk out doors, you don't say anything to the person you are with until you get to the car?

A    It always depends on the situation, you know.  At that time, I didn't say nothing to nobody until I got to the door.  When I opened the car door, I turned around and seen Kelly was not there.  So, I asked Ellis, what about Kelly.

Q    So, you hadn't talked to Ellis from the time that the man told you to leave until the time you got to the car?

A    That's right.

Q    Was Ellis in front of you or behind you coming out?

A    I think he was behind me.

Q    You think.  Are you sure?

A    I believe that I was the first one out.

Q    When you say I think, are you saying that your memory might

not be very good of that night because of what you had to drink?

A    No, I'm not saying that at all.  You know, I have got

to think back on the situation of what happened, but I believe

I was the first one going out the door, because as I was

putting my beer bottle down on the bar, I said, let's go, Ellis

was still talking to the bouncer.

Q    What kind of gun did Ellis have?

A    I don't know.  I didn't see.  It was dark.  I know it was

a handgun.

Q    You grabbed it from him in the car you said?

A    Yeah.

Q    What did you do with it?

A    I put it on my lap, my leg, because when he got in the

car --

Q    What did you do with it after that?

A    Well, I went to my brother-in-law's apartment, and I told

Ellis, hey, I'm going to sleep because I had to take a trip to

Michigan on January the 1st, New Year's Day.

Q    But you never looked at this gun?

A    I grabbed it away from him.  I put it under my leg.  I kept it

under my leg until I got to my brother-in-law's house when I shut

the car off and got out of the car.  Ellis took the gun back.

Q    You mean you just got out and left it on the seat where

it had been under your leg?

A    No, when we stopped, he grabbed it, and he said, I want
that back.

Q    So, you never got a look at it?

A    No, not really.  I mean, I looked at it, but not to the
degree where I studied it or anything.

Q    You weren't that afraid of guns that you were afraid to grab
it from him?

A    Well, let's put it this way, when a man just shoots off
a gun in your car and then waiving it around toward the steering
wheel, I'm not going to have my brains blown out.  I got --
you know, he was kind of drunk, and I didn't want him to
accidentally shoot it off again.

Q    So, when you told us you are afraid of guns, you are not
that afraid of them that you wouldn't grab them?

                    MR. CUPP:  Objection, argumentative.

                    THE COURT:  Overruled.  This is cross-examination

BY MR. WARMAN:

Q    Right?

A    What's that, sir?

Q    You told us you are afraid of guns, but you weren't that
afraid that you wouldn't grab that gun that was held in somebody
else's hands that was just shot?

A    I would never shoot a gun.  I would never pick a gun up
and fire a gun.  That is the honest to God truth.