1        IN THE UNITED STATES DISTRICT COURT
         FOR THE WESTERN DISTRICT OF PENNSYLVANIA
2

3

MARK BREAKIRON,
4
            PETITIONER
5
     VS.              CIVIL ACTION NO. 00-300
6
MARTIN HORN, COMMISSIONER,
7  PENNSYLVANIA DEPARTMENT OF
   CORRECTIONS,
8
            RESPONDENTS
9

10              PROCEEDINGS
      Transcript of EVIDENTIARY HEARING, commencing on FRIDAY,
11  FEBRUARY 2, 2006, AT 9:00 A.M., in the United States District
   Court, U.S. Courthouse, Fifth Floor, Pittsburgh,
12  Pennsylvania, before the HONORABLE THOMAS M. HARDIMAN,
   UNITED STATES DISTRICT COURT JUDGE.

13
APPEARANCES:
14
   FOR THE PETITIONER: By: Stuart B. Lev, Esquire
15                Tricia Russell, Esquire
               Defender Association of Philadelphia
16                601 Walnut Street
               The Curtis Center, Suite 545-W
17                Philadelphia, Pennsylvania  19106

18  FOR THE RESPONDENTS:By: Christopher D. Carusone, Esquire
               Senior Deputy Attorney General
19                Office of the Attorney General

Strawberry Square.

20          Harrisburg, Pennsylvania  17120


21   Reported by:          Sandra Wenger, Official Court Reporter

Fifth Floor, U. S. Courthouse

22          Pittsburgh, Pennsylvania  15219

412.261.6254

23


24   Proceedings recorded by mechanical stenography.  Transcript

produced by computer-aided transcription.

25

1            I N D E X

2                - - -

3   WITNESS          DIRECT  CROSS  REDIRECT  RECROSS

4   J. SULLIVAN       19     28     47        50

5   C. MILLER        54     60     --        --

6   R. PRICE         68     80     112,      114,
                           116, 118  118
7
    E. PRICE        84     90     109       ---
8
    G. BROWNFIELD    120    123    ---       ---
9
    M. MORRISON, ESQ.  127   131    147       ---
10
    HON. R. WARMAN    150    158    165       167
11
    HON. G. SOLOMON   168    171    180       ---
12
    E. ROBERTS       181    183    ---       ---
13
    A. LEPORE, ESQ.   184    187    191       ---
14
    G. KERPCHAR      192    194    196       ---
15
                - - -
16

17

18

19

20

21

22

23

24

25

1     FRIDAY MORNING SESSION, FEBRUARY 2, 2007 9:00 A.M.

2                     - - -

3     THE COURT:  Good morning.

4     MR. LEV:  Good morning, Your Honor.

5     MR. CARUSONE:  Good morning, Your Honor.

6     MR. LEV:  I'm Stuart Lev from the Federal Defender

7  in Philadelphia, in behalf of Mr. Breakiron.

8     MS. RUSSELL:  I'm Tricia Russell from the Federal

9  Public Defender Office, Capital Litigation Unit, located in

10  Pittsburgh.

11     THE COURT:  I suppose I ought to move your

12  admission.  I should say, someone should move your admission.

13  I ought to admit you before we do anything further.

14     MR. CARUSONE:  Yes, Your Honor.  Okay.  Actually,

15  my sponsor is not present right now, if it's okay --

16     MR. LEPORE: I would be glad to move for the

17  admission of Mr. Stuart Lev.  I am a member of this district.

18     THE COURT:  Okay.  Would you just spell your name,

19  for the record, please?

20          MR. LEPORE:  First name, Alphonse, A-L-P-H-O-N-S-E,

21    middle initial P, last name Lepore, L-E-P-O-R-E.

22          THE COURT:  All right.  Can you attest to the

23    fitness and character of Mr. Carusone to become a member of

24    the Bar?

25          MR. LEPORE:  Yes, I can, Your Honor.

1       THE COURT:  How long have you known Mr. Carusone?

2       MR. LEPORE:  For the length of this case, but he's

3  evidenced to be of good character and a strong knowledge of

4  the law.

5       THE COURT:  Thank you.

6       All right.  Mr. Carusone, do you wish to swear or

7  affirm?

8       MR. CARUSONE:  Swear.

9       THE COURT:  All right.

10      MR. LEV:  Judge, Your Honor, before you do, I am

11  not a member of the Western District and I did not make

12  arrangements with the Clerk to be sworn in today.  So, --

13      THE COURT:  All right.  Well, I could administer

14  the oath to you, jointly.

15      MR. LEV:  If you would like to do that jointly,

16  I'll make arrangements with the Clerk.

17      MS. RUSSELL:  I am happy to sponsor Mr. Lev.  I've

18  known him for three years and he's been one of the most

19  wonderful attorneys I've ever worked with.

20          THE COURT:  All right.  Thank you.

21          Would you prefer to swear or affirm?

22          MR. LEV:  Either is fine.

23          THE COURT:  Then I am going to ask you both, raise

24   your right hand and repeat after me, except after I say the

25   word, I, you should state your own names, and after that you

5

1  can repeat everything I say.

2        (Whereupon, the oath was administered by the

3  Court.)

4        THE COURT:  Gentlemen, welcome.

5        MR. CARUSONE:  Thank you, Your Honor.

6        MR. LEV:  Thank you, Your Honor.

7        THE COURT:  We are pleased to have you here in the

8  Western District of Pennsylvania.

9        Are there any matters that we ought to take up

10  while we are awaiting the arrival of the first in-custody

11  witness?

12        MR. LEV:  First, Your Honor, I just want to thank

13  you for the courtesy that you have shown.  I know

14  Mr. Carusone feels the same, but Mr. Carusone and I thank you

15  for the scheduling of the hearing over the last few months.

16        The only matter I would have is to ask, Your Honor,

17  if it would be helpful for me to spend a minute or two just

18  putting the hearing today into the context that I think it

19  fits in within the overall scheme of this case.

20          THE COURT:  I think that would be useful.  And I

21    will give Mr. Carusone a chance to respond.

22          Go ahead, Mr. Lev.

23          MR. LEV:  Thank you.  Your Honor, this is, of

24    course, a capital habeas corpus case.  Mr. Breakiron was

25    convicted of the murder of Saundra Martin, sentenced to death

1   in Pennsylvania back in 1988.  We are here and at the time of

2   trial, the defendant in the case, Mr. Breakiron, has never

3   denied committing the offense.  The question has always been

4   the degree of homicide and his intent of the crime.

5       He presented, I think, badly, and that's another

6   issue not before us today, an intoxication defense at the

7   time of the trial seeking to reduce his degree of

8   culpability.  One of the key witnesses at the time of trial

9   was a man named Ellis Price, who was an inmate in the jail

10  with Mr. Breakiron at the -- prior to Mr. Breakiron's trial.

11      Mr. Price testified, in short, during the course of

12  the trial that Mr. Breakiron confessed his guilt to him,

13  provided some of the details of what happened.  Mr. Price's

14  testimony was extremely important, in my view, to the

15  Commonwealth because it was the only evidence the

16  Commonwealth presented of any planning, premeditated design,

17  that was contrary to the idea of intoxication and a sudden

18  unprovoked attack that might have reduced the culpability of

19  the offense.  That's why Mr. Price's testimony becomes so

20    important within the context of the scheme of the case.

21         Our initial habeas corpus petition to this Court

22    claimed four -- in that petition we raised a Brady,

23    ineffective assistance of counsel claim.  That raised three

24    items that we thought were either not disclosed, were

25    testified wrongly, and were not corrected by the Commonwealth

1  at the time of trial.

2      Those three things were, one, Mr. Price's actual

3  prior record which Mr. Price had described as an assault in

4  Michigan, which, under, in fact, his conviction was for

5  assault with intent to commit armed robbery.  Case much more

6  likely a robbery in Pennsylvania than an assault charge

7  crimen falsi case as opposed to non crimen falsi that was not

8  corrected.

9      We also alleged Mr. Price received favorable

10  treatment following his statement to the Commonwealth

11  implicating Mr. Breakiron, that favorable treatment being

12  Commonwealth's decision not to appeal the grant of an arrest

13  of judgment.  Mr. Price had recently been tried by a jury,

14  convicted of aggravated assault and attempted homicide.  An

15  arrest of judgment had been granted and Mr. Price had made a

16  statement to the police and then the Commonwealth did not

17  appeal the arrest of judgment.

18      That, to us, is a benefit conferred on Mr. Price.

19  Whether it was a deal or not, we'll talk about today.

20          THE COURT:  That all depends on the reason why the

21    arrest of judgment was issued in the first place and the

22    reason why an appeal was not taken; correct?

23          MR. LEV:  In part, it does.  I think that it's the

24    decision not to appeal that is, is a benefit, regardless.

25          But whether or not it's a reasonable benefit, or

1   trial strategy, or something related to this case, is one of

2   the questions before the Court.

3       THE COURT:  Even assuming that's a benefit, is that

4   the type of benefit that would be Brady material?  Because

5   the arrest of judgment was a matter of public record and the

6   failure to appeal was a matter of public record.  So, why

7   would some disclosure be required there?

8       MR. LEV:  Well, I think there's two answers to

9   that, Your Honor.  One is, is that is, that in the

10  alternative, that if it's not Brady material, there is an

11  ineffective assistance of counsel underlying, that counsel

12  hadn't done his homework to fully investigate Mr. Price's

13  record and circumstances and bring them out before the jury.

14      Two, I think Brady law is clear that it's -- that

15  if there is Brady material, exculpatory evidence, impeachment

16  evidence in the Commonwealth's possession, they have a duty

17  to disclose regardless of the could have been otherwise

18  discovered by the defense or not.  Banks v. Drecky, U.S.

19  Supreme Court, said that the Brady process is not a hide and

20  seek kind of game.  It's the Commonwealth's duty to disclose,

21  regardless of the defense.  So, whether it's Brady or whether

22  it's ineffective assistance, they're both covered in that

23  initial claim for --

24          THE COURT:  Let me just challenge the other thing

25  you just said, Mr. Lev.  I think when you began you indicated

1   that the only evidence of your client's intent was the

2   testimony from Mr. Price.  But isn't that contrary to

3   footnote 11 in the Supreme Court's opinion in Breakiron II,

4   which was reported at 556 PA 519?  In that footnote, the

5   Supreme Court stated, in addition to the facts, the guilt was

6   overwhelming, which is not really the issue here because you

7   have conceded that the crime was committed by your client.

8          But, further on, the Supreme Court said that

9   Mr. Breakiron testified that he recalls Miss Martin being

10  stabbed and that he pulled the knife from her back.  He then

11  admitted to dragging her body from the bar and taking it to

12  his grandparents to dispose of the body.

13         Breakiron admits that he took the money from the

14  bar.  Breakiron's testimony did not suggest that he was so

15  intoxicated that he could not walk, drive, and dispose of the

16  body.  Isn't that the Supreme Court indicating that there was

17  other evidence of intent based upon the facts at trial, in

18  addition to whatever Ellis Price testified to?

19         MR. LEV:  Well, I think, in part, and maybe I

20   should correct myself and say this.  Ellis Price was the most

21   direct evidence of intent that was presented.  I think the

22   Commonwealth could rightfully argue that the circumstantial

23   evidence of the stabbing, and the hitting with the one

24   object, there's also -- we would allow inference of intent to

25   be drawn circumstantially.  I think that's what the Supreme

1   Court's referring to as to Mr. Breakiron's testimony.  I

2   don't think the Pennsylvania Supreme Court gets it quite

3   right.

4        Mr. Breakiron testified that he didn't really

5   remember exactly what happened at the time of the killing.

6   He remembered being in the bar, drinking.  And then he

7   remembered waking up next to the body with the knife in it,

8   then admitted all the post-stabbing cover-up things that are

9   described by the Court.

10        But in terms of what actually happened, during the

11  time in which the murder occurred, Mr. Breakiron's testimony

12  was that he did not recall because of alcohol state of mind

13  at the time.  That was the basis for the intoxication defense

14  that was presented.

15        THE COURT:  And in reviewing this case on habeas

16  corpus, am I supposed to credit his testimony or am I

17  supposed to view the evidence in the light most favorable to

18  the verdict winner?

19        MR. LEV:  Part of that, I think, depends on the

20  nature of the issue and the nature of, of the question that

21  you are being faced.  For example, Your Honor, if, if we're

22  looking at a, at a claim of ineffective assistance of

23  counsel, one of the elements that would have to be proved is

24  the prejudice part of that.

25          I think, when you look at the prejudice prong, the

1   Strickman standard requires you to kind of look, look at all

2   the evidence, neither credit the defense, nor, nor the

3   prosecution, neither assume the truth of either.  But if

4   there were an error that counsel made, you would then have to

5   weigh what possible effect that error would have on the

6   deliberations of the jury in terms of their verdict.

7         So, it wouldn't be necessary if you don't accept

8   all the prosecution's evidence as true.  If it were a

9   sufficiency evidence issue, of course, you would accept the

10   evidence and in the view of the verdict winner.  So, I think

11   it depends on the nature of the issue and the nature of the

12   questions being presented to you.

13         Going back to put it in context.  The third part of

14   the original claim was for a claim that Ellis Price had

15   originally told the police that Mr. Breakiron admitted to him

16   that he was intoxicated at the time and that that information

17   was left out of the police report that was provided.

18         Those three things that we have been talking about

19   so far were exhausted in State court and, and came here in

20  federal court as exhausted claims.  They were exhausted in

21  Breakiron III, the second PCRA proceeding.

22          After that, we came across additional information

23  that suggested that Ellis Price had approached the

24  Commonwealth in hopes of obtaining some kind of benefit and

25  some kind of reward in exchange for his testimony.  At trial,

1  Mr. Price denied that he had any interest, that he had asked

2  for, nor received any type of reward or benefit in exchange

3  for his testimony.  The information we came up with was from

4  inmates who had been in Fayette County Jail with Mr. Price at

5  the time who provided affidavits supporting the claim that

6  this was all part of the plan, to try to get some benefits in

7  exchange for his testimony.

8       That information was new and had not been presented

9  in state court.  We agree with the Commonwealth that there

10  was no remedy available in state court.  We pled it as an

11  amendment to claim four as an additional Brady claim.  And

12  it's that part of the claim, as I understand, of what we're

13  here today to do, looking at whether there's cause and

14  prejudice to overcome the default for not having raised it in

15  state court before.

16       And, as Your Honor mentioned on the phone last

17  week, that cause and prejudice tested our view.  Conflates

18  with, ultimately, the merits of the claim that's judged by

19  the same standard as merits of the Brady claim would be.  So,

20   that is my understanding of where we are and what we're doing

21   today.

22        THE COURT:  Thank you, Mr. Lev.

23        Mr. Carusone.

24        MR. CARUSONE:  Your Honor, just briefly.  You had

25   pointed to the Pennsylvania Supreme Court opinion in

1  Breakiron II and recited a number of facts that I agree with

2  this Court are inconsistent with this idea that Mr. Breakiron

3  was so intoxicated that he couldn't intend to kill.

4       I want to point out, you had asked Mr. Lev about

5  how is this Court to view those findings of fact.  And as

6  this Court is probably aware, under 28 U.S.C., Section 2254,

7  which is the habeas statute, this Court is required to accept

8  those factual findings as correct and to presume them as

9  correct, unless the petitioner can demonstrate by clear and

10  convincing evidence that they're not good.  It would be

11  preposterous to do so, since many of those details came from

12  Mr. Breakiron's own mouth during the testimony at the trial.

13       One other thing that I want to point out.  Near the

14  end, Mr. Lev indicated he made certain statements about what

15  Ellis Price said during his testimony during the trial.  I

16  ask the Court to review Ellis Price's testimony very

17  carefully, if you would.

18       THE COURT:  Because there is a distinction between

19  a man who says, I'm looking for a deal and a man who's got a

20   deal.

21          MR. CARUSONE:  Exactly right.  And, you know, was

22   there any testimony that Ellis Price said -- did Ellis Price

23   deny during trial that he was looking for a deal.  I don't

24   believe he was ever questioned about that.  He was questioned

25   about do -- did you have a deal with the DA?  No.  He was

1    asked that numerous times.  I ask you to carefully look at

2    that in assessing Mr. Lev's statement.

3        THE COURT:  Well, that's an issue that I have

4    thought about and I may need some further argument from

5    counsel and briefing after the hearing.

6        But one question that arises in my mind is that, if

7    a cooperating witness, who's interested in a deal, or looking

8    for a deal, or hoping somehow to get a reduction in his

9    sentence, if that is being deemed Brady material, then that's

10    going to be prevalent in almost every criminal case.

11        MR. CARUSONE:  Yes, Your Honor.

12        THE COURT:  That would seem to me to be a change in

13    the law.  I don't know that there is any support in the law

14    for that.  On the other hand, it's pretty clear to me that if

15    Mr. Price had a deal, namely, if you cooperate with us in the

16    Breakiron case, we will, in consideration for that

17    cooperation, do the following for you, then that seems to me

18    axiomatic that that would need to be disclosed and that the

19    prejudice that follows, I think, is self-evident from a

20   violation of that nature.

21        I'm not suggesting that's what happened.  That's

22   what we're here to have testimony on.  But that's how I

23   preliminarily review the legal principles in this case.

24        MR. LEV:  Although, and, perhaps, we will need

25   further briefing and argument, I think I would take issue,

1    Your Honor.  I think that if, if a jailhouse inmate

2    approaches the Commonwealth, asking for a deal, asking for

3    some consideration, that that motivation, the fact that

4    they're doing that, goes to his credibility, is something

5    that the jury should hear.

6        And if the Commonwealth doesn't reveal that, then

7    that is Brady, because it goes to impeachment evidence.

8        Now, there may be a question, how material, that

9    you have to decide.  But that is impeachment evidence.  That

10   is the type that meets -- needs to be disclosed,

11   particularly, when favorable things happen to the witness.

12       Ultimately, the question is for the jury to

13   determine whether -- what weight to give to the person's

14   credibility and it's the information that needs to be put

15   into the hands of the jury.

16       Now, in this case, and I agree with Mr. Carusone,

17   what we should rely on is what Mr. Price testified to at

18   trial.  And he testified to, as I understand it, and I could

19   be mistaken, that his motivation in coming forward was

20  because he thought that Mr. Breakiron's conduct was repugnant

21  and that he should -- that he had a duty to come forward and

22  to be a witness on behalf of the Commonwealth.  Mr. Breakiron

23  shouldn't be allowed to get away with that.

24        That would be very different than somebody who,

25  initially, approached the Commonwealth with the idea of

1   looking for the deal.  Whether they got it or not, the jury

2   should be entitled to know what their initial motivation

3   we're looking for was.

4       That would be my position.  If we need to argue and

5   research more, then we can.

6       THE COURT:  All right.  I would like to start with

7   testimony.

8       MR. CARUSONE:  May I just have fifteen seconds

9   here?

10      I, first of all, the Court should be aware that we

11  dispute the factual contention that Ellis Price asked for a

12  deal.  It's our position he didn't ask for a deal.

13      But even if he did, even if you believe that he did

14  ask for a deal, it's our position, as a legal matter, that

15  that is not Brady material.  If he asked for a deal and the

16  Commonwealth said, you are not getting any kind of a deal,

17  when he gets up on the stand and testifies, he doesn't have

18  an expectation of favorable treatment because it's already

19  been -- that request has already been rejected.

20          Assuming it's even been made, which we dispute, I

21  think that the Court's view of the law is consistent with the

22  United States Supreme Court precedent.  And in the absence of

23  any action by the Commonwealth that would have led Ellis

24  Price to believe that such a request would have been granted

25  and he would have gotten some benefit in the future, that's

1   not Brady material in this instance.  But, we can brief that.

2        THE COURT:  All right.  Let's start.

3        MR. LEV:  I would ask that the witnesses be

4   sequestered of this witness.

5        MR. CARUSONE:  Same motion, Your Honor.

6        THE COURT:  The witnesses will be sequestered.

7        Anyone who may be called as a witness, would you

8   please excuse yourself from the courtroom?

9        (Whereupon, witnesses were sequestered.)

10        MR. CARUSONE:  Your Honor, I just want to point out

11   that I did have representatives from some of the Martin

12   family are present in the courtroom.  They want to observe

13   the proceeding.  I don't intend to call them as witnesses.

14        THE COURT:  All right.  And the other three people

15   in courtroom are not -- non-witnesses; correct?

16        MR. LEV:  That's correct.

17        THE COURT:  All right.  The first witness, Mr. Lev?

18        MR. LEV:  Mr. James Sullivan.  Does Your Honor have

19   a preference of whether we sit or stand as we proceed?

20          THE COURT:  As you wish.

21          Mr. Sullivan, would you step to the front of the

22   courtroom, please, to be sworn?

23          THE DEPUTY CLERK:  Raise your right hand?

24          JAMES FRANCIS SULLIVAN, A WITNESS, having been

25   first duly sworn, was examined and testified as follows:

1           THE DEPUTY CLERK:  State your name, sir?

2           THE WITNESS:  James Francis Sullivan.

3           THE DEPUTY CLERK:  Spell your last name, for the

4  record?

5           THE WITNESS:  S-U-L-L-I-V-A-N.

6           THE DEPUTY CLERK:  Okay, sir.  Would you take the

7  witness stand to my far left?

8           MR. LEV:  Your Honor, is it necessary that the

9  witness remain handcuffed during testimony?

10          THE COURT:  Well, --

11          MR. CARUSONE:  He's basically doing life for

12  murder.  It's a security question, Your Honor.

13          THE COURT:  I would not want to micro-manage the

14  security issue.  I'm going to leave the security to the

15  experts.

16          But having said that, if we could reduce it to some

17  extent, the restraints on Mr. Sullivan, that would be

18  appreciated.  But I'm going to let the experts make that

19  decision.

20          This is not a jury case.  And, the extent to which

21   the witness is handcuffed or shackled is in no way going to

22   affect my assessment.  I understand that he is in custody.

23          MR. LEV:  I understand that, Your Honor.  I just

24   suggest that it would, just trying to make it as comfortable

25   as possible, more comfortable for the witness.  I'll leave

1  that up to the officer.

2       (Whereupon, an off-the-record discussion was had.)

3       MR. LEV:  May I begin, Your Honor?

4       THE COURT:  Yes.  Thank you, Mr. Lev.

5             DIRECT EXAMINATION

6  BY MR. LEV:

7  Q   Mr. Sullivan, you are an inmate in the Pennsylvania

8  Department of Corrections?

9  A   That's correct.

10  Q   And currently you are incarcerated for what convictions?

11  A   I didn't hear that.

12  Q   Currently, what convictions are you incarcerated for?

13  A   Right now, I'm a parole violator serving ten years.  I

14  have a life sentence.  I don't know when it starts because I

15  violated my parole in 2000.  Arrested me later in 2000.

16  Q   And the life sentence was imposed for what crime?

17  A   First degree murder.  Happened in 1987.

18  Q   The parole violation was as a result of what conviction?

19  A   Of a murder that happened in '87.

20  Q    What degree of homicide were you convicted?

21  A    Third degree.

22  Q    Back in 1987, were you incarcerated in the Fayette

23  County Jail?

24  A    Yes, sir.

25        THE COURT:  Mr. Sullivan, could I ask you to get up

1  on that mike a little bit, please?

2      THE WITNESS:  Oh.

3      THE COURT:  There you go.

4  BY MR. LEV:

5  Q    And did you come to know Mark Breakiron during that

6  time?

7  A    Yes, sir.  I knew Mark Breakiron beginning 1979, I think

8  I first met the young man.

9      MR. LEV:  Your Honor, just as an aside.  I suppose

10  the record should reflect, we didn't put this on the record

11  before, that Mr. Breakiron is not present today.  That he

12  waived his presence to be here at this hearing, that he was

13  interviewed by an agent of Mr. Carusone's to insure that,

14  that, that he was, in fact, waiving it, and that is what's

15  going on.  He's waived his presence and is not here.

16      THE COURT:  Thank you for putting that on the

17  record, Mr. Lev.

18  BY MR. LEV:

19  Q    Okay.  Back to you, Mr. Sullivan.  You met Mark

20   Breakiron in the Fayette County Jail; is that what you said?

21   A   Yes, sir.

22   Q   And how did you get to know Mr. Breakiron in the jail?

23   A   We were on the same range together.

24   Q   And what is -- what does that mean, for those of us who

25   don't know what the range is?

1  A   Speaking '87, now.

2  Q   Yes.

3  A   Everybody that had a violent crime was housed on a

4  different range in the jail.  That would have been D range,

5  if my memory serves me right.

6  Q   D range.  How many inmates were housed on a range?

7  A   At that time, we were single cells.  So, there would

8  have been eleven.

9  Q   Was Ellis Price also housed on that range at that time?

10  A   Yes, he was.

11  Q   How about Chris Owen Miller?

12  A   Yes.  Chris was there, too.

13  Q   Robert Price?

14  A   No.  Bobby, they never put the Price brothers together

15  on any range, because there was all hell broke loose when all

16  three were together.

17  Q   During the course -- let me ask you this.  Did you know

18  what Mr. Breakiron was charged with at the time?

19  A   Oh, yes.  Yes.

20  Q    What was he charged with?

21  A    Murder.

22  Q    How did you know what he was charged with?

23  A    It was in the paper.  Plus, I knew the victim's family

24  who was involved in that.

25  Q    Who did you know?

1  A   Her brother, James.

2  Q   Did you devise some kind of plan to try to help yourself

3  at Mr. Breakiron's expense?

4      MR. CARUSONE:  Objection to the leading nature of

5  the question.

6      THE COURT:  Sustained.

7      MR. LEV:  I just meant that as a foundational

8  question, Your Honor.  That was kind of -- just kind of

9  following it up.

10  BY MR. LEV:

11  Q   Would you explain to the Court what happened in terms of

12  information you received from Mr. Breakiron?

13  A   Well, actually, I didn't receive any information from

14  Mr. Breakiron.  Most of it was gleaned from reading his

15  transcripts, most of discovery.

16  Q   How did you get access to his notes from discovery?

17  A   Well, Mark was sharing -- he didn't know what some of

18  the big words were, what the technology words meaning.  He

19  was in the dark, and I have been through this.

20  Q   Did you decide to do anything with that knowledge that

21  you had learned?

22  A   Yes, sir.

23  Q   What did you decide?

24  A   Three of us contacted, we contacted the DA's Office, who

25  at that time was Gerald Solomon, Fayette County.

1  Q    Who were the three people that put their heads together?

2  A    Myself, Ellis Price, and I can't remember his name, now.

3  Blair.  Connor Blair.

4  Q    And what did the three of you decide to do?

5  A    To tell Jerry Solomon that Chris or Mark had confessed

6  the crime to us.

7  Q    Who was Jerry Solomon?

8  A    DA at the time in Fayette County.

9  Q    Why was it that you wanted to tell Mr. Solomon that Mark

10  had confessed a crime to you?

11  A    To see what kind of deals they would offer.  Plus, his

12  father was my employer at the time.

13  Q    Whose father?

14  A    The DA.

15  Q    How did you go about contacting the DA?

16  A    Through the mail.  Wrote a letter.

17  Q    Who wrote the letter?

18  A    I did.

19  Q    And what did you write in the letter?

20  A   Just basic.  Tied bits.  Spiked his interest that we

21  were very useful.  We knew what we were talking about from

22  things I learned from reading his discovery packet, his

23  material.

24  Q   So, are you saying, is that what you described, some of

25  the facts of the case, provided details of that; is that --?

1  A    Right.

2  Q    -- what you mean?

3  A    Right.  Like have a pubic hair trimmed in a heart shape,

4  the knife going through the ear drum, cloth put in a paint

5  can and discarded at grandmother's house as because that's

6  where the body had been taken to from actually the killing

7  site, as I understand.

8  Q    From where had you gotten that information from?

9  A    From the newspapers and his discovery materials.

10  Q    What role did Ellis Price play in this, in this process?

11  A    Of the three of us or Ellis alone?

12  Q    Of the three.

13  A    Pretty equal share in everything.

14  Q    In the letter, what did you ask the DA?  Did you ask for

15  anything in return for this information?

16  A    For myself, my homicide consisted of beating a man up

17  and he died as a result.  I asked, instead of being charged

18  with first degree murder, being charged with murder.  Joshua

19  Perper, who was the coroner in this county, ruled the beating

20  by itself wasn't fatal.  Inclement weather, amount of

21  alcohol, was all contributing factors.  So, I couldn't be

22  charged with the top of the scale.  One, that the beating

23  wasn't the result of the death.

24  Q    Do you know what Ellis Price asked for?

25  A    Ellis asked for the moon.  I didn't think he would get

1  it.  He wanted his conviction for shooting the bartender

2  overturned and his brother's overturned and, in exchange for

3  his testimony, to be sent to a State of Michigan where he had

4  eight to sixty-year sentence for disemboweling a man outside

5  a bar.

6  Q    Who wrote, who actually wrote the letter?

7  A    I did.  I wrote it.  Most of them guys couldn't spell

8  any word if their life depended on it.

9  Q    Who signed the letter?

10  A    I signed my name first.  The other two signed it, as

11  well.

12  Q    Did you see them sign the letter?

13  A    Yes.  Right in front of me.

14  Q    What did you do with it after?

15  A    Mailed it.  Sealed it up, gave to it the prison guard.

16  He took it downstairs and off it went.

17  Q    Now, you spoke to an investigator from my office in 2002

18  about this incident?

19  A    Yes.

20  Q   How was it, if you know, that she came to speak with you

21  about this?

22  A   I called her, told her what I wanted to do.  Told her

23  what I wanted to do.  I wanted to come forward and tell

24  someone how I got this conviction.

25  Q   And this is now fourteen, fifteen years after?

1  A    Good while ago; yes.

2  Q    After the event, why, why then did you decide that you

3  were willing to come forward?

4  A    See, I was placed in the precarious situation.  I liked

5  Mark and I liked Saundra's brother Jimmy.  So, I couldn't do

6  anything physical.

7  Q    Let me interrupt you.  Jimmy was the decreased brother?

8  A    James Martin; yes.  So, I was like between a rock and a

9  hard spot.  So, I figured this is best.  Give it to them, see

10  what they could do.

11      After I seen what was going on in the judicial system,

12  I said, this is crazy for the guy to kill somebody with bogus

13  information, because I think it make them no better than what

14  the actual killer was, because if they knew it was bogus.

