# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

_____

MARK BREAKIRON,                                    :
                                                   :
        Petitioner,                                :
                                                   :        CIVIL ACTION
    v.                                             :
                                                   :        No. 00 - 300:
MARTIN HORN, Commissioner,                         :
Pennsylvania Department of Corrections;            :        Judge Fischer
CONNOR BLAINE, Superintendent of the               :
State Correctional Institution at Greene, and      :
JOSEPH P. MAZURKIEWICZ,                             :        **THIS IS A CAPITAL CASE**.
Superintendent of the State Correctional           :
Institution at Rockview,                           :
                                                   :
        Respondents.                               :
_____                :

_____

## UPDATED MEMORANDUM OF LAW IN SUPPORT OF PETITION
## FOR A WRIT OF HABEAS CORPUS
_____

STUART LEV.
Capital Habeas Corpus Unit
Federal Court Division
Defender Association of Philadelphia
Suite 545W -- The Curtis Center
Independence Sq. West
Philadelphia, PA 19106

TRICIA A. RUSSELL
CAROL WRIGHT
Capital Habeas Corpus Unit
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222-3714

Counsel for Petitioner

**Preliminary Statement**

For the ease of this Court's consideration, this Memorandum incorporates all of the relevant facts set forth in the Petition.  All emphasis in this Memorandum is supplied unless otherwise noted.  Transcripts of Pennsylvania state court proceedings are generally referred to as "Notes of Testimony" and are abbreviated as "NT" followed by the applicable page number. Transcripts of the state post-conviction proceedings are not sequentially numbered.  Accordingly, they are abbreviated as NT PCRA (date) (AM/PM) (page number).

i

# TABLE OF CONTENTS

PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ii

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

PROCEDURAL HISTORY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

THE STANDARD OF REVIEW UNDER 28 U.S.C.§ 2254. . . . . . . . . . . . . . . . . . . . . . . . 7
    A.      The Preconditions for Applying § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . 8
    B.      The Application of § 2254(d)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9
            IV.  Standards Relating to Ineffective Assistance of Counsel . . . . . . . . . . . . . . 11
            VII.  Petitioner is Entitled to Habeas Corpus Relief  . . . . . . . . . . . . . . . . . . . . . 12

CLAIMS FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

CLAIM 1:     PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED
                 BECAUSE COUNSEL WAS INEFFECTIVE AT THE GUILT AND
                 PENALTY PHASES FOR FAILING TO SECURE AN ADEQUATE
                 MENTAL HEALTH EVALUATION AND FOR FAILING TO DISCOVER
                 AND PRESENT THE EVIDENCE OF MR. BREAKIRON'S
                 IMPAIRMENTS TO THE JURY IN SUPPORT OF HIS
                 INTOXICATION/DIMINISHED CAPACITY DEFENSE IN THE GUILT
                 PHASE AND IN THE PENALTY PHASE  . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

    A.      Trial Counsel's Investigation and Preparation For Mr. Breakiron's Capital Trial
           and Sentencing Was Woefully Incomplete and Inadequate. . . . . . . . . . . . . . . . 15
           1.     The legal standards applicable to representation in a capital case . . . . . . 15
           2.     The lack of preparation and investigation . . . . . . . . . . . . . . . . . . . . . 18
                a.     Mr. Kristobek and Mr. Lepore failed to investigate or prepare for
                     trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18
                b.     Jack Heneks and Richard Bower failed to investigate or prepare
                     for trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20
                c.     No Defense strategy . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
                d.     Trial counsel, Mr. Bower, inherits and unprepared case . . . . . . . 24
                e.     The trial and the penalty phase . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

B.  Counsel Unreasonably Relied Upon Dr. Adamski's Report in Lieu of a Defense Mental Health Evaluation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28
    1.  The evaluation was not confidential
    2.  The evaluation was not directed to the issues relevant at trial and sentencing: diminished capacity and mitigation . . . . . . . . . . . . . . . . . . . 30
    3.  Dr. Adamski's report contained numerous red flags that called for further investigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
C.  Counsel was Ineffective at Guilt Stage . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32
    1.  Counsel's performance was constitutionally deficient . . . . . . . . . . . . . 32
    2.  Petitioner was prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35
        a.  Jacobs compels a finding a prejudice . . . . . . . . . . . . . . . . . . . . . 36
        b.  The readily available evidence was vastly more powerful than what counsel presented at trial . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40
    3.  The Pennsylvania Supreme Court's Opinion Relating to Guilt Stage Ineffectiveness Was "Contrary to" Clearly Established Law Because it Applied the Wrong Legal Standard. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41
D.  Counsel was Ineffective at Sentencing
    1.  Counsel's performance was constitutionally deficient
    2.  Petitioner was prejudiced . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50
        a.  The readily available mitigation . . . . . . . . . . . . . . . . . . . . . . . . . 50
        b.  What counsel presented at trial paled in comparison with the available mitigation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 57
        c.  Established law demonstrates that petitioner was prejudiced by counsel's failure to present the available mitigation . . . . . . . . . 58
        d.  The Pennsylvania Supreme Court's opinion was contrary to and an unreasonable application of federal law . . . . . . . . . . . . . . . . . . . 62
E.  Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

CLAIM 2:  PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY AND DUE PROCESS WHERE, DESPITE THE FACT THAT THE COMMUNITY AND THE JURY POOL HAD BEEN SATURATED WITH HIGHLY PREJUDICIAL PUBLICITY, THE TRIAL COURT DENIED PETITIONER'S REQUESTS FOR A CHANGE OF VENUE . . . . . . . . . . . . . 67

CLAIM 3:  PETITIONER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO TESTIFY IN HIS OWN BEHALF, TO PRESENT A DEFENSE AND TO DUE PROCESS WHERE THE TRIAL COURT PRECLUDED PETITIONER FROM TESTIFYING ABOUT HIS INTENT AT THE TIME OF THE KILLING; ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS CLAIM . . 81

A.  The Merits of the Claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 82

  B.   The Error Was Not Harmless . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 87


CLAIM 4   PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE
      THE COMMONWEALTH FAILED TO DISCLOSE RELEVANT EVIDENCE
      WHICH WOULD HAVE IMPEACHED THE TESTIMONY OF ITS KEY
      WITNESS, FAILED TO CORRECT THAT WITNESS' FALSE AND
      MISLEADING TESTIMONY, AND FAILED TO TURN OVER
      EXCULPATORY INFORMATION; TRIAL COUNSEL WAS INEFFECTIVE
      FOR FAILING TO INVESTIGATE AND PROPERLY IMPEACH THE
      WITNESSES' TESTIMONY BY BRINGING OUT THE WITNESS' BIAS AND
      MOTIVE TO LIE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 92

  A.   The Exhausted Allegations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 93
  B.   The Non-Exhausted Allegations  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 94
  C.   Legal Standards . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 95
  D.   The Commonwealth's Failures to Disclose or Correct  . . . . . . . . . . . . . . . . . . 100
    1.  Accurate information about Price's criminal record  . . . . . . . . . . . . . . 100
    2.  Ellis Price's non-final attempted homicide conviction  . . . . . . . . . . . . 102
    3.  Mr. Price's admission that he told the police that Mr. Breakiron told him
       he was intoxicated  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 104
    4.  Price's letters to the District Attorney  . . . . . . . . . . . . . . . . . . . . . . . . . 107
    5.  Suspect in the Sterbutzel assault  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 108
  E.   The Non-Disclosed Evidence Was Material  . . . . . . . . . . . . . . . . . . . . . . . . . 109
  F.   Trial Counsel was Ineffective for Failing to Cross-Examine Mr. Price about His
      Incentives to Testify for the Commonwealth


CLAIM 5:   MR. BREAKIRON'S DEATH SENTENCE IS BASED ON OUTSIDE
      INFLUENCES ON THE JURY'S DELIBERATIONS; THE JURY'S
      FUNDAMENTAL MISUNDERSTANDING OF THE MEANING OF A "LIFE"
      AND "DEATH" SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 114


CLAIM 6:   DURING THE PENALTY PHASE OF THE TRIAL, A JUROR CONSULTED A
      READER'S DIGEST LAW BOOK FOR GUIDANCE.  THIS EXTRANEOUS
      INFLUENCE REQUIRES REVERSAL OF PETITIONER'S DEATH
      SENTENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 120


CLAIM 7:   TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT OR
      FAILING TO MOVE TO STRIKE THE JURY PANEL AFTER A JUROR
      STATED DURING GENERAL VOIR DIRE THAT HE KNEW THE
      DEFENDANT PREVIOUSLY COMMITTED ROBBERIES AND A JUROR
      SEATED ON THAT PANES WAS SELECTED AS A TRIAL JUROR . . . . . 125

    A.     Deficient Performance . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 128
    B.     Prejudice . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 129
    C.     The Pennsylvania Supreme Court's Opinion . . . . . . . . . . . . . . . . . . . . . . . . 131
    D.     Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 133

CLAIM 8:    THE TRIAL COURT'S INSTRUCTION ON INTOXICATION, WHICH
             ERRONEOUSLY TOLD THE JURY THAT THE PROSECUTION HAD NO
             BURDEN TO DISPROVE THAT DEFENSE, UNCONSTITUTIONALLY
             DIMINISHED THE COMMONWEALTH'S BURDEN OF PROOF AND
             IMPROPERLY SHIFTED THAT BURDEN TO THE DEFENSE AND ALL
             PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO
             THE INSTRUCTION OR LITIGATE THIS CLAIM . . . . . . . . . . . . . . . . . . . . 134

    A.     The Instruction Was Constitutionally Erroneous . . . . . . . . . . . . . . . . . . . . . 135
    B.     The Erroneous Burden of Proof Instruction Was Not Harmless . . . . . . . . . . . 137
    C.     Ineffective Assistance of Counsel . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 140

CLAIM 9:    PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE
             PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE
             COUNSEL FAILED TO REQUEST APPROPRIATE INSTRUCTIONS ON THE
             LESSER INCLUDED OFFENSE OF THEFT OR OTHERWISE INSURE THAT
             THE JURY WAS PROPERLY INSTRUCTED THAT PETITIONER COULD
             NOT BE CONVICTED OF ROBBERY, BUT COULD ONLY BE CONVICTED
             OF THEFT, IF AN INTENT TO STEAL AROSE AFTER THE COMMISSION
             OF THE HOMICIDE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141

    A.     Counsel Was Ineffective . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 141
    B.     The Pennsylvania Supreme Court's Opinion . . . . . . . . . . . . . . . . . . . . . . . . 145

CLAIM 10:   PETITIONER IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE
             BECAUSE THE PENALTY PHASE JURY INSTRUCTIONS AND VERDICT
             SHEET UNCONSTITUTIONALLY PRECLUDED THE JURY FROM GIVING
             PROPER EFFECT TO THE EVIDENCE OF MITIGATION . . . . . . . . . . . . . 149

    A.     The Court's Instructions Erroneously Instructed the Jurors That They could Not
             Give Any consideration to the Mitigation Evidence Unless They First conclude
             That Such Evidence Outweighed The Aggravating Circumstances . . . . . . . . . 150
    B.     The Penalty Phase Instructions and Verdict Sheet Unconstitutionally Indicated
             That the Jury Had to Unanimously Find Any Mitigating Circumstance Before it
             could Give Effect to That Circumstance in its Sentencing Decision . . . . . . . . . 155
          1.     The merits of the claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 155
          2.     The Pennsylvania Supreme Court's Opinion . . . . . . . . . . . . . . . . . . . . 163
          3.     Appellate counsel was ineffective for failing to litigate this claim . . . . 165

CLAIM 11:    PETITIONER'S DEATH SENTENCE WAS ARBITRARILY IMPOSED
             WHERE THE JURY IRRATIONALLY FAILED TO GIVE ANY EFFECT TO
             UNREBUTTED STATUTORY MITIGATING FACTORS PRESENTED IN
             THE PENALTY PHASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 167

CLAIM 12:    PETITIONER IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE
             BECAUSE IT WAS BASED UPON AN IMPROPER APPLICATION OF THE
             AGGRAVATING CIRCUMSTANCE OF TORTURE  . . . . . . . . . . . . . . . . . . 174

       A.    The Torture Aggravating Circumstance is Unconstitutionally Vague
             1.    The Pennsylvania Supreme Court's Opinion is "contrary to" and "an
                   unreasonable application of" Federal Law. . . . . . . . . . . . . . . . . . . . . . . 177
             2.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 178
       B.    Counsel was ineffective in failing to develop evidence that the victim was not
             tortured . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 179
       C.    Insufficient Evidence of Torture  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 183

CLAIM 13:    PETITIONER'S DEATH SENTENCE MUST BE VACATED WHERE THE
             TRIAL COURT PRECLUDED THE DEFENSE FROM ELICITING
             RELEVANT MITIGATING EVIDENCE AND ALL PRIOR COUNSEL WERE
             INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THESE
             ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 184

CLAIM 14:    PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING WHERE
             THE PROSECUTOR ENGAGED IN CONSTITUTIONALLY IMPROPER
             CLOSING ARGUMENT AT SENTENCING AND WHERE ALL PRIOR
             COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE THESE
             ISSUES  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 188

       A.    The "show Him The Same Mercy" Argument . . . . . . . . . . . . . . . . . . . . . . . . . 190
       B.    "The Bible Demands the Death Penalty" Argument . . . . . . . . . . . . . . . . . . . . . 192
       C.    Improper Interjection of Petitioner's "Future Dangerousness" . . . . . . . . . . . . . 196
       D.    Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 197

CLAIM 15:    THE COURT'S FAILURE TO INSTRUCT THE JURY THAT "LIFE
             IMPRISONMENT MEANS LIFE WITHOUT POSSIBILITY OF PAROLE
             VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS . . . . . . . . . . . . 198

CLAIM 16:    PETITONER DID NOT RECEIVE THE MEANINGFUL
             "PROPORTIONALITY REVIEW" MANDATED BY 42 PA. C.S.§ 9711(H)(3)
             (III) AND FEDERAL CONSTITUTIONAL LAW . . . . . . . . . . . . . . . . . . . . 206

A.    The Nature of Pennsylvania's Proportionality Review Process and the Review
       Performed in this Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 208

B.    Petitioner's Due Process Liberty Interest in Proportionality Review  . . . . . . . . 210

C.    The Proportionality Database, Data collections Instruments and Methodology
       Utilized by the Pennsylvania Supreme Court to Conduct Proportionality Review
       in this Case were Severely Flawed . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 212

D.    The Pennsylvania Supreme Court's Response in <u>Commonwealth v. Gribble</u> . . 216

E.    The Proportionality Review Provided To Petitioner Was Defective and Therefore
       Petitioner's Right to Due Process of Law and a Reliable Capital Sentence Have
       Been Violated . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 217

CLAIM 17:    TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING
                    TO RAISE THE ISSUES PRESENTED IN THIS PETITION AT TRIAL AND IN
                    POST-TRIAL MOTIONS AND FOR FAILING TO PROPERLY LITIGATE
                    THESE ISSUES ON DIRECT APPEAL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 220

CLAIM 18:    PETITIONER IS ENTITLED TO A NEW TRIAL AND SENTENCING
                    PROCEEDING BECAUSE THE CUMULATIVE EFFECT OF THE ERRORS
                    IN THIS CASE UNDERMINES CONFIDENCE IN THE OUTCOME AT BOTH
                    STAGES OF TRIAL  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 221

PRAYER FOR RELIEF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 224

CERTIFICATE OF SERVICE

## I.    PROCEDURAL HISTORY

This Court set forth the procedural history of this case in its September 19, 2007 Findings of Fact ("Findings"). With the exception of certain parts of Claim 4, the Commonwealth's procedural objections were disposed of in an opinion by Judge Standish, and thus this Memorandum is limited to the merits of the claims. For purposes of this Memorandum, the prior state court opinions are cited as Commonwealth v. Breakiron, 571 A.2d 1035 (Pa. 1990) ("Breakiron-1") (direct appeal); Commonwealth v. Breakiron, 729 A.2d 1088 (Pa. 1999) ("Breakiron-2").(first PCRa); Commonwealth v. Breakiron, 781 A.2d 94 (Pa. 2001) ("Breakiron-3").(second PCRA).

## II.    STATEMENT OF FACTS

Petitioner's conviction and death sentence arose out of the death of Saundra Martin, a bartender at a bar called Shenanigans in Uniontown, Pennsylvania. Petitioner did not deny that he was the cause of Ms. Martin's death. Rather, his defense at trial focused on: 1) his denial that he acted with the specific intent to kill, 2) his denial that he had acted with the intent to rob and 3) his diminished capacity as a result of his intoxication and drug use that evening.

On the night of March 23, 1987, the deceased was working alone at the bar and had the job of closing up the bar at the end of the night. The following morning, one of the bar's owners came to the bar. He noticed that Ms. Martin's car was parked in the lot. NT at 899. When he entered the bar, he saw bloodstains throughout the bar and a broken ashtray on the floor. NT at 901-02. Ms. Martin was not there. The money from the previous night's receipts was also missing. NT at 903. He contacted the police.

The police could not locate the deceased and began an investigation. After interviewing

1

several patrons of the bar from the previous night, they learned that the Petitioner, Mark

Breakiron, was the last person in the bar with the deceased.  NT at 831-34; 842-43; 942-43.  The

police sought out Mr.  Breakiron and found him by his truck at his mother's house.  A search of

the truck revealed apparent blood stains in the truck bed.  NT at 946-47.  A later search revealed

a hunting knife under the seat of the truck.  NT at 1016.

The police soon concentrated their search for the deceased in a wooded area near Mr.

Breakiron's grandmother's house.  A search team found the deceased's body lying near a stream.

NT at 960.  She had been repeatedly stabbed and beaten.  NT at 1048-52. A search of the house

revealed traces of blood in the kitchen, in a bathroom sink, and on the driveway.  NT at 981-82.

The bloodstains in the house and truck were matched to the deceased.  NT at 1203-11.

The Commonwealth's only direct evidence of Petitioner's actions that night came from a

jailhouse informant named Ellis Price.  At the time of trial Mr. Price was serving an 8-60 year

sentence in Michigan for a charge he described to the jury as "just an assault," a description that

went unchallenged by the defense and uncorrected by the prosecution.  NT at 1111.  Earlier that

year, Mr. Price, along with his brother Robert, had been incarcerated with Mr. Breakiron at the

Fayette County Jail awaiting trial on attempted homicide charges.[1]  Mr. Price testified at the

evidentiary hearing before Judge Hardiman that he and two other fellow inmates had written to

the Fayette County District Attorney's office telling them that they had information about the

Mark Breakiron case and seeking benefits in exchange for testifying.  NT 2/2/07 at 100.  Later,

Mr. Price wrote another letter to the District Attorney, this time seeking benefits solely for

---

[1]Robert Price was housed in a different part of the Fayette County Jail in 1986 and did not have any contact with Mr. Breakiron.  NT 2/2/07 at 69.

2

himself and his brother Robert Price in exchange for his testimony against Mark. NT 2/2/07 at 92. A few days after sending this second letter, Trooper Brownfield visited Ellis Price at the Fayette County Jail and took his statement. Post conviction investigation revealed that following his disclosures to the police, the Commonwealth decided to forego an appeal of a trial court order granting Mr. Price a judgment of acquittal following his jury conviction for the attempted murder charges.[2] Thus, Mr. Price was extradited to Michigan to serve out his remaining sentence. The jury never learned of Mr. Price's conviction, the acquittal order, or the decision not to appeal.

Ellis Price had other outstanding problems in Fayette County that were conveniently swept under the rug. Ellis Price was a named suspect in an assault and robbery of a Vincent Sterbutzal which occurred on January 8, 1986,  (See Evidentiary Hearing, Commonwealth Exhibit D (Pennsylvania State Police Report)).  Although he had been identified as one of the perpetrators of this violent crime, no charges were brought against Mr. Price either at the time of his cooperation with the police or at the time of his testimony. NT 2/2/07 at 75, 184. Indeed, Ellis Price was never prosecuted for his role in that offense.  NT 2/2/07 at 184.

The evidence concerning the Sterbutzal assault first came to light during discovery proceedings and was further developed at the evidentiary hearing.  The Commonwealth had not previously disclosed the fact of Price's role in that assault, or the failure to charge and prosecute him in that case.

The existence of a pending investigation against Mr. Price, and the failure to bring charges against him, was exculpatory impeachment information that should have been, but was

---

[2]Robert Price's conviction for attempted homicide was not overturned and he served a 12 year sentence.  At the evidentiary hearing,  Robert Price revealed that Ellis had been the shooter and that he was wrongfully convicted.

3

not, disclosed to the defense.

Price testified at trial that Petitioner had made statements to him about the crime while they were incarcerated together.  He claimed that Petitioner admitted hiding in a bathroom of the bar until all the other patrons were gone.[3]  Petitioner asked for a drink, but the deceased refused as it was closing time.  According to Price, Petitioner admitted striking the deceased with an ashtray several times and then stabbing her with his knife.  Petitioner then took her to his grandfather's house where he "finished her off," before disposing of the body in the woods. NT at 1114-16.

Petitioner's defense centered solely on his lack of the *mens rea* necessary to sustain a conviction for first degree murder and robbery.  The defense sought to have Petitioner testify that he lacked the intent to kill the deceased and to show that he suffered from diminished capacity, as a result of his intoxication.  Although Petitioner had a long history of alcohol and substance abuse, dating back to childhood, as well as a history of blackouts and of psychiatric treatment, trial counsel failed to investigate.  Thus, no evidence of Mr. Breakiron's background was presented in support of the defense.  Nor did counsel seek to engage a defense mental health expert to explain the effect of Mark's history and impairments on his actions and capabilities that evening.  Counsel had sought a pre-trial mental health evaluation of Mark on two occasions.  However, counsel only requested the appointment of a court expert who would report to both the

---

[3]Price's testimony was inconsistent with Commonwealth witness Ed Mihalsky.  Mr. Mihalsky testified that he was a patron at the bar on the night of the killing and that, at the time he left, Petitioner and the deceased were alone in the bar and theirs were the only two cars in the parking lot.  NT at 837-43.  Mihalsky's testimony was inconsistent with Price's claim that Petitioner admitted hiding in the bathroom until afer all of the other patrons had left.  This contradiction was not discussed by counsel in his closing argument.

4

defense and the prosecution.  Additionally, the request was limited to the areas of competency

and insanity.  As even the Pennsylvania Supreme Court recognized, trial counsel in this matter

"mishandled Breakiron's mental health examination."  Breakiron-2 at 1099-1100.

As a result of counsel's failure to investigate, the defense was limited to the presentation

of Petitioner's own testimony.  The trial court, however, precluded Petitioner from testifying that

he did not have the intent to kill, or an intent to rob.  During direct examination, counsel asked,

"when you went out that night, what intentions, if any, did you have to hurt anybody?"  The

prosecutor's objection to that question was erroneously sustained.  Counsel also asked Petitioner

about his intention to take any money that night.  Again, the prosecutor's objection was

sustained.  Counsel asked to go to side bar, where the court informed counsel that "we are

interested in what he did.  And not what he may have intended to do."  NT at 1261-62.

Mark testified that, on the day of the killing,  he had approximately eight beers prior to

dinner.  NT at 1233-38, 1245.  After dinner he went back out and had more beer and a shot of

whiskey.  NT at 1249.  After arriving at Shenanigans, he had approximately six more beers and,

possibly, another shot of whiskey.  NT at 1251.  Mr. Breakiron did not remember the details of

what happened next, though he thought he was struck on the head and knocked unconscious.  He

remembered waking up to find the deceased's body on the floor beside him, with his knife in her

back.  NT at 1251-55.  Mark recalled portions of the incident, "... like a TV screen inside [his]

head and [he] saw someone laying there getting stabbed."  NT at 1256.  Mark proceeded to pull

the knife out of her back, hurry out of the bar, and get in his truck.  NT at 1255.  He tried to get

out of there because "everything was wrong."  Id.  As he was driving, he felt that he was "part of

it" and that "he had to correct it."  Id.  He returned to the bar, went to the body, felt that it was

cold, picked her up, carried her outside and put her in the bed of the truck. At that time, he took

the bags of money, which contained the receipts of the bar for the evening and he took Ms.

Martin's purse.

Petitioner was convicted of first degree murder and robbery. At the sentencing

proceedings, counsel again failed to present any mental health evidence of Mark's childhood

history of alcohol and substance abuse, blackouts, psychiatric problems, and suicide attempts.

Counsel's presentation was limited to testimony from a local pastor, who testified that Mark

came from a broken home, had low self esteem, and was a deep thinker. He described Mark's

teenaged problems with alcohol and his unsuccessful efforts to resolve those problems. Pastor

Collins told the jury of Mark's agitated and depressed state after the killing, his remorse and his

statement that he never intended to hurt anyone that night. NT at 1385-1401. Gloria Breakiron,

Mark's mother, testified that after her divorce, when Mark was about eight years old, Mark's

father rarely saw him. She said that Mark had an alcohol problem, and used drugs, but kept to

himself a lot. NT at 1409-11. The court precluded her from testifying about Mark's feelings of

love for his family as well as her identification of Mark's problems with alcohol and drugs as the

source of his problems. NT at 1411. Lastly, there was very brief testimony from Petitioner

himself who told the jury that he had problems with alcohol, which he described as, "I like to

drink a lot." NT at 1412. Mark testified that he had no intentions to kill the deceased that night

and that his only intent was to go out and have a good time. NT at 1413-14.

The prosecutor did not contest the mitigation evidence that the defense had presented, but

urged the jury to punish a death with a death, as set forth in the Bible, and told the jury to show

the same mercy that Petitioner had shown to the deceased. NT at 1433, 1437. Following the

6

arguments of counsel and the instructions of the court (which inaccurately described the

standards for considering mitigation evidence under Pennsylvania law, NT at 1441-42, and

required that any mitigation be found by the unanimous jury before it could be considered at

sentencing, NT at 1443, the jury retired to deliberate.  Despite the fact that the mitigating

evidence which had been produced was not contradicted by any evidence, and had not been

challenged by the prosecutor, the jury found two aggravating and no mitigating circumstances

and sentenced Petitioner to death.

## III.    THE STANDARD OF REVIEW UNDER 28 U.S.C. § 2254.

The Anti-Terrorism and Effective Death Penalty Act ("AEDPA") applies to this Petition.

For issues as to which there is a state court decision on the merits, review is governed by 28

U.S.C. § 2254(d), and relief is required where the state court decision is "contrary to" or "an

unreasonable application of" clearly established law, or involves an "unreasonable determination

of the facts," § 2254(d)(1)-(2).  Habeas review under § 2254(d) is robust; any "deference"

required by § 2254(d) "does not imply abandonment or abdication of [federal] judicial review."

Miller-El v. Cockrell, 537 U.S. 322, 340 (2003).[4]

The Supreme Court addressed the meaning of this provision in Williams v. Taylor, 529

U.S. 362 (2000).  See also Hameen v. Delaware, 212 F.3d 226 (3d Cir. 2000) (discussing

Williams); Gibbs v. Frank, 387 F.3d 268, 272 (3d Cir. 2004) (same); Jacobs v. Horn, 395 F.3d

---

[4]See also Wiggins v. Smith, 539 U.S. 510 (2003) (finding state court decision contrary to
and an unreasonable application of clearly established law and granting habeas relief); Williams
v. Taylor, 529 U.S. 362 (2000) (same); Outten v. Kearney, 464 F.3d 401, 409-23 (3d Cir. 2006)
(same);  Jacobs v. Horn, 395 F.3d 92, 107 (3d Cir. 2005) (same); Holloway v. Horn, 355 F.3d
707, 729-30 (3d Cir. 2004) ("Holloway-3") (same); Hardcastle v. Horn, 368 F.3d 246 (3d Cir.
2004) (finding state court decision unreasonable, and remanding for evidentiary hearing)  on
remand, 2007 WL 3102221 (E.D.Pa. Oct. 19, 2007) (granting habeas relief).

92, 99-100 (3d Cir. 2005) (same). In this Petition, however, there are numerous claims to which § 2254(d) does <u>not</u> apply at all.

### A.    The Preconditions for Applying § 2254(d)(1)

Some of Mr. Breakiron's claims may not be subject to § 2254(d)(1) at all. By its plain language, § 2254(d) applies to a claim only when the claim "was adjudicated on the merits" by the state court, and only where that adjudication resulted in a "decision" on the claim. <u>See</u> <u>Chadwick v. Janecka</u>, 312 F.3d 597 (3d Cir. 2002). <u>Chadwick</u> explained that Third Circuit precedents – including <u>Everett v. Beard</u>, 290 F.3d 500, 507-08 (3d Cir. 2002); <u>Appel v. Horn</u>, 250 F.3d 203, 209-12 (3d Cir. 2001); and <u>Hameen v. Delaware</u>, 212 F.3d 226, 248 (3d Cir. 2000) – make clear that if the state courts fail to adjudicate the petitioner's actual federal claim and instead rule on some other claim, the federal claim has not been "adjudicated on the merits" and the § 2254(d) standard does not apply.

> <u>Hameen</u>, <u>Appel</u>, and <u>Everett</u> stand for the proposition that, if an examination of the opinions of the state courts shows that they misunderstood the nature of a properly exhausted claim and thus failed to adjudicate that claim on the merits, the deferential standards of review in AEDPA do not apply.

<u>Chadwick</u>, 312 F.2d at 606. <u>See</u>, <u>e.g.</u>, <u>Appel</u>, 250 F.3d at 210-12 (state court adjudicated claim of ineffective assistance of counsel, but failed to rule on claim of constructive denial of counsel; § 2254(d) standard did not apply to constructive denial of counsel claim).

Thus, in order for the standards of §2254(d) to be applied to any one of Petitioner's claims, the state court must have issued a "decision" that (1) addresses the petitioner's actual federal claim (as opposed, for example, to a related state law claim) and (2) addresses and "adjudicate[s]" the federal claim "on the merits" (as opposed to on procedural or other grounds).

8

Where there is no state court "decision" showing that the claim was "adjudicated on the merits," §2254(d) does not apply and the federal habeas court must provide de novo, plenary review.  As the Third Circuit explained in Everett,

> When, as here, AEDPA does not apply for that reason, the pre-AEDPA standards of review apply.  *Id.* Under that standard, a federal habeas court owes no deference to a state court's resolution of mixed questions of constitutional law and fact; *see Williams v. Taylor,* 529 U.S. 362, 400, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (O'Connor, J., concurring) (citing *Miller v. Fenton,* 474 U.S. 104, 112, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985)), whereas the state court's factual findings are presumed to be correct unless, inter alia, the state court's findings are not "fairly supported by the record." *Pemberthy v. Beyer,* 19 F.3d 857, 864 (3d Cir.1994) (quoting 28 U.S.C § 2254(d)(8)). But, of course, as the Supreme Court has recognized, "a state court's incorrect legal determination has [never] been allowed to stand because it was reasonable." *Williams,* 529 U.S. at 402, 120 S.Ct. 1495 (O'Connor, J., concurring) (quoting *Wright v. West,* 505 U.S. 277, 305, 112 S.Ct. 2482, 120 L.Ed.2d 225 (1992)).   Indeed, in her opinion in *Williams,* Justice O'Connor reiterated, "[w]e have always held that federal courts, even on habeas, have an independent obligation to say what the law is." *Id.* (internal quotation omitted).

290 F.3d at 508.   See Jacobs v. Horn, 395 F.3d at 100 ("AEDPA's deferential standards of review do not apply unless it is clear from the face of the state court decision that the merits of the petitioner's constitutional claims were examined in light of federal law as established by the Supreme Court of the United States" (citations and quotation marks omitted)); Bronshtein v. Horn, 404 F.3d 700, 710n.4, 715 (3d Cir. 2005) (*de novo* review of claims where Pennsylvania Supreme Court denied them as untimely under PCRA).

**B.    The Application of § 2254(d)(1).**

For claims to which § 2254(d) does apply, Williams controls its application. First, this Court should address the merits of Petitioner's claim and determine if a constitutional violation has occurred.  Where there is no violation of the Constitution, no relief is due.

9

If, however, this Court concludes that Petitioner's conviction or sentence was tainted by constitutional error, this Court must then decide if he is entitled to relief under §2254 (d). The Supreme Court explained that the statutory language of both the "contrary to" clause and the "unreasonable application" clause of § 2254(d)(1) must be given effect. Thus, a federal habeas court should grant the Writ:

> if one of the following two conditions is satisfied – the state court adjudication resulted in a decision that (1) "was contrary to ... clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of ... clearly established Federal law, as determined by the Supreme Court of the United States."

Williams, 529 U.S. at 412; see also Hameen, 212 F.3d at 235 (Williams "made it clear that the 'contrary to' and 'unreasonable application' clauses have independent meaning").

In Williams, the Supreme Court noted two ways in which a state court decision could be "contrary to ... clearly established federal law."

The first is if the state court does not correctly identify and articulate the legal principles that govern the claim. This happens when the state court's decision is "substantially different from the relevant precedent of this Court," when the state court "applies a rule that contradicts the governing law set forth in our cases" or when the state court applies law that is "diametrically different," "opposite in character or nature," or "mutually opposed" to established Supreme Court precedent. Id. at 405-06.

The second way in which a state court decision may be "contrary to ... clearly established federal law" is "if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from our precedent." Id. at 406. This does not require that the facts of the two cases be identical, but only that they be

"materially indistinguishable."

Relief should be granted under the "unreasonable application" clause "if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 US. at 413. Chadwick explained:

> When making the "unreasonable application" inquiry, the federal habeas court should ask "whether the state court's application of clearly established federal law was *objectively* unreasonable." *Id.* at 409, 120 S.Ct. 1495 (emphasis added); *see also Matteo v. Superintendent, SCI Albion,* 171 F.3d 877, 891 (3d Cir. 1999) (en banc) (stating the test to be "whether the state court decision, evaluated *objectively* and on the merits, resulted in an outcome that cannot reasonably be justified [under existing Supreme Court precedent]") .

290 F.3d at 607. A state court might also unreasonably apply clearly established Supreme Court precedent by unreasonably refusing to extend a legal principle to a new context. Id., n. 8.

## IV.    STANDARDS RELATING TO INEFFECTIVE ASSISTANCE OF COUNSEL

Several of the claims raised in the *Petition* address claims of ineffective assistance of counsel. The following standards are applicable to all such claims.

Sixth Amendment ineffective assistance of counsel claims are evaluated under the two-prong test of Strickland v. Washington, 466 U.S. 668 (1984). Petitioner must show: (a) counsel's deficient performance, i.e., that his attorney's performance fell below "an objective standard of reasonableness," id. at 688; and (b) prejudice, i.e., that confidence in the result of the original sentencing proceeding is undermined due to counsel's deficiencies, id. at 694. In evaluating counsel's performance, the Court should consider the American Bar Association's STANDARDS FOR CRIMINAL JUSTICE (1993) ("ABA STANDARDS") and GUIDELINES FOR THE APPOINTMENT AND PERFORMANCE OF COUNSEL IN DEATH PENALTY CASES (1989) ("ABA

11

GUIDELINES"), which articulate "reasonable" professional "standards for capital defense work" and are the "norms" and "standards to which [the Supreme Court] long ha[s] referred as 'guides to determining what is reasonable'" under the Sixth Amendment. <u>Wiggins v. Smith,</u> 539 U.S. 510, 522-25 (2003) (citing <u>Strickland</u>; <u>Williams</u>); <u>see also</u> <u>Outten v. Kearney</u>, 464 F.3d 401, 417 (3d Cir. 2006) (counsel's representation is "assessed by looking to '[p]revailing norms of practice as reflected in [the] American Bar Association" Standards and Guidelines (quoting <u>Strickland</u> and citing <u>Williams</u>, <u>Wiggins</u> and <u>Rompilla v. Beard</u>, 545 U.S. 374 (2005))).

     <u>Strickland</u> "prejudice" analysis is <u>not</u> an outcome-determinative test. <u>Strickland</u>, 466 U.S. at 693-94. The question is <u>not</u> whether representation by effective counsel would have actually changed the outcome at either the guilt-innocence or sentencing phase, nor even whether representation by effective counsel would "more likely than not" have changed the outcome. <u>Id.</u> Instead, prejudice is established when <u>confidence in the outcome is undermined</u> because of counsel's deficiencies. <u>Id.</u> at 694. "This standard is not a stringent one. It is less demanding than the preponderance standard." <u>Hull v. Kyler</u>, 190 F.3d 88, 110 (3d Cir. 1999) (internal quotation marks and citations omitted) (citing <u>Nix v. Whiteside</u>, 475 U.S. 157, 175 (1986); <u>Baker v. Barbo</u>, 177 F.3d 149, 154 (3d Cir. 1999)); <u>accord</u> <u>Jacobs</u>, 395 F.3d at 105; <u>United States v. Day</u>, 969 F.2d 39, 45 n.8 (3d Cir. 1992) (<u>Strickland</u> "does not require certainty or even a preponderance of the evidence that the outcome would have been different with effective assistance of counsel; it requires only 'reasonable probability' that is the case").

## VII.   PETITIONER IS ENTITLED TO HABEAS CORPUS RELIEF.

     For the reasons stated below, Petitioner is entitled to habeas corpus relief.

## <u>CLAIMS FOR RELIEF</u>

**CLAIM 1:      PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED BECAUSE COUNSEL WAS INEFFECTIVE AT THE GUILT AND PENALTY PHASES FOR FAILING TO SECURE AN ADEQUATE MENTAL HEALTH EVALUATION AND FOR FAILING TO DISCOVER AND PRESENT THE EVIDENCE OF MR. BREAKIRON'S IMPAIRMENTS TO THE JURY IN SUPPORT OF HIS INTOXICATION/DIMINISHED CAPACITY DEFENSE IN THE GUILT PHASE AND IN THE PENALTY PHASE.[5]**

Mr. Breakiron's state of mind at the time of the killing, and his mental health history, were critical factors at both the guilt and sentencing phases of his trial.  However, counsel bungled his investigation and presentation of those issues.   The Pennsylvania Supreme Court concluded that counsel "mishandled" the mental health evaluation of Mr. Breakiron that was essential to the proper development of both guilt and sentencing defenses.  Breakiron-2 at 1099.[6]

_____

[5]This Claim was presented to the Pennsylvania Supreme Court in Breakiron-2.  The Pennsylvania Supreme Court ruled on the merits and thus the standards of §2254(d) are applicable.

[6]The Pennsylvania Supreme Court addressed the claim as follows:

Breakiron asserts that counsel failed to employ the MHPA properly in that the court-appointed psychiatrist, Dr. Adamski, improperly conducted the examination and essentially gave him "Miranda" warnings during the August 1987 interview that were not in accordance with the MHPA. He then argues that, pursuant to the MHPA, he had some expectation of confidentiality, that he had a right to have trial counsel present, and that he had a right to a defense expert psychiatrist following his objection to Dr. Adamski's conduct.  These errors, Breakiron asserts, prejudiced him because the effect was to deprive him of the opportunity to have a private psychiatrist testify as to his mental health and psychiatric history during both the guilt and sentencing phase of the trial.

In reviewing the record in this matter, it appears that trial counsel did mishandle the competency evaluation in a number of respects.  No counsel was present and following objection to Dr. Adamski's "Miranda" warnings, trial counsel did not request a private defense expert to be present at a second court ordered examination.  Further, in reviewing the PCRA testimony of this matter, trial counsel was not able to articulate a reasonable basis for failing to comply with the MHPA. Thus, our determination in this matter hinges upon whether these errors were prejudicial to the defendant at either the guilt or the sentencing phase of the trial.

Moreover, the Court found that counsel was not able to articulate a reasonable basis for failing to have Mr. Breakiron properly evaluated. Id. Indeed, as we will see below, Mr. Breakiron was sequentially represented by four different lawyers, each of whom apparently expected the work to be done by someone else. As a result, the rudimentary steps necessary to represent a capital defendant were not undertaken.

Had these steps been taken, the jury would have learned that Mark Breakiron has long suffered from serious mental problems which include Alcohol Dependence, Drug Dependence, Intermittent Explosive Disorder, and the effects of a traumatic childhood. His alcohol dependence and abuse dates back to his childhood and includes a history of blackouts. These impairments were highly relevant: 1) in the guilt phase to support the intoxication/diminished capacity defense that was offered at trial and; 2) in the penalty phase to prove mitigating circumstances and to rebut the aggravating circumstance of torture.

The jury, however, never heard about Mark's impairments and the way in which they affect him because counsel: (1) failed to have Mr. Breakiron properly evaluated by a mental health expert and (2) failed to adequately investigate Mr. Breakiron's history of alcohol dependence, family dysfunction, and mental illness. As a result of counsel's erroneous understanding of the law, and a flawed investigation, trial counsel presented a fraction of the available evidence to support the intoxication/diminished capacity defense in the guilt phase and to prove the overwhelming mitigating circumstances which actually exist.[7] Counsel was constitutionally ineffective in both the guilt and penalty phase.

---

[7]The jury found no mitigating circumstances existed. Accordingly, pursuant to the Pennsylvania death penalty statute, they were required to sentence him to death if they found an aggravating circumstance.

A.    **Trial Counsel's Investigation and Preparation For Mr. Breakiron's Capital Trial and Sentencing Was Woefully Incomplete and Inadequate.**

Counsel's investigation and preparation for capital sentencing was woefully deficient. Four separate attorneys sequentially represented Petitioner in the eight months prior to trial. During that period, one left for private practice. Two of the four attorneys withdrew from the case in order to join the Fayette County District Attorney's Office. The last attorney discovered that he would be trying the case by himself just weeks before trial after believing that the other attorney would be taking the primary role on the case. Trial counsel's request for a continuance for more time to prepare was denied and he was left holding the bag on an ill-prepared case. Each of Mr. Breakiron's attorneys expected the case preparation to occur later – and to be done by someone else. As a result, <u>no one</u> ensured that Mark received an appropriate mental health evaluation, obtained Mark's extensive records, or investigated his background. The attorney that remained--- trial counsel -- was left holding the bag for his predecessors' failure to prepare for trial. By his own admission, with the trial to occur in just weeks, he had met Mark only once before. Not surprisingly, the Pennsylvania Supreme Court concluded that trial counsel "mishandle[d]" the mental health aspects of the case and found that trial counsel performed deficiently. <u>Breakiron-1</u>, 729 A.2d at 1099. Indeed, the fundamental prerequisites of competent capital representation were not met.

1.    **The legal standards applicable to representation in a capital case.**

The duty to investigate is fundamental to counsel's role as an advocate. Counsel has "a duty to bring to bear such skill and knowledge as will render the [proceeding] a reliable adversarial testing process." <u>Strickland v. Washington</u>, 466 U.S. 668, 688 (1984). This can be

15

done only if counsel <u>investigates</u>, <u>id.</u> at 691 -- "counsel must investigate all apparently substantial defenses available to the defendant."

Counsel in a capital proceeding has a duty to thoroughly investigate and prepare for both the guilt and the penalty phase of the trial.  <u>E.g.</u>, <u>Williamson v. Ward</u>, 110 F.3d 1508, 1514 (10th Cir. 1997) ("in a capital case, counsel's duty to investigate all reasonable lines of defense is strictly observed").   This duty extends to the professionally reasonable investigation and presentation of mental health defenses.  <u>Jacobs v. Horn</u>, 395 F.3d 92 (3d Cir. 2005) (counsel seeking to raise a diminished capacity defense has a duty to investigate the defendant's mental health history and background, and to provide that information to a mental health expert).  Such defenses necessitate the use of meaningful expert assistance.  <u>Ake v. Oklahoma</u>, 470 U.S. 68, 80 (1985) (when defendant's mental condition is relevant to his criminal culpability, "the assistance of a psychiatrist may well be crucial to the defendant's ability to marshal his defense"); <u>Seidel v. Merkle</u>, 146 F.3d 750, 756 (9th Cir. 1998) (counsel's failure to investigate mental health defense to murder objectively unreasonable); <u>United States v. Kauffman</u>, 109 F.3d 186, 191 (3d Cir. 1997) (counsel ineffective for failing to investigate insanity defense); <u>Maddox v. Lord</u>, 818 F.2d 1058, 1061 (2d Cir. 1987) (failure to investigate psychiatric evidence establishing "extreme emotional disturbance" defense that, in New York, reduces the charge from murder to manslaughter, was objectively unreasonable).  <u>See</u> <u>also</u> <u>Commonwealth v. Moore</u>, 805 A.2d 1212, 1217-18 (Pa. 2002) (counsel had been ineffective where he failed to investigate or present a psychological defense challenging the degree of murder); <u>Commonwealth v. Legg</u>, 711 A.2d 430 (Pa. 1998) (same); <u>Commonwealth v. Anderson</u>, 600 A.2d 577, 580 (Pa. Super. 1991).

In preparation for sentencing, capital counsel has an "obligation to conduct a thorough

16

investigation of the defendant's background" for "all reasonably available mitigating evidence." Wiggins, 539 U.S. at 522, 524 (quoting Williams, 529 U.S. at 396, and ABA GUIDELINE 11.4.1). "[C]ounsel's general duty to investigate takes on supreme importance ... in the context of developing mitigating evidence to present to a ... jury considering the sentence of death; claims of ineffective assistance in the performance of that duty should therefore be considered with commensurate care." Marshall v. Hendricks, 307 F.3d 36, 99 (3d Cir. 2002) (citation omitted).

As part of a "thorough investigation" for "all reasonably available" mitigation, counsel should, well before trial, seek out and thoroughly interview family members and others familiar with the client's life history and background; obtain records pertaining to the client's life history; and obtain appropriate mitigation evaluations by mental health experts. E.g., ABA GUIDELINES 11.4.1, 11.8.3, 11.8.6 (counsel should interview people "familiar with ... the client's life history"; obtain records relating to client's life history; seek expert testimony regarding "[f]amily and social history ... and the resulting impact on the client"; and seek "[e]xpert witnesses to provide medical, psychological, sociological or other explanations for the offense(s)"); Rompilla v. Beard, 545 U.S. 374 (2005) (counsel ineffective for failing to obtain records about defendant's prior conviction and use those records to develop mitigating information from family members and mental health experts); Wiggins, 539 U.S. at 516 (counsel ineffective for failing to develop social history from "social services, medical, and school records, as well as interviews with petitioner and numerous family members"); Williams, 529 U.S. at 395-96, 416 (ineffectiveness where counsel presented testimony from defendant's mother and two friends but failed to obtain records and failed to fully interview and present evidence from other "friends, neighbors and family"); Outten v. Kearney, 464 F.3d 401, 409-23 (3d Cir. 2006) (counsel ineffective for failing

to obtain records; interview family members, friends and others familiar with defendant's life history; and obtain expert mental health evaluations for mitigation); Marshall v. Cathel, 428 F.3d 452, 464 (3d Cir. 2005) (counsel ineffective for failing to interview "family members, childhood friends, neighbors and business associates"); Jermyn v. Horn, 266 F.3d 257, 306-07 (3d Cir. 2001) (counsel ineffective for failing to obtain records and interview family members).

Counsel must conduct this thorough investigation "immediately upon counsel's entry into the case," ABA GUIDELINES 11.4.1, 11.8.3(A); it is deficient representation to wait until after the guilt-phase to conduct "the difficult and time consuming task of assembling mitigation witnesses," Jermyn, 266 F.3d at 308 (citation omitted); accord Williams, 529 U.S. at 395 (counsel "fell short of professional standards" when they "did not begin to prepare for [the penalty phase] until a week before trial").

In this case, trial counsel failed to adequately investigate and prepare both the guilt and the sentencing phase

### 2.    The lack of preparation and investigation.

#### a.    Mr. Kristobek and Mr. Lepore failed to investigate or prepare for trial

Petitioner's mental problems were obvious to defense counsel from the start. Prior to his arrest, Mr. Breakiron contacted the Fayette County Public Defender to discuss his involvement in the homicide. Mr. Breakiron was interviewed by Chief Public Defender Alphonse Lepore, Jr, who was familiar with Mark's problems,[8] and assistant public defender Ronald Kristobek. When Petitioner was formally charged, the public defender's office was appointed to represent him and

_____

[8]Mr. Lepore had represented Mark on earlier charges.

18

Mr. Lepore assigned Mr. Kristobek to represent Mr. Breakiron.  Counsel knew that even prior to

Petitioner's arrest on the murder charges, he had been arrested shortly after the killing for public

drunkenness and, because of his threats to commit suicide, was sent to the Fayette County Mental

Health Center for an evaluation.[9]

 Although it was his judgment that a mental health defense was one of the only possible

defenses to pursue, NT at 7/17/97 AM at 65, Mr. Kristobek failed to obtain any background

---

[9]The intake form for that evaluation revealed the following evidence of Mark's
psychiatric and alcohol problems:

The client's judgment appeared to be questionable.

The client was referred by Fayette County Prison Officials and has a prior record
for psychiatric treatment.

Patient expressed suicidal ideations to arresting officers and he had a double
edged razor blade in his shoe that prompted prison officials to ask for an
evaluation.

He has a number of personal problems including family feuds, financial difficulties and
inability to maintain a job or friends.

The patient has had problems with drugs in 1983 and continues at this time to have
problems with alcohol.  Specifically, he admits to having blackouts and tolerance with
alcohol but no indication of withdrawal symptoms.  A lot of his arrests stem from alcohol
and intoxication, including a demonstration of poor judgment, impulsivity and
explosiveness.

The patient was seen by a psychiatrist when he was 13 years old.

The patient says specifically that he has difficulty controlling his temper and reports that
when he gets into jail "I go crazy during the first couple of days"

Reports attempted suicide when he was 8 or 9-years old.

Fayette County Mental Health Center  Readmission Intake, 3/27/87.   None of Mr. Breakiron's
counsel ever obtained this report.

19

records or materials. When asked about his preparation for the case, Mr. Kristobek justified his

lack of preparation and investigation by indicating that he considered his involvement in the case

"rather limited":

> Q:     Okay.  But did you take in any further, you never investigated the
> background?

> A:     I am sorry, once again, I had the case for about three months, <u>I consider
> my role rather limited</u>.  <u>I am sure there were other issues as to intoxication,
> but I think that is an issue for trial</u>.  As to whether I would have addressed
> that at the preliminary stages, <u>I don't believe that I followed up any further
> other than getting the general information.</u>

NT PCRA 7/17/97 AM at 31.   <u>Compare</u> Guideline for Appointment and Performance of

Counsel in Capital Cases § 11.4.1 (investigation into should begin immediately upon counsel's

entry into case).

Mr. Kristobek knew that Mr. Breakiron had mental problems and knew that the

defendant's mental condition was likely to be a critical issue at trial.  Instead of investigating his

background or obtaining a defense mental health expert, defense counsel acquiesced in the

appointment of a court expert who informed Mr. Breakiron that anything he said would be used

against him and only evaluated Mr. Breakiron for his competency to stand trial and whether or

not he was insane.   <u>See</u> Order of Capuzzi, J., 5/4/87.  *Defense counsel did not ask the court-*

*appointed expert to evaluate Mr. Breakiron for either diminished capacity or mitigation.*

### b.      Jack Heneks and Richard Bower failed to investigate or prepare for trial

Before being provided with Dr. Adamski's report on competency and sanity, Mr.

Kristobek resigned the public defender's office, and withdrew from the case.   Jack Heneks and

Richard Bower entered their appearance in the case on August 17, 1987. From the start, Mr.

Heneks, who took the lead counsel role, admitted that he thought he might be joining the Fayette

County District Attorney's Office throughout his representation of Mr. Breakiron:

> Q:  And initially, when – I believe that when you initially entered your
> appearance, you did not anticipate at that point that you would be leaving
> the Public Defender's Office, or did you?
>
> A:  Not specifically, but there was that possibility, because Mr. Lepore had
> run, there was a vacancy, he had lost the primary election, and there was a
> vacancy as a result of Mr. Wagner, at that time, being appointed. So, there
> was a possibility of there being a vacancy in the District Attorney's Office.
> Mr. Lepore was a candidate for that vacancy.

NT 7/18/97 PM at 9. Mr. Heneks did little for Mr. Breakiron. While Dr. Adamski's report did

not address either mitigation or voluntary intoxication, the report contained numerous red flags

that should have alerted competent counsel as to the existence of mental health issues that could

and should have been explored for both an intoxication defense and mitigation including:

> "Mr. Breakiron suffers from long-standing alcohol problems as manifested by his
> symptoms of tolerance to alcohol as well as blackout episodes."
>
> "he []appear[ed] mildly dysphoric"
>
> "From his history he also appears to have had long-standing problems of episodic
> dyscontrol which is manifested by blowing-up out of proportion to a provoking
> incident, having poor impulse control and alienating friends and family. This ...
> reflects a disorder of personality or an inability to deal with stress."
>
> "Patient was seen by a psychiatrist when he was 13 years old."
>
> "attempted suicide when he was 8 or 9 years old."

Adamski report of 8/27/87.

At this point, defense counsel knew (if he either read Dr. Adamski's report or conferred

with prior counsel) that his client had: (a) a history of alcohol problems; (b) a history of

21

"blackout episodes;" c)  long-standing problems of "episodic dyscontrol;" (d) a history of suicide attempts.   Counsel also *knew* that Dr. Adamski opined that Mr. Breakiron was competent and not insane but that the evaluation *had not covered mitigation or a diminished capacity defense*.

Competent counsel would have a) had Mr. Breakiron evaluated for mitigation and diminished capacity; b) obtained the records about Mr. Breakiron's past mental health problems; c) thoroughly investigated Mr. Breakiron's background.  Counsel did none of these things. Counsel never obtained a defense mental health expert.  Counsel never explored whether he might develop evidence from a mental health expert in support of a diminished capacity/intoxication defense, or in support of mitigation at sentencing.  Instead, he ruled out using a mental health expert because Dr. Adamski concluded that Mr. Breakiron was not insane and that he was competent at the time of trial.  NT PCRA PM 7/18/97 at 7.

Nor did counsel conduct the appropriate background interviews or make any effort to obtain records or develop mitigation, despite his knowledge of Mark's problems and that it was a death penalty case.  NT PCRA 7/18/97 PM at 9 (interviewing only his mother and some other relative).

> Q:    Were you aware of Mark's prior problems with drug and alcohol or his mental problems?
>
> A:    We had talked about that, that is Mr. Breakiron and I talked about that.  I was aware in general term about some of those issues, yes.
>
> Q:    Were you aware that he had been an inpatient at Mayview in 1984?
>
> A:    I am not sure that I was aware – I don't have any present recollection of being aware of that.  I may have been aware of that at that time.
>
> Q:    And, the same would apply to Centerville Clinic and the Gateway Rehab, when he was there, and he would have been treated in those facilities?

22

A:     I think my answer would be the same to that.

Q:     Did you personally, during your representation of Mr. Breakiron, ever request any records, or subpoena any records from these facilities?

A:     Not that I am aware of.

NT PCRA 7/18/97 at 10-11.

Q:     [W]hat other investigation did you do in preparation of this case for trial?

A:     I researched the newspaper issues... We also, as I said talked to some of the witnesses, and that is basically what my involvement was at that time.

NT PCRA 7/18/97 at 9.  Compare to Williams, 529 U.S. at 396 (defense counsel has "obligation to conduct a thorough investigation of defendant's background."); Death Penalty Guidelines § 11.4.1 (Investigation should "begin immediately upon counsel's entry into the case and be pursued expeditiously").

### c.    No defense strategy.

Mr. Heneks, indicated that as of his departure for the Fayette County District Attorney's Office, less than three  months before the trial (which began the first week of April), *they had not even formulated a defense strategy*:

Q:     During the time that you represented him in those months, did you ever discuss any defense, what defense would be used at trial with Mark Breakiron?

A:     I believe that we had some general discussion, but we had not even advanced past the pretrial stage at that point.  So, when I left in January, we had still not had a decision on the pretrial.  I believe that that came a couple of weeks after January of '88.  *So, we did not have an occasion to go into a full blown strategy, as far as a defense.*  As I said, the trial was still going to be some months away.  There was some general discussions, but as far as formulating a precise defense at that point, no, we didn't do that.

23

NT 7/18/97 PM at 11.  With a capital murder trial two months away, the defense had not yet

identified a strategy.

      Nor had the defense considered using a mental health expert:

Q:     Given Mark Breakiron's past history of alcohol use...., did you petition or
consider petitioning the court for an expert that would review the case for
the effects of alcohol on this particular defendant?

<div align="center">***</div>

A:     Did I consider using a – not an expert per se, no, *I don't think we reached
that stage*.

NT 7/18/97 PM at 15.

###     d.    Trial counsel, Mr. Bower, inherits an unprepared case.

      Mr. Heneks entered his motion to withdraw on January 13, 1988, leaving Mr. Bower as

sole counsel for Mr. Breakiron.   Court documents filed at the time of trial make it clear that until

Mr. Heneks departed, Mr. Bowers had little involvement with the case.  As of February 29th,

1988, *one month before trial, Mr. Bower had met with Mr. Breakiron only three times*, twice on

the week before, and admitted that "Mr. Heneks ... had handled most of the case until his

resignation." NT Continuance Proceedings 2/29/88 at 4.[10]   As noted above, Mr. Heneks had

indicated in his testimony that at the time of his departure at the end of January to the Fayette

County District Attorney's Office, *they had not formulated a defense strategy*.  NT 7/18/97 PM

at 11.

      Not surprisingly, counsel sought a continuance, at least until May in order to prepare the

---

[10]At the PCRA proceedings, Mr. Bower initially testified that he met with Mr. Breakiron on "numerous" occasions prior to Mr. Heneks departure for the district attorney's office.  After being confronted by the statements that he had made in the continuance proceedings, he admitted that by "numerous" he meant "three."  NT 7/17/97 P.M. at 18.

<div align="center">24</div>

case.  NT 2/29/88 (Continuance Proceedings) at 2.  The continuance was denied.[11]  Mr. Bower

was left holding the bag on a woefully ill-prepared case.   No mental health evidence had been

prepared.  No records had been sought or obtained.  Only Mr. Breakiron's mother had been

interviewed.  Trial counsel did not even know that his client had a history of blackouts.

Trial counsel did little to remedy the failures of his predecessors. Counsel apparently

believed that since Dr. Adamski found Mr. Breakiron competent and not insane there were no

mental health issues in the case and no need to have Mr. Breakiron evaluated.   NT PCRA

7/17/97 at 26 (counsel testifying that second evaluation was unnecessary since Dr. Adamski

found that Mr. Breakiron was competent and sane).

Nevertheless, at his client's request, he requested another evaluation.   Again, counsel did

not request a defense expert, a confidential evaluation, or ask that his client be evaluated for

diminished capacity or mitigation.  Dr. Reich was appointed for the evaluation.  Petitioner was

again informed that this report was not confidential, either, and chose, therefore, not to speak

with the examiner.  Breakiron-2, 729 A.2d at 1098.  Dr. Reich's report was limited to the issue of

competency and, in its entirety, stated: "Mark David Breakiron was evaluated and the chart

reviewed on March 3, 1988.  At this time Mr. Breakiron was found to be competent to stand trial

and assist counsel with his defense.  He is able to consult with a lawyer and has a rational

understanding of the charges against him."  Report of Dr. Reich, 3/3/88.

Counsel was fundamentally confused about the defendant's right to an appropriate mental

health examination:

_____

[11]The continuance was denied apparently because of backlogs in the Court's docket.  See
NT 3/2/88 Continuance Proceedings at 8-9.

25

> Q:    Did you tell Mark that he had the right to have a private psychiatrist
>        evaluate him if he disagreed with the result of the court-appointed
>        psychiatrist from the county?
>
> A:    If he could afford to hire one, he could have gotten one.
>
> Q:    If he could afford to hire one?
>
> A:    Is that what you are talking about?  If he didn't like the one that was there,
>        he could have gone and gotten a private psychiatrist?  Or, if I could have
>        petitioned the court or something like that?

NT PCRA 7/17/97 PM at 35; see also NT PCRA 7/18/97 AM at 24 (Trial counsel admitting:  "I don't think we really ever discussed having psychological testing done.... None of that was ever discussed.")  As the Pennsylvania Supreme Court correctly concluded, counsel "mishandled" the mental health aspects of the case.

Nor did counsel attempt to take advantage of what little time remained to investigate any mental health issues:

> Q:    During your representation, did you subpoena or secure any school
>        records?
>
> A:    I don't believe so.
>
> Q:    Besides psychiatric – the petition for psychiatric evaluation, did you ever
>        petition for a psychological examination for the purpose of psychological
>        tests being done on Mark Breakiron?
>
> A:    No.
>
> Q:    Did you review any psychological testing that may have been done prior to
>        the crime?
>
> A:    No.
>
> Q:    Did you ascertain Mark Breakiron's IQ level?
>
> A:    Do you mean, did I have him tested for it, or did I—

> Q:      No, no, no.  Did you review any records that may have indicated his IQ
>         level prior to March, 1987?
>
> A:      No.

NT PCRA 7/17/97 PM at 23.  <u>See also</u> id. at 29-30 (counsel admits not seeking or reviewing any

other medical records of Mr. Breakiron or asking Mr. Breakiron about them); <u>id.</u> at 32-33

(counsel admitted he doesn't "have any idea" if Dr. Adamski reviewed any records of Mr.

Breakiron).

### e.      The trial and the penalty phase.

At trial, the only evidence to support the diminished capacity defense offered was the

testimony of Mr. Breakiron that he had been drinking and could not remember exactly what

happened.  NT at 1253-56.  Obviously relevant evidence that he had also consumed other drugs

on the night of the offense was excluded without objection from defense counsel. NT at 1239.

No mental health testimony was offered to support Mr. Breakiron's account.  No description of

what a blackout consists of was offered.  None of the available records to corroborate Mr.

Breakiron's history of blackouts were offered.  Indeed, trial counsel admitted at the PCRA

hearing that he did not even know that Mr. Breakiron suffered a history of blackouts.   NT PCRA

7/17/97 PM at 22.

Similarly, at penalty phase, counsel offered no mental health expert, provided no

evidence about Mr. Breakiron's intoxication the night in question.  Nor did he call any mental

health expert to discuss his well-documented mental illness, his history of blackouts, explained

that alcoholism was a disease or explored his traumatic upbringing.   Instead, he presented the

testimony of his mother, his minister and Mr. Breakiron himself.  Unprepared by his attorney,

Mr. Breakiron stated simply, "I like to drink."

**B.    Counsel Unreasonably Relied Upon Dr. Adamski's Report in Lieu of a Defense Mental Health Evaluation.**

Counsel's reliance on Dr. Adamski's report was unreasonable because it was not confidential and it was not directed at the issues relevant to Mr. Breakiron's trial and sentencing: diminished capacity and mitigating circumstances.

**1.    The evaluation was not confidential**.

Dr. Adamski performed the evaluation as the court's expert and produced a report evaluating Mr. Breakiron's competency and sanity. Dr. Adamski was <u>not</u> appointed to be a defense expert.[12] At the evaluation, Dr. Adamski first warned Petitioner that anything he said could be used against him at trial. <u>Breakiron-2</u>, 729 A.2d at 1098. Because he did not want to waive his Fifth Amendment privileges, Mr. Breakiron never told Dr. Adamski about his alcohol and drug use on the night of the offense, NT PCRA 9/29/97 at 76, although Mr. Breakiron's state of mind on the night of the incident was obviously the critical issue at trial. Thus, the evaluation was done without <u>any</u> confidentiality and was performed as much for the court and the prosecution as for the defense. Counsel was ineffective for failing to obtain the defense expert to which he was entitled.

Due process requires that an indigent defendant, especially in a capital case, be provided with the "basic tools of an adequate defense," <u>Britt v. North Carolina</u>, 404 U.S. 266, 277 (1971), including "access to the psychiatric examination and assistance necessary to prepare an effective

---

[12]Petitioner would have absolutely entitled to the appointment of a defense expert if he had requested one. <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985); <u>Szuchon v. Horn</u>, 273 F.3d 299, 318 (2001) ("Under <u>Ake</u>, evaluation by a 'neutral' court psychiatrist does not satisfy due process.")

defense," Ake v. Oklahoma, 470 U.S. 68, 70 (1985). Such "basic tools" for "an effective defense" were not utilized by counsel in this case.

In Ake, the Supreme Court recognized that there are profound, constitutionally significant differences between an "independent" mental health evaluation performed for the court and the prosecution as well as the defense, and the assistance of a defense expert. Because "[p]sychiatry is not ... an exact science, and psychiatrists disagree widely and frequently" in their answers to the questions posed by any case, the finder of fact "must resolve differences in opinion within the psychiatric profession on the basis of the evidence offered by each party." Ake, 470 U.S. at 81.

In other words, "[c]onsistent with the adversarial nature of the fact-finding process and the quasi-scientific nature of psychiatric opinion, the Ake court explicitly rejected the notion ... that there is such a thing as 'neutral' psychiatric testimony." Smith v. McCormick, 914 F.2d 1153, 1157 (9th Cir. 1990). Thus, "under Ake, evaluation by a 'neutral' court psychiatrist does not satisfy due process." Szuchon v. Horn, 273 F.3d 299, 318 (2001).[13] Instead, an expert must be appointed to assist the defense – "[t]he right to psychiatric assistance does not mean the right to place the report of a 'neutral' psychiatrist before the court; rather it means the right to use the services of a psychiatrist in whatever capacity defense counsel deems appropriate." Smith at

---

[13] Accord Starr v. Lockhart, 23 F.3d 1280, 1290 (8th Cir. 1994) (under Ake due process is not satisfied by an "examin[ation] by neutral psychiatrists"); Bright v. State, 265 Ga. 265, 455 S.E.2d 37, 46 (1995) ("Ake counsels that the appointment of neutral psychiatrists whom either the state or the defense may question does not satisfy the requirements of due process."); Rey v. State, 897 S.W.2d 333, 342-43 (Tex. Cr. App. 1995) (en banc) (under Ake, "'neutral' experts are insufficient to satisfy due process in our adversarial system"); see also Marshall v. United States, 423 F.2d 1315, 1319 (10th Cir. 1970) (expert who shares "a duty to the accused and a duty to the public interest" is burdened by "an inescapable conflict of interest").

1157.[14]

As the Third Circuit has explained, counsel cannot effectively prepare and utilize expert mental health assistance unless the defendant is "as free to communicate with a psychiatric expert as with the attorney he is assisting." United States v. Alvarez, 519 F.2d 1036, 1046 (3d Cir. 1975); accord Smith, 914 F.2d at 1159-60 (quoting Alvarez). When, as here, there is no confidentiality because the expert is reporting to the prosecution and the court, the lack of confidentiality has "the inevitable effect of depriving defendants of the effective assistance of counsel." Alvarez, 519 F.2d at 1046; Smith, 914 F.2d at 1160; see also Christy v. Horn, 28 F.Supp.2d 307, 321 (W.D. Pa. 1998) ("A defendant is denied the essential benefits of an expert when the services of the doctor must be shared with the prosecution."). These confidentiality protections were absent in Dr. Adamski's evaluation. The results are apparent where Mr. Breakiron refused to discuss the facts of the case with Dr. Adamski.

Given the circumstances, Mr. Breakiron's lack of trust was wholly appropriate – he was talking to an agent of the court and the state, not a member of the defense team. Dr. Adamski's role as servant of the court and the prosecution prevented the defense from obtaining the appropriate evaluation. Counsel was ineffective for failing to obtain the confidential evaluation of Mr. Breakiron to which he was constitutionally entitled.

### 2. The evaluation was not directed to the issues relevant at trial and sentencing: diminished capacity and mitigation

Even if the defense were not constitutionally entitled to a confidential psychiatrist, Dr. Adamski's evaluation was inadequate because it was not directed at the issues at trial:

---

[14] Accord Liles v. Saffle, 945 F.2d 333, 340 (10th Cir. 1991); Cowley v. Strickland, 929 F.2d 640, 644 (11th Cir. 1991); Christy v. Horn, 28 F.Supp.2d 307, 321 (W.D. Pa. 1998).

30

petitioner's diminished capacity, intoxication, and mitigation.   Dr. Adamski's evaluation was limited to the questions of whether Petitioner understood the proceedings; if he could cooperate with counsel; and if he was insane at the time of the offense.   Thus, any possible benefit of Dr. Adamski's evaluation was further gutted by its narrow scope.

The effects of this narrow focus are apparent on the face of the report.   For example, Dr. Adamski notes that Petitioner suffers from "long-standing alcohol problems as manifested by his symptoms of tolerance to alcohol as well as blackout episodes."   Such information and evidence would be highly relevant to the intoxication/diminished capacity defense offered at trial and to the (e)(2), (e)(3), and (e)(8) mitigating circumstances.[15]   Nevertheless, it was not explored by Dr. Adamski or counsel.   Similarly, the report notes that Mr. Breakiron suffers from "long-standing problems of episodic dyscontrol," and impulsivity problems -- factors that would be relevant to whether he had the specific intent to kill necessary for first degree murder and the (e)(2) ("mental or emotional disturbance"), (e)(3) ("capacity to conform") , and (e)(8) (catch-all) mitigating circumstances.   Dr. Adamski did not explore these factors, however, because he was appointed only to determine Mr. Breakiron's competency, and whether or not he was legally insane.

Ake makes it clear that a general competency examination is not constitutionally adequate.   Ake, 470 U.S. at 1090-91 (Ake had been examined for competency at the time of trial but not for diminished capacity or mitigating circumstances).   "As Ake explains, due process

_____

[15]The Pennsylvania Death Penalty Statute, 42 Pa. C.S. § 9711 (e) reads as follows: Mitigating circumstances shall include the following: (2) The defendant was under the influence of extreme mental or emotional disturbance... (3) The capacity of the defendant to... conform his conduct to the requirements of law was substantially impaired... (8) Any other evidence of mitigation concerning the character and record of the defendant and the circumstances of his offense."   The jury in this case found no mitigating circumstances.

31

requires access to an expert who will conduct, <u>not just any, but an appropriate examination</u>. We find that [Petitioner]'s examination was inappropriate because it did not delve into the mitigating questions essential to [Petitioner]... The issue of mitigation, or diminished capacity is different from that of guilt." <u>Starr v. Lockhart</u>, 23 F.3d 1280, 1289 (8th Cir. 1994).[16]

### 3.  Dr. Adamski's report contained numerous red flags that called for further investigation.

As explained above, the Dr. Adamski evaluation was not addressed to mitigation or diminished capacity. Nevertheless, it included numerous red flags that call for further investigation, childhood suicide attempts, problems of alcohol abuse, blackouts, epidsodic dyscontrol, and prior psychiatric treatment. Adamski report of 8/27/87. As related above, none of Mr. Breakiron's counsel investigated any of these areas. It was ineffective not to perform any investigation of the matters contained in the report or obtain a mental health expert to develop these matters for the diminished capacity defense offered at trial and mitigation at sentencing.

### C.  Counsel was Ineffective at Guilt Stage.

### 1.  Counsel's performance was constitutionally deficient.

In <u>Jacobs v. Horn</u>, 395 F.3d at 103, the Third Circuit recognized that counsel seeking to raise a diminished capacity defense has a duty to adequately investigate the defendant's mental health history and background, and to provide that information to a mental health expert. In

---

[16]A competency evaluation is a far cry from an actual evaluation for mental health mitigating evidence. <u>See</u> <u>Blanco</u>, 943 F.2d at 1503 (there is "a great difference between failing to present evidence sufficient" to show incompetency to stand trial and "failing to pursue mental health mitigating evidence" -- "[o]ne can be competent to stand trial and yet suffer from mental health problems that the jury .... should have had an opportunity to consider."); <u>Kenley v. Armontrout</u>, 937 F.2d 1298, 1307 (8th Cir. 1991) ("The fact that [a psychiatric] report rules out a mental disease or defect and incompetency does not mean it rules out lesser but potentially mitigating conditions and disorders.")

Jacobs, trial counsel pursued a diminished capacity/heat of passion defense, and, in preparation

for trial, had his client examined by a mental health expert with reference to his state of mind at

the time of the killing.  Counsel failed, however, to conduct any investigation into defendant's

background, and, thus, failed to discover evidence of Jacobs' mental retardation, brain damage,

or other impairments.  As a result, the mental health expert relied solely on his oral evaluation of

Jacobs, and was unable to support the diminished capacity defense:

> Trial counsel was thus unable to support Jacobs' diminished capacity defense with
> psychiatric evidence establishing that he suffered from any mental disorders
> which prevented him from formulating the specific intent to kill. Apparently the
> only evidence of heat of passion or diminished capacity presented at the guilt
> phase was Jacobs' own testimony that he "lost it"...

Id. at 102-03.

> The Third Circuit concluded that counsel was constitutionally deficient:

> At the time counsel decided not to investigate further, he knew or should have
> known from Jacobs' behavior and from his interactions with Jacobs that he should
> initiate some investigation "of a psychological or psychiatric nature."  (PCRA
> Hearing Tr. 5/29/97 at 29:24).  Counsel knew that Jacobs, a young man with no
> criminal history or history of violence, admitted to stabbing his girlfriend more
> than 200 times.  Counsel knew that Jacobs faced the death penalty, yet did not
> inform Dr. Davis that the Commonwealth was seeking the death penalty, nor did
> he provide Davis with any background information concerning the crimes or
> Jacobs' history.  Counsel interviewed Jacobs' mother before trial, but did not ask
> her any questions regarding Jacobs' mental health history, childhood, or
> background.  In light of all that was known or made available to counsel, we
> conclude that Jacobs has satisfied the first prong of the Strickland test.  He has
> demonstrated that counsel did not exercise reasonable professional judgment in
> failing to investigate further and discover evidence of Jacobs' mental retardation,
> brain damage, and other impairments that could have prevented him from forming
> the specific intent to kill Tammy Mock.

Id. at 103; see also id. at 104, n.7 ("[t]he unreasonableness of counsel's decision is compounded

by the fact that he pursued a diminished capacity defense without any expert evidence to support

it").

Mr. Breakiron's lawyer did far less than the lawyer found ineffective in <u>Jacobs</u>.  Jacobs lawyer at least retained an expert and had Jacobs evaluated in anticipation of a diminished capacity defense.  Mr. Breakiron's lawyer never even took that initial, basic step.  Here, counsel went to trial with a defense centered on Petitioner's diminished capacity due to alcohol intoxication, yet never made an effort to secure the appropriate and necessary expert evaluation.  Like the ineffective lawyer in <u>Jacobs</u>, Mr. Breakiron's lawyer relied solely on his client's own testimony to support the diminished capacity defense.   <u>Jacobs</u> compels the conclusion that, in this case, the deficient performance prong has been satisfied.

<u>Jacobs</u> also recognized that counsel "knew or should have known from Jacobs' behavior and from his interactions with Jacobs that he should initiate some [mental health] investigation." <u>Id.</u> at 103.  Mr. Breakiron's lawyer had similar knowledge.  Counsel knew that even prior to Petitioner's arrest on the murder charges, he had been arrested shortly after the killing for public drunkenness and, because of his threats to commit suicide, was sent to the Fayette County Mental Health Center for an evaluation.  The report of that evaluation revealed that Mr. Breakiron had a history of psychiatric treatment, drug and alcohol abuse, and blackouts.

Counsel  knew that Mr. Breakiron had mental problems and knew that the defendant's mental condition was likely to be a critical issue at trial.  Instead of investigating his background or obtaining a defense mental health expert defense counsel acquiesced in the appointment of a neutral court expert who only evaluated Mr. Breakiron for his competency to stand trial and whether or not he was insane.  Defense counsel did not ask the expert to evaluate Mr. Breakiron for either diminished capacity or mitigation.

34

As described above, counsel also failed to obtain prior records about Mr. Breakiron that

document his history of mental and emotional problems and alcohol and substance addiction.

Because counsel failed to investigate and develop this information, he also failed to provide it to

a mental health expert.  Nor did counsel interview any relatives of Mr. Breakiron's other than his

mother.  Counsel's failure to obtain and provide to an expert this important background

information constituted ineffective assistance of counsel.  Thus, even if counsel had sought the

necessary evaluation – and he did not – his failure to conduct an appropriate background

investigation renders him ineffective under Jacobs.[17]

### 2.    Petitioner was prejudiced.

In the PCRA proceedings, trial counsel (Mr. Bower) indicated that his strategy was that of

diminished capacity based on Mr. Breakiron's consumption of alcohol at the time of the offense.

NT PCRA 7/18/97 AM at 14.  Nevertheless, counsel failed to have Mr. Breakiron properly

evaluated,  failed to obtain a defense expert, failed to obtain relevant records, and failed to

present any of the evidence available to support the intoxication defense that he offered at trial

---

[17]See also, Glenn v. Tate, 71 F.3d 1204, 1210 n.5 (6th Cir. 1995) ("defense counsel should obviously have worked closely with anyone retained as a defense expert to insure that the expert was fully aware of all facts that might be helpful to the defendant"); Wallace v. Stewart, 184 F.3d 1112, 1118 (9th Cir. 1999) ("It's true that the [defense mental health] experts who examined [the defendant] didn't ask [counsel] to investigate his background further.  However, ... this does not relieve the attorneys of their duty to seek out such evidence and bring it to the attention of the experts."  (footnote omitted)); Smith v. Stewart, 189 F.3d 1004, 1011 (9th Cir. 1999) (in case where counsel had defendant seen by six psychiatrists, the court noted "the duty of defense counsel 'to seek out [evidence of the defendant's background] and bring it to the attention of the experts'" and found counsel ineffective (bracketed material in original)); ABA GUIDELINES, 11.8.6, The Defense Case at the Sentencing Phase (counsel should always investigate and consider presenting the client's "[f]amily and social history (including physical, sexual or emotional abuse, neighborhood surroundings" as well as "[e]xpert testimony concerning [such a background] and the resulting impact on the client").

other that his client's unsupported testimony that he had been drinking. Mr. Breakiron was prejudiced by counsel's deficient performance. The unpresented evidence would have created a reasonable probability that the jury would have found that the Commonwealth could not prove that he had the specific intent to kill beyond a reasonable doubt. The Pennsylvania Supreme Court's rejection of this claim was objectively unreasonable and applied a standard of showing prejudice that was almost insurmountable – and was "contrary to... clearly established Federal law,"

           a.     **<u>Jacobs</u> compels a finding a prejudice.**

<u>Jacobs</u> also mandates the conclusion that Mr. Breakiron was prejudiced by his counsel's error. After explaining that the prejudice "standard is not 'a stringent one,'" <u>id.</u> at 105 *(quoting* <u>Jermyn v. Horn</u>, 266 F.3d 257, 282 (3d Cir.2001)), the <u>Jacobs</u>, the Court relied upon the conclusions of mental health experts who were provided with the appropriate background information to find that the petitioner was prejudiced by counsel's deficient investigation and performance. <u>Id.</u> at 105.

Here, substantial evidence was readily available to support and corroborate Mr. Breakiron's voluntary intoxication defense. Most importantly, a defense mental-health expert could have testified to the fact that Mr. Breakiron was intoxicated on the evening of the event and suffered from a blackout during the events in question. Such testimony could be corroborated by Mr. Breakiron's history of blackouts. This would have negated the specific intent to kill necessary to prove first-degree murder. Moreover, a defense mental health expert could have explained the significance of Mr. Breakiron's extensive record of alcohol dependence to the jury.

36

State post-conviction counsel retained the respected forensic psychiatrist Dr. Christine Martone to evaluate Mr. Breakiron.[18]  In post-conviction proceedings she offered some of the testimony that the jury could and should have heard:

> At the time of the incident, and at the time of his trial, it is my opinion that Mr. Breakiron suffered from Alcohol and Multiple Drug Abuse and Dependence.  He also suffered at the time of the incident from Alcohol and Drug Intoxication.[19]

---

[18]Current counsel have retained the services of two other psychiatrists who have reviewed the relevant materials of this case and have evaluated Petitioner.  Both Dr. Julie Kessel and Dr. Fox reach conclusions consistent with Dr. Martone.  See Affidavits of Drs. Julie Kessel and Robert Fox.

The fact that these affidavits were not presented in state court does not bar this Court's consideration.  As long as the essence of the claim is exhausted in state court, there is no requirement that every fact pled in federal court must have been pled in state court, or that every legal argument for relief must have been articulated verbatim in the state court.  Vasquez v. Hillery, 474 U.S. 254 (1986) (permitting presentation of new facts in federal court that strengthened claim did not alter the federal claim); Stevens v. Delaware Correctional Center, 295 F.3d 361 (3rd Cir. 2002) (presenting additional affidavits that strengthened claim for the first time in federal court did not render the claim unexhausted);  Morris v. Dretke, 413 F.3d 484, 491 (5th Cir. 2005) (Petitioner's presentation of new evidence merely supplemented the Atkins claim Petitioner had already presented to the state courts, and the district court erred in dismissing the Atkins claim for want of jurisdiction). Nevertheless, while Drs. Fox and Kessel corroborate the testimony of Dr. Martone at the PCRA hearing, and provide further support for her conclusions, this Court need not consider their affidavits, as Petitioner is entitled to habeas relief on the basis of the PCRA testimony alone.

[19]Dr. Kessel explained:

> On the evening of the incident for which Mr. Breakiron is incarcerated, he was intoxicated, and suffered a blackout.  In the context of that experience, he also appears to have suffered a trauma to the head, and developed an explosive episode of dyscontrol.  As a result of a combination of his voluntary intoxication, his underlying mental illness, Intermittent Explosive Disorder, he was impaired in his capacity to form the specific intent to kill such that he had diminished capacity.

Affidavit of Dr. Kessel.

NT PCRA 9/17/97 at 33.   Dr. Martone's testimony demonstrated that a defense mental health

expert could also have explained that in her expert opinion Mark suffered a blackout:

> [I]n my opinion, he suffered a blackout.  He has had blackouts before.  The
> amount that he ingested, and the period of time that he ingested in his life from
> age thirteen, would be very consistent with experiencing blackouts.

NT PCRA 9/17/97 at 35.   Her conclusion that Mark suffered a blackout was directly probative to

whether Mark had the specific intent to kill:

> Q:      Maybe for the purpose of the record and for me and the Court, what does
>         the term blackout mean?
>
> A:      ...A blackout does not mean one is unconscious.  <u>It means that they really
>         are acting in almost a state of automation.</u>  They do not remember, and
>         they do not appear to have the same control that a non-intoxicated person
>         would have.

NT PCRA 9/17/97 at 37.   Mr. Breakiron was prejudiced by the absence of this testimony at trial

to explain the effect of alcohol on his behavior support and support his intoxication and

diminished capacity defense.

Further material in support of the diminished capacity defense was available in Mr.

Breakiron's records, all of which were readily available to counsel prior to trial and all of which

would have been obtained and reviewed by effective counsel.  The Mayview Hospital records

note that Mark: "Began to use alcohol at the age of thirteen or fourteen" "he gets out of control

when he drinks."  Mayview Hospital report, 2/10/84.  "He admits to blackouts.... arrests stem

from alcohol and intoxication."  Fayette County Mental Health Center Readmission Intake,

3/27/87.  These records would have substantially buttressed a mental health expert's opinion

supporting Mr. Breakiron's intoxication defense and showed to the jury that Mr. Breakiron had a

long well-documented history of alcohol- related mental infirmity.

38

Even Dr. Adamski's report, which did not specifically address diminished capacity, contained significant support of the diminished capacity defense.  For example, Dr. Adamski notes that "Mr. Breakiron suffers from long-standing alcohol problems as manifested by ... blackout episodes.... From his history he also appears to have had long-standing problems of episodic dyscontrol."  Dr. Adamski's report of 8/27/87.  This material was dropped into counsel's lap and would have substantially buttressed the defense's contention that Mr. Breakiron suffered from a blackout on the night of the event and that, therefore, he did not have the deliberate, willful, premeditated intent to kill required to sustain a conviction of first degree murder. As in Jacobs, Mr. Breakiron was prejudiced by the absence of this kind of testimony at trial to support his intoxication/diminished capacity defense.

Moreover, counsel could have used expert testimony to rebut the Commonwealth's argument that Mr. Breakiron must have had the specific intent to kill because he was able to remember parts of the evening, he was able to drive and acted purposefully in attempting to conceal his crime.  This argument is medically incorrect.  Such behavior is wholly consistent with the diminished capacity as a result of intoxication associated with an alcohol blackout.

A defense mental health expert such as Dr. Martone could have explained to the jury:

> [The person suffering from a blackout] can then suddenly, you know, begin to remember as the intoxication level begins to wear off, or if some very traumatic event occurs, which kind of breaks through, and you can act then in a very purposeful way afterwards, and be aware of some of the pieces of it.

NT PCRA 9/17/97 at 37.

> Q:    And, in your report on page five, I mean, the paragraph under Discussion and Recommendation, about midway down in that first paragraph, you have a sentence there that his actions subsequent to the stabbing do not negate a blackout.

39

A:      Yes.  They do not negate a blackout, because people act in a purposeful
        and or/violent way and/or foolish way.

NT PCRA 9/17/97 at 36-37.   But because counsel bungled Petitioner's mental health evaluation,

the jury never learned these basic facts of alcohol-induced blackouts, and instead were readily

swayed by the prosecutor's inaccurate and unsubstantiated theories that Petitioners' memories of

the events and the purposefulness of his post-homicide actions were necessarily inconsistent with

his intoxication defense.

### b.    The readily available evidence was vastly more powerful than what counsel presented at trial.

Counsel could have presented a powerful case that Mr. Breakiron lacked the specific

intent to kill based on the expert opinion of a mental health expert, the physiological effects of

his consumption of vast quantities of alcohol, his ingestion of illegal drugs, his lack of tolerance,

and his history of alcohol and substance abuse which included blackouts.  Because he failed to

investigate, he was ignorant of the availability of this evidence to support the defense.

Instead of presenting the readily available evidence of Mr. Breakiron's history of

blackouts and expert testimony to support the intoxication/diminished capacity defense, trial

counsel called Mr. Breakiron, to testify that he drank a great deal of alcohol.  NT at 1230-1256.

Mr. Breakiron also testified that he couldn't remember sections of the evening and that "it was

like a tv screen inside my head and I saw somebody laying there getting stabbed."  NT at 1256.

Without any mental health testimony to explain the phenomena of alcoholic blackouts and to put

this into context, the jury likely found this testimony merely bizarre.   Mr. Breakiron attempted to

testify about his illegal drug use on the night of the offense to support his voluntary intoxication

defense, but the Commonwealth's objection was improperly sustained without argument from

40

defense counsel.  NT at 1239.

Had counsel investigated and obtained a proper mental health evaluation, he could have presented a strong case that Mr. Breakiron's alcohol and drug ingestion, combined with his lack of tolerance and history of "episodic dyscontrol" supported his diminished capacity defense at trial.  There is at least a reasonable probability that the jury would have concluded that the Commonwealth did not prove that Mr. Breakiron possessed the specific intent to kill beyond a reasonable doubt.

In Jacobs, 396 F.3d at 105 n.8, the Court emphasized that:

> Jacobs need not establish his diminished capacity defense conclusively for the purpose of demonstrating a Sixth Amendment violation.  Rather, as we have explained, he is required to show only a reasonable probability that the outcome of the proceedings would have been different if trial counsel had presented evidence of Jacobs' mental retardation, organic brain damage, and other mental deficiencies.

Id.

Mr. Breakiron readily meets this standard.  Had counsel conducted an adequate investigation of the available records, he would have realized that a mental health evaluation would have established and supported the diminished capacity and intoxication defenses. Counsel was ineffective and Petitioner is entitled to habeas relief.

> **3.**    **The Pennsylvania Supreme Court's Opinion Relating to Guilt Stage Ineffectiveness Was "Contrary to" Clearly Established Law Because it Applied the Wrong Legal Standard.**

In Strickland, the United States Supreme Court held that the prejudice prong of the ineffective assistance of counsel standard was governed by a "reasonable probability" standard. Instead of applying this standard, the Pennsylvania Supreme Court required Mr. Breakiron to

41

show that counsel's errors "would have" changed the outcome.  Breakiron-2, 729 A.2d at 1099.

The Pennsylvania Supreme Court's application of the wrong legal standard means that its

opinion is "contrary to" to clearly established federal law.

    In this case, the Pennsylvania Supreme Court applied a grossly erroneous standard in

addressing the prejudice caused by counsel's deficient performance.  Rather than apply the

"reasonable probability" standard mandated by Strickland, the Court required Mr. Breakiron to

prove conclusively that the outcome "would have changed."  Given this nearly impossible

burden, it is not surprising that the Court found that Mr. Breakiron was not prejudiced.  The

Pennsylvania Court held:

> These errors [in obtaining a mental evaluation], Breakiron asserts, prejudiced him
> because the effect was to deprive him of the opportunity to have a private
> psychiatrist testify as to his mental health and psychiatric history during both the
> guilt and sentencing phase of the trial.
>
>                     \*\*\*
>
> He surmises that trial counsel's failure to follow the MHPA left the attorney
> without any psychiatric evidence to assist in Breakiron's defense or to present
> mitigating evidence at trial. *We find that Breakiron has not met his burden of*
> *establishing that counsel's errors prejudiced* him because he cannot establish that
> had an examination been done according to the MHPA, the defense strategy, *or*
> *the outcome of either the guilty verdict or sentence of death, would have changed*.
> Instead, the PCRA proceedings show that Breakiron was competent at the time of
> trial, and there was no evidence that trial counsel could have presented an insanity
> defense.  Therefore, the only defense available to trial counsel was of diminished
> capacity, which was presented and rejected by the jury at trial.  Thus, the alleged
> errors, had they been corrected, *would not have led to a different result, and we*
> *cannot find that Breakiron was prejudiced in the guilt phase of the trial.*

Breakiron-2, 729 A.2d at 1099.   The Court rejected  Mr. Breakiron's claim because he could not

establish "his burden" of showing that "the outcome of either the guilty verdict of sentence of

death would have changed."

This is "contrary to... clearly established Federal law."    Indeed, it is <u>so</u> "contrary to...

clearly established Federal law" *that it is the paradigmatic example used by the United States*

*Supreme Court to show  what "contrary to law" means*.  In <u>Williams v. Taylor</u>, the United States

Supreme Court made clear that:

> A state-court decision will certainly be contrary to our clearly established
> precedent if the state court applies a rule that contradicts the governing law set
> forth in our cases.   Take, for example, our decision in *Strickland v. Washington,*
> 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).   If a state court were to
> reject a prisoner's claim of ineffective assistance of counsel on the grounds that
> the prisoner had not established by a preponderance of the evidence that the result
> of his criminal proceeding would have been different, that decision would be "
> diametrically different," "opposite in character or nature," and "mutually
> opposed" to our clearly established precedent because we held in  *Strickland* that
> the prisoner need only demonstrate a "reasonable probability that ... the result of
> the proceeding would have been different."  *Id.,* at 694, 104 S.Ct. 2052.

<u>Williams</u>, 529 U.S. at 405.[20]

The purely outcome determinative standard applied by the state court in Petitioner's case

is therefore contrary to <u>Strickland</u>.  <u>See</u> <u>Magan v. Hofbauer</u>, 253 F.3d 542, 550 (6th Cir. 2001) ("it

is clear that the Michigan Court of Appeals's standard placed too great a burden of proof on the

defendant to show prejudice: under that state court's definition, a defendant must demonstrate,

not just a 'reasonable probability,' but an absolute certainty that the outcome of the proceedings

would be different").  <u>See also</u> <u>Rose v. Lee</u>, 252 F.3d 676, 689 (4th Cir. 2001) (noting that it was

"contrary to" clearly established Supreme Court precedent for state habeas court to require

petitioner to prove prejudice under <u>Strickland</u> by a preponderance of the evidence); <u>Mask v.</u>

<u>McGinnis</u>, 233 F.3d 132, 140 (2d Cir. 2000) (concluding that state trial court which failed to

---

[20]Indeed, the error in Mr. Breakiron's case was even more egregious because the
Pennsylvania Supreme Court did not use a preponderance of the evidence standard but rather the
almost insurmountable "would have changed" standard.

employ "reasonable probability" standard when evaluating claim of ineffective assistance of counsel during plea negotiation unreasonably applied clearly established Supreme Court precedent).

The Pennsylvania Supreme Court engaged in the same incorrect prejudice analysis utilized by Wiliams to exemplify a state court decision that was contrary to clearly established federal law.   The Court did not apply the proper standard of prejudice under Strickland but rather adjudicated Petitioner's ineffectiveness claim under its own "would have changed" standard rather than the correct "reasonable probability" standard.  Strickland at 694.   Petitioner has met the standard for habeas relief required by § 2254(d).  See Jacobs  at 105 ("Jacobs need not show that counsel's deficient performance "more likely than not altered the outcome in the case"-- rather, he must show only "a probability sufficient to undermine confidence in the outcome" (quoting Strickland)); id. at n.8 ("We emphasize that Jacobs need not establish his diminished capacity defense conclusively for the purpose of demonstrating a Sixth Amendment violation. Rather, as we have explained, he is required to show only a reasonable probability that the outcome of the proceedings would have been different if trial counsel had presented evidence of Jacobs' mental retardation, organic brain damage, and other mental deficiencies").

In any event, the determination that Breakiron was not prejudiced would be unreasonable under Strickland and Williams.  The Pennsylvania Supreme Court held that Petitioner was not prejudiced because his evidence at the PCRA did not show that he was either incompetent or insane, and that trial counsel had presented a diminished capacity defense.  This reasoning is objectively unreasonable.

First, the comments about competency and insanity were irrelevant to the issue raised.

44

Petitioner's claim was that counsel was ineffective in his presentation of the diminished/capacity/intoxication defense. Whether or not he presented evidence of incompetency or insanity had nothing whatsoever to do with the issue at hand.

Second, the fact that counsel presented a diminished capacity, albeit through only Mr. Breakiron's testimony, did not negate prejudice. The defense that was presented was anemic. As Petitioner has shown, had counsel conducted a competent investigation, he could have presented a defense that was supported by expert mental health testimony and corroborated by a host of witnesses and records documenting Mr. Breakiron's alcoholic history. The Pennsylvania Supreme Court's reasoning in this regard was nonsensical.

Jacobs also shows that the Pennsylvania Supreme Court's opinion in Breakiron was objectively unreasonable. In Jacobs the state court had rejected Jacobs' claim that counsel's performance was deficient because, based on the results of his expert's evaluation (which found no major mental illness), counsel had pursued a diminished capacity claim "to the best of his ability." Id. at 106. The Court of Appeals found that such a limited view of Strickland was unreasonable. Id. at 106-07 ("In our view, the Pennsylvania Supreme Court's decision, based on a single factor to the exclusion of other relevant factors, involved an unreasonable application of Strickland.)

Likewise, here, the Pennsylvania Supreme Court' applied similar reasoning to its conclusion that Mr. Breakiron had not been prejudiced by counsel's error. Breakiron-2, 729 A.2d at 1099 (absence of prejudice grounded on the fact that "*the only defense available to trial counsel was of diminished capacity, which was presented and rejected by the jury at trial*"). Thus the state Court's prejudice analysis is based on a single fact, rather than the totality of

circumstances required under Strickland. As in Jacobs, such myopic reasoning is an

unreasonable application of Strickland.[21]

The Pennsylvania Supreme Court also noted its belief that the "evidence of Breakiron's

guilt was overwhelming." Breakiron-2 at 1100, n.11. The Court relies upon the fact that four

witnesses identified him as the last person in the bar, traces of the deceased's blood was found on

his clothes, Breakiron's testimony that he pulled a knife from the deceased's back, and his

admissions to disposing of the body, and taking the money. Id.

To the extent the Court relied on this reasoning in rejecting the claim of prejudice, the

Pennsylvania Supreme Court was objectively unreasonable. While its factual litany implicates

Petitioner as the perpetrator, none of the facts demonstrate anything about his intent, and his

ability to form that intent, at the time of the crime. Mr. Breakiron never denied killing the

deceased. He testified that he did not remember. The critical issue at trial, and the defense

counsel failed to develop, focused on the question of intent. As Dr. Martone explained, none of

the facts identified by the state court were inconsistent with an alcohol blackout.

The facts set forth by the Pennsylvania Supreme Court as overwhelming evidence of guilt

are equally consistent with an alcoholic blackout and a diminished capacity/intoxication defense.

---

[21]In Jacobs, the state court found that counsel's performance was not deficient, and, here, the state court found that Petitioner had not been prejudiced by counsel's error. This difference is insignificant. In both cases, the state court found that no error had occurred by focusing on a single fact -- that trial counsel, even without an expert, nevertheless presented a diminished capacity defense. The Court of Appeals found such a narrow, singularly focused standard unreasonable in Jacobs, and it is equally unreasonable here. In both Jacobs and here, defendants with viable diminished capacity defenses were denied the benefit of expert testimony. Here, Dr. Martone could have testified that Petitioner suffered an alcoholic blackout at the time of the killing. Such testimony would have corroborated Petitioner's own testimony of blackout, and supplied badly needed medical support for the defense counsel lamely tried to present. Just as in Jacobs, Petitioner is entitled to relief.

Pennsylvania law recognizes that an accused is entitled to an acquittal if his guilt of the crime charged is not the only reasonable interpretation of which the facts adduced against him are susceptible.  Commonwealth v. Bybel, 611 A.2d 188, 189 (Pa. 1992).[22]  Thus, the state court's assertion that Petitioner was not prejudiced because of the supposedly "overwhelming" evidence of his intent was utterly unsupported by the record and objectively unreasonable.

As demonstrated above, if counsel had Mr. Breakiron properly evaluated, he could have provided an expert opinion to corroborate Mr. Breakiron's account that he suffered a blackout and corroborated his intoxication and diminished capacity defense.  This would have also rebutted the Commonwealth's contention that Mr. Breakiron could not have suffered a blackout because he was able to drive and remember certain things about the evening.  Instead, counsel failed to have Mr. Breakiron properly evaluated and was so unprepared that he did not know that Mr. Breakiron had a documented history of blackouts.  There is far more than a "reasonable probability" that counsel's failures prejudiced Mr. Breakiron.  Habeas relief is appropriate on this claim.

D.    Counsel was Ineffective at Sentencing.

_____

[22]In Commonwealth v. Davis, 312 Pa. Super. 85, 89-90, 458 A.2d 248 (1983), the Court explained:

> However, "[w]hen two equally reasonable and mutually inconsistent inferences can be drawn from the same set of circumstances, the jury may not be permitted to guess which inference it will adopt."  Commonwealth v. Hubbard, 472 Pa. 259, 270, 372 A.2d 687, 692 (1977).  See Commonwealth v. Woong Knee New, 354 Pa. 188, 47 A.2d 450 (1946).  "When a party on whom the burden of proof rests in either a criminal or a civil case, offers evidence consistent with two opposing propositions, he proves neither."

### 1.    Counsel's performance was constitutionally deficient.

As explained above, the revolving door nature of Mr. Breakiron's representation meant that no one ensured that Mr. Breakiron received an adequate mental evaluation, secured records, or interviewed family members.  As explained above, the transcript of the Continuance Proceeding indicates that weeks before trial, Mr. Bower indicated that Mr. Jeneks had been taking the lead role, and that he had only met with Mr. Breakiron once prior.   None of Mr. Breakiron's previous counsel had obtained a defense mental-health expert, secured records, or interviewed family members besides his mother.

Here, trial counsel did not even come close to satisfying his Sixth Amendment duty to thoroughly investigate.  Other than his discussions with Mr. Breakiron's mother and pastor, counsel , counsel did not interview family members and others who knew Petitioner and were familiar with his history, counsel failed to obtain records about Petitioner's family history, and counsel failed to obtain a mental health evaluation for mitigation.  In short, counsel's pre-trial investigation, at most, "acquired only rudimentary knowledge of [Petitioner's] history from a narrow set of sources" and, thus, did not satisfy the Sixth Amendment.  Wiggins, 539 U.S. at 524.

"The scope of [counsel's mitigation] investigation was also unreasonable in light of what counsel actually discovered" before trial.  Wiggins, 539 U.S. at 525.  As discussed above, counsel had some information relating to Mr. Breakiron's mental health history and turbulent background.  Counsel knew that Petitioner had a history of psychiatric and substance abuse problems.  Given the information that counsel knew, or should have known, "any reasonably competent attorney would have realized that pursuing these leads was necessary to making an

informed choice among possible defenses" at penalty-phase. Wiggins, 539 U.S. at 525 (counsel ineffective for failing to pursue leads, follow up on, and develop information that defendant's "mother was a chronic alcoholic," he "was shuttled from foster home to foster home and displayed some emotional difficulties," he had school problems, and "on at least one occasion, his mother left him and his siblings alone for days without food"); Outten, 464 F.3d at 418-19 (same for information that "Outten's father was an abusive alcoholic; Outten had struggled in school and ultimately failed to graduate; he had run away from home; and he had a history of substance abuse").[23]

     All of the evidence that should have been gathered and presented to the jury in support of his diminished capacity defense was also highly relevant to Mr. Breakiron at the penalty phase in support of the (e)(2) (mental or emotional disturbance), (e)(3) (capacity to conform to the law), and (e)(8) (catch-all) mitigating circumstances. A reasonable lawyer, knowing of Breakiron's fragile mental state and chronic history, would have thoroughly investigated and developed mitigating evidence relating to Petitioner's traumatic childhood and sad life history, mistreatment by his parents and others, mental problems, alcoholism, and intoxication at the time of the offense. Yet none of Mr. Breakiron's lawyers ever followed up on the information that was readily available to them. Counsel's representation was deficient. Rompilla, 545 U.S. at 391

---

[23] See also Rompilla, 545 U.S. at 390-91 & n.8 (counsel must pursue "red flags" for possible mitigation); Jermyn, 266 F.3d at 303-12 (counsel must investigate possibly mitigating information revealed by guilt-phase psychiatric evaluation); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) (counsel ineffective where he "had a small amount of information regarding possible mitigating evidence regarding Jackson's history" and "failed to follow up with further interviews and investigation"); Antwine v. Delo, 54 F.3d 1357, 1368 (8th Cir. 1995) (counsel must "follow[] through on" questions raised by mental health evaluation); Kenley v. Armontrout, 937 F.2d 1298, 1308 (8th Cir. 1991) (counsel must "follow available leads" for mitigation).

(counsel ineffective for failing to obtain records about defendant's prior conviction and use those records to develop mitigating information from family members and mental health experts); Wiggins, 539 U.S. at 516 (counsel ineffective for failing to develop social history from "social services, medical, and school records, as well as interviews with petitioner and numerous family members"); Williams, 529 U.S. at 395-96, 416 (ineffectiveness where counsel presented testimony from defendant's mother and two friends but failed to obtain records and failed to fully interview and present evidence from other "friends, neighbors and family"); Outten v. Kearney, 464 F.3d 401, 409-23 (3d Cir. 2006) (counsel ineffective for failing to obtain records; interview family members, friends and others familiar with defendant's life history; and obtain expert mental health evaluations for mitigation); Marshall v. Cathel, 428 F.3d 452, 464 (3d Cir. 2005) (counsel ineffective for failing to interview "family members, childhood friends, neighbors and business associates"); Jermyn v. Horn, 266 F.3d 257, 306-07 (3d Cir. 2001) (counsel ineffective for failing to obtain records and interview family members).

### 2.. Petitioner was prejudiced,

#### a. The readily available mitigation.

Counsel erroneously believed that Petitioner was only entitled to a defense mental health expert if "he could afford to hire one." NT PCRA 7/17/97 PM at 34. Consequently, counsel never sought the appointment of a defense mental health expert. Had he done so, a trained mental health expert could have explained that Mark suffered a blackout at the time of the offense: Dr. Martone's testimony about Petitioner's mental health impairments and alcohol blackouts was just as relevant to sentencing as it would have been to the guilt stage.

Dr. Martone, or any other trained mental health expert could have explained Mark's

mental health impairments:

> At the time of the incident, and at the time of his trial, it is my opinion that Mr. Breakiron suffered from Alcohol and Multiple Drug Abuse and Dependence.[24]  He also suffered at the time of the incident from Alcohol and Drug Intoxication; an Intermittent Explosive Disorder, which was precipitated and aggravated by intoxication . . .

NT PCRA 9/17/97 at 33.  At the penalty phase, she could have explained the mitigating effects of

Mark's Intermittent Explosive Disorder:

> Intermittent Explosive Disorder... is a condition where there is a rage, an uncontrolled rage, with violent aggressive outbursts, which are completely out of proportion to the precipitating stress or the provocation.  When the incident is over, the individual is frequently quite contrite.  It really had no goal in mind.  It wasn't necessarily to protect or to badger or to get money.  It is an uncontrollable rage.[25]

---

[24]Dr. Fox explained the mitigating effects of Alcohol Dependence:

> Alcohol dependence is an Axis I psychiatric illness as defined by the American Psychiatric Association in the Diagnostic and Statistical Manual.  The use of alcohol by alcoholics (individuals with this disease) is not the voluntary action of individuals who do not suffer from this severe disorder.  It is compulsive behavior driven by the disorder itself.

Affidavit of Dr. Robert Fox.

[25]Dr. Kessel explained Mr. Breakiron's Intermittent Explosive Disorder and its sources:

> Mr. Breakiron's father as well as his mother had periods of depression and mood instability.  This likely resulted in his having a genetic vulnerability as well to instability of mood.  In fact, Mr. Breakiron's mental instability continued into his young adult and adult years.  His crying fits and temper tantrums led to frank episodes of gross agitation.  These episodes would be triggered by a variety of stimuli including what seem to be insignificant events.  The episodes would be characterized by a sense of anxiety and agitation.  This experience would escalate to physical discomfort, intense pressure in his head and then an outburst of emotion or aggression, often not directed toward anything or anyone in particular.  The event might last for minutes during which time he would lose track of time and have a sense of unreality.  This would be followed by a sense of tiredness.  These episodes which have their origins in childhood, are consistent with a

NT PCRA 9/17/97 at 33.

Finally, counsel would be able to offer an expert opinion that Mr. Breakiron's

impairments were mitigating circumstances. As Dr. Martone testified:

> In my opinion, this individual, given his past history and his tendency towards an
> explosive disorder, with the amount of alcohol and drugs that he ingested, his
> frustration tolerance, his judgment, and his impulse control, would all be
> diminished to the extent that there would be, within a reasonable degree of
> medical certainty, mitigating circumstances in terms of his state of mind at the
> time of the crime.

NT PCRA 9/17/97 at 43.[26] Thus counsel could have presented expert testimony to support the

(e)(2), (e)(3), and (e)(8) mitigating circumstances.[27]

---

> diagnosis, Intermittent Explosive Disorder. In addition to his tendency to have
> frank aggressive outbursts prompted by a trigger, Mr. Breakiron also maintains a
> constant level of anxiety and tension. He reports period of racing heart, shortness
> of breath, upset stomach and reports frequent loose bowels for most of his life.
> He is often fidgety and restless and has a sense of lack of calm often. His mental
> status examination was consistent with free floating anxiety, distractibility some
> somatic preoccupation.
>     Intermittent Explosive Disorder can be associated with sub-clinical seizure
> activity. Although seizures were never diagnosed in Mr. Breakiron, an EEG
> which was performed at Centerville in 1975 indicated significant abnormality
> identified as "sharp waves". Individuals with Mr. Breakiron's characteristic
> pattern of explosive outbursts coupled with abnormal seizure activity can be
> medicated with anti-seizure medications. Such treatment is often useful in
> reducing explosive outbursts and may eliminate them altogether.

Affidavit of Dr. Julie Kessel.

[26]Again, as discussed supra, Drs. Kessel and Fox concur with these conclusions.

[27]Mental health mitigating evidence "can always be considered under subsection (e)(8)"
when it either does not fall within the ambit or is insufficient to establish the statutorily
enumerated mental health mitigating circumstances. E.g., Commonwealth v. Williams, 532 Pa.
265, 279, 615 A.2d 716, 723 (1992); Commonwealth v. Basemore, 744 A.2d 717, 737 & n.21
(Pa. 2000) ("personality disorders . . . were potential indicators of conditions which would
provide . . . mitigating evidence" under 42 Pa. C.S. § 9711(e)(2), (3); and where such evidence

Had counsel consulted standard medical references, he would have learned the

devastating impact of alcohol on adolescents:

> There are potentially important differences between drug and alcohol use in
> adolescents and in adults.  Among them are the effect of substance use on the
> developmental process itself (e.g. identity, motivation, peer relationships), the
> neurobiological consequences of use and abuse, and the above mentioned
> consideration of continuity versus discontinuity between adolescent and adult
> patterns of use.

Jerry W. Weiner,  Textbook of Child and Adolescent Psychology (1997) (hereinafter Weiner) at

641.  Counsel also could have explained to the jury the relationship between Mark's difficult

childhood environment and his alcohol problems:

> The disruptive effects of a parent's substance use are far-reaching and go beyond
> the poor role modeling that is self-evident.  Disruptive consequences of parental
> drinking include health, financial and legal difficulties; marital discord and
> domestic violence; and an inability to promote self-esteem and social competence
> (S.A. Brown 1989; J.L Johnston et al. 1991; Rivinus 1991).  The relationship
> between parental drinking and the development of psychopathology in offspring is
> well documented and further adds to a young person's risk of engaging in
> substance use....

Id. at 646.[28]  In particular, counsel could have explained that Mark's family situation played a

---

"alone would not appear to be sufficient to satisfy the criteria for subsections (e)(2) or (e)(3),
such evidence would, at a minimum, have been admissible into evidence under the catchall
mitigator in Section 9711(e)(8)").

[28] Dr. Fox explains the significance of his father's alcohol use:

> Mark Breakiron's father's alcoholism is also clinically significant.  A
> history of alcoholism in the prior generation is a significant predictor that Mr.
> Breakiron himself would develop a similar substance abuse disorder.  In an effort
> to cope with his dysfunctional family background and the effects of the trauma he
> suffered, Mr. Breakiron began drinking alcohol and using drugs at an early age.
> This behavior pattern was modeled by his father's alcohol abuse.  Also, such a
> history of turning to alcohol and drugs as a means of escaping inner turmoil is not
> unusual in cases of children raised in households like Mark's.  Alcoholism is a
> progressive disease that usually becomes worse at an early age in individuals with

critical role in causing his alcoholism:

> Family structure has long been thought to play a role in disruptive behavior. A longitudinal study on the impact of changes in family structure that come with divorce and remarriage showed that indeed these changes had profound effects. Boys, especially when divorce took place during adolescence, were most affected, and remarriage seemed to help prevent adolescent substance use (Needle et al. 1990).

Id. at 646

If counsel had fully investigated and contacted Mr. Breakiron's family and asked about his background, he would have learned that the devastating effects of his family dysfunction -- that his violent alcoholic father left them when Mark was eight and that Mark took it very hard. Affidavit of Bruce Breakiron; Affidavit of Gloria Breakiron; Affidavit of Holly Duda; Affidavit of Melanie Breakiron. [29] Counsel scratched the surface of this background in his presentation of Mark's mother's testimony at the penalty phase. NT at 1408-12. But counsel never explained to the jury the relationship between Mark's background and his alcoholism and psychiatric problems:

> Children of alcoholic parents often have associated psychiatric disturbances, such as attention deficit/hyperactivity disorder; conduct disorder; learning and language disorders; anxiety disorders; affective disorders; eating disorders; personality disorders; ingrained personality traits, including compulsive overachieving, low

---

his family history.

Affidavit of Dr. Robert Fox.

[29]Petitioner has submitted the affidavits of Holly Duda, Melanie Breakiron, Mindy Yunk, Bruce Breakiron, and Gloria Breakiron. These are accounts of Mr. Breakiron's family that provide additional background and help explain the genesis of the mental health problems from which Mr. Breakiron suffers. Their inclusion does not "fundamentally alter the legal claim..." Vasquez, Stevens. Nevertheless, even if all of the additional affidavits are ignored, Petitioner is still entitled to habeas relief on this claim based upon the testimony and evidence presented to the state courts.

self-esteem, denial of feelings, and difficulty with interpersonal relationships (Bennet et. al; Russell et. al 1985); and post-traumatic stress disorder (Cermack 1988).   They also are significantly more likely to develop alcoholism (Goodwin 1985, Schuckit 1985b) and to marry a substance abuser.

Weiner at 639-40.[30]

Trial counsel also would have learned that Marks' parents fought violently in front of the family.  Holly Duda reports that Mark's mother threw the wooden leg of a heavy butcher block table at her father.  Affidavit of Holly Duda, ¶ 2.  Similarly, Melanie Breakiron could have testified that she remembers her parents violently throwing each other across the rooms in fights.  Affidavit of Melanie Breakiron, ¶ 2.   The violence is corroborated by Mindy Yunk, Mark's sister.  Affidavit of Mindy Yunk, ¶ 2.[31]

_____

[30]See also Weiner at 645 ("Most efforts to link psychoactive substance abuse and biology focus on the transmission of alcoholism.  Twin studies (Cloninger et al. 1989) and adoption studies (Cadoret et al. 1980, 1986); Cloninger et al. 1981) document a strong genetic component to the predisposition to develop alcoholism.").

[31]Dr. Fox likewise explains the significance of family violence on Mark's development:

Children such as Mr. Breakiron, who witness violent relationships often suffer serious emotional and behavioral adjustment problems.  They are likely to have adjustment difficulties in a number of areas, including behavioral problems, and disorders in cognitive and emotional development.  They are likely to feel guilty for failing to stop the violence and failing to protect  family members.  They feel that they are to blame for the violence.  They carry with them feelings of being sad, withdrawn, afraid and anxious.  Their problems are often externalized in disruptive or inappropriate behavior.  They suffer deficits in social competence and have difficulties in peer relationships.

There is a high correlation between violence in the family and later violent activity by the childhood witness of that violence.  Violence witnessed during childhood may be internalized by the victim in childhood and acted-out in adulthood because children learn adult roles and behaviors by observing and interacting with adults.  Instead of learning appropriate developmental lessons, within his "home" the male role-model  was a violent alcoholic who did not provide appropriate care.  In a chaotic and sometimes violent childhood home,

55

Similarly, had counsel obtained the history referred to in Dr. Adamski's report, he would have discovered a wealth of mitigating evidence.  Dr. Christine Martone testified at the PCRA hearing that the family situation was very traumatic and that his mother had a great deal of difficulty maintaining control and taking care of the children:

> [H]e remembers a great deal of arguing or quarreling.  His father moved to Maryland, and his mother continued the upbringing of her family.  I confirmed with him something that I had already read in the records that she had difficulty maintaining control over these many children and managing as a single mother. He indicated that they were poor and they were raised on welfare and that there were times that Sheriff's notices were on the door.

NT PCRA 9/17/97 at 16.   The records reflect this chaotic environment.  See Centerville Report 6/11/76.  Dr. Martone also noted that when Mark was fourteen years old,  he was removed from the house because of a disruptive home environment.  NT PCRA 9/17/97 at 21.   This fact speaks volumes about the chaos in which the young Mr. Breakiron was raised.[32]

The testimony provided by Dr. Martone at the PCRA hearing that was relevant to Mr. Breakiron's guilt phase, described above, would have been equally applicable to the penalty phase.  Indeed because Petitioner's history of alcohol and substance abuse, including his history of alcohol blackouts, it would have been relevant and vital mitigating evidence, even if the jury

---

what the child learns is that the world is a frightening and unpredictable place. They learn that violence and aggression are normal and acceptable means of problem solving.  That Mr. Breakiron suffered and suffers such impairments is clear from the records, accounts of those who know him, and from my own evaluation of him.

Affidavit of Dr. Robert Fox.

[32]The records of his placement at New Castle YDC also indicate that he did well when he was removed from his chaotic family environment.  New Castle YDC records, 1976 (noting that Mark does not possess a delinquent value system).

56

had rejected the more demanding standards imposed on an intoxication/diminished capacity

defense at the guilt phase. The statutory mental health mitigators (e)(2) and (e)(3), as well as the

catch-all (e)(8) (circumstances of offender and crime) would all permit the jury to consider

Mark's extensive history of alcoholic blackouts and substance abuse problems. Yet the jury

never had the opportunity to consider that evidence because, as a result of counsel's miscues, and

failure to properly investigate, no such evidence was ever presented. Petitioner was prejudiced

by counsel's failures.

> **b.    What counsel presented at trial paled in comparison with the available mitigation.**

Instead, trial counsel presented the meager testimony of Rev. Collins, Mr. Breakiron's

mother, and Mr. Breakiron. Reverend Collins testified that Mark had some problems drinking

and that had been numerous attempts to help Mark with his drinking and drugs. NT at 1388-89.

Mark's mother testified that she divorced her husband, Mark had problems with alcohol, Mark

was an alcoholic and that he used drugs. NT at 1410. Her entire testimony is less than four

transcript pages.[33] Finally, counsel presented the defendant. Unprepared by counsel, when asked

---

[33]The total extent of Gloria Breakiron's testimony about Mark's mental health problems is as follows:

Q:    When Mark was growing up, what kinds of problems did he have, if any, with regard to alcohol?

A.    He had a great deal of problems with alcohol.

Q:    Did he drink a lot?

A:    Yes.

Q:    What kind of problems did he have in regard to drugs, if any when he was growing up?

A:    He was a user of drugs.

Q:    Now in March – on March 23, 1987, could you characterize Mark as an alcoholic?

about his alcohol problems, he replies only: "I like to drink a lot." NT at 1412.

Nowhere in this testimony is any explanation that Alcohol Dependence is a major mental illness. Nowhere is there an explanation that Mark's documented history of blackouts corroborates his account of not remembering the crime. Nowhere is any explanation of Mark's Intermittent Explosive Disorder. Nowhere does counsel argue that Mr. Breakiron's impairments constitute mental health mitigating circumstances – that is they satisfy (e)(2) "The defendant was under the influence of an extreme mental or emotional disturbance" or (e)(3) "The capacity of the defendant to appreciate the criminality of the conduct or to conform his conduct to the requirements of the law was substantially diminished." of the capital sentencing statute. Nowhere in defense counsel's presentation is any psychological <u>explanation</u> for the defendant's actions provided. Instead, the jury simply heard that Mark had a history of drinking a lot and that he doesn't remember the offense very well.

> **c.      Established law demonstrates that petitioner was prejudiced by counsel's failure to present the available mitigation.**

Prejudice is established when there is "a reasonable probability" that the outcome would be different. <u>Strickland v. Washington.</u>, 466 U.S. at 694. This standard for prejudice "is not a stringent one. It is less demanding than the preponderance standard." <u>Hull v. Kyler</u>, 190 F.3d at

---

A:      Yes.  He was an alcoholic.
Q:      And did – he would drink a lot?
A:      Yes.

NT at 1410.   That was it.

Nor did counsel bring out the available mitigation from Mark's mother.  She could have described the difficult conditions of Mark's childhood, his cruel and distant father, and his father's alcoholism.

110.   At a capital sentencing proceeding, in a weighing jurisdiction such as Pennsylvania, the

prejudice inquiry focuses on the probable effect of counsel's errors and omissions on a *single*

*juror*.  Williams, 529 U.S. at 393-95 (ratifying effect on a single juror standard applied by

Virginia trial court).See also Wiggins v. Smith, 123 S. Ct. 2527 (2003); Jermyn v. Horn, 266 F.

3d 257, 309 (3rd Cir. 2001)("[b]ecause the jury's decision must be unanimous [as to penalty], [a

petitioner] can show prejudice in this case if there is a reasonable probability that the presentation

of the specific and disturbing evidence of childhood abuse and neglect as a mitigating factor

would have convinced *one juror* to find the mitigating factors to outweigh the ... aggravating

factor[s] the Commonwealth relied upon in this case."), Commonwealth v. Ford, 809 A. 2d 325

(Pa. 2002).

Petitioner was prejudiced because had counsel presented the mitigating evidence there is

a reasonable probability that the jury would have found the (e)(2), (e)(3), and (e)(8) mitigating

circumstances and a reasonable probability that the jury would not have found the torture

aggravating circumstance.

In the context of counsel's failure to investigate and present mitigating evidence,

prejudice is established if the introduction of the mitigating evidence "might well have

influenced the jury['s] appraisal of [Petitioner]'s moral culpability."  Williams, 529 U.S. at 398.

As the Supreme Court explained in Penry v. Lynaugh, 492 U.S. 302, 319, (1989) "evidence

about the defendant's background and character is relevant because of the belief long held by this

society, that defendants who commit criminal acts that are attributable to a disadvantaged

background, or to emotional or mental problems, may be less culpable than defendants who have

no such excuse. [Petitioner's] early years... coupled with his serious mental problems, might have

caused at least one member of the jury to see sufficient grounds to spare his life." See also

Williams, 529 U.S. at 398 (mitigating evidence satisfies prejudice requirement because it helps

show that "violent behavior was compulsive reaction rather than cold-blooded premeditation.")

"In case after case, federal courts have found prejudice when counsel fails to investigate,

develop, or introduce mitigating evidence that is similar to the evidence in [Petitioner]'s case.

This case is no different." Pursell, 187 F. Supp 2d at 387. E.g. Morris v. Beard, 2007 WL

1795689 (E. D. Pa. 6/20/07)(vacating death sentence due to counsel's ineffective assistance of

counsel); Lewis v. Horn, 2006 WL 2338409 (E.D. Pa. 8/9/06)(vacating death sentence due to

counsel's ineffective assistance of counsel); Bond v. Beard, 2006 WL 1117862 (E.D. Pa.

4/24/06)(vacating death sentence due to counsel's ineffective assistance of counsel); Thomas v.

Beard, 388 F. Supp. 2d 489 (E.D. Pa. 2005)(vacating death sentence due to counsel's ineffective

assistance of counsel); Rollins v. Horn, 2005 WL 1806504 (E.D. Pa. 7/26/05)(vacating death

sentence due to counsel's ineffective assistance of counsel); ; Jacobs v. Horn, 129 F. Supp. 390

(M.D. Pa. 2001).

Counsel can be ineffective, even where defense counsel presents some mitigating

evidence to the jury.  In Jermyn v. Horn, the Court explained:

> [T]he Pennsylvania Supreme Court's conclusion that Jermyn had not been
> prejudiced by counsel's omissions appears to have been based in part on the fact
> that Jermyn's counsel had put some mitigating evidence before the jury....But the
> fact that counsel presented some mitigating evidence of a different nature and
> quality seems largely beside the point, given the significance of the evidence that
> was omitted and the reasonable likelihood that the totality of the available
> mitigating evidence (presented at trial and at the PCRA hearing) might have led to
> a different result

Jermyn, 266 F.3d at 311; Williams v. Taylor, 529 U.S. at 368 (counsel was ineffective and

Petitioner prejudiced even though counsel presented testimony at sentencing from defendant's mother, two neighbors, and a psychiatrist).

Not only might have the unpresented evidence established mitigating circumstances (e)(2), (e)(3), and (e)(8), it would have also served to rebut the evidence of the (d)(8) torture aggravating circumstance. The evidence of Mark's blackout on the night of the incident, his Intermittent Explosive Disorder, his history of Alcohol Dependence, and his history of blackouts would have undermined the "torture" aggravating circumstance, because it would have demonstrated that the offense was committed by a psychologically impaired and extremely intoxicated man in the grips of an uncontrollable rage rather than a person who deliberately intended to cause pain.

Under Pennsylvania law, to be convicted of the torture aggravating circumstance, the Commonwealth must prove that the defendant intended to cause the victim pain above and beyond the pain involved in the murder. The readily available mitigating evidence that chronicled Mr. Breakiron's history of blackouts, his history of episodic dyscontrol, his intoxication from alcohol and drugs on the night of the offense, would have rebutted the Commonwealth's effort to prove the specific intent to torture. As then Chief (now Circuit) Judge Smith explained, in a similar case involving the torture aggravating circumstance:

> [I]ntroduction of this mitigating evidence [of Petitioner's mental problems and intoxication] might have demonstrated to the jury that the attack on [the victim] was an outburst not a preplanned or premediated attack. *While there was testimony to this effect at the sentencing hearing, [Petitioner's unpresented] psychological evidence would have given more weight to this argument....* The jury could have easily married [the expert psychological testimony offered in post-conviction] with the other evidence supporting an "outburst" murder and found death inappropriate... [I]t could have found that [Petitioner] did not torture [the victim], mainly because he lacked the requisite intent.

<div align="center">61</div>

<u>Pursell</u> at 386.

There is a reasonable probability that at least one juror would have found that the mitigating evidence in this case justified a life verdict. A mental health expert could have explained that Mr. Breakiron was functioning like an automaton and was impaired by both alcohol, drugs, and his mental illness on the night of the incident, supporting the (e)(2) and (e)(3) mitigating circumstances and rebutting the intent necessary for torture. A mental health expert could also have placed Mr. Breakiron's actions in context and explained how a young Mark Breakiron was affected by his father's violent alcoholism, his sudden absence, and the chaotic dysfunction that ensued. Similarly, the jury could have learned that by both genetic predisposition, fatherly example, and neglectful environment, Mr. Breakiron was influenced to turn to alcohol and drugs. Finally, the jury could have heard about Mr. Breakiron's mental illness, and the ways in which alcohol, drugs, combined with his mental impairments to impair his ability to conform his conduct to the requirements of the law. "Had it heard this evidence, it would have had a better understanding of how this murder occurred, a thorough picture of [Petitioner]'s life, and substantial reasons for withholding the death penalty." <u>Pursell</u> at 386.. Prejudice is established.

> **d.    The Pennsylvania Supreme Court's opinion was contrary to and an unreasonable application of federal law.**

As it had when evaluating Mr. Breakiron's claim that he was prejudiced in the guilt-phase of the trial, the Pennsylvania Supreme Court applied an erroneous prejudice standard in addressing the prejudice caused by counsel's deficient performance. Rather than apply the "reasonable probability" standard mandated by <u>Strickland</u>, the Court required Mr. Breakiron to

prove conclusively that the outcome "*would have changed.*"  Given this nearly impossible

burden, it is not surprising that the Court found that Mr. Breakiron was not prejudiced:

> These errors [in obtaining a mental evaluation], Breakiron asserts, prejudiced him
> because the effect was to deprive him of the opportunity to have a private
> psychiatrist testify as to his mental health and psychiatric history during both the
> guilt and sentencing phase of the trial.

<div align="center">***</div>

> He surmises that trial counsel's failure to follow the MHPA left the attorney
> without any psychiatric evidence to assist in Breakiron's defense or to present
> mitigating evidence at trial. *We find that Breakiron has not met his burden of
> establishing that counsel's errors prejudiced him* because he cannot establish that
> had an examination been done according to the MHPA, the defense strategy, *or
> the outcome of either the guilty verdict or sentence of death, would have changed*.

Breakiron-2, 729 A.2d at 1099.   The Court rejected  Mr. Breakiron's claim because he could not

establish "his burden" of showing that "the outcome of ... the ... sentence of death would have

changed."   Rather than undertaking the appropriate test – whether there exists a "reasonable

probability" that counsel's failures might have led to a different outcome, the Pennsylvania

Supreme Court utilized the wrong test – requiring the claimant to prove that the outcome "would

have" changed.

As explained above, this is "contrary to... clearly established Federal law."    Indeed, it is

so "contrary to... clearly established Federal law" that it is the paradigmatic example used by the

United States Supreme Court to show  what "contrary to law" means.  Williams v. Taylor, 529

U.S. 362, 405 (2000) (applying wrong Strickland prejudice standard to claim of ineffectiveness is

contrary to law.)

In any event, the state court's decison was objectively unreasonable. In analyzing

<div align="center">63</div>

prejudice at sentencing, the Pennsylvania Supreme Court focused on the fact that Mr.

Breakiron's expert, Dr. Martone, did not contest the conclusion that Breakiron was "competent."

The Court wrote:

> Likewise, while trial counsel in this matter might have mishandled Breakiron's
> mental health examination by not attending and by not requesting a private expert
> following the objections to Dr. Adamski, the outcome of the sentencing was not
> likely to have changed.  The fact remains that the evaluation was ordered to assess
> Breakiron's competency to stand trial, and there is no real dispute that Breakiron
> was competent.  Indeed, at the PCRA hearing, both Dr. Adamski and Breakiron's
> private psychiatrist testified, and neither opined that Breakiron was incompetent at
> the time of trial.  We fail to see how trial counsel's alleged errors, where Breakiron
> was clearly competent to stand trial, had any bearing on the penalty phase of the
> trial.

Breakiron-2 at 1100.  This reasoning makes no sense at all.  Petitioner's competency had nothing

to do with counsel's failure to properly investigate and present evidence of mitigation.  The

Court's opinion was both contrary to, and an unreasonable application of Strickland.

Counsel's presentation of mitigating evidence at sentencing was so pathetic that the jury

found no mitigating circumstances were proved.  As a result, under the Pennsylvania death

penalty statute, the jury was required to sentence Petitioner to death, and never even had the

opportunity to weigh the evidence and consider whether a life sentence should be granted.  Had

counsel conducted an adequate investigation, he could have presented a wealth of information

about Mr. Breakiron's traumatic background and long history of mental health impairments –

evidence that could have led at least one juror to find mitigation and vote for life.  As set forth

throughout this claim, in similar circumstances, the Third Circuit, and Pennsylvania District

Courts, have consistently found that habeas relief was required.  E.g. Outten, Marshall, Jermyn,

Morris, Pursell.

64

Lastly, the state court held that counsel's failure to present evidence of Mr. Breakiron's past mental health history was a reasonable defense strategy because "such history would show his past violence and aggressiveness, which would have an adverse impact on the jury." Breakiron-3 at 1101. Contrary to the state court's view, however, the failure to investigate cannot be excused by a subsequent "strategy." Williams v. Taylor, 529 U.S. 362, 398 (2000) ("failure to introduce [mitigating] evidence... was not justified by a tactical decision [where] trial counsel did not fulfill their obligation to conduct a thorough investigation of defendant's background.") As the Court of Appeals for the Third Circuit has explained, "counsel can hardly be said to have made a strategic choice ... when s/he has not yet obtained the facts on which such a decision could be made .... Under [such] circumstances, counsel's behavior was not colorably based on tactical considerations but merely upon a lack of diligence," and counsel is ineffective. United States v. Gray, 878 F.2d 702, 711-12 (3d Cir. 1989).[34]

---

[34]See Kimmelman v. Morrison, 477 U.S. 365, 385 (1986) (counsel are ineffective when they rely on the prosecution's discovery disclosures and do not conduct their own, independent investigation); Berryman v. Morton, 100 F.3d 1089, 1100-01 (3d Cir. 1996) (where counsel fails to investigate and interview potential witnesses, he has no reason to discount their worth, and his inaction constitutes negligence, not strategy); Jackson v. Herring, 42 F.3d 1350, 1367 (11th Cir. 1995) ("In order for counsel to make a professionally reasonable decision whether or not to present certain mitigating evidence ... counsel must [investigate] the available options. Thus ... case law rejects the notion that a strategic decision can be reasonable when the attorney has failed to investigate his options and make a reasonable choice between them."); Hill v. Lockhart, 28 F.3d 832, 837 (8th Cir. 1994) ("Reasonable performance of counsel includes an adequate investigation of facts, consideration of viable theories, and development of evidence to support those theories."); id. at 840, 843-47 (where counsel testified in post-conviction hearing that he did not present mitigating evidence contained in defendant's records because of his fear that it might have "opened the door" to rebuttal with the defendant's criminal history, ineffective assistance was established because counsel did not fully and meaningfully investigate the records before making the decision); Nealy v. Cabana, 764 F.2d 1173, 1178 (5th Cir. 1985) (counsel's failure to investigate witnesses who could corroborate portions of his alibi defense was not a strategic choice, but a failure to act); Commonwealth v. Mabie, 359 A.2d 369, 374 (1976) (reliance on "the prosecution's file is not a substitute for an independent investigation by defense

Here counsel, who was stuck with the case only weeks before trial, admitted that: 1) he didn't know that Mr. Breakiron had suffered a documented history of blackouts;[35] 2) he had obtained no mental health records on Mr. Breakiron at all;[36] 3) he apparently believed that Mr. Breakiron was only permitted a defense psychiatrist if he could personally afford it.[37]  A decision based on such appalling ignorance of the relevant law and facts is not the product of strategy.

Counsel's "strategy" in this case was merely a post hoc invention in an attempt to excuse his own failures.  Because counsel's failure was a failure of investigation and made in complete ignorance of the testimony that a defense mental health expert might provide, Mr. Breakiron's records, and indeed the relevant law, it cannot be characterized as a "strategy" or "tactic."

### E.     Conclusion

Through no fault of his own, Mr. Breakiron was represented by a series of public defenders, none of whom took the responsibility for investigating and preparing for trial. Because of the revolving door quality of his representation, none of his four attorneys undertook the basic steps that are necessary to effectively represent a capital defendant at trial.  No one ensured that Mr. Breakiron was properly evaluated.  No one thoroughly investigated Mr. Breakiron's background.  No one obtained Mr. Breakiron's mental health records.  When Richard Bowers finally realized he was going to be trying the case by himself, he had only a few weeks to prepare.  Not surprisingly, the diminished capacity defense offered at trial consisted

---

counsel"); Commonwealth v. Baxter, 640 A.2d 1271, 1275 n.3 (1994) (same)

[35]NT PCRA 7/17/97 PM at 22.

[36]NT PCRA 7/17/97 PM at 20, 23.

[37]NT PCRA 7/17/97 PM at 35; NT PCRA 7/18/97 AM at 24.

solely of Mr. Breakiron testifying that he had been drinking and that he didn't remember much of what happened. Trial counsel was unaware that Mr. Breakiron had a history of blackouts. Counsel did not obtain the records that would have corroborated his history of such blackouts. Nor was any of Mr. Breakiron's mental health history developed at the penalty phase.

Mr. Breakiron was intoxicated and suffered a blackout on the night of the offense. His account of the night is consistent with suffering a blackout, and he has a documented history of suffering blackouts. Moreover, he has a long history of mental illness, Alcohol Dependence, Intermittent Explosive Disorder, and the lasting effects of a violently alcoholic father. A defense mental health expert could have effectively explained all of this to the jury in both the guilt and penalty phases of the trial. This evidence would have vastly strengthened defense counsel's diminished capacity intoxication defense in the guilt phase of the trial and acted as powerful mitigation in the penalty phase. The Pennsylvania Supreme Court held that counsel performed deficiently in not securing an appropriate mental health evaluation. Because of this failure, and counsel's failure to investigate, counsel was ineffective and prejudiced Mr. Breakiron in both the guilt and penalty phases of his capital trial.

CLAIM 2:     PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO AN IMPARTIAL JURY AND DUE PROCESS WHERE, DESPITE THE FACT THAT THE COMMUNITY AND THE JURY POOL HAD BEEN SATURATED WITH HIGHLY PREJUDICIAL PUBLICITY, THE TRIAL COURT DENIED PETITIONER'S REQUESTS FOR A CHANGE OF VENUE.[38]

The Due Process Clause of the Fourteenth Amendment guarantees a defendant the right to a "fair trial by a panel of impartial, 'indifferent' jurors" free from outside influences. Irvin v.

---

[38]This claim was raised on direct appeal in Breakiron - 1, and was addressed on its merits by the Pennsylvania Supreme Court. Therefore, the standard of review mandated by Section 2254(d) is applicable.

Dowd, 366 U.S. 717, 722 (1961); Sheppard v. Maxwell, 384 U.S. 333, 351, 362 (1966); Murphy

v. Florida, 421 U.S. 794, 798-99 (1975); Coleman v. Kemp, 778 F.2d 1487, 1489-90 (11th Cir.

1985). The need for a change of venue under such circumstances is especially strong in a capital

case, because "the range of discretion entrusted to a jury in a capital sentencing hearing" creates

"a unique opportunity for ... prejudice to operate." Turner v. Murray, 476 U.S. 28, 35 (1986).

Where prejudicial publicity threatens the impartiality of the jury, due process requires a change

of venue, or some other effective form of relief. See Sheppard at 363; Rideau v. Louisiana, 373

U.S. 723, 726 (1963).

In this case, this clearly established constitutional law was violated when Petitioner was

forced to undergo a trial with a jury that had been chosen from a small community that had been

inundated with pervasive, highly prejudicial publicity. Fayette County was saturated by a media

campaign, designed to convince the public that Mark Breakiron was a bad actor and was guilty of

first degree murder. The pervasiveness of the media coverage, coupled with the presentation of

salacious and often times erroneous information, swayed the public towards a belief in Mark

Breakiron's guilt and therefore violated the constitutional guarantee of a fair trial by an impartial

jury. "With his life at stake, it is not requiring too much that petitioner be tried in an atmosphere

undisturbed by so huge a wave of public passion" and without adequate protective measures by

the court. Irvin v. Dowd, 366 U.S. at 728.

The killing in this case horrified and frightened the Fayette County community, which

lived in fear for almost two weeks until Petitioner's arrest was announced. The events

surrounding the crime and the prosecution were both extensively covered by local media and

regularly discussed by people in the community. The District Attorney and newspaper reports

described the crime as one of the most brutal crimes ever committed in Fayette County.

In Fayette County, news reporting of this crime was sustained, inculpatory, and pervasive. The Uniontown Herald-Standard, the area's major newspaper, devoted substantial coverage to the case from the time of the offense up through the capital sentencing proceedings.  The paper published at least forty two (42) articles between March 25, 1987, when the search for the victim began, and April 15, 1988, when Petitioner's trial ended.  Several other area newspapers, including the Connellsville Courier and the Brownsville Telegraph, carried extensive coverage as well.  Concurrent television and radio broadcasts were similarly unrelenting.

News coverage of the crime and of the accused was not only pervasive, but also highly damaging and prejudicial.  Front-page headlines constantly characterized the murder as "grisly" and "brutal," and several stories reported the autopsy results, in all its graphic particulars.  One article detailed Petitioner's prior criminal record, including arrests that never led to convictions. Both police investigators and representatives of the District Attorney's office continually outlined for the press their theories of how the crime occurred and the motive behind the killing The news reports evince an unmistakable pattern: representatives of the state using the media to cultivate hostility toward the Petitioner, and to present evidence of his guilt to the community. Among the many prejudicial news articles published were the following, from the Uniontown Herald-Standard:

> a) **March 26, 1987: "Body of missing woman found; police check leads."**  Front-page article, four columns wide, with photo of police officers.  The article quoted detectives who indicated that the victim's body was "partially clad"; that bloodstains were found at the bar and in the parking lot; that there was evidence of a struggle; and that money was

taken from the cash register.  The victim's mother was also quoted.

b) **March 27, 1987: "Slain woman's autopsy reveals grisly findings."** Front page, two columns wide.  This article detailed the findings of the autopsy, reporting that the victim had received 18 stab wounds, a skull fracture, and defensive wounds, and that her throat had been cut.  The coroner was quoted as saying that "[s]he literally bled to death."  The last four paragraphs of the autopsy story focused on the victim, listing the surviving members of her family.

c) **April 5, 1987: "Homicide Probe: Suspect charged in brutal killing."**  Front page story, words "Homicide probe" in enlarged, bold font, with large, two-column photo showing the Petitioner, apparently in handcuffs, being escorted by police officer.  The article reported that the Petitioner had been charged with criminal homicide and robbery, and repeated the findings of the autopsy.  The article also reported that District Attorney Gerald R. Solomon had conducted a press conference concerning the case and declared that he believed the death penalty was appropriate.  Solomon was quoted as saying,  "It was a very brutal murder...this is one of the most brutal (murders) I've ever seen."  The District Attorney made it clear that Petitioner had been the sole suspect in this case since early on in the investigation, and catalogued the evidence linking the Petitioner to the crime, including bloodstains found on his clothes and pick-up truck, and the fact that he was the last person believed to have been in the lounge with the victim. He also suggested that Petitioner put the victim in his truck and then transported her somewhere else.  The District Attorney expressed his belief that  the motive for the crime was robbery and told the public that Petitioner had not made any statement incriminating himself.

70

d) **April 5, 1987: "Few willing to talk about troubled Hopwood man."** Front page, four columns wide. The article opened with the following statement: "People don't like to talk about Mark David Breakiron, a troubled 26-year-old Hopwood who faces the death penalty in connection with the brutal slaying of a Smithfield woman." The story quoted an unnamed source who remarked about Petitioner, "He's bad news;" the victim's father, Thomas Martin, who stated "He's a cuckoo;" and the Petitioner's uncle, Wendell Breakiron, who remarked "The biggest gripe I had is that everyone thought he was my son. Please tell them he's not my son."

This devastating article went on to detail Petitioner's prior crimianl record–including charges which were subsequently dropped–as well as an incident in which he had allegedly held his mother and sister at knife point. The story also reported the Petitioner's prior prison sentences, mentioned a psychiatric evaluation, and specifically noted that this offense took place shortly after his last release from prison.

District Attorney Solomon again called the crime "one of the most brutal" he had seen, adding that the victim's "left ear was severed almost completely off. The blows were so hard into her head that they went into her brain."

Finally, the article noted that the entire county "buzzes with the news of Breakiron's arrest. But few are willing to talk for the record. They are motivated by fear–fear of public censure and possible future harm from Breakiron." The story depicted (and contributed to) a community both saturated with information about the crime, and gripped with an appreciable fear of the Petitioner himself.

e) **April 5, 1987: "Breakiron's arrest sheet dates back to 1980, records reveal."**

71

Three columns wide. This article featured another detailed recitation of Petitioner's prior arrests, convictions, and prison terms. It told the public that Petitioner had prior convictions for burglary and theft and had served at least three years imprisonment in various state prisons. The article also described a 1983 incident in which Petitioner had assaulted his sister and mother, tied them up. and threatened them at knife point, but explained that those charges were dismissed when his mother refused to prosecute.

f) **April 7, 1987, "Probe Questions"** This editorial called the crime "one of Fayette County's most brutal and heinous crimes within recent memory" and described the fear that had saturated the community since its discovery. The article also criticized District Attorney Solomon for "inject[ing] himself into a news conference, called far enough in advance to be sure that television cameras would be lined up. He made a media circus out of it."

g) **April 12, 1987: "Living in fear: Barmaids react."** Front page, four columns wide. The article described the anxiety of local barmaids in the wake of the murder. The details of the crime had been so often and so heavily publicized that one barmaid quoted in the story said she was having nightmares, "thinking about how [the victim] must have felt. Even if you didn't know her, it makes you sick to think about how it was done."

h) **April 23, 1987: "Breakiron to stand trial for homicide."** Front page, two-columns wide, with large, two-column photo of the Petitioner, in handcuffs, being led away from his preliminary hearing by a state police trooper. The article described the crime as a "savage slaying" in its lead sentence; reiterated the results of the autopsy, and discussed in detail lab results that matched blood found on the Petitioner's clothing to that of the

72

victim.

The Pennsylvania Supreme Court agreed that this flood of pretrial publicity was inherently prejudicial, in that it "tended to inflame public opinion against Breakiron, and thereby to call for conviction of a "bad" person; it reported Breakiron's prior criminal record; and it arguably commented on Breakiron's protected silence by quoting the district attorney as stating that Breakiron had made no inculpatory statements." Breakiron-1, 571 A.2d at 1037.  Despite this finding, the court held that a fair trial in Fayette County was still possible, given that a one-year "cooling-off period" had elapsed between the prejudicial news coverage and the selection of the jury.

In fact, there was no adequate cooling-off period; the Herald-Standard continued to publish regular updates on the crime and on the accused throughout the year.  On May 5, 1987, an article entitled "Breakiron To Get Mental Testing" explained that Petitioner's lawyer had requested that a competency examination be conducted.  On August 30, 1987, an article announced that the victim's father had filed suit against the owners of the bar where the deceased was killed and recapitulated the facts of the killing and some of the evidence against Petitioner. On October  27, 1987, an article entitled "Breakiron Requests Change of Venue" repeated Petitioner's assertion that the sensational publicity made a fair trial impossible and reported on Petitioner's efforts to suppress evidence against him as illegally seized.  Another article, on November 17, reporting that a fire destroyed the bar where the killing occurred and retold the story of the "brutal stabbing" that had occurred there.  On November 26, 1987, the newspaper published a photo of the deceased with an emotional memorial message from her family.  On December 13, 1987, an article detailing the evidence presented at a pre-trial hearing again

73

reported Petitioner's efforts to suppress evidence, described how the police discovered the incriminating evidence against Petitioner, reported statements Petitioner allegedly made to the police admitting his presence at the bar, but not admitting participation in the killing and explained how "while Breakiron was being questioned by [state trooper] Fayock, other officers were breaking the case open."

On January 3, 1988, the Herald Standard reviewed the top ten stories of the year.  This case, dubbed the "Tavern Murder"  was number 2 on that list.  On January 27, 1988, an article appeared reporting on the denial of the motion for change of venue.  On February 26, an article entitled "DA to Seek Death Penalty Against Breakiron," reported that, in this "brutal" case,  the district attorney announced that this case "has all the earmarks of a capital case," and that his office, had, as a group, decided that there would be no plea bargains offered to Petitioner.  A similar article appeared that day in the Courier as well.   On March 4,1988,  an article reported that Petitioner's trial was delayed, over the Commonwealth's objection, to allow the defense more time to prepare and to seek a second psychiatric examination of Petitioner.  According to that article, Petitioner didn't "trust" the first psychiatrist, because he was informed that the results would be shared with the district attorney's office.  A series of articles in late March, although largely unrelated to Petitioner's case in particular, nevertheless described defense attempts to have the District Attorney disqualified, due to his previous representation of a possible witness against Petitioner.  On April 3, 1988, as jury selection was about to start, the paper published another photo of the deceased with a memorial message from her sister.  This was followed with daily articles on the progress of jury selection and the trial.

In short, there was a constant stream of publicity about the murder, repeatedly described

74

as brutal and heinous, and about the case in chief.  The strategy of the defense, defense efforts to suppress evidence, and prosecutorial opinion about the appropriateness of the death penalty were consistently a matter of public discourse and discussion, from the time of the crime until the start of the trial.

An analysis of the voir dire transcripts reflects the pervasiveness of the coverage, and confirms that it remained fresh in the minds of prospective jurors in this case.  Of the 84 prospective jurors, sixty-three prospective jurors (75%) said they were familiar with the case through news sources.  Only eight venire members (less than 10%) who were asked about their exposure to publicity said they had not seen any news accounts, and of these, three were familiar with the murder from family members or colleagues.[39]  Thus, only five jurors out of eighty four (6%) had not been exposed to some form of prejudicial pretrial publicity.  Twenty six jurors (or over 30 percent) had to be excused or removed for cause because they admitted their exposure to publicity would prevent them from being fair and impartial jurors. For example, prospective juror John Herchko was excused when he said, in open court, that he had formed a fixed opinion based on what he "heard recently countless times over and over again." NT 4/5/88 at 155.

Prospective jurors also indicated that the murder and upcoming trial were the subject of considerable conversation throughout Fayette County, particularly in the days leading up to jury selection.  Several prospective jurors were excused because they had formed fixed opinions

---

[39]The eight prospective jurors who, when asked, said they had not heard news accounts were: George Rohal (NT 4/5/88 at 185-186); Kathleen Kuczynski (NT 4/5/88 at 272); Harold Clark (NT 4/5/88 at 255); Kenneth Buchsbaum (NT 4/6/88 at 352); Valerie Eicher (NT 4/6/88 at 418); Tonya Brewer (NT 4/6/88 at 491); Roberta Belsar (NT 4/6/88 at 543); Francis Renda (NT 4/7/88 at 728). Three of these individuals – George Rohal, Tonya Brewer, and Roberta Belsar – had heard of the case through discussions with others.

based on gossip they heard at work or from friends.[40]  Colleen Carroll, who was ultimately

selected as a juror, indicated during voir dire that several others--including even the man

pumping her gas--had tried to talk to her about the case. NT 4/7/88 at 686.

Even more alarming, it appears that prospective jurors themselves engaged in such

casual conversation about the crime and Petitioner.  Prospective juror Robert Lewis said he had

overheard other members of the venire discussing the case and the defendant in the hallway

outside.  NT 4/7/88 at 631.  Mr. Lewis had the following exchange with defense counsel:

> Q. Have you had any discussions or have you been present at any discussions
> about this case?
>
> A. Sitting outside, people have talked about it in the hallways.
>
> Q. The other jurors were talking about it?
>
> A. Yes. Not that they were in on it, but they knew about the case.  I overheard
> people talking about it, the name, Breakiron.

NT 4/7/88 at 631.  Neither defense counsel nor the trial judge pursued questioning on this point.

Defense counsel also failed to request that the judge instruct members of the venire to refrain

from discussing the case amongst themselves.[41]

---

[40]Jurors who were excused for this reason included: Marilee Barnhart (NT 4/6/88 at 568-569); Todd Griffith (NT 4/7/88 at 655); Anita Hustek (NT 4/7/88 at 663-664); and Harold Lynch (NT 4/7/88 at 746-747).

[41]In a small community such as this one, there existed a very real possibility that members of the venire would exchange gossip and information about the defendant.  One prospective juror's comments during collective voir dire dramatically illustrates this point. When venire members were asked about their familiarity with the case, Charles Gerba volunteered in open court that Mark Breakiron "used to do a lot of robbing" in the neighborhood where he lived. NT 4/6/88 at 448. This statement took place in the presence of 11 other prospective jurors, one of whom, Paul Manges, was ultimately empaneled on the jury. NT 4/6/88 at 520.  Defense counsel failed to request any kind of curative instruction or other relief from the trial judge.  See Claim 7, infra.

The inescapability of both the extensive media coverage and the local discussion of this case was apparent even among those who sat as jurors.[42]  Barry Craft, who said he was only vaguely familiar with the incident, acknowledged that "[i]t was hard not to hear about it."  NT at 42.  Paul Manges had recently read that the case was coming up for trial, and had also discussed the murder with his wife. NT at 512.  Jan Serra recognized Mark Breakiron's name from the newspaper.  NT at 224. Colleen Carroll knew that someone was killed at Shenanigans, and that an individual had been taken into custody. NT at 686.  She also indicated that others had tried to discuss the murder with her when they learned she was being called for jury duty.  NT at 686. Only one selected juror, Harold Clark, said he was completely unfamiliar with the case.  NT at 255.  Another, Carl Price, was not directly asked about his exposure to publicity. NT at 227-241.

In the face of these comments by the prospective jurors, the Pennsylvania Supreme Court's determination that there was a sufficient cooling off period to dissipate the prejudicial effect of the most egregious publicity was an unreasonable application of established Supreme Court law, and/or an unreasonable determination of fact.[43]  The trial atmosphere was tainted by

---

[42]These facts distinguish this case from Pursell v. Horn, 187 F. Supp. 2d 260, 299-304 (W.D. Pa. 2002); where the Court rejected a claim that pre-trial publicity entitled the petitioner to habeas relief, in part because there had been a substantial cooling off period and the publicity around the time of the trial was mild.  Id. at 302.  Unlike Pursell, here, the publicity continually reappeared in the local media throughout the period between arrest and trial.  Moreover, a review of the voir dire in this case shows far more jurors predisposed to believe Mr. Breakiron's guilt and an obvious amount of discussion in the community which was not present in Pursell.

[43]In its decision concluding that Petitioner had failed to demonstrate error in the denial of the change of venue, the Pennsylvania Supreme Court relied upon its prior cases such as Commonwealth v. Casper, 392 A.2d 287 (Pa. 1978), which have properly recognized that the guiding principles of Rideau and Shepard require a reviewing court to look at the totality of the circumstances surrounding the publicity and the jury selection to determine if the defendant was denied a fair trial.  Thus, the Court's decision was not "contrary to" established federal law.

highly inflammatory, sensationalized, and prejudicial pretrial and trial publicity.  This publicity

undermined Petitioner's right to an impartial jury -- a right which requires that the jury, in

reaching a verdict, consider only the evidence lawfully presented during trial.  The jury cannot be

influenced by any information derived from outside sources.  See Chandler v. Florida, 499 U.S.

560, 575 (1981).  Petitioner's constitutional rights to due process and an impartial jury were

violated when the trial court refused to grant a change in venue and drew the jury from an area

saturated with prejudicial information about the crime and the accused.

In Daniels v. Woodford, 428 F.3d 1181 (9th Cir 2006), the Court granted habeas relief

where petitioner's right to a fair trial had been compromised by the extent of pre-trial publicity.

The Court looked at three factors to determine if the publicity was presumptively prejudicial:

> Three factors should be considered in determining presumed
> prejudice:  (1) whether there was a "barrage of inflammatory
> publicity immediately prior to trial, amounting to a huge ... wave of
> public passion";  (2) whether the news accounts were primarily
> factual because such accounts tend to be less inflammatory than
> editorials or cartoons;  and (3) whether the media accounts
> contained inflammatory or prejudicial material not admissible at
> trial.

Id., 428 F.ed at 1211.  After viewing those factors, the Court concluded that:

> The nature and extent of the pre-trial publicity, paired with the fact
> that the majority of actual and potential jurors remembered the
> pretrial publicity warranted a change of venue.   The trial court's
> denial of this motion for change of venue violated Daniels's right to
> a fair and impartial jury and thus, his right to due process.

Id. at 121.

The same analysis and result is applicable here.  The Fayette County/Uniontown

community was saturated with a wave of inflammatory publicity from the time of the crime right

up until the time of trial.  The accounts went beyond the mere facts of the case, were grisly and

graphic and included prejudicial information including Breakiron's prior record, his poor

reputation in the community, and the opinions of the police and prosecutors.  Due process was

violated.

In this case, the steps taken by the trial court to ameliorate the prejudicial effects of the

publicity were plainly insufficient.  Despite the fact that most of the jurors had been exposed to

the barrage of prejudicial publicity, the trial court merely accepted at face value the jurors'

assurance that they would try not to be influenced by that publicity.  In light of the nature and

extent of the publicity at issue, particularly when it is orchestrated by the Commonwealth, such

superficial acceptance is not justified.  In Irvin v. Dowd, 366 U.S. 717 (1961),  the Supreme

Court specifically rejected reliance on the jurors' beliefs that they could set aside the information

they had heard and read

> No doubt each juror was sincere when he said that he would be fair
> and impartial to petitioner, but . . . such a statement of impartiality
> can be given little weight.  As one juror said, "You can't forget
> what you hear and see."  With his life at stake, it is not requiring
> too much that petitioner be tried in an atmosphere undisturbed by
> so huge a wave of public passion.

Id. at 728.  See Rideau v. Louisiana (vacating conviction despite fact that only three jurors saw

the offensive publicity and all expressed their ability to set the publicity aside); Sheppard v.

Maxwell, 384 U.S. at 351 (jurors expression of impartiality despite exposure to publicity is not

dispositive).  In these circumstances, where the rational trial process was eroded, and the

community was unable to provide a fair and impartial forum for petitioner to defend himself,

prejudice must be presumed.  Irvin; Rideau.

79

Indeed, it is hard to reconcile the Pennsylvania Court's decision in this case with its decision in Commonwealth v. Pierce, 303 A.2d 209 (Pa. 1973).[44]  In that case, Petitioner was arrested for a high publicity robbery that was extensively covered by the local media.  The publicity was highly inflammatory.  Law enforcement authorities disclosed the defendant's prior record and revealed some of the evidence against the defendant.  Despite the fact, however, that the defendant was tried some eight months after the crime and the most inflammatory publicity about the case, the Pennsylvania Supreme Court readily concluded that the nature of the news accounts was so inherently prejudicial that prejudice would be presumed.  303 A.2d at 212.[45]

The circumstances of the present case are disturbingly similar to those in Pierce, yet the Court in this case chose not to grant relief.  Such a decision was an unreasonable application of established federal law as set forth in Rideau, Irvin, and Shepard.

"Our system of law has always endeavored to prevent even the probability of unfairness." Sheppard, 384 U.S. at 352.  Such probability of unfairness is more than present here.  The participation of police and prosecutorial authorities in a systematic barrage of highly prejudicial publicity not only created the probability of unfairness, but created an atmosphere that rendered the community utterly unable to provide Petitioner with a fair trial.  The state court's refusal to

_____

[44]In Pierce, the Pennsylvania Court condemned the fact that the information about the case came from police and prosecutors, recognizing that such statements by the authorities "create an even more substantial risk of a denial of a fair trial because of the position in the community these people hold."  Id. at 214.  Thus the Court recognized that a juror exposed to the publicity is likely to give the prejudicial information contained therein far more credence because it comes from a respected and authoritative source.

[45]        Indeed, the Court went even further and, exercising its supervisory powers, issued mandatory guidelines precluding police and prosecutors from engaging in the type of prejudicial dissemination of information as occurred in that case.  Id. at 215.

grant a change of venue was contrary to, and an unreasonable application of, the law as determined by the United States Supreme Court. Petitioner was denied his constitutional rights to due process and an impartial jury. Accordingly, habeas relief is required.

**CLAIM 3:**    **PETITIONER WAS DENIED HIS STATE AND FEDERAL CONSTITUTIONAL RIGHTS TO TESTIFY IN HIS OWN BEHALF, TO PRESENT A DEFENSE AND TO DUE PROCESS WHERE THE TRIAL COURT PRECLUDED PETITIONER FROM TESTIFYING ABOUT HIS INTENT AT THE TIME OF THE KILLING; ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THIS CLAIM.[46]**

During Petitioner's testimony in his defense at the guilt phase portion of his trial, the judge precluded Mr. Breakiron from testifying about his intent at the time of the crime. Despite the fact that Petitioner's intent was the critical issue before the jury, and that the defense had no other means to prove his lack of intent to commit murder or robbery, the trial court held that Petitioner would not be permitted to testify about his intent to the jury. The trial court's actions constituted gross constitutional error of the greatest magnitude.

During Mr. Breakiron's direct examination, defense counsel asked, "when you went out that night, what intentions, if any, did you have to hurt anybody?" The prosecutor's objection to that question was sustained. Counsel also asked Petitioner about his intention to take any money that night. Again, the prosecutor's objection was sustained. Counsel asked to go to side bar, where the following colloquy took place:

Mr. Bower (Defense counsel):    Your Honor, I don't understand the ruling in regard to why I cannot ask the questions about what his intentions were.

The Court:    Well, we are interested in what he did.

---

[46]This claim was raised in <u>Breakiron-3</u>. The Pennsylvania Supreme Court did not address the merits of this claim. This Court's review is de novo.

Mr. Morrison (Prosecutor):     That's right.

The Court:     And not what he may have intended to do.

Mr. Bower:     Well, that also goes . . .

The Court:     I have made my ruling and that's it.  I'm not going to argue with you.

Mr. Bower:     I'm just trying to understand it.

The Court:     We are not interested in what he intended to do.  It's what he did.

NT at 1261-62.[47]

The Court grossly erred.  The question of whether Petitioner's possessed the specific intent to kill was the critical question at trial.  Petitioner had an fundamental constitutional right to testify about his lack of intent.  Petitioner was denied his Sixth Amendment and Fourteenth Amendment right to testify in his own defense and to present a defense.

### A.     The Merits of The Claim

The right to testify:

on one's own behalf at a criminal trial has sources in several provisions of the Constitution.  It is one of the rights that are essential to due process of law in a fair adversary process. . . . The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony . . .  A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his defense--a right to his day in court--are basic in our system of jurisprudence;  and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel.

Rock v. Arkansas, 483 U.S. 44, 51 (1987).  The right to testify in one's own behalf is also

---

[47]During a discussion concerning the court's charge, counsel reiterated that, "I started to ask questions about his intentions, but I was told that I could not ask those questions.  So, therefore, I could not develop anything in regard to his intentions that night or what happened at the bar.  I was precluded by this Court from doing so."  NT 4/13/88 at 1299.

grounded in the Sixth Amendment right to compulsory process. The right to present evidence

that is "material and favorable to the defense," necessarily includes the right to testify as "the

most important witness for the defense, in many criminal case, is the defendant himself." Id. at

52. [48] Accord United States v. Leggett, 162 F.3d 237, 245 (3d Cir. 1998); United States v.

Pennycooke, 65 F.3d 9, 10-11 (3d Cir. 1995).[49]

An accused has a fundamental right to present his own version of the facts and rebut the

claims of the Commonwealth. Washington v. Texas, 388 U.S. 14, 19 (1967) (the right to present

witnesses "is, in plain terms, the right to present a defense" and "is a fundamental tenet of due

process"); see also Chambers v. Mississippi, 410 U.S. 284 (1973). Few rights are more

fundamental. State evidentiary rules must bend when their application prevents the defense from

putting its case before the jury. Chambers at 302. The right to present a defense includes both

the right to present affirmative evidence of innocence as well as the right to present evidence that

disproves a government contention. Pennsylvania v. Ritchie, 480 U.S. 39, 56 (1987).

---

[48]Rock also found that the right to testify was embodied in the Fifth Amendment
proscription against self-incrimination. Id. at 52-53.

[49]The Pennsylvania Supreme Court has held that, "[t]he right of an accused to testify on
his own behalf is a fundamental tenet of American jurisprudence and is explicitly guaranteed by
Article I, Section 9 of the Pennsylvania Constitution." Commonwealth v. Nieves, 560 Pa. 529,
534-35, 746 A.2d 1102, 1105 (2000). Where the actions of the trial court, or defense counsel,
interfere with that right and prevent a defendant from presenting his testimony in support of his
defense, reversal is required. Nieves (erroneous advice by counsel caused defendant to waive his
rights and denied him his right to testify); Commonwealth v. Aguado, 760 A.2d 1181 (Pa. Super.
2000) (en banc) (trial court's refusal to rule on admissibility of defendant's prior conviction until
after defendant testified erroneously caused defendant to give up his right to testify);
Commonwealth v. Neal, 618 A.2d 438 (Pa. Super. 1992) (new trial required where counsel failed
to discuss right to testify with defendant). Here, the trial court did more than merely cause
Petitioner to decide not to testify, the court ruled that he could not testify about the facts central
to his defense.

As long ago as <u>Crawford v. United States</u>, 212 U.S. 183 (1909) (Peckham, J.) the United

States Supreme Court found error where the trial court prevented a defendant from testifying

about his intent at trial:

> We are of opinion, also that the court erred in its refusal to allow defendant to
> testify in regard to his intention in taking the letters from the files.  His counsel
> asked him the question when he was on the stand, after he had admitted their
> taking, whether he took them with the intent to suppress or destroy them or with
> intent that they might be preserved and presented to the jury when his trial should
> come on.  Counsel offered to show the fact by the witness and let the witness say
> which it was.  This was objected to by counsel for the government and the
> objection sustained.
>
> The witness was further asked whether, when he took the evidence, he had
> the intention to destroy it.  This upon, objection was ruled out...

<p style="text-align:center">***</p>

> It was error to reject the evidence, for it was material and proper to go to the jury.
> The court of appeals so held and said: "The intent of the defendant in obtaining
> possession of the letters was material, and, being material, the defendant should
> have been permitted to testify as to his intent and motive.

<u>Id.</u> at 202-03.

In this case, the existence of a specific intent to kill, as well as the existence of an intent

to steal (a necessary element of robbery), were the critical elements of the case.  Indeed, this

*mens rea* are essential elements of the offenses of first degree murder and robbery.  The due

process clause requires that the prosecution prove these elements beyond a reasonable doubt.  <u>In

re Winship</u>, 397 U.S. 358, 364 (1970).

Petitioner had an absolute right to challenge that burden and deny the existence of those

elements.  In <u>United States v. Pohlot</u>, 827 F.2d 889 (3d Cir. 1987), the Court held:

> The defendant's rights to present a defense to one of those elements [of the
> offense], generally includes the right to the admission of competent, reliable

<p style="text-align:center">84</p>

exculpatory evidence . . . Evidentiary rules that would bar the testimony of the
defendant himself, as would a rule barring all evidence of mental abnormality on
the issue of *mens rea*, needs particular justification . . . *a rule barring evidence on
the issue of mens rea may be unconstitutional so long as we determine criminal
liability in part through subjective states of mind*

Id. at 900-01   In this case, the trial court's ruling precluding Petitioner from testifying about his

lack of intent violated these constitutional standards.

The United States Supreme Court has held  that a State may not ordinarily exclude

competent reliable evidence where that evidence is important to the defendant's claim, except

where there is valid justification which outweighs the need for such evidence.  "In the absence of

any valid state justification, exclusion of this kind of exculpatory evidence deprives the

defendant of the basic right to have the prosecutor's case encounter and survive the crucible of

meaningful adversarial testing."  Crane v. Kentucky, 476 U.S. 683, 690 (1986).  See also Rock,

483 U.S. at 55-56 (although right to testify is not unlimited, "restrictions of a defendant's right to

testify may not be arbitrary or disproportionate to the purposes they are designed to serve").   In

Crane, the Court held that the defendant's due process rights were violated by the exclusion of

evidence concerning the circumstances of his confession to the police because those

circumstances bear on important jury questions concerning the voluntariness of the statements

and the credibility of the defense.  476 U.S. at 687-88. In Rock, the Court found that there was

not sufficient justification for the State's *per se* rule prohibiting all hypnotically refreshed

testimony and that application of that rule "infringe[d] impermissibly on the right of a defendant

to testify on his own behalf."  483 U.S. at 62.

Here, of course, the State has not, and indeed cannot, offer any valid justification for

precluding a defendant from testifying about his intent, or lack thereof, at the time of the crime,

85

where that intent is an element of the crime and where a challenge to that intent is the crux of the

defense.[50]   The trial court's preclusion of any testimony concerning Mr. Breakiron's lack of

intent to kill or to rob violated <u>Rock</u> and <u>Crane</u>.  See <u>Greene v. Lambert</u>, 288 F.3d 1081 (9th Cir.

2002) (exclusion of evidence of disassociative identity disorder, including defendant's own

---

[50]Petitioner acknowledges that the right to testify and the right to present a defense may be limited where there is a compelling government justification for that limitation.  In <u>Taylor v. Illinois</u>, 484 U.S. 400, 410-11 (1988), the Supreme Court upheld an Illinois court rule that required the defense to provide to the Commonwealth a list of witnesses that it planned to call before trial, on pain of exclusion of these witnesses.  In <u>United States v. Scheffer</u>, 523 U.S. 303 (1998) the Court, in a fractured opinion, held that the traditional evidentiary rule excluding polygraph evidence did not violate due process.  The plurality opinion noted that the "[evidentiary] rule [precluding polygraph evidence] did not preclude [the defendant] from introducing any factual evidence.  Rather [the defendant] was barred merely from introducing expert opinion testimony to bolster his own credibility."  <u>Id.</u> at 317.  Here, of course, the defendant was not trying to bolster his own credibility, but testify to one of the elements of the offense.  Finally, and most importantly, there exists no equivalent traditional state interest in limiting Mr. Breakiron's testimony.

 <u>Montana v. Engelhoff</u> 518 U.S. 37 (1996), was another fractured opinion upholding Montana's elimination of intoxication as a defense.  Justice Ginsburg's concurrence in the judgment became the fifth vote for the ruling and, thus, her rationale is controlling.  Justice Ginsburg based her opinion on the premise that the Montana legislature had redefined the elements of the offense and not that Montana had excluded otherwise relevant testimony as to alcohol consumption.  In Pennsylvania, at the time of Petitioner's trial, as well as today, voluntary intoxication and diminished capacity remain legitimate defenses to the offense of first degree murder.

        In all three cases, the Supreme Court upheld the exclusion of evidence  evidence based on published rules of evidence that had substantial policy justifications.  Here, there is no rule of evidence in Pennsylvania precluding testimony about the defendant's intent.  Indeed, there is a long tradition of <u>allowing</u> such evidence.  See <u>e.g.</u> <u>Commonwealth v. Legg</u>, 711 A.2d 430, 432 (1998) (defendant testified at trial that her only intent was to scare the deceased); <u>Commonwealth v. Harris</u>, 665 A.2d 1172, 1173 (Pa. 1995) (defendant took the stand and denied that the shooting was intentional).  Nor does the Commonwealth offer any policy reasons comparable to those that support disallowing polygraph evidence or the rule requiring advance notice to the Commonwealth of witnesses.

86

testimony, impermissibly infringed upon defendant's constitutional right to present defense).[51]

The right to testify was not satisfied simply because Petitioner was allowed to testify about matters other than his intent. "[A state] may not apply a rule of evidence that permits a witness to take the stand, but arbitrarily excludes material portions of his testimony." Rock, 483 U.S. at 55.

Petitioner presented an intoxication/diminished capacity defense which effectively conceded his guilt of third degree murder; the *only real question at trial was whether Petitioner had the intent necessary to convict him of first degree murder and robbery*.[52] Petitioner had an absolute right to testify about his lack of intent. The trial court's preclusion of Petitioner's testimony violated his constitutional rights.

### B.    The Error Was Not Harmless

This error cannot be held harmless. The harmless error test announced in Brecht v. Abrahamson, 507 U.S. 619 (1993) frames this analysis. Under Brecht, an error must have a "substantial and injurious effect or influence in determining the jury's verdict" before it can be considered harmful and require relief. 507 U.S. at 632 n. 7. It is not appropriate to ask whether there was untainted evidence is sufficient to support the result. The correct inquiry is whether the

---

[51] Cf. United States v. Gonzalez-Chavez, 122 F.3d 15, 18 (8th Cir. 1997) (no error in precluding defendant from testifying about his good faith belief in the lawfulness of his actions because specific intent was not an element of the offense and, therefore, defendant's good faith was not relevant).

[52] The fact that Petitioner introduced some evidence supporting the affirmative defense of intoxication or diminished capacity does not prevent him from presenting evidence negating the element of intent. Pohlot, 877 F.2d at 901 ("the mere fact that defendant has the right to introduce psychiatric evidence in support of the affirmative defense of insanity does not justify barring the evidence from negating the government's case in chief").

error had a substantial influence on the verdict despite the existence of other, sufficient, evidence. Smith v. Horn, 120 F.3d 400, 417 (3d Cir. 1997) quoting Yohn v. Love, 76 F.3d 508, 523 (3d Cir. 1996).

The Brecht standard is not particularly onerous.  A habeas petitioner does not have the burden of proving the error prejudicial.  Rather, a court's doubt concerning the harmlessness of any such error must be resolved in favor of the petitioner.  Brecht, 507 U.S. at 640-41 (Stevens, J. concurring)[53] (the harmless error standard "places the burden on prosecutors to explain why those errors were harmless"); O'Neal v. McAnnich, 513 U.S. 432, 437 (1995).  The Brecht standard falls somewhere between Chapman harmless error[54] and the Strickland prejudice standards.  See Kyles v. Whitley, 514 U.S. 419, 434 (1995).   In light of the fact that Strickland's prejudice standard requires a showing by less than a preponderance of the evidence, and that Brecht is even more petitioner-favorable, the Commonwealth's has a significant and difficult burden of demonstrating that an error is harmless under Brecht.  Indeed, as Justice Stevens explained, the differences between the Brecht and Chapman standards are not so significant and are "far less important than the quality of the judgement [to] which it is applied."  Brecht, 507 U.S. at 643.

In this case, the Commonwealth cannot demonstrate that the trial court's instructional error was harmless.  Unlike many murder trials, Mr. Breakiron never contested his presence at the scene or his involvement.   His defense was that he lacked the specific intent to kill that

---

[53]Justice Stevens provided the critical fifth vote in Brecht, and, thus, his opinion is precedential.

[54]Chapman v. California, 386 U.S. 18, 24 (1967)

differentiates first degree murder in Pennsylvania from third-degree murder. Consequently, the

trial court's preclusion of his testimony on his lack of intent went to the core of his defense.

"[The] opportunity [to be heard] would be an empty one if the State were permitted to exclude

competent, reliable evidence ... <u>when such evidence is central</u> to the defendant's claim of

innocence." <u>Crane v. Kentucky</u>, 476 U.S. 683 (1986) (unanimous opinion) (reversing state

conviction where defendant was precluded from testifying about circumstances of his confession

on grounds that voluntariness of his confession was already established).

Moreover, the Commonwealth's evidence of Mr. Breakiron's intent was largely

circumstantial and hardly overwhelming. The circumstances of the crime, while sufficient to

support the jury's verdict, are not necessarily consistent with a premeditated and deliberate intent

to kill. The nature of the wounds are at least equally consistent with a killing committed during

an intoxicated rage and/or alcohol blackout, as it is with an intent to kill.

Petitioner's actions after the crime, including his attempts to conceal the body, were also

equally consistent with a killing committed during an alcohol blackout. The conscious efforts at

concealment took place after the Petitioner had revived from the blackout, in a state of panic over

what he had had done. None of his efforts at concealment show his intent at the time of the

killing, and they particularly do not show a premeditated and deliberate intent to kill required for

first degree murder.[55]

The only direct evidence suggesting an intent to kill came from jailhouse snitch Ellis

---

[55]In Pennsylvania, murder of the first degree is statutorily defined as causing the death of
another human being by an intentional killing. 18 Pa. C.S. §§ 2501, 2502. An "intentional
killing" is one which is willful, deliberate, and premeditated. 18 Pa. C.S. § 2502. A killing
committed with malice, but without specific intent, is third degree murder. 18 Pa. C.S. § 2502;
<u>see</u> <u>Commonwealth v. Cruz-Centeno</u>, 447 Pa. Super. 98, 668 A.2d 536 (1995).

Price.  Price claimed that Petitioner admitted his guilt to him and described a planned and premeditated act, contradicting Petitioner's defense theory that he was intoxicated and lacked the specific intent to kill.[56]  As discussed <u>infra</u> in this memorandum, Mr. Price had a history of criminal convictions, some involving *crimen falsi*, and substantial motivations to testify favorably for the Commonwealth.  Moreover, Price's testimony was inconsistent with Commonwealth witness Ed Mihalsky.  Mr. Mihalsky testified that he was a patron at the bar on the night of the killing and that, at the time he left, Petitioner and the deceased were alone in the bar and theirs were the only two cars in the parking lot.  NT 4/8/88 at 837-43.  Mihalsky's testimony was inconsistent with Price's claim that Petitioner admitted hiding in the bathroom until after all of the other patrons had left.  Thus, the Commonwealth's evidence of intent was ambiguous at best.

Moreover, Mr. Breakiron's sole defense focused on his lack of intent, as he did not deny his involvement in the killing.  Mr. Breakiron testified that, on the day of the killing,  he had approximately eight beers prior to dinner.  NT at 1233-38, 1245.  After dinner he went back out and had more beer and a shot of whiskey.  <u>Id.</u> at 1249.  After arriving at the bar, he had approximately six more beers and, possibly, another shot of whiskey.  <u>Id.</u> at 1251.  Mr. Breakiron did not remember the details of what happened next, though he thought he was struck on the head and knocked unconscious.  He remembered waking up to find the deceased's body on the floor beside him, with his knife in her back.  <u>Id.</u> at 1251-55.

The United States Supreme Court has held that a reviewing court should be wary of finding harmless error where a defendant was prevented from testifying about his intent.  In

---

[56]NT 1113-15 (describing Mr. Breakiron hiding in bathroom).

90

Crawford, the Court declared:

> There may have been testimony some time during the trial, inferences might possibly have been drawn as to the motive or intent with which those letters were taken, but, instead of testimony from which such inferences might have been drawn, *the defendant was entitled to state directly on oath to the jury what that intention was, and what were the motives which induced him to take the letters*.

> *It is hardly possible to imagine a case where greater care was necessary in regard to the exclusion of proper and admissible evidence than in the case before us.*. . .  No material and proper evidence upon that issue [of defendant's intent] should have been excluded, and the error committed was not, in our opinion, clearly shown to have been harmless.

Id. 212 U.S. at 205.[57]

Given the highly disputed facts relating to intent, and the lack of uncontradicted direct evidence of that intent, the error in precluding Mr. Breakiron from testifying about his lack of intent to kill and rob had a substantial and injurious effect on the jury's verdict and was not harmless under Brecht.[58]

In determining whether the error was harmless, this Court must not speculate about the weight the jury would have given his testimony.  The Third Circuit has cautioned against an

---

[57]Nor is the error harmless because Petitioner was allowed to testify that he blacked out at some point and did not remember killing the deceased.  Petitioner remembered the events of the evening up until the time he was the last customer remaining in the bar and was left alone with the deceased bartender.   The Commonwealth argued that Petitioner carried out a premeditated plan and intentionally killed the bartender.  Mr. Breakiron was entitled to look the jury in they eye and deny this version of events, to explain what his intent actually was, and have the jury decide what weight to give his testimony.

[58]The fact that Petitioner was able to answer one preliminary question, expressing an intent to "have a good time," does not render any error harmless.  Such testimony is not cumulative to testimony about an intent to do harm or an intent to steal.  Petitioner was entitled to address the questions that were explicitly before the jury – his alleged intent to kill and intent to rob – and the jury should have been entitled to have the opportunity to judge the credibility of his answers.

application of harmless error review which substitutes the appellate court for the jury "by speculating about what portion of the testimony the jury believed." Laird v. Horn, 414 F.3d 419, 428 (3d Cir. 2005).

In this case, the error was not harmless. Given the highly disputed facts relating to intent, and the lack of uncontradicted direct evidence of that intent, the error in precluding Mr. Breakiron from testifying about his lack of intent to kill and rob had a substantial and injurious effect on the jury's verdict and was not harmless under Brecht. See Smith v. Horn, 120 F.3d at 418-19 (erroneous instruction on intent was not harmless, despite substantial evidence that defendant had acted with the intent to kill; Court cannot usurp jury function to weight evidence and "cannot assume that the jury, having found Smith guilty, 'believed all properly admitted evidence against him and disbelieved all evidence in his favor.'" (quoting Roger J. Traynor, THE RIDDLE OF HARMLESS ERROR 28 (1970)).

**CLAIM 4:** **PETITIONER'S CONSTITUTIONAL RIGHTS WERE VIOLATED WHERE THE COMMONWEALTH FAILED TO DISCLOSE RELEVANT EVIDENCE WHICH WOULD HAVE IMPEACHED THE TESTIMONY OF ITS KEY WITNESS, FAILED TO CORRECT THAT WITNESS' FALSE AND MISLEADING TESTIMONY, AND FAILED TO TURN OVER EXCULPATORY INFORMATION; TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO INVESTIGATE AND PROPERLY IMPEACH THE WITNESSES' TESTIMONY BY BRINGING OUT THE WITNESS' BIAS AND MOTIVE TO LIE.**

This claim alleges that the Commonwealth violated Petitioner's constitutional rights under Brady v. Maryland 373 U.S. 83 (1963) and Napue v. Illinois, 360 U.S. 264 (1959) by failing to disclose various items of exculpatory information, and/or correcting false testimony offered by a key Commonwealth witness. During the course of habeas proceedings, Petitioner has twice been permitted to amend this claim to include additional exculpatory items that were not pled in the initial Petition. Because portions of this claim had been exhausted in the state

92

courts, while other portions were not, this Court must engage in two slightly different analyses, though, ultimately, this Court must review the cumulative effect of the Commonwealth's non-disclosures.

### A.    The Exhausted Allegations.[59]

At trial, Petitioner presented a voluntary intoxication defense and essentially conceded guilt of third degree murder.  Consequently, the critical issue at trial was Mr. Breakiron's intent. The only direct evidence of Petitioner's intent was elicited through the testimony of Ellis Price, a jailhouse informant who testified to alleged statements made by Petitioner.  Price claimed that Petitioner described a planned and premeditated act, contradicting Petitioner's defense theory that he was intoxicated and lacked the specific intent to kill.[60]  Mr. Price's testimony was therefore critical to the prosecution's case for first-degree murder.

At the time of trial, the Commonwealth failed to turn over Mr. Price's complete criminal record to the defense (which included *crimen falsi*). The Commonwealth also failed to correct Mr. Price when he falsely testified about his record.  The Commonwealth failed to reveal the fact that Mr. Price had a non-final criminal conviction of attempted murder which gave him a substantial incentive to curry favor with the Commonwealth.  Finally, the Commonwealth failed to reveal the fact that Mr. Price admitted to the police that Mr. Breakiron told him that he was "out of it" and very intoxicated on the night of the killing.  This was inconsistent with Mr Price's

_____

[59]These allegations were presented in Breakiron-3.  The Pennsylvania Supreme Court did not address the merits.  Thus, this Court's review is de novo.

[60]NT 1113-15 (describing Mr. Breakiron hiding in bathroom).

account at trial and supported Petitioner's account of his intoxication.[61]

### B.    The Non-Exhausted Allegations.

As a result of investigation and discovery provided during habeas proceedings, Petitioner uncovered additional information relating to Ellis Price's testimony and credibility.  Petitioner alleged that Ellis Price, along with other inmates in the Fayette County jail including James Sullivan, sent a letter to District Attorney Solomon, offering information and testimony against Mr. Breakiron in exchange for sentencing benefits, or other considerations, to be provided to Ellis and his brother, Robert Price.  Petitioner further alleged that around the time of this letter, Ellis, who was awaiting sentencing following an attempt homicide conviction, was granted an arrest of judgement on those convictions and that the Commonwealth decided not to appeal that ruling.  Petitioner alleged that the decision not to appeal was made in light of the incriminating information Ellis had offered against Mr. Breakiron.  Petitioner also alleged that, in addition, Ellis was a named suspect in a brutal assault and robbery that had been committed against a Vincent Sterbutzel.  That investigation was pending at the time Ellis came forward, and at the time he testified for the prosecution in this case.  No charges were ever brought against him for that case.

As these allegations have not been presented to the state courts (and the parties had agreed that there were no state remedies available), this Court (Judge Hardiman) conducted an evidentiary hearing to determine if Petitioner could show cause and prejudice for his failure to exhaust.  This Court (Judge Fischer), with the consent of the parties, reviewed the transcript and

---

[61]In the alternative, prior counsel were ineffective for failing to investigate and present this information to the jury and/or properly litigate these claims.

94

exhibits and, on September 19, 2007, issued findings of fact ("Findings").  In those findings,

Judge Fischer recognized that under Banks v. Dretke, 540 U.S. 668, 690 (2004) (citing Strickler

v. Greene, 527 U.S. 263 (1991), "the 'cause and prejudice' requirements correspond with the

components of a Brady claim. Therefore, if a petitioner succeeds in demonstrating 'cause and

prejudice,' he will at the same time succeed in establishing the elements of a Brady claim."

Findings at 7-8.  Thus, as with the exhausted allegations, this Court must make a de novo

determination of the merits.

    This Court's findings reflect that Petitioner proved some, but not all, of his allegations.

This Court found that Ellis Price had sent a letter or letters to the District Attorney's Office

requesting benefits in exchange for information against Breakiron, but that there was no

agreement, express or implied, between Price and the Commonwealth that he would receive any

benefits in exchange for his testimony.  Findings at 21, 23.  Moreover, no benefits were provided

by the Commonwealth.  Finding 11 at 23.  This Court also found that Price was, in fact, a suspect

in the Sterbutzel case, but, again, no agreements were made and no benefits were given as to

those charges.  Finding 6 at 22; 14 at 24.

    In light of those findings, the issue before this Court is: Did the Commonwealth's failure

to disclose the letters Price had written, or the fact that Price had been identified as a suspect in

the Sterbutzel assault, violate Petitioner's rights under Brady, Napue, or their progeny.

    C.    **Legal Standards**

    The Due Process Clause of the Fourteenth Amendment to the United States

Constitution requires a prosecutor to disclose evidence to the accused that is favorable to the

defense and that is material.  Banks v. Dretke, 540 U.S. 668 (2004); Brady v. Maryland, 373 U.S.

95

83, 87 (1963); Giglio v. United States, 405 U.S. 150, 153-56 (1972); United States v. Bagley, 473 U.S. 667, 676 (1985); Kyles v. Whitley, 514 U.S. 419, 437 (1995). "There are two components to a Brady claim: 1) favorable evidence must have been suppressed by the government, either intentionally or inadvertently; and 2) the suppressed evidence was material. Simmons v. Beard, 356 F. Supp. 2d 548, 562 (WD Pa.2005), citing Slutzker v. Johnson, 393 F.3d 373, 386 (3d Cir. 2004). The duty to enforce Brady "with painstaking care is never more exacting than it is in a capital case." Kyles v. Whitley, 514 U.S. 419, 422 (1995); accord United States v. Hammer, 404 F.Supp.2d 676, 795 (M.D.Pa. 2006) (citing Kyles and additional Supreme Court precedent).

Due process is also violated "when the State, although not soliciting false evidence, allows it to go uncorrected when it appears." Napue v. Illinois, 360 U.S. 264 (1959). The principle that the state may not knowingly use false evidence applies even where such evidence goes only to the credibility of a witness, since "[t]he jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors . . . that a defendant's life or liberty may depend." Id., at 269. See also Banks, 540 U.S. at 694 ("It has long been established that the prosecution's 'deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with rudimentary demands of justice' . . . [I]t was also appropriate for Banks to assume that his prosecutors would not stoop to improper litigation conduct to advance prospects for gaining a conviction").

The prosecutor is responsible for "any favorable evidence known to the others acting on the government's behalf, including the police." Kyles, 514 U.S. at 437-438 (knowledge of favorable evidence "known . . . to police investigators and not to the prosecutor" is imputed to

the trial prosecutor); Giglio, 405 U.S. at 154 (under Brady, "prosecutor's office is an entity" and knowledge of anyone in office is attributed to trial prosecutor).

Favorable evidence includes impeachment evidence as well as evidence that exculpates the accused. Bagley, 473 U.S. at 676. Impeachment evidence is that which can be used to challenge the credibility of a prosecution witness or that can be used to challenge the prosecution's trial theory. Id. at 676 (Brady's disclosure requirements apply to any materials that, whatever their other characteristics, can be used to develop impeachment of a prosecution witness or theory). See also Commonwealth v. Bazemore, 614 A.2d 684, 688 (Pa. 1992) ("When the reliability of a given witness may well be determinative of guilt or innocence, nondisclosure by the Commonwealth of evidence affecting credibility violates due process").

A prosecutor's failure to disclose Brady material requires a new trial when the exculpatory evidence would have been material to the trial. Kyles, 514 U.S. at 432, quoting Brady, 373 U.S. at 87; See also Banks, 540 U.S. at 675-76. The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434. Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict – "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality. Id., at 435 n. 8. Evidence is "material" when "the favorable evidence could reasonably be taken" to put the case "in such a different light as to undermine confidence in the verdict." Banks, 540 U.S. at 698; Kyles, 514 U.S. at 435.[62] See also Hull v.

---

[62]In introducing the concept of materiality, the District Court in Simmons set forth the applicable standard as follows:

Kyler, 190 F.3d 88, 110 (3d Cir. 1999) (The "undermines confidence" standard "is not a stringent

one. It is less demanding than the preponderance standard."). Thus, if there is "any reasonable

likelihood" that the non-disclosure could have "affected the judgment of the jury," relief must be

granted. Napue, 360 U.S. at 271; Giglio, 405 at 154. The materiality of suppressed evidence

must be "considered collectively, not item-by-item." Kyles, 519 U.S. at 436.

 The prejudicial effect of a Brady violation is to be measured by the usefulness the

undisclosed evidence would have in the hands of effective counsel. Kyles, 514 U.S. at 44; id. at

441-49 (reviewing ways in which competent counsel could have used and developed withheld

information to impeach prosecution witnesses and undercut police investigation); United States

v. Bagley, 473 U.S. 667, 676 (1985) (materiality analysis considers whether suppressed

information, "if disclosed and *used effectively*" *by the defense*, may have made a difference); id.

at 683 (materiality inquiry considers "any adverse effect that the [suppression] might have had on

the preparation or presentation of the defendant's case" and "the course that the defense and the

trial would have taken had the defense not been misled"); United States v. Perdomo, 929 F.2d

---

  The Supreme Court has elucidated the Brady materiality standard as follows:
  "[The] touchstone of materiality is a '*reasonable probability*' of a different result,
  and the adjective is important. The question is not whether the defendant would
  more likely than not have received a different verdict with the evidence, but
  whether in its absence he received a fair trial, understood as a trial resulting in a
  verdict worthy of confidence."

Simmons at 563, quoting Slutzker, 393 F.3d at 387 (quoting Kyles, 519 U.S. at 434). In its
concluding paragraph on the Brady claims, the Simmons Court stated the following:

  Although we cannot say with certainty that the jury would have reached a
  different conclusion on its verdict, Simmons has demonstrated a "*reasonable
  probability*" that it would have done so.

Id, at 566, quoting Bagley, 473 U.S. at 682.

967, 971 (3d Cir. 1991) (materiality "inquiry requires consideration of ... possible effects of non-

disclosure on the defense's trial preparation");  Banks v. Reynolds, 54 F.3d 1508, 1519 (10th Cir.

1995) (in evaluating prejudice, courts must consider that Brady "evidence in the hands of a

competent defense attorney may be used to uncover other leads and defense theories").

Similarly, the evidence must be evaluated for its utility in "attack[ing[ the reliability of the

investigation."  Kyles at 446.[63]

        An even more defense-friendly materiality standard applies when the prosecutor

knowingly conveys false information to the jury; then, the proper materiality standard is that of

United States v. Bagley, 473 U.S. 667, 678-79 & n.9 (1985), United States v. Agurs, 427 U.S. 97,

103 (1976) and Giglio v. United States, 405 U.S. 150, 154 (1972), which requires the

Commonwealth to show that the error is *harmless beyond a reasonable doubt*.  See United States

v. Alzate, 47 F.3d 1103, 1110 (11th Cir. 1995) (quoting Agurs) (when the prosecutor knowingly

conveys false information to jury, falsehood is material "if there is any reasonable likelihood" it

"could have affected the judgment of the jury," requiring the State to show "harmless[ness]

beyond a reasonable doubt").  In determining if a prosecutor's actions are "knowing," actual

knowledge by the trial prosecutor is *not* required.  Instead, the "prosecutor's office is an entity,"

and the knowledge of anyone on the prosecution team is attributed to the trial prosecutor.  Giglio,

405 U.S. at 154.

──────────────

        [63]Even inadmissible evidence can be material under Brady,  if it leads to the discovery of
other admissible evidence.  Wright v. Hopper, 169 F.3d 695, 703 (11th Cir. 1999); Coleman v.
Calderon, 150 F.3d 1105, 1116-17 (9th Cir. 1998) ("to be material [under Brady] evidence must
be admissible or lead to admissible evidence"), rev'd on other grounds, 525 U.S. 141 (1998);
United States v. Gleason, 265 F.Supp. 880 , 886 (S.D.N.Y. 1967) ("prosecution's duty of
disclosure in Brady, cannot be limited to materials or information demonstrated in advance to be
competent evidence").

The defendant's entitlement to relief upon the showing of a <u>Brady</u> violation does not turn upon the good or bad faith of the trial prosecutor. <u>Kyles</u>, 514 U.S. at 438 ("whether . . . a failure to disclose is in good faith or bad faith . . . the prosecution's responsibility for failing to disclose known, favorable evidence rising to a material level of importance is inescapable."); <u>Banks</u>, 540 U.S. at 698 ("<u>Brady</u>, we reiterate, held that the suppression by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good or bad faith of the prosecution"). The <u>Brady</u> standard of review does not require any level of diligence on the part of a defense attorney to "seek" evidence in the control of the Commonwealth. This is true even if defense counsel should know to ask. Rather, federal constitutional law places the burden upon the prosecutor to disclose material evidence without a defense request. "A rule thus declaring 'prosecutor may hide, defendant must seek,' is not tenable in a system constitutionally bound to accord defendants due process." <u>Banks</u>, 540 U.S. at 696.

**D.     The Commonwealth's Failures to Disclose or Correct.**

       **1.     Accurate information about Price's criminal record.**

The Commonwealth's star witness, Mr. Price, had a criminal conviction record of *crimen falsi*. The Commonwealth failed to disclose this fact to defense counsel and failed to correct the perjurious testimony of Mr. Price about his criminal record. At trial Mr. Price admitted that he was incarcerated in the state of Michigan serving a sentence for assault. NT 3/11/88 at 1111. However, Price denied that there were any other convictions underlying that sentence. <u>Id.</u> at 1117 (the crime was "just an assault").

The Commonwealth has conceded that Mr. Price did not accurately describe his prior

record in Michigan.[64]  The crime that Mr. Price maintained was "just an assault" was, in fact, as the Commonwealth now explains, an "assault with the intent to rob while armed," a *crimen falsi*.[65]  Under Michigan law, the elements of the crime of assault with intent to rob while armed are an assault with force or violence, an intent to rob or steal, and the possession of a weapon. Michigan v. Cotton, 478 N.W.2d 681, 688 (Mich. App. 1992).  These elements correspond to the Pennsylvania definition of robbery.  Thus, Price's prior conviction was not "just an assault," but was a robbery -- a *crimen falsi* that goes directly to the truthfulness, honesty, and trustworthiness of a witness because it requires an element of dishonesty.  In contrast, under Pennsylvania law, "just an assault" can be as insignificant as a simple assault, and not involve any element of dishonesty.  Yet the Commonwealth never corrected Mr. Price's testimony and never revealed his true record to the jury or to the defense.

The Commonwealth's failure to disclose that Mr. Price had been convicted of a *crimen falsi* akin to robbery (and its failure to correct his false testimony) was highly prejudicial.  Had Mr. Price's true record been put before the jury, the court would have been required to instruct the jury on the importance of the dishonest nature of Mr. Price in its determination of his credibility.  Commonwealth v. LaMassa, 367 Pa. Super. 54, 59, 532 A.2d 450, 452 (1987). "It is precisely the inherent dishonesty of *crimen falsi* crimes which sets them apart, not just under the rules of evidence, but also in the eyes and minds of the community."  Kinniry v. Abington School

---

[64]See Commonwealth Response to PCRA Petition at 22.

[65]In this case, the prosecutor had actual knowledge of Mr. Price's criminal record since Mr. Price was transported from the Michigan Department of Corrections to testify.  However, the lack of such actual knowledge is no excuse for a Brady violation.  United States v. Auten, 632 F.2d 478 (5th Cir. 1980).

<u>District</u>, 673 A.2d 429, 432 (Pa. Cwmwlth. 1996).  Indeed, at common law, a conviction for

*crimen falsi* prevented the witness from testifying *at all*.  22 C.J.S. Criminal Law § 2.

The Commonwealth had an obligation to correct this record by disclosing Mr. Price's

full record to defense counsel, and correcting Mr. Price's misleading testimony.  As a result of its

failure, the jury was misled and Petitioner did not receive the required *crimen falsi* instruction to

the jury on Mr. Price's credibility, a critical question in Mr. Breakiron's trial.   Alone, and in

conjunction with the Commonwealth's failure to disclose other evidence available to impeach

Mr. Price, these constitutional violations require relief.

### 2.    Ellis Price's non-final attempted homicide conviction.

Not only was the jury prevented from learning that Mr. Price had a criminal history of

*crimen falsi*, but the jury never learned that Ellis Price had substantial reasons to color his

testimony to favor the Commonwealth.  In October, 1986 a jury found him <u>guilty</u> of attempted

homicide.  However, on July 28, 1987, Judge Franks, the trial judge in Mr. Breakiron's case,

granted an arrest of judgment.

Judge Franks' timely order saved Mr. Price from the possibility of a substantial prison

sentence.  The Commonwealth, however, had 30 days in which to file an appeal of that order.  It

was during that period, just one week after Judge Franks' order, that Mr. Price told the police

about Petitioner's alleged admissions.  After reporting these statements to the police, Mr. Price

became a key Commonwealth witness in this case and no appeal was ever taken from the order

granting arrest of judgement.

The possibility of appeal, and the hope that none would be taken, provided Price with

motivation to come forward and accuse Breakiron, and creates a pro-Commonwealth bias.  The

jury was entitled to this information, in order to judge his credibility, regardless of whether there was an actual agreement between Price and the Commonwealth. It should have been up to the jury to determine whether, and to what extent, the Commonwealth's decision to not appeal impacted on Price's motivation, bias, and credibility. After all, regardless of whether there was a benefit in exchange for his testimony, the Commonwealth's failure to appeal eliminated the risk that Price's conviction would be reinstated and a lengthy prison sentence imposed. This provided Price with a bias in favor of the Commonwealth.

Instead, at trial, the prosecutor misleadingly left the impression that Mr. Price had no reason to favor the Commonwealth:

Q:     Are you charged with anything in Pennsylvania at this time?

A:     No.

NT at 1114-15. And, during closing argument, the prosecutor explicitly argued that Mr. Price had "nothing to gain at all" from the Commonwealth. NT at 1325-26 (arguing that Ellis Price was credible and had no bias). The Commonwealth had an obligation to disclose this possible bias, and not mislead the jury, under Brady, Napue, and their progeny. See supra (discussing applicable law).

The jury was entitled to learn of Mr. Price's history of crimen falsi offenses and the motivations that Mr. Price had to bias his testimony towards the Commonwealth. Because the Commonwealth failed to turn over this Brady material, the jury was deprived of a fair opportunity to assess Mr. Price's credibility.[66]

---

[66]These errors were exacerbated by the trial court's improper refusal to allow defense counsel to question Price about whether the Commonwealth provided any benefits to Mr. Price. NT 4/11/88 at 1118.

103

**3.      Mr. Price's admission that he told the police that Mr. Breakiron told him he was intoxicated.**

Ellis Price had also told the police that Mr. Breakiron told him he was "out of it" and that he was very drunk at the time of the offense:

Q:      What did Mark tell you he was drinking?

A:      He said that he was, you know, out of it, that night.

NT PCRA 7/31/2000 at 8.

Q:      By out of it, you understood Mr. Breakiron to mean that he was intoxicated or drunk?

A:      Yes.

Q:      And, do you recall telling the police this?

A:      Yes.

NT PCRA 7/31/2000 at 9.

Q:      Do you recall for certain whether or not you told the police that Breakiron told you that he was really out of it on the night of the murder?

A:      Yes.  They wrote everything down on a piece of paper when I was at the jail.

NT PCRA 7/31/2000 at 11.   Defense counsel and the jury, however, were unaware that Ellis Price had told the police that Mr. Breakiron had said that he was "out of it" at the time of the offense because this information was omitted from the police report and was not brought out at trial.  Thus, the jury never knew that Mr. Price could support Petitioner's intoxication defense, and heard instead only a story consistent with first degree murder.  The Commonwealth's failure to disclose these exculpatory parts of Mr. Price's statement denied Petitioner his constitutional rights to due process.

104

The fact that Ellis Price told the police that Mr. Breakiron told him that he was "out of it" at the time of the offense is clearly exculpatory and highly material. This evidence would have contradicted the Commonwealth's theory of the case and supported the intoxication defense offered by Mr. Breakiron.

At the PCRA hearing, Sherriff Brownfield (who took Mr. Price's statement) testified that if Ellis Price had told him about Mr. Breakiron's intoxication, he would have written it down. Sheriff Brownfield's testimony was based solely upon his written report and the absence of any mention of intoxication. He never testified that he independently recalled the interview of Mr. Price. Instead, the questioning and his responses address only the absence of any mention of intoxication in the written report:

> Q:     When you interviewed Mr. Price, did you put that in your report, and
>         everything that he told you?
>
> A:     Yes, ma'am, I did.
>
> Q:     You did not, – did you intentionally leave anything out?
>
> A:     No, I did not.
>
> Q:     Do you recall Mr. Price telling you that Mr. Breakiron was drunk or really
>         out of it at the time of the murder?
>
> A:     No ma'am, I do not.
>
> Q:     <u>Had</u> he told you that, <u>would</u> you have put that in your report?
>
> A:     Yes, I <u>would</u> have.

NT 7/31/2000 at 16-17.

> Q:     Is it your testimony that Mr. Price did not tell you about Mr. Breakiron
>         being drunk or really out of it at the time of the murder?

A:    No, <u>had</u> he told me that, I <u>would</u> have put it in my report.

NT 7/31/2000 at 18.  Mr. Brownfield's testimony was not based on his independent recollection

of the entire interview — that is clear from his limited memory of the circumstances of the

interview.  Instead, Mr. Brownfield's testimony was based on the fact that the written police

report does not include any mention of intoxication, and Mr. Brownfield's *supposition* that if Mr.

Price had told him that Mark said he was drunk, he *would* have written this down.

Mr. Brownfield testified in the conditional — if he had been told this, he would have put

it in his report.  He never testified that he currently remembered the interview and that Mr. Price

did not tell him that Mr. Breakiron said he was intoxicated.  He did not testify to this because he

had no independent recollection of the details of the interview:  Mr. Brownfield could not recall

whether he went to the jail with anyone to interview Mr. Price, NT 7/31/2000 at 19, or whether

he met with Mr. Price in the prison, NT 7/31/2000 at 19, and he repeatedly noted that thirteen

years had passed since his interview.[67]

In contrast, Mr. Price testified that he specifically remembers telling the police that Mr.

Breakiron told him that he was really out of it on the night of the murder:

Q:    Do you recall for certain whether or not you told the police that Breakiron
      told you that he was really out of it on the night of the murder?

A:    Yes.  They wrote everything down on a piece of paper when I was at the
      jail.

_____

[67]Other irregularities also undermine the reliability of Mr. Brownfield's report and Mr.
Brownfield's entitlement to rely on it.  Mr. Brownfield acknowledged that he destroyed the
contemporaneous notes of the interview, NT 7/31/2000 at 21.  Two days went by between the
time he met with Mr. Price and the time that he memorialized his notes into a written report.  NT
7/31/2000 at 22.   Mr. Price did not have an opportunity to review or sign these notes.  NT
7/31/2000 at 21.

NT 7/31/2000 at 11.  Mr. Brownfield's conclusion that Mr. Price told him this critical piece of

information was based not on present recollection of the interview, but on the fact that there is no

mention of intoxication in his report.   But he candidly admitted that he didn't remember the

circumstances of the interview, that he destroyed the contemporaneous notes of his interview,

and that he did not memorialize the interview in a report until two days later after the interview.

See Commonwealth v. Canales, 454 Pa. 422 (1973) (while witness can use written material to

refresh recollection, witness cannot testify from past writing if he lacks present recollection of

past events).

Perhaps Mr. Brownfield deliberately omitted the critical fact that Mr Breakiron told Mr.

Price that he was drunk.   Perhaps Mr. Brownfield simply forgot to include it in his written

report.  Because he destroyed his contemporaneous record of the interview, and never gave Mr.

Price a chance to review it, we don't know exactly what he wrote.

Whether the omission of this critical piece of evidence was by design, simple error, or

some combination of the two, Mr. Breakiron did not receive a fair trial.  Mr. Breakiron told Mr.

Price that he was "out of it" at the time of the offense.  Mr. Price testified that he told Mr.

Brownfield, the sheriff, that Mr. Breakiron told him this critical fact.  For whatever reason, Mr.

Brownfield failed to include it in his final report.  As a result of this critical error, the jury never

heard this vital information and Petitioner's defense at trial -- that he was intoxicated -- was

immeasurably weakened.  Because of the Commonwealth's failure to turn over exculpatory

evidence, the jury failed to hear all of the facts.

**4.      Price's letters to the District Attorney.**

Price's letters to the District Attorney were exculpatory impeachment material that should

have been turned over to the defense.  The letters show that his initial motivation in coming forward with accusations against Mr. Breakiron was his hope of receiving favorable treatment for him or his brother.  This establishes his motive and bias, regardless of whether he actually received any benefits.  The Commonwealth was constitutionally required to disclose that evidence.

Giglio requires the disclosure of more than just formal plea agreements reached with prosecution witnesses.  Its "thrust . . . has been to ensure that the jury knows the facts that might motivate a witness on giving testimony. . ."  Brown v. Wainwright, 785 F.2d 1457 (11th Cir. 1986).  See also DuBose v. LeFevre, 619 F.2d 973, 978 (2d Cir. 1980) (informal negotiations and codefendant/witness' belief that prosecutor would "do the right thing" if she testified constituted an understanding subject to Brady disclosure rule).  When assessing a Brady violation, "the fact that there was no binding agreement regarding [a] deal in exchange for his testimony, . . . only strengthens the witness's motive to testify favorably for the Commonwealth."   Commonwealth v. Strong, 761 A.2d 1167, 1175 (Pa. 2000) (citing United States v. Bagley, 473 U.S. 667, 683 (1985)).  "The absence of an ironclad, signed, sealed contract does not conclusively establish that no other information affecting the credibility of the witness exists." Id. (citing United States v. Giglio, 405 U.S. 150, 155 (1972)).

**5.    Suspect in the Sterbutzel assault.**

Ellis Price was a named suspect in the Vincent Sterbutzel assault and robbery, a case being investigated by the same state police barracks that investigated the Martin homicide and prosecuted Mr. Breakiron.  On January 8, 1986, Vincent Sterbutzel was assaulted, beaten, and robbed by three men.   His assailants stole his car, which was later set on fire and abandoned.

108

See Federal Evidentiary Hearing ("FEH") (Commonwealth Exhibit D, Pennsylvania State Police Report).  Robert, Kevin, and Ellis Price were involved in that beating and robbery.  FEH at 75.  As detailed in a state police report, on July 23, 1986, Mark DiMatteo admitted his limited involvement in the Sterbutzel attack and named Ellis Price as one of the other perpetrators.

This was exculpatory impeachment information that should have been disclosed to the defense.  The open investigation into Price's complicity in a violent assault, robbery, and arson gave Price much motivation and bias to assist the Commonwealth in its prosecution of Mr. Breakiron.  The police knew of the open investigation, but never revealed it.

### E.    The Non-Disclosed Evidence Was Material.

Even where an individual Brady claim does not amount to a constitutional violation requiring relief, the cumulative impact of multiple violations can.  Kyles, 514 U.S. at 436-37; Jamison v. Collins, 100 F.Supp. 2d 647, 673 (S.D. Ohio, 2000)(cumulative effect of undisclosed exculpatory evidence was material in that it could have been used to direct suspicion to others, to impeach witness' testimony, and to discredit eyewitness identifications), aff'd 291 F.3d 380 (6th Cir. 2002).  Both individually and cumulatively, the failure to disclose the above information, or to correct those instances of Price's false or misleading testimony, was material.

Price was a critical prosecution witness.  His testimony that Mr. Breakiron allegedly confessed to hiding in the bathroom until all the patrons left the bar, provided the only direct testimony of a planned, deliberate assault, and contradicted the intoxication/diminished capacity defense offered by the defense.  It was critical that counsel attack the credibility of his testimony, but counsel lacked the tools necessary to effectively cross examine him.

Had counsel known that Price misled the jury about his criminal record, had a *crimen*

*falsi* conviction, wrote to the District Attorney asking for benefits in exchange for his cooperation, was the suspect in a vicious assault and robbery, and told the police that Breakiron stated he was intoxicated and "out of it," counsel would have had the means necessary to attack Price's credibility and corroborate the intoxication defense.

The Supreme Court's opinion in <u>Davis v. Alaska</u>, 415 U.S. 308, 318 (1974), although addressing the denial of the right to confrontation, nevertheless explains the harm done by the failure to disclose the impeaching evidence to the defense. In <u>Davis</u>, the defendant attempted to challenge his identification by a witness named Richard Green. The defendant sought to impeach Green's credibility by showing that he was on juvenile probation for burglary at the time. The defense contended that Green's status as a probationer may have led him to make a faulty identification to shift suspicion away from himself, and also that he might have made the identification as a result of police pressure and his fear of possible probation revocation. <u>Davis,</u> at 310-11.

Although the trial court permitted the defense to question Green about possible bias, it precluded the defense from introducing his juvenile probation status, which was the factual basis for the claim of bias. <u>Id.</u> at 311-14. That restriction denied the defendant his right of effective cross examination:

> While counsel was permitted to ask Green whether he was biased, counsel was unable to make a record from which to argue why Green might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial. On the basis of the limited cross-examination that was permitted, the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness or, as the prosecutor's objection put it, a 'rehash' of prior cross-examination. *On these facts it seems clear to us that to make any such inquiry effective, defense counsel should have been permitted to expose to the jury the facts from which jurors, as*

> *the sole triers of fact and credibility, could appropriately draw inferences relating to the reliability of the witness.*

Davis, at 318.  As in Davis, Breakiron's counsel "was unable to make a record from which to argue why [Price] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial."  Moreover, "the jury might well have thought that defense counsel was engaged in a speculative and baseless line of attack on the credibility of an apparently blameless witness."[68]

Price's testimony was important.  As discussed in Claim 1, supra, the Commonwealth's evidence of Mr. Breakiron's intent was largely circumstantial and hardly overwhelming.  The circumstances of the crime were not necessarily consistent with a premeditated and deliberate intent to kill.  Both the nature of the wounds, and Petitioner's efforts at concealment, were at least equally consistent with a killing committed during an intoxicated rage and/or alcohol blackout, as it is with an intent to kill.

The only direct evidence suggesting an intent to kill came from jailhouse snitch Ellis Price.  Indeed, not only did Price claim that Breakiron hid in the bathroom until the other patrons left, Price alleged that Breakiron told him that he: "finished her off" at his grandfather's house,

---

[68]See Olden v. Kentucky, 488 U.S. 227, 231- 32 (1988) (per curiam) (limitation of cross-examination of complaining witness about her cohabitation with a third party violated right of confrontation; possible motive for lying was fear of jeopardizing relationship);  Franklin v. Henry, 122 F.3d 1270, 1273 (9th Cir.1997) (where a defendant's guilt hinges largely on the testimony of a prosecution's witness, the erroneous exclusion of evidence critical to assessing the credibility of that witness violates the Constitution); Wealot v. Armontrout, 948 F.2d 497, 500 (8th Cir.1991) (holding that trial court unconstitutionally precluded petitioner from cross-examining alleged rape victim about possibility that she fabricated story because she feared jealous, abusive husband); United States v. Willis, 647 F.2d 54, 57 (9th Cir. 1981) (court violated defendant's right to confront adverse witness by refusing to allow questioning of the witness about his relationship with defendant's former live-in girl friend).

after taking her from the bar.  NT at 1114-15.  Such testimony, if believed, provided strong evidence of a conscious and deliberate intent to kill.  Yet Mr. Breakiron's sole defense focused on his lack of intent, as he did not deny his involvement in the killing.  Thus, impeaching Price's credibility was of critical importance, and evidence that effective counsel could use for impeachment was unquestionably material.

Petitioner's <u>Brady</u> claims are meritorious.  He has established "cause and prejudice" for those aspects of this claim that were not presented to the state courts.  He is entitled to habeas relief.

### F.    Trial Counsel was Ineffective for Failing to Cross-Examine Mr. Price about His Incentives to Testify for the Commonwealth.[69]

As explained above, defense counsel's preparation for this case was abysmal.   He apparently relied upon the Commonwealth's representations about Mr. Price. Trial counsel was constitutionally ineffective to the extent he may have failed to adequately investigate, discover, and introduce for impeachment purposes Mr. Price's actual record, his hopes of leniency, or any actual benefits provided to him.   Defense counsel has a duty to challenge the credibility of the witnesses against the defendant, by presenting evidence of prior *crimen falsi* convictions, the reasons for his pro-Commonwealth bias,  or by developing a motive to fabricate.   Similarly, counsel was ineffective for failing to elicit the critical fact that Mr. Breakiron told Mr. Price that he was "out of it" and was very drunk at the time of the offense.  As explained above, Mr. Breakiron was prejudiced by the fact that the jury did not learn the reasons to question Ellis Price's veracity.

---

[69]This aspect of this claim was raised in state court in <u>Breakiron-3</u>.  The merits were not addressed.  Thus, this Court's review is de novo.

The failure to impeach a key witness or a critical aspect of the prosecution's trial theory with evidence that would have been uncovered had counsel conducted a reasonable investigation constitutes ineffective assistance of counsel under Strickland. In Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996), defense counsel failed to impeach an identification witness with her prior inconsistent statement concerning the comparative heights of the perpetrators. The Third Circuit found that this failure could not be justified, that it "border[ed] on the inconceivable" for counsel not to have used the prior statement, and that counsel was, therefore, ineffective. Id. at 1098. Likewise, in Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995), the court held that counsel's failure to impeach a witness with his prior inconsistent statements to investigators was constitutionally deficient. Id. at 710. In Blackburn v. Foltz, 828 F.2d 1177 (6th Cir. 1987), the court also held that counsel was ineffective when he failed to obtain a transcript of an eyewitness' prior testimony to use to impeach the inconsistent testimony she gave in a subsequent proceeding. The court explained that counsel "failed to pursue the one obvious and only logical means of diminishing" her testimony. Id. at 1184.[70]

As discussed above, Petitioner was prejudiced by counsel's failure to properly attack

---

[70]See also Harris v. Reed, 894 F.2d 871, 879 (7th Cir. 1990) (counsel's failure to impeach witness' testimony with prior inconsistent statement was ineffective); Hadley v. Grose, 97 F.3d 1131 (8th Cir. 1996) (counsel ineffective for failure to impeach critical prosecution witness); Harris ex rel. Ramseyer v. Wood, 64 F.3d 1432 (9th Cir. 1995) (counsel ineffective for failing to interview prosecution witnesses); Griffin v. Warden, 970 F.2d 1355 (4th Cir. 1992) (counsel ineffective for failing to investigate alibi that would have served to impeach prosecution's case); Moffett v. Kolb, 930 F.2d 1156 (7th Cir. 1991) (counsel ineffective for failing to impeach witness with prior inconsistent statement that would have supported counsel's trial theory); Montgomery v. Petersen, 846 F.2d 407 (7th Cir. 1988) (counsel's failure to investigate alibi which would have impeached state's case held ineffective); Williamson v. Reynolds, 904 F. Supp. 1529 (E.D. Okla. 1995), aff'd, Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) (counsel ineffective for failing to impeach prosecution witnesses with plea agreement).

Price's credibility.  For these reasons as well, Petitioner is entitled to relief.

**CLAIM 5:**    **MR. BREAKIRON'S DEATH SENTENCE IS BASED ON OUTSIDE INFLUENCES ON THE JURY'S DELIBERATIONS: THE JURY'S FUNDAMENTAL MISUNDERSTANDING OF THE MEANING OF A "LIFE" AND "DEATH" SENTENCE.[71]**

Mr. Breakiron was sentenced to death as a result of a horrible mistake.  The jury wished to sentence Mr. Breakiron to life in prison without parole.  Based on the common, but erroneous misperception derived from newspapers, television and other media that life-sentenced inmates would be released, the jury wrongly believed that if they sentenced Mr. Breakiron to "life," that he would be released from prison on parole.  Worse still, the jurors wrongly believed that by sentencing Mr. Breakiron to "death" he would not actually be executed but would spend the rest of his life in jail.

Nola Laughery, a member of the jury, has elucidated the jury's mistake in an affidavit submitted to the Court of Common Pleas:

I, Nola Laughery do hereby declare and verify as follows:

I was a juror in <u>Commonwealth v. Breakiron</u>.

During the penalty phase of the trial we wanted to make sure that Mark would never be released.  He seemed very dangerous to us and we wanted to be certain that he would not get out.

We did not believe that Mark would ever really be executed.  We sentenced him to "death" because we believed that this meant he would spent (sic) the rest of his life in jail.  No one had been executed in Pennsylvania in a very long time.  <u>We would not have sentenced him to death if we thought he would actually be executed</u>.

We believed that a life sentence was more lenient than a "death" sentence so that if we decided on a life sentence, Mark would eventually be released.  Since

_____

[71]This claim was raised in <u>Breakiron-3</u>.  The Pennsylvania Supreme Court did not address the merits of this claim.  This Court's review is de novo.

114

Mark was fairly young, we figured he might be fairly young when he was released if we did not sentence him to death.  Since we were worried about his future danger to the community and we did not think he would actually be executed, we sentenced him to death.

Affidavit of Nola Laughery, April 10, 2000.[72]

This account is corroborated by other jurors:

I, Carl A. Price, do hereby declare and verify as follows:

I was a juror in the case of <u>Commonwealth v. Mark Breakiron</u>.

We were very afraid of Mr. Breakiron.   During the penalty phase of the trial, we talked about the fact that even people who get "life" sentences are released from prison for good behavior and parole.  We had all heard of cases where someone was released from prison and commits another crime.  I thought that Mr. Breakiron might be released in as little as ten years.  We did not know that Mr. Breakiron would not be eligible for parole if we sentenced him to life.

It was obvious that Mr. Breakiron was unstable and had some problems. During the penalty phase, I and some of the other jurors were leaning towards a life sentence because we felt sorry for him.  But at the same time, because he was unstable, we were afraid what he might do when he was released.  We knew that he would not receive any help for his problems in jail and I figured he would still be fairly young when he would be released.  We all lived in Fayette County. Most of the jurors had children and we feared that with all of his problems, Mr. Breakiron might hurt someone else when he was released.

Pennsylvania had not executed anyone in a long time and I knew that Governor Casey opposed the death penalty.  I and several other jurors thought that Mr. Breakiron would not actually be executed if we sentenced him to death.  We figured that a death sentence would mean that he would probably spend the rest of his life in prison.  I and several other jurors who  wanted a life sentence agreed to the death sentence because we were worried about his release and because we thought that Mr. Breakiron would never really be executed.

If I had known that Mr. Breakiron would not have been eligible for parole or good behavior,  I would not have sentenced him to death and I think some other

---

[72]The Commonwealth also secured an affidavit from Ms. Laughery, who confirmed that she would not have sentenced Mr. Breakiron to death if she thought that he would actually be executed. Affidavit of Ms. Laughery 7/19/00 attached to Commonwealth's Post-Hearing Brief on Timeliness Issues, 9/8/00.

jurors also would have voted for life.

   I hereby certify that the statements set forth above are true and correct to the best of my personal knowledge, information and belief, pursuant to 28 U.S.C. § 1746 and 18 Pa.C.S. § 4904.

Affidavit of Carl A. Price

   I, Nancy Zwolenik, do hereby declare and verify as follows:

   I was a juror in <u>Commonwealth v. Mark Breakiron</u>.

   During the penalty phase of the case, we were very concerned that Mark would be released.

   We were not sure exactly how long Mark would be in jail if we did not sentence him to death but we all believed he would eventually be released. We had all heard of people sentenced to life in jail being released for good behavior.

   We did not want Mark to be released, ever. It was clear that he had a lot of problems and needed help. It was too dangerous to risk his release and that he might commit another crime.

   We might very well have sentenced Mr. Breakiron to life instead of death if we had known that he would not be released.

Affidavit of Nancy Zwolenik.

   "A criminal defendant is entitled to a determination of his or her guilt by an unbiased jury based solely upon evidence properly admitted against him or her <u>in court</u>." <u>Virgin Islands v. Dowling</u>, 814 F.2d 134, 138 (3d Cir. 1987) (citing <u>Irvin v. Dowd</u>, 366 U.S. 717, 722 – 23 (1961); <u>Martin v. Warden</u>, 653 F.2d 799, 806 (3d Cir. 1981)); <u>Commonwealth v. Mosley</u>, 535 Pa. 549, 554, 637 A.2d 246, 248 (1993); <u>Commonwealth v. Ingber</u>, 516 Pa. 2, 6, 531 A.2d 1101, 1102 (1987). Where the jury is improperly exposed to erroneous information about the sentencing choices before it, the prejudice to the defendant is even greater than that which would have occurred had such evidence been offered during the prosecution's direct case because the

improper evidence "*is then not tempered by protective procedures*." Marshall v. United States, 360 U.S. 310, 312 (1959) (citing Michaelson v. United States, 335 U.S. 469, 475).

While it is generally true that a juror may not impeach his or her own verdict, it must not blind the court to what occurred in this case. Here, the jury was operating under a fundamental misunderstanding of the effect of its verdict and the meaning of death and life imprisonment in Pennsylvania – an understanding that arose not from the evidence at trial but from the media.

This evidence does not consist of improper impeachment of the jury's verdict. "In some instances a *juror's personal experiences may constitute extrinsic evidence*. This is the case when a juror has *personal knowledge regarding ... the issues involved in the litigation that might affect the verdict*." United States v. Navarro-Garcia, 926 F.2d 818, 821 (9th Cir. 1991). In this case, the jury heard no evidence on the meaning of a "life sentence" or "death sentence." The meanings of these terms was obviously critical to the verdict rendered by the jury. In this case, several of the jurors brought extrinsic (and inaccurate) knowledge about the meaning of these terms to the jury room.

In Carpenter v. Vaughn, 296 F.3d 138 (3d Cir. 2001) the Third Circuit Court of Appeals granted sentencing relief finding that trial counsel was ineffective for failing to object to the trial court's answer in response to a jury question regarding the meaning of life without parole. The Court recognized that a "false impression that [a defendant] might be paroled if he was not executed" is "highly prejudicial" This idea is further supported by the Third Circuit's unanimous *en banc* decision in United States v. Levy, 865 F.2d 551, 560 (3d Cir. 1989), that sentences violate due process if "there is an unacceptable risk that [they] are the result of a misconception concerning" parole eligibility. Id. ("sentencing on the basis of materially untrue assumptions"

117

concerning parole eligibility "violates due process" (quoting United States v. Katzin, 824 F.2d 234, 240 (3d Cir.1987) and citing United States v. Tucker, 404 U.S. 443 (1972)).

Here, as in Carpenter, the result was similar. A unanimous jury did not wish Mr. Breakiron to be executed but wanted to ensure that he was not released from prison. Had the jury been properly instructed, they should have been told that a life sentence in Pennsylvania is life without parole and that a death sentence means that Mr. Breakiron will be executed. The jury's "knowledge" about the meaning of life and death sentences in Pennsylvania was an extrinsic influence on the jury – causing them to be misinformed about the meaning of "life" and "death" sentences and causing them to sentence Mr. Breakiron to a death that the unanimous jury did not intend. A death sentence premised on such incorrect, extra-legal "knowledge" is the height of arbitrariness and constitutes a grave miscarriage of justice. This error violated the Petitioner's rights under the Sixth, Eighth,[73] and Fourteenth Amendments[74] to the United States Constitution.

---

[73]See Furman v. Georgia 408 U.S. 238 (1972); Parker v. Dugger, 498 U.S. 308, 321 (1991) ("If a state had determined that death should be an available penalty for certain crimes, then it must administer that penalty in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not. The Constitution prohibits the arbitrary or irrational imposition of the death penalty."). See also Magwood v. Smith, 791 F.2d 1438, 1447-50 (11th Cir. 1986) (death penalty violates Eighth and Fourteenth Amendments where sentence of death is based on critical misunderstanding); Commonwealth v. Peterkin, 513 A.2d 373, 379, 511 Pa. 299, 311 (1986) (justifying excusing juror for cause when juror understood sentencing option of "death" to mean "a term used to give life imprisonment[,] evinc[ing] a misunderstanding of the law which could have led him to misapply the court's instructions").

[74]See Simmons v. South Carolina, 512 U.S. 154, 161, 164 (1994) (possibility that a jury may believe that death-sentenced inmate eligible for parole requires reversal of death sentence). Townsend v. Burke, 334 U.S. 736, 741 (1948) (due process violated when prisoner's sentenced was more weighty as the result of assumptions concerning his criminal record which were "materially untrue"); United States v. Tucker, 404 U.S. 443, 447 (1972) (same); United States v. Levy, 865 F.2d 551, 559-60 (3d Cir. 1989) (en banc) (sentence based on "materially untrue assumptions violates due process"), aff'd sub nom. Gorlon-Peretz v. United States, 498 U.S. 395

118

To allow a man to be executed in these circumstances would simply be wrong.

Petitioner is also entitled to an evidentiary hearing on this claim. An evidentiary hearing is appropriate when the habeas petition alleges facts which, if proved, would entitle the petitioner to relief, and there is a material dispute about those facts.[75] In this and his prior submissions, Petitioner has presented facts demonstrating that he is entitled to relief, therefore, he is entitled to a hearing.

Petitioner sought an evidentiary hearing on this claim in Breakiron-3 and was denied [76]. This Court has ruled that the procedural rule applied by the Pennsylvania Supreme Court in Breakiron-3 was not firmly established and therefore not an adequate bar to merits review of his federal habeas corpus claims (Memorandum Opinion, Standish, J.,October 15, 2004). Since Petitioner sought an evidentiary hearing and was denied due to an inadequate state bar, he has not "failed to develop the factual basis" of his claim in state court proceedings and is therefore not

---

(1991); King v. Hoke, 825 F.2d 720, 724 (2d Cir. 1987) ("It is well established that ... material false assumptions as to any facts relevant to sentencing, renders the entire sentencing procedure invalid as a violation of due process."); United States v. Ruster, 712 F.2d 409, 412 (9th Cir. 1983) (due process violated when sentencer "relies on materially false or unreliable information in sentencing a defendant"). Numerous state supreme courts have also held that the mere risk that jury based its decision on a false perception of a defendant's parole eligibility "renders the sentencing stage fundamentally unfair." Tate v. State, 896 P.2d 1182, 1193 (Okla. 1995); Fontenot v. State, 881 P.2d 69, 74 (Okla. 1994); Salazar v. State, 852 P.2d 729 (Okla. 1993); Mackbee v. State, 575 So. 2d 16, 38-41 (Miss. 1990); Turner v. State, 573 So. 2d 657, 674 (Miss. 1990); see also State v. Henderson, 109 N.M. 655, 789 P.2d 603 (1990).

[75] Townsend v. Sain, 372 U.S. 293, 312-19 (1963); Smith v. Freeman, 892 F.2d 331, 337 (3d Cir. 1989); Zilich v. Reid, 36 F.3d 317, 321-22 (3d Cir. 1994).

[76]After a brief hearing on the timeliness of several of the claims the Court denied the petition and ruled that it was untimely. The Pennsylvania Supreme Court affirmed the Court of Common Pleas denial of the PCRA as untimely. Commonwealth v. Breakiron 781 A.2d 94 (Pa. 2001).

119

barred from receiving a hearing under 28 U.S.C. §2254(e)(2).  Wilson v. Beard, 426 F.3d 653 at

656 (3d. Cir. 2005).  See also Pursell v. Horn, 187 F.Supp.2d 260 at 326.

CLAIM 6:     DURING THE PENALTY PHASE OF THE TRIAL, A JUROR CONSULTED A
             READER'S DIGEST LAW BOOK FOR GUIDANCE.  THIS EXTRANEOUS INFLUENCE
             REQUIRES REVERSAL OF PETITIONER'S DEATH SENTENCE.[77]

During the sentencing portion of the trial, one of the jurors, Colleen Carroll, looked up

aggravating and mitigating circumstances in her Reader's Digest Law Book.  These extra-judicial

legal instructions were "helpful" in her deliberations.

I, Colleen Carroll do hereby declare and verify as follows:

I was a juror in the case of Commonwealth v. Breakiron.

To be certain that I understood the concepts, and to make sure that we
were using the concepts correctly, I looked up aggravating and mitigating
circumstances in my Reader's Digest law book, during the sentencing part of the
trial.  The definitions were helpful.

I hereby certify that the statements set forth again are true and correct to
the best of my personal knowledge, information and belief, pursuant to 28 U.S. C
§1746 and 18 Pa. C.S. § 4904.

Affidavit of Colleen Carroll, April 12, 2000.

The Readers' Digest definitions had the potential to mislead the jury.   In Pennsylvania,

there is a two stage death penalty determination process.   First, the jury determines aggravating

and mitigating circumstances.  The death penalty statute states that mitigating circumstances

"shall include the following." 42 Pa. C. S. § 9711 (e). At this stage, the jury is required to find

the existence of any mitigating circumstances that have been proven by a preponderance of the

---

[77]This Claim was presented to the Pennsylvania Supreme Court in Breakiron-3.  Because
the Pennsylvania Supreme Court did not address this claim on the merits, this Court must review
this claim de novo.

evidence. <u>Commonwealth v. Cox</u>, 728 A.2d 923 (Pa. 1999)..  The jury exercises its discretion at

the second, weighing stage, where the jury gives whatever weight it deems appropriate to the

aggravating and mitigating circumstances to determine whether death is an appropriate

circumstance.

The Readers' Digest definition had the potential to short-circuit this process, by adding an

additional requirement before the jury could even <u>find</u> the mitigating circumstance.  Mitigating

circumstances were defined by Reader's Digest as "facts or events that do not justify or excuse

bad conduct but can reduce the amount of blame.  They warrant a reduced penalty, sentence, fine,

or amount of money damages assessed."   Rather than following the trial court's instructions, the

juror may have decided that because she did not believe the mitigating evidence offered reduced

the amount of blame, she did not find it as a mitigating circumstance.   This would explain why

the jury found no mitigating circumstances despite the fact that the Commonwealth did not

contest that mitigating evidence that had been presented to the jury.[78]

The Readers' Digest definition of aggravation also had the potential to mislead the jury.

The Readers' Digest dictionary defined aggravation as "An action or occurrence that increases

the seriousness of a crime but is not part of its definition.  For example, use of a deadly weapon

in committing a robbery is an aggravation of that offense."   This definition greatly increased the

scope of what was properly considered aggravation.  Under Pennsylvania (and federal

---

[78]The jury's failure to find the uncontroverted mitigation is independent constitutional
error as explained in Claim 11, <u>infra</u>.  As explained in Claim 10, <u>infra</u>, the trial court's
instructions as to mitigating circumstances were also erroneous and may also have contributed to
this error.  Together, the juror's exposure to these erroneous definitions, the trial court's
erroneous instruction on mitigation, and the jury's failure to find uncontroverted mitigation
constitute constitutional error.  <u>See</u> Claim 18, <u>infra</u> (explaining cumulative error analysis).

constitutional) law, aggravating circumstances are strictly defined and ennumerated.   The

definition, in contrast, defined aggravation as potentially <u>any</u> "action or occurrence" that

"increases the seriousness of a crime."  This is unconstitutionally vague.  See Claim 12 <u>infra</u>,

explaining constitutional requirements for aggravation in death penalty cases.

   Moreover, the example used by the definition, using a deadly weapon, is particularly

misleading in the context of this case.   Mr. Breakiron used a deadly weapon. The juror,

considering this definition of aggravation, may have believed that it aggravated the offense.

Under Pennsylvania law, however, this is <u>not</u> an aggravating circumstance.

   Jurors are required to receive their instructions from the judge – not from extra-legal

sources like Readers' Digest law books.   It is clear that the law forbids outside influences of this

kind.   Due process has long required that the jury "consider only the evidence developed before

it at trial," and not information received from outside sources.  <u>Commonwealth v. Bruno</u>, 352

A.2d 40, 49 (1976).

   In <u>Remner v. United States</u>, 347 U.S. 227 (1954), the United States Supreme Court

considered a case when an unknown person allegedly approached a juror during the course of

trial.  The Court concluded that any "private communication ... with a juror during a trial about

the matter pending before the jury is, for obvious reasons, <u>deemed presumptively prejudicial</u>, if

not made in pursuance of known rules of the court and the instructions and directions of the court

made during the trial, with full knowledge of the parties."  <u>Id.</u> at 229.  <u>See also</u> <u>Remner v. United</u>

<u>States</u> (<u>Remner II</u>), 350 U.S. 377 (1956) (possibility that juror was prejudiced by extraneous

contact requires reversal).

   Similarly, in <u>Mayhue v. St. Francis Hospital of Wichita</u>, 969 F.2d 919 (10th Cir. 1992),

the Court of Appeals for the Tenth Circuit found that the fact that a juror looked up critical terms

in a dictionary required a new trial in a <u>civil</u> case holding that a "presumption of prejudice arises

whenever a jury is exposed to external information" other than the judge's instructions.    <u>Id.</u> at

922.    The principle that a juror's exposure to extraneous information is reversible error has been

recognized in numerous jurisdictions.[79]

        The juror's consideration of extraneous information is certainly not consistent with the

careful instructions necessary in a death penalty case.  In addition the extraneous information

may have lessened the jury's responsibility for its verdict in violation of <u>Caldwell v. Mississippi</u>,

472 U.S. 320 (1985).  Because Petitioner had no opportunity to address this information, it

---

        [79] <u>See</u> <u>e.g.</u> <u>United States v. Greer</u>, 620 F.2d 1383 (10th Cir. 1980) (extraneous information
regarding sentencing options raised presumption of prejudice); <u>United States v. Martinez</u>, 14
F.3d 543 (11th Cir. 1994) (juror's use of dictionary and  knowledge of extraneous facts requires
reversal of defendant's conviction); <u>Marino v. Vasquez</u>, 812 F.2d 499 (9th Cir. 1987) (granting
habeas writ to state court prisoner where jury consulted dictionary during deliberations); <u>United
States v. Howard</u>, 506 F.2d 865 (5th Cir. 1975) (extraneous information required hearing);
<u>United States v. Perkins</u>, 748 F.2d 1519 (11th Cir. 1984) (extraneous evidence required new
trial); <u>McCray v. Alabama</u>, 565 So.2d 673 (Ala. Ct. Cr. App. 1990) (juror's reference to Alabama
pattern instructions constituted extraneous evidence and required new trial); <u>Jordan v. Brantley</u>,
589 So.2d 680 (Ala. 1991) (juror's use of dictionary during deliberations required new trial);
<u>State v. Sinegal</u>, 393 So.2d 684 (La. 1981) (reversing conviction for first-degree murder because
juror examined obsolete legal reporter); <u>Niemand v. District Court of County of Jefferson</u>, 684
P.2d 931 (Colo. 1984) (juror's consultation of law dictionary was reversible error); <u>People v.
Coleman</u>, 621 NYS2d 244 (NY 4th Dept. 1994) (inherent prejudice of allowing jury access to
legal dictionary is obvious and requires reversal); <u>Gibson v. Clanon</u>, 633 F.2d 851 (9th Cir. 1980)
(juror's consultation of medical encyclopedia during deliberations required reversal of first degree
murder conviction); <u>Mattox v. United States</u>, 146 U.S. 140 (1892) (extraneous influences on jury
require reversal); <u>United States v. Alker</u>, 180 F. Supp. 661 (E.D. Pa. 1959) (same); <u>United States
v. Pinto</u>, 486 F. Supp. 578 (E.D. Pa. 1980) (same) <u>United States v. Resko</u>, 3 F.3d 684, 690 (3d
Cir. 1993) (juror misconduct requires searching inquiry by trial court) ("It has long been
recognized that when jurors are influenced by the media and other publicity, or when they engage
in communications with third parties, these extra record influences pose a substantial threat to the
fairness of the criminal proceeding because the extraneous information completely evades the
safeguards of the judicial process.")

violated his right to counsel and a fair trial in violation of the Sixth Amendment.

Because of the unparalleled severity and irreversibility of the death penalty, the Eighth and Fourteenth Amendments impose a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case," Woodson v. North Carolina, 428 U.S. 280, 305 (1976) (plurality opinion); see also Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486 U.S. 367, 383-84 (1988).   "It is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, based on reason rather than caprice."  Gardner v. Florida, 430 U.S. 349, 358 (1977) (reversing death sentence as violation of Eighth amendment where sentencer relies upon extra-judicial information).

Clearly the jury's consideration of this extraneous information created a substantial likelihood that a juror's consultation with extra-legal resources may have affected their deliberations thereby prejudicing Mr. Breakiron.   In addition, the Reader's Digest definition of aggravating circumstances expanded the role of aggravators beyond that allowed under the Pennsylvania death penalty statute.

Thus, the error was prejudicial even if only one juror was influenced by the limited Reader's Digest definition, as mitigation can be found by a single juror.  Mills v. Maryland, 486 U.S. 367, 374-75 (1988).  Upon a finding of mitigation by even a single juror, if that juror weighs the mitigation in favor of life, and a life sentence would be imposed.

Petitioner's jury received extraneous extra-legal information.  In ordinary cases, this requires reversal.  A fortiori, the heightened standards for reliability necessary in a death penalty case require this court to grant Mr. Breakiron a new penalty phase.

Petitioner is also entitled to an evidentiary hearing on this claim.  An evidentiary hearing is appropriate when the habeas petition alleges facts which, if proved, would entitle the petitioner to relief, and there is a material dispute about those facts.[80]  In this and his prior submissions, Petitioner has presented facts demonstrating that he is entitled to relief, therefore, he is entitled to a hearing.

Petitioner sought an evidentiary hearing on this claim in <u>Breakiron-3</u> and was denied [81]. This Court has ruled that the procedural rule applied by the Pennsylvania Supreme Court in <u>Breakiron-3</u> was not firmly established and therefore not an adequate bar to merits review of his federal habeas corpus claims (Memorandum Opinion, Standish, J., October 15, 2004).   Since Petitioner sought an evidentiary hearing and was denied due to an inadequate state bar, he has not "failed to develop the factual basis" of his claim in state court proceedings and is therefore not barred from receiving a hearing under 28 U.S.C. §2254(e)(2).  <u>Wilson v. Beard</u>, 426 F.3d 653 at 656 (3d. Cir. 2005).  <u>See</u> <u>also</u> <u>Pursell v. Horn</u>, 187 F.Supp.2d 260 at 326.

**CLAIM 7:      TRIAL COUNSEL WAS INEFFECTIVE FOR FAILING TO OBJECT OR FAILING TO MOVE TO STRIKE THE JURY PANEL AFTER A JUROR STATED DURING GENERAL VOIR DIRE THAT HE KNEW THE DEFENDANT PREVIOUSLY COMMITTED ROBBERIES AND A JUROR SEATED ON THAT PANEL WAS SELECTED AS A TRIAL JUROR.[82]**

---

[80] <u>Townsend v. Sain</u>, 372 U.S. 293, 312-19 (1963); <u>Smith v. Freeman</u>, 892 F.2d 331, 337 (3d Cir. 1989); <u>Zilich v. Reid</u>, 36  F.3d 317, 321-22 (3d Cir. 1994).

[81] After a brief hearing on the timeliness of several of the claims the Court denied the petition and ruled that it was untimely.  The Pennsylvania Supreme Court affirmed the Court of Common Pleas denial of the PCRA as untimely.  <u>Commonwealth v. Breakiron</u> 781 A.2d 94 (Pa. 2001).

[82] This Claim was presented to the Pennsylvania Supreme Court and addressed on its merits in <u>Breakiron-2</u>, 729 A.2d 1088, 1094 (1999). Thus, the standards of §2254(d) are applicable.

Defense counsel was ineffective for allowing a juror who heard that Mr. Breakiron had "[done] a lot of robbing" sit on Mr. Breakiron's jury.

During general voir dire regarding the jury panel's knowledge of the case, Prospective Juror No. 67, Charles Gerba, testified under oath that Petitioner had committed several robberies:[83]

| The Court: | All right. Anybody else that we missed? |
|---|---|
| Juror No. 67: | I know about it from reading it in the papers and I know some of the family. |
| The Court: | Whose family? |
| Juror 67: | Breakirons. |
| The Court: | All right. |
| Juror 67: | I know the boy. I lived in the terrace and he used to do a lot of robbing there. |
| The Court: | From what you know of the family and what you have learned, do you have a fixed opinion about this case that could not be changed no matter what you hear in this room? |
| Juror 67: | Yes. |

NT at 448-49. Paul Manges, one of the jurors who served on this case, was present for this entire exchange, which was sworn testimony under oath.

Under well-established Pennsylvania law, defense counsel could have moved to strike the panel that heard the highly prejudicial comment about Mr. Breakiron's other bad acts. Commonwealth v. Harkins, 328 A.2d 156 (1974). Indeed, the Pennsylvania Supreme Court

---

[83]Mr. Gerba's statement was incorrect. Mr. Breakiron has never been convicted of robbery.

noted that "[u]nder these circumstances, a motion to strike the jury panel may have been an appropriate course of action."  Breakiron-2, 729 A.2d at 1094.

Yet at the time of the prejudicial statement, counsel did not object, make any motion to strike, nor request that the trial court question the remaining jurors.  Counsel did nothing.  During individual voir dire, Mr. Manges was not questioned about the highly prejudicial sworn testimony which he heard.[84]   Mr. Manges served on Mr. Breakiron's jury and convicted and sentenced him to death.

When asked about why he did not object, counsel admitted: "I don't know why there was no request for a mistrial at that time, other than the fact that this guy was excused, and I believe that we questioned all of the jurors individually after that."  NT PCRA 7/17/97 PM  at 76.  He offered no tactical or strategic rationale for his failure to request a mistrial or strike the panel.  None of the venirepersons on the panel were questioned with regard to this prejudicial information, by either the Court or counsel.

To show ineffective assistance of counsel, a petitioner must show deficient performance and prejudice under Strickland v. Washington, 466 U.S. 668 (1984).  Accord Kimmelman v. Morrison, 477 U.S. 365 (1986) (failure to move to suppress evidence was ineffective).  In this

---

[84]During individual voir dire of  Mr. Manges trial counsel asked him whether he heard anyone besides his wife talk about the case:

Q:    Have you heard anyone in your presence talk about this case other than your wife?

A:    No.

NT at 511-12.  The prejudicial comment of Juror No. 67 about Mr. Breakiron was not about "the case"  – rather it concerned Mr. Breakiron's alleged prior history of "robbing."

case, counsel performed deficiently and Petitioner was prejudiced thereby.

**A.     Deficient Performance**

First, counsel did not have any strategic or tactical reason for failing to ensure that Mr. Breakiron's jury was not polluted by inadmissible sworn testimony about his prior bad acts. Here he admitted that he simply did not know why he did not move for a mistrial or object.[85]  To the extent his excuse that they individually questioned jurors thereafter is offered as a strategy, it is belied by the fact that he asked no questions of any of the panel members about this highly prejudicial information.

Nor would such a rationale be reasonable even if one had been offered by trial counsel. It has long been recognized that an accused is entitled to be tried on the offense on which he is charged, and is entitled to a jury that is not polluted by rumors about a defendant's uncharged prior bad acts.  "When such evidence inadvertently reaches the attention of the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence.  A drop of ink cannot be removed from a glass of milk."  Government of Virgin Islands v. Toto, 529 F.2d 278, 283 (3d Cir. 1976) (reversing conviction because jury heard evidence of prior conviction of defendant).  It was patently unreasonable for counsel to fail to ensure that the jury deciding Mr. Breakiron's fate was not polluted by such information.  This is especially true when under long-established state law, he could have ensured that none of the jurors exposed to such prejudicial information served on his jury. Commonwealth v. Harkins, 328 A.2d 156 (1974); Breakiron-2, 729 A.2d at 1094 (1999) (noting that "[u]nder these circumstances, a motion to

---

[85]Indeed, trial counsel testified that keeping any knowledge of prior bad acts by Mr. Breakiron from the jury justified his failure to investigate Mr. Breakiron's past.  See Claim 1, supra.

strike the jury panel may have been an appropriate course of action.") (citing Harkins).[86]  "The justifications [Petitioner]'s attorney offered for his omission betray a startling ignorance of the law--or a weak attempt to shift blame." Kimmelman, 477 U.S. at 385.

### B.    Prejudice

Petitioner was prejudiced by counsel's failure in two ways.  If counsel had raised this issue in the trial court, he was entitled either to a new panel, or if the trial court denied the motion, a new trial on his appeal.   Secondly, counsel's failures resulted in a jury that was exposed to sworn testimony that was both highly prejudicial and clearly inadmissible.

When a Petitioner shows that counsel ineffectively failed to object to reversible error, he has shown prejudice.  Pursell v. Horn, 187 F.Supp 260 at 336 (W.D. Pa. 2002) ("little doubt that [Petitioner] has shown prejudice: if his lawyer had pursued the mistrial motion, a new trial would have been granted."); Murphy v. Puckett, 893 F.2d 94 (5th Cir. 1990) (petitioner prejudiced by counsel's failure to raise valid double jeopardy defense).  Mason v. Hanks, 97 F.3d 887, 892 (7th Cir. 1996) (petitioner prejudiced by counsel's failure to raise meritorious appealable issue); Mayo v. Henderson, 13 F.3d 528, 533 (2nd Cir. 1994) (same); Matire v. Wainwright, 811 F.2d 1430, 1435 (11th Cir. 1987) (same).

Here, it is clear that under state law, Petitioner was entitled to have the jury struck, and that it would have been reversible error for the trial court to fail to do so.  Commonwealth v. Harkins, 328 A.2d 156 (Pa. 1974).   Thus, Petitioner has shown that but for counsel's failure to

---

[86]Harkins is directly on point.   In that case, a venireperson indicated that the defendant had stolen his car.  This venireperson was excused, but other venirepersons who were present sat on the jury.  The Pennsylvania Supreme Court reversed, explaining, "the appellant was ... deprived of a fair trial by a panel of impartial and indifferent jurors."

object, there is a reasonable probability that he would have been granted either a new panel, or a new trial.

Moreover, counsel's failure to prevent this evidence from being heard by the jury prejudiced Petitioner for the same reasons that counsel was unreasonable for failing to prevent the jury from being exposed to such evidence. Courts have long recognized the prejudicial effect of exposure to a defendant's criminal history. Government of Virgin Islands v. Toto, 529 F.2d 278, 283 (3d Cir. 1976) (finding prejudice from jury's exposure to defendant's prior drug conviction). In Dickson v. Sullivan, 849 F.2d 403 (9th Cir. 1988), as here, a juror was exposed to a statement about the defendant's past criminal history. The Court held that reversal was required despite the fact that the jurors were instructed to judge the case only on the evidence elicited at trial. Id. at 407.

> Although we ordinarily assume that instructing the jury to disregard extraneous evidence sufficiently ensures that inadmissible evidence will not influence the jury, where the extrajudicial statement concerns a defendant's prior criminal acts, the efficacy of such instructions is subject to serious doubt.... To tell a jury to ignore the defendant's prior convictions in determining whether he or she committed the offense being tried is to ask human beings to act with a measure of dispassion and exactitude well beyond mortal capacities. This is especially true where, as here, the defendant was deprived of the opportunity to rebut the evidence, to discuss its significance in argument to the jury, or to take other steps to lessen its prejudicial impact.

Id. at 408.

Here, because, counsel was ineffective, there were no curative instructions. Similarly, Courts have long found counsel ineffective where he fails to exclude a defendant's criminal history from the jury's consideration. United States v. Russell, 221 F.3d 615 (4th Cir. 2000) (finding counsel ineffective for failing to exclude defendant's criminal history from jury's

consideration).  See also United States v. Morley, 199 F.3d 129, 140 (3d Cir. 1999) (defendant

prejudiced by wrongful admission of prior bad acts); United States v. Lewis, 787 F.2d 1318,

1323 (9th Cir.1986) (observing that it is extremely difficult for jurors to ignore prior convictions

when deciding guilt), modified, 798 F.2d 1250 (9th Cir.1986). The possible prejudice is even

more likely when the past record is related to the crimes for which the defendant is on trial.

United States v. Bagley, 772 F.2d 482, 488 (9th Cir.1985) (observing "the human tendency to

draw a conclusion which is impermissible in law: because he did it before, he must have done it

again"); United States v. Field, 625 F.2d 862, 872 (9th Cir.1980) (noting that evidence of past

convictions of similar offenses raises the specter of "he did it before, he could do it again").

Counsel could easily have prevented this highly damaging information from reaching the

jury.  He had no strategy or tactic for failing to do so. Courts have long recognized the extremely

damaging character of allegations of prior bad acts.  Petitioner was prejudiced by counsel's

failure to keep this information from the jury.

### C.      The Pennsylvania Supreme Court's Opinion

As noted above, the Pennsylvania Supreme Court recognized that a motion to strike the

panel would have been the appropriate course of action for counsel to take. Breakiron-2, 729

A.2d at 1094  The Court held, however, that counsel was not ineffective for failing to do so:

> At the PCRA hearing, trial counsel testified that he did not make a motion
> to strike or move for a mistrial because the seated juror had stated that he could
> render an unbiased opinion, and consequently there was not basis to strike the
> panel or move for a mistrial.  The PCRA court found that this was a plausible trial
> tactic, and therefore Breakiron failed to meet his burden that counsel's actions
> were not reasonably based.
>       After reviewing the jury voir dire of the juror in question (NT at 512-21)
> we agree with the PCRA court and find that trial counsel had a reasonable basis
> for his actions.

Breakiron-2, 729 A.2d at 1094.

The Pennsylvania Supreme Court's opinion is both "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," "contrary to clearly established Federal law," and an "unreasonable application of" Strickland. 28 U.S.C. § 2254 (d).

As noted above, counsel at the PCRA hearing testified that "he didn't know" why he did not take any action. He certainly did not testify that he had a "trial tactic" to ensure that jurors exposed to this prejudicial information sat on the jury.

Thus, the Pennsylvania Supreme Court simply invented a "tactic" that counsel never said he had. This is both "an unreasonable determination of the facts" and "contrary to" Strickland. Indeed, the Court of Appeals for the Fourth Circuit has described what the Pennsylvania Supreme Court did here as "thoroughly disingenuous" and an "exercise[] in retrospective sophistry." Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992):

> [C]ourts should not conjure up tactical decisions an attorney could have made, but plainly did not. The illogic of this "approach" is pellucidly depicted by this case... A court should "evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689.

Griffin, 970 F.2d at 1358-59.[87] Counsel's "perspective at that time" was one of confusion. He could have moved to strike the panel exposed to this prejudicial information, but he did not. He

---

[87] Accord Kimmelman v. Morrison, 477 U.S. 365, 386-87 (1986) (hindsight cannot be used to supply a "tactical" reason for counsel's errors); Harris v. Reed, 894 F.2d 871, 878 (7th Cir. 1990) (reviewing court should "not construct strategic defenses which counsel does not offer"); Griffin v. Warden, 970 F.2d 1355, 1358 (4th Cir. 1992) ("courts should not conjure up tactical decisions an attorney could have made, but plainly did not" (citing Strickland; Kimmelman)). Thomas v. Lockhart, 738 F.2d 304, 309 (8th Cir. 1984) ("just as hindsight cannot be used to condemn counsel's performance, it cannot be used to justify it").

could have questioned the panel members about this prejudicial information.  He did not.

Moreover, it would be difficult to conceive of a tactical or strategic reason that would support the inclusion of a juror who was exposed to such prejudicial information.   It is remotely conceivable that a thorough exploration of the matter in individual voir dire might reassure counsel that the juror was otherwise desirable and accordingly justify a strategic decision to include the juror.  But see Government of Virgin Islands v. Toto, 529 F.2d at 283 ("When such evidence inadvertently reaches the attention of the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence.  A drop of ink cannot be removed from a glass of milk.")

No such searching examination occurred in this case.  Counsel asked no questions about the sworn testimony the juror had heard in open court just minutes before.   He asked whether the juror had read about the incident, which he had, and asked whether he had heard anyone talk about "the case."   The juror truthfully denied that he had heard anyone talk about the case in his presence.  No other relevant questions were asked.   Thus, even if counsel had testified that he did have a strategy, it would be an unreasonable one in light of his failure to explore this issue. The Pennsylvania Supreme Court's Opinion on this Claim is both "contrary to" Strickland v. Washington and "based on an unreasonable determination of the facts in light of the evidence presented."

### D.    Conclusion

Counsel's actions were objectively unreasonable.  One of the jurors that sat on Mr. Breakiron's case and who eventually decided to convict him and sentence him to death heard highly prejudicial, false information about Mr. Breakiron.   Counsel should have made certain

that no jurors from the panel that was exposed to such inflammatory information served on Mr.

Breakiron's jury.   Counsel ineffectively failed to do so.

**CLAIM 8:**    **THE TRIAL COURT'S INSTRUCTION ON INTOXICATION, WHICH ERRONEOUSLY TOLD THE JURY THAT THE PROSECUTION HAD NO BURDEN TO DISPROVE THAT DEFENSE, UNCONSTITUTIONALLY DIMINISHED THE COMMONWEALTH'S BURDEN OF PROOF AND IMPROPERLY SHIFTED THAT BURDEN TO THE DEFENSE AND ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO OBJECT TO THE INSTRUCTION OR LITIGATE THIS CLAIM.**[88]

Due process prohibits the criminal conviction of any person "except upon proof beyond a

reasonable doubt of every fact necessary to constitute the crime with which he is charged."  In re

Winship, 397 U.S. 358, 364 (1970).  To satisfy the demands of due process, the jury must be

carefully instructed, and the instructions must not in any way relieve the prosecution of the

constitutionally required burden of proof.  E.g.; Sandstrom v. Montana, 442 U.S. 510 (1979).

In Pennsylvania, an accused's intoxication can prevent the Commonwealth from

establishing the "specific intent to kill" element of first degree murder.  The Third Circuit

summarized Pennsylvania law in Whitney v. Horn, 280 F.3d 240 (3d Cir. 2002):

> Under Pennsylvania law, the Commonwealth had to establish beyond a reasonable doubt that Whitney "[had] the specific intent to kill ... and [was] conscious of his own intention." Commonwealth v. Hannibal, 562 Pa. 132, 140 (2000). A killing in Pennsylvania is with the "specific intent to kill if it is willful and deliberate." *Id.* However, Pennsylvania recognizes that someone can be intoxicated to such an extent that he/she is not capable of forming a specific intent to kill. Commonwealth v. Graves, 461 Pa. 118 (1975).

Id. at 249.

In order to make out this defense, the defendant must first present evidence that she was

overwhelmed or overpowered by an intoxicant to the point of losing her faculties or sensibilities.

_____

[88]This claim was exhausted in Breakiron-3.  The Pennsylvania Supreme Court did not address the merits of this claim.  This Court's review is de novo.

At that point, the burden of persuasion shifts to the prosecution to show beyond a reasonable doubt that despite any influence of alcohol or drugs, the defendant was capable of forming the specific intent to kill. Commonwealth v. Reiff, 489 Pa. 12, 413 A.2d 672 (1980). See Suggested Standard Jury Instructions (Criminal), § 8.308B.[89]

Here, the instructions regarding voluntary intoxication relieved the prosecution of its constitutionally imposed burden of proof, and violated Petitioner's due process rights. The trial court instructed the jury on the defense of intoxication as follows:

> The defendant is entitled to claim as a defense that he was so intoxicated at the time of the killing that he did not possess the specific intent to kill required for first degree murder. Now, the Commonwealth is not required to disprove the defendant's claim of intoxication. The Commonwealth's burden to prove specific intent is neither increased nor decreased by the claim by the defendant of voluntary intoxication . . .

NT at 1351-52. Defense counsel did not object to this instruction.

### A.    The Instruction Was Constitutionally Erroneous.

Pennsylvania requires the prosecution to disprove beyond a reasonable doubt that the defendant's drugged condition did not render him incapable of forming the specific intent to kill. Reiff, supra. Shifting the burden of proof to the defendant in this manner violates the due process clause. Winship; Sandstrom. To make clearer, it is the inclusion of constitutionally erroneous language, not the omission of burden of proof language that created the error in this case.

---

[89] When a defendant introduces intoxication evidence, the Commonwealth must prove beyond a reasonable doubt that the defendant had specific intent to kill despite his intoxication. E.g., Commonwealth v. Stoyko, 504 Pa. 455, 475 A.2d 714 (1984); Commonwealth v. Bridge, 495 Pa. 568, 435 A.2d 1207 (1981); Commonwealth v. England, 474 Pa. 1, 375 A.2d 1292 (1977).

In Commonwealth v. Beasley, 544 Pa. 554, 678 A.2d 773 (1996), the Pennsylvania

Supreme Court approved an intoxication instruction which told the jury, "The Commonwealth

has the burden of disproving this defense."  The Court held:

> Since the instruction states that the Commonwealth has the burden of disproving
> the defense of intoxication, the instruction read as a whole did not shift the burden
> to the Appellant.

673 A.2d at 783.  See also Pennsylvania Standard Criminal Jury Instruction 8.308(B) (jury

should be instructed that the Commonwealth has the burden to disprove intoxication).  The trial

court's instruction in this case was erroneous.

Even if the parts of the intoxication instruction were proper, the presence of the improper

instruction renders the verdict improper and unconstitutional. Mills v. Maryland, 486 U.S. 367,

376 (1988) ("the jury's verdict must be set aside if it could be supported on one ground but not

on another") (citing Yates v. United States, 354 U.S. 298, 312 (1957); Stromberg v. California,

283 U.S. 359, 367-368 (1931)).  See Commonwealth v. Cain, 484 Pa. 240, 398 A.2d 1359, 1363

(1979) ("Where a court gives two instructions, one erroneous and prejudicial and the other

correct, reversible error occurs").

This was the situation confronted by the Third Circuit in Whitney.  There the Court

reviewed an intoxication instruction that, at one point,  erroneously allowed the jury to convict

the defendant even if it found him to be intoxicated.  Other portions of the instruction, however,

correctly advised the jury.[90]  Nevertheless, the Whitney Court held:

---

[90]Unlike the present case, the instruction in Whitney correctly informed the jury that,
"The Commonwealth has the burden of disproving this [intoxication] defense."  Id. at 255.  See
id. at 256 ("the judge correctly stated that the Commonwealth had the burden of disproving the
defense . . .").

> Because the misstatement of law concerns the very defense which may negate the specific intent required for murder in the first degree, it is potentially a substantial error. . . . There is no question that this instruction would have been critical to a juror's understanding of the law of voluntary intoxication. It was the only time that the legal consequences of intoxication with respect to specific intent to kill were explained.

Id., 280 F.3d at 254.  The Court rejected the contention that any error was cured by the otherwise correct instructions.  "[A] defect in a charge may result in legal error if the rest of the instruction contains language that merely contradicts, and does not explain, the defective language in the instruction.  Id. at .256

Here, as in Whitney, the trial court's charge did not correct the erroneous instruction that the Commonwealth had no burden to disprove the intoxication defense that was presented by the petitioner at the time of trial.  Here, as in Whitney, "it is reasonably likely, when considered in the context of the instructions on voluntary intoxication, that a juror believed that the defendant had to prove intoxication beyond a reasonable doubt and that the Commonwealth had [no] burden of disproving the defense . . . " Id. at 256.  Here, as in Whitney, "[b]ecause it is reasonably likely that a juror interpreted the instruction as allowing a finding of specific intent to kill based on something less than proof beyond a reasonable doubt, the instruction arguably denied [Breakiron] the due process of law." Id.

## B.    The Erroneous Burden of Proof Instruction Was Not Harmless

Instructional errors must often be examined for harmless error before a defendant is entitled to relief.   The harmless error test announced in Brecht v. Abrahamson, 507 U.S. 619 (1993) frames the analysis. Under Brecht, an error must have a "substantial and injurious effect or influence in determining the jury's verdict" before it can be considered harmful and require

137

relief. 507 U.S. at 632 n. 7.  See discussion supra for a more detailed explanation of the Brecht

standard.

In this case, the Commonwealth cannot demonstrate that the trial court's instructional

error was harmless.  The Commonwealth's evidence of Mr. Breakiron's intent was largely

circumstantial and, unlike Whitney, hardly overwhelming.  The circumstances of the crime,

while sufficient to support the jury's verdict, are not necessarily consistent with a premeditated

and deliberate intent to kill.  The nature of the wounds, and of Petitioner's actions following the

assault, are at least equally consistent with a killing committed during an intoxicated rage and/or

alcohol blackout, as with an intent to kill.[91]  The only direct evidence of Petitioner's intent came

---

[91]Cases are legion in which the Commonwealth has failed to prove specific intent under
circumstances similar to those as here. See e.g. Commonwealth v. Devers, 546 A.2d 12, 12 (Pa.
1988) (third-degree murder (no specific intent), defendant inflicted "multiple slash and stab
wounds" and strangled victim with electrical cord); Commonwealth v. Brockington, 455 A.2d
627, 628 (Pa. 1983) (same, "multiple stab wounds to the upper portion of the body");
Commonwealth v. Pitts, 404 A.2d 1305, 1306 (Pa. 1979) (same, defendant stabbed victim nine
times then hid knife); Commonwealth v. Fuggs, 25 Phila.Co.Rptr. 525, 528-30, 536, 1993 WL
1156044 (1993) (same, defendant threatened to kill victim then did so by "multiple stab wounds
with an ice pick to various parts of his body which included his heart and left lung" and "multiple
blunt force injuries"); Commonwealth v. Gelber, 594 A.2d 672, 675 (Pa.Super. 1991) (same,
"multiple stab wounds to the areas of the face, shoulder, chest, ribs, spinal column, lung, liver
and back" and "numerous defensive wounds to hands and arms," defendant then "dragged
[victim's] body to the basement and wrapped and tied it with various fabrics and clothesline, ...
cleaned up the blood and straightened the furniture so that no one would be aware of what had
transpired"); Commonwealth v. Baskerville, 681 A.2d 195, 200 (Pa.Super. 1996) (same,
defendant, during robbery, shot victim four times in back); Commonwealth v. McFadden, 559
A.2d 58, 61 (Pa. Super. 1989) (same, victim "struck twice in the head with an axe, stabbed with a
knife in the throat, and strangled"); Commonwealth v. Taylor, 405 A.2d 1307, 1309 (Pa. Super.
1979) (same, defendant in "argument in a bar, left and returned armed with a knife, rekindled the
argument, chased the victim after the victim left the bar and stabbed him in the back ... told a
bystander not to interfere and ... fled after the stabbing");  Commonwealth v. Perkins, 373 A.2d
1076, 1080 (Pa. 1977) (second-degree murder (no specific intent), defendant tied victim's hands;
"multiple (eight) stab wounds of the chest and back"); Commonwealth v. Stasko, 370 A.2d 350,
352-55 (Pa. 1977) (same, "multiple stab wounds of the chest," including "six stab wounds which
lacerated her heart and lungs"); Commonwealth v. Davis, 336 A.2d 888, 889 (Pa. 1975) (same,

from jailhouse snitch Ellis Price.  Price claimed that Petitioner described a planned and

premeditated act, including hiding in the bathroom until all the other patrons were gone,

contradicting Petitioner's defense theory that he was intoxicated and lacked the specific intent to

kill.[92]  As discussed in Claim 4 of this memorandum, Mr. Price had a history of criminal

convictions, some involving *crimen falsi*, and substantial motivations to testify favorably for the

Commonwealth.  Moreover, Price's testimony was inconsistent with Commonwealth witness Ed

Mihalsky.  Mr. Mihalsky testified that he was a patron at the bar on the night of the killing and

that, at the time he left, Petitioner and the deceased were alone in the bar and theirs were the only

two cars in the parking lot.  NT 4/8/88 at 837-43.  Mihalsky's testimony was inconsistent with

Price's claim that Petitioner admitted hiding in the bathroom until afer all of the other patrons

had left.  Thus, the Commonwealth's evidence of intent was ambiguous at best.

    Moreover, intoxication was Mr. Breakiron's sole defense, as he did not deny his

involvement in the killing.  Mr. Breakiron testified that, on the day of the killing,  he had

approximately eight beers prior to dinner.  NT 4/12/88 at 1233-38, 1245.  After dinner he went

back out and had more beer and a shot of whiskey.  Id. at 1249.  After arriving at the bar, he had

approximately six more beers and, possibly, another shot of whiskey.  Id. at 1251.  Mr. Breakiron

did not remember the details of what happened next, though he thought he was struck on the

---

multiple stab wounds); Commonwealth v. Coleman, 326 A.2d 387, 388 (Pa. 1974) (same,
defendant said "he was going to kill" then did by "multiple stab wounds"); Commonwealth v.
Morton, 774 A.2d 750, 751 (Pa.Super. 2001) (same, victim stabbed several times in neck);
Commonwealth v. Boone, 354 A.2d 898, 903 (Pa. 1975) (voluntary manslaughter (no specific
intent), "multiple stab wounds of the chest, back, arms and shoulder"); Commonwealth v.
Chasten, 275 A.2d 305, 307 (Pa. 1971) (same, defendant chased victim, stabbed many times, and
said "I told you I would kill you" while stabbing).

    [92]NT 1113-15 (describing Mr. Breakiron hiding in bathroom).

head and knocked unconscious. he remembered waking up to find the deceased's body on the floor beside him, with his knife in her back. Id. at 1251-55.

Given the highly disputed facts relating to intent, and the lack of uncontradicted direct evidence of that intent, the instructional error diminishing the Commonwealth's burden of proof had a substantial and injurious effect on the jury's verdict and was not harmless under Brecht.[93] The Third Circuit has cautioned against an application of harmless error review which substitutes the appellate court for the jury "by speculating about what portion of the testimony the jury believed." Laird v. Horn, 414 F.3d 419, 428 (3d Cir. 2005). See Smith v. Horn, 120 F.3d at 418-19 (court explained that, in evaluating the harm of an erroneous jury instruction, the court must not usurp the role of the jury in making credibility determinations and weighing evidence; given that the jury's deliberations were tainted by the erroneous instruction, and despite significant evidence of Smith's intent to kill, the Court "cannot assume that the jury, having found Smith guilty, 'believed all properly admitted evidence against him and disbelieved all evidence in his favor.'" (quoting Roger J. Traynor, THE RIDDLE OF HARMLESS ERROR 28 (1970)). Here, as in Smith, the error cannot be deemed harmless.

### C.     Ineffective Assistance of Counsel

---

[93]Compare Whitney where the Court found the instructional error harmless. There, the prosecution evidence showed that defendant broke into one apartment and threatened to kill the occupant, announced he was in the wrong apartment and left, then broke into another apartment where he stabbed one victim while repeatedly exclaiming his intent to kill him, and announced his intent to rape and kill a second victim  Id. at 244.  Moreover Whitney told the police that he was not drunk and had only a little to drink .Id. at 245  The Third Circuit placed heavy reliance on Whitney's proclamations of his intent during the crimes, rather than on the circumstantial evidence of the nature and severity of the wounds.  Id. at 259.  None of this type of evidence is present in this case; unlike Whitney, the evidence of Breakiron's mental state was not "overwhelming" and could not "conclusively establish intent."  Id. at 260.

Trial counsel was ineffective for failing to object to the erroneous instruction. Appellate counsel was ineffective for failing to raise and litigate the issue on direct appeal. In these circumstances, "we cannot imagine any justification for a defense attorney not attempting to correct this type of error in an instruction on the only defense his/her client could possibly have to the charge of capital murder." Whitney at 257. Counsel's performance was deficient.

For the reasons discussed above, Mr. Breakiron was prejudiced by this deficient performance. Petitioner is entitled to habeas relief.

**CLAIM 9:    PETITIONER WAS DENIED HIS CONSTITUTIONAL RIGHTS TO DUE PROCESS AND THE EFFECTIVE ASSISTANCE OF COUNSEL WHERE COUNSEL FAILED TO REQUEST APPROPRIATE INSTRUCTIONS ON THE LESSER INCLUDED OFFENSE OF THEFT OR OTHERWISE INSURE THAT THE JURY WAS PROPERLY INSTRUCTED THAT PETITIONER COULD NOT BE CONVICTED OF ROBBERY, BUT COULD ONLY BE CONVICTED OF THEFT, IF AN INTENT TO STEAL AROSE AFTER THE COMMISSION OF THE HOMICIDE.[94]**

### A.    Counsel Was Ineffective

At trial, Petitioner testified that, on the night of the killing, he had gone to the bar to continue to drink and have a good time, and that the homicide had occurred in a drunken haze, of which he had a limited memory. After initially leaving the bar following the stabbing, he returned, found the victim dead, and placed her body in the back of his truck. He then went back into the bar and, for the first time, noticed two money bags lying on the floor. He then picked them up, and placed them in the back of his truck. NT 4/12/88 at 1253-59, 1260-62.[95]

_____

[94]The Pennsylvania Supreme Court addressed the merits of this claim in Breakiron-2 and, therefore, the standard of review set forth in Section 2254(d) should be applied.

[95]Petitioner was directly asked by his counsel to explain his intent to the jury, but was precluded from doing so when the trial court sustained the prosecutor's objection, told counsel that he was not interested in defendant's intent, and barred Petitioner from presenting any

In his closing argument, defense counsel relied upon this testimony to argue to the jury that no robbery occurred.  Counsel emphasized that Petitioner  took the money bags and the deceased's purse <u>after</u> he had already placed the deceased's dead body in the back of his truck.  Thus, counsel argued, Petitioner did not have the intent to take something from a live person, and was therefore not guilty of robbery, but guilty only of theft.  NT 4/13/88 at 1320-21.

When the trial court instructed the jury, however, defense counsel failed to insure that this theory of defense to the robbery charge was properly placed before the jury.  Although the Petitioner and counsel essentially conceded his guilt of theft, counsel failed to request an instruction on that lesser included defense.

Moreover, counsel failed to insure that the jury was properly instructed that Petitioner could be convicted of robbery only if the intent to steal was formed prior to the killing.   The trial court merely instructed the jury that Petitioner would be guilty of robbery if the use of force occurred during the course of committing a theft, attempting to commit theft, or as part of flight from a theft.  <u>Id.</u> at 1352-53.  These instructions failed to explain that, where the intent to steal is not formed until after a homicide,  a theft committed after that homicide is not a robbery.  Counsel, however, failed to object to these instructions and failed to request any other explanatory language consistent with his theory of defense.

Counsel's errors and admissions, both individually and cumulatively, denied Petitioner his constitutional rights to the effective assistance of counsel and due process, as protected by the Sixth, Eighth and Fourteenth Amendments.  The Pennsylvania Supreme Court's decision to the

---

testimony relating either to his intent to kill or his intent to steal.  This erroneous ruling is discussed as a separate claim, Claim 3, <u>supra</u>, but also underscores the fact that the jury was never given an adequate opportunity to determine if Petitioner was guilty of robbery, or theft.

contrary was an unreasonable application of <u>Strickland v. Washington</u>  466 U.S. 668 (1984).

Under Pennsylvania law, Petitioner could not be convicted of robbery if his intent to steal did not arise until after the killing had occurred.  <u>Commonwealth v. Legg</u>, 491 Pa. 78, 417 A.2d 1152 (1980).[96]  <u>See</u> <u>Commonwealth v. Ford</u>, 539 Pa. 85, 97, 650 A.2d 433, 438 (1994) (recognizing that while a robbery could not be committed against a dead person, there was sufficient evidence to find that defendant had the intent to rob at the time of the killing).

In this case, counsel was ineffective for failing to request an instruction on the lesser included of theft, where it was the defense theory that Petitioner was guilty of theft, but not robbery.   The job of insuring that the jury is properly instructed on the law surrounding all of the defenses raised in the case does not rest with the trial judge alone.  Defense counsel has the responsibility of requesting jury instructions on the theory of the defense and of objecting when those instructions are not given.  Counsel's failure to request proper instructions on the theory of the defense renders counsel ineffective.[97]  <u>United States v. Span</u>, 75 F.3d 1383 (9th Cir. 1986)

_____

[96]In <u>Legg</u>, the Supreme Court reversed the defendant's convictions for felony murder and robbery where the trial court had instructed the jury that a defendant could be convicted of felony murder regardless of when the intent to steal had formed.  Where the defendant kills prior to formulating the intent to commit the underlying felony, the felony murder doctrine does not apply.  <u>See also</u> <u>Commonwealth v. Spallone</u>, 267 Pa. Super. 486, 406 A.2d 1146 (1979).  The <u>Legg</u> court also found that these instructions necessitated reversal of defendant's robbery conviction, recognizing that a defendant who forms the intent to steal after the person has been killed for other reasons, is not guilty of robbery.

[97]In Pennsylvania, a defendant is entitled to an instruction on any recognized defense so long as there is support for that defense on the record.  <u>Commonwealth v. Weinberger</u>, 520 Pa. 305, 554 A.2d 10, 14 (1989).  Such evidence can come from any source, including the Commonwealth's case in chief.  <u>Commonwealth v. Rose</u>, 457 Pa. 380, 321 A.2d 880 (1972); <u>Commonwealth v. Crooper</u>, 463 Pa. 529, 345 A.2d 645 (1975).  In determining whether a defendant is entitled to a particular instruction, the evidence must be viewed in the light most favorable to the defendant.  <u>Commonwealth v. Black</u>, 474 Pa. 47, 372 A.2d 627 (1977).

(Sixth Amendment right to the effective assistance of counsel was violated where counsel failed to request appropriate instructions on the defense of self defense in the face of a police officer's use of excessive force); Arrowood v. Clusen, 732 F.2d 1364, 1372 (7th Cir. 1984) (counsel was ineffective in failing to request appropriate instructions that were consistent with the defense theory). See Freeman v. Class, 95 F.3d 639, 642 (8th Cir. 1996) (trial counsel was constitutionally deficient for failing to request a cautionary instruction on accomplice testimony that was available under state law; counsel's failure "deprived [Petitioner] of a jury that would give appropriate analysis to the evidence presented"); Nero v. Blackburn, 597 F.2d 991 (5th Cir. 1979 (same).[98]

Moreover, counsel failed to take any other alternative measures to insure that the jury was adequately instructed. In this case, the trial court gave only the standard "in the course of committing the theft" charge. In light of Petitioner's statement to the police, however, in this case, this instruction was not sufficient to explain to the jury that the intent to steal must be formed at the time of the killing and that, where the intent to steal is formed after the killing, a

---

[98]See also Commonwealth v. Stonehouse, 521 Pa. 41, 555 A.2d 772, 781-82 (1989) (in self defense case, counsel was ineffective in failing to request instructions explaining the legal relevance of the history of abuse suffered by the defendant and in failing to request proper manslaughter instructions concerning the cumulative impact of a series of events on the issue of provocation); Commonwealth v. Roxberry, 529 Pa. 160, 602 A.2d 826, 828-29 (1992) (counsel was "ineffective for inexplicably failing to object to the omission of an alibi instruction, thereby prejudicing appellee's right to a fair trial."); Commonwealth v. Weidner, 395 Pa. Super 608, 577 A.2d 1364, 1374 (1990) (a verdict reached in the absence of an alibi instruction is "inherently tainted" and counsel's failure to object to its absence is constitutionally ineffective); Commonwealth v. Buksa, 440 Pa. Super 305, 665 A.2d 576 (1995) (counsel was ineffective in failing to request instruction on self defense); Commonwealth v. Fierst, 423 Pa. Super. 232, 620 A.2d 1196, 1205-06 (1993) (counsel was ineffective in failing to request instruction that an accident caused by a driver's seizures could render the driver's actions involuntary and thus negate the intent elements of aggravated assault and third degree murder; as a result the jury lacked guidance on how to apply the defense).

theft committed after a killing does not constitute a robbery.[99]  In addition, Petitioner had the right to a jury determination of all of the elements of the offense of robbery beyond a reasonable doubt.  United States v. Gaudin, 515 U.S. 506 (1995).  The instructions given did not fulfill these tasks.  Petitioner's robbery convictions must be reversed.

The reversal of the robbery conviction also necessitates the reversal of Petitioner's death sentence, because one of the aggravating circumstances found by the jury was that the killing had occurred during the commission of a robbery.  Counsel's failures to request appropriate instructions on theft and robbery, at both the guilt and penalty stages, renders this finding invalid because the jury did not adequately determine whether any robbery had occurred.  Moreover, when an aggravating circumstance is based upon a conviction that is invalid, the aggravating circumstance and the resulting death sentence are invalid as well.  Johnson v. Mississippi, 486 U.S. 578 (1988); see also Stringer v. Black, 503 U.S. 222, 232 (1992) ("[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale.").

## B.    The Pennsylvania Supreme Court's Opinion

The Pennsylvania Supreme Court accepted the proposition that counsel's failure to request an appropriate instruction was constitutionally deficient.  Breakiron-2, 729 A.2d at 1095.  The Court found, however, that Petitioner was not prejudiced.  Relying in its conclusion in

---

[99]The trial court had the duty to fully and properly instruct the jury on the issues before them.  Commonwealth v. Cox, 686 A.2d 1279, 1286 (Pa. 1996) (trial court is under a duty to instruct the jury on the correct legal principles applicable to the facts before them); Commonwealth v. Kolenda, 544 Pa. 426, 676 A.2d 1187, 1190 (1996) (duty of trial court is to carefully instruct the jury as to the relationship of the evidence presented by both parties as each bears upon the essential elements of the crimes charged).

Breakiron-1 that the evidence was sufficient to sustain a robbery conviction, the Court summarily

concluded that, "had a theft instruction been given, it is not likely that the jury would have

returned a verdict only on the theft charge." Id. This conclusion is both contrary to, and an

unreasonable application of, Strickland.

      The state court's reliance on the sufficiency of other evidence to conclude that Petitioner

was not prejudiced by trial counsel's deficient performance applies an altogether different

standard than the "reasonable probability of a different result" standard mandated by Strickland.

This prejudice standard is contrary to Strickland, and, as a result, Petitioner has met the standard

for relief required by §2254(d)(i).[100]

      The proper issue is not what the Pennsylvania Supreme Court would have done had it sat

on the jury. The issue is whether there is a reasonable probability that the jury could have

rejected robbery and convicted Breakiron of theft, in light of the trial evidence, had it been

properly instructed. It certainly could have, especially when the evidence is viewed, as it must be

---

[100] An examination of the proper analysis undertaken in determining the existence of a Brady violation illustrates why the standard used by the state courts was erroneous and contrary to Strickland. A prosecutor's failure to disclose Brady material requires a new trial when the exculpatory evidence was material to the trial. Kyles v. Whitley, 514 U.S. 419, 432 (1995), quoting, Brady v. Maryland, 373 U.S. 83, 87 (1963). The "touchstone of materiality is . . . not whether the defendant would more likely or not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial. . . ." Kyles, 514 U.S. at 434. Thus, to show materiality, Petitioner need not demonstrate that the non-suppressed evidence would have been inadequate to convict -- "sufficiency of [the remaining] evidence [is not] the touchstone" of materiality id., at 435 n.8.

    Brady's materiality prong is identical to the "prejudice" standard applied to Sixth Amendment claims of ineffective assistance of counsel, Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995); Strickland v. Washington, 466 U.S. 668, 694 (1984). Therefore, because sufficiency is not the "touchstone" of materiality, Kyles 514 U.S. 435 n.8, whether there was sufficient evidence to convict Petitioner despite counsel's deficient performance is also not "touchstone" of whether counsel's failure prejudiced Petitioner and violated his right to effective assistance of counsel.

in this context, in a light favorable to Petitioner.

A proper prejudice analysis would have applied an analysis similar to that applied in

Smith v. Horn. In Smith, 120 F.3d 400 at 418 (3rd Cir.1997), the Commonwealth argued that the

instructional error was harmless because the evidence overwhelmingly supported a finding of

specific intent. Indeed, in Smith, the Pennsylvania Supreme Court had found:

> [T]he evidence of [Smith's] guilt [of first degree murder] is so overwhelming that
> no serious question can be posed as to its sufficiency. Indeed, the conviction is
> supported by physical evidence as well as by the testimony of numerous
> eyewitnesses, including those who observed appellant at the scene of the crime
> and those who accompanied appellant in the getaway vehicle, the latter witnesses
> having even provided testimony that Smith admitted having intentionally shot the
> pharmacist.

Commonwealth v. Smith, 513 A.2d 1371, 1374 (Pa. 1986).

The Third Circuit, however, rejected the Commonwealth's harmless error argument, and

held that the error could not be deemed harmless. Smith, 120 F.3d at 418-19. The Court

explained that, in evaluating the harm of an erroneous jury instruction, the Court must not usurp

the role of the jury in making credibility determinations and weighing evidence. Given that the

jury's deliberations were tainted by the erroneous instruction, the Court "cannot assume that the

jury, having found Smith guilty, 'believed all properly admitted evidence against him and

disbelieved all evidence in his favor.'" Smith, 120 F.3d at 418. Here, the fact that the

Commonwealth's evidence was sufficient to prove robbery does not mean that a properly

instructed jury would have concluded that a robbery, as opposed to a theft, had occurred. The

state court's contrary conclusion was an unreasonable application of the Strickland prejudice test.

Moreover, the state court's determination that any error was harmless as to sentencing

because the jury had found one other aggravating circumstance and no mitigating circumstances

147

likewise cannot stand.  The mere fact that Pennsylvania law requires the jury to return a death

sentence when there is at least one aggravating circumstance and no mitigating circumstances

cannot end the harmless error inquiry.  Instead, proper harmless error analysis requires the

reviewing court to make a de novo examination of the entire trial record and to grant relief unless

the error is harmless beyond a reasonable doubt.  E.g., Delaware v. Van Arsdall, 475 U.S. 673,

680 (1986); United States v. Hastings, 461 U.S. 499, 509-10 (1983).  No such full record review

was done in this case.  Instead, the Pennsylvania Supreme Court simply applied a per se rule –

the jury's failure to find mitigation automatically rendered the errors harmless.

        The utter inadequacy of the Pennsylvania Supreme Court's automatic harmless error rule

is illustrated by Sochor v. Florida, 504 U.S. 527 (1992), which reviewed and vacated the Florida

Supreme Court's affirmance of a death sentence.  Florida's capital sentencing statute, at issue in

Sochor, requires the trial court to impose a death sentence in every case when "there are

insufficient mitigating circumstances to outweigh the aggravating circumstances."  Fla.Stat.  §

921.141(3)(b).  Thus, Florida's statute, like Pennsylvania's, requires the court to impose a death

sentence whenever there is at least one aggravating circumstances and there are no mitigating

circumstances.

        In Sochor, the trial court found four aggravating circumstances and no mitigating

circumstances and, as required by Florida law, sentenced the defendant to death.  Id., 504 U.S. at

530.  On appeal, the Florida Supreme Court invalidated one of the aggravating circumstances but

affirmed the sentence of death because "[e]ven after removing the [improper] aggravating factor

... there still remain three aggravating factors to be weighed against no mitigating circumstances,"

thus requiring a death sentence under Florida law.  Id., 504 U.S. at 531.  Thus, the Florida

148

Supreme Court disposed of the constitutional error precisely as the Pennsylvania Supreme Court did here – it automatically found the error harmless because, in the absence of mitigating circumstances, a death sentence was required by the statute.

The United States Supreme Court granted certiorari. It agreed with the Florida Supreme Court that one of the four aggravating circumstances upon which Sochor's death sentence was based was invalid, but rejected the Florida Supreme Court's automatic harmless error analysis. As the United States Supreme Court explained:

> Since the Supreme Court of Florida did not explain or even "declare a belief that" this error "was harmless beyond a reasonable doubt" in that "it did not contribute to the [sentence] obtained," Chapman [v. California], 386 U.S. [18, 24 (1967)] ..., the error cannot be taken as cured by the State Supreme Court's consideration of the case. It follows that Sochor's sentence cannot stand on the existing record of appellate review.

Sochor, 504 U.S. at 540.

The Pennsylvania Supreme Court's harmlessness analysis was both contrary to, and unreasonable application of, Sochor. The mere fact that Pennsylvania law requires the jury to return a death sentence when there is at least one aggravating circumstance and no mitigating circumstances cannot end the harmless error inquiry. Petitioner is entitled to relief.

**CLAIM 10:     PETITIONER IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE THE PENALTY PHASE JURY INSTRUCTIONS AND VERDICT SHEET UNCONSTITUTIONALLY PRECLUDED THE JURY FROM GIVING PROPER EFFECT TO THE EVIDENCE OF MITIGATION.**

In a capital case, the sentencer may not be precluded from considering and giving full effect to any mitigating aspect of the defendant's character or record, or the circumstances of the offense. Mills v. Maryland, 486 U.S. 367, 374-75 (1988) (citing Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586 (1978); Skipper v. South Carolina, 476 U.S. 1

149

(1986)); <u>Osborne v. Shillinger</u>, 861 F.2d 612, 628 n.16 (10th Cir. 1988) (that capital sentencer cannot be precluded from hearing or giving full effect to relevant mitigating evidence "is the clearest principle in modern death penalty jurisprudence"). This clear and fundamental principle of Eighth Amendment jurisprudence was violated at Petitioner's trial by a series of erroneous jury instructions which unconstitutionally limited the jury's ability to properly consider the mitigating circumstances that had been established by the evidence at trial.

> **A.    The Court's Instructions Erroneously Instructed the Jurors That They Could Not Give Any Consideration to the Mitigation Evidence Unless They First Concluded That Such Evidence Outweighed The Aggravating Circumstances.[101]**

Under the Pennsylvania capital sentencing scheme the jury is first required to determine if there are any aggravating circumstances.  If none are found, a life sentence is imposed.  If one or more aggravating circumstances are found by any juror(s), each juror must then determine if there are any mitigating circumstances.  If none are found, the jury must impose death.  If one or more mitigating factors are found, the jury is then required to weigh the aggravating and mitigating circumstances and may impose death only if the aggravating circumstances outweigh the mitigating circumstances.  In the event of a deadlock, life is imposed.  <u>See</u> 42 Pa.C.S.A. § 9711; <u>Blystone v. Pennsylvania</u>, 494 U.S. 299 (1990).

In this case, the trial court's instructions to the jury were inconsistent with Pennsylvania law, misled the jury, precluded the jury from giving proper consideration to the mitigating evidence and denied Petitioner his constitutional rights to a fair and reliable sentencing hearing.

---

[101]This portion of the claim was raised in <u>Breakiron-3</u>.  The merits of this section of this claim were not addressed by the Pennsylvania Supreme Court.  This Court should conduct de novo review.

<u>Carter v. Bowersox</u>, 265 F.3d 705 (8th Cir. 2001) (trial court's penalty phase instructions

deprived defendant of due process where they erroneously defined state law for imposing the

death penalty).

The court gave the following instruction:

> As I previously said to you, the finding of mitigating circumstances
> is not the same standard as you use for finding aggravating
> circumstances.  Now, it is just if you find that the evidence of
> mitigation is greater than the aggravating circumstances by a fair
> preponderance of the evidence, which means simply to exceed in
> weight as used as an example of the balancing scales, then, you
> would make a finding of mitigation or mitigating circumstances.

NT 4/14/88 at 1440-41.[102]  In this instruction the trial court confused the initial determination of

whether mitigating circumstances exist with the subsequent weighing stage where the jury

weighs any mitigating circumstances against aggravating circumstances.  Before the jury weighs

aggravation against mitigation, the jury must make a threshold determination as to whether

mitigating and/or aggravating circumstances exist.  At this first stage, the jury must determine if

there is proof beyond a reasonable doubt of aggravating circumstances and proof by a

preponderance of the evidence of mitigating circumstances.  If and only if the jury finds both

aggravating and mitigating circumstances does the jury weigh the aggravating circumstances and

the mitigating circumstances against each other to determine if the aggravating circumstances

outweigh the mitigating circumstances.

---

[102]<u>Compare</u> Pennsylvania Standard Jury Instruction, 15.2502E ("Aggravating circumstances must be proven by the Commonwealth beyond a reasonable doubt while mitigating circumstances must be proven by the defendant by a preponderance of the evidence, that is, by the greater weight of the evidence"); Pennsylvania Standard Jury Instruction 15.2502F ("By contrast, the defendant must prove any mitigating circumstance.  However, he only has to prove it by a preponderance of the evidence, that is, by the greater weight of the evidence.")

The trial court's instructions short-circuited the consideration of mitigating circumstances. The jury was only permitted to find that mitigating circumstances existed if they found that they outweighed the aggravating circumstances. But before the jury credited the mitigating circumstances, they could not possibly outweigh the aggravating circumstances since the jury had not yet found them. Mr. Breakiron was placed in a catch-22 because jurors could only consider his mitigating evidence if it a priori somehow already outweighed aggravating circumstances. But until the jury determined that mitigating circumstances existed they could not outweigh the aggravating circumstances.[103]

The instructions were also erroneous because they required the jury to reject any mitigation unless the mitigating evidence outweighed the aggravation by a fair preponderance of the evidence. Such instructions are directly contrary to the Pennsylvania statute and create a presumption of a death sentence, unless that presumption is overcome by the weight of mitigation. The death penalty statute, actually, creates the opposite presumption. Commonwealth v. Eichinger, 915 A.2d 1122, 1138 (Pa. 2007). If the jury is in equipoise -- that is, the evidence of aggravation and mitigation are of equal weight -- or if any single juror believes that life is the appropriate sentence, a life sentence *must* be imposed. Commonwealth v. Baker, 614 A. 2d 663, 677 (Pa. 1992) (Pennsylvania's"statute . . . decides a 'tie,' and equal balance of aggravation and mitigation, in favor of the defense."). It is only where the aggravation outweighs the mitigation that a jury is entitled to return a death sentence. Cf. Commonwealth v. Bardo, 709 A.2d 871, 876 (Pa. 1998) ("The statute provides that if the jury finds that the aggravating circumstance(s) do not outweigh the mitigating circumstance(s), it must impose a life sentence"). The instruction

---

[103]The instruction also presumed the existence of aggravating circumstances.

provided to Mr. Breakiron's jury reversed the burden of proof, were contrary to the statute and violated the Eighth and Fourteenth Amendments. [104]

In <u>Rojem v. Gibson</u>, 245 F.3d 1130 (10th Cir.2001), the Court held that the failure to give death-penalty weighing instruction, as provided for in state statute, violated due process in that it deprived defendant of legitimate expectation under state law that he would receive the death penalty only if aggravating circumstances outweighed mitigating circumstances. Similarly, in <u>Carter v. Bowersox</u>, the Court held that the state court's erroneous instructions on the sentencing process violated the defendant's due process rights were not just error under state law, but violated the defendant's due process rights. 265 F.3d at 714.[105]

The same analysis is applicable here. The trial court's erroneous explanation of the sentencing process and inaccurate definition of the weighing process created a reasonable likelihood that the jury applied the instructions in a manner that prevented consideration of relevant mitigating evidence and unconstitutionally shifted the burden required by the weighing process to impose the death penalty. See <u>Boyde v. California</u>, 494 U.S. at 380.

The trial court's instructions, which mangled the statutorily mandated deliberation

---

[104]Because the trial court's instruction created an improper presumption for death, it "'conflict[s] with the overriding presumption of innocence [here, the presumption of life] with which the law endows the accused and which extends to every element of the crime,'" and thereby "'invade[d] [the] factfinding function' which in a criminal case the law assigns solely to the jury." <u>Sandstrom v. Montana</u>, 442 U.S. 510, 523 (1979); <u>Francis v. Franklin</u>, 471 U.S. 307 (1985). Furthermore, by shifting the burden of persuasion to the defendant to show why he should not be sentenced to death, the jury "may have interpreted the judge's instruction as constituting either a burden-shifting presumption...or a conclusive presumption." <u>Id</u>. at 524. The instruction violated Petitioner's right to due process.

[105]In <u>Carter</u>, the instructions omitted one step in the state process for jury deliberations in capital sentencing proceedings.

process and created a presumption of death that the defendant's evidence must overcome,

prevented the jury from giving full mitigating effect to the evidence presented in this case and

erected an improper "barrier to the sentencer's consideration of all mitigating evidence," in

violation of Petitioner's Eighth and Fourteenth Amendment rights. Mills v. Maryland, 486 U.S.

367, 374-75 (1988); Jackson v. Dugger, 837 F.2d 1469, 1473-74 (11th Cir.) (reversing death

sentence as a result of instruction that "death is presumed to be the proper sentence unless

[aggravators] are overridden by one or more of the mitigating circumstances").[106]

As the Jackson court explained, the presumption that death is the appropriate penalty

unless overcome by mitigation "vitiates the individualized sentencing determination required by

the Eighth Amendment," Jackson, 837 F.2d at 1473, that "may well have skewed the jury

towards death."  The Jackson court found that the instruction improperly burdened the jury's

consideration of relevant mitigating evidence, "creat[ing] the risk that the death penalty w[ould]

be imposed in spite of factors which may call for a less severe penalty," id. (quoting Sumner v.

Shuman, 107 S. Ct. 2716, 2276 (1987); and erected the type of evidentiary presumption that "in

the context of criminal proceedings ha[s] traditionally been viewed as constitutionally suspect."

Id. at 1374 (citing Sandstrom and Franklin).  The Court further reasoned that:

> When such a presumption is employed in sentencing instructions given in a
> capital case, the risk of infecting the jury's determination is magnified.  An
> instruction that death is presumed to be the appropriate sentence tilts the scales by
> which the jury is to balance aggravating and mitigating circumstances in favor of
> the state.

---

[106]See also Eddings v. Oklahoma, 455 U.S. 104 (1982); Lockett v. Ohio, 438 U.S. 586
(1978); Skipper v. South Carolina, 476 U.S. 1 (1986); Penry v. Lynaugh, 492 U.S. 302 (1989);
Osborne v. Shillinger, 861 F.2d 612, 628 n.16 (10th Cir. 1988); Frey v. Fulcomer, 132 F.3d 916
(3d Cir. 1997).

Jackson, 837 F.2d at 1374.  Similarly, the instruction results in an arbitrary and capricious death

sentence because it "is so skewed in favor of death that it fails to channel the jury's sentencing

discretion appropriately."  Id. (citing Gregg v, Georgia, 428 U.S. 153, 189 (1976)).

The errors in the sentencing instructions were not harmless.[107]  Relying upon  these

instructions, the jury found no mitigating circumstances existed, even though the defense

presented uncontradicted evidence establishing the existence of some mitigation, and the

prosecutor conceded the credibility of that evidence.  See Claim 11, infra.  Under these

circumstance, erroneous jury instructions which impeded the finding of mitigation and misstated

the burden of proof cannot be considered harmless.

**B.    The Penalty Phase Instructions and Verdict Sheet Unconstitutionally Indicated That the Jury Had to Unanimously Find Any Mitigating Circumstance Before it Could Give Effect to That Circumstance in its Sentencing Decision.** [108]

**1.    The merits of the claim**

The trial court failed to advise the jury that any juror who individually found a mitigating

circumstance could weigh that circumstance against the aggravating circumstances unanimously

found, even if there was not unanimity as to the existence of that mitigating circumstance.

Instead, the penalty phase jury instructions and the penalty phase verdict sheet led the jury to

incorrectly believe that it had to be unanimous in finding any mitigating circumstance before it

---

[107]Even if other parts of the sentencing instruction were proper, the presence of the improper instruction rendered the verdict improper and unconstitutional. Mills v. Maryland, 486 U.S. 367, 376 (1988) ("the jury's verdict must be set aside if it could be supported on one ground but not on another") (citing Yates v. United States, 354 U.S. 298, 312 (1957); Stromberg v. California, 283 U.S. 359, 367-368 (1931)).

[108]The Pennsylvania Supreme Court addressed this portion of the claim on the merits. Commonwealth v. Breakiron-2, 729 A. 2d at 1097.  Thus the standards Section 2254(d) apply.

could give effect to that mitigating circumstance in its sentencing determination. The jury

instructions and verdict sheet thus created a barrier to the sentencer's consideration of all

mitigating evidence, and, under <u>Mills v. Maryland</u>, 486 U.S. 367 (1988). violated Petitioner's

Eighth and Fourteenth Amendment rights.

  The trial court provided the jury with the following instructions:

> Your verdict must be unanimous. It can not be reached by a majority vote or by
> any percentage. In other words, in order to return a sentence of death, all twelve
> of you must unanimously agree upon it. Your verdict must be a sentence of death
> if you unanimously find at least one aggravating circumstance and no mitigating
> circumstances; or if you unanimously find one or more aggravating circumstances
> which outweigh any mitigating circumstances.

NT 4/14/88 at 1443.

  The Third Circuit's precedents – <u>Frey v. Fulcomer</u>, 132 F.3d 916 (3d Cir. 1997); <u>Banks v.

Horn</u>, 271 F.3d 527 (3d Cir. 2001), <u>vacated on other grounds</u>, 536 U.S. 266 (2002), on remand

316 F.3d 228 (3d Cir.2003), <u>reversed</u> <u>Beard v. Banks</u>, 542 U.S. 406 (2004); <u>Hackett v. Price</u>, 381

F.3d 281 (3d Cir. 2004); and <u>Albrecht v. Horn</u>, 485 F.3d 103 (3d Cir. 2007) – compel the

conclusion that <u>Mills</u> was violated and that relief be granted on this claim.[109] <u>Albrecht</u> represents

---

[109] In <u>Banks v. Horn</u>, the Court of Appeals held: 1) instructions almost identical to those
in the case <u>sub judice</u> were unconstitutional; 2) the Pennsylvania Supreme Court's opinion was
unreasonable because (as in the case <u>sub judice</u>) it addressed only the constitutionality of the
Pennsylvania Death Penalty statute and did not address the relevant legal issue: the likelihood
that the jury may have been confused by the instructions and the verdict slip; 3) relief was
required under the AEDPA because the Pennsylvania Supreme Court's opinion was an
unreasonable application of the relevant law.

  In <u>Beard v. Banks</u>, the Supreme Court held that the rule in Mills would not be
retroactively applied to any case that became final prior to <u>Mills</u>. The Court held that convictions
become "final" for purposes of determining retroactivity on the date that the Supreme Court
denies certiorari in direct appeal. <u>Beard. Banks</u>, 542 U.S. 406, at 413.

  Here, in contrast to <u>Banks</u>, <u>Mills</u> was announced before Breakiron's conviction became

the Third Circuit's thoroughly considered and clearly expressed views as to the proper analysis of

<u>Mills</u> claims.  Applying that analysis, Petitioner is entitled to relief.  According to the Third

Circuit:

      **a.**     The instructions given in <u>Frey</u>, <u>Banks</u> and <u>Albrecht</u> (and therefore the almost

identical instructions here) "were constitutionally infirm." <u>Albrecht</u> at 117.

      **b.**     The verdict slips used in <u>Banks</u> and <u>Albrecht</u> (and therefore the almost identical

verdict slip here) were "confusing and more likely suggestive [of unanimity]." <u>Id.</u> at 118.

      **c.**     In <u>Albrecht</u>, the Pennsylvania Supreme Court had denied the <u>Mills</u> claim on the

ground that Pennsylvania's capital sentencing statute does not require a unanimous finding as to

mitigating factors, and that the jury instructions tracked the language of the sentencing statute.

<u>Commonwealth v. Albrecht</u>, 720 A.2d 693, 706 (Pa. 1998).  The Third Circuit found this was an

unreasonable application of <u>Mills</u>:

> This is an unreasonable application of <u>Mills</u>, because the Court ignored
> <u>Mills</u>' teachings and focused instead on the meaning of the state statute and
> whether it was subject to a reasonable construction, rather than on the issue of jury
> confusion.  <u>Banks</u>, 271 F.3d at 544-45.  As in <u>Banks</u>, the state court should have
> focused on whether the need for unanimity was a conclusion that a reasonable
> juror could have drawn from the instruction and verdict slip.  <u>Id.</u> at 547.  In
> Albrecht's case, our caselaw holds there is a reasonable likelihood that a

---

final.  In this case, Mark Breakiron's direct appeal was decided by the Pennsylvania Supreme
Court on March 14, 1990.  This was  after the United States Supreme Court decided <u>Mills v.
Maryland</u> on June 6, 1988.   Thus, <u>Mills</u> is applicable to Mr. Breakiron since it was decided
before Mark Breakiron's direct appeal became final.   See <u>Morris v. Horn</u>, 2007 WL 1795689,
*30 (E.D. Pa. 2007)(<u>Mills</u> applies to case where direct appeal became final seven months after
<u>Mills</u> was decided).

While <u>Banks</u> was ultimately reversed by the Supreme Court on procedural grounds, the
Third Circuit, however, has twice emphasized that its substantive holding in  <u>Banks</u>, while no
longer precedential, is nevertheless "instructive and relevant" regarding AEDPA review of a
<u>Mills</u> claim.  <u>Albrecht</u> at 117 n.5; <u>Hackett</u> at 294 n.9.

reasonable juror could have assumed the existence of a unanimity requirement with respect to mitigating circumstances. Id. at 548-49. Moreover, the state Supreme Court's statement that the verdict slip clearly required unanimity only upon the existence of the sole aggravating factor advanced by the prosecution is objectively unreasonable and not just incorrect, Williams [v. Taylor], 529 U.S. [362,] 410 [(2000)]. The verdict slip used in Albrecht's case is virtually identical to the confusing verdict slip disapproved of in Banks, 271 F.3d at 549-50.

Albrecht v. Horn, 485 F.3d at 119.  The same reasoning applies here.  See Morris v. Horn, 2007 WL 1795689, *30-36 (E.D. Pa. 2007) (most recent District Court applying Third Circuit cases and granting relief in circumstances virtually identical to those at issue here).

In Banks, the trial court had instructed the jury as follows:

The Crime Code in this Commonwealth provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.

Id. at 546.  Banks held that those instructions, like the instructions given to Mr. Breakiron's jury, were constitutionally erroneous.  Banks at 547-48.  The instructions in Mr. Breakiron's case included the same improper language that the Court of Appeals found likely to create confusion in Banks: "if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstance." See Albrecht at 117-18.

As in Albrecht, Banks and Frey, the  jury instructions in this case repeatedly emphasized the requirement of unanimity.  The instructions did not distinguish between the requirement of unanimity necessary to the determination of aggravating circumstances and the non-unanimity required for the finding of any mitigating circumstance.  The instructions made it reasonably likely that the jury could have believed that it was required to find the existence of mitigating

158

circumstances unanimously before those circumstances could be considered in its deliberations. The jury instructions thereby created a barrier to the sentencer's consideration of all mitigating evidence, in violation Petitioner's Eighth and Fourteenth Amendment rights.

The trial court's efforts to distinguish aggravating and mitigating circumstances emphasized the unanimity requirement. The court explicitly told the jury that different standards applied to the findings of aggravating and mitigating circumstances and explained (erroneously) what those differences were. See §A, supra.[110]  There was, however, never any mention that the unanimity requirement applicable to a finding of aggravating circumstances was not applicable to the finding of mitigating circumstances. Because the court defined the differences between the aggravators and mitigators, yet made no mention of a different unanimity requirement, the jury would logically assume that the unanimous standard required for the finding of aggravating circumstances was equally applicable to the finding of mitigating circumstances.

The trial court later reiterated the differing burden of proof between aggravating and mitigating circumstances:

> As I have told you, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt and I have defined that term beyond a reasonable doubt in my charge to you. The defendant has the burden of proving mitigating circumstances, but only by a fair preponderance of the evidence.

Id. at 1442.

---

[110]As discussed above, the instruction standing alone, created constitutional error as it allowed the aggravating evidence in the case to pose a threshold barrier to the jury's consideration of mitigating evidence by transposing the weighing step onto the threshold determination of the existence of mitigation. Accordingly, this instruction violated the Eighth Amendment. In addition, however, when read in conjunction with the other instructions, this instruction emphasizes a unanimity requirement for the finding of mitigating circumstances because the jury is consistently told that this weighing process requires that the jury reach a unanimous decision.

The <u>Frey</u> court noted that similar burden of proof instructions were likely to add to the jury's misunderstanding and make the jury believe that mitigating circumstances, like aggravating circumstances, must be proved to the satisfaction of the unanimous jury. <u>Id.</u>,132 F.3d at 923-24. As the <u>Frey</u> court explained, "[it is what is not said here that is significant." <u>Id.</u> Since the burden of proof instructions stressed the different burdens of proof for aggravating and mitigating circumstances, but were silent as to unanimity, a lay jury would reasonably conclude that both:

> aggravating and mitigating circumstances must be discussed and unanimously agreed to, as is typically the case when considering whether a burden of proof has been met. Such an understanding, however, is plainly inconsistent with the requirements of Mills, and adds to our concern that the jury could have understood the charge to require unanimity in consideration of mitigating evidence.

132 F.3d at 924. Accord <u>Banks</u>, 271 F.3d at 548. Here as well, it is what was not said that is significant and compounded the error

In addition to the erroneous instructions, the penalty-phase verdict sheet explicitly required that any findings as to the existence of mitigating circumstances must be unanimously found. The verdict sheet read, in pertinent part, :

2.    We, the jury, have found unanimously

(   )   at least one aggravating circumstance and no mitigating circumstance. The aggravating circumstance(s) (is) (are):

(   )   one or more aggravating circumstances which outweigh any mitigating circumstances. The aggravating circumstance(s) (is) (are)

The mitigating circumstance(s) (is) (are)

_____
Foreperson

The requirement of unanimity appears at the start of the section and is applicable to each and every determination to be made by the jury under that section, including the finding of any mitigating circumstances. Thus, the requirement of juror unanimity as to consideration of both aggravating and mitigating circumstances is explicit as well as implicit. Since there is a single verdict sheet for the entire jury, and no place for individual jurors to record individual findings relating to mitigation, it was logically impossible for the jury to conclude that each individual juror was free to give effect to mitigation found by him or her alone.

The Third Circuit found similar language in a penalty phase verdict slip to be unconstitutional in Banks

> We find it only reasonable to conclude that the form itself is at least confusing, and more likely suggestive, regarding the need for unanimity as to mitigating circumstances. The lead-in language to the overarching second question is "We the jury have found unanimously...." By implication, everything that follows was found unanimously. What follows is a reference both to aggravating and to mitigating circumstances, with no additional language that would imply that there is a different standard for aggravating circumstances than there is for mitigating circumstances. There is also no language anywhere on the form from which the jury could infer that a mitigating circumstance might be marked if only one juror had found that circumstance to exist.

271 F.3d at 550. Accord , Albrecht, 485 F.3d at 118.

Finally, the trial court's instructions to the jury regarding its use of the penalty-phase verdict sheet confirm that the jury must have been laboring under the misimpression that it had to be unanimous in its finding of mitigation before it could give it effect. The trial court showed the

161

penalty-phase verdict sheet to the jury and instructed:

> The aggravating circumstance or circumstances is or are and you must list there the aggravating circumstances which you find. In addition, you will see typed the mitigating circumstance or circumstances is or are and you must list your mitigating circumstance or circumstances that you have found.

Id. at 1445. No distinction is made between a "finding" of aggravating circumstance and a "finding" of a mitigating circumstance. The jury could only conclude that its finding with respect to each must be unanimous.

In Hackett v. Price, 381 F.3d 281, (3rd Cir. 2004), the Third Circuit distinguished its previous holding in Banks on the basis of the jury's finding of no mitigating circumstances. It held that, in light of the jury's verdict form, there was no reasonable likelihood that the jurors applied the challenged instruction in a way that prevented the consideration of constitutionally relevant evidence. Thus, the Court found no Mills-Boyde violation as no juror found that there was any mitigating circumstance.

Although the jury in Breakiron's case also found no mitigating circumstances, the conclusion reached in Hackett cannot be confidently applied here. It cannot be applied here because in this case, the trial court's instructions to the jury were inconsistent with Pennsylvania law, and precluded the jury from giving proper consideration to the mitigating evidence and denied Petitioner his constitutional rights to a fair and reliable sentencing hearing. See, § A, supra. In addition, the conclusion of Hackett cannot be applied here because the jury failed to give any effect to the unrebutted statutory mitigating factors that were presented. See, Claim 11, infra. Hackett rested on the Court determining that because the jury found unanimously that there was "no mitigating circumstance" there was no "room to speculate that perhaps one juror was

162

confused about unanimity requirements and therefore precluded from considering mitigating evidence." Hackett at 301.  The same logic cannot apply here where the jury instructions themselves precluded the jury from considering mitigating evidence, and where the prosecutor did not contest the mitigation evidence presented to the jury. The trial court instructed the jury that it could only be permitted to find that mitigating circumstances existed if they found that they outweighed the aggravating circumstances.  This is incorrect under Pennsylvania law. Moreover it creates confusion which resulted in the jury finding no mitigation although there was clearly unrebutted mitigating evidence presented.

For all of these reasons, the jury instructions and verdict sheet prevented the jury from fully considering and giving effect to mitigating evidence, in violation of the Eighth and Fourteenth Amendments.  Trial counsel was ineffective for failing to object and seek a proper instruction, and direct appeal counsel was ineffective for failing to raise and litigate this issue. These errors deprived Petitioner of his rights under the Sixth, Eighth and Fourteenth Amendments.

## 2.     The Pennsylvania Supreme Court's Opinion

The Pennsylvania Supreme Court rejected the merits of Petitioner's claim with the following analysis, which Petitioner quotes in its entirety:

> Further, Breakiron's claims lack merit because we have previously held that instructions quite similar to those used by the trial court in this matter do not violate Mills.  See, e.g., Commonwealth v. Hardcastle, 549 Pa. 450, 701 A.2d 541 (1997);  Commonwealth v. Frey, 520 Pa. 338, 554 A.2d 27 (1989).

Breakiron-2, 729 A.2d at 1097.[111]  The state court recognized that the Third Circuit had rejected

---

[111]Commonwealth v. Hardcaslte, 701 A.2d 541 (Pa. 1997), cited by the Court, contained no independent analysis of the claim, but simply relied on prior Pennsylvania cases such as

its Frey analysis and had granted relief in that case, but held that it would continue to reject the

Third Circuit's rulings:

> Note, however, that the Third Circuit vacated defendant's sentence in Frey v.
> Fulcomer, 132 F.3d 916 (1997)(Becker, J.), cert. denied, --- U.S. ----, 118 S.Ct.
> 2076, 141 L.Ed.2d 151 (1998).  The Third Circuit found that an essentially similar
> jury instruction to the one at issue here improperly limited the jury's consideration
> of mitigating circumstances.  We reached a contrary result in Commonwealth v.
> Frey, 520 Pa. 338, 348, 554 A.2d 27, 31 (1989), cert. denied, 494 U.S. 1038, 110
> S.Ct. 1500, 108 L.Ed.2d 635 (1990) and we are not bound to accept the Third
> Circuit's interpretation of this issue.  Commonwealth v. Clark, 551 Pa. 258, 710
> A.2d 31 (1998) (citing Commonwealth v. Travaglia, 541 Pa. 108, 130 n. 15, 661
> A.2d 352, 366 (1995))

Id. at n.7.

In Frey, the Pennsylvania Supreme Court based its rejection of the Mills claim on the

belief that the jury instructions in that case, like those here, simply tracked the language of the

death penalty statute.  Because the statute was constitutional, the instructions tracking that statute

were, therefore, constitutional as well.  Frey, 554 A.2d at 346.

In Banks, the Third Circuit held that this statutorily based analysis was an unreasonable

application of both Mills and Boyde v. California, 494 U.S. 370 (1990).

> We must conclude that the Pennsylvania Supreme Court ruling involved an
> unreasonable application of Mills.  In fact, we conclude that the Pennsylvania
> Supreme Court ruled that there was no Mills violation without ever really
> applying the teachings of Mills, and by examining the statute, not the potential for
> confusion by jurors in what they were told to do. Further, as noted in Hackett,
> Mills itself involved a situation in which the statute had been interpreted to be
> constitutional, but the Supreme Court vacated the sentence based on the risk of
> confusion.

Banks, 271 F.3d at 544.  Accord Albrecht, 495 F.3d at 119.  Moreover, the Banks Court also held

---

Commonwealth v. Banks, 656 A.2d 467 (Pa. 1995).  As discussed throughout this claim, the
Third Circuit has determined that the Banks decision was an unreasonable application of federal
constitutional law.

that the state court's failure to examine and critique the defective verdict sheet was likewise an

unreasonable application of <u>Mills</u>:

> Thus, the structure and form of the verdict slip itself runs afoul of the dictates of
> Mills.  Further, for the Pennsylvania Supreme Court to have ruled that there was
> no Mills violation without an examination of the content and implications of the
> verdict slip and without employing the proper inquiry was an unreasonable
> application of Mills.

<u>Banks</u>, 271 F.3d at 548.

    <u>Albrecht</u> and <u>Banks</u> are controlling.  The Pennsylvania Supreme Court's approval of the

jury instructions and verdict sheet in this case was an unreasonable application of <u>Mills</u> and

<u>Boyde</u>. Petitioner is entitled to relief.

### 3.    Appellate counsel was ineffective for failing to litigate this claim

    As discussed above, the penalty phase instructions were plainly unconstitutional.

Appellate counsel failed to raise this issue on direct appeal.[112]  Appellate counsel was ineffective.

    Ineffective assistance of appellate counsel claims are judged by the <u>Strickland</u> standard.

<u>Mason v. Hanks</u>, 97 F.3d 887, 892 (7th Cir. 1996); <u>Mayo v. Henderson</u>, 13 F.3d 528, 533 (2d

Cir. 1994); <u>Matire v. Wainwright</u>, 811 F.2d 1430, 1435 (11th Cir. 1987). A defendant establishes

that he was prejudiced by appellate counsel's ineffectiveness where he shows that there was a

reasonable possibility that, but for counsel's error, there was a reasonable probability that the

outcome of the appeal would have been different.  <u>Mason</u>, 97 F.3d at 893; <u>Mayo</u>, 13 F.3d at 534;

<u>Matire</u>, 811 F.2d at 1439.  Thus, where appellate counsel fails to raise a substantial, meritorious

claim on appeal, counsel is constitutionally ineffective. <u>Id.</u>

---

[112]Although no objection was made at trial, appellate counsel could have raised this issue
under the Pennsylvania Supreme Court's relaxed waiver doctrine.

The Pennsylvania Supreme Court rejected petitioner's claim of appellate counsel's ineffectiveness both because the issue lacked merit and because trial counsel had not been questioned about any strategy he might have had for failing to raise this issue. Breakiron-2, 729 A.2d at 1097. This analysis is an unreasonable application of Strickalnd. There simply can be no reasonable strategy for failing to raise a meritorious issue on appeal in a capital case.[113] Greer v. Mitchell, 264 F.3d 663, 679 (6th Cir. 9/4/01) ("in a capital case ... appellate attorneys must err on the side of inclusion particularly where, as here, there appear to exist a significant number of facts to support the claim).

The Third Circuit's conclusion in Whitney v. Horn, 280 F.3d 240, (3d Cir. 2002), although addressed to counsel's failure to challenge an erroneous guilt phase instruction, is equally applicable here. "[W]e cannot imagine any justification for a defense attorney not attempting to correct this type of error in an instruction on the only defense his/her client could possibly have to the charge of capital murder." Whitney at 257. Thus, where, as here, the trial court has given the jury penalty phase instructions and a verdict sheet which could reasonably lead the jury to erroneously believe that the findings of mitigation must be unanimously made,

---

[113]In Commonwealth v. Townsell, 474 Pa. 563, 379 A.2d 98 (1977), the Pennsylvania Supreme Court found that appellate counsel was constitutionally ineffective for failing to raise a meritorious challenge to the impropriety of the district attorney's closing argument on appeal. Counsel explained that he did not raise the claim because he was afraid the error would be rejected as harmless and would take the focus off the good issue. The Court concluded that counsel's strategy was unreasonable. "[A] substantial matter of arguable merit is not to be abandoned on the ground that it might de-emphasize another issue . . . at the least, appellate counsel should brief each significant arguable issue. . . complete disregard of an important issue cannot be ignored as a matter of strategy." Id., 379 A.2d 101. Accord Commonwealth v. Yocham, 483 Pa. 478, 397 A.2d 766, 768 (1979) (appellate counsel failure to raise an important and meritorious issue, based on his personal view of the facts, was unreasonable and deprived defendant of ineffective assistance of appellate counsel)

appellate counsel's failure to raise that substantial, meritorious claim on appeal renders counsel

constitutionally ineffective.  The state court's contrary conclusion was an unreasonable

application of <u>Strickland</u>.

**CLAIM 11:    PETITIONER'S DEATH SENTENCE WAS ARBITRARILY IMPOSED WHERE THE JURY IRRATIONALLY FAILED TO GIVE ANY EFFECT TO UNREBUTTED STATUTORY MITIGATING FACTORS PRESENTED IN THE PENALTY PHASE.[114]**

At the sentencing hearing, Petitioner introduced some mitigating evidence relating to his

upbringing and background.  The meager evidence presented, far less than could have been

presented had a competent investigation been conducted,[115] was nevertheless uncontradicted.

Indeed, the prosecutor told the jury that "I am not going to challenge what the Reverend [and

Mrs. Breakiron] told you."  NT at 1430.

Despite the uncontroverted mitigating evidence, the jury found <u>no</u> mitigating

circumstances.  Accordingly, they were <u>required</u> by the statute to sentence him to death.  The

jury's failure to find any mitigating circumstances was likely because the trial court's instructions

on mitigating circumstances were flawed in at least two ways, <u>see</u> Claims 10A (instructions were

flawed because they required jury to be unanimous to find mitigation), and Claim 10B

(instructions allowed a finding of aggravation to prevent even <u>finding</u> any mitigating evidence)

and because of a juror's exposure to improper definitions of mitigating circumstances.  <u>See</u>

Claim 6, <u>supra</u>.  In any event, even if the instructions had been flawless, it is constitutional error

for a sentencer to fail to weigh uncontroverted mitigating evidence.  "The sentencer... may

[114]The Pennsylvania Supreme Court addressed this claim on the merits.  <u>Commonwealth v. Breakiron-1</u>, 571 A.2d 1035, 1043. Thus the §2254(d) standards are applicable.

[115]See Claim 1, <u>supra</u>.

determine the weight to be given relevant mitigating evidence.  But they may not give it *no*

weight...."  Eddings v. Oklahoma, 455 U.S.104, 114-15 (1982).

 Pastor Darwin Collins testified that Mark was a member of his church and he had known

him for around fifteen years.  Pastor Collins told the jury that Mark came from a broken home

and that he lacked the influence of a positive male role model in his life.  Mark's father did not

have much contact with him, and, as a result, Mark's development was limited.  He described

Mark as having very poor self esteem, and as the kind of person who consistently doubts himself.

NT at 1387-88.

Mark began to have trouble with alcohol and drugs by the age of fourteen.  Pastor Collins

explained that Mark had made numerous efforts over the years to come to grips with his alcohol

and drug problems and was making progress in those efforts.  Mark was transformed by alcohol,

the Pastor explained turning from his normally passive and quiet demeanor into someone who is

vocal, stronger, and far more aggressive.  NT at 1368-70.  The Pastor also told the jury that Mark

had, since the time of the killing, repeatedly expressed remorse for his actions.  NT at 1399-1403.

Mark's mother, Gloria Breakiron, testified that she divorced Mark's father when he was

about eight years old.  Mark's father had little contact with him after that divorce.  Mark began

drinking and abusing drugs as a young man and had a great deal of problems as a result.  NT at

1407 - 1411.

The Commonwealth did not challenge the veracity of this testimony and did not present

any evidence contradicting this evidence of Mark's background.  Indeed, the prosecutor told the

jury, "From the Commonwealth's point of view, I am not going to challenge what the Reverend

told you.  I wouldn't do that.  And I am not going to challenge what Mrs. Breakiron told you, his

168

mother." NT at 1430.

The evidence of Mark's upbringing, the effect of his parents' divorce, his low self esteem, his teenage alcoholism and drug use, his failed efforts to confront those problems, and his repeated expressions of remorse were unquestionably the type of mitigating evidence that a jury is required to consider in its sentencing determination.[116]  Petitioner's jury, however, failed to consider that evidence, determining instead, contrary to all the evidence presented, that there was no mitigation to consider and therefore no weighing process to engage in.

The jury's failure to weigh these unrebutted mitigating factors makes Petitioner's death sentence unconstitutional.  This unconstitutional refusal to consider statutory mitigating circumstances renders the death penalty arbitrary and irrational.

This case is controlled by Parker v. Dugger, 498 U.S. 308 (1991).  In Parker, the Florida Supreme Court considered the effect of error with respect to the aggravating circumstances found by the sentencer in a capital case.  Whether the error was prejudicial depended on whether mitigating circumstances had also been found by the sentencer.  In its consideration of the aggravating and mitigating circumstances, the state court "ignore[d] the evidence of mitigating circumstances in the record," Parker, 498 U.S. at 320, and did not find any mitigating circumstances, despite "uncontroverted" mitigating evidence in the record.  Id. at 318.  Consequently, the state court did not weigh the mitigating evidence against the aggravating circumstance and instead affirmed the death sentence based on its assumption of no mitigation.  Id. at 318, 322.

―――――――――――

[116]All these factors are relevant mitigation evidence under 42 Pa. Cons. Stat. § 9711(e)(8), anything "concerning the character and record of the defendant..."

169

The United States Supreme Court found that it was arbitrary and capricious, in violation of the Eighth Amendment, for the state court to affirm the death sentence "without considering the [uncontroverted evidence] of mitigating circumstances." Id. at 322.  In this case as in Parker, the sentencer "ignor[ed] the evidence of mitigating circumstances in the record," and imposed the death sentence arbitrarily, treating the case as one in which there was no mitigation (and thus the death sentence was mandatory on the finding of an aggravating factor) rather than as a case in which aggravating factors had to be balanced against mitigating factors.

Relief is also compelled by Eddings v. Oklahoma, 455 U.S. 104 (1982), and Penry v. Lynaugh, 492 U.S. 302 (1989).  In Eddings, the sentencer and the appellate court *failed to weigh* some of the mitigating evidence because they believed that it did not excuse the crime.  The United States Supreme Court reversed and held that the sentencer's failure to *weigh* the uncontroverted mitigating evidence violated the Eighth Amendment.  "The sentencer, and the Court of Criminal Appeals on review, may determine the weight to be given relevant mitigating evidence.  But they may not give it *no* weight...." Eddings, 455 U.S. at 114-15.  The Supreme Court held there was Eighth Amendment error despite the fact that the sentencer (and the appellate court) heard and reviewed the proffered mitigating evidence before rejecting it.  Id. at 109-10; see Eddings v. State, 616 P.2d 1159, 1169-70 (Okl.1980).[117]

Eddings thus requires a sentencer to *weigh* relevant uncontroverted mitigating evidence against the aggravating circumstances.  Mere exposure to the mitigating evidence is not enough.

---

[117]See also Eddings, 455 U.S. at 117, 119 (O'Connor J., concurring)(Eighth Amendment requires the sentencer to "consider *and weigh* all of the mitigating evidence"; where sentencer mentioned certain mitigating evidence but "believed he could not consider some of the mitigating evidence *in imposing sentence,"* Eighth Amendment was violated.

In <u>Eddings</u>, as in this case, the sentencer failed to *weigh* relevant mitigating circumstances.  By failing to find, and thus necessarily failing to weigh, the mitigating evidence, the jury necessarily gave the evidence "no weight."  In this case, as in <u>Eddings</u>, the Eighth Amendment was violated.[118]

If there was any doubt about the meaning of <u>Eddings</u>, it was removed by the Supreme Court's decision in <u>Penry</u>.  In <u>Penry</u>, the Court explained the holding of <u>Eddings</u> as follows:

> <u>Eddings</u> makes clear that it is not enough simply to allow the defendant to present mitigating evidence to the sentencer.  The sentencer must also be able to consider *and give effect to* that evidence in imposing sentence.

<u>Penry</u>, 492 U.S. at 319 (citing <u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987)).[119]

This same principle was recently reaffirmed by the Court.  On April 25, 2007, in separate 5 to 4 opinions, the United States Supreme Court reversed three death judgments rendered under Texas's former death penalty statute.  ( <u>Abdul-Kabir v. Quarterman</u> __U.S.__, 127 S.Ct. 1654,

---

[118]<u>Accord</u> <u>McDowell v. Calderon</u>, 130 F.3d 833, 837 (9th Cir. 1997) (en banc)(death sentence vacated where jury failed to consider and weigh mitigating evidence as result of jury confusion); <u>Magwood v. Smith</u>, 791 F.2d 1438, 1447-50 (11th Cir. 1986)(death penalty violates Eighth and Fourteenth Amendments where sentencer fails to find and give effect to uncontroverted mitigating circumstances; "[t]o find that mitigating circumstances do not exist where such mitigating circumstances clearly exist returns us to the state of affairs which were found by the Supreme Court in <u>Furman v. Georgia</u> to be prohibited by the Constitution.")

[119]In fact, the Eighth Amendment error in this case is even more egregious than those in <u>Parker</u>, <u>Eddings</u>, and <u>Penry</u>, because in Pennsylvania, the sentencing jurors are required to sentence the defendant to death if they find aggravation but do not find mitigation. 42 Pa. C.S. § 9711(c)(1)(iv)("The verdict *must* be a sentence of death if the jury unanimously finds at least one aggravating circumstance ... and no mitigating circumstances"). In Florida, Oklahoma, and Texas (the states from which <u>Parker</u>, <u>Eddings</u>, and <u>Penry</u>, respectively, arose), in contrast, the sentencer could sentence the defendant to life even without finding any mitigating circumstances. Here, however, once the sentencer arbitrarily failed to find the uncontroverted mitigating circumstance, it could not "give effect" to the mitigating evidence and was required by law to sentence Mr. Breakiron to death.

167 L.Ed.2d 585 (2007); Brewer v. Quarterman __ U.S.__, 127 S.Ct. 1706, 167 L.Ed.2d 632;

Smith v. Texas __U.S. __, 127 S.Ct. 1686, 167 L.Ed.2d 632).  The underlying Eighth

Amendment claim in each case was that, as a result of prosecutor's argument and/or court

instructions, the jury was not able to give "meaningful" effect to the evidence proffered in

mitigation.  The Court relied on the same analysis as in Penry and Eddings.

Judge Cohill of the U.S. District Court, Western Division of Pennsylvania affirmed a

magistrate's decision on similar grounds in Copenhefer v. Horn, 99-CV-5E (December 9, 2002).

In Copenhefer, as in Breakiron, the jury failed to find uncontroverted mitigating circumstances.

In the Report and Recommendation, the magistrate explained why the jury's failure to find

uncontroverted mitigating evidence was unconstitutional:

> Copenhefer's death sentence was just like the one invalidated in
> Parker [v. Dugger, 498 U.S. 308, 321-22 (1991).   As did the Florida
> Supreme Court in Parker, Copenhefer's jury completely ignored
> uncontested and proven mitigating evidence; it imposed death
> automatically when the law required that a weighing process take
> place, id.; and it deprived him of the individualized treatment to
> which he is entitled under the Constitution.

Copenhefer v. Horn, 99-CV-5E (August 15, 2002) R & R at 109.  The District Court Judge

affirmed this analysis noting that a jury must not merely consider but must give effect to

mitigating evidence.  Copenhefer v. Horn, 99 CV 5E, 12/9/02 Opinion at 6. The same analysis

applies to Mr. Breakiron.

The Pennsylvania Supreme Court denied relief on direct appeal:

> As this Court stated in Commonwealth v. Fahy, 512 Pa. 298, 317, 516
> A.2d 689, 698, "Under our legislative scheme, it is exclusively a jury
> question whether any mitigating factor is to be given determinative
> weight when balanced with other mitigating and aggravating
> circumstances."

<u>Breakiron-1</u>, 571 A.2d at 1043.   While it is true that it is up to the jury whether a mitigating

factor is to be given "determinative weight," that is not what happened here.   Here the jury

simply did not find uncontroverted mitigating evidence.   Since it failed to find it, it could not

give it <u>any</u> weight.[120]

      The Pennsylvania Supreme Court's summary dismissal of this claim never addressed the

questions concerning the jury's failure to find any mitigating circumstances, despite

uncontradicted and unchallenged testimony to their existence.   Instead, it appears that the Court

entirely missed the import of the jury's failure to find any mitigation.   The Court's summary

discussion of this claim was limited to its refusal to review the jury's balancing process.   Yet, in

this case, the jury never reached the balancing stage.   The claim of error presented here is focused

on the jury's failure to find, and consequent failure to consider or weigh, uncontradicted

mitigation evidence. By treating Petitioner's claim as a challenge to the jury's weighing process,

where no such weighing process occurred, and by failing to analyze the jury's refusal to consider

uncontradicted mitigation evidence, the Pennsylvania Supreme Court's analysis was both

---

[120]In <u>Commonwealth v. Rizutto</u>, 777 A.2d 1069, 1088-89 (Pa. 2001) the Pennsylvania
Supreme Court recognized that constitutional error occurs in this instance.  In <u>Rizutto</u>, the jury
found aggravation but found no mitigation, even though the parties had stipulated that the
defendant had no prior record.  <u>Rizzuto</u>, 777 A.2d 1088.

      [T]he jury failed in its statutorily imposed duty to weigh the mitigating and
      aggravating circumstances prior to reaching a conclusion as to sentence.... As the
      Jury reached its verdict on sentence without undertaking the required weighing of
      aggravating and mitigating circumstances, the trial court erred in accepting the
      jury's verdict as to the sentence of death.

<u>Id.</u> at 1089.  The prosecutor's concession in closing argument that he would not challenge the
accuracy of the mitigating evidence that was presented is no different than the prosecutor's
stipulation in <u>Rizzutto</u>.

contrary to, and an unreasonable application of, the constitutional principles that were clearly

established in Eddings, Penry, and Parker and most recently reaffirmed in Abdul-Kabir, Brewer,

and Smith v. Texas.

**CLAIM 12:    PETITIONER IS ENTITLED TO RELIEF FROM HIS DEATH SENTENCE BECAUSE IT WAS BASED UPON AN IMPROPER APPLICATION OF THE AGGRAVATING CIRCUMSTANCE OF TORTURE.[121]**

One of the aggravating circumstances found by the jury and relied upon in imposing the

death sentence was that "[t]he offense was committed by means of torture," 42

Pa.C.S. 9711(d)(8).  This aggravating circumstance was improperly applied to this case because

(1) the jury instructions as to torture were unconstitutionally vague and the Pennsylvania

Supreme Court has not applied a consistent narrowing definition to the circumstance; and (2)

Counsel was ineffective in failing to develop the forensic evidence that shows that the victim was

rendered unconscious almost immediately.

**A.    The Torture Aggravating Circumstance is Unconstitutionally Vague.**

In this case the trial court defined the "torture" aggravating factor as follows:

> The law defines torture as follows: the offense of murder committed by means of torture is designed for the defendant who causes a considerable amount of pain and that the language used for this particular aggravating circumstance is that the murder was especially heinous, atrocious, or cruel and manifesting exceptional depravity.  In order to establish that the offense was committed by means of torture, the Commonwealth must prove beyond a reasonable doubt that a defendant had the specific intent to inflict unnecessary pain, suffering or both pain and suffering in addition to the specific intent to kill.

NT 4/14/88 at 1439.   The "heinous, atrocious or cruel" language has been specifically held

---

[121]The Pennsylvania Supreme Court addressed this claim on the merits in Commonwealth v. Breakiron-2, 729 A. 2d at 1096. Thus, the standards of §2254(d) are applicable.

unconstitutional by the United States Supreme Court in <u>Maynard v. Cartwright.</u> 486 U.S. 356

(1988); <u>accord</u>, <u>Pursell v. Horn</u>, 187 F.Supp.2d 260, 399 (W.D. Pa. Feb. 1, 2002) (granting relief

on unconstitutionality of torture instructions).  Similarly, the "intention to inflict pain or

suffering" language has also been found to be unconstitutionally broad.  <u>Id.</u>

     The law controlling this issue has been clearly established by the United States Supreme

Court.  In <u>Furman v.  Georgia</u>, 408 U.S. 238 (1972), the Supreme Court held that the penalty of

death may not be imposed under sentencing procedures that create a substantial risk that the

punishment will be imposed in an arbitrary and capricious manner.  This principle was

reaffirmed in <u>Gregg v.  Georgia</u>, 428 U.S. 153 (1976), where the Court upheld the Georgia

penalty scheme and rejected a defense challenge to the vagueness and overbreadth of the

aggravating circumstance that the killing was "outrageously or wantonly vile, horrible or

inhuman in that it involved torture, depravity of mind or an aggravated battery to the victim."

Although the plurality recognized that this aggravator could be applied to any murder, the Court

assumed that the Georgia Supreme Court would not adopt "such an open-ended construction."

<u>Id.</u> at 201.

     In <u>Godfrey v. Georgia</u>, 446 U.S. 420 (1980), the Court revisited the application of this

aggravating circumstance in Georgia.  The Court reiterated its fundamental premise that, for a

death sentence to withstand constitutional scrutiny, a State must "channel the sentencer's

discretion by clear and objective standards that provide specific and detailed guidance and that

make rationally reviewable the process for imposing a sentence of death."  <u>Id.</u> at 428.   The

language of the Georgia statute, however, did not comport with that basic requirement.  The

Court found that the words "outrageously or wantonly vile, horrible or inhuman" did not,

standing alone, imply "any inherent restraint on the arbitrary and capricious infliction of the death sentence." Id. at 428-29.   As a result, there was no principled way to distinguish that case, in which the death penalty was imposed, from the many where it was not, and the Court struck down the death sentence. Id. at 433.

In Maynard v. Cartwright, 486 U.S. 356 (1988) the unanimous Supreme Court, applying Godfrey, held that the phrase "especially heinous, atrocious or cruel" is unconstitutionally vague in defining an aggravating circumstance:

> [T]he Court of Appeals was quite right in holding that Godfrey controls this case.   First the language of the Oklahoma aggravating circumstance at issue -- "especially heinous, atrocious, or cruel" -- gave no more guidance than the "outrageously or wantonly vile, horrible or inhuman" language that the jury returned in its verdict in Godfrey.  The State's contention that the word "especially" somehow guides the jury's discretion, even if the term "heinous" does not, is untenable.  To say that something is "especially heinous" merely suggests that the individual jurors should determine that the murder is more than just "heinous" whatever that means...

Maynard at 363-64.  The "especially heinous, atrocious, or cruel" language found unconstitutional by the Supreme Court in Maynard is identical to the instructions given in this case.  See also Espinosa v. Florida, 505 U.S. 1079, 1081 (1992) (per curiam) ("especially wicked, evil, atrocious, or cruel" instruction no less vague than instructions found lacking in Maynard, and Godfrey).   "By equating torture with [heinous, atrocious, or cruel], a clearly unconstitutional phrase, the trial judge instructed the jury in away that was unconstitutionally vague itself."  Pursell, 187 F.Supp.2d at 390.[122]

---

[122]Nor does the phrase, "manifesting exceptional depravity" survive constitutional scrutiny. As the Pursell court noted, "the use of the word depravity, even when accompanied by the words, especially heinous, or cruel is unconstitutionally vague." Id. at 391.

The second part of the trial court's instruction, that the defendant intend to cause pain, is also constitutionally deficient. Then Chief (now Circuit) Judge Smith in Pursell also explained why the "intention to inflict pain or suffering" language is unconstitutionally broad:

> Little imagination is needed to catalog the class of cases that fall within this instruction's expansive reach. It is the extremely rare murderer who does not also have the intent to cause pain and suffering to his victim.... [i]n virtually all cases of murder the perpetrator inflicts terrible pain and suffering on the victim and by definition, the person who inflicts the killing upon the other does so with specific intent.

Pursell at 394. Consequently, the "instruction was too broad to aid the jury in distinguishing between those murder that are subject to the death penalty and those that are not." Id. [123]

### 1.     The Pennsylvania Supreme Court's Opinion is "contrary to" and "an unreasonable application of" Federal Law.

The Pennsylvania Supreme Court addressed this claim on the merits in Breakiron-2, 729 A.2d at 1096. The Court rejected this claim because:

> Breakiron's suggested interpretation of Maynard [v. Cartwright, 486 U.S. 356 (1988)] is incorrect. Maynard held that a jury instruction that defined an aggravating circumstance only as a murder that was "especially heinous, atrocious or cruel," without any additional limiting construction was unconstitutionally vague. However, such language was not constitutionally deficient if limited to circumstances of torture or serious physical abuse, as was done in this case. The torture instruction given in this case was not vague

_____

[123]The Pursell court noted that this error was exacerbated by the prosecutor taking advantage of the broad definition of torture. Pursell at 392. The same thing occurred in this case. The prosecutor took advantage of the vague definition by framing the issue as whether or not the victim was alive – rather than conscious – when she was stabbed. Of course, whatever wounds the victim suffered while unconscious caused no pain. Under the prosecutor's construction of the aggravator, however, that was irrelevant. Indeed he emphasized in closing argument that he asked the pathologist if any of the victim's wounds would have brought about instantaneous death. NT at 1429. This misleading argument highlights the overbreadth of the definition of torture used in this case.

under the <u>Maynard</u> analysis, and Breakiron's claim lacks merit.

<u>Id.</u>   The <u>Maynard</u> court, however, was discussing <u>appellate</u> review and reconsideration of the sentence  -- not instructions to the jury.  <u>See</u> <u>Maynard</u> at 366 (noting that the Oklahoma Court of Criminal Appeals has begun to review sentences for whether torture or serious physical abuse is present.)

 "Where the death sentence has been infected by a vague or otherwise constitutionally invalid aggravating factor, the state appellate court ... must actually perform a new sentence calculus if the sentence is to stand." <u>Pursell</u> at 398.  Pennsylvania, unlike Oklahoma, does not undertake appellate review of the sentences in this fashion.  <u>Id.</u>  "In the present case, the Pennsylvania Supreme Court performed no such calculus.  It did not expressly adopt a narrowing construction of torture; it did not reweigh the aggravating and mitigating circumstances; and it did not perform a harmless error analysis." <u>Id.</u>  Consequently, the Pennsylvania Supreme Court's reliance on the appellate reweighing referenced in <u>Maynard</u> is simply irrelevant to whether there is a reasonable likelihood that the jury understood the instructions in an unconstitutionally broad fashion.

Moreover, as Chief Judge Smith concluded, the intent to cause pain instruction did not accomplish the constitutionally required narrowing because it "was too broad to aid the jury in distinguishing between those murders that are subject to the death penalty and those that are not." <u>Pursell</u> at 394. Consequently, the Pennsylvania Supreme Court's rejection of this claim is an unreasonable application of <u>Maynard</u> and its progeny.

**2.     Conclusion**

As this Court found in <u>Pursell</u>, both the "heinous, atrocious, and cruel" and "intent to

cause pain" instructions did not meaningfully distinguish the few murders deserving of the death penalty from the many that do not. Consequently, Mr. Breakiron's death sentence violates the Eighth Amendment.

**B.    Counsel was ineffective in failing to develop evidence that the victim was not tortured.[124]**

Trial counsel was ineffective for failing to properly investigate and elicit evidence that the victim was unconscious almost immediately and that the victim's wounds were inconsistent with intent to torture or cause pain.

Under Strickland v. Washington, counsel has a duty to investigate. See cases cited supra in Claim 1. "The basic concerns of counsel during a capital proceeding are to neutralize the aggravating circumstances advanced by the state, and to present mitigating evidence." Starr v. Lockhart, 23 F.3d 1280, 1285 (8th Cir. 1994). Here counsel's failure to investigate the facts surrounding the victim's death left him unable to rebut the torture aggravating circumstance.

Petitioner was prejudiced by counsel's failure to investigate. Had he done so, he would have learned that the victim in this case incurred severe injuries which rapidly rendered her unconscious and which were characteristic of a "rage reaction" not torture. Undersigned counsel asked Dr. John Smialek, a nationally noted forensic pathologist, to examine the autopsy results in this case. He found :

> From my review of this case, it is my medical opinion that Saundra Marie Martin was rendered unconscious shortly after she was attacked by the quantity and severity of the injuries she sustained. The autopsy indicates a furious assault inflicted by the assailant on the victim which include:

---

[124]This Claim was raised in Breakiron-3. Because the Pennsylvania Supreme Court did not address this claim on the merits, this Court must review this claim de novo.

A) Multiple blows to the head which resulted in:
    1) Fracture of the base and convexity of the skull.
    2) Contusions of the left temporal lobe.
    3) Subarachnoid hemorrhage
    4) Fracture of facial bones, left side.
    5) Laceration of right eyebrow

B) Multiple stab wounds of the:
    1) Head:
        (a) Left ear penetrating the left temporal fossa and lacerating the brain.
        (b) Cuts of scalp and left ear.

    2) Neck:
        a) Stab wound of the left side of the neck with laceration of left jugular vein and carotid artery.
        b) Cuts of the anterior and lateral side of the neck (4).

    3) Chest and Abdomen:
        Eighteen Stab wounds of the back of the left lower chest, abdomen, and lower back which involved both lungs, liver, left kidney, stomach and diaphragm and included two rib fractures.

Ms. Martin's death was caused by a brief overwhelming attack. *The repeated blows to the head and the severing of her left carotid artery would cause loss of consciousness by Ms. Martin due to lack of arterial blood flow to her brain within one or two minutes at most. If she had continued to breath and struggle for a longer time evidence of aspirated or swallowed blood resulting from bleeding into her airway would have been evident.*

There is no evidence of wound patterns inflicted for torturing or inflicting pain to the victim. The characteristics of such wounds are superficiality and multiplicity. In contrast, the severity of the wounds inflicted here indicate strenuous efforts by the assailant to inflict immediately fatal injuries, characteristic of a "rage reaction."

180

> The medical bases supporting my opinions were all in existence in 1988 and were accepted within the medical community at that time.

<u>Affidavit of Dr. John Smialek</u>.

Thus the medical evidence <u>disproved</u> the prosecution's contention that the victim suffered for an extended period of time.   In short, the forensic evidence is clear that victim was quickly rendered unconscious by the overwhelming number of fatal wounds.  Such evidence is inconsistent with torture or any intent to cause pain and is characteristic of an explosive "rage reaction" by the assailant.[125]   In short, the medical evidence makes it clear that: 1) Petitioner did not intend to torture or deliberately inflict unnecessary pain to the victim; 2) the victim suffered little pain because she was quickly unconscious.

Defense counsel failed to conduct an appropriate investigation into the medical evidence. Not only did counsel fail to seek independent expert analysis of the medical evidence, counsel failed to even ask the testifying pathologist the relevant questions necessary to undermine the Commonwealth's theory of torture.  Trial counsel simply failed to develop the critical medical information that the wounds suffered by the victim meant that she was unconscious almost immediately.  Similarly, counsel failed to elicit the fact that the wounds suffered by the victim were inconsistent with an intent to cause pain or torture the victim.  The severity and sudden quantity of the wounds suffered by the victim indicate that the Commonwealth's hypothesis that the defendant intended to cause pain is simply false.  Because trial counsel never asked Dr.

---

[125]    See Claim 1, <u>passim</u>, discussing Petitioner's blackout, Alcohol Dependence, and Intermittent Explosive Disorder.

181

Pelaez about the victim's consciousness or whether the wounds were inconsistent with torture, he never developed substantial evidence to rebut the Commonwealth's aggravating circumstance.

Petitioner was prejudiced by counsel's failure to investigate. Had he done so, he would have learned that the victim in this case incurred severe injuries which rapidly rendered her unconscious and which were characteristic of a "rage reaction" not torture. See Affidavit of John Smialek. In short, the medical evidence makes it clear that: 1) Petitioner did not intend to torture or deliberately inflict unnecessary pain to the victim; 2) the victim suffered little pain because she was quickly unconscious.

Trial counsel failed in their fundamental duty to conduct an independent and thorough investigation of the facts of the crime, contrary to the prevailing professional norms. The duty to investigate has been long recognized by the Supreme Court and under the ABA Guidelines. Counsel's failure to investigate meant that substantial and compelling medical evidence went undiscovered by counsel.

Petitioner was prejudiced by this failure. Because of counsel's deficient performance the jurors that sentenced Breakiron to death never had a chance to consider the medical evidence that rebutted the aggravating circumstance offered by the Commonwealth. Prejudice is demonstrated under the prejudice prong of the Strickland test for ineffective assistance of counsel if "there is a reasonable probability that at least one juror would have struck a different balance." Wiggins, 539 U.S. at 537. At the very least, petitioner is entitled to a hearing on this claim.[126]

---

[126]Mr. Breakiron is entitled to an evidentiary hearing on this claim if he "alleges facts which, if proven would entitle him to relief," and "where the facts are in dispute." Townsend v. Sain, 372 U.S. at 312-313. He did not fail to develop the factual basis of this claim in State court proceedings for the purposes of 28 USC § 2254 (e)(2) because he requested an evidentiary hearing on this claim in state court. Pursell v. Horn at 296-97 (because Pennsylvania Supreme

C.    **Insufficient Evidence of Torture**[127]

Finally, even accepting arguendo, the trial court's erroneous instructions as to this aggravating circumstance, there was also insufficient evidence for any juror to find that the Petitioner accomplished the murder by means of torture beyond a reasonable doubt.   A state court's finding of an aggravating circumstance is subject to a review for sufficiency in the same manner as a finding of guilt.  Lewis v. Jeffers, 497 U.S. 764, 781-83 (1990) (the Eighth and Fourteenth Amendments require that a habeas court utilize standard set forth in  Jackson v. Virginia, 443 U.S. 307 (1979) to determine whether an aggravating circumstance is supported by sufficient evidence).  Therefore, in applying the Jeffers/Jackson standard to the aggravating circumstance in this case, this Court must determine whether any rational factfinder could have found that Petitioner "had a specific intent to commit unnecessary pain, suffering, or both pain and suffering in addition to the specific intent to commit murder."

The Commonwealth's evidence failed to meet this standard.  While the victim suffered numerous wounds, there was no evidence that she was conscious.  The evidence of the deceased's injuries alone can not sustain the finding of torture in the absence of any other evidence that Petitioner acted with an intent to torture.  See Commonwealth v. Auker, 545 Pa. 521,  681 A.2d 1305, 1321-22 (1996) (evidence that defendant placed victim in back of car, drove her to a wooded location and then stabbed her 7-10 times was insufficient to establish aggravating circumstance of torture).  Thus, there was no evidence from which a rational

Court's conclusion that claim was procedurally defaulted was not adequate for the purposes of federal court review, no impediment to hearing on claim).

[127]The Pennsylvania Supreme Court addressed this claim on the merits in Commonwealth v. Breakiron-1, 571 A.2d 1040-41.

factfinder could conclude, beyond a reasonable doubt, that the victim was tortured or that any of the injuries that the victim suffered were intended by the assailant to cause unnecessary pain beyond that encompassed by the intent to kill.  The evidence in this case was insufficient, in violation of Petitioner's rights under the Eighth and Fourteenth Amendments.

The Pennsylvania Supreme Court's contrary conclusion in <u>Breakiron-1</u>, 571 A.2d at 1040-41, fails to identify the standard of review applied to Petitioner's challenge to the sufficiency of evidence of the torture aggravator and, therefore, is contrary to <u>Jackson</u> and <u>Jeffers</u>.  Moreover, even if it is assumed that the Court applied a constitutionally correct standard of review, its application of that standard to the facts of this case was unreasonable.  Had the jury been properly instructed on torture, they could not have found the death was accomplished by means of torture.  Petitioner is entitled to relief.

**CLAIM 13:**  **PETITIONER'S DEATH SENTENCE MUST BE VACATED WHERE THE TRIAL COURT PRECLUDED THE DEFENSE FROM ELICITING RELEVANT MITIGATING EVIDENCE AND ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE AND LITIGATE THESE ISSUES.**[128]

Mark Breakiron's mother testified in his behalf at the sentencing hearing.  During the course of that testimony, counsel asked Mrs. Breakiron, "When he was growing up and even now, what kind of feelings does Mark have in regard to the love of his family?"  The prosecutor's objection to this question was sustained.  NT at 1411.  Counsel later asked, "and because of drugs and alcohol he had problems?"  The prosecutor again successfully objected, arguing that "[t]his is not the purpose of this proceeding or the purpose of this witness' testimony."  <u>Id.</u>

---

[128]This claim was raised in <u>Breakiron-3</u>.  Because the Pennsylvania Supreme Court did not address this claim on the merits, this Court must review this claim <u>de novo</u>.

184

The trial court erred in precluding the defense from offering his mother's testimony

concerning Mark's feelings of love for his family as well as her identification of Mark's

problems with alcohol and drugs as the source of his problems. The Eighth and Fourteenth

Amendments require that a capital defendant be permitted to present, and the jury be allowed to

consider and give mitigating effect to, "any aspect of a defendant's character or record and any of

the circumstances of the offense that the defendant proffers as a basis for a sentence less than

death." Lockett v. Ohio, 438 U.S. 586, 604-05 (1978).   "Any exclusion of the 'compassionate or

mitigating  factors stemming from the diverse frailties of humankind' ... would fail to treat all

persons as 'uniquely individual human beings" and violate the Eighth Amendment." McCleskey

v. Kemp,  481 U.S. 279, 304 (1987) (quoting Woodson v. Ohio, 428 U.S. 280, 304 (1976)).

Here, the Eighth and Fourteenth Amendments were violated when the trial court excluded

evidence from Petitioner's mother relating to his family relationships [129] and to his problems with

alcohol and drugs.[130]

---

[129]Hitchcock v. Dugger, 481 U.S. 397-98 (1987)(relevant mitigating evidence includes poverty and positive family relationships); Richmond v. Lewis, 506 U.S. 40, 44 (1992) (mitigating circumstances include that "the Defendant's family ... will suffer considerable grief as a result of any death penalty that might be imposed").  Moreover, numerous cases have found defense counsel ineffective for failing to present evidence of a defendant's family relationships. E.g. Collier v. Turpin, 177 F.3d 1184 (11th Cir. 1999) (counsel was ineffective for failing ot present evidence of defendant's positive family relationships); Bean v. Calderon, 163 F.3d 1079 (9th Cir. 1998) (traumatic childhood, mental illness, drug use); Dobbs v. Turpin, 142 F.3d 1383, 1388 (11th Cir. 1998) (traumatic childhood); Smith v. Stewart, 140 F.3d 1263 (9th Cir. 1998) (mental illness, traumatic childhood, positive family relationships); Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992) (positive family relationships); Harris v. Dugger, 874 F.2d 756 (11th Cir. 1989) (positive family relationships); Torres-Arboleda v. Dugger, 636 So. 2d 1321 (Fla. 1994) (adaptability to prison, poverty, positive family relationships); State v. Johnson, 494 N.E.2d 1061 (Ohio 1986) (supportive family).

[130]Numerous cases explain that a capital sentencer cannot be precluded from considering and giving mitigating effect to the defendant's history of alcoholism and/or other substance

The United States Supreme Court has consistently held that, in order for a death sentence to be constitutional, the defendant must have an unlimited opportunity to present mitigating evidence.[131] In Eddings v. Oklahoma, 458 U.S. 104 (1982), the sentencing judge indicated that he would not consider in mitigation the circumstances of Eddings' unhappy upbringing and emotional disturbance.  Id. at 109.  The Supreme Court found that court's refusal to consider the mitigating evidence of the defendant's family history violated the Constitution.

> Just as the state may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.

Id. at 113-14.

There can be no doubt that evidence of the defendant's family relationships and the nature of his troubled childhood falls within the wide boundaries of permissible mitigation.  As the Court said in Eddings, "Evidence of a difficult family history and of emotional disturbance is

---

abuse.  E.g., Tennard v. Dretke,124 S.Ct. 2562, 2569-72 (2004) (jury instructions did not allow jury the opportunity to consider the mitigating evidence presented); Smith v. Texas, 125 S.Ct. 400, 404-05 (2004) (same). Hargrave v. Dugger, 832 F.2d 1528, 1534 (11th Cir. 1988) (en banc) (death sentence violates Eighth Amendment when jury is not allowed to consider and give mitigating effect to history of drug abuse); Mason v. State, 597 So.2d 776, 780 (Fla. 1992) (same); Jackson v. Herring, 42 F.3d 1350, 1365 & n.42 (11th Cir. 1995) (counsel was ineffective for failing to present history of alcoholism); Kenley v. Armontrout, 937 F.2d 1298 (8th Cir. 1991) (same); Eutzy v. Dugger, 746 F. Supp. 1492, 1497-98 (N.D. Fla. 1989) (same); People v. Howery, 687 N.E.2d 836 (Ill. 1997) (same); Middleton v. Dugger, 849 F.2d 491 (11th Cir. 1988) (counsel ineffective for failing to investigate and present history of alcohol and drug abuse); People v. Ruiz, 686 N.E.2d 574 (Ill. 1997) (same); Williamson v. Ward, 110 F.3d 1508 (10th Cir. 1997) (same); People v. Ledesma, 729 P.2d 839 (Cal. 1987) (same); Hendricks v. Calderon, 70 F.3d 1032 (9th Cir. 1995) (same); Hildwin v. Dugger, 654 So.2d 107 (Fla. 1995) (same); People v. Perez, 592 N.E.2d 984 (Ill. 1992) (same); Morgan v. Florida, 639 So. 2d 6, 14 (Fla. 1994) (same).

[131]Accord Osborn v. Shillinger, 861 F.2d 612 n.16 (10th Cir. 1988) (that the state cannot impede or restrict a juror's consideration of relevant mitigating circumstances is "the clearest principle in modern death penalty jurisdiction").

typically introduced by defendants in mitigation."  458 U.S. at 113.

The Supreme Court has consistently adhered to the <u>Lockett/Eddings</u> rule.  In <u>Skipper v. South Carolina</u>, 476 U.S. 1 (1986), the court held that the exclusion of evidence of a defendant's good behavior in jail since his incarceration was constitutional error which necessitated the reversal of his death sentence.  And in <u>Hitchcock v. Dugger</u>, 481 U.S. 393 (1987), Justice Scalia, writing for a unanimous court, struck down a death sentence where the advisory jury and the sentencing judge were precluded from considering mitigation evidence that did not fall within the elements of mitigation specifically set forth in the Florida statute.  <u>See</u> also <u>Penry v. Lynaugh</u>, 492 U.S. 302, 319-20, 328 (1989) (jury must be instructed that it can give mitigating effect to evidence of defendant's abused childhood).

As Mark's mother, Mrs. Breakiron was unquestionably competent to testify about the nature of the family relationships in her family, about Mark's feelings towards his family and about the source of Mark's problems during his childhood and adolescence.  Petitioner was constitutionally entitled to present that evidence to the jury.

The error cannot be harmless under <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993).[132]   In a state such as Pennsylvania, in which the jury has discretion to impose a life sentence if even a single juror is convinced by a preponderance of the evidence of the existence of even a single mitigating factor, the harmlessness inquiry focuses on the probable effect of the court's errors on a single juror.  <u>E.g.</u>, <u>Frey v. Fulcomer</u>, 974 F.2d 348, 368 (3d Cir. 1992) (prejudice means reasonable probability that "at least one juror would have decided differently and held out for a verdict of life imprisonment"); <u>Jermyn v. Horn</u>, 266 F.3d 257, 309 (3d Cir. 2001).   If even a

_____

[132]The proper application of the <u>Brecht</u> standard is discussed in Claim 3, <u>supra</u>.

187

single juror reasonably could have found a mitigating circumstance that was not found, or might have balanced the aggravating and mitigating circumstances found differently, the error cannot be harmless.  Here, the jury announced that they had found no mitigation and, therefore, did not even attempt to weigh the mitigating evidence against the aggravating circumstances.  The excluded testimony would reasonably have required the jury to find mitigation and engage in that weighing process where, if only one juror concluded that the aggravating circumstances did not outweigh that mitigation, Petitioner would have been sentenced to life.  Mr. Breakiron was prejudiced by the court's error.

For all of these reasons, Petitioner is entitled to sentencing phase relief.

**CLAIM 14:**       **PETITIONER IS ENTITLED TO A NEW SENTENCING HEARING WHERE THE PROSECUTOR ENGAGED IN CONSTITUTIONALLY IMPROPER CLOSING ARGUMENT AT SENTENCING AND WHERE ALL PRIOR COUNSEL WERE INEFFECTIVE FOR FAILING TO LITIGATE THESE ISSUES.[133]**

A prosecutor's proper concern in a criminal prosecution "is not that it shall win a case, but that justice shall be done."  Berger v. United States, 295 U.S. 78, 88 (1935); United States v. Modica, 663 F.2d 1173, 1181 (3rd Cir. 1981).  While a prosecutor "may strike hard blows, he is not at liberty to strike foul ones."  Berger, 295 U.S. at 88.   When a prosecutor's argument infects the trial with unfairness, due process is violated.  Moore v. Morton, 255 F.3d 95, 105-06 (3d Cir. 2001); Lesko v. Lehman, 925 F.2d 1527, 1546 (3d Cir. 1991).  Even where individual remarks by themselves do not create a due process violation, their cumulative effect may.  Id.;[134] Cf.

_____

[133]This claim was raised in Breakiron-3.  Because the Pennsylvania Supreme Court did not address the merits of this claim, this Court's review is de novo.

[134]See also Floyd v. Meachum, 907 F.2d 347, 355 (2nd Cir. 1990) (cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense violated due process where the only curative instruction was

Donnelly v. DeChristoforo, 416 U.S. 637, 645 (1974) (setting out standard and finding no due process violation where prosecutor made an isolated, ambiguous comment which was followed by specific disapproving instructions).   On habeas review of a prosecutor's argument, under established United States Supreme Court precedent, a reviewing court must examine the prosecutor's offensive actions in the context of the entire trial, assessing the severity of the conduct, the effect of the curative instructions and the quantum of evidence against the defendant.  Moore, 255 F.3d at 107.

The Third Circuit has held that these principles are particularly applicable in the penalty phase of a capital case:

> The sentencing phase of a death penalty trial is one of the most critical proceedings in our criminal justice system.  It is clearly the most critical legal proceeding from the standpoint of the defendant whose life is at stake. Because of the surpassing importance of the jury's penalty determination, a prosecutor has a heightened duty to refrain from conduct designed to inflame the sentencing jury's passions and prejudices.  [The statement from Berger quoted above] applies with particular force to the prosecuting attorney in the penalty phase of a capital case.

Lesko v. Lehman, 925 F.2d 1527, 1541 (3d Cir. 1991).

Where the trial court does not correct the prosecutor's improper arguments, "the effect is the same as if the trial court had actually instructed the jury that the prosecutor's comments represented a correct statement of the law."  Mann v. Dugger, 844 F.2d 1446, 1457 (11th Cir. 1988) (citing Tucker v. Kemp, 802 F.2d 1293, 1295 (11th Cir.1986) (en banc)); Lesko, 925 F.2d at 1546-1547.

In this case, the prosecutor's closing at penalty phase was filled with improper and highly

---

the standard instruction that counsel's arguments are not evidence); Davis v. Zant, 36 F.3d 1538, 1550 (11th Cir. 1994) (prosecutor's conduct as a whole violated due process)

prejudicial arguments, which suggested that the jury should sentence Mr. Breakiron to death for

reasons having nothing to do with any of the potentially applicable statutory aggravating

circumstances.  The argument was "directed to passion and prejudice rather than to an

understanding of the facts and the law." Lesko, 925 F.2d at 1545.  It was "calculated to incite an

unreasonable and retaliatory sentencing decision, rather than a decision based on a reasoned

moral response to the evidence." Id.  A sentence of death cannot stand when the prosecutor has

made arguments that may have misled the jury into imposing the sentence for irrelevant or

impermissible reasons. Commonwealth v. Morales, 701 A.2d 518, 528 (Pa. 1997);

Commonwealth v. LaCava, 666 A.2d 221, 237 (Pa. 1995).  See also  Caldwell v. Mississippi,

472 U.S. 320 (1985); Wilson v. Kemp, 777 F.2d 621, 626 (11th Cir. 1985).   Both individually

and cumulatively, the prejudicial effects of the prosecutor's closing argument undermined the

fairness and reliability of the sentencing proceeded and denied Petitioner his rights under the

Sixth, Eighth and Fourteenth Amendments

### A.    The "Show Him The Same Mercy" Argument

A common theme throughout the prosecutor's argument urged the jury to show Petitioner

the same mercy that he had shown to the deceased at the time of the killing.  The prosecutor

argued:

> The defendant asks for mercy, ladies and gentlemen, and
> I ask you to show him the same mercy that he showed Sandra
> Marie Martin.

> Mr. Bower (Defense counsel):          Objection

> The Court: Overruled

> When she extended her hands to protect herself and

190

received those defensive wounds.   I am asking you to show him
the same mercy.  No more.  No less.

NT 4/14/88 at 1433.

The prosecutor returned to this theme towards the close of argument:

Should the defendant be given his life?  Should he be
allowed to live?  That is what he is asking you.  And I'm asking
you that that same consideration should have been given to Sandra
Marie Martin.  Consider what the determination, who made it and
what it was on the night of March 31, 1987 and the early morning
hours.  Consider who was determining life and death at that time.
And then consider giving that person the exact same consideration.

Mr. Bower:      Objection.  Considering the law.

The Court:      Overruled.

Id. at 1437.

A capital sentencing scheme cannot be constitutional unless it allows the jury to "show

mercy" and impose a life sentence "no matter how egregious the crime or dangerous the

defendant . . . .  [T]he suggestion that mercy is inappropriate was not only a misrepresentation of

the law, but it withdrew from the jury one of the most central sentencing considerations, the one

most likely to tilt the decision in favor of life."  Lesko v. Lehman, 925 F.2d 1527, 1545 (3d Cir.

1990) (quoting Drake v. Kemp, 762 F.2d 1449 (11th Cir. 1985)); see also Wilson v. Kemp, 777

F.2d 621, 624 (11th Cir. 1985) ("the validity of mercy as a sentencing consideration is an implicit

underpinning of many United States Supreme Court decisions in capital cases") (citing Woodson

v. North Carolina, 428 U.S. 280 (1976); Lockett v. Ohio, 438 U.S. 586 (1978)).

Here, the prosecutor told the jury that it should not show mercy to Petitioner because he

had shown no mercy to the victim -- i.e., Petitioner was entitled to no more mercy than that

191

<u>received by the victim</u>.  Courts have consistently condemned such arguments.  "[T]he prosecutor exceeded the bounds of permissible advocacy by imploring the jury to make its death penalty determination in the cruel and malevolent manner shown by the defendant[]."  <u>Lesko</u>, 925 F.2d at 1545.  <u>Accord</u>  <u>Romine v. Head</u>, 253 F.3d 1349, 1366-68 (11th Cir. 2001) (prosecutor's no mercy argument violated basic constitutional principles of capital sentencing) .

Defense counsel properly objected to the prosecutor's improper comments, but the trial court failed to correct the prosecutor's error.

**B.    "The Bible Demands the Death Penalty" Argument**

The prosecutor closed his argument with a series of Biblical references that the death penalty was the <u>only</u> permissible punishment for any murder:

> Ladies and Gentlemen, from the Bible, Exodus, Chapter 21, the law as related to justice, "He that striketh a man with a will to kill him shall be put to death."  From Leviticus, "He that striketh and killeth a man dying, let him die."  And finally, ladies and gentlemen, from Numbers, "If any man strike with iron and he die that was struck, he shall be guilty of murder and he himself shall die."  Ladies and gentlemen, on behalf of the Commonwealth, let the punishment fit the crime."

NT 4/14/88 at 1438.

The prosecutor's reliance on the Bible as justification for the imposition of the death penalty was constitutionally improper and violated the Eighth and Fourteenth Amendments.  In <u>Sandoval v. Calderon</u>, 241 F.3d 765 (9th Cir. 2001), the Court held that the prosecution's closing argument in penalty phase of capital trial, which invoked religious authority to justify imposition of death sentence, was both improper and highly prejudicial, in violation of defendant's constitutional rights.

The Court held:

> any suggestion that the jury may base its decision on a "higher law" than that of the court in which it sits is forbidden. *See Jones v. Kemp,* 706 F.Supp. 1534, 1558-59 (N.D.Ga.1989); *Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 644 (1991). The obvious danger of such a suggestion is that the jury will give less weight to, or perhaps even disregard, the legal instructions given it by the trial judge in favor of the asserted higher law.
>
> In a capital case like this one, the prosecution's invocation of higher law or extra-judicial authority violates the Eighth Amendment principle that the death penalty may be constitutionally imposed only when the jury makes findings under a sentencing scheme that carefully focuses the jury on the specific factors it is to consider in reaching a verdict. *See Godfrey v. Georgia,* 446 U.S. 420, 428, 100 S.Ct. 1759, 64 L.Ed.2d 398 (1980) (holding that capital sentencing statutes must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death") (internal citations and quotation marks omitted). The Biblical concepts of vengeance invoked by the prosecution here do not recognize such a refined approach. *See Jones,* 706 F.Supp. at 1559-60; *cf. Tison v. Arizona,* 481 U.S. 137, 180-81, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987) (Brennan, J., dissenting) (noting the "crude proportionality of 'an eye for an eye'"); *Coker v. Georgia,* 433 U.S. 584, 620, 97 S.Ct. 2861, 53 L.Ed.2d 982 (1977) (Burger, C.J., dissenting) ("As a matter of constitutional principle, [the Eighth Amendment proportionality] test cannot have the primitive simplicity of 'life for life, eye for eye, tooth for tooth.'").
>
> Argument involving religious authority also undercuts the jury's own sense of responsibility for imposing the death penalty. The Supreme Court has disapproved of an argument tending to transfer the jury's sense of sentencing responsibility to a higher court. *See Caldwell v. Mississippi,* 472 U.S. 320, 330-34, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985) (holding that a prosecutor's argument that the jury's capital sentencing decision was not final because it would be reviewed by an

193

appellate court unconstitutionally encouraged the jury to delegate its feeling of responsibility for the defendant's sentence to the appellate court). A fortiori, delegation of the ultimate responsibility for imposing a sentence to divine authority undermines the jury's role in the sentencing process.

For these reasons, religious arguments have been condemned by virtually every federal and state court to consider their challenge. *See Coe v. Bell,* 161 F.3d 320, 351 (6th Cir.1998); *Bennett v. Angelone,* 92 F.3d 1336, 1346 (4th Cir.1996); *Cunningham,* 928 F.2d at 1019- 20; *United States v. Giry,* 818 F.2d 120, 133 (1st Cir.1987); *Chambers,* 599 A.2d at 644; *People v. Eckles,* 83 Ill.App.3d 292, 38 Ill.Dec. 934, 404 N.E.2d 358, 365 (1980); *State v. Wangberg,* 272 Minn. 204, 136 N.W.2d 853, 854-55 (1965).

Id., 241 F.3d at 776-78. Here, as in Sandoval, the prosecutor's argument injected issues other than those presented by the evidence and the law, pandered to the jury's biases and sympathies, violated the Eighth Amendment principle that death penalty be imposed based on jury's weighing only of applicable factors, and undercut jury's sense of responsibility for imposing death penalty.

The Eleventh Circuit Court of Appeals reached a seemlier result in Romine v. Head, 253 F.3d 1349 (11th Cir. 2001). The Court found that the prosecutor's use of Scripture in his penalty phase closing argument to suggest that, according to the Bible, the death penalty was mandatory punishment for one convicted of murder was contrary to the constitutional principles underlying capital sentencing and denied defendant a fair sentencing hearing. Id., 253 F.3d at 1366.

Nor can the prosecution's argument be justified as fair response to the defense closing. Although defense counsel referred to the "Christian" principle of mercy, NT at 1427, it was only a general reference and did not urge the jurors to apply Biblical law in its deliberations. See Sandoval, 241 F.3d at 777 (prosecutor's Biblical argument was not "fair response" to defense

194

counsel"s references to "playing God" and the doctrine of "an eye for an eye").

The prosecutor ended his closing argument with the citations to Biblical authority. Clearly the purpose of that argument was to convince the jury to reject mercy and, instead, follow the dictates of the Bible which, in his view, prescribe a death for a death. As in <u>Sandoval</u>, the prosecutor's argument in this case was not harmless:

> The prosecutor in this case, although reminding the jury on various occasions that its duty was to determine whether the evidence in aggravation substantially outweighed the mitigating evidence and to follow the trial court's instructions, clearly intended to appeal to religious authority and did so repeatedly. The prosecutor meant this argument to have an effect on the jury. We think it did. At a minimum, we have grave doubts about the harmlessness of the error and therefore grant relief.

<u>Id.</u>, 241 F.3d at 780. <u>See also</u> <u>Romine</u>, 253 F.3d at 1369 (trial court's general instructions about closing arguments did not cure harm of Biblical argument and habeas relief was required despite the absence of defense objection).

Nor did the defense counsel's general invocation of "the Christian doctrine of mercy" justify the prosecutor's thoroughly improper comments. Defense counsel's mention of generic Christian principles of mercy hardly justified the Bible quoting, death demanding end of the prosecutor's argument. The prosecutor did not merely refer to generic biblical principle, but quoted three specific portions of the Bible, all of which suggested that death was the <u>mandatory</u> penalty for any killing. Nothing defense counsel said justified this biblical demand for death. Similarly, in <u>Sandoval</u>, defense counsel suggested to the jury that it was playing God, and urged them not to apply "an eye for an eye, a tooth for a tooth . . ." <u>Id.</u>, 241 F.3d at 777, n2. These comments are little different than Breakiron's counsel's reference to the Christian doctrine of

195

mercy and this Court, like the <u>Sandoval</u> court, should reject the suggestion that the door was opened for the prosecutor's biblical oration.

### C.    Improper Interjection of Petitioner's "Future Dangerousness"

The prosecutor suggested to the jury that Petitioner was likely to commit other acts of violence in the future unless he was sentenced to death.

> You have evidence before you from this proceeding that defendant has had a problem with alcohol, that he has been to A.A. and he still has problems and he has been to some program which the Reverend talked about and he still had a problem. And even after this event, the next day or the day after, whichever the Reverend testified to, he still had a problem. And at that time, <u>he was going to do violence again</u> only this time to himself. Consider that ladies and gentlemen. Consider that other contemplated act of violence.

NT 4/14/88 at 1433. The prosecutor's message was clear -- Petitioner was capable of future acts of violence and the jury should consider that future dangerousness in sentencing. Such a message is improper. Future dangerousness is not an aggravating circumstance in Pennsylvania.[135]

The Pennsylvania capital sentencing statute specifically limits the evidence and argument the jury may consider in imposing a sentence of death. The statute reads: "Evidence of aggravating circumstances shall be limited to those circumstances specified in subsection (d)." 42 Pa. C.S. § 9711(a)(2). The language of the capital sentencing statute, does "not authorize a trial court to allow the introduction of any evidence unrelated to the aggravating circumstances presented during the sentencing procedure" and non-statutory evidence or argument "is not a legitimate factor on which a sentence of death can be based." <u>Commonwealth v. Fisher</u>, 545 Pa.

---

[135]Yet, as the juror affidavits supporting Claim 5 show, future dangerousness was of central concern to the jurors.

196

233, 266, 681 A.2d 130, 146 (1996).

"[F]uture dangerousness is not an aggravating circumstance under Pennsylvania's death penalty statute, and therefore is not a valid factor to be considered by the jury." Commonwealth v. Marrero, 546 Pa. 596, 610 n.19, 687 A.2d 1102, 1108 n.19 (1996); Commonwealth v. Christy, 540 Pa. 192, 656 A.2d 877, 883 n.7 (1995) ("It is noted that "future dangerousness' is not a valid aggravating circumstance in Pennsylvania."). Therefore, the Commonwealth's reliance on future dangerousness in support of its argument for death constituted improper non-statutory aggravating evidence and argument that was impermissible under 42 Pa. C.S.  9711.

Consequently, these arguments were "directed to passion and prejudice rather than to an understanding of the facts and the law." Lesko, 925 F.2d at 1546.

### D.    Conclusion

Both individually and cumulatively, the prosecutor's arguments far exceeded the bounds of permissible advocacy and denied Petitioner his constitutional rights to a fair and reliable sentencing proceeding. See Lesko, 925 F.2d at 1546. See  also Washington v. Hofbauer, 228 F.3d 689 (6th Cir. 2001) (due process violated by various pros argument and misconduct); Paxton v. Ward 199 F.3d 1197 (10th Cir. 1999) (due process violated by improper argument conjoined with misconduct); Floyd v. Meachum, 907 F.2d 347, 355 (2d Cir. 1990) (cumulative effect of prosecutor's improper remarks in closing argument, including vouching for the credibility of a witness and disparaging the defense violated due process where the only curative instruction was the standard instruction that counsel's arguments are not evidence); Davis v. Zant, 36 F.3d 1538, 1550 (11th Cir. 1994) (prosecutor's conduct as a whole violated due process);  Here, the cumulative effect of the prosecutor's improper penalty phase arguments denied Petitioner his due

197

process and Eighth Amendment rights to a fair penalty hearing.

To the extent defense counsel failed to object to these remarks at trial, counsel was ineffective. Counsel was also ineffective in direct appeal and in PCRA proceedings for failing to raise and litigate these meritorious claims.

**CLAIM 15:    THE COURT'S FAILURE TO INSTRUCT THE JURY THAT "LIFE IMPRISONMENT" MEANS LIFE WITHOUT POSSIBILITY OF PAROLE VIOLATED PETITIONER'S CONSTITUTIONAL RIGHTS.[136]**

In Pennsylvania, a sentence of life imprisonment for first degree murder means life without possibility of parole. The jury, however, did not know this crucial sentencing information. In fact, as the juror affidavits demonstrate, the jury was misinformed that a life-sentenced prisoner would be eligible for release on parole. The failure to correct this error with proper instructions violated a number of constitutional provisions.[137]

This instructional error violated the due process proscription against sentences imposed under a material misapprehension of law or fact. Townsend v. Burke, 334 U.S. 736, 741 (1948); United States v. Tucker, 404 U.S. 443, 447 (1972).

The failure to provide a life without parole instruction also arbitrarily denied Petitioner's due process liberty interest in being sentenced by a jury that was able to exercise its statutorily prescribed discretion between the statutorily prescribed options of life without possibility of parole and death. See Hicks v. Oklahoma, 447 U.S. 343 (1980); Wolff v. McDonald, 418 U.S.

---

[136]This claim was raised in Breakiron-3. Because the Pennsylvania Supreme Court did not address the merits of this claim, this Court's review is de novo.

[137]This claim is not based on Simmons v. South Carolina, 512 U.S. 154 (1994), which was decided after Petitioner's direct appeal, but on principles of constitutional law that were fully developed prior to that appeal.

539, 557 (1974); see also Toney v. Gammon, 79 F.3d 693, 699-700 (8th Cir. 1996); Walker v.

Deeds, 50 F.3d 670, 673 (9th Cir. 1995); Fetterly v. Paskett, 997 F.2d 1295, 1299-1300 (9th Cir.

1993).

     In addition, the error created a false choice of sentencing options, denying Petitioner the

heightened procedural safeguards required in capital cases.  Woodson v. North Carolina, 428

U.S. 280, 305 (1976) Godfrey v. Georgia, 446 U.S. 420, 427-28 (1980); Mills v. Maryland, 486

U.S. 367, 383-84 (1988).  This heightened need for reliability requires the provision of "accurate

sentencing information [as] an indispensable prerequisite to a reasoned determination of whether

a defendant shall live or die."  Gregg v. Georgia, 428 U.S. 153, 190 (1976); see Walton v.

Arizona, 497 U.S. 639, 647 (1990) ("When a jury is the final sentencer, it is essential that the

jurors be properly instructed regarding all facets of the sentencing process.").  This resulted in an

arbitrary and capricious sentence.  Furman v. Georgia, 408 U.S. 238 (1972).

     The court's failure also violated the hallmark Eighth Amendment requirement that a

capital sentencing jury must be permitted to consider and give effect to all relevant mitigating

evidence.  Penry, 492 U.S. at 319; Skipper, 476 U.S. at 4; Eddings, 455 U.S. at 110; Lockett v.

Ohio, 438 U.S. 586, 605 (1978).  "[T]here is no question but that ... inferences [that a life

sentenced defendant would not pose a future danger to society] would be 'mitigating' in the

sense that they might serve 'as a basis for a sentence less than death.'" Skipper, 476 U.S. at 4-5

(quoting Lockett, 438 U.S. at 604), and therefore, "evidence that the defendant would not pose a

danger if spared (but incarcerated) must be considered potentially mitigating."  Skipper, 476 U.S.

at 4.  An instruction that a life sentence meant life without parole was particularly necessary in

light of the prosecutor's closing argument, discussed supra,  which erroneously interjected

Petitioner's alleged future dangerousness into the jury's deliberations.  An appropriate instruction would have helped mitigate the harm of that improper argument.  In addition, the failure to provide a life without parole instruction also prevented the jury from giving full effect to other potentially mitigating evidence.

A life without parole instruction was particularly important in this case.  The prosecutor had, during his penalty phase argument, wrongly interjected argument concerning Petitioner's future dangerousness, an argument that was irrelevant to the jury's decision under Pennsylvania law.  See Claim 14(C).  A life without parole instruction would have gone a long way towards curing that error.  Moreover, we know from the juror affidavits that the jurors were very concerned about the possibility of parole in the future and, indeed, believed that if sentenced to life, Mr. Breakiron would be released after a period of years.   A proper instruction would have relieved that concern, corrected the erroneous belief, and would have led to the imposition of a life sentence.

Nor does this claim rely on  Simmons v. South Carolina, 512 U.S. 154 (1994), decided after Petitioner's direct appeal.  In Simmons, the defendant presented a number of arguments, under both the due process clause and the Eighth Amendment,  in support of his claim that the trial court had erred by failing to inform the jury that a sentence of life imprisonment carried no possibility of parole.[138]  The Supreme Court, however, did not address the merit of many of those arguments.  Id. at 162, n.4 ("We express no opinion on the question whether the result we reach today is also compelled by the Eighth Amendment").  Instead, the Court, in a series of plurality opinions, held that due process was denied when no instruction on the non- paroleability of a life

[138]Specifically, petitioner argued that under the Eighth Amendment his parole ineligibility was " 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death

sentence was provided after the interjection of defendant's alleged future dangerousness into the sentencing proceedings.  Thus, the arguments Petitioner present are not a repackaging of the successful arguments in <u>Simmons</u>, but a presentation of arguments and claims that were not addressed by the <u>Simmons</u> pluralities.

The Eighth Amendment entitles a defendant to a jury capable of a reasoned moral judgment about whether death, rather than some lesser sentence, ought to be imposed.  <u>Simmons v. South Carolina</u>, 512 U.S. at 172 (Souter, J. concurring).[139]  Because of the unparalleled severity and irreversibility of the death penalty, the Amendment imposes a heightened standard "for reliability in the determination that death is the appropriate punishment in a specific case," <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976) (plurality opinion).  <u>See also</u> <u>Godfrey v. Georgia</u>, 446 U.S. 420, 427-28 (1980); <u>Mills v. Maryland</u>, 486 U.S. 367, 383-84 (1988).

This heightened need for reliability requires the provision of "accurate sentencing information [as] an indispensable prerequisite to a reasoned determination of whether a defendant shall live or die," <u>Gregg v. Georgia</u>, 428 U.S. 153, 190 (1976) (plurality opinion), and invalidates "procedural rules that ten[d] to diminish the reliability of the sentencing determination," <u>Beck v. Alabama</u>, 447 U.S. 625, 638 (1980).  As part of the requirement that capital juries must receive accurate sentencing information, the jury must be properly instructed as to all material elements in its sentencing-stage deliberations, including the meaning of legal terms such as "life in prison."  <u>Walton v. Arizona</u>, 497 U.S. 639, 647 (1990) ("When a jury is the

---

[139]Although the full Court did not decide <u>Simmons</u> on Eighth Amendment grounds, Justice Souter's thoughtful concurrence carefully lays out the clearly established law that compels the determination that the failure to instruct a capital sentencing jury that life means life without parole also violates the Eighth Amendment.

final sentencer, it is essential that the jurors be properly instructed regarding all facets of the sentencing process.").[140]

The trial court's failure to instruct the jury that, in Pennsylvania, "life imprisonment" means life without possibility of parole," denied Petitioner the heightened procedural safeguards required in a capital case.  For this reason, his death sentence "should be vacated as having been 'arbitrarily or capriciously' and 'wantonly and . . . freakishly imposed.'"  Id. at 173 (quoting Furman v. Georgia, 408 U.S. 238, 249 (1972) (Douglas, J., concurring); and id. at 310 (Stewart, J., concurring)).

Moreover, the imposition of a death sentence by a jury that believed that a death sentence actually meant that he would spend his life in prison, see Claim 5, offended the evolving standards of decency that underlie the Eighth Amendment.  A sentencing process that offends "the evolving standards of decency that mark the progress of a maturing society" violates the Eighth Amendment.  Atkins v. Virginia, 122 S. Ct. 2242, 2247 (2002) (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958)); Gregg v. Georgia, 428 U.S. 153, 173 (1976) (same).  Petitioner's death sentence, which was imposed by a jury that was not informed that, in Pennsylvania, "life imprisonment" means "life without possibility of parole" (and therefore had been denied accurate and material information concerning its sentencing options), was a product of such a process.

The evolving standards of decency that give content to the Eighth Amendment are measured by objective indicia of community values, including legislative judgments, sentences

---

[140]See also Russell v. State, 607 So.2d 1107, 1118 (Miss. 1992) ("The knowledge that the alternative to death is a life sentence, without the possibility of probation or parole is the type of relevant and accurate sentencing information to which our cases speak and which every jury faced with the determination of life or death is entitled to consider.").

imposed by juries, public opinion, and international practices and opinion.  See, e.g., Roper v. Simmons, 543 U.S. 551 (2005),  Atkins, 122 S. Ct. 2242 (2002); Thompson v. Oklahoma, 487 U.S. 815 (1988); Ford v. Wainwright, 477 U.S. 399 (1986); Enmund v. Florida, 458 U.S. 782 (1982); Coker v. Georgia, 433 U.S. 584 (1977).  The imposition of a death sentence, returned by a jury that has been presented a materially false and harsher sentencing choice, offends every one of these indicia of community values.

The Eighth Amendment places great weight upon legislative judgments as a primary indicator of community values.  E.g., Atkins, 122 S. Ct. at 2247 ("the 'clearest and most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures'" (quoting Penry v. Lynaugh, 492 U.S. 302, 331 (1989))).  The judgments of these legislative bodies universally reject Pennsylvania's approach.[141]

---

[141]Indeed, the Pennsylvania legislature did not require the withholding of information concerning parole ineligibility.  Pennsylvania's current refusal to provide a life without parole instruction is a *court-made rule*.  This rule arose during an era in which a life sentence carried with it the possibility of parole, and was initially designed to *protect defendants* against harsher punishment caused by jury speculation about the possibility of discretionary acts of leniency by the executive branch that could result in early release from prison.  E.g., Commonwealth v. Johnson 368 Pa. 139, 81 A.2d 569 (1951).  The Court later interpreted these decisions as removing the subject matter of parole -- as opposed to harmful speculation as to when a defendant might be released on parole -- from the jury.  Commonwealth v. Strong, 522 Pa. 445, 563 A.2d 479 (1989); Commonwealth v. Henry, 524 Pa. 135, 569 A.2d 929 (1990).

Pennsylvania's practice is followed by virtually no other death-penalty state. Twenty-two (22) of the other twenty-three (23) comparable states that provide the jury an option between life without possibility of parole and death inform the sentencing jury of the defendant's parole ineligibility, either by instructing the jury to choose between the sentencing alternatives of death and life without parole, or by giving the jury the power to specify whether the defendant should or should not be eligible for parole.[142] After the Simmons trilogy of South Carolina cases, Pennsylvania is the only remaining state that fails to provide an accurate life without parole instruction. This "nearly universal acceptance" that juries should be advised when "life" means "life without parole," "establishes the value to the defendant of this procedural safeguard." Beck v. Alabama, 447 U.S. 625, 636-37 (1980). Furthermore, neither Congress nor *any* state legislature has approved the imposition of a death sentence (such as was imposed here) by a jury that had been presented a materially false and harsher choice as to its sentencing options, nor has

---

[142]ALA. CODE § 13A-5-46(e) (1982); ARK. CODE ANN. § 5-4-603(b) (Supp. 1993); CAL. PEN. CODE §190.3 (West 1988); CONN. GEN. STAT. §53a-46a(f) (West 1985); DEL. CODE. ANN. tit. 11, 4209(a) (1987); 1993 Fla. Sess. Law Serv. 93-406, S.B. 26-B, § 16; FLA. STAT. 775.0823(1) (effective 1/1/94), FLA. STAT. 921.142 (West 1992) & Standard Jury Instructions-Criminal Cases, 603 So.2d 1175, 1205 (Fla. 1992); LA. CODE CRIM. PROC. ANN. art. 905.6 (West Supp. 1993); MO. ANN. STAT. § 565.030.4 (Vernon Supp. 1993); N.H. REV. STAT. ANN. § 630:5 (IV) (Supp. 1992); WASH. REV. CODE ANN. § 10.95.030(1), 95.050 (West 1990). Case law in four other states requires that capital sentencing juries be informed whenever a life sentence means the defendant will be ineligible for parole. See COLO. REV. STAT. § 16-11-103(1)(b) (Supp. 1993); ILL. REV. STAT. ch. 38, ¶ 1005-8-1 (Smith-Hurd Supp. 1992); MISS. CODE ANN. § 47-7-3(1)(a) (Supp. 1992); Yarbrough v. Commonwealth, 258 Va. 347, 374, 519 S.E.2d 602, 616 (1999). Nine states give the jury the power to specify when the defendant should be eligible for parole. See GA. CODE § 17-10-31.1(a) (Supp. 1993); IND. CODE § 35-50-2-9 (Supp. 1993); MD. ANN. CODE art. 27, § 413(c)(3) (1987); NEV. STAT. 182; NEV. REV. STAT. ANN. § 175.554(2)(c)(2), - (4) (1992); N.Y. CORRECT. Ch. 43, art. 22-B, Historical & statutory notes (McKinney 1995); OKLA. STAT. ANN. tit. 21, 701.10(A) (West 1993); OR. REV. STAT. § 163.105 (Supp. 1992); TENN. CODE ANN. § 39-13-204(a), -(f)(2) (Supp. 1993); UTAH CODE ANN. § 76-3- 207(4) (Supp. 1993).

any state or federal legislature other than Pennsylvania acquiesced in such a practice adopted by the courts in that jurisdiction.

Thus, legislative judgments provide powerful evidence that Pennsylvania's practice of withholding material information concerning the "life without possibility of parole" sentencing option, offends the evolving standards of decency that prevail in this Nation, and therefore violates the Eighth Amendment. E.g., Ford v. Wainwright, 477 U.S. at 408 (execution of insane violates Eighth Amendment, in part because no state legislature permits execution of insane); Coker v. Georgia, 433 U.S. at 594 (death penalty for non-homicidal rape of adult woman violates Eighth Amendment, in part because no other state legislature authorizes death penalty in those circumstances).

The sentencing practices employed in this case also draw no support from any other of the indicia of community values employed by the courts to assess the constitutionality of a penal sanction under the Eighth Amendment, whether the indicator is the judgments of juries,[143] public opinion,[144] or international law and practices.[145] This Court should grant the writ of habeas corpus

---

[143] The United States Supreme Court has made clear that "a jury that must choose between life imprisonment and capital punishment can do little more -- and must do nothing less -- than express the conscience of the community on the ultimate question of life or death." Witherspoon v. Illinois, 391 U.S. 510, 519 (1968). Indeed, "one of the most important functions any jury can perform in making such a selection is to maintain a link between contemporary community values and the penal system -- a link without with the determination of punishment would hardly reflect 'the evolving standards of decency that mark the progress of a maturing society.'" Id. at 519 n.15 (quoting Trop v. Dulles, 356 U.S. 86, 101 (1958) (plurality opinion)). Pennsylvania's refusal to inform jurors as to the true nature of their sentencing options severs that vital link between contemporary community values and the penal system, distorts the community's expression of its contemporary values, and, in so doing, offends the Eighth Amendment.

[144] The courts also have looked both to general expressions of public opinion and the opinion of professional associations to determine whether a challenged punishment comports with contemporary community values. E.g., Thompson v. Oklahoma, 487 U.S. 815, 830 & nn.

and grant Petitioner a new sentencing hearing because American constitutional justice has

unquestionably evolved beyond such a practice.

CLAIM 16:    PETITIONER DID NOT RECEIVE THE MEANINGFUL "PROPORTIONALITY
             REVIEW" MANDATED BY 42 PA. C.S. § 9711(H)(3)(III) AND FEDERAL
             CONSTITUTIONAL LAW.[146]

    At the time of Petitioner's trial, the Pennsylvania Supreme Court was required by statute

to determine whether the sentence of death imposed in his case was "excessive or

disproportionate to the penalty imposed in similar cases."  42 PA. C.S. § 9711(h)(3)(iii); see

32 & 33 (1987); Woodson v. North Carolina, 428 U.S. 280, 298 n.34 (1976); Roper v. Simmons
543 U.S. 55, 561-566 (2005); Atkins v. Virginia, 536 U.S. 304, 313-316 (2002). General public
opinion surveys provide evidence that the public does not support Pennsylvania's capital
sentencing scheme.  Polling data from the Simmons case reveals that only 7.1% of eligible jurors
believed that a person who was sentenced to life would actually spend his entire life in prison --
and therefore that 92.9% of respondents were unaware of the jury's actual sentencing options.
Petitioner's Brief, Simmons v. South Carolina, 1993 WL 657673 at *154a, Table 2.  Yet, if they
were faced with a decision between sentencing a defendant to life or death, 86.8% of the jurors
polled said it would be important to them to know "how much time the person would have to
spend in prison before they would have a chance to be released, if you sentenced them to life
imprisonment."  Id. at *155a (Table 3).  Additionally, Pennsylvania practice is squarely at odds
with the long-standing positions of the American Law Institute that capital sentencing juries
should be informed "of the nature of the sentence of imprisonment that may be imposed,
including its implication with respect to possible release upon parole, if the jury verdict is against
the sentence of death."  See ALI MODEL PENAL CODE § 210.6 (Prop. Off. Draft 1962).

    [145]International practices and opinion provide additional evidence that Pennsylvania's
practice of withholding from jurors material information concerning the "life without possibility
of parole" sentencing option, and its mandating in certain instances that death sentences be
imposed by a jury that is presented a materially false choice as to its sentencing options, violates
the Eighth Amendment.  E.g., Thompson, 487 U.S. at 830-31 & nn.31 & 34; Coker v. Georgia,
433 U.S. 584, 596 n.10 (1976).  Pennsylvania's death-penalty practices do not draw any support
from international law and practices and not one international or regional human rights treaty
envisions that death sentences would be imposed by a jury that has based its judgment on a
materially inaccurate and harsher view of its sentencing options.

    [146]As explained infra, this Claim was exhausted in Breakiron-1, and Breakiron-2. See
also, Pursell v. Horn, 187 F.Supp. 2d 260, at 289-90, (explaining that Pennsylvania Supreme
Court necessarily addressed proportionality claim on direct review).

Commonwealth v. Ford, 650 A.2d 433 (1992) (discussing "duty" to conduct comparative proportionality review). This statute created a "vested right[] . . . in the legislatively created right to proportionality review" that mandated this review in all cases in which a death sentence was returned. Commonwealth v. Gribble, 703 A.2d 426 (Pa. 1997) (right to proportionality review "vested" in all cases prior to subsequent legislative repeal of statute); Commonwealth v. Collins (Rodney), 549 A.2d 593, 702 A.2d 540 (Pa. 1997) (Court is "required to consider the proportionality of the death sentence" for direct appeals filed prior to repeal date).

On direct appeal, the Pennsylvania Supreme Court, relying upon the database maintained by the Administrative Office of Pennsylvania Courts ("AOPC"), found the death sentence was not excessive or disproportionate. Breakiron 1, 571 A.2d at 1044 ("our review of the data supplied by the Administrative Office of Pennsylvania Courts for other cases involving similar aggravating circumstances, without mitigating circumstances, indicates that there is no disproportion in the sentence."). In Breakiron-2, Petitioner challenged the reliability of the Pennsylvania Supreme Court's proportionality review process. He noted that systemic and case-specific defects in the information provided by the AOPC to the Pennsylvania Supreme Court rendered meaningful comparative proportionality review in this case impossible.

The Pennsylvania Supreme Court summarily rejected Petitioner's challenge to the constitutionality of the state court's proportionality review:

> Breakiron also argues that the database we used to assess Petitioner's sentence in Breakiron I was flawed, inaccurate and incomplete. Breakiron then requests us to revisit the proportionality review, citing, Commonwealth v. Gribble, 550 Pa. 62, 703 A.2d 426 (Pa.1997). It does not appear that Breakiron has raised sufficient information to indicate that the figures used in 1990 were invalid.

> This argument lacks merit, was previously litigated in Breakiron I,
> and we will not revisit this issue here.

Breakiron-2, 729 A.2d at 1093, n.3.  The Pennsylvania Supreme Court's refusal to recognize and

address the constitutional and statistical flaws in its proportionality data base was an

unreasonable application of established principles of due process.

Petitioner's death sentence must be vacated because the Pennsylvania Supreme Court

failed to provide him the meaningful proportionality review statutorily mandated by 42 Pa. C.S. §

9711(h)(3)(iii), in violation of his federal constitutional rights to due process and to meaningful

appellate review of capital cases.

At the time of Petitioner's trial and direct appeal, the Pennsylvania Supreme Court was

required by statute to determine whether the sentence of death imposed in his case was

"excessive or disproportionate to the penalty imposed in similar cases."  42 Pa. C.S. §

9711(h)(3)(iii); see Commonwealth v. Ford, 539 Pa. 85, 650 A.2d 433, 443 (1992) (discussing

Pennsylvania Supreme Court's "duty" to conduct comparative proportionality review).  Because,

however, of the significant constitutional flaws in the Pennsylvania Supreme Court's

proportionality review process (described below), Petitioner was denied meaningful review.  His

death sentence must be vacated.

## A.    The Nature of Pennsylvania's Proportionality Review Process and the Review Performed in this Case.

The Pennsylvania Supreme Court has explained the nature of its proportionality review

process as follows:

> This Court conducts an independent evaluation of all cases of murder
> of the first degree convictions which were prosecuted or could have been

prosecuted under the Act of September 13, 1978, P.L. 756, No. 141, 42 Pa.C.S.A. '9711.... In order to facilitate our review, this Court has ordered the President Judge of each county to supply to the Administrative Office of Pennsylvania Courts (the AOPC) information pertaining to each such conviction and imposed a continuing obligation on the President Judges to update the AOPC with data pertaining to future cases. This information includes the facts and circumstances of the crimes, the aggravating and mitigating circumstances arguably presented by the evidence, the gender and race of the defendant and the victim, and other information pertaining to the conduct and prosecution of the case. The data will be compiled and monitored by the AOPC to insure that the body of "similar cases" is complete and to expedite our proportionality review.

Commonwealth v. Frey, 504 Pa. 428, 444, 475 A.2d 700, 707-08 (1984) (citations omitted); see also Commonwealth v. Zettlemoyer, 500 Pa. 16, 454 A.2d 937, 961 (1982).

Thus, the Pennsylvania Supreme Court has established two important criteria for determining comparison cases for the purposes of comparative proportionality review. First, the determination of "similar cases" must involve a factual comparison of the full range of aggravating and mitigating features of the defendant and the offense. Second, the cases against which a given death sentence is compared for proportionality must include the entire universe of Pennsylvania death-eligible cases, first-degree murder convictions that have resulted in life sentences as well as those resulting in death sentences. The inclusion of life cases in the comparative proportionality review is dictated by the plain language of the Pennsylvania Supreme Court's decisions in Frey and Zettlemoyer, and is further supported by the data collection instrument employed by the Administrative Office of Pennsylvania Courts (AOPC), which requests information for cases resulting in life sentences as well as death sentences. Moreover, comments made by the Pennsylvania Supreme Court in a number of its opinions discussing the proportionality reviews it has actually performed demonstrate that the Court

209

employs life cases as part of its comparative review.  E.g., Commonwealth v. Rolan, 520 Pa. 1, 549 A.2d 553, 560 (1988); Commonwealth v. Clayton, 516 Pa. 263, 532 A.2d 385, 388 n.4 (1987); Commonwealth v. Sneed, 514 Pa. 597, 526 A.2d 749, 758 & n.2 (1987); Commonwealth v. Smith, 511 Pa. 343, 513 A.2d 1371, 1378 (1986).

There is no doubt that the Supreme Court of Pennsylvania in general, and in this case specifically, bases its proportionality review on the AOPC database.  This reliance was plainly expressed in the Court's opinion in this case.  Breakiron-1, 571 A.2d at 1044.

### B.    Petitioner's Due Process Liberty Interest in Proportionality Review.

When a state statute creates a vested right, as did Pennsylvania's proportionality review provision, see Commonwealth v. Gribble, 550 Pa. 62, 703 A.2d 426, 439-40 (1997), it also creates a federal due process liberty interest in the statutory entitlement.  E.g., Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Hewitt v. Helms, 459 U.S. 460, 469-72 (1983).  Thus, by statutorily mandating proportionality review, Pennsylvania created a due process liberty interest in the performance of a rational and meaningful proportionality review.  E.g., Foster v. Delo, 39 F.3d 873, 882 (8th Cir. 1994) (liberty interest in proportionality review under Missouri capital sentencing statute); Wilkins v. Bowersox, 933 F. Supp. 1496, 1524-26 (W.D. Mo. 1996) (same), aff'd, 145 F.3d 1006 (8th Cir. 1998); Campbell v. Blodgett, 997 F.2d 512, 522 (9th Cir. 1993) (liberty interest in proportionality review under Washington capital sentencing statute); Harris v. Blodgett, 853 F. Supp. 1239, 1286-90 (W.D. Wash. 1994) (same), aff'd sub nom., Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995).

When the procedures employed in conducting proportionality review are defective, the

210

liberty interest in meaningful proportionality review is arbitrarily denied and the defendant's due

process rights are violated.  See Wilkins (Missouri proportionality review violates due process);

Harris (Washington's proportionality review violates due process).

Here, Petitioner had a constitutionally protected liberty interest in review by the

Pennsylvania Supreme Court to determine whether his death sentence is "excessive or

disproportionate to the penalty imposed in similar cases."  42 Pa. C.S. ' 9711(h)(3)(iii).  That

review was supposed to "encompass all similar cases, taking into consideration both the

circumstances of the crime and the character and record of the defendant in order to determine

whether the sentence of death is excessive or disproportionate."  Zettlemoyer, 454 A.2d at 961.

Providing Petitioner proportionality review that failed to meet his substantial and legitimate

expectation that the Pennsylvania Supreme Court can (and will) in fact review "all similar cases"

and can (and will) take into consideration mitigating information concerning his character and

record violated Petitioner's due process rights.

As demonstrated below, the proportionality information provided to the Pennsylvania

Supreme Court by the Administrative Office of Pennsylvania Courts in this case -- the

information upon which the Pennsylvania Supreme Court expressly relied -- did not and could

not provide that Court with a meaningful basis to perform its statutory duty.  Consequently, the

Pennsylvania Supreme Court could not (and did not) afford Petitioner the review required by due

process.

In addition, Petitioner was not provided procedural due process in the proportionality

review process.[147]  See Harris v. Blodgett, 853 F. Supp. at 1287-90.  "If there is one 'fundamental requisite' of due process, it is that an individual is entitled to an 'opportunity to be heard.'"  Ford v. Wainwright, 477 U.S. at 430 (O'Connor, J., concurring) (quoting Grannis v. Ordean, 234 U.S. 385, 394 (1914)); Gardner v. Florida, 430 U.S. 349, 360 (1977) (due process "requires us ... to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases").  Petitioner had no notice or opportunity to meaningfully participate in the Pennsylvania Supreme Court's appellate factfinding concerning what constituted "similar" cases and whether the sentence imposed in this case was disproportionate.  This resulted in adverse findings "on the basis of information which [Petitioner] had no opportunity to deny or explain," in violation of due process.  Gardner v. Florida, 430 U.S. 349, 362 (1977); see also Harris, 853 F. Supp. at 1287.

For the reasons described herein, the "proportionality review" actually provided to Petitioner by the Pennsylvania Supreme Court arbitrarily denied him the proportionality review mandated under Pennsylvania law and violated his due process rights.

## C.    The Proportionality Database, Data Collections Instruments and Methodology Utilized by the Pennsylvania Supreme Court to Conduct Proportionality Review in this Case were Severely Flawed

Testimony in the matter of Commonwealth v. Terry, No. 1563-79, (Mtgy C.P.), from AOPC legal counsel, Zygmont Pines, and Professor Eugene Ericksen, shows that the database compiled by the AOPC and the raw data upon which it is based, cannot do what the Pennsylvania

---

[147]Whether the procedures employed by the Pennsylvania Supreme Court in conducting proportionality review satisfied state law is irrlelvant to this portion of Petitioner's claim. Ford v. Wainwright, 477 U.S. at 428-30 (O'Connor, J., concurring)("federal law defines the kind of process a state must afford prior to depriving an individual of a protected liberty interest").

Supreme Court has requested be done by the AOPC with regard to proportionality review:

> It is not possible to conduct a meaningful proportionality review under a statute such as Pennsylvania's, which conditions the sentencing of life or death upon what combination of aggravating and mitigating circumstances are found, if the data collection instrument does not collect, and the database cannot report, the mitigating circumstances found. (NT 2/21/96, 241-42).

> The data collection instrument used by the AOPC to encode the information actually contained in the proportionality review database does not collect information on mitigating circumstances found. Moreover, Zygmont Pines, admitted that the AOPC could not provide the Pennsylvania Supreme Court with information on mitigation found in capital cases and that the AOPC could not provide any comparison of capital cases based upon mitigation actually found by the capital sentencer. (NT 2/21/96, 185-86).

> Instead of collecting and recording "mitigating circumstances found," the AOPC database collects and records "mitigating circumstances presented." (NT 2/21/96, 186).

> In Dr. Ericksen's uncontested expert opinion, there is nothing in the AOPC database that "could meaningfully substitute for [the] missing information" on mitigation found. (NT 2/21/96, 240). Based upon his previous review of the database, "there was no [statistical] relationship between the number of mitigating circumstances presented and the likelihood of a death sentence," and any proportionality review based upon a comparison of "mitigation presented" would be "statistically irrelevant." (NT 2/21/96, 241-42).
>
> Even if "mitigation presented" had any statistical relevance, Mr. Pines acknowledged that the AOPC database provides no meaningful basis to do "any kind of qualitative review" (NT 2/21/96, 198). The AOPC cannot ascertain the strength of mitigating evidence presented in a case (id.), nor does anything in the database permit the AOPC to identify, select out, or compare between specific types of mitigating evidence presented under 42 Pa.C.S. § 9711(e)(8). (NT 2/21/96, 243-49).

> Consequently, the AOPC could not provide to the Supreme Court in this case any set of comparison cases based upon specific mitigating information, so that the Court could conduct any meaningful comparison of these cases or to permit the Court to conduct any qualitative analysis of whether the death penalty was disproportionate in a particular case.

> Even if one attempted to do merely a quantitative comparison of mitigating evidence, flaws in the data collection process systemically undercount mitigation in cases in

which evidence of multiple types of constitutionally recognized mitigating circumstances had been presented under 42 Pa.C.S. § 9711(e)(8). Neither a statistician nor the court would be able to identify from the database which cases were subject to such undercounting, and so a comparison of cases based upon the numerical figures provided in the portion of the database reporting "mitigation presented" under (e)(8) would not be meaningful. (NT 2/21/96, 250).

Additionally, the database does not indicate if or when aggravating evidence has been double-counted in a particular case and served as the basis for multiple aggravating circumstances found. (NT 2/21/96, 202-03).

Pa. R. Crim. P. 358(a), provides that when a jury is unable to reach a verdict during the sentencing stage of a capital trial, it does not complete a verdict slip and does not specify the aggravating and mitigating circumstances found. Consequently, relevant information on aggravating circumstances found is not recorded, and an entire class of cases in which the outcome was "life" is unavailable for meaningful comparison. The proportion of factually comparable death cases available for comparison in the database is artificially higher as a result. Moreover, this produces a corresponding skewing towards death of any proportionality review based upon a comparison from which these cases are omitted. (NT 2/21/96, 189-92, 251-53).

In guilty plea cases resulting in a sentence of life, no sentencing hearing is held and no aggravating or mitigating circumstances are presented. The AOPC makes no effort to find out what mitigation the defense could have presented, and this information is unavailable in the database. As with hung jury cases, this removes an entire class of "life" cases from the proportionality review, artificially increasing the proportion of death sentences available for comparison purposes, and skewing the resulting proportionality review towards death. (NT 2/21/96, 227-28, 254).

These data collection errors are exacerbated by data entry errors that undermine the reliability of the proportionality database. For example, Dr. Ericksen testified that the database contains "a large number of cases [124] where the death penalty was not sought, but there were aggravating circumstances found and/or mitigating circumstances presented." (NT 2/21/96, 250-51, 261). The database contains cases in which aggravating circumstances were found and no mitigators and a life sentence was imposed. (NT 2/21/96, 261). As of June 1994, the database contained 77 entries purportedly from cases in which no aggravation was presented, yet a death verdict was returned. The database also contained 19 entries purportedly from cases in which no evidence of aggravation was ever presented and yet the verdict was death. (NT 2/21/96, 208-09, 220-21). Every one of these outcomes is a statutory impossibility.

214

Dr. Ericksen testified that the presence of these many obvious and important errors in the database ("to me, it could very well be the tip of the iceberg") undermined his confidence as a statistician in the accuracy of the rest of the database. At a minimum, he said, these errors "make your [proportionality] review uncertain." (NT 2/21/96, 259-62). Even assuming that these are the only errors, approximately 220 major errors in a database of approximately 3,000 entries represents a known-error rate in excess of 7.3%.

Given this combination of case-specific, data collection, and data entry problems with the AOPC database, it was Dr. Ericksen's conclusion that "based on the information provided in the database, the Supreme Court could not conduct a meaningful proportionality review if they relied upon this data base." (NT 2/21/96, 262).

In <u>Riley v. Taylor</u>, 277 F.3d 261, 310 (3d Cir. 2001), the Third Circuit Court of Appeals held that extensive proportionality review process accorded by the Delaware Supreme Court satisfied due process. The Delaware procedures upheld by the Court were far more extensive than the "review" that occurred in Pennsylvania. In Delaware, the Supreme Court conducted a detailed analysis of twenty-one cases, summarizing the relevant facts, and explicitly comparing the facts of those cases with the facts of Riley. In contrast, Mr. Breakiron never received a meaningful, good-faith review of whether his sentence was proportional. As explained above, the data relied upon by the Pennsylvania Supreme Court was riddled with errors and made relevant comparisons impossible. Moreover, in constrast to the detailed analysis of the Delaware Court, the review that occurred in the instant case consisted of one sentence summarily concluding that the sentence was not disproportinate. <u>Commonwealth v. Breakiron-1</u>, 571 A.2d at 1044 (1990). No effort was made to identify similar cases or similar facts. Indeed, this sentence resembles similar sentences found in every other Pennsylvania capital case. In fact, the

Pennsylvania Supreme Court had never found a death sentence disproportionate.

      **D.**      **The Pennsylvania Supreme Court's Response in <u>Commonwealth v. Gribble</u>.**

In <u>Commonwealth v. Gribble</u>, 550 Pa. 62, 703 A.2d 426 (1997), the defendant challenged the integrity of the proportionality review process review using arguments similar to those presented herein.  The Pennsylvania Supreme Court rejected Gribble's challenge.  The <u>Gribble</u> opinion, however, does not respond to the concerns expressed by AOPC Counsel Pines and Professor Ericksen regarding the integrity of the database and the methodology utilized.

In fact, in <u>Gribble</u> the Pennsylvania Supreme Court asserted that when it conducts its review, <u>it relies on information other than that contained in the AOPC database</u>:

> When we conduct our review, we examine not only the compiled data from the AOPC, but we also have at our disposal the verdict sheets and the review forms submitted by the President Judges.

703 A.2d at 441.  Because the verdict sheets and review forms submitted to the AOPC fail to capture all relevant data, as described above, the Pennsylvania Supreme Court's reliance on the raw data that comprise the database fails to address the concerns identified in the Pines/Ericksen testimony.

Moreover, the Pennsylvania Supreme Court's statement in <u>Gribble</u> that its proportionality review relied upon more than the AOPC database was a clear break from its prior descriptions of that review.  Indeed, in Petitioner's case, the Court indicated that it had relied <u>solely</u> upon the AOPC database.  <u>Breakiron-1</u>, 571 A.2d at 1044.  To the extent that the Court followed the <u>Gribble</u> procedure rather than that identified in <u>Breakiron-1</u> and <u>Frey</u> ("[t]he data will be compiled and monitored by the AOPC to insure that the body of 'similar cases' is complete and

216

to expedite our proportionality review," <u>Commonwealth v. Frey</u>, 504 Pa. 428, 444, 475 A.2d 700, 707-08 (1984)), Petitioner was denied his due process right to know how that review was actually accomplished.  <u>See</u>, <u>e.g.</u>, <u>Gardner</u>, <u>supra</u>.

The evidence summarized above demonstrates that systemic and case-specific defects in the information provided by the AOPC rendered meaningful comparative proportionality review by the Pennsylvania Supreme Court in this case impossible.  Accordingly, Petitioner did not receive the proportionality review to which he is entitled under 42 Pa. C.S. § 9711(h)(3)(iii) and his due process rights were violated.

> **E.    The Proportionality Review Provided To Petitioner Was Defective and Therefore Petitioner's Right to Due Process of Law and a Reliable Capital Sentence Have Been Violated.**

The lack of meaningful proportionality review denied Petitioner his rights to a reliable determination of sentence, as required by the Eighth Amendment, and his due process rights under the Fourteenth Amendment.  Petitioner's right to due process of law was violated not just because the defective review process arbitrarily denied his life and liberty interests in meaningful proportionality review, but also because he has not been provided an opportunity to litigate the propriety of the system used to determine proportionality.

In <u>Gardner v. Florida</u> 430 U.S. 349, 362 (1977), the Supreme Court struck down a death sentence that was based, in part, on a presentence report which had not been disclosed to either the defendant or his counsel.  The Court found that, at least in capital cases, it is a denial of due process for a death sentence to be imposed, even in part, based on information that the defense had no opportunity to contest.  <u>Id.</u> at 362.  Moreover, the Court held, without full disclosure of

217

the basis for the death sentence, the capital sentencing procedure is subject to the risk of

unconstitutionally arbitrary application.  Id. at 361; see id. at 363-64 (White, J., concurring) (the

Eighth Amendment prohibits a procedure for imposing the death penalty that allows for the

consideration of secret information); see also Harris v. Blodgett, 853 F. Supp. 1239, 1286-90

(W.D. Wash. 1994) (proportionality review violated due process when defendant was denied the

kind of "timely notice of the proceedings that is appropriate to the case and provides the ability to

discover the reasons for the risk of loss" and "a meaningful opportunity to argue the strengths of

his position").

    The proportionality review in the present case was in clear violation of Gardner.  The

Pennsylvania Supreme Court, using unknown data in an unknown manner, compared the death

sentence in this case to unknown cases and found it proportional.  The secrecy of that process

coupled with the failure to allow the Petitioner to make his argument on the issue violated the

Eighth and Fourteenth Amendments to the United States Constitution.

    Petitioner's due process rights were also violated as a result of the Pennsylvania Supreme

Court's consideration of material that was not subject to any type of adversarial testing process

and by the Court's possible secret adoption of the Gribble procedure.  If the Court actually used

the Gribble procedure, it did so without providing Petitioner an opportunity to challenge the facts

underlying the Court's ruling or to inquire as to the methodology used by the Court to review the

raw data.

    Whenever liberty interests are at stake, a criminal litigant is entitled to due process,

including notice of the procedure to be followed and an opportunity to challenge information that

218

is considered by the decision maker.  Harris v. Blodgett, 853 F.Supp. 1239, 1286-1291 (W.D.

Wash. 1994), aff'd sub nom., Harris v. Wood, 64 F.3d 1432 (9th Cir. 1995) (death sentence

vacated when a capital defendant was not afforded his right to due process in regard to

proportionality review, including the right to notice of the procedures to be followed in

proportionality review and an opportunity to be heard); Gardner v. Florida, 430 U.S. 349, 362

(1977) ("We conclude that petitioner was denied due process of law when the death sentence was

imposed, at least in part, on the basis of information which he had no opportunity to deny or

explain.").

Significantly, appellate counsel was not given any notice of the comparison cases; an

opportunity to seek inclusion or exclusion of cases from the comparison; an opportunity to be

heard on the actual comparison; or an opportunity to review the database information and seek

correction of errors in that information.  No rules whatsoever existed at the time of the direct

appeal to provide appellate counsel (and thus Petitioner) with any opportunity to be heard on

these matters.  This lack of proper notice and an opportunity to be heard violated Petitioner's due

process rights.  See Harris v. Blodgett, 853 F.Supp. 1239, 1287 (W.D. Wash. 1994).

Since Petitioner has had neither notice of the nature of the review nor an opportunity to

be heard in that review, proportionality review is de facto, a standardless, arbitrary and irrational

process that violates due process.  See Wilkins v. Bowersox, 933 F.Supp. 1496, 1526 (W.D. Mo.

May 15, 1996) ("Although the United States Supreme Court does not require a state to do a

proportionality comparison in every case, it is well established that the state court must provide a

meaningful appellate review as an essential factor in protecting against the arbitrary and

capricious imposition of the death penalty .... The review by the Missouri Supreme Court,

however, was not meaningful and resulted in an arbitrary deprivation that violated petitioner's

right to liberty [and] is a denial of due process of law.") (citations and internal quotation marks

omitted), aff'd, 145 F.3d 1006 (8th Cir. 1998); Harris v. Blodgett, 853 F.Supp. at 1286.

     For all the reasons described above, the "proportionality review" actually provided to

Petitioner's arbitrarily denied him the proportionality review mandated under Pennsylvania law,

and therefore his right to due process of law under the Fourteenth Amendment to the United

States Constitution.  Moreover, since as a matter of state law the proportionality review is a part

of appellate review, Petitioner was deprived of complete appellate review of his death sentence.

**CLAIM 17:**     **TRIAL AND APPELLATE COUNSEL WERE INEFFECTIVE FOR FAILING TO RAISE THE ISSUES PRESENTED IN THIS PETITION AT TRIAL AND IN POST-TRIAL MOTIONS AND FOR FAILING TO PROPERLY LITIGATE THESE ISSUES ON DIRECT APPEAL.[148]**

     To the extent that trial counsel failed to properly investigate and to make the objections

and arguments raised throughout this memorandum and in the Habeas Petition, he provided

ineffective assistance of counsel in violation of Petitioner's rights under the Sixth, Eighth and

Fourteenth Amendments to the United States Constitution.  To the extent that appellate counsel

failed to raise on direct appeal any of the claims set forth herein, such counsel rendered

ineffective assistance of counsel in violation of Petitioner's rights under the Sixth, Eighth and

Fourteenth Amendments to the United States Constitution. Although each instance of counsels'

failures requires relief individually, in addition, the cumulative effect of each instance of

counsels' failures is sufficiently prejudicial to require relief.  Berryman v. Morton, 100 F.3d 1089

---

[148]This issue was raised and presented to the state courts in Breakiron -3.  The state courts did not address the merits of the claim.  Thus, the standard of review is de novo.

(3d Cir. 1996) (the cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief).

Habeas review of ineffective assistance of counsel claims is not limited to assertions that trial and/or appellate counsel failed to raise meritorious claims of <u>federal</u> law.  A habeas petitioner's Sixth and Fourteenth Amendment rights to counsel are violated where counsel prejudicially fails to raise meritorious issues of <u>state</u> law.  <u>Nero v. Blackburn</u>, 597 F.2d 991, 994 (5th Cir. 1979) (ineffective assistance under the Sixth and Fourteenth Amendments for failing to object at state court trial to error under state law).

**CLAIM 18:**    **PETITIONER IS ENTITLED TO A NEW TRIAL AND SENTENCING PROCEEDING BECAUSE THE CUMULATIVE EFFECT OF THE ERRORS IN THIS CASE UNDERMINES CONFIDENCE IN THE OUTCOME AT BOTH STAGES OF TRIAL.[149]**

Even if none of the individual errors set forth in this memorandum are sufficiently harmful to require relief, the cumulative prejudice resulting from all of the trial court, prosecutorial, and counsel errors undermined the fundamental fairness of Mr. Lambert's's trial and sentencing and denied him his constitutional right to due process.

The Third Circuit Court of Appeals has long recognized the claim of cumulative error. <u>See</u>, <u>e.g.</u>, <u>United States ex rel Sullivan v. Cuyler</u>, 631 F.2d 14, 17 (3d Cir. 1980) ("the cumulative effect of the alleged errors may violate due process, requiring the grant of the writ, whereas any one alleged error considered alone may be deemed harmless"); <u>Cannon v. Maroney</u>, 373 F.2d 908, 909-10 (3d Cir. 1967) (reviewing the cumulative prejudicial effect of several errors in order to determine whether those errors were so prejudicial as to deprive the defendant

---

[149]This issue was raised and presented to the state courts in <u>Breakiron -3</u>.  The state courts did not address the merits of the claim.  Thus, the standard of review is de novo.

of a fair trial). The Court reaffirmed this approach to cumulative error in <u>Marshall v. Hendricks</u>, 307 F.2d 36, 94 (3d Cir. 2002). There, this Court reviewed all of Marshall's claims of trial error, to determine if "the errors of all kinds," in the aggregate, amounted to a denial of due process. <u>Id.</u>

A cumulative prejudice claim is a claim that a petitioner's due process right to a fair trial has been violated by a series of constitutional errors that, individually, might be considered harmless. <u>Thomas v. Hubbard</u>, 273 F.3d 1164, 1179-80 (9th Cir. 2001). Such a claim requires the Court to determine whether the errors are harmless together, rather than individually. Analysis of cumulative error is, therefore, a particular kind of harmless error inquiry. <u>Cargle v. Mullin</u>, 317 F.3d 1196, 1220 (10th Cir. 2003).[150] Thus, the standard to be applied in determining whether due process has been violated by a collection of constitutional errors is the same as the standard for harmless constitutional error set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993). <u>See</u> <u>Thomas</u>, 273 F.3d at 1179-80; <u>Cargle</u>, 317 F.3d at 1220; <u>McKinney v. Rees</u>, 993 F.2d 1378, 1385-86 (9th Cir. 1993) (describing the similarity between the due process and <u>Brecht</u> standards).

Claims of ineffective assistance of counsel must likewise be judged cumulatively, as well

---

[150]In <u>Parks v. Mullin</u>, 327 F.3d 1001 (10th Cir. 2003), the Court explained:

A cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless. Unless an aggregate harmless determination can be made, collective error will mandate reversal, just as surely as will individual error that cannot be considered harmless.

<u>Id</u>. at 1218.

as individually. Although each instance of counsels' failures requires relief individually, in addition, the cumulative effect of each instance of counsels' failures is sufficiently prejudicial to require relief. Berryman v. Morton, 100 F.3d 1089 (3d Cir. 1996) (the cumulative effect of each instance of counsel's deficient performance was sufficiently prejudicial to require relief).

The circumstances of this case demonstrate that the cumulative effect of counsel's serious failures, and the constitutional errors committed by the court and the prosecutor, so undermined the fairness of the trial and sentencing proceedings that Petitioner's conviction must be overturned, or, alternatively, that his sentence of death must be vacated. As the Sixth Circuit has explained:

> Viewing the total picture, and considering both the nature of the material presented to the jury that should not have been and the nature of the material not presented to the jury that should have been, we cannot have much confidence in the jury's weighing of the factors relevant to the issue of whether [the defendant] should be sentenced to death.

Glenn v. Tate, 71 F.3d 1204, 1210 (6th Cir. 1995). Given all the factors discussed throughout the Petition and herein, Petitioner is entitled to habeas relief.

223

## PRAYER FOR RELIEF

WHEREFORE, based upon the foregoing, all prior proceedings and all submissions,

Petitioner respectfully prays that the Court grant him a new trial, a new sentencing hearing, an

evidentiary hearing on any claims involving disputed issues of facts, and/or any other relief

which this Court deems just.

<div style="margin-left: 40%;">

Respectfully Submitted,

*/s/ Tricia A. Russell*
Tricia A. Russell
Carol Wright
Capital Habeas Corpus Unit
1450 Liberty Center
1001 Liberty Avenue
Pittsburgh, PA 15222-3714
(412) 644-6565

Stuart Lev, Esq.
Capital Habeas Corpus Unit
Federal Court Division
Defender Association of Philadelphia
Suite 545W -- The Curtis Center
Independence Sq. West
Philadelphia, PA 19106
(215) 928-0520

</div>

Dated: December 19, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that on this date I caused a true and correct copy of the foregoing to be

served on the following person at the location and in the manner indicated below:

BY FIRST CLASS MAIL

Christopher Carusone, Esq.
Office of Attorney General
16th Floor, Strawberry Square
Harrisburg, PA 17120

/s/ Tricia A Russell
Tricia A. Russell, Esq.

Dated:  December 19, 2007