**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

MARK BREAKIRON,

                 Petitioner,

                                 Civil Action No. 00-300

      v.

                                 The Honorable Nora Barry Fischer

MARTIN HORN, et al.

                 Respondents.


## O P I N I O N

During the early morning hours of March 24, 1987, Petitioner Mark Breakiron ("Breakiron" or "Petitioner") killed Saundra Marie Martin, then age 24, during a robbery that took place as she was preparing to close Shenanigans' Lounge, the bar she worked at in Fayette County, Pennsylvania. In April 1988, a Fayette County jury convicted Breakiron of first degree murder and of robbery. Following a separate penalty hearing, he was sentenced to death. Currently pending before this court are Breakiron's claims for federal habeas corpus relief, which he has filed pursuant to 28 U.S.C. § 2254 and which are set forth in full in his Updated Memorandum Of Law In Support Of Petition For A Writ Of Habeas Corpus ("Updated Memorandum Of Law") (Docket No. 173).

Breakiron has shown that the prosecution withheld favorable evidence that could have been used to impeach the testimony of an important prosecution witness. Because the prosecution relied upon this witness's testimony to support its case of first degree murder and to challenge Breakiron's defense that he was guilty of a lesser degree of murder, I am constrained to hold that the withheld evidence resulted in a first degree murder conviction that is unworthy of

confidence and that Breakiron is entitled to a new trial to determine his degree of guilt on the crime of murder.

## I.    RELEVANT FACTUAL AND PROCEDURAL HISTORY[1]

This case has a lengthy and complex factual and procedural history that spans more than twenty years.  Breakiron has sought unsuccessfully to have his convictions and his death sentence overturned on direct appeal and in two separate state post-conviction proceedings.  Now his claims of alleged federal constitutional errors are before this court.  I will summarize only that which is pertinent to this decision.

## A.    The Crimes

On the evening of March 23, 1987, Martin was working at Shenanigans' Lounge.  She was to close the bar at the end of the night shift.  At around 11:00 a.m. on March 24, 1987, Richard Sanzi, Jr., one of the owners of the bar, arrived there.  He observed that Martin's car was still in the parking lot, and discovered that the dead bolt was not set on the door.  He entered the bar and saw two pools of wet blood stains on the floor, blood along the back of chairs, and blood on the door.  He observed a bloodied, broken ashtray on the floor.  Martin was nowhere to be found, her purse was not there, the bar's register had been emptied and approximately $140 was missing.  Sanzi notified the police and the search for Martin began.  (N.T. at 889-99, 903-04).

The police investigation quickly revealed that Breakiron had been the last patron at Shenanigans' Lounge.  The police interviewed him and he relinquished samples of what appeared to be blood from his truck and his clothing.  Testing showed that those blood samples matched

---

[1]  The Commonwealth has submitted portions of the state court record in hard copy format in seven volumes containing Appendices 1 through 51.  The trial transcript is numbered sequentially and is located at Appendices 4 through 12.

Martin's bloodtype.  On March 25, 1987, the police discovered Martin's unclothed body in a

wooded area not far from a vacant house owned by Breakiron's grandparents.  On April 3, 1987,

the police arrested Breakiron and charged him with the crimes of criminal homicide[2] and

robbery.[3]  (N.T. at 943-969, 981-83).

## B.    The Trial

Jury selection began in Breakiron's trial one year after his arrest, on April 4, 1988, in the

Court of Common Pleas of Fayette County.  (N.T. at 3-775).  His trial commenced on April 7,

1988.  Judge William J. Franks presided over the trial.  Mark F. Morrison, Esquire, then the

---

[2]  At Breakiron's trial, the jury was charged on first degree murder, second degree murder
(which is commonly referred to as felony murder), and third degree murder.  (N.T. at 1345-50).
In Pennsylvania, murder of the first degree is statutorily defined as causing the death of another
human being by an intentional killing.  18 PA.CONS.STAT. § 2502(a).  "Intentional killing" is
defined as "[k]illing by means of poison, or by lying-in-wait, *or by any other kind of willful,
deliberate and premeditated killing*."  Id. § 2502(d) (emphasis added).  Second degree murder is
defined as a criminal homicide committed while the defendant was engaged in the perpetration of
a felony (in this case, a robbery).  Id. § 2502(b).  All other killings with malice are third degree
murder.  Id. § 2502(c); see Commonwealth v. Cruz-Centeno, 668 A.2d 536 (Pa.Super.Ct. 1995).

The jury also was charged on voluntary manslaughter, id. § 2502(a), and instructed that it
could find Breakiron guilty of that crime if it concluded that the killing was without malice and
was committed under a sudden and intense passion resulting from provocation from the victim.
(N.T. at 1350).  There was no serious allegation made by the defense that Martin provoked her
attack or that a conviction of voluntary manslaughter was a viable option for the jury.  Breakiron
admits that at his trial he effectively conceded that he was guilty of murder, but contends that he
is guilty of third degree murder and not first degree murder.  (Docket No. 173 at 87).

[3]  In relevant part, under Pennsylvania law, "[a] person is guilty of robbery if, in the
course of committing a theft, he: (i) inflicts serious bodily injury upon another; (ii) threatens
another with or intentionally puts him in fear of immediate serious bodily injury; (iii) commits or
threatens to commit any felony of the first or second degree; [or] (iv) inflicts bodily injury upon
another or threatens another with or intentionally puts him in fear of immediate bodily injury[.]"
18 PA.CONS.STAT. § 3701.  "Theft" is defined as the unlawful taking, or exercise of unlawful
control over, the movable property of another with intent to deprive him thereof.  Id. § 3921.

Acting District Attorney of Fayette County, and Cynthia M. Cline, Esquire, Assistant District Attorney, prosecuted the case. Breakiron had been represented by three Public Defenders during the pre-trial proceedings, but from January 1988 forward he was represented solely by Public Defender Richard E. Bower, Esquire.

### 1.   The guilt-phase of the trial

At the trial, the Commonwealth contended that Breakiron was guilty of first degree murder. Breakiron did not contest that he was criminally responsible for Martin's homicide. He acknowledges that he "effectively conceded his guilt of third degree murder[.]" (Docket No. 173 at 87). He presented a diminished capacity defense based upon his voluntary intoxication, asserting that he was too drunk to have the specific intent to kill. Commonwealth v. Marshall, 810 A.2d 1211 (Pa. 2002) (a showing of voluntary intoxication can negate the intent necessary for a conviction of first degree murder and reduce the crime of murder from first to third degree).

Breakiron testified in his own defense at the trial. He stated that when he got off work at 5:30 p.m. on March 23, 1987, he drank two beers and then went to Hopwood Tavern and drank two more beers. (N.T. at 1235-36, 1268-70). Around 7:00 p.m., he drove to his mother's house and then to his grandmother's house. He said he noticed a car parked on a nearby dirt road, and walked up that road. He met a group of people there, and consumed approximately four more beers. (N.T. at 1238, 1268-70). At about 10:00 p.m., Breakiron testified, he went to Rockin' R Lounge, where he drank a couple of beers and had a shot of Jack Daniels. (N.T. at 1245-48). Next, he went to Shenanigans' Lounge, where he sat with Edward Mihalsky, an acquaintance of

his.[4]  (N.T. at 1249, 1276).

Breakiron testified that when he went to Shenanigans' Lounge, his intentions were to "[j]ust to have a good time[,]" meaning "[h]ave a few beers, talk with some people, watch a little t.v."  (N.T. at 1261).  While there, Breakiron testified, he had a total of six sixteen-ounce beers. (N.T. at 1250).  He stated that when he was at Shenanigans' Lounge, he "had a pretty good buzz on" and was "[f]eeling good."  When asked if he was drunk, he replied: "I was not falling down, staggering drunk."  (N.T. at 1256).

Breakiron testified that after Mihalsky left, he and Martin were alone in the bar.  (N.T. at 1251).  He stated that he and Martin began to talk.  (N.T. at 1252-53).  Breakiron explained that he thinks he may have put his arm around Martin, and that the next thing he knew he was "getting hit over the head with something heavy" and he fell to the floor.  (N.T. at 1253-54). When he sat up, he testified, he saw Martin's body lying beside him with a knife sticking out of her back.  (N.T. at 1254-55).  He said he pulled the knife out, ran out of the bar, got into his truck and began driving away.  (N.T. at 1255).  Breakiron testified that the event was "like a t.v. screen inside my head and I saw somebody laying there getting stabbed."  (N.T. at 1256).  He explained that he "remember[ed] a person getting stabbed" and that he had pulled "a knife out of her." (N.T. at 1258-59).  Breakiron stated that he turned around and drove back to the bar because he knew "something wrong was done.  Something wrong had happened and that some way [he] felt that [he] was a part of it" and he "had to correct it."  (N.T. at 1257).  When he reentered the bar, he stated, he picked Martin's body up, took it outside, and put it in the bed of his truck.  (N.T. at

---

[4]  Mihalsky testified for the Commonwealth and he stated Breakiron had arrived at the bar after him and that they sat and talked for approximately an hour to an hour and a half.  He said that Breakiron's speech was not slurred.  (N.T. at 838, 856).

1259-60). Breakiron said that when he started to leave, he saw the bar's money bags on the floor, took them, and put them in his truck (he later admitted that he also took Martin's purse). (N.T. at 1260-61, 1281). Breakiron testified that he drove Martin's body to his grandparent's house and "[t]ried to figure out what to do." (N.T. at 1264, 1281). Eventually, he drove up a dirt road and disposed of her body at the location where the police found it the next day. (N.T. at 1282).

The Commonwealth presented the testimony of Dr. Manuel Pelaez, the pathologist who performed the autopsy, to show that Breakiron had inflicted brutal injuries upon Martin. Dr. Pelaez testified at length as to the nature of the severe injuries that Martin had sustained to her head, neck, trunk, and extremities. (N.T. at 1048-62). He stated that the cause of Martin's death was internal and external bleeding secondary to multiple stab wounds, and that blunt force injuries to her head contributed to her death. (N.T. at 1062-63). Dr. Pelaez also stated that there were numerous cuts and slashes on both of Martin's hands, which he described as defensive wounds that indicated that she had attempted to protect herself with her hands. (N.T. at 1092).

The Commonwealth also presented the testimony of Ellis Price. In 1986, Ellis Price had been serving an out-of-state prison term in Michigan. Fayette County authorities obtained temporary custody of him from Michigan so that he could stand trial in October 1986 on an unrelated criminal case that also was tried before Judge Franks. Ellis Price was imprisoned in the Fayette County Jail at the same time as Breakiron, and on August 4, 1987, Trooper Gary D. Brownfield interviewed him and he reported incriminating statements that he said that Breakiron had made to him regarding Martin's murder. As will be discussed in more detail *infra,* Fayette County authorities returned Ellis Price to Michigan custody in or around the fall of 1987, and he was temporarily transferred back to Fayette County in order to testify at Breakiron's April 1988

trial.

At Breakiron's trial, Ellis Price testified that when they were imprisoned together, Breakiron had described to him how he had carried out the murder of Martin. Ellis Price stated that Breakiron told him that he hid in the bathroom of Sheningans' Lounge and waited for the remaining patrons to leave before coming back out. (N.T. at 1114). According to Ellis Price, Breakiron said that when Martin told him he had to leave because it was closing time, he picked up an ashtray and started hitting her and when "[s]he wouldn't go to the floor[,]" "he pulled out the knife." (Id.) Ellis Price further testified that Breakiron told him that he dragged Martin out of the bar, took her to his "pap's house," and "finished her off there." (N.T. at 1114-15). He said that Breakiron explained to him that he disposed of both his and Martin's clothes "in a paint can and threw them in some kind of water." (N.T. at 1115). He testified that Breakiron told him that "[h]e had a knife that he said that they [the police] found in his truck later on … that was used in there and they don't know about it.... He said that it was used to stab her with and that the police don't know that that's the weapon."[5] (Id.)

During direct examination, Morrison asked Ellis Price what crime he had been convicted of in Michigan. (N.T. at 1111). Ellis Price stated that his Michigan sentence was for "assault." (Id.) Morrison also asked him whether the prosecution had made any deal with him in exchange for his testimony. Ellis Price testified that there was no deal. (N.T. at 1115-16). Bower probed further during cross examination, and asked Ellis Price whether he had been offered money to testify against Breakiron. He responded that he had not been offered any money. (N.T. at 1116).

_____

[5] Dr. Pelaez testified that Martin's stab wounds were consistent with the size, weight, and physical characteristics of the knife that the police had seized from Breakiron. (N.T. at 1064-72).

Bower also asked Ellis Price whether the prosecution had tried to assist him in receiving sentencing relief from his Michigan conviction for cooperating with it in its case against Breakiron. Once again, Ellis Price denied receiving any benefit in exchange for his testimony. (N.T. at 1117-18). Bower asked Ellis Price whether he "work[ed] out any type of deal at all in regard to any charges which were pending against [him] at the time" he gave his statement to Trooper Brownfield, and Ellis Price stated that no deal had been made. (N.T. at 1125).

Next, Bower attempted to suggest that Ellis Price had read about the Martin homicide in the newspaper and that he had learned about the case from an outside source, and not from Breakiron. Ellis Price acknowledged that he had read about the case in the newspaper when the murder first occurred, but he denied the suggestion that his testimony had been derived from newspaper reports or from any other individual aside from Breakiron. (N.T. at 1119, 1123-24). Bower asked Ellis Price whether his Michigan conviction for assault was for an attempted murder, and Ellis Price responded: "No.... Just an assault." (N.T. at 1117).

On April 13, 1988, counsel gave their closing arguments. Bower highlighted Breakiron's alcohol consumption on the evening of the killing. He stated that the evidence demonstrated that Breakiron had consumed approximately 232 ounces of beer between 5:30 p.m. and 12:30 a.m., and he contended that that amount of alcohol consumption by a "thin" man such as Breakiron would have affected his ability to form the specific intent to kill. He also reminded the jury that Breakiron testified that he could not remember harming Martin, that he had lost consciousness, and that when he had regained consciousness he looked over and saw the knife in her body. Bower stated that Breakiron panicked and tried to cover up the murder because he knew that he was responsible and that he had done something wrong. (N.T. at 1314-23).

Bower also stressed to the jury that on the issue of specific intent to kill "[t]here are two people" whose testimony it had to "examine" and "reconcile" and that "those two people are Ellis Price and Mark Breakiron." (N.T. at 1313-14). He argued that Ellis Price's testimony was not credible, and suggested that Ellis Price learned about the case from reading about it in the newspaper. (Id.) Bower asserted that Ellis Price (who was from Uniontown, Pennsylvania) was motivated to testify against Breakiron so that he could get a "free trip" from Michigan jail to Fayette County so that he could see his family. (N.T. at 1313-14, 1319).

Voluntary intoxication is not a defense to any other criminal charge other than first degree murder, nor may evidence of voluntary intoxication be introduced to negate the element of intent for other offenses. 18 Pa.Cons.Stat. § 308. Therefore, Breakiron's assertion of voluntary intoxication could not be relied upon as a defense to the crime of robbery. In defense of that charge, Bower argued that Breakiron's testimony indicated that he did not decide to steal the bar's money bags or Martin's purse until after he had killed Martin, had returned to the bar the second time, and had noticed then that the items were available to take. Bower asserted that under those circumstances, Breakiron did not take the purse and money bags by force or while he was inflicting bodily injury upon Martin and therefore he could not be found guilty of a robbery. (N.T. at 1320-21).

In his closing, Morrison discussed Ellis Price's testimony and maintained that his testimony was credible, stating:

> Mr. Bower talked to you about Ellis Price. Ellis Price told you that he read about this case in the paper when it happened. *He also told you that he had no deal with the Commonwealth, no bargain. He was paid no money. Nothing to gain at all.* He told you he had several conversations with the defendant, some in the defendant's cell. Remember, ladies and gentlemen, we don't know if Ellis Price

had any visits with his family.  We don't know if he has any family.  Please consider that.  Further, ladies and gentlemen, remember that this individual has to go back to prison.  Now would a reasonable person, even a prisoner, fraudulently or frivolously testify against another person and then be returned to the prison population?  Consider that, ladies and gentlemen.  *Consider the credibility of Ellis Price.  Consider whether Ellis Price had any bias or interest in the outcome of this case*.  Consider that in determining whether or not he made that up to get a free trip back to Uniontown.

(N.T. at 1325-26 (emphasis added)).

Next, Morrison reviewed all of the evidence of Breakiron's conduct before and after the killing and maintained that his actions showed that he had sufficient volition to know what he was doing and therefore his voluntary intoxication defense had no merit.   (N.T. at 1327-36).  In discussing the element of specific intent necessary for a first degree murder conviction, Morrison referenced the brutal nature of Breakiron's attack and pointed to Dr. Pelaez's description of the severity of Martin's injuries and to Ellis Price's testimony that Breakiron had admitted that he had taken Martin to his "pap's house to be finished off."  (N.T. at 1338).  Morrison also highlighted Ellis Price's testimony to establish a premeditated killing, stating:

As for premeditation, ladies and gentlemen, please consider Ellis Price and if you believe him, consider that the defendant waited until everyone was gone; that he struck Saundra Marie Martin and she wouldn't go down.  So, he got his knife.  Consider that he had a knife in the first place.  Consider that he took her to finish her off in Mr. Price's words.  Consider that he attempted to hide the evidence in making your determination as to whether or not there was premeditation and the period of time over which this all evolved.

(Id.)  He later asked the jury to consider "the testimony of Ellis Price regarding Mark David Breakiron's statement concerning his committing this crime [of first degree murder]."  (N.T. at 1340).

In arguing that the jury should also convict Breakiron of robbery, Morrison pointed out

that Breakiron admitted that he took the money bags and the purse from the bar and that the evidence supported the finding that Breakiron did so while inflicting serious bodily injury upon Martin. He asserted that Breakiron's defense that he did not notice or decide to take the money bags and purse until after Martin had already been killed was not believable and the jury should reject it. (N.T. at 1334-36).

The jury did not credit Breakiron's defenses. It convicted him of first degree murder and of robbery. (N.T. at 1373-74). Court recessed at 11:50 a.m. and reconvened at 2:30 p.m. for the sentencing hearing.

**2.     The sentencing phase of the trial**

To support its case that Breakiron should be sentenced to death, the Commonwealth relied upon two statutorily-defined aggravating circumstances: that the killing was done during the commission of a felony (the robbery), 42 PA.CONS.STAT. § 9711(d)(6), and that the killing was done by means of torture, id. § 9711(d)(8). It moved into evidence all that it had presented during the guilt phase of the trial and it rested its case. (N.T. at 1383-84). Breakiron testified at the sentencing hearing, and he also presented the testimony of his pastor, David Collins, and his mother, Gloria Breakiron. He relied upon three statutorily-defined mitigating circumstances: (1) that his capacity to conform his conduct to the requirements of the law was substantially impaired due to his alcohol consumption, 42 PA.CONS.STAT. § 9711(e)(3); (2) his age (25), id. § 9711(e)(4); and, (3) any other evidence of mitigation concerning his character and his record or the circumstances of the offense, id. § 9711(e)(8) (commonly referred to as the "catch all" mitigating factor). (N.T. at 1441).

On April 14, 1988, the jury reached the verdict on the sentence Breakiron should receive.

It found the two aggravating factors proposed by the Commonwealth and no mitigating factors. (N.T. at 1448; App. 13). Judge Franks imposed the mandatory sentence of death. (N.T. at 1451-52). On December 21, 1988, Judge Franks sentenced Breakiron on the robbery conviction to a term of imprisonment "of not less than five years nor more than ten years. This sentence to commence and be computed at the expiration of the sentence imposed on April 14, 1988." (App. 14).

## C.    Post-Trial History

### 1.    Direct appeal

Breakiron, through Bower, filed a motion for new trial (App. 15), which Judge Franks denied on December 12, 1988 (App. 17). He filed a direct appeal to the Pennsylvania Supreme Court. (App. 18). On March 14, 1990, the Pennsylvania Supreme Court affirmed. Commonwealth v. Breakiron, 571 A.2d 1035 (Pa. 1990) ("Breakiron-1"). The United States Supreme Court denied *certiorari* on October 1, 1990. Breakiron v. Pennsylvania, 498 U.S. 881 (1990). Accordingly, Breakiron's judgment of sentence became final on that date. Swartz v. Meyers, 204 F.3d 417, 419 (3d Cir. 2000) (a judgment of sentence becomes final at the conclusion of direct review).

### 2.    First state post-conviction proceeding

In March 1996, Breakiron commenced in the Court of Common Pleas a proceeding under Pennsylvania's Post-Conviction Relief Act ("PCRA," or the "Act"), 42 PA.CONS.STAT. § 9541 *et seq.* (the "first PCRA proceeding"). Judge Franks appointed Phyllis A. Jin, Esquire, to represent him. She filed an amended PCRA petition on his behalf. (App. 23; see also App. 30). Judge Franks presided over evidentiary hearings on July 17 and 18, 1997 and on September 17 and 29,

1997.[6]  On January 27, 1998, Judge Franks issued his Opinion in support of the denial of PCRA

relief.  (App. 33).  The Pennsylvania Supreme Court affirmed on April 19, 1999.

Commonwealth v. Breakiron, 729 A.2d 1088 (Pa. 1999) ("Breakiron-2").  The United States

Supreme Court denied *certiorari* on February 22, 2000.  Breakiron v. Pennsylvania, 528 U.S.

1169 (2000).

### 3.  The commencement of this federal habeas proceeding and the second state post-conviction proceeding

On February 7, 2000, then Governor Tom Ridge signed a death warrant for Breakiron.