15  Q    Did you ever get any response to your letter from -- to

16  DA Solomon?

17  A    Not from the DA.  From Court appointed Mark Morrison.

18  M-O-R-R-I-S-O-N, I, I believe that's right.

19  Q    And Mr. Morrison was representing you on what charges at

20   the time?

21   A    Criminal homicide.

22   Q    And that's the beating case that you --?

23   A    Right.  That was in '87.

24   Q    And did you tell Mr. Mark Morrison about the letter that

25   you sent?

1   A   Well, no.  When he came over, he was up in arms about

2   it.  He said that I really screwed up.  That I should have

3   wrote the letter to him, let him take it to Jerry.  He said,

4   you blew it.  Just sat there and looked at him.  He was

5   really upset about it.

6   Q   He came to see you after you had sent the letter?

7   A   Oh, yes.  Almost immediately, because I remember I --.

8   Q   Other than Mr. Morrison coming to you about the letter,

9   did you get any official response from any police officer,

10  investigator, --

11  A   No.   Nothing like that.

12  Q   -- member of the DA's Office?

13      Mr. Sullivan, besides the offenses you have told us

14  about today, you have some other prior convictions in your

15  past?

16  A   Yes.  From age of eighteen up.  I have burglary, stolen

17  Corvettes.

18  Q   In 1965, you were convicted of a burglary?

19  A   I stole two Hondas.  Motorcycles.

20  Q   We don't need the details.  And, in 1975, were you

21  convicted of two counts of burglary, larceny, receiving

22  stolen property?

23  A   I was in the penitentiary in '75.

24  Q   I am sorry?

25  A   I was in the pen at that point until '76.

1  Q    In the early seventies, did you have additional

2  convictions for burglary, larceny, receiving stolen property

3  that you --

4  A    1970; yes.  '69 to '70.

5  Q    Oh, in 1970?

6  A    Um-hum.

7  Q    And, in 1983, were you convicted of receiving stolen

8  property and a weapons charge?

9  A    Yes.  I got, eventually got found guilty of them.  I was

10  convicted of carrying a firearm without a license.

11        MR. LEV:  I have no further questions of this

12  witness.

13        THE COURT:  Thank you, Mr. Lev.

14        Cross-examination, Mr. Carusone.

15        MR. CARUSONE:  Thank you, Your Honor.

16              CROSS-EXAMINATION

17  BY MR. CARUSONE:

18  Q    Mr. Sullivan, Mark Breakiron confessed to you in jail to

19  the murder of Saundra Martin; isn't that?

20   A    He never came right out and told me he did it.

21   Q    Really?  Do you remember being interviewed by Agent

22   Kerpchar of the Office of Attorney General?

23   A    Oh, yes.  Yes.  I remember that, up in Dallas.

24   Q    Right.  You remember he interviewed you about your

25   affidavit that you had presented?  You had put together and

1  signed?

2  A   Yes.

3  Q   Okay.  Do you remember telling Agent Kerpchar that Mark

4  Breakiron confessed to the homicide of Saundra Martin to you,

5  and that you told Agent Kerpchar Mark killed Saundra because

6  she was a common whore, and Mark wanted to fuck her, and

7  Saundra didn't want anything to do with Mark, other than

8  being friends.  Do you recall telling him that?

9  A   That is actually what I said to him.

10  Q   So, Mark Breakiron did, in fact, confess to you to the

11  murder of Saundra?

12       THE COURT:  If both of you could slow down a

13  little, too, that would help.

14  BY MR. CARUSONE:

15  Q   So, he did confess to you; is that right?

16  A   He never said, I did that.  I have -- never in those

17  words at all.

18  Q   But you told Agent Kerpchar that he did confess?

19  A   We were just talking off the cuff.  I wasn't real at

20  ease with that guy.  That only lasted thirty minutes.  I got

21  up and walked out.

22  Q   After he told you that your statements that you were

23  giving had to be -- were subject to penalties for

24  falsifications, isn't that true, isn't that when you ended

25  the interview?

1   A    I didn't think I should be talking to him in the

2   beginning.  So, --.

3   Q    So, you made off-the-cuff statements to Agent Kerpchar

4   that Breakiron confessed to you that he murdered Saundra

5   Martin; is that right?

6   A    That is, yes, sir that's what I just testified to.

7   Q    All right.  Now, Mr. Sullivan, isn't it true, that Ellis

8   Price received no benefit whatsoever in exchange for his

9   testimony?

10       MR. LEV:  Objection, Your Honor.

11       THE COURT:  That's -- hold on.  Hold on.  The

12   objection is?

13       MR. LEV:  That how would Mr. Sullivan know if

14   Mr. Price received any benefits?

15       MR. CARUSONE:  I can lay a foundation.

16       THE COURT:  All right.  Go ahead.  Try to lay a

17   foundation.

18   BY MR. CARUSONE:

19   Q    Do you recall being interviewed by the Office of

20  Attorney --

21  A    Same guy we're talking --

22  Q    Yes.

23  A    Yes.

24  Q    Do you recall being questioned about whether Ellis Price

25  received any benefit in exchange for his testimony?

1  A   No.  If he would have, I would certainly told him.

2  Q   So, you didn't talk to him about that?

3  A   Not there.

4  Q   Okay.  You didn't tell Kerpchar that Ellis Price

5  received nothing in exchange for his --

6  A   If I did-- refresh my memory.  I'll tell you if I did or

7  not.

8  Q   In Mr. Kerpchar's report, --

9       MR. LEV:  Could you show the witness the report,

10  please?

11       MR. CARUSONE:  Sure.

12  BY MR. CARUSONE:

13  Q   Mr. Sullivan, I'm going to show you a report prepared by

14  Sergeant Greg Kerpchar, dated March 8 of 2005.  I'm going to

15  turn to page 2 of that report and ask you to read the first

16  highlighted sentence on the second page?

17       MR. LEV:  Excuse me.  Could you just tell me where

18  on the second page?

19       MR. CARUSONE:  It's the second sentence on that

20   page.

21       MR. LEV:  Okay.

22   BY MR. CARUSONE:

23   Q   Why don't you read it out loud?

24   A   I don't have my glasses.  That's why I'm going like

25   this.

1  Q   It says, Sullivan remarked that neither he, nor Ellis

2  Price, or Blair, received any benefit as a result of a letter

3  to District Attorney Solomon.

4      Is that true?

5  A   That's what I said.

6  Q   That is what you told him.  All I asked you.  Did you

7  tell him that?

8  A   Obviously, I said that; yes.

9  Q   All right.  Now, do you recall signing a

10  declaration/affidavit for the Defender's Association?

11  A   Yes.

12  Q   In your statement, have you seen that statement

13  recently?

14  A   Um-hum.

15  Q   You have; okay.  In your statement, sir, do you recall

16  indicating that Ellis Price signed your letter to the

17  District Attorney and asked for a deal?  Do you remember

18  saying that in your affidavit?

19  A   Um-hum.

file:///A|/BREAKA.TXT

20  Q    All right.  You didn't mention Robert Price or Clinton

21  -- Conrad Blair signing that letter; did you?

22  A    In that right there?

23  Q    Yes; in that affidavit?

24  A    Because Bobby Price never signed it.  There was only

25  three of us, Clinton, myself, and Ellis.  When I was talking

1  to them people there, we may not have been talking about

2  Blair, because Blair was very, very small player in any of

3  this.

4  Q    Again, I want to refer you back to your interview with

5  Agent Kerpchar of the Office of Attorney General.

6        MR. CARUSONE:  May I approach, Your Honor?

7  BY MR. CARUSONE:

8  Q    Mr. Sullivan, I'm going to show you again page 2 of

9  Agent Kerpchar's report, ask you to read the first sentence

10  of that report?  Very first sentence on the top?

11  A    Sullivan confirmed he wrote the letter on behalf of

12  Ellis Price.  I didn't say Bobby Price.  This isn't --

13  Q    The sentence reads -- why don't you read the sentence as

14  it is, first?

15  A    Sullivan confirmed he wrote the letter on behalf of

16  Ellis Price, Bob Price, Clinton Blair, to Fayette County DA

17  Gerald Solomon, stating that I had information against Mark

18  Breakiron for containing leniency relative to charges pending

19  all of them.

20  Q    Oh, so Agent Kerpchar reported in his report that you

21  had written that letter also on behalf of Bob Price, being

22  Robert Price?  You are saying you disagree with that; that's

23  not true?

24  A    I don't remember saying that.

25  Q    Did he --

1   A   I don't remember saying that.

2   Q   Did you take any notes of the interview that you had?

3   A   Oh, no.  No.  Why should I.

4   Q   Did he take notes?

5   A   Did he take notes?

6   Q   Yes.

7   A   I don't know.  I can't remember if he did or not.

8   Q   Do you dispute this statement, where he says that you

9   wrote the letter on behalf Ellis Price, Bob Price, Clinton --

10   A   I may have made a misstatement on my part.  I certainly

11   didn't write on behalf of Bobby.  Bobby wasn't involved.

12   Q   May be a misstatement on your part?

13   A   Yes, sir.  We're talking about years ago.

14   Q   Mr. Sullivan, I want to refer you to your

15   declaration/affidavit that you had signed for Mark

16   Breakiron's attorneys.  I want to refer you to paragraph 3

17   and ask you to review that to yourself.

18   A   There is no paragraph -- for the whole thing?

19   Q   Yes.  Paragraph 3 that you have listed here.  Why don't

20    you read that to yourself?

21    A    Okay.

22    Q    Would you agree with me that nowhere in that paragraph

23    do you say anything about Robert Price or Clinton Conrad

24    Blair signing that letter to the District Attorney?

25    A    I said, the other guys.  I didn't put names in there.

1  Q   Okay.  Where is that?  Where is that indication there?

2  A   Where does it say, other guys at?

3  Q   Signing the letter?

4  A   Me and the other guys was -- the letter was an attempt

5  by me and the other guys -- let me finish -- who were in on

6  it to get deals in exchange for testifying against Mark.

7      I asked for the prosecutor to reduce the charges to

8  third degree murder on my case.  Ellis asked the prosecutor,

9  who also signed the letter, also asked for a deal.

10  Q   Is there any mention in this affidavit that, that Robert

11  Price or Clinton Conrad Blair also signed that letter?

12  A   No.  There is not.

13  Q   Thank you.  Mr. Sullivan, you were never interviewed by

14  the police in response to your letter; is that right?

15  A   No, sir.

16  Q   Was Clinton Conrad Blair ever interviewed by the police

17  in response to your letter?

18  A   I don't know.

19  Q   What was that?

file:///A|/BREAKA.TXT

20   A   I don't know.

21   Q   How about Rob Price?  Do you know if he was ever

22   interviewed by the police in response to your letter?

23   A   I don't know.  I don't know.

24   Q   Where is this letter today?

25   A   (Indicating.)

1  Q   Did you keep a copy of it?

2  A   No.

3  Q   You don't keep a copy of stuff like that in jail?

4  A   No.  Please.  You know that.

5  Q   I've never been in jail.

6  A   You're a prosecutor.  You know how the snitch network

7  goes.

8  Q   So, you didn't keep a copy of this?

9  A   Absolutely not.  Sent it off to Jerry.  Let him deal

10  with it.

11  Q   What was the date of the letter?

12  A   I don't remember.  1987.

13  Q   So, it was written in 1987?

14  A   I believe the summer of '87.

15  Q   Summer of '87?

16  A   I believe.

17  Q   How long was the letter?

18  A   Two pages.

19  Q   You remember that?  You remember it was only two pages?

20   A   Um-hum.

21   Q   Everybody signed it?

22   A   Yes.

23   Q   What deals, specifically, did you say Ellis Price asked

24   for?

25   A   He wanted his conviction dropped for shooting the

1  bartender, him and his brother, and turned over to the

2  Michigan authorities where he had an eight- to sixty-year

3  sentence to serve and they were going to drop Bobby's down

4  to a five to ten.

5      Reason why I know so much of this stuff because the

6  person who overturned the conviction of Ellis Price was my

7  wife's first cousin.  I was married to the Judge's cousin.

8  That's how I know what went on.  Shortly after, the Judge who

9  tried the case resigned.

10  Q    You are aware Ellis Price's conviction was vacated in

11  the summer of 1987?

12  A    Um-hum.

13  Q    So, you are saying, you are saying he asked for his

14  conviction to be vacated in the summer and his conviction had

15  already been vacated?

16      MR. LEV:  I would object to that.  Summer carries a

17  stretch of time and the befores are not clear.

18      THE COURT:  Right.  I agree.

19      Why don't you rephrase?

20  BY MR. CARUSONE:

21  Q   Ellis Price's conviction was vacated on July 24, 1987.

22  A   If you say so.

23  Q   Okay.  That's what the record is will show.  When was

24  this letter written?

25  A   I came to jail in March.  So, had to be before that.

1   But I know one thing, that's the first and only time in

2   Fayette County anything like that ever happened.  Then the

3   District Attorney refused to re-charge.  Re-try.  Come on.

4   It's like egg in your face.  So, it's so obvious.

5   Q    Did you beat up on Mark Breakiron?

6   A    Did I?

7   Q    Did you used to beat up on Mark while you were in --

8        MR. LEV:  Objection, Your Honor.

9        THE COURT:  Mr. Sullivan, just when there is an

10  objection, just don't answer until I rule on the objection;

11  all right?

12       THE WITNESS:  All right.

13       MR. LEV:  Relevance.

14       THE COURT:  What's the relevance?

15       MR. CARUSONE:  I think, Your Honor, there is going

16  to be some testimony from other witnesses that Mr. Lev is

17  going to call that Breakiron was a guy who used to get picked

18  on a lot.

19       I want to know, is that true.  Was, was

20   Mr. Sullivan involved in picking on and beating up Mark

21   Breakiron?  We are going to have witnesses, that Mr. Lev is

22   going to call, witnesses that say that Mr. Sullivan was one

23   of the main people that used to beat up Mark Breakiron.

24        MR. LEV:  I don't know that we're going to have

25   that testimony or not.

1      MR. CARUSONE:  Well, if we're not, sure then he

2   ought --

3      MR. LEV:  Let --

4   BY MR. CARUSONE:

5   Q    Used to beat up Mark Breakiron?

6   A    Never physically hit him.  Never physically hit him.

7   Q    Anyone hit him at all?

8   A    Only scared him.  Threw water on him.  Coffee.  Never

9   put my hands on him.

10  Q    Never put your hands on him?

11  A    No.  I did not.

12  Q    Mr. Sullivan, how would you describe your reputation

13  among criminals in Fayette County?

14     MR. LEV:  Objection.  How would he know?  What is

15  the relevance of that?

16     MR. CARUSONE:  I believe this is proper,

17  reputation, 608A, Your Honor.

18     MR. LEV:  We didn't put forth reputation evidence

19  on behalf of Mr. Sullivan and reputation among criminals.  I

20  just, I don't understand the relevance.

21      MR. CARUSONE:  That goes to truthfulness, Your

22  Honor.  If he enjoys a good reputation among criminals, in

23  other words, a criminal's criminal, that goes to truthfulness

24  or untruthfulness.  I believe it fits under the end of the

25  Rule 608A.

1        THE COURT:  Doesn't Mr. Lev have to open the door

2   on that?

3        MR. CARUSONE:  I don't think so, Your Honor, under

4   608A.  I think I can impeach with reputation for

5   truthfulness.

6        THE COURT:  Well, on direct, we heard testimony

7   about prior crimen falsi of this witness; correct, Mr. Lev?

8        MR. LEV:  Correct.

9        THE COURT:  Doesn't that put his truthfulness at

10  issue?

11        MR. LEV:  I think his truthfulness is at issue by

12  virtue of his testimony by appearing as a witness, as all

13  witnesses is at issue, Your Honor.  The question is, is his

14  reputation at issue?  Is his reputation evidence?

15        As I understand the normal course of reputation

16  evidence, you, you don't ask about your own reputation.

17  That, that you would present a witness who would be aware of

18  someone else's reputation.  That would be relevant and would

19  testify to that reputation in the community.  I don't know

20   about asking a witness about their own reputation within a

21   very narrow community.  Doesn't seem to me to fit within the

22   context of the rule.

23          MR. CARUSONE:  Your Honor, I think the witness is

24   capable of knowing what the reputation is.  In fact, I have a

25   -- in a prior interview, just make this proffer.

1          In a prior interview with Agent Kerpchar, there was

2   a statement made by James Sullivan to Agent Kerpchar that he

3   enjoyed a good reputation among the criminals in Fayette

4   County.  I believe that with that proffer he clearly knows

5   what his reputation is among criminals in Fayette County.

6          Also, Rule 608A doesn't say anything about having

7   that reputation be at issue before I can introduce evidence

8   of bad reputation.  It's only where, and this is 608 in the

9   second paragraph.  You can't introduce evidence of good

10  character for truthfulness until the reputation for bad

11  character has been attacked.  So, I don't think there is any,

12  anything improper with my question.

13         MR. LEV:  Let me -- just a minute -- say.  Under

14  Rule 608, if you are going to allow, the question should be

15  limited to the character for truthfulness, untruthfulness, as

16  opposed to general character.

17         THE COURT:  I believe I agree.  You can ask the

18  question, but I goes to the issue of truthfulness --

19         MR. CARUSONE:  Or untruthfulness.

20         MR. CARUSONE:  Okay.  I believe that this, this

21    question that I am asking about his reputation among

22    criminals in Fayette County, I think that does go to the

23    question of truthfulness or untruthfulness.

24         THE COURT:  I think you have to make that part of,

25    of the question.

1        MR. CARUSONE:  Okay.

2    BY MR. CARUSONE:

3    Q    How is your reputation for truthfulness in testifying in

4    Court proceedings?  How would you describe your reputation?

5    A    I have never had to testify in a Court proceeding like

6    this.

7    Q    Never had to testify in Court before?

8    A    For myself.

9    Q    Never been an informant, jailhouse informant, for the

10    police?

11    A    Nope.

12    Q    Never?

13    A    Never.

14    Q    Never been interviewed before by the State Police on

15    other homicides?

16    A    Sure.  Sure.  They got nothing.

17    Q    What do you mean, they have nothing?

18    A    They got nothing because I didn't do anything with what

19    they were questioning about.

20   Q    You didn't commit any murder?

21   A    No.  I have yet to kill anybody.  Directly kill someone.

22   Q    Did you tell Agent Kerpchar that you describe yourself

23   as having a good reputation among criminals in Fayette

24   County?

25        MR. LEV:  Objection.

1          THE COURT:  Sustained.

2          MR. CARUSONE:  All right.  I'll move on, Your

3    Honor.

4    BY MR. CARUSONE:

5    Q    Ellis Price didn't take any discovery materials from

6    Mark Breakiron's cell; isn't that true?

7    A    No.  It was Clinton Blair took.

8    Q    Clinton Blair?

9    A    Um-hum.

10   Q    So, it was only one person that took it, Clinton Blair?

11   A    Yes.  Gave it back to Mark Breakiron.

12   Q    So, you, you -- once those materials were obtained by

13   Blair, you gave them back to Breakiron?

14   A    Got them off of him.

15   Q    Why?

16   A    Why?  Because I didn't -- it wasn't right what Clinton

17   was doing, was beating up the kid.  Kid was scared to death

18   on that range.  They was taking advantage of this.

19   Q    But this was your scheme; isn't that what you are

20  saying?

21  A   I just wrote the letter.  Don't hate the postman, the

22  messenger.  I just wrote it.

23  Q   So, you were just a messenger?  You just wrote a letter?

24  A   On my behalf.  I don't think I wasn't -- I don't care

25  what -- the reason why I got involved in it, I didn't plead

1    guilty to nothing.  I don't believe in the plea bargains.

2        Reason why I wrote the letter, got myself involved in

3    it, I wanted to see if they were willing to deal, if they're

4    not willing to deal, they're not sure of this.  So, I can

5    play the game like they played.

6    Q    You were playing a game?

7    A    Yes, sir.

8    Q    You were in charge of this little conspiracy that you

9    were mentioning; right?

10   A    Excuse me?

11   Q    You were in charge of this little group?

12   A    Wasn't in charge of anything.

13   Q    I thought that's what you testified on direct

14   examination, that you devised a scheme?

15   A    I wasn't in charge of it.  I didn't make anybody sign

16   that thing.  I didn't make Ellis take the deal they offered.

17   I didn't make him do anything.

18   Q    What deal did they offer Ellis Price?

19   A    You haven't got it, yet.  They dropped it.  He was

20    already convicted of shooting the bartender outside of a bar

21    there with a .357 Magnum in the chest.

22    Q    He was already convicted?

23    A    He was already convicted.

24    Q    So, what deal did he receive?

25    A    They dropped his conviction.  First time in Fayette

1   County history.  Dropped his conviction.  Let him go to the

2   State of Michigan where he only did six years on nine, then

3   didn't want to re-prosecute him.

4   Q    Didn't you tell Agent Kerpchar that Ellis Price received

5   nothing in exchange for his testimony?  Didn't you tell him

6   that?

7   A    I don't think I said that to he received nothing.  I

8   just didn't tell him what he got.  I know what he got.  You

9   know what he got because it's in the record.

10  Q    You know Chris Owen Miller.

11  A    Yes.  I know Chris Miller.

12  Q    How do you know him?

13  A    He was in County, county jail; wasn't he?

14  Q    Chris Miller said that you used to beat up Breakiron;

15  would that be true?

16  A    I don't know.  No.  That wouldn't be true.  I have no

17  idea what he may have told you.

18  Q    You indicated in your testimony that you reached out and

19  spoke to Mark Breakiron's mother; is that correct?

20   A   Yes, I did.

21   Q   That was when you were in the Fayette County Jail?

22   A   Yes, sir.

23   Q   And so that would have been in 1987, 1988?

24   A   No.  No.  No.  No.  This was in 2000 something.

25   Q   Weren't you committed to the State Correctional

1   Institution in 1988?

2   A   I was paroled in 2000.  First time on -- up on a twenty

3   years sentence.

4   Q   Then you went back to jail for the murder of Lynn

5   Kovach?

6   A   Went back to jail for having a cell phone. --

7   Q   You were prosecuted for Lynn --

8   A   You want to spent the rest of your life in jail?  That

9   is not the highlight of my day.  No.

10  Q   So, you don't want to spend the rest of your life --

11  A   Not if I can help it.

12  Q   Okay.  Are you trying to help yourself by testifying in

13  this case?  You hoping --?

14  A   How?

15  Q   Are you hoping that that Defender's Associates might be

16  able to help you?

17  A   How could that be?  Just turned down one of my appeals.

18  I am on my way to the Third Circuit.  They can't do nothing

19  for me.  I am doing this all myself.  Little typewriter in a

20  cell.

21  Q   You were convicted of third degree murder; correct?

22  A   In 1988 for the murder of Charles Wheeler.

23  Q   Are you saying you didn't commit that crime?

24  A   Oh, yes, sir.  I beat him up; yes, sir.

25  Q   You beat him?

1  A   Yes.  Absolutely.

2  Q   You killed --

3  A   Led to his death.

4  Q   You said -- testified on direct examination that Ellis

5  Price also asked to be let off on an aggravated assault.  You

6  described that as a disemboweling of a person.  What were you

7  referring to?

8  A   These charges in Michigan that he had to face, he was

9  convicted of this.

10  Q   Looking for some consideration of his charges in

11  Michigan?

12  A   To get out of that time; yes, sir.

13  Q   He was asking the District Attorney in Pennsylvania --

14  A   To assist him.  Yes, sir.

15       MR. CARUSONE:  No further question.

16       MR. LEV:  Briefly.

17       THE COURT:  All right.

18            REDIRECT EXAMINATION

19  BY MR. LEV:

20  Q   Robert Price.  Was Robert Price Ellis Price's brother?

21  A   Yes, sir.

22  Q   Were you in contact with him during the time that, that

23  this letter was being written to District Attorney Solomon?

24  A   No.  Bobby was never on the same range with Ellis and I.

25  Q   In the Fayette County Jail, if you were on different

1  ranges, were you able to have contact with inmates on other

2  ranges?

3  A    Only if you went to the yard.

4  Q    In the letter, did Ellis Price ask for assistance for

5  Robert Price?

6  A    No.  The deal was, was carried over by Mark Morrison

7  himself.  That's how, how Ellis got the deal.  Nothing from

8  our letter.

9  Q    But in the letter, did Ellis Price ask that something

10  happen for Robert Price?

11  A    Yes.  For him and his brother both.

12       MR. LEV:  Can I have this marked as Petitioner's

13  Exhibit 1, please?  Would you like a copy?

14       THE COURT:  What is it?

15       MR. LEV:  It's the affidavit that Mr. Sullivan

16  signed.

17       THE COURT:  I got it.

18  BY MR. LEV:

19  Q    Mr. Sullivan, I'm going to show you what's been marked

20  as Plaintiff's Exhibit 1 and ask if you can identify what

21  that is?

22  A   Um-hum.

23  Q   What is it?

24  A   It's for -- a statement that I gave the first time I

25  talked to any of you people from the Defender's.

1   Q    Did you -- are you the person who wrote that out?

2   A    No.  I'm not.  I didn't have my glasses.

3   Q    Who wrote that out?

4   A    Either Pam or the gentleman that was with him.  I am not

5   sure which.

6   Q    There were two people who came to visit you?

7   A    Yes, sir.

8   Q    At that time, one of them wrote that out?

9   A    Um-hum.

10   Q    Did they give you a chance to read it after they wrote

11   it out?

12   A    Yes, sir.

13   Q    They wrote it right there in the jail when they talked

14   to you?

15   A    Um-hum.

16   Q    Now, I notice at several times, in the course of that

17   affidavit, there are things crossed out or added and

18   initialed?  JFS?

19   A    Um-hum.

20   Q    There, who put those initials?

21   A    I did.  That's my writing.

22   Q    Are those changes that you made after reading it?

23   A    Yes.  Um-hum.

24   Q    And at the end, is that your signature?  At the end of

25   the affidavit?

1   A   Yes, sir.

2         MR. LEV:  I would move for the admission of the

3   affidavit.

4         MR. CARUSONE:  Your Honor, I would object to the --

5   a portion of that; specifically, paragraph 2 of that, of that

6   statement, which references a, a statement allegedly made by

7   the brother of the victim to Mr. Sullivan.

8         Your Honor, I can read it to you.  But -- and this

9   is why I object to it.  It says that, I knew Saundra Martin's

10  brother Jimmy through his girl.  He's who I met in

11  Brownsville.  Jimmy and I were friends.  Jimmy got word to me

12  through the other inmates to try to get Mark.

13        I object to that part.  That's hearsay.

14        MR. LEV:  I have to object to his objection to

15  that.

16        THE COURT:  All right.  Then Exhibit 1 will be

17  admitted with that hearsay statement excised.

18        MR. LEV:  Thank you.  I have no further question.

19        MR. CARUSONE:  Your Honor, just follow-up.

20          RECROSS EXAMINATION

21  BY MR. CARUSONE:

22  Q    You actually signed this, this affidavit; correct?

23  A    Yes, sir.

24  Q    Adopted these words as your own?

25  A    Yes.

1  Q   Do you have a copy of it in front of you right now?

2  A   No.

3  Q   No?

4  A   No.

5  Q   I notice that where you saw the need, you made

6  corrections where you thought it was appropriate; correct?

7  A   Let me see.

8       MR. LEV:  Mr. Carusone, what are you referring him

9  to?

10      MR. CARUSONE:  He is reading the entire statement.

11  I've asked -- the question is, where you saw fit, you made

12  corrections to the language in that, in that statement;

13  correct?

14      MR. LEV:  Okay.

15  A   Yes.  I don't understand, we were friends.

16  Q   So, you struck that, the language in paragraph 2 where

17  you were talking about Jimmy?  You said, we were friends.

18  You, you struck that out and put your initials there?

19  A   No.  I put, Jimmy and I were friends.

20  Q    But this, those are your initials right here?

21  A    Um-hum.

22  Q    That is your signature at the bottom?

23  A    Um-hum.

24  Q    All right.  On page 2, this is paragraph 3.  I saw in

25  paragraph 3 where you said, I asked for the prosecutor to

1   reduce charges to third degree murder, and then you added on,

2   my case.  And then you indicated Ellis Price also asked for a

3   deal.  Do you see that, that correction there that you made?

4   A   Um-hum.

5   Q   Did you make a correction to this affidavit indicating

6   that also other people, Clinton Conrad Blair, had also signed

7   the letter?  Did you indicate that in this affidavit.

8   A   I don't think so.

9   Q   No.  And down here, down here in paragraph 4 of this

10  affidavit, where you say, we got details about the crime from

11  Mark's discovery materials which we took from his cell.

12      Did you correct the we and to mean Clinton Conrad Blair?

13  A   I don't know.  There is no correction in there; is

14  there?

15  Q   No.  Which means you said in the statement, that we took

16  this from his cell, meaning, meaning more than one person

17  took these materials from his cell?

18  A   That's what that was.

19  Q   That's not true.  Only Clinton Conrad Blair?

20  A   I think it's splitting hairs.  No.

21  Q   No, you don't?

22  A   No.

23  Q   You don't; okay.  The number of people involved in this

24  alleged theft is not splitting hairs.

25       MR. CARUSONE:  No further question.

1        MR. LEV:  Nothing further.

2        THE COURT:  All right.  Mr. Sullivan, you are

3   excused.  The officer will take you into custody.

4        (Whereupon, the witness was excused from the

5   witness stand.)

6        THE COURT:  Who's the next witness, Mr. Lev?

7        MR. LEV:  Chris Owen Miller, please.

8        THE COURT:  All right.

9        MR. LEV:  Mr. Miller had, while we are waiting,

10   when I saw him yesterday at SCI-Greene, asked if I would ask

11   the Court to do whatever it can to see that he got back out.

12   He's normally held in SCI-Greensburg.  To get him back to

13   Greensburg as quickly as possible.  He's held in

14   administrative segregation in Greene as a result of his being

15   a witness here.

16        I assured him I would ask the Court and that I

17   would do so in his presence.  So, I just wanted to alert you,

18   if it's all right with the Court, to make that request to you

19   before he testifies.

20          THE COURT:  That's fine.  I don't control.  So,

21   I'll tell him that.

22          MR. LEV:  I understand that.

23          THE COURT:  But I appreciate you explaining to me

24   why you are going to make the request.

25          MR. LEV:  Your Honor, may I take a brief break

1   before we get going?

2          THE COURT:  Go ahead.

3          (Whereupon, a recess was had.)

4                  - - -

5          (Whereupon, the following was had in open Court.)