On February 14, 2000, attorneys from the Capital Habeas Corpus Unit, Federal Court Division,

Defender Association of Philadelphia, began federal habeas corpus proceedings in this court by

filing a motion for stay of execution and a motion for appointment of counsel.  The case was

initially assigned to Judge William L. Standish of this court, who issued a stay of execution and

ordered counsel for Breakiron to file a petition for writ of habeas corpus.  (Docket Nos. 1-3).

At the same time that Breakiron was seeking habeas relief in federal court, he continued

to pursue his remedies in the state court.  On March 23, 2000, he filed another PCRA petition

("second PCRA petition") in the Court of Common Pleas, in which he raised new claims for state

post-conviction relief, including claims of prosecutorial misconduct.  (App. 40-41).  Almost five

months later, in August 2000, he filed his petition for writ of habeas corpus with this court.

(Docket No. 6).  Many of the claims that Breakiron raised in this original habeas petition,

including the prosecutorial misconduct claims, also were being simultaneously litigated in the

second PCRA petition.  Accordingly, on June 13, 2001, Judge Standish issued an Order that this

_____

[6]  Transcripts of these state PCRA hearings are contained at Appendices 24 through 29.

13

federal proceeding was to be held in abeyance pending resolution of the second PCRA petition in state court. (Docket Nos. 22, 27).

On July 31, 2000, Judge Franks presided over a PCRA hearing that was limited to the timeliness of Breakiron's second PCRA petition. (App. 44). On December 1, 2000, he issued an Opinion in which he held that the second PCRA petition was untimely under the one-year statute of limitations enacted by the 1995 amendments to the Act, 42 Pa.Cons.Stat. § 9545(b). (App. 48). The Pennsylvania Supreme Court affirmed. Commonwealth v. Breakiron, 781 A.2d 94 (Pa. 2001) ("Breakiron-3"). It held that under the 1995 amendments to the PCRA, "[a]ny PCRA petition, including a second or subsequent petition, must be filed within one year of the date the judgment becomes final." Id. at 97. It ruled that because Breakiron's judgment of sentence became final on October 1, 1990, and he did not file his second PCRA petition until March 2000 – "almost ten years later" – the petition was time barred.[7] Id. at 97-101.

After the Pennsylvania Supreme Court issued its decision in Breakiron-3, Judge Standish reactivated this federal proceeding. On May 15, 2002, Breakiron filed an Amendment to Petition For Habeas Corpus (Docket No. 44), which, as explained in more detail infra, raised additional claims of prosecutorial misconduct based upon "recently discovered additional evidence" of misconduct. (Id. at 6).

In its Answer (Docket No. 48), the Commonwealth contended, inter alia, that: (a) the

---

[7] Because it was his second PCRA petition, Breakiron was not entitled to the one-year grace period for first petitions in cases that were final before the 1995 PCRA amendments took effect. The 1995 amendments to the PCRA provided that a first-time PCRA petitioner whose judgment of sentence became final on direct appeal on or before the effective date of the amendments could file a first PCRA petition within one year of the effective date of the amendments (January 16, 1996). See Section 3(1) of the Act of Nov. 17, 1995 (Spec.Sess. No. 1) P.L. 1118, No. 32.

ruling by the Pennsylvania Supreme Court in Breakiron-3 that the second PCRA petition was untimely mandated a finding by this court that all of the claims raised by him in that proceeding may not be reviewed on the merits by this court under the doctrine of procedural default; and, (b) in addition, the new assertions of prosecutorial misconduct raised in his amended habeas petition were never exhausted in state court, and for that reason were procedurally defaulted.

On October 15, 2004, Judge Standish issued a Memorandum Opinion in which he ruled on the Commonwealth's procedural default defense. (Docket No. 62). As explained more fully in that decision, Judge Standish held that the claims Breakiron raised in his second PCRA petition were not procedurally defaulted from federal habeas review because the procedural rule applied by the Pennsylvania Supreme Court in Breakiron 3 (the statute of limitations enacted by the 1995 amendments to the PCRA) was not "firmly established and regularly followed" at the time of Breakiron's alleged default between October 1990 and October 1991 (the one year period following the conclusion of his direct review). (Docket No. 62 at 12-14 and cases cited therein).[8] Accordingly, this court is not procedurally barred from ruling on the merits of the federal constitutional claims that were raised in the second PCRA petition. Subsequently, the United

---

[8] In capital cases in Pennsylvania, the statute of limitations set forth in 42 PA.CONS.STAT. § 9545(b)(1) was not firmly established or regularly applied until November 23, 1998, at the earliest, when the Pennsylvania Supreme Court decided Commonwealth v. Albrecht, 720 A.2d 693, 700 (Pa. 1998). Before the issuance of that case, the Pennsylvania Supreme Court would review the merits of claims raised in capital PCRA proceedings under the "relaxed waiver" rule, regardless of any alleged procedural bar at issue. Bronshtein v. Horn, 404 F.3d 700, 708-09 (3d Cir. 2005) (collecting Pennsylvania cases). In Albrecht, the Pennsylvania Supreme Court declared that it would no longer follow the "relaxed waiver" rule in capital PCRA cases. In Commonwealth v. Banks, 726 A.2d 374, 376 (Pa. 1999) the Pennsylvania Supreme Court addressed the relationship between the "relaxed waiver" rule and the § 9545(b)(1) time limitations and held that "the issue here is one of jurisdiction and not waiver." See also Lines v. Larkins, 208 F.3d 153, 164 n.17 (3d Cir. 2002) ("Prior to Banks there was some doubt as to the proper scope and application of the one year limitations period under the amended PCRA.").

States Court of Appeals for the Third Circuit has decided a number of cases that are consistent with Judge Standish's ruling. See, e.g., Bronshtein, 404 F.3d at 707-10 (recognizing that petitioner, whose second PCRA petition was untimely under § 9545(b)(1), had not defaulted federal review because Pennsylvania previously applied the "relaxed waiver" rule, under which a claim of constitutional error in a capital case would not be waived by a failure to preserve it); Taylor v. Horn, 504 F.3d 416, 427-28 (3d Cir. 2007) (same); Fahy v. Horn, 516 F.3d 169, 188-89 (3d Cir. 2008) (same).

Judge Standish also made further rulings regarding the new assertions of prosecutorial misconduct that Breakiron had raised in his amended habeas petition. (Docket No. 62 at 18-21). I shall discuss those rulings and the subsequent matters that occurred in this proceeding when I address Breakiron's prosecutorial misconduct claims. At this point, it is sufficient to note that limited discovery was permitted and that while the parties were conducting discovery, this case was reassigned to Judge Thomas J. Hardiman. After discovery concluded, an evidentiary hearing was held in this court on February 2, 2007. Soon afterwards, Judge Hardiman was elevated to the Court of Appeals for the Third Circuit, and the case was reassigned to me. After post-hearing findings of fact were issued, Breakiron submitted his Updated Memorandum of Law (Docket No. 173) and the Commonwealth supplemented its Answer to address Breakiron's amended prosecutorial misconduct claims (Docket No. 177).

I now turn to the merits of Breakiron's claims for habeas relief.

## II.  STANDARD OF REVIEW

Under the federal habeas statute, 28 U.S.C. § 2254, a state prisoner is entitled to habeas corpus relief only if he demonstrates that his state custody violates his federal constitutional rights.  28 U.S.C. § 2254(a).  In 1996, Congress amended 28 U.S.C. § 2254 with the enactment of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA").  AEDPA "modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  Bell v. Cone, 535 U.S. 685, 693 (2002).  As codified at 28 U.S.C. § 2254(d), it provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

See also Williams v. Taylor, 529 U.S. 362, 405-06 (2002); Lambert v. Blackwell, 387 F.3d 210, 234 (3d Cir. 2004).

Evaluation of a petitioner's legal claims under § 2254(d)(1) proceeds in two steps.  See Hackett v. Price, 381 F.3d 281, 287 (3d Cir. 2004); Werts v. Vaughn, 228 F.3d 178, 197 (3d Cir. 2000).  First, the court must identify the applicable United States Supreme Court precedent to determine whether the state court's adjudication of the claim is contrary to it.  "A state-court decision is 'contrary to' clearly established federal law if the state court (1) 'contradicts the

governing law set forth in [the Supreme] Court's cases' or (2) 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a [different] result.'" Lambert, 387 F.3d at 234 (quoting Williams, 529 U.S. at 405-06).

The federal habeas court more often must determine whether the state court adjudication was an "unreasonable application" of Supreme Court precedent. "A state-court decision 'involve[s] an unreasonable application' of clearly established federal law if the state court (1) 'identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular … case'; or (2) 'unreasonably extends a legal principle from [Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply.'" Id. (quoting Williams, 529 U.S. at 407). "Under the 'unreasonable application' prong of § 2254(d)(1), 'the question … is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Abu-Jamal v. Horn, 520 F.3d 272, 279 (3d Cir. 2008) (quoting Schriro v. Landrigan, — U.S. — , 127 S.Ct. 1933, 1939 (2007) (citing Williams, 529 U.S. at 410)).

As the introductory sentence of § 2254(d) makes explicit, the standard of review set forth therein applies to only those claims that were "adjudicated on the merits" by a state court. Rompilla v. Horn, 355 F.3d 233, 243 (3d Cir. 2004), rev'd on other grounds sub nom., 545 U.S. 374 (2005);Chadwick v. Janecka, 312 F.3d 597, 605-07 (3d Cir. 2002); Bronshtein, 404 F.3d at 701 n.4; Fahy, 516 F.3d at 197, 203 n.36. When a claim was not "adjudicated on the merits," review is de novo. Id. at 243; Chadwick, 312 F.3d at 605-07; Bronshtein, 404 F.3d at 710 n.4.

In addition, regardless of whether a given claim was adjudicated on the merits and is

subject to the standard of review set forth at § 2254(d), a state court's factual determinations are presumed to be correct under AEDPA pursuant to 28 U.S.C. § 2254(e)(1). Lambert, 387 F.3d at 239; Taylor, 504 F.3d at 429. Section 2254(e)(1) instructs that "a determination of a factual issue made by a State court shall be presumed to be correct. The [petitioner] shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."

## III.    BREAKIRON'S GUILT PHASE CLAIMS

### A.    The Trial Court's Refusal To Order A Change Of Venue[9]

Breakiron contends that he was denied his constitutional right to an impartial jury because Judge Franks denied his request for a change of venue. He raised this same claim during direct review, and the Pennsylvania Supreme Court rejected it on merits in Breakiron-1, giving two reasons. First, it held that any prejudice against Breakiron created by the media coverage dissipated during an almost one year "cooling-off" period between the most extensive and inflammatory coverage and the selection of the jury. Breakiron-1, 571 A.2d at 1037. Second, it examined the 772 pages of *voir dire* testimony and concluded that none of the individuals actually chosen for the jury were affected by the pretrial publicity. Id. at 1038.

Because the Pennsylvania Supreme Court adjudicated this claim on the merits, the standard of review set forth in 28 U.S.C. § 2254(d) applies. Breakiron admits that the Pennsylvania Supreme Court applied the correct rule of law from United States Supreme Court precedent in a manner that was not "contrary to" that precedent. (Docket No. 173 at 77 n.43). Therefore, the only issue before me is whether its decision was "an unreasonable application of"

---

[9] This is Claim 2 of Breakiron's Updated Memorandum of Law.

that law or an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

## 1. Factual Background

On or about September 10, 1987, Breakiron filed a motion for change of venue, citing the extensive publicity Martin's murder and his arrest received in the local media. (App. 1). He directs this court to the same newspaper articles that he relied upon in his pre-trial motion for change of venue. These articles date from March 26, 1987 (just a day after Martin's body was recovered by the police) through April 23, 1987 (almost twelve months prior to selection of the jury). (Docket No. 173 at 69-73; App. 1, Exs. A-K).

The newspaper articles cited by Breakiron were issued by THE UNIONTOWN HERALD-STANDARD, one of the area's major newspapers. These articles show that the coverage of Martin's murder and Breakiron's arrest was considerable, and oftentimes graphic. The newspaper accounts revealed details of the severity of the wounds Martin sustained, of her autopsy, and included information and quotes from her family. One article included pictures of Breakiron, apparently in handcuffs, being escorted by a police officer, and quoted the District Attorney as stating: "It was a very brutal murder … this is one of the most brutal (murders) I've ever seen." (App. 1, Ex. E). Another article detailed Breakiron's prior record – including charges that were subsequently dropped – as well as an incident in which he had allegedly held his mother and sister at knife point. (App. 1, Ex. F). The story also reported Breakiron's prior prison sentences, mentioned a psychiatric evaluation, specifically noted that the offenses involving Martin took place shortly after his last release from prison, and contained quotes such as "He's bad news," and "He's a cuckoo[.]" (Id.)

In addition to the newspaper articles, Breakiron also relied upon an April 7, 1987, news editorial from the UNIONTOWN HERALD-STANDARD. This editorial called Martin's murder "one of Fayette County's most brutal and heinous crimes within recent memory." The editorial also criticized the District Attorney for "inject[ing] himself into a news conference, called far enough in advance to be sure that television cameras would be lined up. He made a media circus out of it." (App. 1, Ex. H).

On January 26, 1988, Judge Franks denied Breakiron's motion for change of venue "without prejudice, with leave to renew if it appeared during *voir dire* that a significant number of jurors were affected by the publicity." (App. 3 at 2). Breakiron did not renew his request for change of venue before Judge Franks.

### 2.    Legal Analysis

The United States Supreme Court has held that the due process clause of the Fourteenth Amendment guarantees a criminal defendant the right to "a trial by an impartial jury free from outside influences." Sheppard v. Maxwell, 384 U.S. 333, 362 (1966); see also Irvin v. Dowd, 366 U.S. 717, 722 (1961); Rideau v. Louisiana, 373 U.S. 723 (1963); Estes v. Texas, 381 U.S. 532 (1965); Murphy v. Florida, 421 U.S. 794 (1975); Patton v. Yount, 467 U.S. 1025 (1984). When prejudicial pretrial publicity or an inflamed community atmosphere preclude seating an impartial jury, due process requires the trial court to grant a defendant's motion for change of venue, Rideau, 373 U.S. at 726, or a continuance, Sheppard, 384 U.S. at 362-63. Ultimately, the question is whether a defendant's trial was not fundamentally fair. Two standards guide analysis of this question. They are the "presumed prejudice" standard and the "actual prejudice" standard.

### a. Refusal to presume prejudice

"Where media or other community reaction to a crime or a defendant engenders an atmosphere so hostile and pervasive as to preclude a rational trial process, a court reviewing for constitutional error will presume prejudice to the defendant without reference to an examination of the attitudes of those who served as the defendant's jurors." Rock v. Zimmerman, 959 F.2d 1237, 1252 (3d Cir. 1992), overruled on other grounds by Brecht v. Abrahamson, 507 U.S. 619 (1993); see also Sheppard, 384 U.S. at 333; Rideau, 373 U.S. at 723. Such cases, however, are "exceedingly rare." Id. at 1253; Flamer v. Delaware, 68 F.3d 736, 754 (3d Cir. 1995). In fact, for a court to presume prejudice, "the community and media reaction … must have been so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." Id. at 1252.

In refusing to presume prejudice in Breakiron's case, the Pennsylvania Supreme Court relied on the almost twelve month "cooling-off period" between the time when the alleged prejudicial coverage was released and the selection of the jury. Breakiron-1, 571 A.2d at 1037-38. The United States Supreme Court has explained that, even when pretrial publicity is extensive and severe, a lapse in time between the publicity and the trial can dissipate any prejudice that may have resulted. In Murphy, for instance, the Supreme Court held that extensive media coverage of the defendant's prior crimes did not amount to prejudice, particularly since the publicity had stopped seven months before jury selection. 421 U.S. at 802. In Patton, the Court found no prejudice when the extensive and prejudicial media coverage occurred four years before the trial itself. During that time, "the community sentiment had softened." Patton, 467 U.S. at 1034. "That time soothes and erases is a perfectly natural phenomenon, familiar to all," the

Patton Court explained.

> The relevant question is not whether the community remembered the case, but whether the jurors at [the defendant's] trial had such fixed opinions that they could not judge impartially the guilt of the defendant. It is not unusual that one's recollection of the fact that a notorious crime was committed lingers long after the feelings of revulsion that create prejudice have long passed. . . . *[I]t is clear that the passage of time. . . can be a highly relevant fact. In the circumstances of this case, we hold that it clearly rebuts any presumption of partiality or prejudice that existed at the time of the initial trial.*

Id. at 1035 (emphasis added) (internal citations omitted).

Acknowledging that some of the newspaper coverage in this case was "inherently prejudicial," Breakiron-1, 571 A.2d at 1037, the Pennsylvania Supreme Court nonetheless held that "there was an adequate cooling-off period to enable an impartial jury to be empaneled." Id. There is ample support for the Pennsylvania Supreme Court's conclusion that the "cooling off period" had an effect in the present case. The news articles that Breakiron presented to the trial court in his motion for change of venue ran nearly twelve months before the jury was selected in the case, long enough for any initial hostility in the community to have dissipated. See Murphy, 421 U.S. at 802; Flamer, 68 F.3d at 755 (refusing to presume prejudice when there was a lapse of eight months between the publication of the last newspaper story on which the defendant relied and the start of jury selection); see also Pruett v. Norris, 153 F.3d 579, 586 (8th Cir. 1998) (recognizing benefits of cooling-off period of eleven months). I cannot conclude that the Pennsylvania Supreme Court's reliance on a "cooling off period" was an unreasonable application of Supreme Court precedent or an unreasonable determination of the facts in light of the evidence presented before it on direct appeal and the trial court in ruling on the motion for change of venue.

Breakiron contends, however, that the Pennsylvania Supreme Court's reliance on this "cooling-off period" was in error because the UNIONTOWN HERALD-STANDARD continued to publish regular updates on the case throughout the year. In support, he summarizes the following articles, which he submitted to this court in Exhibit 21 of his Appendix In Support Of Petition For Writ Of Habeas Corpus, which is lodged at Docket No. 42:

- "On May 5, 1987, an article entitled 'Breakiron to Get Mental Testing' explained that Petitioner's lawyer had requested that a competency examination be conducted."

- "On August 30, 1987, an article announced that the victim's father filed suit against the owners of the bar where the deceased was killed and recapitulated the facts of the killing and some of the evidence against Petitioner."

- "On October 27, 1987, an article entitled 'Breakiron Requests Change of Venue' repeated Petitioner's assertion that the sensational publicity made a fair trial impossible and reported on Petitioner's efforts to suppress evidence against him as illegally seized."

- "Another article, on November 17, [1987,] reporting a fire that destroyed the bar where the killing occurred and retold the story of the 'brutal stabbing' that had occurred there."

- "On December 13, 1987, an article detailing the evidence presented at a pre-trial hearing again reported Petitioner's effort to suppress evidence, described how the police discovered the incriminating evidence against Petitioner, reported statements Petitioner allegedly made to the police admitting his presence at the bar, but not admitting participation in the killing and explained how 'while Breakiron was being questioned by [state trooper] Fayock, other officers were breaking the case open.'"

- "On January 3, 1988, the Herald Standard reviewed the top ten stories of the year. This case, dubbed the 'Tavern Murder' was number 2 on the list."

- "On February 26, [1988,] an article entitled 'DA to Seek Death Penalty Against Breakiron,' reported that, in this 'brutal' case, the district attorney had announced that this case 'has all the earmarks of a capital case,' and that his office[ ] had, as a group, decided that there would be no plea bargains offered to Petitioner."

- "On March 4, [1988,] an article reported that Petitioner's trial was delayed, over the Commonwealth's objection, to allow the defense more time to prepare and to seek a second psychiatric examination of Petitioner."

(Docket No. 173 at 73-74). In addition to the above-cited articles, Breakiron also cites two memorials – one published in the newspaper on November 17, 1987 and the other on April 3, 1988 – that Martin's family members placed in the newspaper in her honor. Each memorial contained a picture of Martin and a message from her family or a family member. (See Ex. 21 to Docket No. 42).

Breakiron's reliance upon the above-cited articles and memorials is misplaced for several reasons. First, it appears that only one of these articles was presented to the trial court in support of the motion for change of venue: the August 30, 1987 article about the civil case that Martin's father had filed. (See App. 1 & 2; App. 18 at 11). Breakiron could have, as Judge Franks expressly stated, renewed his motion for change of venue at the time of jury selection to include the additional publications upon which he now relies. He did not. Nor does it appear that Breakiron presented these articles to the Pennsylvania Supreme Court in his direct appeal when he challenged the denial of his request for a change of venue. (See App. 18 at 8-15; see also App. 15). Because he never presented these "new" articles to the state courts, they are not part of the state court record and this court may not consider them in reviewing this claim. The United States Supreme Court "ha[s] made clear that whether a state court's decision was unreasonable must be assessed in light of the record the [state] court had before it." Holland v. Jackson, 542 U.S. 649, 652 (2004) (per curiam) (citing Yarborough v. Gentry, 540 U.S. 1, 6 (2003) (per curiam) (denying relief where state court's application of federal law was "supported by the record"); Miller-El v. Cockrell, 537 U.S. 322, 348 (2003) (reasonableness of state court's finding

assessed "in light of the record before the court"); <u>Bell</u>, 535 U.S. at 697 n.4 (declining to consider evidence not presented to state court in determining whether its decision satisfied § 2254(d)'s standard of review)); <u>see</u> <u>also</u> <u>Taylor</u>, 504 F.3d at 436-37, 439 n.19 (petitioner not entitled to introduce new evidence in federal habeas proceeding when he had the opportunity to present that evidence when he was litigating the claim at issue in state court).