6          THE DEPUTY CLERK:  State your name, please?

7          THE WITNESS:  Chris Owen Miller, Senior.

8          CHRIS OWEN MILLER, SENIOR, A WITNESS, having been

9   first duly sworn, was examined and testified as follows:

10          THE DEPUTY CLERK:  Would you take the witness

11   stand?

12          THE COURT:  Mr. Miller, I am going to ask you to

13   get up on that microphone there?  If you can pull it towards

14   you, if necessary?  Thank you.

15          Mr. Lev.

16          MR. LEV:  Thank you, Your Honor.

17                  DIRECT EXAMINATION

18   BY MR. LEV:

19   Q   Mr. Miller, in the summer of 1987, were you incarcerated

20   in the Fayette County Jail?

21   A   Yes, sir.

22   Q   And was Mark Breakiron incarcerated with you?

23   A   Yes.  I was on the same range with him.

24   Q   On the same range?

25   A   Yes, sir.

1   Q   Was James Sullivan incarcerated with you?

2   A   Yes.  He was on the same range with all of us together.

3   Q   And does Sullivan have a nickname?

4   A   Silky.

5   Q   Who is Ellis Price?  Was he also on the range?

6   A   Ellis was on the range, also.

7   Q   Were there other Prices incarcerated at that time?

8   A   Bobby was there, but they weren't on -- they split the

9   brothers up.  They had them all on different ranges.

10  Q   Okay.  In the summer of 1987, while you were

11  incarcerated there, did you interact with, with Sullivan, and

12  Ellis Price, and Conrad Blair?

13  A   Yes.

14  Q   Did there come a time when they asked you about Mark

15  Breakiron's case?

16  A   Yes, they did.

17  Q   Could you tell Judge Hardiman, please, what happened?

18  A   Well, we were playing cards and the guys -- I don't

19  remember which one had discovery papers, but they was --

20   wanted to write a letter to the DA's office to try to get

21   deals in their own cases.  I declined to even want any part

22   of it.

23   Q   Did they ask you to participate in that?

24   A   Yes, they did.  I declined.

25   Q   Why did you decline?

1  A   I am facing a homicide case myself.  I have enough of my

2  own problems facing the death penalty.

3  Q   Do you know if they took any steps towards trying to get

4  deals for themselves?

5  A   I don't really know, because before Mark's trial

6  started, you know, I was transferred out after my trial was

7  completed.  I observed them writing the letters and, you

8  know, the letter.  But I -- for what kind of deals they got,

9  I don't know.

10  Q   What did you observe them doing?

11  A   Writing the letter to the DA's Office.

12  Q   They did that right in front of you?

13  A   Ranges were small.  It ain't like you can't see what

14  everything goes on.  There's only fourteen cells on a tier.

15  Q   Do you remember who was writing the letter?

16  A   To my recollection, I can't recall.  But, you know, who

17  actually wrote the letter?  No.  But I know that they all

18  three were taking part in it.

19  Q   Do you know what kind of assistance Ellis Price was

20  looking for from the DA's Office?

21  A   Do I know what kind of assistance?

22  Q   Yes; that he was hoping to get?

23  A   See, I wouldn't know if he was trying to get any kind of

24  assistance or anything.  All I know is that his, you know,

25  him and his brother was involved in a case and that's all I

1  know.

2  Q   Did Ellis ever say to you what he was hoping to get?

3  A   No.  He never said anything.

4  Q   How come you are willing to testify about this now?

5  A   Because it's the right thing to do.  You know, it's been

6  a routine practice in Fayette County that they been using

7  jailhouse informants possibly convicting people.

8       MR. CARUSONE:  Objection.  Lack of foundation, how

9  he could possibly know.  There is no foundation laid for

10  that.

11       THE COURT:  Sustained.  Why don't you rephrase,

12  Mr. Lev?

13  BY MR. LEV:

14  Q   Speaking just from your knowledge, why is it that you

15  are willing to come forward and testify?

16       MR. CARUSONE:  Same objection.  Without laying a

17  foundation.

18       MR. LEV:  I am sorry.

19  BY MR. LEV:

20  Q   That your feelings, your beliefs about --

21          MR. CARUSONE:  Same objection.  There is no

22  foundation.

23          MR. LEV:  Not asking for the truth of the matter,

24  just what motivates him to come forward.

25          MR. CARUSONE:  This is not a hearsay objection.  It

1  calls for speculation.  He keeps talking about he's going to

2  testify about common practices in Fayette County.  There is

3  no foundation laid for how he could possibly know.

4        THE COURT:  No.  It just goes to his motivation;

5  right?  Isn't his motivation at issue or are you saying his

6  motivation is not --

7        MR. CARUSONE:  Witness's motivation?  No.  It is at

8  issue.

9        THE COURT:  Then he needs to explain his

10  motivation.  So, I'll overrule it.

11        You may answer the question, Mr. Miller.

12        THE WITNESS:  Please, would you rephrase the

13  question?

14  BY MR. LEV:

15  Q    What is it that motivates you to come and tell your

16  story?

17  A    What motivates me?

18  Q    Yes.  Why?  Why you doing this?

19  A    Because it's the right thing to do.  The man, you know,

file:///A|/BREAKA.TXT

20   those other guys didn't have to get involved in his case; you

21   understand?  Man had enough of his own problems.

22        And them guys, it's been -- that's been going on because

23   it also happens in my case, you know?  But I just, I don't

24   want to mention no names because then he is going to start

25   objecting and all this.  But it's, it's the proper thing to

1  do.

2  Q   Are you getting any benefits --

3  A   No.  I'm not getting --

4       THE COURT:  Hold on.  Hold on.  Please wait until

5  Mr. Lev completely finishes his question so the court

6  reporter can take everything down.

7       THE WITNESS:  All right.

8       MR. LEV:  Should I repeat?

9       THE COURT:  Please.

10  BY MR. LEV:

11  Q   Are you getting any benefits for your testimony today?

12  A   No, sir.

13  Q   Have I or my office promised you any assistance or

14  anything in exchange for your testimony?

15  A   No.

16  Q   Okay.  What, Mr. Miller, what sentence are you currently

17  serving?

18  A   Life sentence.

19  Q   For what offenses?

20  A   Criminal homicide.

21  Q   And when were you convicted of that?

22  A   I got a new trial in '90.  I was convicted originally

23  back in, I think, '87 or something?  I can't actually

24  remember because I have had a new trial.  It's been so long,

25  I can't remember.

1   Q    You were convicted, then had a new trial, then what

2   happened after that?

3   A    I got re-convicted.

4   Q    And, in 1980, if you remember, did you plead guilty to

5   burglary in another offense?

6   A    Yes, sir.  That was in Allegheny County.

7        MR. LEV:  Can I just have a second, Your Honor?

8        (Whereupon, an off-the-record discussion was had.)

9        MR. LEV:  I have no further questions.

10       THE COURT:  Thank you, Mr. Lev.

11       Mr. Carusone.

12                CROSS-EXAMINATION

13   BY MR. CARUSONE:

14   Q    Mr. Miller, Mark Breakiron rarely left his jail cell; is

15   that right?

16   A    Exactly.

17   Q    So, usually, more time than not, he was in his jail

18   cell; correct?

19   A    Yes.

file:///A|/BREAKA.TXT

20  Q   That's where his discovery materials were located?

21  A   Exactly.

22  Q   In fact, there came a time when, according to your

23  statement, the guards moved him up front where they could

24  keep an eye on him; is that right?

25  A   Exactly.

1  Q    And so, did they move him and all his stuff up front --

2  A    Yes, sir.

3  Q    -- Where they could keep an eye on him?

4       So, that's where his discovery materials would have

5  been; right?

6  A    Yes.  It could have been when he was in the back of the

7  block, you know it?  If he moved from cell to cell,

8  apparently, discovery papers would go with him.

9  Q    That's my question.  Thank you.

10      When the inmates were in the yard in the Fayette County

11  Jail, were the jail cells closed or were they closed up?  I

12  known it's been a while.

13  A    Sometimes they would leave them opened.  Sometimes they

14  would close them.

15  Q    Was it up to the inmates to decide whether to leave it

16  open or close it?

17  A    No.  Actually, it was the guard -- when I first got

18  there, it was only single cell.  Then they started double-

19  bunking guys.

20  Q   Right.

21  A   So, then it was on discretionary thing.  Guards didn't

22  have to lock the cells and cells remained opened.

23  Q   I thought when, when in the jail, there was times for

24  the inmates to go in the yard; is that correct?

25  A   Stretch your legs.  Yes.

1   Q    I thought the practice in the Fayette County Jail was,

2   when that happened, when it was time to go in the yard, the

3   cell doors were closed; do you recall?

4   A    Wasn't always a practice.  I spent almost two years

5   there.  I can tell you right now that wasn't always a

6   practice of them locking the doors.

7   Q    More time than not, you think?

8   A    More times than not.

9   Q    Did you witness anyone taking the materials out of Mark

10   Breakiron's cell?

11   A    I didn't actually see them guys take it, but --

12   Q    That's my question.

13       MR. LEV:  Can the witness finish his answer?

14       THE COURT:  You can deal with it on redirect.

15   BY MR. CARUSONE:

16   Q    You didn't discuss your case with Mark Breakiron;

17   correct?

18   A    No, sir.

19   Q    And you didn't -- he didn't discuss his case with you;

20   correct?

21   A   All I know of his is from what I read in the paper.  We

22   never spoke about particulars of his case or mine.

23   Q   And, I take it, when you were incarcerated in Fayette

24   County Jail at the time Mark Breakiron was there, your focus

25   was on your case; correct?

1  A   Exactly.

2  Q   In trying to solve your problems; right?

3  A   Yes.

4  Q   You weren't really paying particular attention to Mark

5  Breakiron and his problems; is that right?

6  A   Well, it wasn't like I wasn't trying to pay attention,

7  but, when you live in a small area, you know your

8  surroundings.

9  Q   But your focus was you were, let's say it this way, you

10  weren't particularly concerned with Mark Breakiron and his

11  problems; correct?

12  A   No, because I had, I had enough of my own.

13  Q   So the answer is, yes?  Is that right?

14  A   Yes to what?

15  Q   That you weren't particularly concerned with Mark

16  Breakiron?

17  A   You could say that I wasn't concerned.  I was concerned

18  about my own being.

19  Q   And you weren't present every time Mark Breakiron had a

20  conversation with Ellis Price; is that right?

21  A    No.

22  Q    I am sure they had plenty of conversations.  You just

23  weren't around for them; is that right?

24  A    Exactly.  Could possibly be nine times out of ten if --

25  Q    You answered my question.

1   A    I am trying to answer your questions.

2        THE COURT:  That's right.  Let the witness finish.

3   Go ahead.

4   A    As small as the ranges are, it's not like that you can't

5   see people talking.  The range is, is only as wide from that

6   wall to the end of that bench.  So, you see everything, and

7   the ranges are very short.

8   Q    But you can't hear every conversation going on?

9   A    It's cell doors are wide open.  It's all bars.

10  Q    But you can't hear, even though I understand your

11  description -- let me finish?

12  A    Expect me to go right up to the cell --

13       THE COURT:  Whoa.  Slow down.  Please wait until

14  the counselor finishes his question before you answer.

15  BY MR. CARUSONE:

16  Q    I am not arguing with you.  I am just trying to

17  understand that the area -- I understand the range is small;

18  okay?  But there were conversations, I'm sure, that Ellis

19  Price had with Mark Breakiron that you were not able to

file:///A|/BREAKA.TXT

20  overhear?

21  A   If he has, I am not aware of them.

22  Q   You are not aware of all the conversations those two

23  had?

24  A   Even if he did, did have any conversations, I don't

25  know.

1  Q    Were you present at all when Ellis Price provided

2  information to the Pennsylvania State Police about what Mark

3  Breakiron told them?

4  A    Was I present?

5  Q    Yes.

6  A    I stood right there and watched them.  They asked me to

7  get involved.

8  Q    Who asked you to get involved?

9  A    Silky Sullivan, Clinton Blair, and Ellis Price.

10  Q    My question is, were you present when Trooper Brownfield

11  from the Pennsylvania State Police interviewed Ellis Price

12  about what Mark Breakiron had told him?

13  A    No.  How could I have been there?

14  Q    So, you weren't present for that conversation?

15  A    No.

16  Q    Were you aware that, during that conversation, Ellis

17  Price's conviction had already been overturned?  Did you know

18  that?

19  A    May I answer?  The way that you are putting the question

file:///A|/BREAKA.TXT

20  is, to me, is the only way that I have known of that case,

21  was through his brother.

22  Q   Robert?

23  A   Yes.  Now, --

24  Q   My question to you is, did you know, and if you didn't

25  know, just say you didn't know.

1    But did you know, at the time that Ellis Price talked

2    with the Pennsylvania State Police about what Mark Breakiron

3    had told him, that Ellis Price's conviction had already been

4    overturned?

5    A    I don't know that.

6        MR. CARUSONE:  No further questions.

7        THE COURT:  All right.  Anything further, Mr. Lev?

8        MR. LEV:  Nothing further, Your Honor.

9        THE COURT:  All right.

10        MR. CARUSONE:  Your Honor, I, I am sorry.  Could I

11    ask a couple more questions?

12        THE COURT:  Go ahead.

13        MR. CARUSONE:  Thank you.

14            CROSS-EXAMINATION (CONTINUED)

15    BY MR. CARUSONE:

16    Q    Mr. Miller, finally, I take it, you feel like you have

17    been treated unfairly by Fayette County; is that right?

18    A    I have been; yes.  You could say that, but that doesn't

19    have any motive on why I am standing here in this courtroom.

20   Q   Are you sure?

21   A   Fact is the reason I am in this courtroom today is to

22   stand up for the truth of what's right.

23   Q   I thought you had testified under -- on direct

24   examination that part of your motivation was that the

25   practices in Fayette County --

1  A    Exactly.  But you objected to that.  That's why --

2  Q    No.  No.  Then you started to get into the details of

3  what he thought those practices were.  That's what -- when I

4  objected.

5       But my question is, it is, I suppose, it's always on

6  your mind what the way that you feel you have been wronged by

7  Fayette County?

8  A    Exactly, but that has not -- no motivation of why I am

9  here.  I am here to testify to the truth of the facts of what

10  happened when those guys got involved in Breakiron's case,

11  when they had no business to get involved in it.  It was the

12  Commonwealth's responsibility.  They had enough evidence to

13  convict him without them.

14  Q    My question was, is it still on your mind what they did

15  to you?  You feel Fayette County --

16  A    Why I got a life sentence out of the deal.

17       MR. CARUSONE:  Thank you.  Nothing further.

18       MR. LEV:  I have nothing, Your Honor.

19       THE COURT:  All right.  Mr. Miller's excused.

20          (Whereupon, the witness was excused from the

21   witness stand.)

22          MS. RUSSELL:  We're just getting our next witness.

23          THE COURT:  That would be Mr. Price?

24          MS. RUSSELL:  Correct.

25          MR. LEV:  Thank you, Mr. Miller.

1          THE COURT:  Mr. Price, would you step to the front

2    of the courtroom, please, here to be sworn?

3          THE DEPUTY CLERK:  Raise your right hand?

4          ROBERT KEITH PRICE, A WITNESS, having been first

5    duly sworn, was examined and testified as follows:

6          THE DEPUTY CLERK:  State your name, for the record,

7    and spell your last name?

8          THE WITNESS:  Robert Keith Price, P-R-I-C-E.

9          THE DEPUTY CLERK:  Thank you.  Take the witness

10   stand, please.

11                    DIRECT EXAMINATION

12   BY MS. RUSSELL:

13   Q    Good morning, Mr. Price.  How are you?

14   A    Good.

15   Q    In 1968, you and your brother, Ellis Price, were tried

16   together for an attempted homicide; is that correct?

17   A    Yes, it is.

18   Q    And that was, basically, a shooting incident that took

19   place outside of a Fayette County bar?

20   A   Yes.

21   Q   Do you remember the victim's name in that case?

22   A   I believe it was two of them, Richter and Fletcher.

23   Q   And, subsequently, you and your brother were tried

24   together for that?

25   A   Yes.

1  Q    Attempted homicide?

2  A    Yes.

3  Q    And you were both found guilty?

4  A    Yes.  First.

5  Q    Can you tell us what you were sentenced for that crime?

6  A    I was given ten- to twenty-year sentence.

7  Q    And how long of that sentence did you actually serve?

8  A    Twelve years, three months, three days, and whatever.

9  Q    And did your brother, Ellis Price, serve a sentence for

10  that crime?

11  A    No.  He did not.

12  Q    And are you aware of why Ellis Price didn't serve any

13  time for that?

14  A    Well, I believe he, he got his charges overturned.  For

15  what reason, I have no idea.

16  Q    Okay.  Who was the real shooter in that case?

17  A    Ellis was.

18  Q    So, in essence, you did twelve years for a crime you

19  didn't commit and your brother's case was subsequently over-

20  turned?

21  A   Yes.  That's the truth.

22  Q   Is there some point when you were incarcerated for the

23  attempted homicide of Mr. Richter that your brother Ellis

24  wrote --

25          MR. CARUSONE:  Objection.  Hearsay.

1          MS. RUSSELL:  I'll -- all right.

2   BY MS. RUSSELL:

3   Q    Did your brother Ellis write to you while you were

4   incarcerated?

5   A    Yes, he did.

6   Q    And what did that letter say?

7          MR. CARUSONE:  Objection.  Hearsay.

8          MS. RUSSELL:  I'm asking the witness to testify to

9   a letter that he received.

10          THE COURT:  You are asking him to tell me what the

11   statement of an out-of-Court declarant was.  It sounds like

12   you are asking for the substance of the letter.  That's

13   classic hearsay; is it not?

14          MR. LEV:  May I, Your Honor?  I would say it's

15   hearsay, but it's also an admission from Ellis Price whose

16   activities are at issue here, also.

17          THE COURT:  He's not a party.

18          MR. LEV:  It's also a co-conspirator statement, to

19   the extent that we've put forth evidence of an conspiracy

20   between Sullivan, Sullivan, Blair, and Ellis Price, to, to

21   give false information in exchange for a deal.  Statements

22   Mr. Price would have made.

23        MR. CARUSONE:  Your Honor, the co-conspirator

24   exception only applies where the conspiracy involves the

25   party, and Ellis Price is not a party.

1        THE COURT:  And Ellis Price is available as a

2   witness.

3        MR. CARUSONE:  Yes.  He's here.

4        THE COURT:  Why wasn't he subpoenaed to testify?

5        MR. CARUSONE:  He is here.  I subpoenaed him and he

6   is here.

7        THE COURT:  Well, then you can ask him that

8   question, then.  It's not hearsay.  So, sustained.

9        MS. RUSSELL:  Can I have one moment, Your Honor?

10       THE COURT:  Yes.

11       (Whereupon, an off-the-record discussion was had.)

12  BY MS. RUSSELL:

13  Q   Mr. Price, are you aware of that your brother Ellis was

14  trying to help you knock five years off your sentence?

15       MR. CARUSONE:  Objection.  Same objection.  That's

16  the product of the letter.  They're trying to get around the

17  hearsay exception.

18       THE COURT:  This witness can testify as to his own

19  understanding.  As long as you don't repeat what was in the

20    hearsay document, you can testify as to your understanding.

21            MR. CARUSONE:  Your Honor, his understanding then

22    would not be accepted by the Court for the truth of the

23    matter asserted, merely to explain his state of mind; is that

24    correct?

25            THE COURT:  Correct.

1          MR. CARUSONE:  Okay.

2          MS. RUSSELL:  You can go ahead and answer.

3          THE WITNESS:  Repeat the question, please.

4    BY MS. RUSSELL:

5    Q    Are you aware that your brother, Ellis Price, was trying

6    to help you knock five years off your sentence?

7    A    Yes.  I received a letter from my brother, Ellis,

8    stating that.

9          MR. CARUSONE:  Objection.  It's hearsay.

10   BY MS. RUSSELL:

11   Q    Mr. Price, without repeating the contents of the letter,

12   can you, in your own words, describe what your understanding

13   of what your brother was trying to do for you?

14   A    He was trying to make a deal with the District

15   Attorney's office in Fayette County to knock five years off

16   my sentence.  For what, I don't know.

17          MR. CARUSONE:  Your Honor, again, that's only being

18   admitted for his state of mind; is that correct?  Not for the

19   truth of the matter asserted?

file:///A|/BREAKA.TXT

20      THE COURT:  Correct.

21   BY MS. RUSSELL:

22   Q   Mr. Price, are you aware of how your brother, Ellis,

23   came to know Mark Breakiron?

24   A   I believe he was on the same range in the county jail

25   with him.

1   Q    Were you in the Fayette County Jail at the same time

2   that your brother, Ellis Price, was?

3   A    Yes.

4   Q    But you were housed on the same range?

5   A    No.  I was on different range.  I was on D range.  He

6   was on C range.

7   Q    Did you ever have any conversations with your brother,

8   Ellis, about the fact that Ellis Price was going to testify

9   in the Mark Breakiron case?

10         MR. CARUSONE:  Objection.  Hearsay.

11         THE COURT:  He can testify to whether he had

12  conversations, just not the substance of what someone else

13  said.  Unless it's an exception to the rule.

14         MS. RUSSELL:  I understand.

15         THE COURT:  Did I hear the question correctly?  Did

16  you ask him if he had conversations?

17         MS. RUSSELL:  Yes.

18         THE COURT:  You can answer the question.

19  A    No.  I did not.

20  Q   Did you ever get five years knocked off your sentence

21  for the attempted homicide?

22  A   No.  I did not.

23  Q   Are you aware of why you didn't receive any five years

24  off your sentence?

25  A   Why?  I don't know.

1  Q    Did you ever ask your brother, Ellis, why you didn't

2  receive five years off your sentence?

3  A    No.  I did not.

4  Q    Did you ever write a letter to him or letters to him

5  asking him why you weren't receiving five years off your

6  sentence?

7        MR. CARUSONE:  Objection.  Leading.

8        THE COURT:  Overruled.

9  A    I, I got a letter stating for me to contact my attorney

10  on this attempted homicide case about that deal and --

11        MR. CARUSONE:  Objection to the contents of the

12  letter that he received as hearsay.

13  BY MS. RUSSELL:

14  Q    Can you just answer that again?  I am sorry.  I didn't

15  hear your first part of your answer.  You received letters?

16  A    I received a letter stating -

17        MR. CARUSONE:  Objection.

18        THE COURT:  Well, don't tell us what was in the

19  letters.  That's hearsay.

file:///A|/BREAKA.TXT

20  A   I received a letter.

21  Q   From your brother, Ellis?

22  A   Yes.  From my brother, Ellis.

23  Q   Did you yourself write your brother, Ellis, asking him

24  why you weren't receiving any sort of deal or getting the

25  five years knocked off?

1        MR. CARUSONE:  Objection.  Asked and answered.  He

2   already answered that he didn't write a letter.

3        MS. RUSSELL:  I am sorry.  I didn't hear the answer

4   to that.

5        THE COURT:  Is that correct, Mr. Price?

6        THE WITNESS:  Yes.

7        THE COURT:  You did not write a letter?

8        THE WITNESS:  That's correct.

9        MR. CARUSONE:  You did not write a letter; okay.

10        MS. RUSSELL:  Moving on to a different area.

11   BY MS. RUSSELL:

12   Q    In September of 1989, were you involved in an assault of

13   Vincent Steurbutzel?

14   A    Yes, I was.  Assault and robbery.

15   Q    Vincent Steurbutzel.

16        MS. RUSSELL:  Your Honor, I need to make a

17   correction.  I misspoke.

18   BY MS. RUSSELL:

19   Q    The assault and robbery of Vincent Steurbutzel took

20   place in 1986?

21   A   Yes.

22   Q   Can you tell me who the other actors or the other

23   participants in this assault and robbery were?

24   A   I believe it was my brother, Kevin, and my brother,

25   Ellis.

1   Q    And, in September of '89, did you plead nole contendere

2   of the assault and robbery of Mr. Heez (Spelled

3   phonetically.)

4   A    I did.

5   Q    Do you remember what sentence you received for that

6   crime?

7   A    I was given five- to ten-year concurrent sentence with

8   the ten to twenty I was already serving.

9   Q    So, you didn't receive any additional time for that

10  crime?

11  A    No.

12  Q    Who was your defense attorney that in case?

13  A    Mark Morrison.

14  Q    Are you aware of what sentence your brother, Kevin,

15  received?

16  A    I think it was five to ten, something like that.

17  Q    And are you aware of what sentence your brother, Ellis,

18  received for that case?

19  A    I don't recall him ever being charged.

20  Q   I misspoke before.  The crime occurred in 1986 and you

21  were charged and then sentenced in 1989?

22  A   Yes, sir.

23  Q   There was a three-year gap there.  Are you personally

24  aware of why it took so long for anyone to be prosecuted in

25  this case or yourself to be prosecuted?

1  A   I was wondering.

2  Q   But you are not aware?

3  A   No.

4  Q   And, lastly, Mr. Price, in May of 2005, were you

5  contacted by Special Agent Greg Kerpchar of the Attorney

6  General's Office at your house and interviewed?

7  A   Yes, I was.

8  Q   And do you recall if there was a tape recording of this

9  interview made?

10  A   Yes, there was.

11  Q   Did you ever happen to see a transcript of that

12  interview?

13  A   No.

14  Q   Did they later contact you on May 24 and had you write

15  up a statement and sign it?

16  A   Yes.

17  Q   And did you receive a copy of that statement?

18  A   No.  I didn't.

19  Q   And last, did they contact you by phone sometime in June

20   of that same year, 2005, and ask you about whether or not you

21   had told anyone about the information you received from your

22   brother, Ellis?

23   A    I can't recall.

24          MS. RUSSELL:  Your Honor, can I approach?

25   BY MS. RUSSELL:

1  Q    Mr. Price, I just wanted to you look at that right here?

2  A    I don't know, ma'am.

3  Q    Does that refresh your memory that they contacted you by

4  phone?

5  A    Right.  Right.

6  Q    Were the statements that you gave to the agents when

7  they spoke with you consistent with what you've told the

8  judge today?

9  A    Yes.

10        MR. CARUSONE:  Objection.  I am sorry.  I don't

11  understand your question.  What is your question?

12        MS. RUSSELL:  I am just asking whether the

13  statements he gave today in Court were consistent with what

14  he told the special agent.

15        MR. CARUSONE:  I guess that is argumentative, Your

16  Honor, whether they're consistent or not.

17        THE COURT:  I think I need to be the judge of that,

18  but that's all right.

19        MS. RUSSELL:  I have nothing further.

20          THE COURT:  Cross-examine.

21          MR. LEV:  Your Honor, before Mr. Carusone begins,

22   can I, perhaps, just ask you this?  I respect your rulings on

23   the hearsay nature of the letter.  It would be my expectation

24   that Ellis Price will deny writing.

25          THE COURT:  You may recall this witness if

1  necessary.

2       MR. LEV:  I'm trying to save them having to stay

3  around the courthouse all day.  Since he is here, could we

4  take that testimony as a proffer to be used only if the

5  impeachment becomes otherwise?  And since we have no jury

6  here and you're capable of striking it from the record and

7  from your mind and not consider it later, to just take that

8  testimony now as a proffer?

9       MR. CARUSONE:  Your Honor, I would object.  I

10  understand it might expedite things, but this is a critical

11  point here and I would object to proceeding in that manner.

12       You know, we're going to call Ellis Price to

13  testify.  If Ellis denies making those statements, then they

14  can call Robert Price again in an effort to impeach him.  But

15  I would object to proceeding in that manner.  I prefer that

16  we do it by the book.

17       THE COURT:  All right.  My preference would be to

18  do it out of order for efficiency sake, but I think the

19  objection's well-founded as a matter of procedure.

20          So, I do certainly recognize the Petitioner's

21    right, though, to call Robert Price on rebuttal, if

22    necessary.  And, perhaps, what we can do to accommodate that

23    is, perhaps, the Commonwealth could call Ellis Price first.

24          MR. CARUSONE:  Okay, Your Honor.

25          THE COURT:  All right?  This is your last witness;

1   correct?

2        MR. LEV:  That's correct.

3        THE COURT:  All right.

4        MS. RUSSELL:  Chris, I don't have anything further.

5        THE COURT:  Cross-examination.

6        MR. CARUSONE:  Thank you, Your Honor.

7             CROSS-EXAMINATION

8   BY MR. CARUSONE:

9   Q   Mr. Price, good morning.

10      You never received any benefit whatsoever in exchange

11  for Ellis Price's testimony against Mark Breakiron; correct?

12  A   No.  I did not.

13  Q   As far as you know, neither did your brother, Ellis

14  Price; right?

15  A   I still don't know that.

16  Q   You don't know whether he got any kind of a benefit or

17  not?

18  A   No.  I don't.

19  Q   Did you offer to testify against Mark Breakiron?

20  A   No, sir.

21  Q   So, if James Silky Sullivan wrote a letter to the

22  District Attorney, saying that you were among the folks that

23  had offered to testify against Breakiron, would that be true?

24  A   That would be false.

25  Q   That would be false.  In fact, you never had any

1   conversations with Mark Breakiron when he discussed his case;

2   correct?

3   A    No.  I've never talked to him.

4   Q    In fact, because you were on a different range than he

5   was?

6   A    Right.

7   Q    And you were never interviewed by the police in

8   connection with this homicide investigation?

9   A    No.  No, sir.

10  Q    I take it that you, I believe, -- strike that.

11       I take it, you are not too fond of your brother; is that

12  right?

13  A    You know, I keep hearing that all the time.  Let me just

14  say this.  I did twelve years of my life for a crime I didn't

15  do.  You know, at first, yes, I was very upset.  But I got

16  over it, you know?  He's my brother.  He is going to be my

17  brother the rest of my life.  I don't have no hard feelings

18  whatsoever for him.  I forgave him for what happened, and

19  that was it.

20  Q   But you thought Ellis should be the one doing the time;

21  don't you?

22  A   Sure.  Absolutely.

23  Q   I see that you completed an affidavit back in 2002 that

24  you submitted to Mark Breakiron's attorney.  Do you remember

25  that?

82

1  A    There was a lady come see me at Huntingdon; yes.

2       MR. CARUSONE:  May I approach, Your Honor?

3  BY MR. CARUSONE:

4  Q    Mr. Price, I'm going to show you a declaration/affidavit

5  that is dated April 30 of 2002.  Just ask you to take a look

6  at that for a moment.