Second, even if I could consider the articles at issue, they do not advance Breakiron's argument. The articles are of a tone and quality much different from the newspaper articles that where published in the month or so after Martin's murder and upon which Breakiron relied in his motion for change of venue. The "new" articles are primarily factual in nature, and Breakiron has not demonstrated that they are sufficiently prejudicial and inflammatory such that a jury drawn from the community in which they were issued could not have been fair. <u>Murphy</u>, 421 U.S. at 802 (refusing to presume prejudice from pre-trial publicity that was largely factual in nature); <u>Flamer</u>, 68 F.3d at 754-55 (same). Nor were the two memorials that Martin's family placed in the newspaper sufficiently inflammatory or prejudicial to warrant a change of venue. Breakiron was not mentioned in the memorials, and he does not provide this court with information as to where the memorials were located in the newspaper.

Finally, the transcript of the *voir dire* proceeding provides support for the Pennsylvania Supreme Court's conclusion that the "cooling off period" had an effect in this case. As the Commonwealth sets forth in its Answer, although many of the potential jurors had read or heard something about the case, most had vague recollections of that information, had not been exposed to recent media accounts, had not formed any opinions, and had indicated that they could base their verdict solely on the evidence presented at trial. Of the eighty-four prospective

26

jurors questioned in his case, twenty-three had to be excused for cause because they admitted that exposure to pretrial publicity would prevent them from being fair and impartial.[10] The remaining prospective jurors – over 70% – indicated that they had no fixed opinion regarding the guilt or innocence of Breakiron and would base their verdict solely on the evidence presented. Such figures do not evidence "a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displaced no animus of their own." Murphy, 421 U.S. at 800.

In sum, the publicity upon which Breakiron now relies is not the kind that would have created a "trial atmosphere … utterly corrupted by press coverage," id. at 799, that the Supreme Court has required before attaching a presumption of prejudice. Breakiron has failed to show that his is one of those "exceedingly rare" cases, Rock, 959 F.2d at 1252, where "the community and media reaction … [was] so hostile and so pervasive as to make it apparent that even the most careful *voir dire* process would be unable to assure an impartial jury." Id. Accordingly, the Pennsylvania Supreme Court's refusal to presume prejudice was not an unreasonable application of clearly established federal law or an unreasonable determination of the facts based upon the record before it. 28 U.S.C. § 2254(d).

### b. Refusal to find actual prejudice

The second standard utilized by the Supreme Court in pretrial publicity cases is "actual prejudice." To find the existence of actual prejudice, Breakiron must satisfy two basic

---

[10] Breakiron claims twenty-six potential jurors were excused for cause based on publicity. Three potential jurors were excused not because of their exposure to media accounts, but because they either knew the victim or Breakiron and did not think that they could be impartial. (N.T. at 570, 741, 744).

prerequisites. First, he must shown that one or more jurors who decided the case entertained an opinion, before hearing the evidence adduced at trial, that the defendant was guilty. <u>Irvin</u>, 366 U.S. at 727. Second, he must show that these jurors could not have laid aside these preformed opinions and "render[ed] a verdict based on the evidence presented in court." <u>Id.</u> at 723. As the Supreme Court has explained:

> It is not required … that jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.*

<u>Id.</u> at 722-23 (emphasis added).

In determining whether actual prejudice existed, the Pennsylvania Supreme Court appropriately looked to the totality of the circumstances, including the *voir dire* of those potential jurors ultimately empaneled. <u>Murphy</u>, 421 U.S. at 799-801. The court examined the 772 pages of the *voir dire* and determined that "none of the jurors selected had more than vague recollections of news coverage of the Martin murder; at least two of them were totally unaware of any newspaper coverage; and none had been so affected by the pre-trial publicity that he or she was unable to hear the evidence in the case fairly and impartially." <u>Breakiron-1</u>, 571 A.2d at 1038.

Breakiron does not dispute the figures recited by the Pennsylvania Supreme Court. Rather, he takes issue with Judge Franks's acceptance "at face value, [of] the jurors' assurance

that they would try not to be influenced by the publicity." (Docket No. 173 at 79). He urges that this court make a determination – notwithstanding Judge Franks's findings to the contrary – that the jurors who sat could not set aside the information they had heard and read and serve fairly and impartially. This the court will not do. Judge Franks determined that the jurors who sat could be impartial, and his findings are entitled to deference here. As the Supreme Court recently reiterated: "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." Uttecht v. Brown, — U.S. — , 127 S.Ct. 2218, 2224 (2007). Under 28 U.S.C. § 2254(e)(1), the trial court's determination regarding partiality of the individual jurors during *voir dire* are factual findings that must be presumed to be correct unless Breakiron can demonstrate by clear and convincing evidence that those determinations were erroneous. See Martini v. Hendricks, 348 F.3d 360, 363 (3d Cir. 2003). He has not met that burden. Nor has he shown that the state courts' adjudication of this claim "involved an unreasonable application of" "clearly established Federal law," or amounted to an unreasonable determinations of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1), (2).

**3.      Conclusion**

I will deny Breakiron's claims for relief concerning the trial court's failure to grant a change of venue. Because I do not believe that he has made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), on this claim, I will also deny him a certificate

of appealability.[11]

## B. Counsel's Failure To Object Or Move To Strike The Jury Panel After A Prospective Juror Stated During General *Voir Dire* That He Knew Breakiron Had Previously Committed Robberies[12]

Breakiron claims that Bower provided him with ineffective assistance of counsel in violation of his Sixth Amendment rights because he failed to object or move to strike a jury panel after a prospective juror stated during general *voir dire* that he knew that Breakiron had previously committed robberies. One of the veniremen on this panel, Juror 114, was seated on the jury. Breakiron raised this claim in the first PCRA petition and the Pennsylvania Supreme Court rejected it on the merits, Breakiron-2, determining "that trial counsel had a reasonable basis for his actions." 729 A.2d at 1094. Breakiron acknowledges that the standard of review set forth in 28 U.S.C. § 2254(d) is applicable to the Pennsylvania Supreme Court's decision that Bower's performance was not deficient.

### 1. Factual Background

During general *voir dire* regarding the jury panel's knowledge of Breakiron's case, the following colloquy took place:

The Court:            All right. Anybody else that we missed?

Prospective Juror 67: I know about it from reading it in the papers and I know some of
                     the family.

_____

[11] In order to make a "substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2), Breakiron must prove "that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

[12] This is Claim 7 of Breakiron's Updated Memorandum of Law.

| The Court: | Whose Family? |
|---|---|
| Prospective Juror 67: | Breakiron's |
| The Court: | All Right. |
| Prospective Juror 67: | *I know the boy.  I live in the terrace and he used to do a lot of robbing there.* |
| The Court: | From what you know of the family and what you may have learned, do you have a fixed opinion about this case that could not be changed no matter what you hear in this room? |
| Prospective Juror 67: | Yes. |
| The Court: | We are going to excuse you sir.  You are now excused. |

(N.T. at 448-49) (emphasis added).

Juror 114, who eventually sat on the jury, was on the same panel as Prospective Juror 67. At the time of Prospective Juror 67's statement, Bower did not object, did not make any motion to strike the panel, and he did not request that the trial court question the remaining members of the panel whether they had heard the statement.  Breakiron claims that Bower's failure to do any of these things amounted to constitutionally deficient performance.

## 2.    Legal Analysis

### a.    The standard for evaluating claims of ineffective assistance of counsel

The "clearly established Federal law," in which to analyze a claim of ineffective assistance under 28 U.S.C.§ 2254(d)(1) is the familiar two pronged test set forth in <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  First, a petitioner must show that "counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688; <u>see</u> <u>also</u> <u>Williams</u>, 529 U.S. at 390-91.  It is all too easy to second-guess counsel after conviction: without benefit of hindsight,

petitioner must overcome the presumption that under the circumstances, the challenged action of counsel "might be considered sound trial strategy." Id. at 689. As the Court of Appeals for the Third Circuit has explained, "[i]t is only the rare claim of ineffective assistance of counsel that should succeed under the properly deferential standard to be applied in scrutinizing counsel's performance." United States v. Kauffman, 109 F.3d 186, 190 (3d Cir. 1997).

Second, petitioner must show that he was prejudiced by the deficient performance. "This requires showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. In other words, petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

### b. The state court's decision

The Pennsylvania Supreme Court's adjudication of this claim was not "contrary to" Strickland. In Commonwealth v. Pierce, 527 A.2d 973, 976-77 (Pa. 1987), the Pennsylvania Supreme Court held that Pennsylvania law for judging ineffectiveness corresponds with the Strickland standard. See also Commonwealth v. Kimball, 724 A.2d 326 (Pa. 1999); Jacobs v. Horn, 395 F.3d 92, 106 (3d Cir. 2005) ("We have previously ruled that Pennsylvania's test for assessing ineffective assistance of counsel claims is not contrary to Strickland.") (citing Werts, 228 F.3d at 204)). At the beginning of its analysis of Breakiron's first ineffective assistance claim in Breakiron-2, the Pennsylvania Supreme Court outlined the elements of such a claim –

failure to raise a meritorious claim, lack of strategic reason, and prejudice[13] – and cited to decisions it had issued which cite to Strickland and/or Pierce, and/or the progeny of those cases. Breakiron-2, 729 A.2d at 1094 (citing Commonwealth v. Collins, 687 A.2d 1112 (Pa. 1996) and Commonwealth v. Pierce, 645 A.2d 189 (Pa. 1994)). Therefore, the Pennsylvania Supreme Court applied the correct legal standard to this claim, and that is sufficient to satisfy review under the "contrary to" clause of § 2254(d)(1). Williams, 529 U.S. at 406 ("a run-of-the mill state-court decision applying the correct legal rule from [Supreme Court] cases [does] not fit comfortably within § 2254(d)(1)'s 'contrary to' clause."); Jacobs, 395 F.3d at 106; Werts, 228 F.3d at 202-04.

The issue here is whether the Pennsylvania Supreme Court's adjudication was an "unreasonable application of" Strickland. The Pennsylvania Supreme Court held that Bower articulated a reasonably strategic basis for his conduct with regard to the issue presented in this claim. It noted that at the PCRA hearing "trial counsel testified that he did not make a motion to strike or move for a mistrial because the seated juror [Juror 114] had stated that he could render an unbiased opinion, and consequently there was no basis to strike the panel or move for a mistrial." Breakiron-2, 729 A.2d at 1094.

Breakiron claims that the Pennsylvania Supreme Court's decision was unreasonable because Bower testified at the PCRA hearing that he "didn't know" why he did not take any action in response to Prospective Juror 67's statement. (Docket No. 173 at 127 (citing N.T. PCRA 7/17/97 PM at 76)). Therefore, Breakiron claims, the Pennsylvania Supreme Court

---

[13] Although Pennsylvania courts articulate a three-prong test for gauging ineffective assistance claims and Strickland sets forth its test in two prongs, the legal evaluation is the same, and the differences merely reflect a stylistic choice on the part of state courts. Rompilla, 335 F.3d at 448; Werts, 228 F.3d at 202-04.

"invented" a tactic and improperly attributed it to trial counsel in its decision. This argument has no merit. The Pennsylvania Supreme Court's interpretation of Bower's testimony is fairly supported by the record and was not an unreasonable interpretation of it. At the PCRA hearing, Bower testified that he did not object to Prospective Juror 67's statement at the time because he was immediately excused. He also testified that he did not seek further curative action because the individual *voir dire* of Juror 114 did not establish a need for any further action. (N.T. PCRA 7/17/97 PM at 76 ([*Bower:*] "I don't know why there was no request for a mistrial at the time, *other than the fact that this guy was excused, and I believe that we questioned all of the jurors individually after that.* The court had asked several questions based on what [Juror 114] said [during individual *voir dire*]" and "after consultation with Mr. Breakiron, we felt that he would be a fair and impartial juror[.]" (emphasis added)); <u>see also</u> N.T. PCRA 7/18/97 AM at 36 (*[Robert Graci, Esquire, appearing on behalf of the Commonwealth]*: Did you, as trial counsel at the time during the jury selection think that anything egregious had occurred that had caused you to move for a mistrial? *[Bower]*: No. *[Graci]:* Is that why you didn't move for a mistrial? *[Bower]:* Yes."). Thus, contrary to Breakiron's argument, the state court did not "invent" a tactic that counsel never articulated.

This claim also fails because Breakiron has not met the prejudice prong of <u>Strickland</u>.[14] During individual *voir dire*, Juror 114 stated that all that he knew about the case was what he had read about it in the newspaper and that his wife was the only person with whom he had discussed

_____

[14] Because the state court found Bower's representation adequate, it did not reach the issue of prejudice. Therefore, § 2254(d) does not apply to a prejudice analysis of this claim and I may examine this element of <u>Strickland</u> *de novo*. <u>Wiggins v. Smith</u>, 539 U.S. 510, 534 (2003); <u>Rompilla v. Beard</u>, 545 U.S. 374, 390 (2005).

the case.  (N.T. at 512; <u>see</u> <u>also</u> <u>id.</u> at 440, 444-45).  He then stated that he had not formed any opinion in regard to the guilt or innocence of Breakiron.  (N.T. at 512-13).  Juror 114 also said that he understood that under the law a person is innocent until proven guilty beyond a reasonable doubt, and that he did not believe that a person charged with a crime was necessarily guilty of that crime.  (N.T. at 512).  Nothing in the responses that Juror 114 gave during individual *voir dire* made Bower, Morrison, or Judge Franks question his partiality.  In sum, Breakiron has failed to show that Juror 114 was anything but a fair and impartial juror or that his presence on the jury prejudiced him.

**3.    Conclusion**

This claim of ineffective assistance of counsel is denied.  Further, because I believe that Breakiron has failed to make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I will deny him a certificate of appealability on this claim as well.

**C.    Prosecutorial Misconduct Claims**[15]

Breakiron's next set of claims address allegations that the prosecution suppressed evidence that the defense could have used to impeach Ellis Price's trial testimony.  "The prosecution's affirmative duty to disclose evidence favorable to a defendant can trace its origins to early 20th-century strictures against misrepresentation and is of course most prominently associated with [the Supreme Court's] decision in <u>Brady v. Maryland</u>, 373 U.S. 83 [ ] (1963)." <u>Kyles v. Whitley</u>, 514 U.S. 419, 432 (1995) (citations omitted).  <u>Brady</u> held "that the suppression

---

[15]  Breakiron's prosecutorial misconduct claims are raised at Claim 4 of his Updated Memorandum of Law.

by the prosecution of evidence favorable to the accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." <u>Kyles</u>, 514 U.S. at 432 (citing <u>Brady</u>, 373 U.S. at 87 (citations omitted)). The Supreme Court subsequently held that "a defendant's failure to request favorable evidence did not leave the Government free of all obligation," and a <u>Brady</u> violation might arise "where the Government failed to volunteer exculpatory evidence never requested, or requested only in a general way." <u>Id.</u> at 433 (citing <u>United States v. Arguros</u>, 427 U.S. 97, 108 (1976)).

"Impeachment evidence…as well as exculpatory evidence, falls within the <u>Brady</u> rule." <u>United States v. Bagley</u>, 473 U.S. 667, 676 (1985) (citing <u>Giglio v. United States</u>, 405 U.S. 150, 154 (1972)). "Such evidence is 'evidence favorable to an accused,' so that, if disclosed and used effectively, it may make the difference between conviction and acquittal." <u>Id.</u> (quoting <u>Brady</u>, 373 U.S. at 87; citing <u>Napue v. Illinois</u>, 360 U.S. 264, 269 (1959) ("The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence, and it is upon such subtle factors as the possible interest of the witness in testifying falsely that a defendant's life or liberty may depend.")) "<u>Brady</u> … envisions two requirements for overturning a verdict: (1) that evidence in the possession of the government was actually suppressed, and (2) that the suppressed evidence was material." <u>Slutzker v. Johnson</u>, 393 F.3d 373, 386 (3d Cir. 2004).

### 1. Factual Background

#### a. Ellis Price's criminal history and involvement in Breakiron's case

At the time of the events in question, Ellis Price was serving a sentence imposed by the State of Michigan. In or around June 1986, Michigan authorities delivered custody of Price to

Fayette County authorities so that he could be tried there on numerous felony charges, including attempted murder, in a case involving victims Raymond Ricker and Richard Pletcher (the "Ricker/Pletcher case"). In October 1986, Judge Franks presided over a consolidated criminal jury trial in the Ricker/Pletcher case in which Ellis Price and his brother Robert Price were co-defendants. (N.T. 2/2/07,[16] Commw. Ex. E). At that time, Gerald Solomon, Esquire, was the District Attorney of Fayette County. Ralph Warman, Esquire, was an Assistant District Attorney, and he prosecuted the Ricker/Pletcher case. (Solomon and Warman presently are judges on the Court of Common Pleas of Fayette County).

The offenses in the Ricker/Pletcher case arose out of a shooting that occurred outside a bar on January 1, 1986. Ricker was an employee at the bar and had asked the Price brothers to leave. He followed the Price brothers outside and was shot by Robert Price. At the same time, Pletcher, a bar patron, went outside to assist Ricker, and he too was shot. (N.T. 2/2/07, Commw. Ex. C at 2-3). At the conclusion of the Ricker/Pletcher trial, the jury found Robert Price guilty of the attempted homicide of both Ricker and Pletcher, and related crimes. The jury found Ellis Price guilty of crimes against Pletcher only, and those convictions were for attempted homicide, reckless endangerment, aggravated assault, and attempt to cause serious bodily injury. (N.T. 2/2/07, Commw. Ex. E at 194-96).

After his trial and prior to his sentencing, Ellis Price filed a motion in arrest of judgment and for a new trial. (N.T. 2/2/07, Commw. Ex. F). While awaiting judgment on that motion, he was incarcerated in the Fayette County Jail. After Breakiron was arrested, he too was jailed there

---

[16] Citations to the hearing conducted on February 2, 2007 are to the evidentiary hearing held in this court on that date. The transcript of that hearing is lodged at Docket No. 168.

and he was housed in the same range as Ellis Price. (N.T. at 1111; N.T. 2/2/07 at 20-21, 55).

The Commonwealth opposed Ellis Price's post-trial motion in a brief filed on June 8, 1987. (N.T. 2/2/07, Commw. Ex. G). On or around July 28, 1987, Judge Franks issued an Opinion and Order granting Ellis Price's motion in arrest of judgment in the Ricker/Pletcher case and reversing the verdicts of guilt against Ellis Price.[17] (N.T. 2/2/07, Commw. Ex. C). The Commonwealth had thirty days to appeal. On August 4, 1987, less than two weeks after Judge Franks issued his decision, Trooper Brownfield interviewed Ellis Price at the Fayette County Jail as part of his investigation in the Martin murder case. (Brownfield presently is the Sheriff of Fayette County). During that interview, Ellis Price reported the incriminating statements that Breakiron allegedly had made to him. (N.T. 2/2/07, Commw. Ex. A).

The Commonwealth did not appeal Judge Franks's July 28, 1987 decision. Therefore, the decision reversing Ellis Price's convictions in the Ricker/Pletcher case stood. About a month or two after Ellis Price gave his statement to Brownfield, Fayette County authorities returned him to Michigan custody. (N.T. 2/2/07 at 105). It appears that on some date after late March 1988, he was transported back to Fayette County to testify at Breakiron's April 1988 trial. (See Docket

---

[17] Judge Franks held:

> [T]his Court is of the opinion that the Commonwealth has presented evidence of two mutually exclusive inferences. Either Robert Price fired the shot from within the car at Pletcher, or [Ellis Price] did. Pletcher specifically stated when asked, which of the two had shot at him, that he did not know. The Commonwealth failed to produce any other witnesses to this shooting.

> Accordingly, this Court finds that it should have granted [Ellis Price's] demurrer[.]"

(N.T. 2/2/07, Commw. Ex. C at 3 (citing Commonwealth v. Tribble, 467 A.2d 1130, 1131 (Pa. 1983); Commonwealth v. Woong Knee New, 47 A.2d 450, 468 (Pa. 1946)).

No. 42, Ex. 21 at 27). After he testified at Breakiron's trial, Ellis Price was returned to Michigan to continue to serve the sentence that had been imposed by it. (N.T. 2/2/07 at 87). Robert Price served a term of twelve years imprisonment for his convictions in the Ricker/Pletcher case. (N.T. 2/2/07 at 69). In 1994, Ellis Price was released from imprisonment in Michigan and served the next six years of his term in a halfway house. (N.T. 2/2/07 at 86-87).

### b. Litigation of Breakiron's prosecutorial misconduct claims during the second PCRA proceeding

In his second PCRA petition, Breakiron raised several claims of prosecutorial misconduct. (App. 40 at 4-11). First, based upon the temporal relationship of the issuance of Judge Franks's July 27, 1987 decision granting Ellis Price post-trial relief in the Ricker/Pletcher case, Trooper Brownfield's August 4, 1987 interview of Ellis Price during which he reported Breakiron's incriminating statements, and the Commonwealth's subsequent decision not to appeal Judge Franks's decision, Breakiron asserted that there must have been an express or implied deal between Ellis Price and the Commonwealth that the Commonwealth would not pursue an appeal in the Ricker/Pletcher case in exchange for Ellis Price's testimony against Breakiron. He alleged that the Commonwealth failed to disclose that a deal had been made in violation of Brady and its progeny, and that the Commonwealth presented false testimony when it permitted Ellis Price to testify that there was no deal. (App. 40 at 4-11). Second, Breakiron asserted that he had recently discovered that Ellis Price actually had been convicted of two crimes in Michigan – assault and armed robbery. He contended that the prosecution failed to disclose Ellis Price's true criminal history and failed to correct his false testimony that his Michigan conviction was for "just an assault." (App. 40 at 5). Third, Breakiron claimed that the Commonwealth suppressed that Ellis

Price told Brownfield during his interview that Breakiron had told him that he was "out of it" on the night of the killing. (App. 40 at 6).