7  A    Yes.

8  Q    Is that your declaration?

9  A    Yes, it is.

10  Q    Is that the first declaration that you had given

11  concerning this Breakiron case?

12  A    I believe so.

13  Q    Had you revealed any of the information contained in

14  this affidavit prior to April 30 of 2002?

15  A    To what?

16  Q    To anybody?

17  A    No.

18  Q    If Mark Breakiron attorneys had come to you ten years

19  before or, you know, in the late eighties or the nineties and

20   asked you about this, would you have told them the same

21   thing?

22   A   I can only testify to what my brother wrote me.  Period.

23   Period.

24   Q   If they had come to you ten years ago, you would, you

25   would have told Mark Breakiron's attorneys the same thing

1  that you told them in your statement?

2  A    Absolutely.

3        MR. CARUSONE:  Nothing further.

4        THE COURT:  All right.  Any redirect, Miss Russell?

5        MS. RUSSELL:  No, Your Honor.

6        THE COURT:  All right.  Thank you Mr. Price.  I'm

7  going to ask that you remain in the courthouse briefly until

8  we ascertain whether there's need for further testimony from

9  you.

10        (Whereupon, the witness was excused from the

11  witness stand.)

12        THE COURT:  Is that your last witness?

13        MR. LEV:  That is our last witness.  That completes

14  our presentation.

15        (Whereupon, petitioner rests.)

16        THE COURT:  All right.  Thank you, Mr. Lev.

17        MR. CARUSONE:  Your Honor, I wasn't intending to

18  call Ellis Price first, but I will for the convenience of the

19  Court, if I can go out and get him.

20          Mr. Price, would you step to the front of the

21   courtroom, please?

22          THE DEPUTY CLERK:  Raise your right hand, sir?

23          ELLIS PRICE, A WITNESS, having been first duly

24   sworn, was examined and testified as follows;

25          THE DEPUTY CLERK:  Would state your name and spell

1  it for the record, please?

2      THE WITNESS:  Ellis Price, E-L-L-I-S, P-R-I-C-E.

3      THE DEPUTY CLERK:  Thank you.  Take the witness

4  stand, sir.

5      MR. LEV:  Have a moment Your Honor?

6      (Whereupon, an off-the-record discussion was had.)

7      MR. LEV:  Thank you.

8                DIRECT EXAMINATION

9  BY MR. CARUSONE:

10  Q   Mr. Price, good morning.

11  A   Good morning.

12  Q   Did you testify against Mark Breakiron during his murder

13  trial?

14  A   Yes, sir.

15      THE COURT:  Sir, I am going to ask you to get up on

16  that microphone, please.  You can turn it towards you, if

17  that helps.  There you go.

18  BY MR. CARUSONE:

19  Q   Your answer to that question was?

20  A   Yes.

21  Q   Did you receive any benefits whatsoever in exchange for

22  your testimony against Mark Breakiron?

23  A   No.

24  Q   Then why did you come forward and tell the police about

25  what Mark told you?

1   A    That I thought it was the right thing to do.

2   Q    Did you feel sorry for Saundra Martin?

3   A    Yes, I did.

4   Q    Have you ever been convicted of killing anybody?

5   A    No.

6   Q    Did the Commonwealth promise you anything in exchange

7   for your testimony against Mark?

8           MR. LEV:  Object to the leading question.

9           MR. CARUSONE:  Doesn't suggest the answer.  Desires

10   it.

11          MR. LEV:  Yes or no question certainly does.

12          THE COURT:  Well, try to think of a way he could

13   ask.  Why don't you try to rephrase that?

14   BY MR. CARUSONE:

15   Q    Can you tell me whether or not the Commonwealth promised

16   you anything in exchange for your testimony?

17          MR. LEV:  He could ask what interactions he had

18   with the Commonwealth.

19          THE COURT:  It doesn't suggest the answer in any

20   way.  So, overruled.

21   A   No.

22   Q   Did you have any agreements, express or implied, with

23   the Commonwealth in exchange for your testimony?

24   A   No.

25   Q   Did any representative of the Commonwealth do anything

1   to lead you to believe that you would get some benefit in the

2   future for exchange for your testimony?

3   A   No.

4   Q   At the time that you provided your information to the

5   police about what Mark told you, and at the time of Mark

6   Breakiron's trial, did you think that the District Attorney

7   here in Fayette County could do anything to help you?

8   A   No.

9   Q   Why not?

10  A   Because of the flat sentence.

11  Q   Where was that flat sentence?

12  A   State of Michigan.

13  Q   Can you explain for the Court what you meant when you

14  said, flat sentence?

15  A   It's just you do your eight years and you are out and

16  you get released on parole.

17  Q   So, because you had flat time, you didn't think the DA's

18  Office could do anything for you?

19  A   No.

20  Q   How much time, total, did you spend in jail for the

21  charges in Michigan?

22  A   Almost fourteen years.

23  Q   How much of that, how was that sentence broken up?

24  A   I did eight years in the prison system, then the rest in

25  a halfway house.

1  Q    And do you recall, precisely, how many years you spent

2  in a halfway house or not?

3  A    About three and a half.

4  Q    And about eight years incarcerated; correct?

5  A    Yes.

6  Q    After you testified in Mark Breakiron's trial, where did

7  you go?

8  A    Went back to Michigan.

9  Q    And when were you eventually released in Michigan?

10  A    In 1994.

11  Q    That would have been from the halfway house?

12  A    Yes.

13  Q    Mr. Price, were you aware that you were a suspect in the

14  assault of Vincent Steurbutzel?

15  A    No.

16  Q    You didn't even know?

17  A    I didn't even know that.

18  Q    At the time you did your statement to Sheriff Brownfield

19  -- let me ask it this way.  Excuse me.

20     Did you talk to anyone from the Pennsylvania State

21   Police about what Mark Breakiron had told you?

22   A   Yes.

23   Q   And you recall who you spoke to at the State Police?

24   A   There is a few of them, but I talked to Brownfield.

25   Q   Trooper Brownfield?

1  A   Yes.  Detective Brownfield.

2  Q   At the time that you talked to Trooper Brownfield, do

3  you recall what the status of your, your case, your attempted

4  homicide case was?

5  A   I was going to appeal.

6  Q   Do you recall whether or not the Court had already ruled

7  on your, on your petition to vacate your conviction?

8  A   No.  The next day my attorney come and gave me the

9  overturn.

10  Q   So, your attorney told you that, that your conviction

11  had been overturned; correct?

12  A   Correct.

13  Q   Do you recall precisely when that was?

14  A   I believe it was two, three days after I talked to

15  Detective Brownfield.

16  Q   Are you sure about that?

17        MR. LEV:  Objection.

18        MR. CARUSONE:  That's confusing.

19        THE COURT:  Sustained.  Don't lead the witness.

20          MR. CARUSONE:  Your Honor, may I have a moment?

21          THE COURT:  Yes.

22          MR. CARUSONE:  Sorry.  I just need one moment,

23    Judge.

24    BY MR. CARUSONE:

25    Q    Mr. Price, do you recall having your deposition taken in

1  connection with this matter?

2  A   Yes.

3  Q   And do you recall being asked the question about when

4  your attorney had come to inform you that your conviction had

5  been overturned?

6  A   I'm not sure of the time.

7  Q   Who was your lawyer for that case?

8  A   Izzo.

9  Q   I-S-S-O?

10  A   I-Z-Z-I.

11  Q   Is he still with us?

12  A   No.  He, he died.

13       MR. CARUSONE:  I am sorry, Your Honor.  Just one

14  more moment.

15       I'll move on, Your Honor.  I'll get back to that.

16  BY MR. CARUSONE:

17  Q   Have you ever testified as a witness in a criminal case,

18  other than in the Breakiron case?

19  A   No.

20  Q    Did you ever steal materials out of Mark Breakiron's

21  cell?

22  A    No.

23         MR. LEV:  Objection to the leading questions.

24         MR. CARUSONE:  Wouldn't suggest the answer.

25  Desired.

1          THE COURT:  It's overruled.

2    A    No.

3    Q    Did you fabricate his confession?

4    A    No.

5    Q    Can you tell me whether or not Mark Breakiron actually

6    confessed to you?

7    A    Yes, he did.

8          MR. CARUSONE:  Nothing further, Your Honor.

9          THE COURT:  All right.  Cross-examination, Mr. Lev.

10         MR. LEV:  Thank you, Your Honor.

11                  CROSS-EXAMINATION

12   BY MR. LEV:

13   Q    Mr. Price, did you ever write a letter to your brother,

14   Robert, telling him that you were going to try to get his

15   sentence reduced?

16   A    No.

17   Q    Did you ever write a letter to your brother, Robert,

18   telling him in that letter that you were going to testify

19   against Mark Breakiron to try to get five to ten years

20   knocked off your sentence?

21   A   No.

22   Q   Did you ever write a letter to your brother, Robert,

23   telling him that some of the things you were saying about

24   Mark Breakiron weren't true?

25   A   No.

1  Q    You've testified on direct exam that you talked to a few

2  State Police officers?

3  A    I believe it was.

4  Q    Do you recall who else you might have talked to besides

5  Trooper Brownfield?

6  A    I'm not sure if it was Detective Roberts.  I'm not sure

7  there.  It's been a long time.  I can't remember.

8  Q    Do you know if you talked to anyone from the District

9  Attorney's Office?

10  A    Yes.

11  Q    And who was that?

12  A    Mark Morrison.

13  Q    Did you ever sign any statements for a state trooper?

14  A    Yes.

15  Q    And how did that come about?

16  A    After I told him what Mark Breakiron told me, and he

17  wrote down, and came back, I believe he came back to type,

18  and I signed it.

19  Q    Somebody came back with a typed statement sometime after

20  you told them -- was that Trooper Brownfield?

21  A   I believe so.

22  Q   But regardless of who it was, you're sure that you

23  signed a written statement?

24  A   I believe so.

25  Q   I see.  So, -- strike that.

1       You wrote a letter, didn't you, to the District

2   Attorney's Office telling them that you had information about

3   Mark Breakiron?

4   A    Yes.

5   Q    And, at the time you wrote that letter, you had already

6   been convicted of the aggravated assault and attempted

7   homicide charges at a jury trial; right?

8   A    I believe so.

9   Q    You hadn't been sentenced yet on that case, yet, at that

10   time; right?

11   A    Correct.

12   Q    And, at the time you wrote the letter, you didn't know

13   that, that an arrest of judgment had been granted on your

14   case; is that correct?

15   A    That's correct.

16   Q    In fact, do you remember if you wrote that letter before

17   or after the arrest of judgment was granted?

18   A    I don't remember.  I can't remember.

19   Q    How long before Trooper Brownfield came and talked to

20  did you write that letter?

21  A   I would say, maybe four, five days, I believe.

22          MR. CARUSONE:  Can you clarify?  Are you saying the

23  letter before Brownfield was seeing him?

24          MR. LEV:  Let me ask it.

25  BY MR. LEV:

1  Q    Well, the letter that you wrote to the District

2  Attorney, did you write that before Brownfield came to see

3  you or after Brownfield came to see you?

4  A    Before.

5  Q    Do you recall how long before you had written that

6  letter?

7  A    I would say, maybe three, four days.  Maybe a week.

8  Q    So, the time you wrote that letter, to your knowledge,

9  you were awaiting -- you knew that you had been convicted and

10  were awaiting sentencing on your case?

11  A    Correct.

12  Q    Okay.  That was a serious case; true?

13  A    True.

14  Q    And you had a prior record that included a drug

15  possession conviction in Michigan?

16  A    Yes.

17  Q    And an assault with attempt to rob while armed

18  conviction in Michigan?

19  A    Yes.

20  Q    And that assault with attempt to rob while armed, that

21  was the prison sentence you were serving before you were

22  brought back to Fayette County?

23  A    Correct.

24  Q    And, in that crime, did somebody get injured during that

25  incident?

1  A   Yes.

2  Q   You stabbed somebody?

3  A   No.

4  Q   What did you to do to them?

5      MR. CARUSONE:  Objection.  I don't believe the

6  details here are relevant.

7      MR. LEV:  I'll strike that.

8  BY MR. LEV:

9  Q   In the assault case in Pennsylvania, the assault and

10  attempted homicide case, you were tried with your brother,

11  Robert; is that correct?

12  A   Correct.

13  Q   You knew that you were the actual shooter; is that

14  right?

15  A   No.

16  Q   No.  Bobby was the shooter?

17  A   I'm not sure.

18  Q   You don't remember now who the shooter was?

19  A   I was, more or less, but I was out of it.

file:///A|/BREAKA.TXT

20  Q   So, you could be so out of it that you lose your memory

21  of what happens during the course of an event?  You can

22  understand how that could happen?

23  A   True.

24  Q   Even if something bad happens during that time; right?

25  A   True.

1  Q    You were driving the car that the shots were fired from;

2  do you remember that?

3  A    No.

4  Q    Do you remember the argument in the bar?

5        MR. CARUSONE:  Your Honor, I object to the

6  relevance of these questions about the specifics of what

7  happened in that incident.

8        THE COURT:  Goes to credibility.  Overruled.

9  BY MR. LEV:

10  Q    Do you remember what happened in the bar, the events in

11  that incident?

12  A    Somewhat.  Little bit.

13  Q    Do you remember any shooting at all?

14  A    I remember shooting; yes.

15  Q    Your brother, Bobby, has a deformed hand; doesn't he?

16  A    Yes.

17  Q    Has three fingers missing?

18  A    Yes.

19  Q    Couldn't shoot a gun if he wanted to; could he?

20   A   I am sure he could.

21   Q   Did you ever see him?

22   A   Sure.

23   Q   You have shot guns together?

24   A   Sure.

25   Q   Okay.  Well, at the time, then, that you are in jail,

1  writing this letter, you know that you are facing a

2  substantial sentence?

3  A   That is true.

4  Q   You know that Bobby is facing a substantial sentence?

5  A   Yes.

6  Q   You know that Bobby is not as responsible for that crime

7  as you?

8  A   True.

9      MR. CARUSONE:  Objection.  Argumentative.

10     THE COURT:  Overruled.  Overruled.

11     MR. LEV:  He answered the question.

12  BY MR. LEV:

13  Q   You feel guilty about what happened to Bobby?

14  A   Not really.

15  Q   You want to help him out; if you could?

16  A   If I could; sure.

17  Q   Did you think it was fair that Bobby got ten to twenty?

18  A   That's up to the judge.

19  Q   So, it was fine?

20   A   Yes.

21   Q   Okay.  When you were in the Fayette County Jail in 1987,

22   did you come to know James Sullivan, known as Silky Sullivan?

23   A   Yes.

24   Q   Were you on the same range as him?

25   A   Yes.

1  Q    Did you have conversations with him?

2  A    Sure.

3  Q    Did you talk about your case with him?

4  A    Little bit.

5  Q    Did you talk about his case?

6  A    He really didn't want to talk about his case.

7  Q    Did you talk about Mark Breakiron's case?

8  A    Little bit; yes.

9  Q    What were your discussions with Silky about Mark

10  Breakiron's case?

11  A    It was just about what he was saying.

12  Q    Did you tell Silky that you were going to go to the

13  District Attorney and tell him what Breakiron said to you?

14  A    I don't believe so.  I am not sure.

15  Q    You're not sure you might have said that to him?

16  A    I might have said that.

17  Q    Did Silky did Mr. Sullivan tell you that he was going to

18  write a letter to the District Attorney?

19  A    Yes.

20  Q   What did Mr. Sullivan tell you that he was going to try

21  to get his case reduced to get some benefit for testifying

22  against Breakiron?

23  A   Yes.

24  Q   And did you agree with that?

25  A   Sure.  If he did.

1  Q    And you went along with him in that; didn't you?

2  A    No.

3        MR. CARUSONE:  Objection to, went along with him.

4  Ask to clarify.

5        MR. LEV:  Cross-examination.

6        THE COURT:  It's -- rephrase it.

7        MR. LEV:  Okay.

8  BY MR. LEV:

9  Q    And you also thought that you could write to the

10  District Attorney and get some benefit; didn't you?

11  A    No.

12  Q    Did Mr. Sullivan talk to you about writing a letter

13  together?

14  A    Yes.

15  Q    Did he suggest you could both get benefits for

16  testifying against Breakiron?

17  A    Yes.

18  Q    Did he suggest that you could help out your brother,

19  Robert, too?

20   A   No.

21   Q   Did you suggest that maybe Robert could be helped out,

22   as well?

23   A   I did; yes.

24   Q   You did?

25   A   Yes.

1  Q    Was Clinton Conrad Blair involved in this, too?

2  A    I really don't know him.

3  Q    I am sorry?

4  A    I do not know him.

5  Q    Was he on the same range as you?

6  A    I, I don't know.

7  Q    You didn't have any contact with him?

8  A    I can't recall.

9  Q    Did you play cards with him?

10  A    No.

11  Q    You remember Chris Owen Miller?

12  A    Yes.  I heard of him in the jail.

13  Q    He was on the same range as you?

14  A    No.

15  Q    Did you ever suggest that Chris Owen Miller, that he

16  should write a letter to the District Attorney, too?

17  A    No.

18  Q    Did you and Mr. Sullivan write a letter together to the

19  District Attorney?

20  A   I remember one letter.

21  Q   I am sorry?

22  A   I remember one letter.

23  Q   That you and he wrote together?

24  A   Well, he wrote it out and then I think I did sign it.

25  Q   And that you signed it?

1  A   Yes.  Then I wrote my own letter.

2  Q   Then you wrote your own letter, a second one?

3  A   Yes.

4  Q   And, in the letter that Mr. Sullivan wrote, it talked

5  about getting some kind of benefit in exchange for testifying

6  against Breakiron; is that right?

7  A   I believe so.

8  Q   And it was after you wrote the letter -- how far apart

9  were the two letters that were sent, the one that you sent

10  with Sullivan and the one you sent by yourself?

11  A   I'm not sure.

12  Q   Which one was written first; do you remember?

13  A   I believe his was.

14  Q   And, so, would it have been a week, or two weeks, or

15  something afterwards that you wrote yours?

16  A   It could have been.

17  Q   Is it that you don't really remember?

18  A   I don't.  I don't remember.

19  Q   That's fine.  Did Brownfield come to see you after the

20   letter that you, you and Sullivan had written or after the

21   letter that you had written?

22   A   The one that I wrote.

23   Q   After you talked to Brownfield, Mr. Izzo came and told

24   you that your, your motion for arrest of judgment had been

25   granted and your case was being thrown out?

1  A   Yes.

2  Q   Did he tell you at that time that the Commonwealth of

3  Pennsylvania wasn't going to appeal the case?

4  A   No.

5  Q   Were you worried about the appeal?

6  A   Sure.

7  Q   Were you hoping by your cooperation against Breakiron

8  that that would help them decide not to appeal?

9  A   No.

10  Q   In the letter that you wrote with Silky, what kinds of

11  benefits -- did you ask, specifically, for benefits or did

12  you ask, generally, what you could do for him?

13  A   Well, that's what I thought he had in the letter, is

14  what he can do for me.

15       MR. CARUSONE:  Your Honor, I ask the court reporter

16  to read that back.  I didn't hear the whole question.

17       (Whereupon, the question was read back.)

18  BY MR. LEV:

19  Q   The letter that you wrote to Solomon, did you put in the

20   details of what Breakiron had told you in the letter?

21   A   No.

22   Q   What did you say that in letter?

23   A   Tell you the truth, I can't remember.

24   Q   How did you send it?

25   A   Sent it.  There's a guy that goes back and forth to the

1  Courts and you send him -- I think it was a case worker or

2  something like that.

3  Q    Somebody who worked for the jail?

4  A    Yes.

5  Q    And did you ask them to put it in the mail?  Was it

6  stamped or did you ask them to just deliver to it the DA's

7  Office?

8  A    I wrote on it, District Attorney.

9  Q    Did you make copies of that letter?

10  A    I did.

11  Q    Do you have any of those copies today?

12  A    No.

13  Q    Do you know what happened to them?

14  A    Probably got thrown out or something because I moved

15  about three, four times already.

16  Q    Did you get a copy of the signed statement that you gave

17  to the police?

18  A    No.  I, I didn't.

19  Q    Would you agree with me, Mr. Price, that the District

20    Attorney's not appealing the motion for an arrest of judgment

21    was something very favorable for you?

22         MR. CARUSONE:  Objection.  Argumentative.

23         THE COURT:  Overruled.

24    A    No.

25    Q    Why not?

1   A   Because he already done told me, you couldn't do

2   nothing.  So, --.

3   Q   I am sorry?

4   A   That the District Attorney told me that he couldn't do

5   nothing.  He couldn't make no deals, no nothing.  So, --.

6   Q   Morrison told you?

7   A   Mark Morrison; yes.

8   Q   Did you ever talk with District Attorney Solomon?

9   A   I don't believe so.

10  Q   District Attorney Warman?

11  A   Assistant district.  I can't remember.

12  Q   Do you recall, back in the summer of 1987, talking to

13  any member of the District Attorney's Office?

14  A   I talked to somebody.  Yes.  One of them.

15  Q   And did they tell you that they weren't going to appeal

16  the motion for arrest of judgment?

17  A   No.

18  Q   How did you find out that no appeal was being filed?

19  A   I didn't.

20  Q   You didn't?

21  A   No.

22  Q   You just know that the case went away?

23  A   I just know my lawyer came over there and told me that I

24  got an arrest of judgment.

25  Q   But you told me earlier that you were worried about

1  whether or not they would appeal?

2  A   Sure.

3  Q   But you never found out if they did or not?

4  A   No.

5  Q   It was a good thing for you that they didn't appeal;

6  don't you think?

7  A   Sure.

8       MR. LEV:  Would you just indulge me for a second,

9  Your Honor, please?

10  BY MR. LEV:

11  Q   Did you ever tell Bobby about writing to the District

12  Attorney?

13  A   I don't believe so.  I'm not sure.  I can't remember if

14  I did or not.

15  Q   If you had, did you have personal contact with Bobby in

16  1987 where you were able to talk with him?

17  A   He was in the yard, or he come down, or I went up

18  sometimes.

19  Q   But after you went back to Michigan, you weren't able to

20  talk to Bobby anymore; is that right?

21  A   Correct.

22  Q   Do you recall when you went back to Michigan?

23  A   No.  No, I can't.  No.  I can't remember.

24  Q   You were, you were taken back to Michigan, am I right,

25  before Mr. Breakiron's trial?  And then brought back and

1  forth when you testified; is that -- is that what happened?

2  A   Yes.  Yes.

3  Q   How soon after you gave your statement to Brownfield

4  were you taken back to Michigan; if you remember?

5  A   Could have been maybe a month or two.

6  Q   Did you write letters to Bobby during that period?

7  A   Couple.

8  Q   But you never talked about Breakiron's case, or getting

9  him a deal, or anything like that?

10  A   No.

11  Q   From what you said on direct examination, that you

12  didn't know that you were under investigation for this

13  assault on Vincent Steurbutzel?

14  A   No.

15  Q   Do you remember the incident?

16  A   No.

17  Q   Do you remember a time with your brothers where you beat

18  somebody up and took his car?

19  A   No.

20  Q   Would it surprise you you were accused of doing that?

21  A   Yes.

22  Q   Did you know that, that your brother, Kevin, was later

23  tried on that case?

24  A   Yes.

25  Q   And did you ever talk with Kevin about your involvement

1   in that case?

2   A   No.

3   Q   Did you know that Bobby pled nolo contendere in that

4   case?

5   A   No.

6   Q   Did you ever talk to Bobby about that case?

7   A   No.

8   Q   Do you remember a -- meeting a guy in a bar and agreeing

9   that you and your brothers agreed to sell him a VCR?

10  A   No.

11  Q   And driving out to get the VCR and getting in a traffic

12  accident?

13  A   No.

14  Q   Don't remember beating him up and taking things from

15  him?

16  A   I never did that.

17  Q   Never, never tried to?

18  A   I never done it.

19        MR. LEV:  Your indulgence, please, Your Honor.

20   BY MR. LEV:

21   Q   You testified today that you never wrote to Bobby and

22   told him about what you told the District Attorney; is that

23   right?

24   A   What do you mean?

25   Q   Did you ever, did you ever write to your brother, Bobby,

1   and tell him that you wrote to the District Attorney to tell

2   him about what you learned from Mark Breakiron?

3   A   No.

4   Q   Do you recall testifying -- do you recall being at a

5   deposition on November 1, 2006?

6   A   No -- yes.

7   Q   In Uniontown?

8   A   Yes.

9        MR. LEV:  Chris, bottom of 29, top of 30.

10  BY MR. LEV:

11  Q   I'm going to show you and ask you to read -- just down

12  here, the end of this, and on to the next line.

13  A   From 20?

14  Q   Yes.  Just read it to yourself the last few lines there,

15  then on to the top of the next page, please?

16       MR. CARUSONE:  Which lines are you asking to read,

17  Stu?

18       MR. LEV:  I'm asking him to read --

19       MR. CARUSONE:  From page 29?

20          MR. LEV:  Twenty-nine.

21          MR. CARUSONE:  Which lines?

22          MR. LEV:  I'm asking him to read lines 23 to 25,

23   and then 1 and 2 on the next page.

24          MR. CARUSONE:  Okay.  Thank you.

25   BY MR. LEV:

1   Q    Had a chance to read that?

2   A    Yes.

3        MR. CARUSONE:  Your Honor, I am sorry.  I would

4   ask that from reading just those lines it's difficult to

5   understand what letter the testimony is referring to.  So, I

6   would ask, in fairness to the witness, that he be able to

7   read the entire page 29, starting at the top, so he

8   understands what letter is being talked about.

9        MR. LEV:  No problem.

10       MR. CARUSONE:  Take your time, Ellis.

11  BY MR. LEV:

12  Q    Okay.  You had a chance to read all that?

13  A    Yes.

14  Q    You told me then that you did write to Bobby; didn't

15  you?

16  A    Yes.

17  Q    And you wrote to Bobby and told him you were trying to

18  cut a deal with the District Attorney; didn't you?

19  A    Yes.

20  Q   You told him you were trying to help Bobby out, too;

21  didn't you?

22  A   Yes.

23          MR. LEV:  I have nothing further.

24          THE COURT:  All right.  Thank you.

25          MR. LEV:  Just a minute, Your Honor.

1  BY MR. LEV:

2  Q   Did you tell Bobby in the letter that some of the things

3  you said about Mark Breakiron weren't true?

4  A   No.

5       MR. LEV:  Have nothing further.

6       THE COURT:  All right.  Redirect.

7       MR. CARUSONE:  Thank you, Your Honor.

8            REDIRECT EXAMINATION

9  BY MR. CARUSONE:

10  Q   Mr. Price, do you have any difficulty reading?

11  A   No.

12  Q   I'm going to show you again pages 29 and 30 which you

13  were just showed by defense counsel.  The letter that that

14  testimony is referring to at the deposition, what letter is

15  that?  What letter is being talked about there?

16  A   Well, that's probably Silky's letter.

17  Q   Take a look at it closely.  Read that again so you are

18  not confused.

19  A   (Indicating.)

20  Q   In that deposition, are you talking about your letter

21  that you wrote to District Attorney Solomon or some other

22  letter?

23  A   My letter.

24  Q   Your letter?

25  A   Yes.

1  Q    Okay.  And when you testified in that deposition, did

2  you state, quote, that you told your brother, Bobby, about

3  the letter that you wrote to the District Attorney?

4  A    No.  I didn't tell him.

5      MR. LEV:  I am sorry.  I didn't hear that.

6      THE WITNESS:  I did not tell him.

7      MR. LEV:  About the letter you wrote to the

8  District Attorney?

9      THE WITNESS:  Yes.

10  BY MR. CARUSONE:

11  Q    Mr. Price, are you, are you certain about the order of

12  the events that you have testified to today?

13  A    Might not be in right order, but it's --.

14  Q    Okay.  And why is it that these events might not be in

15  the right order?

16  A    It's been a long time.

17  Q    Okay.  It's understandable.  I want to show you another

18  page of your deposition.

19      MR. CARUSONE:  Stu, this is page 45 on Exhibit 16,

20  9 through 16.

21  BY MR. CARUSONE:

22  Q   I'm going to ask you to read between the checkmarks

23  here, lines 9 through 14.

24  A   (Indicating.)

25  Q   The question I have for you, after reading that, does

1  that help refresh your recollection as to the order of when

2  you spoke to Trooper Brownfield?

3      What I am trying to get at is --

4        MR. LEV:  Has he answered your question?

5  BY MR. CARUSONE:

6  Q    Has that helped refresh your recollection somewhat?

7  A    Somewhat.

8  Q    My question is, when was it that you learned from your

9  attorney that your motion for arrest of judgment had been

10  granted?  Was it before you talked to Trooper Brownfield or

11  after you talked to Trooper Brownfield?

12  A    I believe it was before.

13  Q    Before.  Okay?

14  A    Yes.

15  Q    When you testified in the trial of Mark Breakiron, did

16  you know at that time that your motion for arrest of judgment

17  had been granted?

18  A    Yes.

19  Q    Despite the letters that you have been testifying to

20   today, did you ever receive anything of benefit from the

21   Commonwealth?

22   A    No.

23   Q    Did they ever lead you to believe in any way that you

24   were going to get any benefit as a result?

25        MR. LEV:  Objection, Your Honor.  That was covered

1  on direct examination.

2      THE COURT:  Sustained.  It's cumulative.

3      MR. CARUSONE:  Nothing further.

4      THE COURT:  Anything else, Mr. Lev?

5      MS. RUSSELL:  I have nothing further, Your Honor.

6      THE COURT:  All right.  Thank you, Mr. Price.  You

7  are excused.

8      (Whereupon, the witness was excused from the

9  witness stand.)

10      MR. LEV:  At this time, Your Honor, would you allow

11  us to go out of order and recall Bobby Price?

12      THE COURT:  Yes.

13      MR. LEV:  Thank you.  Appreciate that.

14      THE COURT:  Mr. Price, would you please resume the

15  witness stand?  You are still under oath, sir.

16      ROBERT PRICE, A WITNESS, having been first duly

17  sworn, was further examined and testified as follows:

18      THE COURT:  Mr. Lev.

19      MR. LEV:  I am sorry.  Miss Russell will do this.

20        THE COURT:  I am sorry.

21                  REDIRECT EXAMINATION

22   BY MS. RUSSELL:

23   Q    Mr. Price, when you were incarcerated for the attempted

24   homicide against Mr. Richter, did you receive any letters

25   from your brother, Ellis Price?