Breakiron argued that his prosecutorial misconduct claims were timely filed under the PCRA's statute of limitations because his failure to raise the claims earlier "was the result of interference by government officials[,]" who had suppressed evidence relevant to those claims. 42 PA.CONS.STAT. § 9545(b)(1)(i). He also requested discovery, including "any and all correspondence between Mr. Price and any arm of the Commonwealth, including but not limited to, the Pennsylvania State Police, the Fayette County District Attorney's Office or the Office of the Pennsylvania Attorney General, and all notes, memoranda, letters, documents, etc. relating to the decision whether to appeal the order arresting judgment in Mr. Price's case[.]" (App. 40 at 9 n.5).

In its answer to the second PCRA petition, the Commonwealth contended that Breakiron's prosecutorial misconduct claims did not fall within the "governmental interference" exception to the PCRA limitations period. (App. 42 at 11-12). It asserted that there was no deal between Ellis Price and the Commonwealth regarding the Ricker/Pletcher case. (App. 42 at 23-25). It did not deny that the prosecution failed to accurately disclose Ellis Price's Michigan record. With regard to that allegation, the Commonwealth simply responded that "Price was convicted of *assault with intent to rob while armed*," not the two separate crimes of assault and armed robbery. (App. 42 at 21-22). It then argued that when Bower asked Ellis Price whether his Michigan conviction was for an attempted murder and Ellis Price answered that it was "[j]ust an assault," Ellis Price had answered the question he was asked and the prosecution was under no duty to clarify that his testimony actually was inaccurate. (Id.) Finally, the Commonwealth also

denied that the prosecution had suppressed that Ellis Price told Brownfield that Breakiron had told him that he was "out if it" at the time of the killing. (App. 42 at 24 n.6).

The Commonwealth opposed Breakiron's request for discovery. (App. 42 at 25-26). The record before this court does not reveal whether Breakiron was permitted any discovery during the second PCRA proceeding. If there was any discovery, the information that formed the basis of his amended habeas petition, discussed *infra*, was not produced during the PCRA proceeding.

In response to the Commonwealth's answer, Breakiron countered that the Commonwealth conceded that it had suppressed Ellis Price's criminal record when it admitted that he had actually been convicted of assault with intent to rob, and not just assault. (App. 45 at 2-3). When given the opportunity to respond to that assertion, the Commonwealth once again did not deny that it had failed to accurately disclose to the defense Ellis Price's Michigan record. (See App. 46 at 5). Breakiron argued that under Michigan law, the elements of the crime of assault with intent to rob correspond to the Pennsylvania definition of the crime of robbery. See MICH.COMP.LAWS § 750.89; Michigan v. Cotton, 478 N.W.2d 681, 688 (Mich.App. 1992) (the elements of assault with intent to rob are assault with force or violence, an intent to rob or steal, and the possession of a weapon). He asserted that because Ellis Price's Michigan conviction was a *crimen falsi* (a point the Commonwealth also did not dispute), if the prosecution had disclosed that information and had corrected Ellis Price's false testimony, the defense could have impeached him with that information and would have requested and received an instruction advising the jury that it could consider the fact that Ellis Price had been convicted of a crime of dishonesty when evaluating his credibility. (See N.T. PCRA 7/31/00 at 32-33, 53; App. 45 at 1-3).

On July 31, 2000, Judge Franks presided over a PCRA hearing that was limited to the

timeliness of the claims raised in Breakiron's second PCRA petition. (The transcript of that hearing is at App. 44). Ellis Price and Brownfield testified at that hearing. The bulk of the testimony was regarding whether Brownfield omitted from his police report Ellis Price's alleged statement that Breakiron had told him he was "out of it." Ellis Price testified that he "believed" he told Brownfield that Breakrion had made the disputed statement to him. (N.T. PCRA 7/31/00 at 8-11). He explained that he interpreted Breakiron's statement to mean that he had been intoxicated. (N.T. PCRA 7/31/00 at 9). Brownfield testified that he put in his report everything that Ellis Price had told him. He stated that if Ellis Price had told him that Breakiron had said he was "out of it" at the time of the offense, that information would have been included in his report. Since that information was not contained in his police report, Brownfield denied that Ellis Price had made the statement to him. (N.T. PCRA 7/31/00 at 16-18).

On cross examination, Ellis Price testified that he was not offered a deal in exchange for his testimony against Breakiron. (N.T. PCRA 7/31/00 at 12-13). The Commonwealth also submitted affidavits by Morrison, Judge Solomon, and Judge Warman, who each averred that there had been no deal between Ellis Price and the Commonwealth. (App. 42, Ex. A; App. 43, Ex. A).

On December 1, 2000, Judge Franks issued an Opinion and Order holding that the second PCRA petition was untimely. (App. 48). He rejected Breakiron's contention that his prosecutorial misconduct claims were timely filed due to interference by government officials. Judge Franks found that there was no evidence of a deal between the Commonwealth and Ellis Price. (App. 48 at 7-8). He held that the prosecution had no obligation to correct Ellis Price's inaccurate testimony about his criminal record, holding:

Price's testimony that his conviction constituted an assault was, in the opinion of the Court, a layperson's understanding of a legal charge, *not an attempt by the Commonwealth to intentionally withhold evidence about a witness' record.* Having concluded that Price did not lie about his record under oath, it must follow that the Commonwealth at no time had an obligation to correct Price's testimony.

(App. 48 at 7 (emphasis added)).  Finally, Judge Franks rejected Breakiron's contention that Brownfield omitted from his police report the statement that Ellis Price had allegedly told him regarding Breakiron's intoxication, holding:

Defendant argues that Price testified at Defendant's PCRA hearing that Defendant did tell Price that he was intoxicated or "out of it" on the night of the murder, and that Price told the police everything that Defendant told Price.  However, Price's recollection of these facts at Defendant's PCRA hearing was unclear.  When Defendant's counsel questioned Price as to whether he relayed this information to the police, Price responded, "I believe so."  PCRA N.T. 7/31/00 at 8.  Then when prompted by the Court to be more precise, Price testified "I can't remember back that far."  Id. at 8.  Only after consulting an affidavit of April of 2000, some 12 years after Defendant's trial, did Price state that he told everything that Defendant told him to the police.  Id. at 9.

(App. 48 at 8).  Judge Franks also credited Brownfield's testimony, and determined that Breakiron presented no evidence to support his claim that the prosecution suppressed Ellis Price's alleged exculpatory statement.  (App. 48 at 8-9).

### c. Litigation of the prosecutorial misconduct claims before this court

After the Pennsylvania Supreme Court issued its decision in Breakiron-3 and held that the second PCRA petition was untimely under the Act's statute of limitations, Judge Standish, who had held this federal habeas case in abeyance, lifted the stay and this proceeding resumed.

Subsequent to this proceeding being reactivated, Breakiron amended his federal habeas petition to raise additional prosecutorial misconduct claims based upon factual assertions that he had not made in either his original federal habeas petition or in the second PCRA petition.  (Docket No.

43

44).  He claimed that he had discovered long-suppressed evidence to support his contention that the prosecution failed to disclose information that could have been used to impeach Ellis Price's trial testimony.  He asserted that Ellis Price and at least one other inmate, James "Silky" Sullivan, had created the story about Breakiron's jailhouse confession and wrote a letter to then District Attorney Solomon offering to testify against Breakiron in exchange for benefits in their respective criminal cases.  (Docket No. 44 at 4; <u>see also</u> Sullivan Aff., attached to Docket No. 44 as Ex. 23; Chris Own Miller Aff., attached to Docket No. 58 as Ex. B).  Breakiron alleged that neither the letter nor the contents of the letter, which showed Ellis Price's efforts to solicit benefits from the Commonwealth, had been disclosed to the defense in violation of <u>Brady</u>.  (Docket No. 44 at 6-7).  He also averred that he had recently learned that that prior to Breakiron's trial, Ellis Price had informed his brother Robert Price that Ellis's cooperation in the Breakiron case would get him (Robert) five years off the sentence he was serving in the Ricker/Pletcher case.  (Robert Price Aff., attached to Docket No. 44 as Ex. 24).  Finally, Breakiron contended that his new information also showed that Ellis Price "lied throughout his testimony in this case" and "lied when he testified that he sought and received nothing from the Commonwealth in return for his testimony."  (Docket No. 44 at 7).

The Commonwealth contended that the "newly-discovered" prosecutorial misconduct assertions were procedurally defaulted because Breakiron had never presented those assertions to the state courts.  (Docket No. 48 at 29-31, 86-87; <u>see also</u> Docket No. 62 at 19-20).  In response, Breakiron argued that he could establish "cause and prejudice" to overcome his default because the Commonwealth had consistently and unlawfully withheld the information at issue.  (Docket No. 44 at 10-11; Docket No. 58 at 47-50 (citing <u>Strickler v. Greene</u>, 527 U.S. 263 (1991) for the

proposition that in this case the "cause and prejudice" requirements correspond with the components of a claim under <u>Brady</u>)).  Judge Standish held that whether Breakiron could establish "cause" and the resulting "prejudice" sufficient to overcome his default of his amended prosecutorial misconduct claims was a question this court could not answer on the record before it and so he permitted limited discovery on the issues presented by the amended habeas petition. (Docket No. 62 at 18-21; Docket Nos. 70, 72).

The parties conducted discovery, which included the production of documents and the takings of depositions.  In February 2006 and while discovery was ongoing, this case was reassigned to Judge Hardiman.  Based upon information gained in discovery, Breakiron supplemented his amended habeas petition to incorporate allegations involving the assault and robbery of Vincent Sterbutzel (the "Sterbutzel case").  (Docket No. 162).  Breakiron alleged that at the time Ellis Price first offered his information to the Commonwealth and at the time he testified at the trial, he was a suspect in the ongoing investigation of the Sterbutzel case.  (Docket No. 162 ¶ 2).  Ellis Price was never charged with any crimes in the Sterbutzel case and the other suspects in the case – his brothers Robert and Kevin Price and another individual named Mark DiMatteo – were all successfully prosecuted for crimes against Sterbutzel.  Breakiron contended that the Commonwealth's decision not to prosecute Ellis Price in the Sterbutzel case was in exchange for his cooperation in the Breakiron prosecution.  (Docket No. 162 ¶¶ 2-4).  He further alleged that the Commonwealth did not disclose to Breakiron's defense counsel that Ellis Price was a suspect in that Sterbutzel case.  (<u>Id.</u>)

### d.    The evidentiary hearing and this court's factual findings

After discovery concluded, the parties agreed that an evidentiary hearing would be

necessary.[18]  (Docket No. 102).  On February 2, 2007, Judge Hardiman presided over the hearing.

Breakiron presented the testimony of James "Silky" Sullivan, Chris Owen Miller, and Robert

Price.  The Commonwealth called Ellis Price, Morrison, Judge Solomon, Judge Warman, and

Alphonse Lepore, Esquire, who was the District Attorney of Fayette County beginning in or

around May of 1988 and who had made the decision in March 1989 not to prosecute Ellis Price

in the Sterbutzel case.  Additionally, the Commonwealth called Brownfield, Earl Roberts, an

investigator in the Ricker/Pletcher case and the Breakiron case, and Greg Kerpchar, an

investigator who interviewed Sullivan in 2005.

At the conclusion of the evidentiary hearing, Judge Hardiman instructed the parties to file

post-hearing proposed findings of fact.  Before the proposed findings of fact were submitted and

could be ruled upon, Judge Hardiman was elevated to the United States Court of Appeals for the

Third Circuit and the case was reassigned to me.  Both parties expressly stated that they did not

object to me making findings of fact based upon the evidence of record.  (Docket No. 158).  I

advised the parties that if, after I review each party's proposed findings of fact and the relevant

record, I determined that I needed to have witnesses recalled to assist in making credibility

_____

[18]  28 U.S.C. § 2254(e)(2) prohibits an evidentiary hearing in a habeas case if the
petitioner "failed to develop the factual basis of a claim in State court proceedings[.]"  Breakiron
contended that the failure to develop the evidence at issue before the state court could not be
attributed to him because the Commonwealth had suppressed it, and therefore 28 U.S.C. §
2254(e)(2) did not apply.  (Docket No. 44 at 9-10 (quoting Williams, 529 U.S. at 432 "a failure
to develop the factual basis of a claim is not established unless there is a lack of diligence, or
some greater fault, attributable to the prisoner or the prisoner's counsel.")).  Alternatively, the
Court of Appeals for the Third Circuit has held that § 2254(e)(2) does not apply to the
determination of whether a habeas petitioner can overcome a procedural default of a claim.
Cristin v. Brennan, 281 F.3d 404, 412-419 (3d Cir. 2002).  When § 2254(e)(2) does not apply to
a petitioner, it is within the district court's discretion to grant an evidentiary hearing on a habeas
claim.  Schriro, 127 S.Ct. at 1939-40; Thomas v. Varner, 428 F.3d 491, 497-98 (3d Cir. 2005).

determinations, I would schedule another evidentiary hearing.  (Id.)

Based upon my review of the parties' submissions and the relevant record in this case, I determined that I could make the necessary factual findings without conducting an additional evidentiary hearing.  On September 19, 2007, I issued the court's Findings of Fact, which are lodged at Docket No. 171.

I found as fact that in the summer of 1987, Ellis Price sent two letters to then District Attorney Solomon.  (Docket No. 171 ¶¶ 2, 6).  I determined that at the time Ellis Price sent the letters, he was seeking post-trial relief from his October 1986 convictions in the Ricker/Pletcher case.  (Docket No. 171 ¶ 6).  The first letter was a letter sent jointly by Sullivan and Ellis Price, and the second letter was sent solely by Ellis Price.  (Docket No. 171 ¶ 2).  I also found as fact that although Judge Solomon, Judge Warman, and Morrison did not recall seeing the two letters that Ellis Price sent to the District Attorney's Office, some representatives of the Commonwealth were aware that Ellis Price had offered information in the Breakiron case, because Brownfield interviewed Ellis Price on August 4, 1987 in the Fayette County Jail "after [he] had learned that [Ellis Price] had possible information concerning [Martin's homicide]."  (Docket No. 171 ¶¶ 4-5).

I found as fact that in both letters, Ellis Price requested benefits for himself and his brother Robert in the Ricker/Pletcher case in exchange for information about Breakiron's confession.  (Docket No. 171 ¶ 2; N.T. 2/2/07 at 24, 36-37, 95-100, 107-08, 113).  Sullivan testified that he and Ellis Price wrote their letter "[t]o see what kind of deals [the Commonwealth] would offer."  (N.T. 2/2/07 at 23).  According to him, Ellis Price "asked for the moon[,]" including a request that his and Robert Price's convictions in the Ricker/Pletcher case be "overturned."  (N.T. 2/2/07 at 24-25).  Sullivan testified that he and Ellis Price "knew what

[they] were talking about from things I learned from reading [Breakiron's] discovery packet " and

from reading newspaper reports. (N.T. 2/2/07 at 23-24). Ellis Price maintained that he did not

fabricate Breakiron's confession to him. (N.T. 2/2/07 at 90). Miller testified that he was playing

cards one day with Sullivan and Ellis Price and they discussed writing a letter to the District

Attorney "to try to get deals in their own cases." (N.T. 2/2/07 at 55, 65). They asked Miller to

participate, but he declined.[19] (N.T. 2/2/07 at 55-56).

Regarding the allegations surrounding the Sterbutzel case, I found as fact that at the time

Ellis Price sent the letters to then District Attorney Solomon, he was a suspect in that case along

with his brothers Robert and Kevin Price and Mark DiMatteo. (Docket No. 171 ¶ 6; N.T. 2/2/07,

Commw. Ex. D at 1-3, 12-13). The Sterbutzel case was still under investigation at the time of

Breakiron's trial. Evidence admitted at the hearing showed that in February 1988, DiMatteo was

---

[19] Coincidentally, at the time that Sullivan and Ellis Price sent their joint letter, Sullivan
was represented by Morrison, who was then in private practice. Sullivan testified that Morrison
learned that he had sent the letter and was very upset that he had not spoken with him before he
sent it. (N.T. 2/2/07 at 26-27). Sullivan was not interviewed by the police in regards to the letter
and he did not testify at Breakiron's trial. (N.T. 2/2/07 at 35). Morrison would become Acting
District Attorney around January 1, 1988 upon Solomon's election to the Court of Common Pleas
and he assumed the role as prosecutor of Breakiron's case. (N.T. 2/2/07 at 127, 131). At the
evidentiary hearing before this court, Morrison did not immediately recall that he had represented
Sullivan prior to becoming Acting District Attorney. (N.T. 2/2/07 at 134-35). However, he did
not dispute that a transcript from a hearing conducted in the Breakiron case in March 1988
indicated that he was aware that Sullivan had sought a deal with the Commonwealth in exchange
for testimony against Breakiron. (N.T. 2/2/07 at 135-40). After Morrison assumed his new
position as prosecutor, Breakiron's defense counsel filed a motion seeking Morrison's
disqualification on the basis that the Commonwealth might call Sullivan to testify at Breakiron's
trial. Judge Conrad B. Capuzzi conducted a hearing on that motion on March 29, 1988, and the
relevant portion of the transcript of that proceeding was admitted at the evidentiary hearing
before this court as Plaintiff's Ex. 3. At that hearing, Morrison stated the prosecution was not
going to call Sullivan "or us[e] anything that he offered to us." (N.T. 2/2/07, Plaintiff's Ex. 3 at
5). Because Sullivan was not going to be called as a witness, Morrison was not disqualified from
prosecuting Breakiron's case.

arrested for crimes against Sterbutzel, and in December 1988 he pleaded guilty to theft by unlawful taking and was sentenced to two years probation and a fine. (N.T. 2/2/07, Commw. Ex. D at 14-15, 17). Kevin and Robert Price were arrested for crimes against Sterbutzel in February and March of 1989, respectively. (N.T. 2/2/07, Commw. Ex. D at 16, 18-20). On September 22, 1989, Robert Price pleaded *nolo contendere* to charges of robbery, theft by unlawful taking or disposition, recklessly endangering another person, and criminal conspiracy and he was sentenced to serve five to ten years concurrent with the sentence he was serving in the Ricker/Pletcher case. (N.T. 2/2/07, Commw. Ex. D at 21). On February 2, 1990, a jury found Kevin Price guilty of robbery, theft by unlawful taking, and criminal conspiracy and he was sentenced to serve six to twenty years imprisonment. (N.T. 2/2/07, Commw. Ex. D at 23). Ellis Price was never arrested for any crime related to the Sterbutzel case. A police report by Trooper David D. Nickle, dated March 10, 1989, explained that:

> On this date 03/10/89 this investigating officer contacted the Fayette County District Attorney Alphonse Lapore [sic] and advised him of the circumstances of this investigation. He was also asked if the District Attorney[']s office would [e]xtradite Ellis Price [from] the State Prison System in Michigan. He advised that Ellis Price is currently serving a long sentence in the State of Michigan [and] it would serve no useful purpose to charge and try him in this state. He therefore advised this Investigating officer not to file charges against Ellis Price.

(N.T. 2/2/07, Commw. Ex. D. at 20).

Ultimately, Breakiron could not prove that there was a deal, either express or implied, between Ellis Price and the Commonwealth. Consistent with Judge Franks's determination made after the PCRA hearing on timeliness, I found as fact that there was no evidence that a deal had been made. (Docket No. 171 ¶¶ 8-9, 11-12, 14-15). Brownfield testified that he did not promise Ellis Price any benefit in exchange for information. (N.T. 2/2/07 at 123). Judge Solomon

testified that he did not recall ever meeting Ellis Price and that he did not make any agreement with him.  (N.T. 2/2/07 at 169-70).  Judge Warman testified that he never talked to Ellis Price and only saw him at the preliminary hearing and trial in the Ricker/Pletcher case.  (N.T. 2/2/07 at 157).  Morrison testified that prior to Breakiron's trial, he met with Ellis Price and told him that he could provide him no benefit in exchange for his testimony.[20]  (N.T. 2/2/07 at 128-30; see also id. at 103).

Of course, Ellis Price had received suspiciously coincidental positive outcomes in the Ricker/Pletcher case and the Sterbutzel investigation, but Breakiron could not show that those outcomes were the result of his participation in the Commonwealth's case against Breakiron. Judge Warman testified that the decision not to appeal Judge Franks's order granting Ellis Price relief in the Ricker/Pletcher case was based upon considerations that were not related to Ellis Price's involvement in the Breakiron case.  He explained that the District Attorney's Office did not file an appeal because:

> [W]e had a small office to begin with.  We – I think we had five assistants back

---

[20] Ellis Price was transported back to Michigan in September or October of 1987, before Morrison became the Acting District Attorney and assumed the prosecution of Breakiron's case. Therefore, when Morrison told Ellis Price that the prosecution could make him no deal or offer him any benefit in exchange for his testimony, that had to have been right before Breakiron's April 1988 trial, after Ellis Price had been brought back to Fayette County for the sole purpose of testifying against Breakiron.  By that point, Ellis Price had already received at least one of the things that he was looking for in his letters – relief in the Ricker/Pletcher case – and so the fact that the prosecutor told him that he would get nothing in exchange for his testimony likely had little impact, if any, on him continuing to present what the defense would attempt to show at trial was an unreliable alleged jail-house confession.  None of the events that had transpired since Ellis Price sent his letters to then District Attorney Solomon in the summer of 1987 would have dissuaded him from having a pro-prosecution bias.  Morrison also testified at the evidentiary hearing before this court that he was unaware that at the time Ellis Price testified in the Breakiron case that he was a suspect in that Sterbutzel case.  (N.T. 2/2/07 at 140-47).  Thus, when Morrison met with Ellis Price, he would not have referenced that investigation.

then. Everybody was part-time. The District Attorney was part-time. And we just – we didn't have the manpower. We didn't file any appeals. There might have been one appeal we filed in the ten years or so there. We were, generally, satisfied with what our judges did. They always gave us a decent shake.