1   A   I did.

2   Q   About the Mark Breakiron case?

3   A   I did.

4   Q   And can you tell me, did he tell you in those letters

5   that he was trying to help you out with your sentence?

6   A   Yes, he did.

7   Q   Did he tell you in those letters that he had made up

8   facts about the Breakiron case?

9       MR. CARUSONE:  Objection.  Leading.

10      THE COURT:  Just briefly rephrase, please.

11  BY MS. RUSSELL:

12  Q   What did your brother tell you about the Mark Breakiron

13  case in those letters?

14  A   He said he was trying to cut a deal with the District

15  Attorney's Office to cut five years off my sentence.

16  Q   Did he say anything in the letters about the facts of

17  the Breakiron case?

18  A   Facts?  No.

19  Q   Did he tell you anything about what he was going to

20  testify to?

21  A   He just said that he was trying to cut a deal in return

22  for his testimony against Breakiron.

23        MR. LEV:  Nothing further.

24        THE COURT:  All right.  Thank you.

25        Cross.

1                    - - -

2                RECROSS EXAMINATION

3   BY MR. CARUSONE:

4   Q    Mr. Price, I want to show you a copy of your

5   declaration/affidavit that you had signed back on April 30 of

6   2002.  Take a look at that.

7   A    Yes.

8   Q    In that affidavit, do you say anywhere that Ellis Price

9   made up testimony?

10  A    I can't see it.

11  Q    Nowhere in there; is it?

12  A    No.

13  Q    Thank you.  You describe in this affidavit -- let me

14  show it to you again.  I am sorry.

15       You say you claim that Ellis said that he was making a

16  deal that would get five years off of your sentence; is that

17  what you are saying?

18  A    Yes.

19  Q    Not off of his sentence?

20   A   Off my sentence.

21   Q   Off your sentence.  Where is this letter?

22   A   Destroyed.

23   Q   How did you destroy it?

24   A   I rip them up and I flush them down the toilet, all my

25   letters that I receive in prison.  That's what I did after a

1  certain period of time, all letters.

2  Q   You just -- your practice was you ripped up the letters

3  and you flushed them down the toilet?

4  A   Yes.

5  Q   That was -- and you're certain about that?

6  A   Correct.  I'm positive.

7  Q   Positive.  Do you recall an interview that you had with

8  Agent Kerpchar of the Office of Attorney General?

9  A   I've had conversations, but, I don't know.  Couple

10  times.  I don't know if that was the gentleman or not.  I

11  don't remember the names.  Couple different.

12  Q   Do you recall telling Agent Kerpchar that you burned the

13  letter?

14  A   Burned?  Yes.  I probably tell him that; yes.

15  Q   So, you think you told, you told Agent Kerpchar you

16  burned the letter, but you are positive today you ripped it

17  up and flushed it down the toilet?

18  A   Well, that was my practice in my cell.  After a period

19  of time, I ripped my letters up and I flushed them.

20  Q   Your practice wasn't to burn them?

21  A   No.

22  Q   Even though you told Agent Kerpchar --

23  A   I tell him that I destroyed it.

24  Q   Regardless of that, you -- they're destroyed --

25  A   They're destroyed.

1   Q   It's an important letter and I am trying to --

2   A   I said, it's --

3   Q   It's important and I am not arguing you.  I am trying to

4   figure out why it's not here.

5           MR. LEV:  Objection, Your Honor.

6           THE COURT:  It's totally inappropriate.

7           MR. LEV:  He is arguing.

8           MR. CARUSONE:  Sorry Your Honor.

9           No further questions, Your Honor.

10          THE COURT:  Anything further, Miss Russell?

11          MS. RUSSELL:  May I approach, Your Honor?

12          THE COURT:  Yes.

13                  REDIRECT EXAMINATION

14   BY MS. RUSSELL:

15   Q   Mr. Price, what I am going to show you is transcripts of

16   your interview with Special Agent Kerpchar that took place

17   May 6, 2005.  And I think you testified earlier that you have

18   never seen a copy of this?

19   A   True.

20  Q   I'm just going to ask you to read.  I'll go ahead, read

21  the question, let you go ahead, read the answer?

22      It looks like it's Special Agent Nye, not Kerpchar.

23      What did he mean, Ellis tell you he did in exchange to

24  try and get this five years knocked off your sentence.  Then

25  your answer begins right there.

1  A    Let me tell you this.  I, I kept writing him and asking

2  him what, what is holding up.  Why am I getting five years

3  cut off.  And then once I, at once, like I told you, can't,

4  can't when the cat's out of the bag.  He told me that he made

5  up a story to testify against Breakiron to cut five years off

6  my sentence, which never took place, and he's sorry,

7  whatever.

8  Q    Does that help you refresh your recollection of what

9  Ellis Price told you in the letters that he wrote you?

10  A    Yes, it is.

11  Q    So, Mr. Price, Ellis Price did tell you that he made up

12  facts that he was testifying to?

13        MR. CARUSONE:  Objection to the leading nature of

14  the question.  Asked and answered.

15        THE COURT:  Sustained.  You can rephrase it.

16  BY MS. RUSSELL:

17  Q    Ellis Price, in the letter that he wrote you, talked to

18  you about his testimony in the Breakiron case?

19  A    Yes.

20  Q    What did he tell you?

21  A    He told me that he -- I don't know if he made up half of

22  it, some of it, but he did tell me that he made something up

23  and to make it good to cut five years off my sentence.

24  Maybe not exact words, but in that neighborhood.

25       MS. RUSSELL:  Nothing further, Your Honor.

1          THE COURT:  Anything else, Mr. Carusone?

2          MR. CARUSONE:  Just briefly, Your Honor.

3                    RECROSS EXAMINATION

4  BY MR. CARUSONE:

5  Q    Did Ellis Price ever say in the letter that he had

6  received some benefit for himself?

7  A    No.

8  Q    No.  And you never received any benefit; correct?

9  A    No, sir.

10  Q    Did Ellis Price ever say in that letter that they got

11  discovery materials from Mark Breakiron's cell?

12  A    No.

13  Q    How long ago did you receive this letter?

14  A    I can't tell you that.  It's been a lot of years.

15  Q    Lot of years.  And can you recall the exact contents of

16  that letter?

17  A    The exact content?  No.

18  Q    And that letter was either burned or ripped up and

19  flushed down the toilet?

20   A   Yes.

21         MR. CARUSONE:  Nothing further.

22         THE COURT:  All right.

23         MS. RUSSELL:  Just one last question.

24                 REDIRECT EXAMINATION

25   BY MS. RUSSELL:

1   Q    Mr. Price, did you have the ability to burn letters when

2   you were in prison?

3   A    Ability to?  Sure.

4         MS. RUSSELL:  Nothing further.

5         THE COURT:  All right.  You may step down,

6   Mr. Price.  Thank you.

7         (Whereupon, the witness was excused from the

8   witness stand.)

9         THE COURT:  All right.  We'll go off the record.

10        (Whereupon, an off-the-record discussion was had.)

11        THE COURT:  We'll break for lunch, now.  Let me

12   just see counsel at side-bar for a moment.

13        (Whereupon, an off-the-record discussion was had,

14   and the luncheon recess was had.)

15                      - - -

16

17

18

19

20

21

22

23

24

25

1      FRIDAY AFTERNOON SESSION, FEBRUARY 2, 2007, 1:30 P.M.

2                      - - -

3      (Whereupon, the following was had in open Court.)

4      MR. LEV:  Good afternoon, Judge.  Mr. Carusone went

5  downstairs to the cafeteria to try to find his witness.

6      THE COURT:  Mr. Carusone.

7      MR. CARUSONE:  Your Honor, apologize for the delay.

8      Commonwealth calls Sheriff Brownfield.

9      THE COURT:  Sheriff, would you step to the front to

10  be sworn, please?

11      THE DEPUTY CLERK:  Raise your right hand?

12      GARY D. BROWNFIELD, A WITNESS, having been first

13  duly sworn, was examined and testified as follows?

14      THE DEPUTY CLERK:  Would you state and spell your

15  name?

16      THE WITNESS:  Gary D. Brownfield.

17      THE DEPUTY CLERK:  Spell that name, sir?

18      THE WITNESS:  B-R-O-W-N-F-I-E-L-D.

19              DIRECT EXAMINATION

20  BY MR. CARUSONE:

21  Q   How long have you been a county sheriff?

22  A   I'm in my eighth year.

23  Q   Prior to becoming sheriff, what was your employment?

24  A   I was employed with the Pennsylvania State Police.

25  Q   Your position there?

1  A   Trooper.

2  Q   How many years with the state police?

3  A   Thirty.

4  Q   Did you investigate the murder of Saundra Martin?

5  A   Yes, sir; I did.

6  Q   I want to draw your attention to August 4, 1987.  Did

7  you have occasion to interview Ellis Price?

8  A   Yes.

9  Q   Where did that interview take place?

10  A   Fayette County Prison.

11  Q   Do you recall what the subject matter of that interview

12  was?

13  A   Yes.

14  Q   What was that?

15  A   He was supposed to have evidence in the Saundra Martin

16  homicide case.

17       MR. CARUSONE:  May I approach, Your Honor?

18       THE COURT:  Counsel doesn't need request to

19  approach; that's fine.

20      MR. CARUSONE:  Sorry, Your Honor.

21   BY MR. CARUSONE:

22   Q    I am going to show you what's been marked as for

23   identification Commonwealth Exhibit 1.  Can you identify that

24   document?

25   A    Yes, sir.

1  Q   What is that?

2  A   It's a supplemental report of my homicide report.

3  Q   What is the subject of that report?

4  A   The interview of Ellis Eugene Price.

5  Q   That is a fair and accurate description of what Ellis

6  Price told you on August 4, 1987?

7  A   Yes.

8        MR. CARUSONE:  Move for the admission of

9  Commonwealth Exhibit No. 1.

10        MS. RUSSELL:  There is no objection.

11        THE COURT:  Can we mark the Commonwealth exhibits

12  with letters?

13        MR. CARUSONE:  Sure.  Sure.

14        THE COURT:  Because we already marked plaintiff's

15  No. 1.  So, we'll call that A.

16        MR. CARUSONE:  Very good, Your Honor.  I'll make

17  the correction there.

18        THE COURT:  A is admitted.

19  BY MR. CARUSONE:

20  Q   Sheriff Brownfield, what were the first words, according

21  to your report, what were the first words out of Ellis Price?

22  A   I am aware, Fayette County, you can't do anything as far

23  as my sentence in the State of Michigan, but I think that I

24  know, what I know will be of help to you.

25  Q   Sheriff, did Ellis Price ask you for anything during

1　that interview you had with him?

2　A　No, sir.

3　Q　Did you have any express or implied agreements with

4　Ellis Price in exchange for his testimony?

5　A　No, sir.

6　Q　Did you have any agreements of any kind with Ellis Price

7　regarding his testimony?

8　A　No, sir.

9　Q　Did you make any promises to him whatsoever?

10　A　No, sir.

11　Q　Did you do or say anything that would have led Ellis

12　Price to believe that he was going to get some sort of a

13　benefit in exchange for his cooperation?

14　A　No, sir.

15　Q　Did you give Ellis Price anything of benefit either

16　before or during his testimony or after his testimony?

17　A　No, sir.

18　　　　MR. CARUSONE:  Nothing further.

19　　　　THE COURT:  All right.  Cross-examination.

20          MR. LEV:  Miss Russell will take it.

21                    CROSS-EXAMINATION

22   BY MS. RUSSELL:

23   Q    Sheriff, it's true that you don't know how you learned

24   that Ellis Price had information about the Breakiron case?

25   A    Ma'am, I have difficulty hearing.  If you could speak

1  up?

2  Q   I am sorry.  It's true that you don't know how you

3  learned that Ellis Price has information about Mark

4  Breakiron?

5  A   That is true.  I don't recall.

6  Q   Just a moment ago, you read the first statement of your

7  report, supplemental report, in which Ellis Price says that

8  he knows you can't do anything about his sentence in

9  Michigan.  How did he know that?  Did you talk about that?

10       MR. CARUSONE:  Objection.  Calls for speculation.

11       MS. RUSSELL:  Did you talk about.

12       THE COURT:  The part about how did he know it is

13  sustained.  The part about did you talk about it, he can

14  answer that.

15  A   What part do you want?

16  Q   Did you talk about -- did you talk with Ellis Price

17  about not being able to help him with his sentence in

18  Michigan?

19  A   Evidently not or I would have put it in the report.

20  Q    And it's true that you didn't -- there is nowhere in

21  your report here you didn't talk to him about helping him

22  with his charges in Pennsylvania?  Or any charges he might

23  have in Pennsylvania?

24  A    I was unaware of any charges he had in Pennsylvania.

25  Q    Before you went to interview Ellis Price, did you look

1  into his criminal record?

2  A   No, ma'am.

3  Q   Did you look into his criminal record after you

4  interviewed him?

5  A   No, ma'am.

6       MS. RUSSELL:  Ask the Court's indulgence.

7       (Whereupon, an off-the-record discussion was had.)

8  BY MS. RUSSELL:

9  Q   Did you talk to Ellis Price on any other occasion about

10  information that he had in the Breakiron case?

11  A   If I had, it would be in a report.  And I haven't had

12  the opportunity to review the entire report.  So, I couldn't

13  say honestly if I did or not.

14  Q   Did you have him sign anything regarding the information

15  he gave you?

16  A   No.

17  Q   Did you take any notes in that interview?

18  A   I am sorry?

19  Q   Did you take any notes from the interview?

20   A   All my notes would have been taken at the time of

21   interview.

22   Q   Would you have shown Mr. Price those notes?

23   A   I am sorry.  I have to ask you to repeat.

24   Q   I am sorry.  The question was, did you show Ellis Price

25   those notes that you took during the interview?

1  A    No.

2  Q    Are you aware of anyone else having any deals with

3  Mr. Price regarding the testimony he was going to give in the

4  Breakiron case?

5  A    None to my knowledge.

6  Q    So, you are not aware of whether or not he had a deal

7  with the District Attorney or the prosecutors in the case?

8  A    There was no such deal that I was aware of.

9  Q    That you weren't personally aware of?

10  A    No.

11  Q    Did you ever talk to James Sullivan, who's known by the

12  nickname of Silky, about any information he had in the

13  Breakiron case?

14  A    Not on this case.  No.

15  Q    What about Chris Miller?

16  A    I don't recall name.

17  Q    Did you ever talk to Clinton Conrad Blair about

18  information he might have in the Breakiron case?

19  A    Not on the Breakiron case.  No, ma'am.

20          MS. RUSSELL:  I don't have anything further at this

21   time.

22          THE COURT:  Thank you.

23          MR. CARUSONE:  No redirect.

24          THE COURT:  Sheriff Brownfield, you are excused.

25          THE WITNESS:  Am I free to leave then?

1          THE COURT:  Yes, sir.

2          THE WITNESS:  Thank you very much.

3          (Whereupon, the witness was excused from the

4   witness stand.)

5          THE COURT:  That is fine there, Mr. Morrison.

6          THE DEPUTY CLERK:  Raise your right hand.

7          MARK MORRISON, ESQUIRE, A WITNESS, having been

8   first duly sworn, was examined and testified as follows:

9          THE DEPUTY CLERK:  Would state your name, please,

10  and spell your last name?

11          THE WITNESS:  My name is Mark F., as in Frederick,

12  Morrison, M-O-R-R-I-S-O-N.

13          THE DEPUTY CLERK:  Thank you.  Take the witness

14  stand please.

15                    DIRECT EXAMINATION

16  BY MR. CARUSONE:

17  Q    Mr. Morrison, good afternoon.

18  A    Good afternoon.

19  Q    Did you serve as the Fayette County DA?

20  A   I did.

21  Q   During what period; do you recall?

22  A   Between 1987 and 1988.

23  Q   Did you prosecute Mark Breakiron for the murder of

24  Saundra Martin?

25  A   I did.

1  Q    Was there any other prosecutors working with you on that

2  trial?

3  A    There was.

4  Q    Who was that?

5  A    Attorney Cynthia Cline, C-L-I-N-E.

6  Q    Is she deceased?

7  A    She is.

8  Q    Did you meet -- did you call Ellis Price as a witness

9  during the trial?

10  A    Yes, I did.

11  Q    Prior to calling him as a witness, did you meet with

12  him?

13  A    Yes, I did.

14  Q    Can you describe that meeting for the Court?

15  A    Yes.  The meeting took place in my office in the

16  Courthouse.  That would be the District Attorney's Office.

17  I asked, I believe it was then, Trooper Brownfield, now

18  Sheriff Gary Brownfield, to bring Ellis to my office.

19       Purpose of the meeting was for me to tell Ellis that

20    there was nothing that I could do for him.  He was, if I

21    remember correctly, serving a period of incarceration in

22    Michigan, I believe it was.

23        And I believe that sentence had already been handed out.

24    I wanted him to know that there was nothing I could do for

25    him.  I could make him no offer.  Of course, I wanted to hear

1  what he had to say.

2  Q   Did you, in fact, communicate what you intended to

3  communicate then?

4  A   Yes, I did.

5  Q   Did Mr. Price explain why he was cooperating in this

6  case?

7  A   Yes, he did.

8  Q   What did he say?

9  A   He told me that he wanted to do it because he thought it

10  was a terrible thing is what Mr. Breakiron had done to the

11  girl.  He thought it was the right thing to do.  Or words to

12  that effect.  I don't know if that's verbatim, but it was

13  words to that effect.

14  Q   You did, in fact, call Ellis Price to testify during the

15  trial; is that correct?

16  A   That is correct.

17      MR. CARUSONE:  Your Honor, I'm going to move for

18  the admission of Commonwealth Exhibit B, a stipulation.  It

19  is a transcript of Ellis Price's testimony during the

20  Breakiron trial.

21          THE COURT:  All right.  That's stipulated; is that

22  right?

23          MS. RUSSELL:  Yes.

24          MR. LEV:  Yes, sir.

25          THE COURT:  All right.  B is admitted.

1                    - - -

2  BY MR. CARUSONE:

3  Q   Mr. Morrison, did Ellis Price ask you for anything in

4  exchange for his testimony?

5  A   He did not.

6  Q   Did you enter into any express agreements with Ellis

7  Price for his testimony?

8  A   I did not.

9  Q   Did you enter into any tacit or implied agreements with

10  Ellis Price in exchange for his testimony?

11  A   I did not.

12  Q   Did you enter into any agreements of any kind with Ellis

13  Price in exchange for his testimony?

14  A   I, at no time, ever made any agreement of any type

15  whatsoever with Ellis Price in return for his testimony in

16  the Breakiron case.  Never.

17  Q   Did you promise him anything?

18  A   I never promised him anything, tacitly or specifically.

19  Nothing, ever.

20  Q    Finally, did you say or do anything that could have led

21  Ellis Price to believe that he was going to receive some sort

22  of a benefit in the future in exchange for his testimony?

23  A    Absolutely not.  Be impossible.  As the first thing I

24  told him was, there was nothing, absolutely nothing, that I

25  could do for him.

1  Q    If you, if you had entered into some, some sort of

2  agreement with Ellis Price in exchange for his testimony,

3  would you have recorded that?

4  A    Yes, I would have.

5  Q    Where would you have recorded that?

6  A    I would have kept the written memorandum of agreement in

7  the file in the Breakiron homicide file.

8        MR. CARUSONE;  Nothing further.

9        THE COURT:  All right.  Cross-examination.

10                CROSS-EXAMINATION

11  BY MR. LEV:

12  Q    Mr. Morrison, I want to establish the time line of your

13  time as DA a little more specifically, please.

14  A    Yes, sir.

15  Q    When did you become the acting District Attorney?

16  A    I believe it was in either December of 1987 or January

17  of 1988.

18  Q    And it was in that role that you prosecuted Mark

19  Breakiron; right?

20  A    That's correct.

21  Q    Prior to becoming acting District Attorney, what had you

22  been doing?

23  A    I was in private practice as a, an attorney in Fayette

24  County, doing a general practice.

25  Q    Now, is it correct that you don't know what, other than

1  what was in the file that you had in the DA's Office, you

2  don't know what conversations were had between any members of

3  the District Attorney's Office or any members of the police

4  and Ellis Price prior to your becoming acting District

5  Attorney?

6  A   No.  I only know about what I did or did not say to him.

7  Q   Is it correct that you never had any conversation with

8  your predecessor District Attorney about Mark Breakiron's

9  case prior to your trying the case?

10  A   I am sorry.  I can't remember if I -- when you say, any

11  conversation, if you could be a little more specific?

12     I never sat down and spoke with them at length about --

13  over the evidence, what we had, we didn't have, that I didn't

14  do.  But, in passing, did I say, mention something about it?

15  I don't know.  I can't say that for certain.

16  Q   Maybe, perhaps, some casual conversations, but you never

17  had any briefing by the people who were in charge of the

18  investigation before?

19  A   No, sir.

20   Q   Okay.  When was the first time you started to learn

21   about the details of Mark Breakiron's case?

22   A   It would have been in February of 1988.

23   Q   Okay.  So that would have been long after Mr. Ellis

24   Price's motion for arrest of judgment had been granted and

25   that the decision not to appeal had been made?

1  A   I honestly don't even recall that happening.

2  Q   You didn't have any part in any of that?

3  A   No, sir; I did not.

4  Q   In your review of the file, did you ever see any letters

5  from Ellis Price written to District Attorney Solomon?

6  A   No.  I didn't.

7  Q   Did you see any letters from James Sullivan written to

8  District Attorney Solomon in the file?

9  A   No.  I didn't.

10  Q   If you had seen those letters, would you have made sure

11  they were turned over to the defense?

12  A   Absolutely.  Having been a defense attorney, I knew how

13  important discovery was.  I made it a point during my

14  overseership of the office, if you will, that discovery was

15  complete and to the fullest extent.

16  Q   Now, you did not do the initial discovery package in

17  this case; isn't that correct?

18  A   The record will have to speak for itself.  I don't

19  remember if I did the initial one or if there was a

20  subsequent one.  I don't remember.

21  Q    In Fayette County, was the process of turning over

22  discovery usually the answer to the bill of particulars?

23  A    Either answer to bill of particulars, answer to informal

24  request for discovery, depending on which rule they came

25  under.

1  Q    So, if the docket in this case shows that an answer to

2  the bill of particulars was filed in July of 1987, that would

3  have been before you had any contact with this case as a

4  prosecutor; right?

5  A    Yes, sir.

6  Q    Did you ever see a signed statement from Ellis Price in

7  the file?

8  A    I don't recall ever seeing a signed statement, signed by

9  Ellis Price.  I don't recall.

10  Q    Do you recall seeing any other statement from Ellis

11  Price, other than the police report that Sheriff Brownfield

12  had filed?

13  A    No.  I don't remember seeing anything other than that.

14  Q    When you interviewed Ellis Price, did you memorialize

15  that into any kind of report?

16  A    I didn't even sit down.  It took place in a very brief

17  period of time and I didn't, I wasn't even at my desk.

18  Q    So, the answer is, you didn't memorialize it?

19  A    Yes.  I am sorry.  I did not memorialize it.

20 Q   Okay.  Do you recall, Mr. Morrison, that you were

21 representing Mr. Sullivan in the summer of 1987 on the

22 homicide conviction -- on the homicide charges that

23 Mr. Sullivan was facing at that time?

24 A   That's possible.  The record, again, would have to speak

25 for itself.

1  Q    Mr. Morrison, I'm going to show you a copy of the

2  Fayette County Criminal Court docket of homicide charges

3  against James Francis Sullivan and refer you, particularly,

4  to, here, to the April 16 entry.

5  A    Yes, sir.

6  Q    Okay?

7  A    Um-hum.

8  Q    That shows appearance.  Says, Morrison.

9  A    Yes, it does.

10  Q    Then, on the next page, I'm going to refer you to the

11  October 16 entry and ask you to look at that?

12  A    I don't see an October 16.  I see a 14 and 15.

13  Q    I am sorry.  I -- my vision.  October 14 entry, then?

14  A    Yes.  I see it.

15  Q    That shows you were permitted to withdraw as -- from

16  Sullivan's counsel?

17  A    Yes, sir.

18  Q    Does that refresh your recollection about whether you

19  represented Mr. Sullivan between April of 1987 and October of

20   1987?

21   A    Yes.  I have no reason to doubt those dates.

22   Q    Were you ever made aware of Mr. Sullivan writing a

23   letter to the District Attorney offering to testify against

24   Mr. Breakiron in exchange for getting some benefits in this

25   case?

1  A   If you say ever, certainly, since this appeal has come

2  up, I've been told.

3  Q   At -- during 1987, during your time of representing

4  Mr. Sullivan --

5  A   No, sir.

6  Q   -- were you aware of any offer?

7  A   No, sir.

8  Q   Do you recall that in 1988, while you were prosecuting

9  Mr. Breakiron's case, there were allegations made by another

10  attorney in another case suggesting that you had a conflict

11  in the Breakiron case because you knew of -- that

12  Mr. Sullivan had offered to provide information?

13  A   I honestly don't recall that.  If you have a record,

14  maybe.

15  Q   From an Attorney Nessar.  Do you remember Attorney

16  Nessar had raised that issue in a brief?

17  A   It occurs to me that there was something that Mr. Nessar

18  did, but I don't recall specifically what it was.

19  Q   Do you recall then that Mr. Breakiron's defense counsel

20  filed a motion asking that you be disqualified from

21  prosecuting this case?

22  A   I do remember that he did that.  Yes.  In fact, I

23  believe he even asked for Miss Cline to be disqualified.

24  Q   Miss Cline was your law partner, as well as your

25  assistant, in this case?

1   A    That's correct.  Although, the reason I remember, if I

2   may, Your Honor?  Was related to the fact that we had both

3   been law clerks for the Honorable Judge William J. Franks and

4   Mr. Nessar believed in some way we might receive favorable

5   treatment from him.  I remember that issue, specifically.

6         MR. LEV:  Could I have this -- Chris, this is the

7   transcript of the motion to recuse.  Could I have this marked

8   as plaintiff's 2, please?

9   BY MR. LEV:

10  Q    Mr. Morrison, I'm going to show you notes of testimony

11  from a motions Court proceeding in Fayette County Court of

12  Common Pleas from March 29, 1988 before the Honorable Conrad

13  B. Capuzzi.  I'm going to ask you -- it's just a couple pages

14  long.  I am going to ask you if you would to take a look at

15  that?

16  A    Certainly.  (Indicating.)

17        THE WITNESS:  I am sorry, Your Honor.  This

18  document is incomplete.  I'm missing page 3.

19        MR. LEV:  Tricia, let's have that one, if that one

20   has page 3.  Let's have this marked as maybe Exhibit 2-A.

21        MS. RUSSELL:  Sorry.

22        MR. LEV:  I am sorry about that, Mr. Morrison.

23   It's my error.  Let's mark it 3, so we don't mix up letters.

24        THE COURT:  That would be better.

25   BY MR. LEV:

1  Q    There?

2  A    Thank you.  I've completed it.

3  Q    Does that refresh your recollection, Mr. Morrison, about

4  what the subject of that recusal motion was?

5  A    Yes, it does.

6  Q    And what was the subject of that recusal motion?

7  A    There's a reference made in the motion to the fact that

8  I had previously represented Mr. Sullivan, I or a member of

9  my staff had previously represented Mr. Sullivan.

10  Q    And there was a concern that Mr. Sullivan might be

11  called to testify against Mr. Breakiron; correct?

12  A    Defense counsel had, it appears from the motion, defense

13  counsel had that concern; yes.

14  Q    Let me refer you now to page 5 of that transcript there

15  that you have?

16  A    Yes, sir.

17  Q    Down in the middle.  You tell the Court, all we would

18  offer is that we're not using that witness, Your Honor.

19      And the Court says, You are not.

20      Then you say, we're not using Mr. Sullivan.  No.  We're

21   not calling him or using anything that he offered to us.  And

22   in fact, I was not a party to the allegations made by

23   Mr. Nessar that there was a deal.  Mr. Sullivan took that

24   upon himself to do.  That's the only thing we would offer.

25   A   I see that.

1  Q    Do you remember saying that to the Judge?

2  A    No.  I remember from seeing it here in the record.

3  Q    Okay.  Well, then when you said, Mr. Sullivan took that

4  upon himself to do, do you know what it was that you were

5  talking about?

6  A    Apparently, as I see this now, and I'm trying to recall

7  it, Mr. Sullivan attempted to make his own deal with the

8  District Attorney's Office with some information he believed

9  might have some merit in the case.

10  Q    He did that during the time you were District Attorney

11  or at another time?

12  A    I don't know.

13  Q    Do you recall Mr. Sullivan ever approaching you and

14  telling you that he had information in the case?

15  A    No.  I don't recall that.

16  Q    Do you recall during time you represented Mr. Sullivan,

17  in the summer of 1987, learning that Mr. Sullivan had written

18  a letter to the District Attorney offering information?

19  A    I am sorry.  Could you repeat the question?

file:///A|/BREAKA.TXT

20  Q    During the summer of 1987, when you were representing

21  Mr. Sullivan, do you recall learning that Mr. Sullivan had

22  written a letter to the District Attorney offering

23  information in the Mark Breakiron case?

24  A    I don't recall that, specifically.  No.  Again, if there

25  is a record, it would have to speak for itself.

1  Q    Do you recall going to see Mr. Sullivan and telling him

2  that he shouldn't have done that?  That he should have gone

3  through you?

4  A    Sounds like something I would do.  I can't say I

5  specifically recall it, but it -- that does sound like

6  something I would do.

7  Q    I'll take that back from you.

8        MR. LEV:  Your Honor, I would move to admit

9  Plaintiff's Exhibit 3.  I'll withdraw Exhibit 2 and move to

10  admit Exhibit 3.

11        MR. CARUSONE:  No objection.

12        THE COURT:  Three is admitted.

13  BY MR. LEV:

14  Q    Let me change the area with you, now, Mr. Morrison; if I

15  may.  As, as acting District Attorney, were you responsible

16  for open criminal investigations that were going on?

17  A    No.

18  Q    Who would be responsible for open criminal

19  investigations?

20  A   The investigating law enforcement agency, whether it be

21  the police department, Pennsylvania State Police, whoever.

22  Q   I mean, were you aware of any criminal activity

23  surrounding an assault and robbery against a Vincent

24  Steurbutzel?

25  A   No.  I don't remember that.

1  Q   If Mr. Steurbutzel had been assaulted in 1986, and if

2  during that year reports had come from one of the alleged

3  participants admitting his participation, and naming the

4  other people who were involved, is that something that the

5  District Attorney should have been or would have been aware

6  of?