(N.T. 2/2/07 at 155; see also id. at 159-67). Similarly, Lepore testified that his decision not to prosecute Ellis Price in 1989 in the Sterbutzel case was based upon considerations that were not related to Ellis Price's involvement in the Breakiron case. Lepore stated that he decided not to file charges against Ellis Price in that case because he "was in Michigan serving a long sentence for another crime." (N.T. 2/2/07 at 185-87 and Commw. Ex. D at 20).

All of my findings were consistent with the observations that Judge Hardiman had expressed at the conclusion of the evidentiary hearing. (N.T. 2/2/07 at 198, 203-05). I now turn to Breakiron's Brady claims, to determine if any of them have merit.

## 2. Legal Analysis

### a. The Commonwealth's failure to disclose Ellis Price's letters and disclose that he was a suspect in the Sterbutzel case

I shall first address Breakiron's contentions that the Commonwealth suppressed: (1) the two letters that Ellis Price sent to the District Attorney, which showed that at the same time that he was offering his information against Breakiron he was seeking benefits from the Commonwealth; and, (2) that Ellis Price was a named suspect in the Sterbutzel case both when he sent the letters and when he testified at Breakiron's trial. These claims were first raised in the amended habeas petition and, as Judge Standish previously noted, Breakiron acknowledged they are procedurally defaulted because he did not present them to the state court in any prior proceeding. (Docket No. 62 at 19-20). Therefore, technically the issue before me is whether Breakiron has demonstrated "cause" for his default and resulting "prejudice." Both parties

acknowledge that this analysis corresponds with the underlying Brady claim, because the cause and prejudice necessary to excuse procedural default in this case parallel the components of the alleged Brady violation itself. (Docket No. 171 at 95; Docket No. 177 at 2);[21] see also Strickler, 527 U.S. at 282; Slutzker, 393 F.3d at 385-86 (citing Strickler and Banks v. Dretke, 540 U.S. 668 (2004)).

There is no dispute that the Commonwealth did not disclose the letters or the contents of the letters to the defense.[22] The Commonwealth contends that the prosecution had no duty to disclose the letters under Brady because there ended up being no deal between the prosecution and Ellis Price. (Docket No. 177 at 3). Under the unusual circumstances of this case, I cannot agree that the letters did not constitute Brady material. Here, a jailhouse informant sent letters to the District Attorney in which he offered information about a fellow inmate's alleged confession while at the same time requesting relief from non-final convictions of attempted homicide, reckless endangerment, aggravated assault, and attempt to cause serious bodily injury that were

_____

[21] The Commonwealth does not argue that Breakiron cannot establish "cause" because he did not develop during the second PCRA proceeding the evidence that he developed before this court. (See Docket No. 177). And, because the Commonwealth did not disclose the evidence at issue during the second PCRA proceeding, such an argument would have no merit.

[22] The Commonwealth points out that Judge Solomon, Judge Warman, and Morrison all testified at the evidentiary hearing that they could not recall seeing the letters that Ellis Price sent to the District Attorney's Office. But the letters were addressed to then District Attorney Solomon, and I found as fact that some representative of the Commonwealth was aware that Ellis Price had sent the letters because Trooper Brownfield interviewed Ellis Price soon after the letters were sent. (Docket No. 171 ¶¶ 4-5). Whether the failure to turn over the letters was inadvertent or intentional does not matter, because "the good faith or bad faith of the prosecution" is not relevant to the Brady analysis. 373 U.S. at 87.

pending against him.[23]  Soon after the informant made the request to the District Attorney, he fortuitously received the relief he was requesting because the District Attorney's Office did not have the manpower to file appeals.  The impeachment value of the letters was not diminished because Ellis Price received the primary thing that he was asking for – relief for himself in the Ricker/Pletcher case – without the need for negotiations or deal making with the Commonwealth. The letters showed that Ellis Price's initial motive to come forward with information against Breakiron was inextricably tied to his hope that he would receive benefits from the government. That information could have been used by competent defense counsel to establish motive to fabricate Breakiron's confession, regardless of whether there was any deal.  By failing to disclose the letters, the Commonwealth also concomitantly suppressed that, even though no deal had been made, Ellis Price had received what he had requested in exchange for information against Breakiron since the District Attorney's Office did not file an appeal in the Ricker/Pletcher case because it was understaffed.  That information too could have been used by competent defense counsel to show that Ellis Price would have had a pro-prosecution bias.

Because the District Attorney's Office decided to forego an appeal in the Ricker/Pletcher case, in a very real sense it did not have to enter into any negotiations with Ellis Price and it did not have to make any deals with him in exchange for his testimony against Breakiron.  The events played out in a manner that made all of that unnecessary.  However, even if the

---

[23]  Ellis Price sent his letters to the District Attorney's Office sometime in the summer of 1987, but the exact date that he sent the letters has not been established.  He testified that he and Sullivan sent their joint letter a week or two before he sent his own letter, and that Trooper Brownfield probably interviewed him four or five days after he sent own his letter.  (N.T. 2/2/07 at 92, 100).  Ellis Price testified that when Trooper Brownfield interviewed him on August 4, 1987, his attorney had not yet notified him of Judge Franks's decision granting him post-trial relief in the Ricker/Pletcher case.  (N.T. 2/2/07 at 92-93).

Commonwealth would have been disinclined to negotiate with Ellis Price, the letters had impeachment value because of the way subsequent events transpired.

Another factor that cuts against the Commonwealth's argument that the letters were not Brady material is Morrison's testimony before this court. He stated that when he became Acting District Attorney and reviewed the Breakiron case file that he had inherited from former District Attorney Solomon, it did not contain the letter that had been sent by Ellis Price or the letter sent by Sullivan and Ellis Price. (N.T. 2/2/07 at 133). He admitted that if he had seen the letters, he would have "absolutely" disclosed them to the defense, noting: "Having been a defense attorney, I knew how important discovery was. I made it a point during my overseeship of the office, if you will, that discovery was complete and to the fullest extent." (Id.) Since the prosecutor of Breakiron's case candidly and to his credit acknowledged that the letters should have been disclosed to the defense, I shall not conclude otherwise.

Morrison also acknowledged that the prosecution should have disclosed to the defense that Ellis Price was a suspect in the Sterbutzel case. (N.T. 2/2/07 at 147). He admitted that that information "[a]bsolutely" would have been important to defense counsel. (Id.) The Commonwealth does not dispute Breakiron's contention that the open investigation into Ellis Price's complicity in the Sterbutzel case gave Ellis Price motivation and bias to assist the Commonwealth in its prosecution of Breakiron, nor does it dispute that the prosecution failed to disclose to the defense that Ellis Price was a suspect in that case. Breakiron argues that the fact that Ellis Price was a suspect in the Sterbutzel investigation would have been admissible on cross-examination of him to show bias, motive, and self interest. The only argument the Commonwealth makes in rebuttal is that the information would not have been admissible

because Ellis Price testified at the evidentiary hearing before this court that he was not aware that he was a suspect in the Sterbutzel case and therefore that information was not impeachment material because the defense would not have been able to lay the foundation at trial for bias. (Docket No. 177 at 3-4).

The Commonwealth's argument is unpersuasive. In its proposed post-hearing findings of fact, the Commonwealth did not request that this court credit Ellis Price's testimony that he was unaware that he was a suspect in the Sterbutzel case. (<u>See</u> Docket No. 166). If it had proposed such a finding, I would have rejected it. The evidence of record tends to show that Ellis Price was an active participant in the crimes against Sterbutzel, along with his two brothers and Mark DiMatteo, and therefore he would have known at the time of Breakiron's trial that future prosecution against him in that case was a possibility. After all, Lepore ultimately determined in March 1989 not to charge Ellis Price for crimes against Sterbutzel because he was serving his sentence in Michigan, and not because the police or Lepore had determined he had no involvement in the Sterbutzel case. Thus, as Breakiron convincingly argues, it is very likely that when Ellis Price wrote his letters to then District Attorney Solomon and when he testified at Breakiron's trial, he was aware that he could some day face charges in the Sterbutzel case.

**b.      Ellis Price's criminal record**

In addition to suppressing the letters and that Ellis Price was a suspect in the Sterbutzel case, the prosecution also failed to disclose additional impeachment evidence – that Ellis Price's Michigan conviction actually was assault with intent to rob, a *crimen falsi*. <u>See</u> <u>Commonwealth v. Yarris</u>, 549 A.2d 513, 521 (Pa. 1988) (witness may be impeached by evidence that he has prior *crimen falsi* convictions, meaning those that bear on a witness's honesty and truthfulness, such as

robbery or theft).  Ellis Price testified at trial that his Michigan conviction was for "just an assault."  However, the Commonwealth conceded during the litigation of the second PCRA petition before the Court of Common Pleas that his conviction actually was assault with intent to rob and, as noted above, it did not deny before that court that it had failed to accurately disclose to the defense Ellis Price's Michigan criminal record.

In denying the second PCRA petition as untimely, Judge Franks did not address the specific Brady claim that the Commonwealth failed to accurately disclose Ellis Price's Michigan criminal record.  He addressed the related claim that Ellis Price had perjured himself and that the prosecution had failed to correct his perjured testimony.  In disposing of that claim, Judge Franks ruled that Ellis Price did not perjure himself because as "a layperson" he was likely testifying as to his "understanding of a legal charge," and therefore the incident did not amount to "an attempt by the Commonwealth to *intentionally* withhold evidence about a witness' record."  (App. 48 at 7).  Thus, Judge Franks did not reject Breakiron's assertion that the Commonwealth had failed to accurately disclose Ellis Price's criminal record, he just held that the Commonwealth's failure to do so was not intentional.  And, in ruling as he did, Judge Franks avoided addressing the more pertinent claim – that the prosecution failed to disclose accurate information about Ellis Price's criminal record and that as a result, impeachment evidence was withheld from the defense and a *crimen falsi* instruction was not given.  Although the Commonwealth may not have "intentionally with[held] evidence" of Ellis Price's actual criminal history, a Brady violation may occur "irrespective of the good faith or bad faith of the prosecution," 373 U.S. at 87.  See also Agurs, 427 U.S. at 110 ("If the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor.")

Even if Ellis Price did not appreciate that he was testifying inaccurately, Morrison should have.[24]  There is an important difference between "just an assault" and "assault with intent to rob while armed," as the latter is *crimen falsi* that goes directly to the trustworthiness of a witness because it requires an element of dishonesty.  In contrast, under Pennsylvania law, "just an assault" cannot be used for impeachment purposes.  Commonwealth v. Moore, 715 A.2d 448, 451-52 (Pa.Super.Ct. 1998) (aggravated assault not a *crimen falsi* conviction).  Accordingly, the prosecution had an obligation to disclose that Ellis Price's Michigan conviction was a *crimen falsi*.  If it had, competent defense counsel would have ensured that Judge Franks instruct the jury that it could consider the dishonest nature of Ellis Price's prior conviction in evaluating his credibility.  See Commonwealth v. LaMassa, 532 A.2d 450, 452 (Pa. 1987) (on direct appeal, reversible error when the trial court did not instruct the jury regarding the impeaching effect of prosecution witness's prior convictions for criminal offenses which were *crimen falsi* in nature).

### c.       The non-disclosed evidence was material

The next issue this court must address is whether the cumulative impact of the suppressed

---

[24]  Fayette County authorities had borrowed Ellis Price from the Michigan Department of Corrections in order to prosecute him in the Ricker/Pletcher case in 1986, and then again for the purpose of having him testify at Breakiron's trial.  Breakiron argues that the documentation and communications necessary to carry out those transfers would have revealed to the prosecutors in Fayette County the precise crime that Ellis Price had been convicted of in Michigan.  However, even if the prosecution did not have actual knowledge of Ellis Price's Michigan record, it should have known that information.  It was not as if it had to do a multi-state search for information about Ellis Price's criminal history.  The only step that the prosecution had to take was to contact the Michigan Department of Corrections to get the information.  Hollman v. Wilson, 158 F.3d 177, 180-81 (3d Cir. 1998) (the prosecution has a duty to search accessible files to learn the criminal history of its witnesses).  In addition, during his direct examination, Morrison asked Ellis Price:  "[C]an you tell us what you are in prison for?" (N.T. at 1111).  Ellis Price responded that his Michigan conviction was for "assault." (Id.)  Because he had elicited the testimony, Morrison should have taken the steps necessary to make sure that Ellis Price's response was correct.

impeachment evidence was material. Kyles, 514 U.S. at 436 (the materiality of suppressed evidence must be "considered collectively, not item by item.")  In evaluating the materiality of the suppressed evidence, it must be stressed that this court is only examining the effect that the absence of the impeachment evidence reasonably would have had on the jury in its consideration of whether Breakiron had premeditated the murder in the manner that the prosecution had asserted at trial, and thus on its deliberation of whether he was guilty of first degree murder, as opposed to second degree or third degree murder.  Ellis Price's testimony was not relevant to the robbery conviction, nor was it relied upon by the prosecution to support the conviction of robbery.[25]

In Kyles, the Supreme Court set forth the materiality analysis that must be undertaken in ruling on a Brady claim.  It explained:

> Although the constitutional duty is triggered by the potential impact of favorable but undisclosed evidence, a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal (whether based on the presence of reasonable doubt or acceptance of an explanation for the crime that does not inculpate the defendant). [The] touchstone of materiality is a "reasonable probability" of a different result, and the adjective is important.  *The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial."*
> Bagley, 473 U.S. at 678[.]

Kyles, 514 U.S. at 434 (emphasis added) (additional internal citations omitted).  The Supreme

---

[25]  Breakiron has argued that Ellis Price's testimony supported the Commonwealth's theory that he had planned to rob Martin.  (Docket No. 44 at 3 n.12).  I reject that contention. Ellis Price's trial testimony did not reference the bar's money bags, Martin's purse, or any statement Breakiron allegedly had made to him regarding the intent to steal or the robbery.  His testimony was not material to the charge of robbery.

Court in <u>Kyles</u> also emphasized another important point:

> [M]ateriality ... is not a sufficiency of the evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict. The possibility of an acquittal on a criminal charge does not imply an insufficient evidentiary basis to convict. One does not show a <u>Brady</u> violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

<u>Id.</u> at 434-35 (emphasis added) (citing <u>Bagley</u> generally).

Applying the materiality standard here, I conclude that by failing to disclose impeachment evidence regarding Ellis Price to the defense, the prosecution arrived at a conviction of first degree murder that is unworthy of confidence. Whether the prosecution had proven intent to kill necessary to secure a first degree murder conviction was the critical issue at trial. The prosecution relied upon Ellis Price's testimony to support its case that Breakiron committed a planned and premeditated act and so he should be convicted of first degree murder, as opposed to a lesser degree of murder. The prosecution also relied upon Ellis Price's testimony to contradict the defense theory that Breakiron's capacity to form specific intent was diminished based upon his voluntary intoxication. (N.T. at 1338). It asserted to the jury that Ellis Price had "[n]othing to gain at all" in testifying against Breakiron and that he had no reason to be "biased" in favor of the prosecution. (N.T. at 1325-26). The suppressed evidence could have been used by competent counsel to challenge the veracity of Ellis Price's testimony because he did have "something to gain" when he first offered information against Breakrion and, in fact, gained much of the relief that he had sought, even though there was no deal. The suppressed evidence could also have been used to challenge the prosecution's assertion that he had no reason to be

biased in favor of it.[26]

In arguing that the suppressed evidence was not material, the Commonwealth contends that Breakiron has "seriously exaggerated" the importance of Ellis Price's testimony because the prosecution presented strong circumstantial evidence at trial that Breakiron had the specific intent to kill. I cannot agree with that assertion. To be sure, the circumstantial evidence the prosecution presented at trial – evidence of Breakiron's volitional conduct before and after the killing and Dr. Pelaez's expert testimony[27] – did support a finding that Breakiron acted with specific intent to kill, and if the prosecution had relied just upon that circumstantial evidence, it

---

[26] One point does give me pause, and it is one that neither party addresses. When Breakiron testified at trial, he did not discuss Ellis Price and thus, did not deny that he had made the statements that Ellis Price attributed to him. However, Breakiron's testimony, in and of itself, contradicted how Ellis Price stated Breakiron had described the murder to him, and the prosecution never exploited that Breakiron did not expressly disavow making the statements that Ellis Price said he had made to him. Indeed, the closing arguments of both Bower and Morrison show that the defense and the prosecution were in agreement that the credibility of Ellis Price's testimony was a crucial factor in the jury's determination of Breakiron's degree of guilt, with the defense urging the jury to discredit his testimony and the prosecution arguing that Ellis Price was credible and that his testimony established premeditation. (N.T. at 1313-14, 1325-26, 1338).

[27] Dr. Pelaez's testimony and his discussion of the violent attack that Martin sustained certainly provided the Commonwealth with evidence to support its case that Breakiron committed first degree murder, as opposed to second or third degree murder. However, there is at least a reasonable probability that if the jury did not credit Ellis Price's testimony that Breakiron hid in the bathroom until the other patrons left and that he actually continued his attack on Martin at his pap's house, it might have viewed Dr. Pelaez's testimony as being more consistent with Breakiron's defense that the killing had occurred during a period of diminished capacity. The jury was instructed in this case that it could infer the specific intent to kill from the intentional use of a deadly weapon on a vital part of the victim's body (N.T. at 1347), but it was also instructed that, if it did not find the elements of first degree murder to be present, it could infer the malice necessary for a conviction of third degree murder "when a deadly weapon is intentionally used against a vital part of the human body[.]" (N.T. at 1349). See, e.g., Commonwealth v. Johnson, 719 A.2d 778, 785 (Pa.Super.Ct. 1998) (citation omitted) (the malice necessary for a conviction of third degree murder could be inferred from the use of a deadly weapon on the vital part of a body); Commonwealth v. Marks, 704 A.2d 1095, 1099 (Pa.Super.Ct. 1997) (same).

60

would have presented sufficient evidence to support a conviction of first degree murder. But the materiality analysis under Brady is not a sufficiency of the evidence analysis, see Kyles, 514 U.S. at 434-35, and the prosecution did not present a case based upon circumstantial evidence alone. Through Ellis Price, it introduced direct evidence of Breakiron's premeditation and planning, which undeniably added strength to its case of first degree murder. His testimony also made the Commonwealth's case one that was markedly different from a case in which the jury could infer specific intent from the surrounding circumstances, because through his testimony the Commonwealth presented disturbing evidence to show that Breakiron hid in the bathroom at Sheningans' Lounge, came out when the other patrons had left, beat Martin and stabbed her when she "wouldn't go to the floor," and then continued his attack on her at his pap's house where he "finished her off." (N.T. at 1114-15). Because the prosecution relied upon Ellis Price's testimony to establish premeditation and to counter Breakiron's defense to the crime of first degree murder, I cannot say that in light of the impeachment evidence that was not disclosed to the defense the first degree murder conviction is worthy of confidence. Therefore, Breakiron is entitled to a new trial to determine whether he is indeed guilty of first degree murder or of a lesser degree of murder.[28]

---

[28] In addition to the Brady claims discussed above, Breakiron contends here (Docket 173 at 104-07), as he did in his second PCRA petition (App. 40 at 6; App. 45 at 5-9), that the prosecution suppressed Ellis Price's alleged statement to Brownfield that Breakiron had told him that he was "out of it" at the time of the killing. Judge Franks ruled on the merits of this claim and after considering the testimony given at the PCRA hearing, he reasonably concluded that Ellis Price's recollection on the issue was too unreliable to credit and that therefore Breakiron did not demonstrate that Ellis Price had told Brownfield that Breakiron said he was "out of it" the night of the murder. (App. 48 at 8-9). Judge Franks's credibility determination is entitled to deference and therefore Breakiron is not entitled to relief on this claim under 28 U.S.C. § 2254(d) and (e)(1). Moreover, Breakiron cannot satisfy the "materiality" prong of Brady. Breakiron testified at length at his trial about how much alcohol he ingested the night of the killing and

**D. Failure To Investigate And Discover Available Expert Mental Health Evidence To Support The Diminished Capacity Defense Based Upon Voluntary Intoxication[29]**

**1. Factual Background**

On March 25, 1987, after Martin's murder but prior to Breakiron's arrest for crimes against her, he was arrested for public drunkenness and for parole violations. See Breakiron-2, 729 A.2d at 1098. Fayette County Prison officials became concerned that he was suicidal and he was referred to Thomas Adamski, M.D., of the Fayette Community Mental Health Center, for a psychiatric evaluation. The intake form for that evaluation shows that Breakiron had a history of psychiatric and alcohol problems and had been hospitalized for detox at Gateway Center in 1985 and for an evaluation at Mayview State Hospital in 1984. (Docket No. 42, Ex. 16 at 1-2). On March 27, 1987, Dr. Adamski performed a psychiatric evaluation. He diagnosed Breakiron with alcohol dependence and antisocial personality disorder. He further noted that Breakiron expressed recent suicidal ideations, admitted to having blackouts, attempted suicide when he was 8 or 9 years old, and was seen by a psychiatrist when he was 13 years old. (Docket No. 42, Ex. 16 at 4-5). Breakiron contends that his defense counsel never obtained and reviewed this report, although he does not direct this court to record support for that contention. (Docket No. 173 at 19 n.9).

When Breakiron was charged in the Martin case, Lepore was the Public Defender and he assigned Assistant Public Defender Ronald Kristobek, Esquire, to represent him. On May 21,

---

about his recollection of the circumstances of the killing. Even if he had told Ellis Price that he had been "out of it," and even if Ellis Price had reported that information to Brownfield (which Breakiron has not established), Breakiron has not shown that the alleged suppression was material.

[29] This is Claim 1 of Breakiron's Updated Memorandum of Law.