7        MR. CARUSONE:  Objection.  It calls -- it's

8  hypothetical.  It calls for speculation on the part of this

9  witness.  I think he can respond to things that he can do or

10  he would do.  But the question was phrased, what the District

11  Attorney should do.

12        MR. LEV:  I will rephrase the question.

13  BY MR. LEV:

14  Q   In terms of when you were acting District Attorney, is

15  that something that you would have been aware of?

16        MR. CARUSONE:  Objection.  He's already asked and

17  answered.  He has already testified he was unaware of this.

18        MR. LEV:  Or he doesn't recall.

19        THE COURT:  Why don't you ask the question again?

20   BY MR. LEV:

21   Q    If there were police reports indicating a robbery and

22   assault with injury, and naming the participants, and that

23   one participant had confessed and named the others, is that

24   something that you, when you were acting District Attorney,

25   would have known about?

1          MR. CARUSONE:  Your Honor, I object.  He's already

2    testified that he doesn't remember.  All he can say is

3    whether he knew about it or he didn't know about it.

4          THE COURT:  Well, he testified he didn't know about

5    Steurbutzel.  But if you want to ask him, generically, is

6    that something he would have normally known?

7          MR. LEV:  That's right.

8          THE COURT:  Can you, can you answer that,

9    Mr. Morrison?

10   A    The problem, counsel, that I am having with your

11   question is, are you asking me if a piece of mail came into

12   the office identifying perpetrators of an alleged crime,

13   would I have necessarily read that letter and been made aware

14   of that?  Is that the nature of your question?

15   Q    I am asking you, if there were police reports

16   identifying the perpetrators, the suspected perpetrators of

17   an alleged crime?

18   A    That report would not have come into my office until

19   charges had already been filed, unless the prosecuting

20   officer had questions about the case before he made the

21   arrest.

22        In that event, the officer would have spoken to whoever

23   was in the office whenever he or she came in to talk about it

24   or questioning.  It may have been me.  It may have been

25   another assistant.  Otherwise, they would have come in in the

1  form of the answer to discovery after the charges had already

2  been filed.

3      To say what -- would I have personally been made aware

4  of it?  Maybe, maybe not.  Would the office had, necessarily,

5  mandatory, I don't know what the word is I'm looking for.  I

6  can only say, maybe.  That's the fairest answer I can give

7  you to that question.

8  Q    So, is it your testimony that the District Attorney's

9  Office in Fayette County at that time did not exercise any

10  supervision and control over the charging process of when

11  somebody was arrested and charged with a crime; is that what

12  you are telling me?

13      MR. CARUSONE:  Just ask for a clarification.  What

14  time period are you referring to, the time period he was

15  District Attorney?

16      MR. LEV:  The time period he was District Attorney.

17  A    Again, if they had a question about the case before they

18  filed, they might come in.  We might, at that point, exercise

19  some discretion in saying, don't file this charge, file this

20   charge.

21        Generally, what they would do is they would do their

22   investigation.  They would file their charge with the issuing

23   authority or with the district justice.

24   Q    Could you explain why?

25        MR. CARUSONE:  Mark.

1          THE WITNESS:  I'm not feeling very, very well.

2          Thank you.

3          MR. LEV:  You want to break?

4          THE WITNESS:  No.  Go ahead.

5          MR. CARUSONE:  Your Honor, Mr. Morrison has a

6    medical condition and it's fairly serious.  I know that

7    occasionally he needs time to stretch his legs.

8          THE COURT:  Mr. Morrison, whenever you need to get

9    up and move, feel free to do so.  We'll take a break.

10         THE WITNESS:  Thank you, Your Honor.  Thanks.

11         THE COURT:  Are you sure.

12         THE WITNESS:  Yes.  Sorry.

13         THE COURT:  No apology required.

14         Why don't you repeat the last question?

15         MR. LEV:  Your Honor, Mr. Morrison, are you ready

16   to proceed?

17         THE WITNESS:  Yes, sir.

18         MR. LEV:  Could the court reporter please read back

19   the last question?

20    (Whereupon, the question was read back.)

21  A    And to complete that process, then it would come into

22  our office for us to prepare the informations and file them

23  of record.

24  Q    Do you have any explanation as to why the Steurbutzel

25  assault and robbery that occurred in January of 1986 was not

1    prosecuted until some time in 1988 or '89?

2    A    No, sir.  I don't know anything about the Steurbutzel

3    case at all.

4    Q    Well, do you remember that you represented Robert Price

5    after your time as District Attorney?

6    A    Very possible.

7    Q    In the charges, and that he was charged as a participant

8    in the Steurbutzel case?

9    A    I don't recall that, specifically.  But the record, I am

10    sure, would speak for itself.

11    Q    Do you recall arranging a plea in which Mr. Price was

12    allowed to plead nolo contendere to the charges and that he

13    received a five- to ten-year sentence concurrent with the

14    time that he was already serving?

15    A    Again, I don't have specific memory of that, now.  The

16    record would have to speak for itself.  I'm not trying to be

17    evasive under the circumstances, it's just been a very long

18    time and a lot of cases.

19    Q    Were you aware -- although, you remember Ellis Price

20   pretty clearly; don't you?

21   A    This case, the Breakiron case, has been with me every

22   day.

23   Q    But you don't remember that Ellis Price was named as one

24   of the participants in the Steurbutzel case?

25   A    I don't recall the Steurbutzel case.  I mean, if you

1  could be a little more specific about the facts, maybe I

2  might be able to remember something about it.

3  Q   If you will give me -- I'm going to ask you,

4  Mr. Morrison, if you would read this police report and see if

5  that refreshes your recollection at all?

6  A   (Indicating.)

7  Q   Does that refresh your recollection about the

8  Steurbutzel case at all?

9  A   It does.   It refreshes my recollection to the extent

10  that I recall now that Robert Price had been in an accident

11  involving a Jeep and he had been burned rather severely.  And

12  he went AMA, which is an abbreviation for against medical

13  advice.  Signed himself out of the hospital here in

14  Pittsburgh the day after, two days after the accident.

15      I believe that's the reference to the next paragraph

16  that's in that report.  And now, after reading that, I have

17  some recollection that he got into some kind of problem

18  within a few short days after being in that accident which I

19  am going to have to conclude was the Steurbutzel matter.

20  Q   Do you recall knowing of Ellis Price's involvement in

21  the Martin --

22  A   Honestly, no.  I don't.

23  Q   Did you conduct, as before, in putting Ellis Price on

24  the witness stand at Mark Breakiron's trial, did you conduct

25  any inquiry to see whether Ellis Price was the subject of any

1  open or pending investigations in Fayette County?

2  A    No.  I don't recall doing that, because I wasn't even

3  sure I was going to use him.

4  Q    But you did?

5  A    Yes.

6  Q    And you didn't conduct any inquiry into --

7  A    No.  I don't believe I did.  I don't recall doing that.

8  No.

9  Q    If you had known that Ellis Price was the subject of an

10  investigation and was named as a participant in an assault

11  and robbery, is that information that you would have provided

12  to the defense counsel?

13  A    Yes.  Once I decided to use Ellis Price as a witness, I

14  would have certainly provided it.

15  Q    Because that open investigation would have been

16  important information for defense counsel?

17  A    Absolutely.  Absolutely.

18        MR. LEV:  I don't have any further questions of

19  Mr. Morrison.  Thank you, sir.

20          THE COURT:  All right.  Mr. Carusone, anything

21  further?

22          MR. CARUSONE:  Yes, Your Honor.

23                REDIRECT EXAMINATION

24  BY MR. CARUSONE:

25  Q    Did you call Jim Sullivan to the -- as a witness during

1   the --  Breakiron trial?

2        MR. LEV:  Stipulate that he didn't.

3   BY MR. CARUSONE:

4   Q    Is there any, is there any mention in Exhibit P-3 -- you

5   still have that in front of you?

6   A    No, sir.  I don't.

7        MR. CARUSONE:  Well, maybe counsel can stipulate

8   there is no mention in Exhibit P-3 of Ellis Price?

9        MR. LEV:  Correct.

10       MR. CARUSONE:  Okay.

11  BY MR. CARUSONE:

12  Q    Mr. Morrison, when you were questioned about whether you

13  approached Mr. Sullivan in the jail to discuss with him some

14  letter that he wrote, you responded, it sounds like something

15  I would do, but I don't recall.

16     I would ask you to explain your answer.  Did you do it?

17  Or didn't you?  Or don't you know?

18  A    I don't know.

19  Q    You don't know?

20  A   I don't know.  I don't recall doing that, specifically,

21  to be very honest with you.  I don't recall doing that.

22       However, as a defense lawyer, I would also admonish my

23  client not to have direct conversations with the prosecution.

24  Q   So, that was your habit?

25  A   That was my habit.

1  Q    But you have no specific recollection of doing that?

2  A    No, sir.  I don't.

3  Q    And, Mr. Morrison, as District Attorney of Fayette

4  County, you do not review every police report that was

5  generated in Fayette County; is that correct?

6  A    No, sir.

7  Q    Mr. Lev discussed the timing of the filing of the

8  charges in the Steurbutzel case.  Mr. Morrison, did you, did

9  you take any action to purposely delay the filing of charges

10  in the Steurbutzel case?

11  A    Absolutely not.

12        MR. CARUSONE:  No further questions.

13        MR. LEV:  I have nothing.

14        THE COURT:  All right.  Thank you, Mr. Morrison.

15  You are excused.

16        (Whereupon, the witness was excused from the

17  witness stand.)

18        MR. CARUSONE:  Your Honor, I just need a minute to

19  see if the judges are here.

20      THE WITNESS:  Your Honor, may I remain for a few

21   minutes, if you are not going to use me as rebuttal?

22      MR. LEV:  I have no objection to that.

23      THE COURT:  That's fine.

24      THE WITNESS:  Thank you.

25      THE COURT:  Mr. Carusone.

1          MR. CARUSONE:  Judge Warman, Your Honor.

2          THE COURT:  All right.  Judge, would you stand

3   there to be sworn, please?

4          HONORABLE RALPH C. WARMAN, A WITNESS, having been

5   first duly sworn, was examined and testified as follows:

6          THE DEPUTY CLERK:  State your name, for the record,

7   and spell your last name, please?

8          THE WITNESS:  Ralph C. Warman, W-A-R-M-A-N.

9          THE DEPUTY CLERK:  Thank you, sir.  Please take the

10   witness stand.

11                 DIRECT EXAMINATION

12   BY MR. CARUSONE:

13   Q   Judge Warman, good afternoon.

14   A   Good afternoon.

15   Q   How are you currently employed, sir?

16   A   I am a Common Pleas Court Judge in Fayette County.

17   Q   And when did you become a judge?

18   A   June 6, 1996.

19   Q   And were you previously employed by the District

20    Attorney's Office?

21    A    Yes.  I was.  I was the District Attorney from 1991 to

22    19 - June 6/19/96.

23    Q    Were you also employed as an assistant with the office?

24    A    I was employed as an assistant from October, 1977 to

25    December 31, 1988.

1  Q    And during the period of time that you were employed as

2  an assistant, do you recall who the District Attorney was?

3  A    A judge.  He is now Judge Gerald R. Solomon.  He went in

4  in October, in the District Attorney's Office, as District

5  Attorney.  He had been an assistant before, but he, he went

6  in as the District Attorney in October, '77 and I started at

7  that time with him.

8  Q    Sir, did you prosecute Robert and Ellis Price for the

9  attempted homicide of Mark Richter?

10  A    Yes, I did.

11  Q    Can you just generally describe that incident to the

12  best you can recall of what the general plot --

13  A    It was a shooting at a local nightclub Teego's Tavern.

14  (Spelled phonetically.)  The place has since burnt down.

15  There's, I think, a gas station there, now.

16      But it happened on New Year's, as I recall.  And Ellis

17  Price and his brother, Robert Price, went in late, after

18  twelve o'clock, I think.  After midnight.  They were having a

19  New Year's, New Year's Eve party.

20  Q   Do you recall the year?

21  A   I think it's January 1, '86?

22  Q   Okay.

23  A   And they were in the bar for a while.  They got,

24  subsequently got involved with an argument with the bartender

25  and the bouncer, whose nickname was Tiny.  It was Richter.

1    Mr. Richter told them that they had to leave.  He gave

2    them money that they wanted and he told them to leave.  And

3    they went outside the bar.  He went out to make sure that

4    they were not damaging cars or anything and one of them

5    pulled a gun and shot him.

6    Q    Did that case to go trial?

7    A    Yes, it did.

8    Q    Do you recall what the jury's verdict was?

9    A    Jury's verdict was guilty for Robert Price for criminal

10   attempt to commit criminal homicide for Raymond Richter,

11   aggravated assault on Raymond Richter.   Recklessly

12   endangering for Raymond Richter.  And also the same three

13   offenses for a Richard Fletcher who was a witness.

14       And Ellis Price was convicted of criminal attempt to

15   commit homicide with regard to Raymond -- Richard Fletcher.

16   And recklessly endangering and also danger -- assault with

17   regard to Richard Fletcher.  There had been a demurer granted

18   by Judge Franks to the conspiracy charges and to the other

19   charges against -- that had been filed against Ellis Price.

file:///A|/BREAKA.TXT

20  Q   Is that prior to trial or during the trial?

21  A   During the trial.

22  Q   But still there were certain charges that he was

23  convicted of?

24  A   Yes.

25  Q   When it went to the jury?

1   A    Right.

2   Q    Following the trial, did Ellis Price file a motion in

3   arrest of judgment?

4   A    He filed more than, more than that.  There were more

5   than that that were filed.  I don't recall everything that

6   was filed, but one of the things was a motion of an arrest of

7   judgment.

8   Q    Can you recall on what the Court's decision was on that

9   motion?

10   A    Judge Franks granted his motion.

11   Q    Sorry, Your Honor.

12       I'm going to show you what's been marked for

13   identification as Commonwealth Exhibit C.  Just ask you to

14   take a moment to review that document.  When you are ready.

15   Take your time.  If you could identify that document for the

16   Court?

17   A    Yes.  I can identify this as being Judge Franks'

18   opinion.  It's dated July 24, '87.  And this is where he

19   granted the, the arrest of judgment with regard to Ellis

20  Price.

21           MR. CARUSONE:  Move for the admission of Exhibit C?

22           MR. LEV:  No objection.

23           THE COURT:  C is admitted.

24  BY MR. CARUSONE:

25  Q   Did the Commonwealth oppose the motion in arrest of

1  judgment?

2  A    My recollection is that we did.  We filed -- our office

3  filed a brief with Judge Franks as to it.

4  Q    Were you surprised about Judge Franks' decision?

5  A    I was not surprised by Judge Franks' decision.  No.

6  Q    Can you explain why not?

7  A    Well, I was involved in this case, initially, after the

8  police filed the charges.  I believe it was Trooper Roberts

9  that filed the charges to begin with.  And as I recall, I

10  went to the preliminary hearings, too.

11      But they had charged both, both Robert and Ellis.  And

12  when I looked over the information that they had, it was only

13  Robert that they appeared to have any information relative

14  to.  Robert was the one that was, that the Commonwealth

15  witnesses indicated was involved in the shooting, but Ellis

16  was there.  They were both together there.

17      They went to the bar together.  And, when they left the

18  area, they left together.  So, the police charged them both.

19      What I believed is we could never convict Ellis by

file:///A|/BREAKA.TXT

20  himself, but he was, as I recall, he was in Michigan at the

21  time.  At the time, we were trying to get him back.  He had

22  been convicted of a robbery or something in Michigan and we

23  borrowed him from Michigan on the Interstate Detainers Act.

24  And we tried them together, which I believe was the only way

25  we could convict them and because his involvement, his

1   involvement was, basically, being there with his brother.

2   Q    And arriving and leaving together?

3   A    Yes.  As I recall, he drove the car from the scene.

4   Q    Okay.  Did the District Attorney's Office appeal the

5   decision of Judge Franks?

6   A    No.

7   Q    Can you explain to the Court why not?

8   A    We had, we had a small office to begin with.  We -- I

9   think we had five assistants back then.  Everybody was

10  part-time.  The District Attorney was part-time.  And we just

11  -- we didn't have the manpower.  We didn't file any appeals.

12      There might have been one appeal we filed in the ten

13  years or so there.  We were, generally, satisfied with what

14  our judges did.  They always gave us a decent shake.

15      And, in this case, the, the fact was that Francis was,

16  Franks was probably right.  He probably should, should have

17  granted an arrest of judgment because he probably should have

18  granted the demurer in the first place.  I mean, I argued

19  against it, but then I was on the opposite side.

file:///A|/BREAKA.TXT

20  Q    Now, you said that your office did defend against

21  appeals that were filed; correct?

22  A    Yes, we did.

23  Q    You responded to appeals?

24  A    We filed responsive briefs.  We had, we had for a while,

25  I think most of the ten years, we had, we had an independent

1   brief writer.

2   Q    Was that person employed by the DA's Office?

3   A    Was employed by the DA's Office and paid for by the

4   county.  And it was, when I started, it was like thirty-five

5   dollars a brief, no matter what level it was.  And then it

6   went up to like fifty dollars a brief, something like that.

7        And they would brief locally post-trial motions and then

8   they would brief the -- at the Superior Court level and at

9   the Supreme Court level, as necessary.

10  Q    How would you describe the support staff in the office?

11  Did you have a large support staff, small support staff?

12  A    We had, like I said, I think we had five assistants.

13  They were all part-time.

14  Q    Right.  What about secretaries?

15  A    We had probably four, four secretaries.  Like an office

16  manager and three.  We had, we had one that typed up all the

17  informations.  They each had separate duties.  One would send

18  out all the subpoenas.  I can't remember everything back

19  then.

20  Q    Okay.  That's fine, Judge.  Was there any agreement not

21  to appeal Judge Franks' decision in exchange for Ellis

22  Price's testimony in the Breakiron case?

23  A    No.  Not to my knowledge.

24  Q    Did Ellis Price ask you for anything in exchange for his

25  testimony in the Breakiron case?

1  A   I never talked to him.  I don't believe I've ever seen

2  Ellis Price, maybe except for preliminary hearing and trial.

3  Q   So, I take it, then, that there were no express

4  agreements or implied agreements between you and Ellis Price

5  regarding his testimony in the Breakiron case?

6  A   That is correct.

7  Q   You recall making any promises to him whatsoever in

8  exchange for his testimony in the Breakiron case?

9  A   Absolutely not.

10  Q   Did you recall whether you -- strike that.

11     Did you do or say anything?

12  A   I would have thought they didn't even needed him, there

13  was so much evidence against Mark Breakiron, anyway.

14  Q   Did you ever do or say anything that would have led

15  Ellis Price to believe that he was going to receive some sort

16  of a benefit in exchange for his testimony in the Breakiron

17  case?

18  A   No.

19  Q   Did you give Ellis Price any benefit whatsoever in

20  exchange for his testimony in the Breakiron case?

21  A   I wasn't involved in the Breakiron case.  I left the

22  office December 31, 1988.  I think.  And it was -- or '87.

23  He wasn't tried until the next year.

24  Q   Right.  Who was the District Attorney then?

25  A   The District Attorney would have been, well, Alphonse

1   Lepore was appointed, and Mark Morrison, who was interim

2   District Attorney, because Al Lepore had been the Public

3   Defender on cases where there were conflicts.

4   Q   Judge, I just want to -- did you give Ellis Price any

5   benefit whatsoever in his testimony in the Breakiron case?

6   A   No.

7       MR. CARUSONE:  Nothing further.

8       THE COURT:  All right.  Thank you.

9       Mr. Lev.

10              CROSS-EXAMINATION

11   BY MR. LEV:

12   Q   Judge Warman, good afternoon.

13   A   Good afternoon.

14   Q   My name is Stuart Lev.  I represent Mr. Breakiron.

15   A   Nice to meet you, sir.

16   Q   Judge Warman, were you aware at the time the motion --

17   around at the time the motion for arrest of judgment in Ellis

18   Price's case?

19   A   Yes.

20  Q    Do you know whether Ellis Price had written any letters

21  to District Attorney Solomon concerning the Mark Breakiron

22  case?

23  A    No.  Not to my knowledge.  I don't recall anything in

24  that regard.

25  Q    Were you aware that then Trooper Brownfield had, on

1  August 4, gone to speak to Ellis Price?  And filed a police

2  report concerning the information Ellis Price was offering

3  against Mark Breakiron?

4  A    No.

5  Q    Sir, who made the decision not to appeal; was it you or

6  was it District Attorney Solomon?

7  A    Well, I wasn't happy.  I wasn't happen about this, this

8  decision of Judge Franks handed down, but I understand it.

9  He should have granted the demurer, probably, but my job was

10  to prosecute people.

11      I think it is likely that Ellis had -- I think Ellis and

12  his brother discussed this.  Outside the bar, they went to

13  the same side of the vehicle.  They didn't get in.  They

14  didn't -- one of them got in the passenger side, one in the

15  driver side, initially.  So, I think, you know, it was my

16  opinion that there was a conspiracy, but, but our evidence

17  was not, our evidence didn't really point to that.  I mean,

18  that was our position.

19  Q    I take it that at the time of the prosecution you had a

20  good faith belief that Ellis Price was guilty of these crimes

21  or you wouldn't have prosecuted him; is that fair?

22  A    Well, he was charged by the police.  My job as the

23  prosecutor was to try cases.  And I wasn't going to second-

24  guess the police.  But I knew that in order to convict him

25  we would have to try them together because if he was tried on

1  his own, he would have never been convicted.

2  Q   Sir, are you telling me if the police charge someone who

3  they thought was innocent that you would, nevertheless,

4  prosecute the case?

5  A   If they thought he was guilty, that would be why they

6  charged him.  It's -- there may have been cases I tried where

7  I thought the case is stupid going to trial, because the

8  evidence is insufficient.  But the man's charged.  That's my

9  job, is to try case.  That's what I did.

10  Q   Now, as I understand the facts of the case, by the way,

11  did you refresh your recollection as to the facts of this

12  case before coming here to testify?

13  A   Yes, I did.

14  Q   As I understand it, the facts in the case, there is a

15  shooting.  The first, first shots were fired outside of the

16  bar.  And that's when Mr. Richter got hit; is that correct?

17  A   Mr. Richter was a big -- he was a big man.  He was -- he

18  had sort of -- he had a big belly on him.  He was hefty.

19  Yes.  They nicknamed him Tiny.

20      He had told these people to leave and they did leave.

21      And, according to him, and I, I remember distinctly this case

22      and I remember talking to him.  And he said that it just

23      happened.  He just happened to think maybe while they were

24      out there, since they was disgruntled about getting thrown

25      out, maybe they would break into cars, maybe do some damage

1  outside.  So, he just decided to go to the door and check on

2  them.

3      So, he went out.  And there was, apparently, there were

4  words that were exchanged, and one of them pulled out a gun,

5  and shot him.

6  Q   The evidence was, the testimony in that trial was, that

7  it was Robert Price who pulled out the gun and shot him?

8  A   But Richter, he wasn't able to identify who shot him.

9  It was only the patron of the bar that came outside, too.

10 Q   And after Mr. Richter was shot, as I understand it, then

11 the -- Ellis and Robert Price got into a car?

12 A   Right.

13 Q   And Ellis was the driver?

14 A   It's my recollection.

15 Q   And then another shot came from within the car towards

16 the witness?

17 A   Blowing out the passenger window of the car.

18 Q   Am I correct that that was a shotgun blast?

19 A   No.  It was a pistol.

20  Q    It was a pistol.  Second shot was a pistol?

21  A    Handgun; yes.

22  Q    And the car drove away?

23  A    Car drove away.

24  Q    So, at the time of the shooting, Ellis and Robert were

25       in the car?

1   A   Right.

2   Q   That second shot in particular --

3   A   Right.

4   Q   Ellis was the driver?

5   A   Right.

6   Q   And there is a shot fired and they drove away together?

7   A   Right.  The shot went through the passenger side window

8   of the vehicle.

9   Q   Sounds to me like accomplice liability for the assault

10   on the second shot?  Does it sound that way to you?

11   A   That's why I tried.

12   Q   And that would be a reasonable thing that a reasonable

13   judge might find; right?

14   A   Right.

15   Q   Or a reasonable jury might find?

16   A   That's what I believed.

17   Q   That's right.  Now, the standard for a motion for arrest

18   of judgment in Pennsylvania is, is a very high standard for a

19   defendant to meet; right?

20  A    Well, it's like a motion -- in arrest of, in arrest of

21  judgment is like a motion for judgment of acquittal is now.

22  So, they make the demurer and that's preserved.  Then later

23  on -- and he made his motion following the trial.  And, so,

24  the judge decided that he made a mistake in not granting the

25  demurer.  So, that's --

1   Q    And in making that decision, the Judge has to -- it's a

2   sufficiency of the evidence claim; right?

3   A    That's it; right.

4   Q    The Judge has to take all the evidence and all the

5   inferences in favor of the verdict winner, the Commonwealth?

6   A    Right.

7   Q    There has to be so little evidence that no reasonable

8   juror could possibly convict?

9   A    That is true.

10  Q    Don't you think you could have won that issue on appeal?

11  A    I doubt it, because, because you have to understand that

12  the appellate judge, I know this from the ten years, eleven

13  years that I have been a judge.  They have a tendency to

14  follow the local judge, if what was done was appears to be

15  reasonable and in accordance with the law.

16       They won't, they won't make, they won't make factual

17  findings.  They wouldn't make a finding probable that the

18  facts would justify the conviction once Judge Franks found

19  otherwise.

20      And, in this case, very, very thin facts holding Ellis

21   to this case to begin with?  He was there, basically.  That's

22   all we could prove.

23   Q   There in the car, driving the car, while the shots came

24   from the car?

25   A   He was there in the bar.  He left with his brother.  He

1   was outside, on the same side of the vehicle as his brother,

2   talking.

3       When the bouncer went out, and he was there when the

4   shots were fired, and he drove the vehicle from the scene.

5   That's what we had to prove.

6   Q   You wrote a brief, your office wrote a brief, in

7   opposition to a motion for arrest of judgment?

8   A   That is my recollection.

9   Q   So, turning that into a Superior Court brief would not

10  have been a very difficult proposition?

11  A   You have to understand, we never filed appeals.  My --

12  our office never filed appeals.  I think we had one appeal we

13  went to the Supreme Court, the United States Supreme Court.

14  Only one case.  And I think it was because the Superior Court

15  had overturned something.  It was in a homicide case, but I

16  don't recall any time us ever filing an appeal.  Initially,

17  starting a case, filing an appeal at the Clerk's Office.

18  Q   Would you agree that the grant of an arrest of judgment

19  by a judge, following a jury verdict, after a trial in a

20  serious criminal case, is a pretty unusual circumstance?

21  A   No.  I wouldn't agree with that.  It depends on the

22  facts.

23  Q   It happens frequently in Fayette County?

24  A   I wouldn't say it happens frequently, but I wouldn't say

25  it was unusual, either.

1          MR. LEV:  I don't have anything further.

2          THE COURT:  All right.  Mr. Carusone.

3          MR. CARUSONE:  Just a few.

4                    REDIRECT EXAMINATION

5   BY MR. CARUSONE:

6   Q    Judge Warman, you tried this case as an assistant

7   District Attorney; is that correct?

8   A    That's right.  I probably tried two hundred fifty, three

9   hundred cases while I was an assistant.

10  Q    Your job as an ADA was you file, you try the case?

11         Was your job, as an ADA, assistant district attorney,

12  you get the file and you try the case; correct?

13  A    Basically.  I was like -- I was what they call the first

14  administrative assistant district attorney.  I was the person

15  who was the most full-time person.  I was part-time, but I

16  was the most, I was there more than anybody else in the

17  office.

18         The person that had the job before me didn't try cases.

19  He might try just a couple cases, but, but this was an

20  administrative job.  I took care of approving all the

21  informations when they come in.  I did a lot of other types

22  of work.  But when a case -- well, I did a lot of work in the

23  office on a daily basis.  Trying cases is just another thing

24  I did because I liked to do it.

25  Q    You have the exact numbers with you today of the number

1  of appeals your office had filed or the District Attorney has

2  filed over the years?

3  A    I don't have an exact figure, but I cannot remember one

4  that we filed that we initiated the appeal on, from filing an

5  appeal in the office of our Clerk of Courts of Fayette

6  County.  We just didn't do it.

7     It was -- we had what we considered to be a decent bench

8  and very seldom did they do anything that we didn't really

9  agree with.

10  Q    Did you enter into plea bargains with defendants and

11  their counsel?

12  A    That's, unfortunately, that's something you have to do,

13  enter into plea bargains, because you can't try all your

14  cases.

15  Q    Did you ever drop charges as part of plea agreements?

16  A    Certainly.

17  Q    Judge, you were asked about, in essence, a division of

18  authority, I guess, between the police and DA's Office.  Did

19  the DA's Office file criminal charges when you were there?

20  A   No.

21  Q   Who did that?

22  A   We might, we might have filed through our county

23  detective.  We filed some.  The county detective would file

24  charges, as I recall, when there may be contraband brought

25  into the jail or a prisoner would attack somebody else in our

1  county jail.  That's when he would file charges.

2      But, other than that, all the charges that were filed

3  would come from either the State Police or local police

4  agencies in our county.

5  Q   You didn't review the filing of those charges; correct?

6  A   I, I read every case that came into that office.

7  Q   That came to your office?

8  A   Yes.

9  Q   Okay.  When it came in; correct?

10  A   When it came in.

11  Q   After the charges were filed?

12  A   Yes.  Not before.

13      MR. CARUSONE:  Nothing further.

14      THE COURT:  All right.

15      MR. LEV:  One more question.

16          RECROSS EXAMINATION

17  BY MR. LEV:

18  Q   Judge Warman, you said you tried two hundred fifty to

19  three hundred cases.  How many arrest of judgments were

20  granted in those cases?

21  A   I am sure there were a few, but I can't remember how

22  many.

23          MR. LEV:  I have nothing further.

24          THE COURT:  All right.  Thank you, Judge Warman.

25  You are excused.

1          THE WITNESS:  Thank you.

2          (Whereupon, the witness was excused from the

3  witness stand.)

4          THE COURT:  Mr. Carusone.

5          MR. CARUSONE:  Your Honor, Commonwealth calls

6  Judge Solomon.

7          THE DEPUTY CLERK:  Please stand there to be sworn,

8  Judge.

9          HONORABLE GERALD R. SOLOMON, A WITNESS, having been

10  first duly sworn, was examined and testified as follows:

11          THE DEPUTY CLERK:  Would you please state your

12  name, for the record, and spell your last name, sir?