1987, Kristobeck filed a motion with the trial court requesting a mental health evaluation under Pennsylvania's Mental Health Procedures Act (the "MHPA"), 50 PA.STAT. § 7101 *et seq.* (N.T. PCRA 7/17/97 AM at 21-22, 42-43, 59-60). The Pennsylvania Supreme Court subsequently explained in Breakiron-2 that:

> In relevant part to this matter, the MHPA provides a statutory procedure for assessing a defendant's competency to stand trial. Section 7402(c) provides that the prosecution, the defense or a warden may present to the court an application for an order directing an evaluation for the competency of a criminal defendant. Following the [request for an] examination, the court appoints a psychiatrist, who then prepares a report and submits it to "the court and to counsel." Section 7402(e). The MHPA contains specific rules concerning the conduct of the mental health examination, and provides the parameters for when it is to be used in a court proceeding. Id. In particular, the MHPA provides that the defendant is entitled to have counsel present and that "[n]othing said or done by such person during the examination may be used as evidence against him in any criminal proceedings on any issue other than that of his mental condition." Section 7402(e)(3). The MHPA also provides that the defendant is entitled to the appointment of his own private psychiatrist to attend the examination, if the defendant has a "substantial objection" to the conclusions reached by the court-appointed psychiatrist. Section 7402(f).

729 A.2d at 1099.

On May 4, 1987, the trial court entered an order that the "Fayette County [Department of] Mental Health is hereby directed to evaluate the defendant herein, to determine whether defendant is competent to stand trial and assist counsel with his defense, to determine if defendant was competent at the time of the incident, and to determine whether defendant is in need of treatment." Id. at 1098. Dr. Adamski conducted this evaluation as well. (Docket No. 42, Ex. 15). Kristobek resigned from the Public Defender's Office in or around early August 1987. He did not obtain background records and materials on Breakiron because he considered his involvement in the case "rather limited," (N.T. PCRA 7/17/97 AM at 31), and therefore,

counsel did not provide Dr. Adamski with Breakiron's records from his 1985 hospitalization at Gateway Center for detox, from his Mayview State Hospital 1984 mental health evaluation, or from Centerville Clinic (where Breakiron had been examined in 1975 when he was 13). (N.T. PCRA 9/29/97 PM at 74; see also Docket No. 42, Exs. 17-18).

When he interviewed Breakiron, Dr. Adamski told him that he was conducting a court-ordered evaluation and that any report he generated would not remain confidential. (N.T. PCRA 9/29/97 PM at 39, 69-70). As a result of Dr. Adamski's warning, Breakiron would not discuss the circumstances of the crimes with him. (N.T. PCRA 9/29/97 PM at 38-42); see also Breakiron-2, 729 A.2d at 1098. Dr. Adamski did not know or learn during that interview that Breakiron had been drinking the night of the offense. (N.T. PCRA 9/29/97 PM at 75-76). He also was not aware that Breakiron's was a capital case. (N.T. PCRA 9/29/97 PM at 78).

On August 27, 1987, Dr. Adamski issued his report. (Docket No. 42, Ex. 15). By that time, Kirstobek had left the Public Defender's Office for private practice, and the report was sent to his colleagues Bower and Jack Heneks, Esquire, who had entered their appearance as Breakiron's counsel. (Id.)

Dr. Adamski concluded that Breakiron was competent to stand trial and that there was no indication that he was insane at the time of the murder. (Docket No. 42, Ex. 15 at 1-2). Dr. Adamski also observed that:

> Mr. Breakiron suffers from long-standing alcohol problems as manifested by his symptoms of tolerance to alcohol as well as blackout episodes…. From his history he also appears to have had long-standing problems of episodic dyscontrol which is manifested by blowing-up out of proportion to a provoking incident, having poor impulse control and alienating friends and family. This in itself is not an indication of insanity, rather it reflects a disorder of personality or an inability to cope with stress. Although long-term treatment may be needed to ameliorate

these problems, I see no possibility of him receiving such therapy in jail. At this point, alcohol problems are best treated with abstinence such as he is presently experiencing while incarcerated.

If I can be of any further assistance, please do not hesitate to contact me.

(Docket No. 42, Ex. 15 at 2).

Breakiron contends that Dr. Adamski's March 1987 and August 1987 reports contain "numerous red flags" that should have alerted his counsel as to the existence of mental health issues that could and should have been explored to support his diminished capacity/voluntary intoxication defense at the guilt phase of his trial and his mitigation case during the sentencing phase. Breakiron contends that notwithstanding the issuance of Dr. Adamski's reports containing these "red flags," no subsequent efforts were made by his counsel to obtain a defense mental health expert, even though Heneks admitted that "it was clear … from the start of this case that this was going to be a death penalty case." (N.T. PCRA 7/18/97 PM at 16).

In January 1988, Heneks left the Public Defender's Office. When asked at the PCRA hearing if he had discussed a defense strategy with Breakiron during his representation of him, Heneks responded:

> A.    I believe that we had some general discussion, but we had not even advanced past the pretrial stage at that point. So, when I left in January, we had still not had a decision on the pretrial [motions]. I believe that that came a couple weeks after January of '88. So, we did not have an occasion to go into a full blown strategy, as far as a defense. As I said, the trial was still going to be some months away. There was some general discussions, but as far as formulating a precise defense at that point, no, we didn't do that.

(N.T. PCRA 7/18/97 PM at 11). Nor had counsel considered using a defense expert:

> Q.    Given Mark Breakiron's past history of alcohol use…., did you petition or consider petitioning the court for an expert that would review the case for

65

the effects of alcohol on this particular defendant?

***

A.    Did I consider using a – not an expert per se, no, I don't think we reached that stage.

(N.T. PCRA 7/18/97 PM at 15).

Heneks entered his motion to withdraw on January 13, 1988, leaving Bower as sole counsel for Breakiron. Bower stated at a subsequent hearing before the trial court that "Mr. Heneks … had handled most of the case until his resignation." (Docket No. 173 at 24 (quoting 2/29/88 Continuance Hearing Tr. at 4)). Because Dr. Adamski had found Breakiron to be competent and legally sane, Bower did not think that any further mental health evaluation of Breakiron was needed. (N.T. PCRA 7/17/97 PM at 26). Nevertheless, because Breakiron insisted, he requested another court-ordered psychiatric evaluation. See Breakiron-2, 729 A.2d at 1098-99. Once again, the trial court ordered that the Fayette County Department of Health evaluate Breakiron to see if he was competent to stand trial, sane at the time of the incident, and in need of treatment. (See App. 30 at 6 n.9 (quoting the pre-trial order)). Manuel D. Reich, D.O., of the Fayette Community Mental Health Center was directed to perform the evaluation and when he informed Breakiron that the evaluation was not confidential, Breakiron refused to speak with him. Breakiron-2, 729 A.2d at 1098. On March 3, 1988, Dr. Reich sent a letter to the trial court stating: "Mark David Breakiron was evaluated and the chart reviewed on March 3, 1988. At this time Mr. Breakiron was found to be competent to stand trial and assist counsel with his defense. He is able to consult with a lawyer and has a rational understanding of the charges against him." (Docket No. 42, Ex. 14).

The defense did not present any expert mental health evidence at trial. The only evidence

to support Breakiron's diminished capacity/voluntary intoxication was his own testimony. Breakiron claims that without any expert mental health testimony to explain the phenomena of alcoholic blackouts and his other mental health issues, Breakiron's own account of the homicide playing "like a t.v. screen inside his head" with "somebody laying there getting stabbed" likely just came off as bizarre to the jurors. (Docket No. 173 at 40).

During the first PCRA proceeding, Breakiron raised a number of ineffective assistance of counsel claims related to his counsel's handling of his mental health issues. (See App. 23; App. 30 at 5-6, 8-12; App. 34 at 13-17). He claimed that his attorneys failed to properly prepare and advise him for his competency evaluations under the MHPA. As a result, he contended, he never had a proper mental health evaluation. He further claimed that counsel's mishandling of the mental health examinations resulted, *inter alia*, in their failure to gather and present at trial available expert mental health testimony to support his defense of diminished capacity based upon voluntary intoxication. He raises the latter claim before this court, contending that if counsel would have presented expert mental health evidence to corroborate his trial testimony and explain his record of alcohol dependence and his history of alcoholic blackouts, there is a reasonable probability that the jury would have credited his defense and found him guilty of third degree murder instead of first degree murder.

To support this claim when he was litigating it before the state court, Breakiron presented the testimony of Dr. Christone Martone, a psychiatrist who examined him on August 27, 1997 for the purpose of the PCRA proceeding. (N.T. PCRA 9/17/97 AM at 14). Breakiron asserts that Dr. Martone's PCRA testimony represents what his defense could have presented at his trial if counsel had obtained a defense mental health expert. Dr. Martone's PCRA testimony will be

discussed below.

## 2. Legal Analysis

### a. The state court's decision

When reviewing Breakiron's claims of ineffective assistance in <u>Breakiron-2</u>, the

Pennsylvania Supreme Court accepted Breakiron's argument that his counsel "had a basic

misunderstanding of" the MPHA. 729 A.2d at 1099-1100. It held: "it appears that trial counsel

did mishandle the competency evaluation in a number of respects" and "was not able to articulate

a reasonable basis [at the PCRA hearing] for failing to comply with the MHPA." <u>Id.</u> at 1099. As

a result of counsel's misunderstanding, the Pennsylvania Supreme Court concluded, Breakiron's

competency evaluations were not performed properly. It did not deny that due to counsel's

"misunderstanding" and "mishandl[ing]" of the mental health evaluations, Breakiron was

deprived of the opportunity to be examined by a defense mental health expert in order to develop

evidence to support his diminished capacity/voluntary intoxication defense.[30] <u>Id.</u> at 1099-1100.

---

[30] The Pennsylvania Supreme Court may have agreed with Breakiron's argument that his counsel's performance was deficient in failing to develop expert mental health evidence to support his diminished capacity/voluntary intoxication defense (<u>Strickland</u>'s first prong). At the very least, it did not address that part of the <u>Strickland</u> analysis because it determined that Breakiron could not satisfy <u>Strickland</u>'s second prong of prejudice. In presenting this claim to this court in his Updated Memorandum of Law, Breakiron argues at length why his counsel were deficient for failing to develop expert mental health evidence for use at the guilt phase of his trial. (Docket No. 173 at 32-35). He asserts that it was objectively unreasonable for defense counsel to forego any further mental health evaluations and to rely solely on Dr. Adamski's conclusions. Dr. Adamski's evaluation was for competency (which was mishandled); he was not asked by defense counsel to explore whether there was mental health evidence to support a diminished capacity defense (which is different than an insanity defense); he was not provided with background records by counsel; he was not aware that Breakiron was facing the death penalty; and, he did not know that Breakiron had been drinking the night of the offense. (N.T. PCRA 9/29/97 PM at 18, 30, 37-42, 74-78). <u>See</u> <u>Jacobs</u>, 395 F.3d at 101-03 (counsel ineffective for relying on information provided by a psychiatrist who performed a competency evaluation to limit scope of investigation regarding diminished capacity in a capital case; psychiatrist had

The Pennsylvania Supreme Court determined that its review of Breakiron's ineffective assistance claims regarding the handling of the mental health evaluation for the guilt phase of his trial "hinge[d] upon whether" counsel's deficient performance prejudiced him.  Id.  The court then noted that the jury had considered and rejected the diminished capacity defense, it described the "overwhelming" evidence of Breakiron's guilt, and concluded that trial counsel's error "would not have led to a different result, and we cannot find that Breakiron was prejudiced in the guilt phase of trial."  Id. at 1100 & n.11.  Breakiron acknowledges that this court must review the Pennsylvania Supreme Court's finding of no prejudice under § 2254(d).  (Docket No. 173 at 13 n.5).

### b.     The Pennsylvania Supreme Court's decision was not "contrary to" Strickland

Breakiron argues that the Pennsylvania Supreme Court's decision was both "contrary to" and an "unreasonable application of"  Strickland. 28 U.S.C. § 2254(d).  It was "contrary to" Strickland, he asserts, because the court required him to prove in establishing prejudice that counsel's failure to pursue expert mental health testimony "would have" produced a different outcome, not whether, as stated in Strickland, there was a "reasonable probability" of a different outcome.  I am not persuaded by Breakiron's argument that the Pennsylvania Supreme Court applied – as he terms it – a "would have changed" standard instead of Strickland's "reasonable

_____

examined the petitioner for competency and found no major mental illness, but he was not looking into factors that might advance the defense of diminished capacity; counsel had not provided that psychiatrist with background information; and, the psychiatrist had not been aware that the Commonwealth was seeking the death penalty).

I need not decide whether counsel's performance was deficient because the Pennsylvania Supreme Court's determination that Breakiron was not prejudiced by counsel's performance withstands review under 28 U.S.C. § 2254(d).

probability of a different result" standard. As noted previously, in <u>Commonwealth v. Pierce</u>, 527 A.2d 973, 976-77 (Pa. 1987), the Pennsylvania Supreme Court held that Pennsylvania law for judging ineffectiveness corresponds with the <u>Strickland</u> standard. Less than three months before it decided <u>Breakiron-2</u>, the Pennsylvania Supreme Court issued <u>Commonwealth v. Kimball</u>, 724 A.2d 326 (Pa. 1999), in which it emphasized that the PCRA does not create a higher burden on a petitioner to show prejudice in an ineffective assistance claim than the standard that applies on direct appeal. Thus, at the time the Pennsylvania Supreme Court issued its decision in <u>Breakiron-2</u>, it was well settled that the standard for evaluating prejudice on a PCRA ineffective assistance claim was <u>Strickland</u>'s "reasonable probability of a different result" standard. Moreover, as I also previously noted, in <u>Breakiron-2</u> the Pennsylvania Supreme Court cited to decisions it had issued which cite to <u>Strickland</u> and/or <u>Pierce</u> and/or the progeny of those cases.[31] <u>Breakiron-2</u>, 729 A.2d at 1094. Additionally, Judge Franks had articulated the proper "reasonable probability" prejudice standard in the underlying decision that the Pennsylvania Supreme Court was reviewing in <u>Breakiron-2</u>. (App. 33 at 4 ). For all of these reasons,

---

[31] The United States Supreme Court has counseled that a federal habeas court should not be quick to assume that the state court applied the wrong law, even if the state court was imprecise in language it used in evaluating a claim. <u>Woodford v. Visciotti</u>, 537 U.S. 19, 23-24 (2002) (<i>per curiam</i>) (finding the Court of Appeals for the Ninth Circuit's "readiness to attribute error [to the state court] is inconsistent with the presumption that state courts know and follow the law," and is "also incompatible with § 2254(d)'s 'highly deferential standard for evaluating state-court rulings,' which demands that state court decisions be given the benefit of the doubt."); <u>see</u> <u>also</u> <u>Cox v. Horn</u>, 174 Fed.Appx. 84, 87-88 (3d Cir. 2006) (non precedential) (despite the Pennsylvania Superior Court's failure to describe the prejudice standard with accuracy, its rejection of the petitioner's claim was not "contrary to" <u>Strickland</u>). In <u>Visciotti</u>, the Supreme Court admitted that even it has stated imprecisely <u>Strickland</u>'s prejudice standard at points in some of its decisions, and noted that the California Supreme Court's shorthand reference to the <u>Strickland</u> standard that was not entirely accurate "can no more be considered a repudiation of the standard than can this Court's own occasional indulgence in the same imprecision." 537 U.S. at 24 (citing <u>Mickens v. Taylor</u>, 535 U.S. 162, 166 (2002); <u>Williams</u>, 529 U.S. at 393).

Breakiron has not shown that the Pennsylvania Supreme Court applied an incorrect standard when evaluating the prejudice component of this ineffective assistance claim, notwithstanding any imprecise or shorthand language it may have used.

### c. The Pennsylvania Supreme Court's decision was not "unreasonable"

The dispositive question with regard to this claim, then, is whether the Pennsylvania Supreme Court's denial of this claim was an "unreasonable application" of Strickland. Breakiron argues that it was, and in support he relies upon the testimony that Dr. Martone gave at the PCRA hearing. When read in full, however, Dr. Martone's PCRA testimony provides little support for Breakiron's contention that he suffered from mental health impairments at the time of the killing that affected his cognitive functions to an extent that precluded deliberation and premeditation.

To understand why, it must be remembered that diminished capacity is an extremely limited defense under Pennsylvania law. See Commonwealth v. Taylor, 876 A.2d 916, 926 (Pa. 2005); Commonwealth v. Legg, 711 A.2d 430, 444 (Pa. 1998); Commonwealth v. Terry, 521 A.2d 398, 404-09 (Pa. 1987); Commonwealth v. Zettlemoyer, 454 A.2d 937, 943 (Pa. 1982); Commonwealth v. Weinstein, 451 A.2d 1344, 1347 (Pa. 1982). Only expert mental health testimony that "speaks to mental disorders affecting the cognitive functions necessary to formulate a specific intent" is relevant to support the defense. Terry, 521 A.2d at 404 (quoting Weinstein, 451 A.2d at 1347)); Commonwealth v. McCullum, 738 A.2d 1007, 1009 (Pa. 1999); Legg, 711 A.2d at 444-45. Not all expert mental health opinions are relevant, or even admissible, to support a diminished capacity defense:

[Commonwealth v. Walzack, 360 A.2d 914 (Pa. 1976)][32] did not make *all* expert
psychiatric testimony on the issues of sanity, malice, specific and general intent
admissible or relevant. . . . Such testimony must be definite and specific and
address a recognized defense under Pennsylvania substantive law.  Nor did
[Walzack and its progeny] change the rule that expert testimony offered to prove a
medico-legal fact, such as causation, is incompetent and inadmissible unless it
speaks to more than a mere possibility.

Id. (emphasis in original) (citing Zettlemoyer, 454 A.2d at 943; Weinstein, 451 A.2d at 1347);

see also Taylor, 876 A.2d at 926-27; McCullum, 738 A.2d at 1009-10.  Where the proffered

expert mental health evidence does not speak to those mental disorders that affect cognitive

functions, the evidence "is irrelevant[.]"  Id. (quoting Weinstein, 451 A.2d at 1347).  Moreover,

conclusory expert testimony on an ultimate fact, such as the non-existence of specific intent, is

improper under Pennsylvania law if the testimony is unsupported by the expert's underlying

testimony.  Id. at 403 n.9, 406; Zettlemoyer, 454 A.2d at 943-47.

Dr. Martone testified at the PCRA hearing that it was her opinion that at the time of the

killing Breakiron suffered from alcohol and multiple drug abuse and dependence and was

intoxicated.  (N.T. PCRA 9/17/97 AM at 33).  She diagnosed Breakiron with "Intermittent

Explosive Disorder," which she explained is:

a condition where there is a *rage, an uncontrolled rage, with violent, aggressive
outbursts,* which are completely out of proportion to the precipitating stress or the
provocation.  When the incident is over, the individual is frequently quite contrite.
It [the crime] really had no goal in mind.  It wasn't necessarily to protect or to
badger or to get money.  *It is an uncontrollable rage.*  Mr. Breakiron gave history
of this condition as a child when he would just lash out violently.  As he became

---

[32] Prior to the decision of the Pennsylvania Supreme Court in Walzack, state law had
precluded the use of expert psychiatric testimony on the issue of a defendant's *mens rea* because
of doubt as to the reliability of such testimony.  Terry, 521 A.2d at 404 (citations omitted);
Walzack, 360 A.2d at 918.  In Walzack, the Pennsylvania Supreme Court recognized the
"tremendous advancements made in the field" of psychiatry and concluded that such testimony
could be admissible to support a diminished capacity defense.  360 A.2d at 918-20.

older, it was precipitated primarily when he was intoxicated, when his inhibitions
were reduced.

(N.T. PCRA 9/17/97 AM at 33 (emphasis added)).  Dr. Martone also diagnosed Breakiron with

"Antisocial Personality Disorder," which she explained is:

> a pervasive pattern and lifestyle in an individual… The criteria includes such
> things as *inability to conform one's behavior to the law,* you know, as manifested
> by a history or arrest.  We have that present.  Inability to maintain a stable work
> status.  Inability to maintain a stable relationship with significant others.  A
> disregard for people's rights, such as stealing, that kind of thing.  Frequently,
> these people abuse alcohol and drugs.

(N.T. PCRA 9/17/97 AM at 33-34 (emphasis added)).

Dr. Martone also testified that in her opinion, Breakiron suffered at the time of the

incident from "*a memory blackout*" caused by alcohol ingestion.  (N.T. PCRA 9/17/97 AM at 35

(emphasis added)).  She explained:

> [T]he psychiatric and medical definition of a blackout is when someone is
> intoxicated, and they still act to observers as if they are conscious, I mean, they
> will be doing things.  The will go home, or they will be violent, or they will act
> ridiculous, *but they have no memory for it.  Their memory is blacked out.  It does
> not mean that they are unconscious.  Their memory is blacked out.*  People say
> that they don't remember how they got home.  Or, someone said you should have
> seen what a fool you made of yourself, and they have no memory of it.  However,
> he also was hit over the head, and I think that part of the time he was also, he
> possibly was unconscious, both from being hit over the head, but he also had a
> memory blackout for much of the incident, because of the amount of alcohol that
> he ingested.
>                         ---
> [Breakiron's actions subsequent to the killing do not] negate a blackout, *because
> people act in a purposeful and/or violent way and/or foolish way.  When they have
> a blackout, they just don't remember it.*
>                         ---
> [Y]ou don't have to be in a blackout the whole time.  I mean, you can then
> suddenly, you know, begin to remember as the intoxication level begins to wear
> off, or if some very traumatic event occurs, which kind of breaks through, and you
> can act then in a very purposeful way afterwards, and be aware of some pieces of
> it.