13          THE WITNESS:  Gerald R. Solomon, S-O-L-O-M-O-N.

14          THE DEPUTY CLERK:  Thank you, sir.  Would you take

15  the witness stand?

16                    DIRECT EXAMINATION

17  BY MR. CARUSONE:

18  Q    Judge Solomon, good afternoon.

19  A    Good afternoon.

20   Q   Sir, what is your current employment?

21   A   I am a Judge in the Court of Common Pleas of Fayette

22   County Pennsylvania.

23   Q   And how long have you been so employed?

24   A   This is my twentieth year.

25   Q   Were you previously employed by the District Attorney's

1   Office in Fayette County?

2   A   I was.

3   Q   In what capacity, sir?

4   A   Two years as an assistant, first assistant, and then

5   District Attorney of Fayette County.

6   Q   And during what period of time were you the District

7   Attorney in Fayette County; do you recall?

8   A   From October of 1977 until the last day of 1987.  Did I

9   say '78?

10   Q   You said '77.

11   A   '77.

12   Q   Were you the District Attorney in 1986 when then

13   Assistant District Attorney Ralph Warman prosecuted Robert

14   and Ellis Price for the attempted homicide of Raymond

15   Richter?

16   A   I was.

17   Q   Were you the District Attorney in 1978 when Judge Franks

18   granted Ellis Price's motion in arrest of judgment?

19   A   I was.

20   Q   Did your office appeal that ruling of Judge Franks?

21   A   We did not.

22   Q   Did that decision have anything to do with the fact that

23   Ellis Price was a witness in the Breakiron case?

24   A   No.

25   Q   Was there any agreement not to appeal Judge Franks'

1   decision in exchange for Ellis Price's testimony in the

2   Breakiron case?

3   A   No.

4   Q   Do you recall whether Ellis Price ever asked you

5   anything, for anything in exchange for his testimony?

6   A   I don't recall ever meeting Ellis Price.  But he,

7   certainly, never asked me for anything.

8   Q   Do you ever recall receiving any correspondence from

9   Ellis Price asking you for anything?

10  A   No.

11  Q   Did you ever enter into any express or implied

12  agreements with Ellis Price in exchange for his testimony in

13  the Breakiron case?

14  A   No.

15  Q   In fact, were you District Attorney when the Breakiron

16  case was tried?

17  A   I believe it was tried in my first year on the bench.

18  Q   1988?

19  A   Yes.

20  Q   Did you make any promises to Ellis Price whatsoever in

21  exchange for his testimony in the Breakiron case?

22  A   I did not.

23  Q   Judge, finally, did you do or say anything that could

24  have led Ellis Price to believe that he was going to receive

25  some sort of a benefit in the future in exchange for his

1   testimony?

2   A    No.

3        MR. CARUSONE:  Nothing further.

4        THE COURT:  All right.  Thank you.

5        Cross-examine.

6              CROSS-EXAMINATION

7   BY MR. LEV:

8   Q    Judge Solomon, good afternoon.

9   A    Good afternoon.

10  Q    My name is Stuart Lev.  I, with Miss Russell, represent

11  Mr. Breakiron in these proceedings.

12       Judge Solomon, did you supervise the investigation of

13  the Saundra Martin homicide?

14  A    No.

15  Q    Who was responsible for supervising and directing that

16  investigation?

17  A    The prosecuting officer.  Pennsylvania State Police.

18  Q    By the prosecuting officer, do you mean the Pennsylvania

19  State Police officer?  That's the terminology you use in your

20  county?

21  A    Yes.

22  Q    When -- how did you become aware that Ellis Price was,

23  was offering information about Mr. Breakiron?

24  A    I think I heard about it sometime in the fall of 1987.

25  Q    Did you ever see the police report that was prepared by

1   Trooper Brownfield?

2   A   I don't recall.  I don't recall if I did or did not.

3   Q   Who would have provided discovery to the defense?

4   A   Our office would have.

5   Q   In Mr. Breakiron's case?

6   A   Our office.  District Attorney Office of Fayette County.

7   Q   Would it have been you or someone else responsible for

8   that?

9   A   Usually, it would have been Ralph Warman, who is now a

10  judge on the bench and has testified before me.  He was my

11  first administrative assistant and he was primarily

12  responsible for discovery.

13  Q   If a police report had come into your office from

14  Trooper Brownfield, reporting that, that Ellis Price was

15  offering information against Mr. Breakiron, would you have

16  been made aware of that in August of 1987?

17  A   Only if I had been the person in my office who was going

18  to be trying the case.  Since I was not, it probably -- if it

19  did come in, it was never made available to me.  I didn't

20  review all the discovery that came in.

21  Q   Who made the decision not to appeal the arrest of

22  judgment granted?

23  A   Ultimate decision was mine.

24  Q   And why did you make that decision?

25  A   Based upon, based on Ralph Warman's recounting to me

1   what had taken place in the trial and since, since he had

2   tried the case, I relied upon, upon his judgment.  And I read

3   the opinion of Judge Franks.  And based upon what, at that

4   time, Mr. Warman, now Judge Warman, told me, and on the

5   opinion of Judge Franks, I decided not to prosecute the case

6   any further.

7   Q    Would you agree with me that whereafter a shooting

8   occurs, and the shooter and another person get into a car,

9   and as they're driving away, shots are fired from that car,

10  that there is a reasonable argument, a reasonable inference,

11  to be drawn that the driver is an accomplice to the shooter?

12        MR. CARUSONE:  Your Honor, I object to that

13  question.  First of all, the facts of the attempted homicide

14  case are of record and that record would --

15        MR. LEV:  Judge Warman just testified about the

16  facts.

17        MR. CARUSONE:  That is Judge Warman.

18        THE COURT:  He prosecuted the case.  Those are

19  facts of evidence.  So, overruled.

20          You may answer the question.

21          THE WITNESS:  I am sorry.  Could you please repeat

22   the question?

23   BY MR. LEV:

24   Q    If the evidence showed that there was a shooting outside

25   a bar, then the shooter and another person is his brother,

1   got into a car, the brother in the driver's seat, then

2   another shot rang out, came from the car, shattering the

3   passenger side window and putting a witness to the first

4   shooting in danger, would you agree that there is a

5   reasonable inference to be drawn that the driver of the car

6   is at least, if not the shooter, an aider, an abettor, an

7   accomplice of the shooter?

8   A   I couldn't agree on that simple statement of the facts.

9   I could not agree that a reasonable inference would arise.  I

10  would have to hear more.

11  Q   So, if that was the evidence, would you prosecute such a

12  case?

13  A   I don't recall the evidence in the Ellis Price case.  If

14  what you are telling me is the evidence in his case, I have

15  no reason to argue with you.  He was prosecuted.  If that was

16  the evidence he was prosecuted on, I don't know the evidence.

17  I didn't try the case.

18  Q   But let me ask you.  On the basis of facts that I told

19  you, would you, as a prosecutor, as the chief prosecutor in

20   your office, authorize a prosecution on those facts?

21   A   Probably.

22   Q   Even though you don't think it's a reasonable inference

23   to be drawn that the driver is, is involved in the crime?

24   A   Well, you said, initiate a prosecution.  Did you mean

25   investigation?

1  Q    No.  I mean, I mean, go to trial?

2  A    If the facts were such that it was undetermined which

3  one fired the shot, then I would, I would still go forward

4  with the prosecution at that point.

5  Q    Because it's a reasonable inference that somebody's

6  either the shooter or an aider and abettor?

7  A    At that stage of the prosecution, yes.

8  Q    And having gone forward with the trial, you would defend

9  that, take it to the jury, argue vigorously for guilt, and

10  defend a verdict if you got it; wouldn't you?

11  A    If I got a verdict that he was an accomplice, yes.

12  Q    Well, in Pennsylvania, there are no specific verdicts

13  for accomplice liability?

14  A    No.  I'm assuming you are speaking of a responsible

15  conspiracy conviction.

16  Q    I am speaking as liability as an accomplice?

17  A    If he were a co-conspirator and convicted as such, then

18  I would defend that vigorously, if it were overturned; yes.

19  Q    Now, in Pennsylvania, as I understand the law is, there

20   is no separate charge for being an accomplice to a crime;

21   correct?

22   A    If you say so.

23        MR. CARUSONE:  I would stipulate to that.

24   BY MR. LEV:

25   Q    Okay.  And that an accomplice is charged as equally

1   responsible for the, for the crime as the principal of the

2   crime?

3   A   Yes.

4   Q   Is that the law, as you understand it?

5   A   Law as I understand it; yes.

6   Q   And when a person is charged, there's no separate jury

7   verdict on accomplice liability?  They're just charged with

8   the crime and can be convicted either as a principal or under

9   a theory of accomplice liability; correct?

10  A   Correct.

11  Q   You testified that you never received any letters from

12  Ellis Price.  Is that right?

13  A   To my knowledge, I never received a letter from Ellis

14  Price.

15  Q   Did you ever receive a letter from James Sullivan?

16  A   No.  I did not.

17  Q   Did Mr. -- do you know who I mean by James Sullivan?

18  A   I represented Mr. Sullivan one time.

19  Q   Did Mr.  -- I think he kept a lot of Fayette County

20   lawyers in business.

21      Did Mr. Sullivan ever make an effort to contact you with

22   information about the Mark Breakiron case that you are aware

23   of?

24   A   I'm aware of no attempt by him to contact me.  He never

25   has contacted me.  What he may have done, I have no way of

1   knowing.

2   Q   Do you know if anyone in your office was -- had a letter

3   written to them by either Mr. Sullivan or Mr. Price?

4   A   Not to my knowledge.

5   Q   Do you know how Trooper -- how the State Police came to

6   talk to Mr. Price about information about Mr. Breakiron?

7   A   I can only tell you what I heard.  I don't know of my

8   own knowledge.

9   Q   You had nothing to do with directing them to go speak to

10  Mr. Price?

11  A   No.

12  Q   And as far as you know, no one in your office did?

13  A   As far as I know, no one did.

14  Q   Were you aware in 1986 and 1987 of a criminal

15  investigation arising out of an assault and robbery committed

16  allegedly by the Price brothers against a man named Vincent

17  Steurbutzel?

18  A   I have no recollection of any such investigation.

19  Q   Okay.  If -- if, if the State -- if the State Police

20  were investigating a robbery and an assault, and had

21  information as to who the participants were, at what stage

22  would -- while you were District Attorney -- would the

23  District Attorney's Office be involved?

24  A    There is two possibilities.  The first would be when

25  charges were filed.

1     The second would be if, for some reason, they wanted

2   someone to, to wear a wire or something, they would have to

3   get approval through the Courts.  They would come to us in

4   that way.

5     Normally, after charges, they complete their

6   investigation, filed charges, then our office would become

7   involved.

8   Q   Would it be unusual for there to be a two- to three-year

9   lapse of time before the State Police would institute charges

10  in an ongoing investigation?

11     MR. CARUSONE:  Objection.  Calls for speculation on

12  the part of this witness who does not work for the police

13  department.

14     MR. LEV:  He was the District Attorney.

15     MR. CARUSONE:  We've already heard testimony

16  between the time police file the charges and the District

17  Attorney prosecuted them.

18     MR. LEV:  I am asking, from his knowledge, would it

19  be unusual for there to be this long period of time between.

20          MR. CARUSONE:  This --

21          THE COURT:  This witness can testify regarding his

22   experience as District Attorney regarding the lapse between

23   the date of crime and date of charges filed, but he's not

24   going to testify as an expert regarding that issue.  But he

25   can testify regarding his experience.

1          MR. LEV:  That's all I'm asking.

2          THE COURT:  Go ahead, judge.

3   A    My experience as the District Attorney and also as a

4   judge, a number of times crimes are committed but it takes a

5   year sometimes to make an arrest because the information is

6   not sufficient to make an arrest.

7        You mentioned Mr. Sullivan.  He's now serving a life

8   sentence because of a crime that was committed how many years

9   before he was actually arrested.  So, it's not unusual.  It

10  does happen.

11  Q   Would it be unusual for that to happen if there was no

12  new evidence developed during that period of time?

13  A   Between what period of time?

14  Q   Between the time of the crime and the time between, the

15  time of the crime and the time of the arrest.

16       Would it be, would it be unusual if, from the last piece

17  of evidence developed by the police, there was more than a

18  two-year gap between the investigation and the charge?

19  A   I don't know that that ever occurred.  It may have

20  occurred.  I have no recollection of that ever occurring.

21  Q    Do you have any recollection of Ellis Price being a

22  suspect or named as a suspect in an assault and robbery while

23  during the time that he was incarcerated in 1986 and 1987?

24  A    No.

25         MR. LEV:  Thank you, Judge Solomon.  I don't have

1  anything further.

2       THE WITNESS:  You're welcome.

3       THE COURT:  All right.  Thank you.

4       Redirect?

5       MR. CARUSONE:  Yes, Your Honor.

6              REDIRECT EXAMINATION

7  BY MR. CARUSONE:

8  Q   Judge Solomon, referring to the Steurbutzel matter that

9  you were just questioned about.  Did you order the delay in

10  the filing of those charges because of Ellis Price's

11  cooperation in the Breakiron case?

12  A   No.  I didn't even know about that case.

13  Q   You were presented with a series of hypothetical facts

14  and you were asked to render judgments just based on those

15  facts.

16      Sir, is it fair to say that you do not have a complete

17  command on all of the facts in the prosecution of Ellis Price

18  and Robert Price for the attempted homicide case?

19  A   That would be very fair to say.

20          MR. CARUSONE:  Nothing further.

21          THE COURT:  Thank you, Judge Solomon.  You are

22   excused.

23          THE WITNESS:  You're welcome.  Thank you, Your

24   Honor.

25          (Whereupon, witness was excused from the witness

1   stand.)

2        MR. LEV:  Your Honor, can we take a brief recess?

3        THE COURT:  Now is a good time for that.  We'll

4   take a fifteen-minute recess, reconvene at 2:55.  Let me just

5   see counsel briefly at side-bar.

6        (Whereupon, an off-the-record discussion was had,

7   and the afternoon recess was had.)

8                    - - -

9        (Whereupon, the following was had in open Court.)

10       MR. CARUSONE:  Commonwealth calls Earl Roberts.

11       THE COURT:  Mr. Roberts, will you step to the front

12   to be sworn?

13       THE DEPUTY CLERK:  Please raise your right hand?

14       EARL F. ROBERTS, A WITNESS, having been first duly

15   sworn, was examined and testified as follows:

16       THE DEPUTY CLERK:  State your name, please?

17       THE WITNESS:  Earl F. Roberts.

18       THE DEPUTY CLERK:  Take the witness stand, please?

19            DIRECT EXAMINATION

20  BY MR. CARUSONE:

21  Q   Mr. Roberts, good afternoon?

22  A   Good afternoon.

23  Q   How are you currently employed, sir?

24  A   I'm a tipstaff for Judge Liskenin.

25  Q   And prior to that, how are you employed?

1    A    Pennsylvania State Police.

2    Q    How many years did you have with the state police?

3    A    Twenty-five and a half.

4    Q    Did you investigate the attempted homicide of Raymond

5    Richter?

6    A    Yes.

7    Q    Did you have any role in the District Attorney's

8    decision not to appeal Judge Franks' decision granting Ellis

9    Price's motion in arrest of judgment?

10    A    No.

11    Q    Did Ellis Price ever approach you and ask you for

12    anything in exchange for his testimony in the Breakiron case?

13    A    No.

14    Q    Did you ever enter into any agreements of any kind,

15    both express or implied, with Ellis Price that you would give

16    him some benefit in exchange for his testimony?

17    A    No.

18    Q    Did you ever do or say anything that would have led

19    Ellis Price to believe that he was going to receive some sort

20  of a benefit in exchange for his testimony against Mark

21  Breakiron?

22  A   No.

23  Q   Did you ever give him anything of value in exchange for

24  his testimony in the Breakiron case?

25  A   No.

1   Q   Ever make any promises to him of anything, any benefit

2   whatsoever, in exchange for his testimony?

3   A   No.

4        MR. CARUSONE:  Nothing further.

5        THE COURT:  Thank you, Mr. Carusone.

6        Cross-examine.

7        MS. RUSSELL:  Just one question.

8                CROSS-EXAMINATION

9   BY MS. RUSSELL:

10  Q   Did you have any involvement in the investigation of the

11  Breakiron case?

12  A   Yes.

13       MS. RUSSELL:  Nothing further.

14       MR. CARUSONE:  Thank you, Your Honor.

15       MR. LEV:  Excuse me.

16  BY MR. LEV:

17  Q   Mr. Roberts, did you have any involvement in talking

18  with Ellis Price regarding his knowledge of the Breakiron

19  case?

20   A   No.

21   Q   You never talked with Ellis Price at the Fayette County

22   Jail?

23   A   I believe I didn't; no.

24        MR. LEV:  Nothing further.

25        MR. CARUSONE:  Thank you.

1          THE COURT:  All right.  You are excused.  Thank

2   you, Mr. Roberts.

3          (Whereupon, the witness was excused from the

4   witness stand.)

5          MR. CARUSONE:  Mr. Lepore.

6          THE COURT:  Mr. Lepore, will you step to the front,

7   please, to be sworn?

8          ALPHONSE P. LEPORE, ESQUIRE, A WITNESS, having

9   been first duly sworn, was examined and testified as follows:

10         THE DEPUTY CLERK:  Would state your name and spell

11  your name, please?

12         THE WITNESS:  Alphonse P. Lepore.  Alphonse,

13  A-L-P-H-O-N-S-E, middle initial P., last name L-E-P-O-R-E.

14         THE DEPUTY CLERK:  Thank you.

15         MR. CARUSONE:  Your Honor, by agreement, I am going

16  to move for admission of Commonwealth Exhibit D, which is the

17  Pennsylvania State Police report into the Vincent Steurbutzel

18  case.

19         MR. LEV:  We agree, Judge.

20        THE COURT:  D is admitted.

21              DIRECT EXAMINATION

22  BY MR. CARUSONE:

23  Q    Good afternoon, Mr. Lepore.  How are you currently

24  employed?

25  A    I am a employed, currently, as the deputy chief counsel

1   for the Pennsylvania Turnpike Commission.

2   Q    Are you the former District Attorney of Fayette County?

3   A    I am.

4   Q    And what were your years as District Attorney of Fayette

5   County?

6   A    I started about May of '88 and left there, I believe, in

7   '90 or late '90, early '91.

8   Q    Prior to becoming District Attorney, how were you

9   employed?

10  A    I was employed in private practice in the Fayette

11  County.  For the twelve years prior to becoming the District

12  Attorney, I was the Fayette County Defender in various

13  positions there.

14  Q    Mr. Lepore, I want to draw your attention to March 10 of

15  1998.  Were you contacted by the Pennsylvania State Police

16  about extraditing Ellis Price for the aggravated assault for

17  the Vince Steurbutzel?

18  A    Yes.

19  Q    What was your decision; do you recall?

20    A    I do.  I recall discussing that with Trooper Nickel.  My

21    decision at that time that was Ellis Price was in Michigan

22    serving a long sentence for another crime.  We chose not to

23    extradite him.

24    Q    Who made that decision?

25    A    I made that decision.

1  Q    Did that decision have anything to do whatsoever with

2  the fact that Ellis Price had previously testified against

3  Mark Breakiron?

4  A    It was in no way related to that fact.

5  Q    Did you have any connection with the Mark Breakiron

6  case?

7  A    When I was the Public Defender, that case came into our

8  office when it happened and it was assigned to another

9  attorney to try.  Whenever I left the Public Defender's

10  Office, I had a brief hiatus before I went into the District

11  Attorney's Office and Mark Morrison was the prosecutor on

12  that case.

13  Q    While -- when you became District Attorney, did you take

14  any steps to separate yourself from the Breakiron case?

15  A    During that period when I was out of the Public

16  Defender's Office and before I had taken the oath as the

17  District Attorney, that case was tried and I made it a point

18  not to read anything, not to pay any attention to it, not to

19  discuss it with anyone.  So, when I began my position as

20   District Attorney, I had no knowledge of the trial

21   whatsoever.

22   Q    Did Ellis Price ask you not to extradite him from

23   Michigan?

24   A    No.  I never had any discussion with Ellis Price

25   whatsoever.

1   Q   So, you never had any express or implied agreements with

2   Ellis Price whatsoever?

3   A   That's correct.

4   Q   Did you promise anything to Ellis Price?

5   A   No promises were made to anyone.

6   Q   Did you give him -- did you say or do anything that

7   would have led Ellis Price to believe that he was receiving

8   some sort of a benefit in exchange for his testimony in the

9   Breakiron case?

10  A   No.  There was no way he could have construed anything I

11  would have said.

12        MR. CARUSONE:  Thank you.  Nothing further.

13        THE COURT:  All right.  Cross-examine.

14              CROSS-EXAMINATION

15  BY MS RUSSELL:

16  Q   Good afternoon, Mr. Lepore.  How are you?

17  A   Good afternoon, Miss Russell.  I am well.  Thank you.

18  Q   You mentioned that you were District Attorney from May

19  of 1988 until May of 1990.  Did I get that?

20  A   I don't recollect the time I left the office.  It was

21  either 1990 or 1991.

22  Q   Okay.  And before that, did you practice?  Were you a

23  defense attorney, prosecutor?

24  A   Before I was?

25  Q   District attorney?

1   A    I was in the Public Defender's Office for almost twelve

2   years.

3   Q    So, on a total, how long did you practice criminal law

4   in Fayette County?

5   A    Almost sixteen -- almost sixteen years.

6   Q    During that time you were practicing law in Fayette

7   County, did you ever have a judge grant you an arrest of

8   judgment in any of your cases?

9   A    An arrest of judgment?  No.

10  Q    Did you ever hear about an arrest of judgment being

11  granted in a case by a judge in Fayette County?

12  A    Only from you.  I guess the answer to the question you

13  want is I don't have any recollection while I was there of

14  any judge granting such a motion.

15  Q    When you made the decision to not extradite Ellis Price

16  for the assault and robbery in the Vincent Steurbutzel case,

17  did you review the case history or the, the investigative

18  report, supplemental report, the crime reports?

19  A    I would have looked at those before I made that

20  decision.

21  Q    Would you agree that it was a fairly brutal assault and

22  robbery by three or four guys?  They stole this guy's car,

23  they burned it, they beat him up pretty, pretty bad?

24  A    That's a fair statement of it.

25  Q    Did you also learn by reviewing this case or would you

1  agree that in 1986, of course, this crime occurred in January

2  of 1986, in July of 1986, that one of the defendants Mark

3  DeMadio (Spelled phonetically.) identified the other three

4  participants, that being Ellis, Kevin, and Robert Price?

5  A    DeMadio made such a statement; that's correct.

6  Q    I understand that you weren't involved in the

7  prosecution as District Attorney until you came into office

8  of 1988.  Did you ever make any inquiries to the delay of why

9  these three gentlemen weren't prosecuted?

10  A    I was only concerned with Ellis Price at that point and

11  I didn't -- I knew he was in prison in Michigan.

12  Q    How did you learn that Mr. Price was in prison in

13  Michigan?

14  A    We would have either run an NCIC on him or the officer

15  would have brought that with him.

16  Q    So, you never made any inquiries?  You never asked the

17  police officer?  You never even noted it that there was some

18  three-year delay from the time this crime was committed to

19  the time that Kevin was brought to trial?

20  A    Kevin Price was brought to trial and Robert Price pled

21  nolo contendere.

22  Q    And your decision not to prosecute Ellis?

23  A    Your question is?

24  Q    Is that, did you ever make any inquiries or did you ever

25  note it, talk to the officers about it, or the prosecutors in

1  this case, about why there was no activity on this case from

2  the date the crime occurred in 1986 to the date, that of the

3  final disposition of the three gentlemen involved?

4       MR. CARUSONE:  I object.  That misrepresents the

5  content of the Commonwealth Exhibit D.  So, it's

6  misrepresenting facts that are in evidence, that there was

7  nothing going on between the time of the assault and the time

8  of the decision.

9       THE COURT:  All right.  Why don't you rephrase,

10  Miss Russell.

11      MS. RUSSELL:  Okay.  Let me rephrase that.

12  BY MS. RUSSELL:

13  Q   There was no activity -- am I mistaken, in fact, that

14  there was no activity from the time that Mark DeMadio gave

15  his statement identifying Kevin Price, Ellis Price, and

16  Robert Price, in July of 1986, until those three were either

17  disposed -- their cases were disposed of in 1989?

18      MR. CARUSONE:  Your Honor, I object.  The exhibit

19  speaks for itself.  And if we want Mr. Lepore to tell us

20  what's in the police report, then he'll have to be presented

21  with it, review it.  The exhibit actually speaks for itself

22  as to what the investigative steps were in the case.

23  Cumulative.

24       MS. RUSSELL:  I'll move on.

25  BY MS. RUSSELL:

1  Q   Were you aware of, at the time you made your decision

2  not to extradite Ellis Price from Michigan for the

3  Steurbutzel assault, were you aware that Ellis Price been

4  extradited in 1986 for an attempted murder charge?

5  A   I knew he had been extradited once before.

6  Q   Would you admit that the charges or do you know the

7  charges he was extradited on in 1986?

8  A   I don't recall what they were.

9        MS. RUSSELL:  I have nothing further, Your Honor.

10        THE COURT:  All right.  Thank you, Miss Russell.

11        MR. CARUSONE:  One question, Your Honor.

12                REDIRECT EXAMINATION

13  BY MR. CARUSONE:

14  Q   Sir, did you purposely delay final disposition of the

15  Steurbutzel matter in any way?

16  A   No.

17  Q   Did you have any role or input in the timing of the

18  events as it occurred in the Steurbutzel investigation?

19  A   None whatsoever.

20          MR. CARUSONE:  Nothing further.

21          THE COURT:  All right.  Thank you, Mr. Lepore.

22          THE WITNESS:  Thank you, Your Honor.

23          THE COURT:  You are excused.

24          (Whereupon, the witness was excused from the

25   witness stand.)

1          MR. CARUSONE:  Final witness is Special Agent Greg

2    Kerpchar.

3          THE COURT:  Would you step to the front of the

4    courtroom, please, to be sworn?

5          THE WITNESS:  Yes, Your Honor.

6          GREGORY KERPCHAR, A WITNESS, having been first duly

7    sworn, was examined and testified as follows:

8          THE DEPUTY CLERK:  State your name, for the record,

9    and spell your last name?

10          THE WITNESS:  Gregory Kerpchar, K-E-R-P-C-H-A-R.

11          MR. CARUSONE:  One moment, Your Honor.

12                    DIRECT EXAMINATION

13    BY MR. CARUSONE:

14    Q    Good afternoon.

15    A    Good afternoon.

16    Q    Sir, are you the -- currently retired from the Office of

17    Attorney General; correct?

18    A    That's correct.

19    Q    How were you employed with the office?

20  A    As a special agent with the Bureau of Criminal

21  Investigation.

22  Q    I want to draw your attention to March 7, 2005.  At that

23  time, did you have occasion to interview James Francis

24  Sullivan?

25  A    Yes.

1  Q    Do you recall where that interview took place?

2  A    Took place at the State Correctional Institution at

3  Dallas, Pennsylvania.

4  Q    Did you interview him concerning his affidavit that he

5  had filed in support of Mark Breakiron?

6  A    Yes, I did.

7  Q    Did you prepare a report of your interview with

8  Mr. Sullivan?

9  A    Yes, I did.

10  Q    I want to turn to the second page of your report.  I

11  believe it's page 9 overall of your investigative report.  Do

12  you have that in front of you?

13  A    Yes, I do.

14  Q    Do you recall asking Mr. Sullivan about whether he, or

15  Ellis Price, or Clinton Conrad Blair, received any benefit at

16  all from the DA's Office?

17  A    Yes, I did.

18  Q    Do you recall what he said, if you would look at your

19  report?

20   A    Yes, I do.  He said that neither -- excuse me.  That

21   none of them received any type of consideration in return for

22   that.

23   Q    That would include which folks?

24   A    That would include the author of the letter, which would

25   be Mr. Sullivan, Mr. Ellis Price, Bob Price, and Clinton

1  Blair.

2  Q    Did you also speak with Mr. Sullivan about whether Mark

3  Breakiron ever confessed to him that he had killed Saundra

4  Martin?

5  A    Yes, I did.

6  Q    Can you tell me what, what he told you?

7  A    Yes, he did.  Mr. Sullivan advised me that Mr. Breakiron

8  did confess to the killing of Miss Martin.

9  Q    And did he add anything else as to why?

10  A    Yes, he did.  Do you want me to read verbatim, quote?

11  Q    Yes.

12  A    This is the quote, Mark killed Saundra because she was a

13  common whore and Mark wanted to fuck her and Saundra didn't

14  want anything to do with mark, other than being friends.

15  Close quote.

16        MR. CARUSONE:  Nothing further.

17              CROSS-EXAMINATION

18  BY MR. LEV:

19  Q    Agent Kerpchar, you wrote your report the day after you

20    spoke with Mr. Sullivan?

21  A   That's correct.

22  Q   Did you write your report from notes?

23  A   That's correct.

24  Q   Where are your notes?

25  A   I would have -- the Office of the Attorney General

1  policy at the time would have been that the notes would have

2  been destroyed upon the completion of report, as long as the

3  report comported to the notes.  They would be purged.

4  Q   So, you're telling me those notes are destroyed?

5  A   That's correct.

6  Q   Okay.  I take it that Mr. Sullivan never had a chance to

7  read your report?

8  A   No.  He did not.

9  Q   You didn't go back and check the accuracy to see whether

10  he would adopt the accuracy of your report; did you?

11  A   No.  I did not.

12  Q   You didn't take a verbatim interview with him?

13  A   I attempted to, but the tape recorder malfunctioned.

14  Q   So, so, your report reflects a summary of what you

15  talked about, based on your notes?

16  A   That's correct, sir.

17  Q   How long did you talk to Mr. Sullivan for?

18  A   Approximately, thirty minutes.

19  Q   Were you involved in taking a statement from Robert

20   Price relating to this case?

21   A   Yes, I was.

22   Q   And then you went back a couple weeks later, had

23   Mr. Price write out a statement?

24   A   That's correct.

25   Q   Why did you do that?

1    Well, strike that.  You didn't do that with

2  Mr. Sullivan?

3  A   No.  I did not.

4        MR. LEV:  I have nothing further.

5        MR. CARUSONE:  Your Honor, just briefly.

6              REDIRECT EXAMINATION

7  BY MR. CARUSONE:

8  Q   Is your report accurate?

9  A   Yes, it is.

10  Q   And I notice that language -- that you have certain

11  language in quotes, Mark killed Saundra because she was --

12  that that language is actually in quotes?