---

> A blackout does not mean one is unconscious. It means that they really are acting in almost a state of automation. *They do not remember, and they do not appear to have the same control that a non-intoxicated person would have. They can act in a violent way. They can act in a purposeful way, in a foolish way, an amerce way, and have no memory of it.*

(N.T. PCRA 9/17/97 AM at 35-37 (emphasis added)).

Finally, Dr. Martone stated that if she had testified at Breakiron's trial, she could have explained to the jury that Breakiron's state of mind at the time of the crimes "*limited his ability to control his behavior, to control his impulses.*" (N.T. PCRA 9/17/97 AM at 46). She emphasized that his intoxication would have had an impact on his "judgment, frustration, tolerance." (N.T. PCRA 9/17/97 AM at 57). The import of her opinion was that when Breakiron drank, his "*impulse control was decreased*, and the frustration tolerance was decreased, and he would become violent again as he did as a youth." (N.T. PCRA 9/17/97 AM at 83).

Dr. Martone's diagnoses and opinions provide little support for Breakiron's contention that his intoxication and mental health impairments would have had an impact on his cognitive ability to formulate the specific intent to kill. Basically, she opined that Breakiron's blackout affected his memory, that he lacked the same control that a non-intoxicated person would have, that he acted impulsively at the time of the killing, and that he did not have the ability to conform his conduct to the law. The Pennsylvania Supreme Court has "repeatedly rejected the contention that evidence" of the type that Dr. Martone offered at the PCRA hearing "of a defendant's supposed *inability to control his actions* – by virtue of an 'irresistible impulse,' a 'compulsion,' or otherwise – is relevant to negate specific intent[.]" Taylor, 876 A.2d at 926-27 (emphasis added) (collecting cases); see also Zettlemoyer, 454 A.2d at 949 ("[N]either social maladjustment, nor

74

lack of self-control, nor impulsiveness, nor psycho-neurosis, nor emotional instability, … nor all such conditions combined" "bear upon the narrow defense of diminished capacity.") At no point in her PCRA testimony did Dr. Martone state that Breakiron's memory blackout or his mental health impairments affected his cognitive functions of deliberation and premeditation necessary to formulate a specific intent. Therefore, her testimony was not akin to the post-conviction expert mental health testimony that resulted in habeas relief in the case upon which Breakiron relies – Jacobs v. Horn, 395 F.3d 92 (3d Cir. 2005). In that case, the petitioner's mental health experts expressly concluded that petitioner's mental retardation, organic brain damage, and schizoid personality disorder affected his cognitive functions and substantially diminished his capacity to formulate the specific intent to kill. Id. at 101-02. Also, in Jacobs the Commonwealth failed to challenge the expert mental health testimony that the petitioner had presented at the PCRA hearing with its own expert testimony. 395 F.3d at 105 n.8. Here, Dr. Adamski testified for the Commonwealth at the PCRA hearing and he did not agree with Dr. Martone's conclusions. Dr. Adamski stated that in his opinion Breakiron did not have Intermittent Explosive Disorder. (N.T. PCRA 9/27/97 PM at 50). He also testified that alcohol dependence, Intermittent Explosive Disorder, and Antisocial Personality Disorder do "not interfere with an individual's ability to premeditate or lose their cognitive functions." (N.T. PCRA 9/27/97 PM at 50-51).

In conclusion, Dr. Martone's PCRA testimony may have been supportive of mitigating factors that could have been presented during the sentencing hearing.[33] However, Breakiron has

---

[33] In fact, much of the language that Dr. Martone used in her testimony tracks the language of the Pennsylvania Death Penalty Statute, which provides that mitigating circumstances shall include the following: that the defendant was under the influence of extreme

not demonstrated that there is a reasonable probability that the outcome of the guilt phase of his trial would have been different if counsel had presented Dr. Martone's testimony, let alone that the Pennsylvania Supreme Court's denial of this claim was objectively unreasonable under Strickland or an unreasonable determination of the facts in light of the evidence presented at the PCRA hearings. 28 U.S.C. § 2254(d).

No doubt aware of the limited assistance Dr. Martone's PCRA testimony provides to this claim, Breakiron seeks to have this court consider the opinions of additional psychiatrists, Julie B. Kessel, M.D., and Robert A. Fox, M.D. They each performed a psychiatric examination of Breakiron sometime after the first PCRA proceeding concluded and they prepared affidavits for this court, which Breakiron has submitted in his Appendix In Support For A Writ Of Habeas Corpus (Docket No. 42, Exs. 1 & 2). In her affidavit, Dr. Kessel opines that "[a]s a result of the combination of [Breakiron's] voluntary intoxication, his underlying mental illness, Intermittent Explosive Disorder, he was impaired in his capacity to form the specific intent to kill such that he had diminished capacity." (Docket No. 42, Ex. 1, Dr. Kessel Aff. ¶ 12). Dr. Fox reached a similar conclusion, stating that Breakiron's Intermittent Explosive Disorder and alcohol consumption resulted in him not having the ability to form the specific intent to kill. (Docket No. 42, Ex. 2, Dr. Fox Aff. ¶¶ 9-10).

Dr. Kessel's and Dr. Fox's opinions do not advance Breakiron's cause. Importantly, because Breakiron did not present either of their opinions to the state court during the first PCRA proceeding when he was litigating this claim there, those affidavits are not part of the state court

---

mental or emotional disturbance, 42 PA.CONS.STAT. § 9711(e)(2); and, that the capacity of the defendant to conform his conduct to the requirements of the law was substantially impaired, id. § 9711(e)(3).

record and this court may not consider them in reviewing this claim under § 2254(d).  Holland, 542 U.S. at 652; Taylor, 504 F.3d at 436-37, 439 n.19.  Nevertheless, even if I could consider Dr. Kessel's and Dr. Fox's opinions, I would not grant Breakiron relief on this claim.  Similar to Dr. Martone, they offer little relevant evidence as to how Breakiron's intoxication and mental health impairments affected his cognitive abilities to form the specific intent to kill.  Their opinions, like Dr. Martone's, show that Breakiron may have lacked that ability to control his actions and had acted impulsively at the time of the murder, but they do not explain how his mental health impairments had an impact on his cognitive functions.  Although they both give a conclusory opinion that Breakiron lacked the specific intent to kill, neither doctor provided a sufficient nexus between Breakiron's impairments and their conclusions.  Their opinion on the ultimate fact – whether Breakiron lacked the specific intent to kill – was not supported by their underlying diagnoses and explanation of those diagnoses.  See Terry, 521 A.2d at 403 n.9, 406-08; Zettlemoyer, 454 A.2d at 943-47.

Of course, it is difficult at this point for me to determine the impact that counsel's failure to present expert mental health evidence to support Breakiron's diminished capacity/voluntary intoxication defense had on the jury's deliberations on whether to convict Breakiron of first, second, or third degree murder.  Such an analysis requires an evaluation of the evidence of specific intent to kill that was introduced at trial, see, e.g., Zettlemoyer v. Fulcomer, 923 F.2d 284, 297 (3d Cir. 1991), and I have already determined that the prosecution withheld impeachment evidence related to Ellis Price's testimony, that the prosecution relied upon his testimony as part of its case to show that Breakiron had acted with specific intent to kill, and that there is a reasonable probability that the jury may have evaluated the evidence of specific intent

77

differently had the prosecution not suppressed the impeachment evidence. But in reviewing this specific ineffective assistance claim, I must look at the record the Pennsylvania Supreme Court had before it during the first PCRA proceeding and I cannot conclude that its determination that Breakiron was not prejudiced at the guilt phase of his trial was an unreasonable application of Strickland or resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented to it during that proceeding. 28 U.S.C. § 2254(d).

3.    **Conclusion**

Because I do not find that the expert mental health evidence that Breakiron relies upon is as supportive of a diminished capacity defense as Breakiron contends that it is, I do not find this claim to be particularly compelling. Nevertheless, because the Pennsylvania Supreme Court did conclude that Breakiron's defense counsel was deficient in at least some respects in handling Breakiron's mental health evaluations, and because the issue of whether Breakiron had the specific intent to kill was the critical issue as trial, reasonable jurists could find my denial of this claim to be debatable or wrong. Therefore, I will issue Breakiron a certificate of appealability on it under 28 U.S.C. § 2253. Slack, 529 U.S. at 484.


**E.    Whether The Trial Court's Evidentiary Rulings Precluded Breakiron From Presenting A Defense And Testifying About His Intent**[34]

Breakiron claims that evidentiary rulings Judge Franks made during his direct testimony precluded him from testifying about his intent at the time of the crimes and from presenting a defense, in violation of his rights under the Sixth and Fourteenth Amendments. Breakiron raised

---

[34] This is Claim 3 of Breakiron's Updated Memorandum of Law.

this claim during the second PCRA proceeding and neither Judge Franks nor the Pennsylvania Supreme Court adjudicated it on the merits. Therefore, 28 U.S.C. § 2254(d)'s standard of review does not apply, and my review is *de novo*.

### 1. Factual Background

During his direct examination, and after Breakiron had detailed his version of the events of March 23-24, 1987, including what he recalled happening at Shenanigans' Lounge and what he did afer the killing, the following occurred:

Bower:      When you went out that night, what intentions, if any, did you have to hurt anybody?

Morrison:      Your Honor, I am going to object to that question.

The Court:      Sustained.

Bower:      When you went into Shenanigans', what were your intentions?

Breakiron:      Just to have a good time.

Bower:      What do you mean by a good time?

Breakiron:      Have a few beers, talk with some people, watch a little t.v.

Bower:      What intentions, if any, did you have to take any money that night?

Breakiron:      I had no intentions to taking no money.

Morrison:      You Honor, I object to that question too and ask that the answer be stricken and the jury directed to disregard it.

The Court:      Objection sustained. The jury will disregard the question and answer.

Bower:      You Honor may we approach the Bench?

*Sidebar discussion held on the record*

| | |
|---|---|
| Bower: | Your Honor, I don't understand the ruling in regard to why I cannot ask the question about what his intentions were. |
| The Court: | Well, we are interested in what he did. |
| Morrison: | That's right |
| The Court: | And not what he may have intended to do. |
| Bower: | Well, that also goes – |
| The Court: | I have made my ruling and that's it.  I'm not going to argue with you. |
| Bower: | I'm just trying to understand it. |
| The Court: | We are not interested in what he intended to do.  It's what he did. |

(N.T. at 1261-62).

## 2.  Legal Analysis

The right to present a meaningful defense at a criminal trial is a fundamental

constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and

the Due Process Clause of the Fourteenth Amendment.  Rock v. Arkansas, 483 U.S. 44, 51

(1987).[35]  The right is not, of course, unlimited and a defendant "does not have an unfettered right

to offer testimony that is incompetent, privileged, or otherwise inadmissible under standard rules

of evidence."  Taylor v. Illinois, 484 U.S. 400, 410 (1988).  The Supreme Court has

---

[35] "The necessary ingredients of the Fourteenth Amendment's guarantee that no one shall be deprived of liberty without due process of law include a right to be heard and to offer testimony[.]" Rock, 483 U.S. at 51.  The Compulsory Process Clause "protects the presentation of the defendant's case from unwarranted interference by the government, be it in the form of an unnecessary evidentiary rule, a prosecutor's misconduct, or an arbitrary ruling from the trial judge."  Government of Virgin Islands v. Mills, 956 F.2d 443, 445 (3d Cir. 1992).  The Court of Appeals for the Third Circuit has held that "[t]here is apparently little, if any, difference in the analysis" of whether a trial court's ruling denied a petitioner his federal constitutional right to compulsory process or due process of law.  Id. at 445 n.4.

acknowledged its "traditional reluctance to impose constitutional constraints on ordinary evidentiary rulings by state trial courts."  Crane v. Kentucky, 476 U.S. 683, 689 (1986).

The existence of the intent to kill and the existence of an intent to steal are elements of first degree murder and robbery, respectively.  Breakiron argues that the two above-cited instances in which Judge Franks sustained the prosecution's objections were evidentiary rulings that deprived him of the right to present a defense to elements of those offenses in violation of his constitutional rights.  I find Breakiron's argument as he presents it misleading, because in presenting this claim he failed to quote the entire relevant portion of the trial transcript, which I have set forth above.  When the relevant part of the transcript is reviewed in its entirety, it shows that notwithstanding the two evidentiary rulings at issue, Breakiron *was not precluded from testifying about his intent*.  Bower asked him: "When you went into Shenanigans', *what were your intentions*?"  Breakiron responded: "*Just to have a good time*."  Bower then asked: "What do you mean by a good time?," to which Breakiron responded: "Have a few beers, talk with some people, watch a little t.v."  (N.T. at 1261 (emphasis added)).

In the two instances about which Breakiron complains, Judge Franks had ruled that what Breakiron's intentions were when he first went out for the evening on March 23, 1987 were irrelevant to the issues at trial, apparently because the Commonwealth did not present its case in a manner that suggested that Breakiron planned the murder and robbery hours before going to Shenanigans' Lounge.  Whether Judge Franks's relevancy rulings were correct under Pennsylvania's evidentiary law is unreviewable by this court.  Priester v. Vaughn, 382 F.3d 394, 402 (3d Cir. 2004) ("Federal courts reviewing habeas claims cannot 'reexamine state court determinations on state-law questions.'" (quoting Estelle v. McGuire, 502 U.S. 62, 67-68 (1991));

<u>Wells v. Pestock</u>, 941 F.2d 253, 256 (3d Cir. 1991). This court's inquiry is limited to deciding whether the state court's ruling amounted to a deprivation of petitioner's federal constitutional rights. <u>Estelle</u>, 502 U.S. at 67-68; <u>see</u> <u>also</u> 28 U.S.C. § 2254(a).

Breakiron contends that Judge Franks's evidentiary rulings violated his constitutional rights because he was precluded from presenting his version of the facts, but the trial transcript shows that he was not. I have already explained that, contrary to Breakiron's contention, he was allowed to testify about what his intentions were when he went to Shenanigans' Lounge. He also gave extensive testimony about how much alcohol he consumed that day, what he could remember about his encounter with Martin, what occurred after he killed her, and he discussed taking the bar's money bags and Martin's purse. Breakiron has not shown that the trial court's two challenged evidentiary rulings infringed upon his constitutional rights to testifying on his own behalf or to present a defense.

Additionally, even if Breakiron demonstrated that Judge Franks's two challenged evidentiary rulings implicated his constitutional rights – and he has not – any error would be harmless in light of the entire scope of his trial testimony. The harmless error evaluation applicable to this claim is that which is set forth in <u>Brecht v. Abrahamson</u>, 507 U.S. 619 (1993), which requires that in order to grant habeas relief a federal habeas court must find that a trial error had a "substantial and injurious effect or influence in determining the jury's verdict." <u>Id.</u> at 637 (quoting <u>Kotteakos v. United States</u>, 328 U.S. 750, 776 (1946)). <u>See</u> <u>also</u> <u>Fry v. Pliler</u>, – U.S. – , 127 S.Ct. 2321 (2007). "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict, that error is not harmless." <u>O'Neal v. McAninch,</u> 513 U.S. 432,

436 (1995) (quotation marks omitted); <u>Bond v. Beard</u>, 539 F.3d 256, 276 (3d Cir. 2008).

Because I am not in grave doubt that Judge Franks's challenged evidentiary rulings had a

"substantial and injurious effect or influence" on the jury's verdicts, any error was harmless under

<u>Brecht</u>.

### 3.        Conclusion

This claim of constitutional error is denied.  Moreover, because Breakiron has failed to

make a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), I will

deny him a certificate of appealability on this claim as well.

### F.        Whether The Trial Court's Instruction On The Defense Of Voluntary Intoxication Violated Breakiron's Constitutional Rights And Whether Counsel Was Ineffective For Failing To Object[36]

In his next claim, Breakiron contends that the trial court's instruction on voluntary

intoxication improperly shifted the burden of proof onto him in violation of his due process

rights.  He also contends that Bower was ineffective for failing to object to the allegedly

erroneous instruction.  Breakiron raised these claims during the second PCRA proceeding.

Because neither Judge Franks nor the Pennsylvania Supreme Court addressed the merits of these

claims, the standard of review set forth at 28 U.S.C. § 2254(d) does not apply and I must review

them *de novo*.

### 1.        Factual background

At Breakiron's trial, Judge Franks instructed the jury that the burden was on the

Commonwealth to prove his guilt beyond a reasonable doubt.  When instructing on the elements

---

[36]  Breakiron raises these claims as Claim 8 of the Updated Memorandum of Law.

of first degree murder, Judge Franks explained:

> You may find the defendant guilty of first degree murder if you are satisfied that the following four elements have been proven beyond a reasonable doubt by the Commonwealth: First, that Saundra Marie Martin is dead; second, that the defendant killed her; third, that the killing was with a specific intent to kill, and fourth, that the killing was with malice, as I have defined malice for you.

(N.T. at 1346). After charging the jury on the elements of the other degrees of murder and on voluntary manslaughter, Judge Franks instructed on the defense of voluntary intoxication:

> We have had testimony in this case regarding alleged voluntary intoxication on the part of the Defendant. The general rule is that voluntary intoxication is not a defense to a criminal charge. Generally speaking, a person who voluntarily uses intoxicants cannot become so intoxicated that he is for that reason legally incapable of committing a crime. This general rule, however, is subject to qualification when the crime charged is first degree murder. The defendant is permitted to claim as a defense that he was so intoxicated at the time of the killing that he did not possess the specific intent to kill required for first degree murder.

> *Now, the Commonwealth is not required to disprove the defendant's claim of intoxication.* The Commonwealth's burden to prove specific intent is neither increased or decreased by a claim of voluntary intoxication. The Commonwealth may offer any relevant evidence in response to the defense of intoxication or it may offer none whatsoever. The Commonwealth may rely on the testimony of the surrounding circumstances to prove its case. Voluntary intoxication may reduce a crime of murder from first and second degree to third degree. However, voluntary intoxication is no defense to third degree or voluntary manslaughter.

(N.T. at 1351-52 (emphasis added)). Later in the charge, Judge Franks instructed:

> In this case … as in all criminal cases, the burden of proving guilty [sic] of the defendant rests upon the Commonwealth. The person accused of a crime is presumed to be innocent and this presumption remains in his favor throughout his trial unless it is overcome by proof of guilt beyond a reasonable doubt. This means, members of the jury, that when a trial begins, you assume the defendant to be innocent. You have heard nothing up to that time indicating that the defendant has committed any offense and it rests upon the Commonwealth, that is, the state, to produce sufficient evidence that satisfies you, the jury, of the defendant's guilt beyond a reasonable doubt and not until the Commonwealth has done so may the defendant be convicted of any offense.

(N.T. at 1353-54).

## 2. Legal Analysis

Breakiron argues that the sentence in which Judge Franks instructed that "the Commonwealth is not required to disprove the defendant's claim of intoxication" implicated his due process rights because it was an incorrect pronouncement of Pennsylvania law and improperly shifted the burden of proof to the defense. In general, challenges to the correctness of jury instructions raise purely state law issues that do not have an impact on a defendant's federal constitutional rights, see Engle v. Isaac, 456 U.S. 107, 119 (1982), unless the jury instructions are so defective that they violate the defendant's fundamental due process rights. Geschwendt v. Ryan, 967 F.2d 877, 883 (3d Cir. 1992); Government of Virgin Islands v. Smith, 949 F.2d 677, 684 n.7 (3d Cir. 1991) ("[A] habeas corpus petitioner faces a heavy burden in challenging allegedly defective jury instructions. The petitioner must show that the offending instruction is so oppressive as to render a trial fundamentally unfair.") (internal citations and quotations omitted)). One type of instructional error that has been held to violate due process are instructions lessening the state's burden to prove the elements of the offense charged beyond a reasonable doubt. See, e.g., Gilmore v. Taylor, 508 U.S. 333 (1993); Cupp v. Naughten, 414 U.S. 141 (1973).

Because the Commonwealth has an unshifting burden to prove every element of the crime beyond a reasonable doubt, In re Winship, 397 U.S. 358, 364 (1970), a jury may not be instructed that the defendant has the burden of proving that he was so intoxicated that he could not form

specific intent.  <u>See</u> <u>Commonwealth v. Rose</u>, 321 A.2d 880, 883 (Pa. 1974) ("<u>Rose-1</u>");[37]

<u>Whitney v. Horn</u>, 280 F.3d 240, 254 (3d Cir. 2002); <u>Engle</u>, 456 U.S. as 121.  At no point during

the charge given at Breakiron's trial was the jury so instructed.  Judge Franks informed the jury

that "the Commonwealth is not required to disprove the defendant's claim of intoxication.  The

Commonwealth's burden to prove specific intent is neither increased or decreased by a claim of

voluntary intoxication."  (N.T. at 1352).  That instruction did not shift any burden of proof to

Breakiron.  It did not instruct that Breakiron had the burden of proving that he was so intoxicated

that he did not have the specific intent to kill.  It did not negate an element of the offense of first

---

[37] Traditionally, Pennsylvania law had required that a defendant who presented a voluntary intoxication defense was required to "prove by a fair preponderance of the evidence that his degree of intoxication was such as to prevent his forming the requisite intent."  <u>Rose-1</u>, 321 A.2d at 883.  In 1974, the Pennsylvania Supreme Court yielded to the trend indicated by leading commentators and held that:

> In any criminal prosecution, the Commonwealth has an unshifting burden to prove beyond a reasonable doubt all elements of the crime.  One of such elements in first degree murder is, of course, a specific intent to kill.  This burden is neither increased nor diminished by an attempt by a defendant to disprove the element of intent by a showing of lack of capacity, due to intoxication, to form such an intent.  Whether the Commonwealth will, in a particular case, elect to carry that burden without introducing evidence to negate the existence of a disabling condition of intoxication, or whether it will seek to introduce such evidence, will be for it to decide; as in every case, the risk of non-persuasion remains with the Commonwealth.  *Whatever the district attorney's decision may be in that regard, it is error for the trial judge to instruct the jury that there is a burden upon the defendant to establish his intoxication by a preponderance of the evidence.*  Such evidence is offered by the defense solely to cast doubt upon the existence of the specific intent to kill and, as with all elements of the crime, the defendant has no burden of persuasion.