13  A   That's correct.

14  Q   What is the significance of the quote?

15  A   Quote would be a verbatim statement attributed to

16  Mr. Sullivan.

17        MR. CARUSONE:  Nothing further.

18        MR. LEV:  Nothing.

19        THE COURT:  All right.  Thank you, Special Agent

20    Kerpchar.  You may step down.

21          THE WITNESS:  Thank you, Your Honor.

22          (Whereupon, the witness was excused from the

23    witness stand.)

24          MR. CARUSONE:  No further evidence, Your Honor.

25          (Whereupon, Defendants rest.)

1        MR. LEV:  Nor from us.

2        THE COURT:  All right.  First, let me commend

3   counsel for the efficient presentation of testimony today.  I

4   appreciate the preparation that you put into this because we

5   covered a tremendous amount of ground.

6        I think I would benefit from hearing some argument

7   from you to synthesize the evidence that we heard today.  I'm

8   not going to make any rulings today, but I would appreciate a

9   synthesis, then I think what we ought to do is get detailed

10  proposed findings of fact and conclusions of law within

11  thirty days of the --

12        MR. LEV:  Of the transcript?

13        THE COURT:  Of the transcript.

14        My secretary advises me by e-mail that I just

15  received motion for temporary restraining order.  So, I think

16  what we ought to do is let me give you a chance to take a

17  break.  It's been a grueling day for you.  Why don't you take

18  a break, gather your thoughts, let me deal with this other

19  matter, and then have you come back in about fifteen minutes

20    or so?

21          MR. CARUSONE:  Leave the courtroom, Your Honor?

22          THE COURT:  If you wouldn't mind.

23          (Whereupon, a recess was had.)

24                    - - -

25          (Whereupon, the following was had in open Court.)

1          THE COURT:  Okay.  Let's go back on the record.

2          If counsel could just give me ten minutes each

3    side, a synthesis, to help me continue to think about this

4    while we're awaiting preparation of the transcript and then

5    your written proposed findings.  That would be helpful.

6          Mr. Lev.

7          MR. LEV:  Okay.  Thank you, Your Honor.

8          I think underlying the claims here are a number of

9    factual questions that, that we addressed during the hearing

10   today.  And let me address some of those in my view of those.

11   And I think that these are some of the important questions

12   that you are going to need to think about and answer in

13   resolving these issues.

14          The first question is were letters written?  Did

15   Ellis Price write a letter or letters to the District

16   Attorney's Office?  And I think we showed today the answer to

17   that question is yes, that Mr. Sullivan testified to that.

18   And I understand that, that one looking at Mr. Sullivan, on

19   his face, would have questions about his credibility.  But I

20   think it was supported by other evidence.

21          THE COURT:  It seems to me there were two letters

22   written.  Ellis Price himself testified that he signed a

23   letter prepared by Jim Sullivan and then Ellis Price

24   testified that he himself, apparently, on his own initiative,

25   wrote a later letter.

1       MR. LEV:  We know at least the letter that was

2   signed by, signed with Sullivan was asking for some kinds of

3   benefit in exchange for their testimony.  Sullivan testified

4   to that.

5       Miller, who wasn't a part of it, who was, I think

6   Miller is an important witness here, because Miller stayed

7   away from them.  He said, I don't want to be involved in

8   this.  I don't want any part of this business.  But he saw

9   what they were doing.

10       And I also think that it makes, and that it makes

11   common sense.  Sullivan's not the kind of guy, I think, that

12   is going to be writing letters to the District Attorney

13   offering, out of the goodness of his heart, to give

14   information.  If there is a letter from Sullivan and Price,

15   it's a letter looking for benefits.  And I think that makes

16   sense.

17       I think that's, that's common sense, is that

18   criminals, people in jail, and these are people all of whom

19   are people with serious and long criminal histories who have

file:///A|/BREAKA.TXT

20  been through the system, who know how it works, who have

21  serious charges pending, and have been in serious convictions

22  before, and aren't volunteering out of the goodness of their

23  heart to give information that Ellis Price, who, who stabbed

24  somebody in a robbery in Michigan, isn't likely to be giving

25  information just because he was offended by the homicide.

1          What's likely, what makes more sense, is he is

2  looking at least at first to give information.  He gets into

3  this because he's hoping for some kind of benefit for himself

4  or for his brother.

5          So, were the, were the letters written?  I think

6  the answer is yes.  Was Ellis looking for help?  I think the

7  answer is yes.  I think another way we know that somehow, and

8  I mentioned this at side-bar before, the question that's

9  unanswered on this record is how did Trooper Brownfield come

10  to Ellis Price?  Where did that information come from?  The

11  DAs say they never got it.  Brownfield says, I don't know.

12  I was just told to go there.

13          You know, but somehow we know these letters were

14  written.  We know somehow Brownfield was told to go and talk

15  to Price.  So, there's something there.  There's something

16  there that, that's being -- that's not been disclosed.

17          Ellis Price also told us that he talked to several

18  officers and that he signed a second statement, a signed

19  statement that was type-written and brought back to him, that

20   he signed.  That's another statement that's never been

21   disclosed.  That no one has ever taken responsibility for.

22          The prosecutors have never admitted having that

23   there is no State Police trooper who ever said he took such a

24   letter and no, no such statement from Ellis Price that was

25   ever turned over to the defense.  So, so there's another open

1   question about what's going on here, you know.

2        Where's -- what's the deal with the sentence.  We

3   talked about this a little bit and, clearly, this is going to

4   have to be something I need to research more and brief for

5   you.  Are the letters themselves Brady material.  I think

6   that they are because I think that letters show that a

7   motivation for a witness to, to come forward with purported

8   evidence, that they're looking for a benefit, that that

9   motivation goes, can be used to impeach the credibility of

10  their testimony, particularly, when they testify at trial

11  that their only motivation was because they were offended by

12  the crime and that they had no other motivation in coming

13  forward to the police or provide -- for providing that

14  testimony.

15        And, so, I think those letters are legitimate

16  impeachment material.  I think that if a defense lawyer had

17  them and used them, that, Your Honor, if you were hearing

18  that trial, would allow that questioning of the witness about

19  their motivation for coming forward.  And I think that makes

20   it exculpatory evidence that should have been disclosed under

21   Brady.

22          THE COURT:  Let me just cut you off there for a

23   minute.  I know what I am about to ask you to assume is

24   anthema to you.  Suspend your disbelief.

25          MR. LEV:  I have had judges do that to me before.

1          THE COURT:  Assume for the minute that anthema.

2     That there was ample evidence of Mr. Breakiron's intent and

3     no real evidence of diminished capacity, separate and apart

4     from whatever Ellis Price testified to.  In other words,

5     Ellis Price wasn't, quote, icing on the cake.  Ellis Price

6     was a side show that wasn't material to the jury's decision.

7     But then what --

8          MR. LEV:  Well, let me, let me answer that by

9     disagreeing with you, in part.  I would say -- and I was

10     going to say that Brady, of course, has two components.

11     There is, there's the failure to disclose exculpatory

12     material and then there is the materiality standard.  And in

13     order for there to be a constitutional violation, not only

14     does there have to be a failure to disclose, the evidence

15     that's not disclosed has to be material.

16          Certainly, the question you are asking me goes to

17     the materiality.  And if, if you were to review this record

18     and find that there was overwhelming evidence of Breakiron's

19     intent and little evidence of his intoxication, and as an

20  aside, I would say to you, I would remind you, Judge

21  Hardiman, that our first claim in the habeas petition is that

22  defense counsel was ineffective because they botched the

23  investigation into the intoxication, diminished capacity

24  defense by failing to do an adequate investigation by failing

25  to use expert testimony that would have bolstered Breakiron's

1  claim.  The intoxication defense was presented solely with

2  himself, with no corroborating supporting expert testimony.

3  But that's an aside.  We'll put that aside.

4      THE COURT:  Let me just ask you one other question.

5      You've said or posed the question, were letters

6  written.  It seems to me the answer to that is, yes.  It

7  seems to me two letters were written.  Was Ellis Price

8  looking for help?  Not so sure.  Maybe yes.  Maybe no.

9      The next question seems to me is, did Ellis Price

10  actually receive consideration.  And the answer seems to me

11  to be, no.  Fairly overwhelmingly, from what we heard today.

12  You take issue with that.

13      MR. LEV:  If you, if you accept that testimony at

14  face value.  My, our position on there, and I understand what

15  the evidence is, there is a series of circumstantial

16  evidence.  Does that create an inference?  We know good

17  things happened to Ellis Price.  Now, whether they would have

18  happened without his cooperation, who knows.

19      But having that arrest of judgment granted, and although

file:///A|/BREAKA.TXT

20   Judge Warman said it's done fairly often, that is not my

21   experience.  And I don't know if that's true, but Mr. Lepore

22   said, in all his years of practicing law and being the Public

23   Defender for twelve years, he's never seen an arrest of

24   judgment granted in Fayette County before.  Strikes me as the

25   more likely scenario of how unusual that is.

1        And then, for the District Attorney's Office not to

2   appeal it.  The one thing I thought to me was fairly clear,

3   is, this was a very appealable issue.

4        THE COURT:  But if they had a habit of not

5   appealing these things, they're busy, defending appeals

6   raised by disappointed defendants.  So, that seemed to me to

7   be credible.  I agree with you to the extent that there was

8   --

9        MR. LEV:  I don't want --

10        THE COURT:  To the extent there was a suggestion

11   that arrest of judgment is a common occurrence, no.  I think

12   they may not be exceedingly rare.  But, but that seems to me

13   to beg the question, because the Judge that issued the arrest

14   of judgment can't speak.  He's decreased; correct?

15        MR. LEV:  Correct.

16        THE COURT:  So, the reason I said earlier that it

17   seems to me clear that Ellis Price did not, in fact, receive

18   consideration in exchange for his testimony in the Breakiron

19   case is that I would have to find that a whole series of

20  witnesses I heard today, including two sitting judges, former

21  District Attorneys, are all in some grand conspiracy in lying

22  on that issue.

23         So, I don't deny the fact that you have some

24  temporal circumstantial evidence that raises a question mark

25  regarding the issue, but in weighing the scales of that

1  circumstantial evidence I have a mountain of direct

2  testimonial evidence to the contrary.

3      MR. LEV:  And I understand that.  And that is

4  something you are going to decide for yourself.  And I could

5  talk from here to eternity, but you are still going to make

6  the decision of what you believe and what you found credible.

7      And, so, we can continue this discussion with the

8  assumption that, that your likely finding is that there was

9  no actual deal and, no, no quid pro quo benefits given.  And

10  I think that even with that we still have viable claims.

11      And let me go back to Ellis Price.  Ellis Price

12  testified that Breakiron told him he was sitting, that he was

13  at the bar that night, drinking.  And that as, as most people

14  had left, there were just a few people left.  Breakiron told

15  Price, according to Price, that he went into the bathroom and

16  hid and waited until everybody else left and then came out.

17      That is evidence of planning and premeditation and

18  intent that doesn't come from anything else.  There is

19  nothing else that even supports it.  Everything else is much

20   more consistent with all these events leading up to the

21   killing with a kind of unplanned thing.

22          Breakiron is in the bar for hours, drinking.  He's

23   talking to people in the bar who he knows not making any

24   attempt to hide himself, hide his identity, hide his presence

25   there.  His truck, which is a beat-up truck, very

1   recognizable with out of state plates, is in the parking lot.

2   And people know that it was the last truck in the parking

3   lot.

4          So, this is not the kind of thing where you could

5   look at what happened and say, this was a planned robbery.

6   This was something that happened.  Something horrible that

7   happened, but something that happened in the bar that night

8   while he was drinking.

9          Ellis Price's testimony was really, was very

10  important because of that element of premeditation and

11  planning of going into the bathroom and hiding.  That comes

12  from nothing else.

13          All the other elements of intent and of intent to

14  kill come from the nature of the crime itself.  The brutality

15  of the beating and the establishing.  And not from and from

16  marks actions afterwards of trying to cover up and hide it.

17  And that's very different evidence than the kind of evidence

18  that Ellis Price gave that's why I think Ellis Price and his

19  motivations and the truthfulness offer his testimony was

20    very, very material to this case.

21          There's one other element I think that I want, that

22    I want to discuss with you a little bit and that that's the

23    Steurbutzel information, which, which the Steurbutzel police

24    reports, and I think you got the gist of this.  The

25    Steurbutzel incident was a crime that occurred in January of

1   '86.  And a few months later, I don't remember if it was June

2   or July, a guy named Mark DeMadio admitted his participation.

3   It was a brutal crime.  Guy who was beat up twice, actually.

4   Beat very badly.  Seriously injured.  Car stolen, later

5   found, burned.  Money stolen.  Clothes stolen.  Mark DeMadio,

6   a few months later, admits his participation in the crime.

7   Names three of the Price brothers, Ellis, Robert, and I

8   forget who the third one --

9          THE COURT:  Kevin.

10         MR. LEV:  That's right.  Ellis, Robert, and Kevin.

11  Then, no charges are brought at that time.  Nothing is done

12  with that case.  And, at the time of this trial, at the time

13  Ellis Price testified against Breakiron, at the time of

14  Breakiron's trial, there is an open criminal investigation

15  with Ellis Price named as a suspect in a serious robbery and

16  assault that could cost Ellis Price a lot of time if they

17  were prosecuted and convicted of that case.

18         Now, the District Attorneys, the prosecutors who

19  testified before us today, said they didn't know anything

20    about it.  And let's take that at face value, for now.  The

21    police did.  And under Brady, under Kyles v. Whitley, the

22    prosecutors are charged with the knowledge that law

23    enforcement has.  And so, the fact that law enforcement has

24    an open investigation against Ellis Price, on serious

25    charges, is information that could be used to question Price

1   to impeach his bias, his motivation to testify favorably to

2   the Commonwealth, to impeach his testimony, that he is only

3   there out of his own good will, that, to me, even now,

4   putting aside the question of whether there is a deal or not,

5   that to me is clearly Brady material that there is an

6   obligation to disclose, whether the individual District

7   Attorney trying the case knew of it or not, because the

8   police had knowledge of it and the same police, State Police,

9   same police are prosecuting, the prosecuting authority,

10   started off the Breakiron thing.

11        And, so, now, when we're talking about materiality,

12   we're looking at information that could have been presented

13   to the jury with Ellis Price.  Now, we're looking at, at his

14   motivation, looking for some kind of benefit for himself and

15   for his brother.  We're looking at these outstanding

16   investigations that have not been charged, even though the

17   evidence is there, the investigation is there.  Charges have

18   never been brought against them.

19        We're looking at this decision not to appeal.  For

20   whatever that's worth, there's evidence, impeaching evidence

21   that could go to the jury that could shed doubt on Ellis

22   Price's credibility.  And if you take Ellis Price out of the

23   picture at trial, then the question of intent to kill here

24   and whether it's a first, second, or third degree murder,

25   that's all we're talking about, the question of intent

1    becomes a much different question.  It's a question that

2    reasonable jurors could have a doubt about.  And that's all

3    Breakiron iron has to show; right?

4          It's the Commonwealth's burden to prove intent to

5    kill, the premeditated, deliberate, and specific intent to

6    kill beyond a reasonable doubt.  There is, there is

7    sufficient evidence, there's evidence from which a jury could

8    have a reasonable doubt as to whether Breakiron harbored that

9    intent.  It could still be second degree murder.  It could

10   still be a commission in the commission of a felony for the

11   robbery.  If they disbelieve Breakiron's testimony about the

12   robbery, it could be a third degree murder.  And it would

13   still be a homicide, but a marked difference.  That's what we

14   are talking about here, Judge.  We are talking about the

15   death penalty in this case.  We're talking the possibility of

16   death versus life imprisonment.  That's where Ellis Price's

17   testimony goes to.  That's why, in our view, it's so

18   important to it.

19          Now, I know I am running on fast on the Steurbutzel

20   stuff that has not been formally pled, even though it was the

21   subject of this hearing, because that information was brought

22   out during the discovery process that Judge Standish ordered,

23   and then you took over and supervised, and then was the

24   subject of the hearing.

25          So, for your benefit, it is our intention, probably

1  at the same time we do findings of fact and conclusions of

2  law, we'll likely file a motion to amend our claim to include

3  that information and that allegation as part of our Brady

4  claim.

5       THE COURT:  All right.  Thank you very much,

6  Mr. Lev.

7       MR. LEV:  Thank you, Your Honor.

8       THE COURT:  Mr. Carusone.

9       MR. CARUSONE:  Your Honor, thank you.

10       First of all, intent to kill can be formed in an

11  instant.  That is the law in Pennsylvania.  I think that's

12  consistent with federal law.  Can be formed in an instant.

13       Does it require extensive planning, premeditation?

14  When you look at the facts in this case, as evidenced by the

15  trial record, you'll see that Mark Breakiron -- Saundra

16  Martin -- stabbed Saundra Martin twenty times.  Slashed her

17  in the neck, bashed her in the head, stripped her down naked,

18  hid her in the woods.  These are all facts which show a

19  person who is deliberate in their actions and who can form

20    and as a capacity to form specific intent to kill.  Not a

21    person who's in some drunken, mental rage.   Doesn't know

22    what he is doing.  He knew exactly what he was doing.  He

23    knew it because he tried to cover it up.

24          So, this idea that Ellis Price's testimony was the

25    lynch pin to the jury's finding of specific intent to kill

1  doesn't make sense when you look at the overwhelming evidence

2  of specific intent to kill that existed in this case.

3       Your Honor, there was some discussion by counsel of

4  the Steurbutzel case and, still, some argument before the

5  Court that somehow there was some kind of a deal in that

6  case.  And that the police and that the prosecutors, that,

7  really, it wasn't, it wasn't because of what Alphonse Lepore

8  said, that there had to be some other evil motive behind the

9  decision not to extradite Ellis Price.  And just from

10  experience in a county DA's office, especially one that's as

11  small as Fayette County, it's an expensive proposition.  You

12  don't extradite everybody.

13       You had the decision-makers.  One of the keys that

14  I wanted to present to the Court today, which is why I called

15  so many people, is I wanted to bring the decision-makers to

16  you so that when you are presented with theories and

17  suspicious, timing, you hear from the decision-makers own

18  mouth why they did what they did, why didn't they file an

19  attempt to homicide case, why didn't they extradite Ellis

20  Price.

21       You heard from the decision-makers.  I gave you

22  direct testimony.  They've given you theories about why

23  things were the way they were.

24       There was mention of Kyles v. Whitley and I believe

25  that that case, I am pretty sure that case was decided after

1   the trial in this case.  And, in fact, there was a series of

2   Pennsylvania decisions following Kyles versus Whitley, which

3   in Pennsylvania which still were going under the old rule.

4   Old rule, of course, that the DA's Office was only

5   responsible for disclosing discovery, that which was in its

6   possession and control.

7          And, when I was in the DA's office, that was the

8   rule.  Then the law changed somewhat after Kyles, but that

9   change came very slow in Pennsylvania.

10         So, to say now, in 2007, that we're going to apply

11  the law of 2007 as it exists, when it comes to obligations

12  for discovery extending to police agencies, and then turn

13  back and say, okay, that applies to a trial which occurred in

14  1988, that's not consistent with federal law.  And I would

15  ask you to consider that argument.

16         The Court went through a series of factual

17  questions and gave its opinion on how you think you come out

18  on it.  I don't know that I'll revisit that.  The legal

19  question is, is, are letters -- let's assume for argument

20   that letters were written and that Ellis Price signed the

21   letter which -- in which he requested some benefit; okay?

22   And I dispute that, but let's say for the moment that's true.

23          THE COURT:  Let me cut you off for a moment.  Do

24   you dispute the content of the letters or the fact that the

25   letters were written, because Ellis Price was your witness

1  and seemed to me he himself testified that he signed a letter

2  that was presented to him by James Sullivan and he himself

3  authored a second letter regarding his desire to, quote, do

4  the right thing and provide helpful information in the

5  Breakiron trial.

6       MR. CARUSONE:  I am sticking with Ellis Price's

7  testimony.  He gave you his testimony.  I think the question

8  is, assume for the moment that, that Ellis Price's letter,

9  letter or letters, the one he signed off on and the one he

10  wrote, let's assume for the second that he requested some

11  benefit in exchange for his testimony.  Is that, in and of

12  itself, favorable to the defense?  Is that, in and of itself,

13  Brady material?

14       THE COURT:  You are going to argue that it's not

15  Brady.

16       MR. CARUSONE:  It's absolutely not Brady material,

17  especially in the absence of any reciprocation on behalf of

18  the Commonwealth.  Any hint, forget --

19       THE COURT:  Cuts both ways.  If I ask for help, I

20  don't get any.  I have Mr. Morrison telling me there is

21  nothing I can do for you at the present.  Then that might, to

22  a reasonable juror, make that juror think that he's got an ax

23  to grind with the government at that point.

24       MR. CARUSONE:  Yes.  Maybe is more credible,

25  because I think, you know, he's, he's been told specifically

1  there is nothing we can do to help you and, yet, still comes

2  forward and testifies.

3       One of the things that's not clear from the

4  testimony today, will be clear when you look at all the

5  documents, is that at the time that Ellis Price spoke with

6  Trooper Brownfield, the decision had already been made,

7  motion for arrest of judgment had already been granted.

8       Certainly, at the time that he testified, Ellis

9  Price knew that that decision had been, had been granted.

10  And, yet, he still came.  Yet, he still followed through on

11  this and still testified.

12       THE COURT:  I'm with you on that, but there's

13  something incongruous about the Petitioner's theory in the

14  sense that the theory seems to claim that the DA's Office

15  gave Mr. Price this benefit and then relied on his good faith

16  to do his part of the deal after the county's, the county's

17  right to appeal from the arrest of judgment had already

18  expired.  That seems to me to be unprecedented, in my

19  experience, when you have a cooperating witness.  You make

20    sure you secure the cooperation before the state does its

21    part of the bargain.

22            In other words, the cooperating witness always has

23    to go first.  But it seems to me the petitioner's theory here

24    is the inverse of that.

25            MR. CARUSONE:  I understand, and I agree with you,

1    Your Honor.  So, if we get down to a claim of, if we get

2    something, I think there is no -- there was no deal.  There

3    was nothing the Commonwealth did to, to encourage Ellis Price

4    to say that he was going to get some type of a benefit that

5    he would lead him astray.  No hints.

6         THE COURT:  He was doing it for his brother.

7         MR. CARUSONE:  Hum?

8         THE COURT:  What if he was doing it for his

9    brother?

10        MR. CARUSONE:  Testifying for his brother.

11        THE COURT:  No.  What if he -- it seems to me clear

12   that Ellis Price already had his arrest of judgment.  The

13   time for appeal of that had already expired.

14            But what if he was giving testimony in the

15   Breakiron case consistent with what his brother Robert

16   testified to, namely, I'm going to try to help you out.  Get

17   you five years instead of ten?

18        MR. CARUSONE:  If that was, if that was his hidden

19   motivation and there was some reciprocation by the

20   Commonwealth on that, let's say they had an agreement to that

21   effect.  And that was not disclosed.  I would admit that

22   would be favorable information.

23          Now, would it have been a Brady violation not to

24   disclose it?  I don't think, because I don't think they're

25   going to be able to establish prejudice.  But I think the

1  fact that, in your hypothetical, it's not hypothetical.  In

2  your theory here, if the benefit was to go to someone other

3  than Ellis Price, would that change the Brady analysis?  I

4  don't think it would.

5      THE COURT:  Well, isn't that something that I want

6  to know as a defense counsel?

7      MR. CARUSONE:  Yes.

8      THE COURT:  I mean, if I'm defense counsel,

9  cross-examining Mr. Price, I want to be able to try to show

10  the jury that he's spinning some yarn here to try to help his

11  brother out.

12      MR. CARUSONE:  Well, it would be worth something if

13  there was some reciprocation on behalf of the goverment that

14  there was, in fact, some type of agreement.

15      But, here, you have no evidence of that.  I mean,

16  none.  Not even from their side is there any evidence that

17  the government reciprocated in any of these requests that

18  they say have occurred.   Regardless of whether it happened

19  to the brother, in the end, it's complete absence.

20        THE COURT:  There's some evidence that Robert told

21  -- Robert hoped he was going to help him out.  I think there

22  is no evidence that Ellis actually communicated that to

23  anyone at the county DA's Office or any of the investigators.

24        MR. CARUSONE:  Even if he did, even if you accept

25  the premise that the letter went out, actually, was received

1  by the DA's Office?  Although everybody says they never got

2  it.

3        I think the more important question is, what was

4  their reaction to that?  You know?  They, obviously, didn't

5  accept such a deal.  They didn't make any type of an

6  agreement.  More importantly, there wasn't anyone with even a

7  wink or a nod, okay, we'll take care of you after.  When we

8  talk at the trial, we are going to give you some type of a

9  benefit.  There was nothing.  There was no evidence at all to

10  that effect.

11        THE COURT:  And brother Robert did his time.

12        MR. CARUSONE:  And brother Robert did his time.

13        Ellis Price did a whole chunk of time in Michigan.

14  Did a lot of time.  So, there is no, no benefit here to Ellis

15  Price.

16        And, for those reasons, I would, I would ask you to

17  rule in our favor, Your Honor.

18        THE COURT:  All right.  I, again, I want to commend

19  counsel for the expert presentation.  Obviously, a case, a

20    case of great importance to both sides.

21         And I am going to ask the court reporter to prepare

22    the transcript at the joint expense of parties.  And I will

23    give you thirty days from the date the transcript issues to

24    submit paragraph-by-paragraph proposed findings of fact.

25         I am not sure conclusions of law make sense because

1  what I really need is a complete brief on all the issues, not

2  just legal issues that were raised during this hearing.  And

3  I think we've already talked that I'm more than happy to have

4  you cut and paste work that you had already done previously,

5  which is substantial.

6       But, it's very important to me in rendering a

7  proper decision that, that you update what had previously

8  been submitted in 2002 because there has been a lot of water

9  under the bridge since 2002.

10      MR. CARUSONE:  Your Honor, just with the findings

11  of fact, I just want to make sure I give you what you are

12  looking for.  I mean, it's my understanding that I bear the

13  burden of proof here.  I would like to make a number of

14  arguments, they haven't met their burden of proof, they

15  haven't -- is there going to be room for me to do that?

16      THE COURT:  Well, if you want to add some

17  argumentation, either as a prelude or at the end of your

18  findings?  But, basically, what I want is paragraph-by-

19  paragraph findings.  For example, on such and such a date or

20  on or about such and such a date, James Sullivan authored a

21  letter that was signed by Ellis Price and Blair and was sent

22  to so and so.  That would be presumably a proposed finding

23  for the defense.

24        MR. CARUSONE:  So, those that are favorable to me.

25        THE COURT:  Yes.  Yes.  I want your competing -- I

1  want you to read the transcript, look at the documents,

2  submit to me your competing versions of what the facts are.

3  And I'm quite certain they'll agree with some of both sides.

4      So, the question I have regarding the briefing is,

5  does it make sense to submit briefs at the same time or is it

6  more appropriate for the petitioner to submit first, then the

7  Commonwealth to respond?

8      MR. CARUSONE:  I would like the latter, if it's

9  okay with you.  Gives me an opportunity to meet their

10  argument one at a time.  If we do it simultaneous, we may be

11  ships in the night missing each other's points.

12      MR. LEV:  I just want to separate out the proposed

13  findings from the briefings for this purpose.  That although

14  I understand your feelings and I'm happy to oblige you, the

15  job of redoing and updating all of the claims involved in

16  case is going to be a far more time-consuming process and

17  time-taking process than, than providing you with proposed

18  findings of facts.

19      THE COURT:  Well, I understand that.  I don't want

20   to micro-manage that process.  So, why don't we do this.

21   We'll stick with the thirty days from the date of the

22   transcript.  I think that's important, because we, the

23   farther we get away from today, the more we're all going to

24   have our memories adversely affect the process.

25          So, we'll say thirty days from transcript for the

1    proposed findings.  I'll ask you counsel to confer about an

2    appropriate briefing schedule, dates, who goes first, who

3    goes second.  Obviously, page limitations aren't in issue

4    here.

5         So, I'll ask you to submit that to me.  If you can

6    consent to that, well, just file it of record and put it on

7    the docket.  You don't need to do that now, unless you want

8    to, you want to do that now.

9         MR. LEV:  I would rather if we continue.

10        THE COURT:  Do that at your convenience next week.

11        MR. LEV:  But I do have one, one question about

12   that, Judge.  Judge Standish previously issued an opinion

13   rejecting all of the procedural defenses of non-exhaustion

14   and default that had been raised by the Commonwealth in

15   ordering that the issues be addressed on their merits and

16   then discovery moved ahead from that.

17        THE COURT:  That is the law of the case; right.

18        MR. LEV:  That's what I think.  Regardless of

19   whether I agree with what he did, that's the law of the case.

20   So, there is no need for us to re-brief or reconsider the

21   procedural issues that Judge Standish issued?

22          MR. CARUSONE:  Only thing is the Court has not

23   ruled, though, on the procedural arguments that we've made in

24   response.

25          MR. LEV:  I agree with that.  I am leaving that

1  part.

2          MR. CARUSONE:  Yes.

3          MR. LEV:  But I am talking about all the other.

4          MR. CARUSONE:  Right; okay.

5          MR. LEV:  So we don't have to address those.

6          THE COURT:  Correct.  All right.  Thank you for all

7  your hard work.

8          MR. LEV:  Thank you, Your Honor.

9          MR. CARUSONE:  Thank you, Your Honor.

10           THE DEPUTY CLERK:  All rise.  This Honorable Court

11  stands adjourned.

12                    - - -

13          (Whereupon, the hearing was adjourned at 4:35 p.m.

14  on the second day of February, 2007.)

15                    - - -

16              C E R T I F I C A T E

17          I certify by my original signature herein that

18  the foregoing is a correct transcript from the record of

19  proceedings in the above-entitled matter.

20

21                    s/Sandra Wenger
                  Sandra Wenger,
22                    Official Court Reporter

23
         *****NOT CERTIFIED WITHOUT ORIGINAL SIGNATURE*****
24

25