<u>Id.</u> at 884 (emphasis added) (citing McCormick, Evidence § 341, p. 802 (2d ed. 1972); The American Law Institute's Model Penal Code (Prop. Official Draft, 1962); J. Wigmore, Evidence, § 2514 (3d ed. 1940)).

degree murder, and it did not convey that the prosecution carried a burden of proof less than

beyond a reasonable doubt. (N.T. at 1351-52).

The challenged sentence at issue in this claim concerned the burden of production placed

on the prosecution once Breakiron introduced evidence of his intoxication. Under Pennsylvania

law, the prosecution may carry its burden of proving specific intent without introducing evidence

that directly refutes the defendant's claim that he was intoxicated and instead may rely on

evidence of the surrounding circumstances to prove the specific intent to kill. See

Commonwealth v. Fairell, 381 A.2d 1258, 1261 (Pa. 1977) (the Commonwealth may offer any

relevant evidentiary response to defense evidence of intoxication, or none whatsoever);

Commonwealth v. Miller, 897 A.2d 1281, 1285 (Pa.Super.Ct. 2006), appeal denied, 906 A.2d

1196 (Pa. 2006) ("Contrary to appellant's argument, … the Commonwealth was not required to

'disprove' her intoxication at the time of the crimes." (citing Commonwealth v. Tucker, 406 A.2d

785 (1979) for the proposition that evidence of intoxication places no additional burden on the

Commonwealth)); Commonwealth v. Groff, 514 A.2d 1382, 1386-87 (Pa.Super.Ct. 1986) ("The

Commonwealth may rely on testimony of the surrounding circumstances to prove its case. The

Commonwealth is not required to disprove appellant's claim of intoxication."), appeal denied,

531 A.2d 428 (Pa. 1987). As the Pennsylvania Supreme Court has held:

> [E]vidence [of defendant's intoxication] creates no new presumption for the
> defendant and imposes no new burden on the Commonwealth. As with other
> defense evidence, the Commonwealth may offer any relevant evidentiary response
> that it chooses. "[The burden to prove the specific intent to kill] is neither
> increased nor diminished by an attempt by a defendant to disprove the element of
> intent by a showing of lack of capacity, due to intoxication, to form such an intent.
> Whether the Commonwealth will, in a particular case, elect to carry that burden
> without introducing evidence to negate the existence of a disabling condition of
> the intoxication, … will be for it to decide; as in every case, the risk of

non-persuasion remains with the Commonwealth."

Commonwealth v. Rose, 344 A.2d 824, 826 (Pa. 1975) (quoting Rose-1, 321 A.2d at 884)).

I am aware that the Pennsylvania's standard jury instruction on the defense of voluntary intoxication does contain the sentence: "The Commonwealth has the burden of disproving this defense." PA.STAND.JUR.INST.(Crim) 8.308B.  However, prosecutor Morrison objected to this sentence being included in the instruction given to the jury, arguing that it "simply is not an accurate reflection of what the law is[.]"  (N.T. at 1305).  Morrison submitted cases to support his argument, and Judge Franks agreed, stating:

> Well, my reading of the charge that appears in the standard instructions has always been confusing and I believe hard to apply because it states that the Commonwealth must disprove the voluntary intoxication.… I believe that this case, Groff, which I have previously read, along with the Fairell case, are probably a better statement of the law.  So I am going to accept the Commonwealth's point for charge[.]

(N.T. at 1307).  As federal habeas review is limited to considering violations of the federal constitution, this court is bound by Judge Franks's state law decision that the cases relied upon by the prosecution presented a more accurate summarization of Pennsylvania's law.  Estelle, 502 U.S. at 67-68; Priester, 382 F.3d at 401-02.  And in any event, even if the instruction was erroneous under state law (and Breakiron has not shown that it was), it was not violative of his federal constitutional rights because it did not shift the burden of proof onto him.

Moreover, in assessing whether the jury charge was erroneous, this court must follow the familiar rule stated in Cupp v. Naughten, 414 U.S. 141 (1973), that: "[i]n determining the effect of this instruction on the validity of respondent's conviction, we accept at the outset the well-established proposition that a single instruction to a jury may not be judged in artificial

isolation, but must be viewed in the context of the overall charge." Id. at 146-47. See, e.g., Boyd v. California, 494 U.S. 370, 378 (1990). In this case, any alleged defect in the challenged sentence was immediately cured by Judge Franks's very next sentence, in which he instructed that "[t]he Commonwealth's burden to prove specific intent is neither increased or decreased by a claim of voluntary intoxication." (N.T. at 1352). Judge Franks also instructed the jury at an earlier point of the charge that the Commonwealth had the burden of proving the elements of first degree murder beyond a reasonable doubt, and later in the charge emphasized again "that the burden of proving guilt[] rests upon the Commonwealth." (N.T. at 1346, 1353). Thus, Judge Franks's charge when read as a whole clearly instructed the jury that the Commonwealth had the burden to prove specific intent.

Finally, in support of this claim Breakiron relies upon the Court of Appeals for the Third Circuit's decision in Whitney v. Horn, 280 F.3d 240 (3d Cir. 2000). That case is inapposite to the instant case. In Whitney, the trial court instructed the jury that "you cannot find the defendant guilty of first degree murder unless you are satisfied beyond a reasonable doubt that the defendant *was so* intoxicated at the time that he was incapable of [forming the specific intent to kill.]" Id. at 254-55 (emphasis added). During the subsequent federal habeas review, the parties agreed that the italicized portion of the charge was incorrect and that words "was" and "so" should have been separated by the word "not." 280 F.3d at 255. The error, the Court of Appeals for the Third Circuit held, "made it reasonably likely that a juror believed that intoxication had to be established beyond a reasonable doubt and/or that the prosecution then had to disprove the defense by a lower standard of proof." Id. at 257. It further held that, even though the trial court had correctly explained the law at other points in the charge, the defect from the erroneous

instruction was not cured because the proper portion of the charge and the erroneous portion of the charge contradicted each other, and the contradictory language was not clarified for the jury. Id. at 255-56 (citing Francis v Franklin, 471 U.S. 307, 322 (1985) (a defect in a charge may result in legal error if the rest of the instruction contains language that merely contradicts and does not explain the defective language in the instruction); United States v. Hernandez, 176 F.3d 719, 733 (3d Cir. 1999) (finding an instruction on reasonable doubt to be unconstitutional, where a later clarification of the term did no serve to "unring the bell.")).

In contrast to what occurred in Whitney, the sentence Breakiron challenges in this claim was not an incorrect pronouncement of the law, it did not shift the burden of proof to Breakiron, and it did not indicate to the jury that the prosecution had a lower burden of proof. Further, the challenged sentence did not contradict other portions of the jury charge, and so there was no unexplained conflicting language for the jurors to resolve on their own, as there was in Whitney.[38]

Breakrion has not demonstrated that the challenged instruction violated his due process rights. And, because the challenged instruction was not improper, Bower was not deficient for failing to object to it. Strickland, 466 U.S. at 691 (counsel not ineffective for failing to raise a meritless claim); Priester, 382 F.3d at 401-02 (habeas petitioner was not entitled to relief on

---

[38]  If Breakiron had established that the jury charge impermissibly lessened the Commonwealth's burden of proving specific intent, I would have to conduct a harmless error review under Brecht to determine if the instruction had a "substantial and injurious effect or influence" on the jury's verdict of first degree murder.  Whitney, 280 F.3d at 258; Bronshtein, 404 F.3d at 712.  Such a review would require an analysis of the evidence of Breakiron's specific intent that the Commonwealth relied upon at trial.  Id. at 259.  Because Breakiron has not established that the jury instructions improperly shifted the burden of proof onto him, no harmless error analysis needs to be conducted on this claim.

ineffective assistance claim predicated on counsel's failure to object to jury instruction because instruction comported with state law).

### 3.    Conclusion

Breakiron is not entitled to habeas relief on his claim that the instruction on the defense of voluntary intoxication violated his constitutional rights or his claim that Bower was ineffective for not objecting to the instruction.  He has not made a "substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and he is not entitled to a certificate of appealability on these claims.

## G.    Failure To Request An Instruction On The Lesser Included Offense Of Theft[39]

Breakiron claims that Bower was ineffective because he did not request that the jury be given an instruction that it could convict him solely of the crime of theft, which is a lesser included offense of robbery.  He argues that if the jury would have received such an instruction, there is a reasonable probability that it would have acquitted him of the crime of robbery. Breakiron raised this claim during the first PCRA proceeding and the Pennsylvania Supreme Court rejected it on the merits.  Blystone-2, 729 A.2d at 1095.  He acknowledges that the standard of review set forth in 28 U.S.C. § 2254(d) applies and that therefore the only issue that I must resolve is whether the Pennsylvania Supreme Court's decision was a "contrary to" or an "unreasonable application of" Strickland.  (Docket No. 173 at 145-46).

### 1.    Factual background

In instructing the jury on the crime of robbery, Judge Franks explained:

_____

[39]  This is Claim 9 of Breakiron's Updated Memorandum of Law.

In order to find the defendant guilty of robbery, *you must be satisfied that the following two elements have been proven beyond a reasonable doubt by the Commonwealth. First, that the defendant inflicted serious bodily injury upon Saundra Marie Martin or threatened Saundra Marie Martin with [imminent] serious bodily injury, or he intentionally put her in fear of such injury or threatened immediately to commit the crime of murder. The second element for robbery is that the defendant did so in the course of committing a theft.*

Serious bodily injury, as used in this definition, is bodily injury which creates a substantial risk of death or which causes serious permanent disfigurement or protracted loss of impairment of the function of any bodily member or organ....

As I have already indicated, you cannot find the defendant guilty of robbery unless you are satisfied beyond a reasonable doubt that he committed a theft. A person commits a theft if he unlawfully takes the moveable property of another person with intent to deprive that person of it permanently. You would need to decide in this case whether the defendant took money and/or a purse which were the moveable property of Saundra Marie Martin by inflicting serous bodily injury or the threat of serious bodily injury or the threat to commit the crime of murder and that defendant did these acts in the course of committing the theft.

(N.T. at 1352-53 (emphasis added)).

Breakiron has never asserted that Judge Franks's instruction on the elements of the crime of robbery was in any way incorrect under Pennsylvania law. Rather, during the first PCRA proceeding he contended that Bower was ineffective for not requesting that the jury be instructed that Breakiron could be convicted *solely* of the lesser included crime of theft. (See App. 30 at 23; App. 34 at 32-33). Breakiron argued that since, according to his trial testimony, he did not decide to take anything from Martin until after he had killed her, he was guilty of theft, but not robbery (since one cannot rob a dead person). Commonwealth v. Legg, 417 A.2d 1152 (Pa. 1980). He claimed that if Bower would have requested that the jury be charged on the lesser included offense of theft, there is the reasonable probability that the jury would have found him

guilty of theft and not of the more serious crime of robbery. Because Bower failed to request the theft instruction, Breakiron asserted, the jury was "left with no alternative to finding [him] guilty of committing a robbery on the facts presented, save that of a complete acquittal [on the robbery charge.]" (App. 34 at 32).

### 2. Legal Analysis

#### a. The state court's decision

In rejecting this claim, the Pennsylvania Supreme Court held:

> The next claim of ineffectiveness is that counsel, during the guilt phase of the trial, did not request a jury instruction as to theft. The argument is that if the jury was given the option, they might have found Breakiron guilty of theft but not robbery.… We find that even if this argument had merit and that trial counsel could have requested a theft and a robbery jury charge, Breakiron cannot establish that he was prejudiced.
>
> The charge of the trial court instructed the jury not to return a guilty verdict of robbery without first finding that a theft had occurred. (N.T. at 1352-54). Moreover, trial counsel argued to the jury during closing argument that there could be no robbery, but solely a theft because Breakiron took money only after Ms. Martin was dead. (N.T. at 1312, 1320-21). The jury rejected this argument and convicted Breakiron of robbery. In Breakiron[-1], we held that the evidence supported this verdict because there was no question that Breakiron took the victim's purse and the bags of money from the bar. Breakiron[-1, 571 A.2d at 1042].[40] Had a theft instruction been given, it is not likely that the jury would

---

[40] On direct appeal, Breakiron contended that his trial testimony showed that he had not stolen the money bags and the purse until after Martin was dead and therefore there was insufficient evidence for the jury to find that he inflicted serious bodily injury on Martin in the course of committing a theft. In denying this claim, the Pennsylvania Supreme Court held:

> Certainly the jury was entitled to discredit [Breakiron's] seemingly implausible statement of events. From the physical evidence that blood stains matching the blood of the victim were found on Breakiron's clothes and truck, and that in Breakiron's truck was a recently washed knife which could have produced stab wounds of the type suffered by the victim, it was proper for the jury to infer that Breakiron killed Martin in the course of a robbery. Accord Commonwealth v. Lovette, 498 Pa. 665, 670, 450 A.2d 975, 977 (1982) ("The fact that the evidence

have returned a verdict only on the theft charge.

Breakiron-2, 729 A.2d at 1095.

### b. The state court's decision withstands review under § 2254

Breakiron contends that the Pennsylvania Supreme Court's denial of this claim in

Breakiron-2 was both "contrary to" and an "unreasonable application of" Strickland because by

referencing its decision in Breakion-1, it focused on the sufficiency of the evidence to support the

verdict of robbery rather than applying Strickland's prejudice analysis, which asks not whether

there was sufficient evidence to convict notwithstanding trial counsel's error, but whether there

was a reasonable probability of a different result (here, an acquittal on the robbery charge) but for

counsel's error.  This argument is unconvincing.

First, although the Pennsylvania Supreme Court did reference the decision it had made in

Breakiron-1 to inform its decision in Breakiron-2, it did not base its finding of no prejudice

solely on the holding that it had made in that earlier decision.  It initially observed that Bower

had argued to the jury that Breakiron was not guilty of robbery because he purportedly had not

decided to steal until after he had killed Martin and the jury had rejected Bower's argument.

Therefore, there was no basis upon which to conclude that there was a reasonable probability that

the jury would have acquitted Breakiron of robbery had a theft instruction also been given.

_____

establishing a defendant's participation in a crime is circumstantial does not
preclude a conviction where the evidence coupled with the reasonable inferences
drawn therefrom overcomes the presumption of innocence.")

Breakiron-1, 571 A.2d at 1042.  See also Commonwealth v. Whitfield, 376 A.2d 617, 625 (Pa.
1977) ("Although no person witnessed the actual beating and robbery of [the victim], the
circumstantial evidence offered by the Commonwealth, if believed, was sufficient to supply a
combination of evidence link[ing] the defendant to the crime by a reasonable doubt.") (internal
quotation and citation omitted).

Second, inquiring into the strength of the evidence presented at trial when making a ruling on the prejudice prong in Strickland is entirely proper, and that is what the Pennsylvania Superior Court did in Breakiron-2. As the Court of Appeals for the Third Circuit has noted, "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl v. Vaughn, 166 F.3d 163, 172 (3d Cir. 1999) (citing Strickland, 466 U.S. at 695)). This is so because "[a] court simply cannot" "determine whether there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different[,]" "without considering the strength of the evidence against the accused." Id.

However, even if I accepted Breakiron's contention that the Pennsylvania Supreme Court improperly applied a "sufficiency of the evidence" test to this claim instead of Strickland's prejudice standard, I would still deny this claim.[41] Even under a de novo review, Breakiron has not established that there is a reasonable probability that the jury would have acquitted him of robbery but for Bower's alleged deficient performance. Judge Franks's charge properly set forth the elements required to support a conviction of robbery, and the jury's verdict shows that it found that the Commonwealth had proven those elements beyond a reasonable doubt. If the jury

_____

[41] See Aleman v. Sternes, 320 F.3d 687, 690 (7th Cir. 2003) (If state court's opinion was "contrary to" Supreme Court law under 28 U.S.C. § 2254(d), that section no longer applies; but, petitioner still must establish an entitlement to the relief he seeks under § 2254(a): that he is "in custody in violation of the Constitution or laws or treaties of the United States."); Gibbs v. VanNatta, 329 F.3d 582, 584 (7th Cir. 2003) (the petitioner "is not entitled to relief in the federal courts unless he can show that he was in fact denied effective assistance of counsel, not merely that the state courts bobbled the issue."); cf. Hollman, 158 F.3d at 180 n.3 (although the state court applied the wrong federal constitutional standard on a Brady claim, "the particulars of the [state court's] reasoning do not affect our ruling because we hold that, in any event, the state court adjudication did not result in a decision that was contrary to, or an unreasonable application of, clearly established federal law because we, too, find that Brady is not implicated.).

had determined that the Commonwealth had not proven the elements of robbery, it would have acquitted him of that charge. It did not. Therefore, I can say unequivocally that Breakiron has not established that there is a reasonable probability that if the jury had been instructed on the lesser included offense of theft that it would not have convicted him of robbery. For this additional reason, this claim fails.

Finally, Breakiron attempts to tack onto this claim an additional claim that counsel was ineffective for failing to request that the jury be instructed that he could be convicted of robbery only if the intent to steal was formed prior to the killing. He did not raise this claim before the state court (see App. 30 at 22-23; App. 34 at 32-33), and therefore, he failed to exhaust it. Landano v. Rafferty, 897 F.2d 661, 668 (3d Cir. 1990) (habeas petitioner must have "fairly presented" his constitutional claims to the state court; the claim raised in a federal habeas petition must be the "substantial equivalent" to that presented to the state courts.); Duncan v. Henry, 513 U.S. 364, 366 (1995) ("Mere similarity" of claims presented to the state and federal courts is "insufficient to exhaust."). This additional claim also has no merit. As the Pennsylvania Supreme Court noted, Bower argued to the jury during closing argument that Breakiron did not commit a robbery because he did not decide to take anything from Martin until *after* he had killed her. (N.T. at 1321-20). The charge that Judge Franks gave on robbery instructed that the jury could not find Breakiron guilty of that crime unless it found that he unlawfully took moveable property from Martin with intent to deprive her of it and that *during the course of that act he "inflicted serious bodily injury upon [her] or threatened [her] with [imminent] serious bodily injury, or he intentionally put her in fear of such injury or threatened immediately to commit the crime of murder[.]"* (N.T. at 1352-53*). That instruction therefore communicated to

the jury that Breakiron could not be convicted of robbing Martin unless it determined that during

the course of stealing from her he was inflicting serious bodily injury upon her, threatening to

inflict serious bodily injury upon her, or threatening to murder her.  Therefore, the instruction

comported with the defense theory and Breakiron has not demonstrated that Bower performed

deficiently in not specifically requesting that the jury be instructed that in order to convict him of

robbery it had to find that the intent to steal arose prior to the commission of the killing.

### 3.    Conclusion

This claim is denied.  Breakiron has not made a "substantial showing of the denial of a

constitutional right," 28 U.S.C. § 2253(c)(2), in this claim and so I also deny him a certificate of

appealability.

### H.    Cumulative Effect Of Trial Counsel's Alleged Errors[42]

Finally, I briefly turn to what can be called Breakiron's "catchall" ineffective assistance

claim.  He contends that, if none of his ineffective assistance claims individually are sufficiently

prejudicial to require relief, the cumulative prejudice resulting from counsel's alleged deficient

performance entitles him to relief.  Breakiron raised this claim during the second PCRA

proceeding and neither Judge Franks nor the Pennsylvania Supreme Court adjudicated it on the

merits.  Therefore, 28 U.S.C. § 2254(d)'s standard of review does not apply, and my review is *de

novo*.

A cumulative effect claim is out of place here, because there are not multiple errors on the

part of defense counsel that resulted in prejudice to Breakiron.  In <u>Berryman v. Morton</u>, 100 F.3d

---

[42]  This is Claim 18 of Breakiron's Updated Memorandum of Law.

1089, 1097-1102 (3d Cir. 1996), the Court of Appeals for the Third Circuit found that, as to each error alleged by petitioner, counsel had been deficient under Strickland, and therefore considered the cumulative effect of these errors for purposes of deciding whether prejudice had been shown. In this case, with regard to his first degree murder conviction, the only instance in which Breakiron has arguably shown that counsel may have performed deficiently is his claim that counsel's mishandling of his mental health examinations resulted in the failure to present expert evidence to support a diminished capacity defense. The only other instance in which counsel arguably performed deficiently is when counsel failed to request a theft instruction, but that claim goes to the robbery conviction only, and therefore it cannot be coupled with any alleged prejudice that may have resulted from counsel's alleged deficient performance for failing to present expert mental health evidence in order to get an acquittal on first degree murder. Because there are no errors on the part of counsel to aggregate, Breakiron is not entitled to habeas relief on this claim, nor is he entitled to a certificate of appealability on it.

## IV. CONCLUSION

Breakiron has not demonstrated that he is entitled to habeas relief as to his robbery conviction. However, he has shown that his conviction of first degree murder is unworthy of confidence because the prosecution suppressed evidence that could have been used by competent defense counsel to impeach the credibility of Ellis Price, whose testimony it relied upon to establish an element of first degree murder. As a result, within 120 days of the entry of the following Order, the Commonwealth shall conduct a new trial to determine if Breakiron is guilty

of first degree murder or a lesser degree of murder or a writ of habeas corpus shall issue as to the

murder conviction.

                                                 s/Nora Barry Fischer

Date: September 24, 2008                  Nora Barry Fischer
                                         United States District Judge

cc:    All counsel of record